## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | |
|---|---|
| **JAMES D'CRUZ, ANDREW PAYNE, and NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.,**<br><br>　　　**Plaintiffs,**<br><br>　vs.<br><br>**BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; KENNETH E. MELSON, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and ERIC H. HOLDER, Jr., in his official capacity as Attorney General of the United States,**<br><br>　　　**Defendants.** | **Case No. 5:10-cv-00140-C** |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
## <u>TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    Statutory Provisions at Issue.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    II.    Legislative History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    III.    Regulations at Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.    THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS FOR
        LACK OF SUBJECT MATTER JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . 12

        A.    The Individual Plaintiffs Have Not Met the Requirements
              for Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.    The Court Should Dismiss the NRA Because It Has Not
              Shown that Any of Its Members Possess Standing. . . . . . . . . . . . . . . . . 18

    II.    THE UNDER-TWENTY-ONE AGE QUALIFICATION ON THE
        PURCHASE OF HANDGUNS IS A LAWFUL REGULATORY
        MEASURE AND THEREFORE DOES NOT VIOLATE THE
        SECOND AMENDMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        A.    The States Have Long Established Age Qualifications on
              the Purchase and Use of Firearms, Up to and Including
              the Common-Law Age of Majority. . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        B.    The Legislative Power to Set an Age Qualification
              Within an Established Range for the Exercise of a
              Right or Privilege Includes the Power to Raise and
              Lower the Minimum Age Within the Established Range. . . . . . . . . . . . 29

        C.    The Age Qualification Is Substantially Related to the
              Important Governmental Interest in Protecting Public
              Safety and Combating Violent Crime. . . . . . . . . . . . . . . . . . . . . . . . . 34

    III.    THE NRA HAS FAILED TO STATE A SECOND AMENDMENT
        CLAIM ON BEHALF OF ITS LICENSED DEALER MEMBERS. . . . . . . . . . 42

IV.     THE AGE QUALIFICATION DOES NOT VIOLATE THE EQUAL
        PROTECTION COMPONENT OF THE DUE PROCESS CLAUSE.. . . . . . . . 43

V.      THE OTHER STATUTORY AND REGULATORY PROVISIONS
        CHALLENGED BY PLAINTIFFS ARE CONSISTENT WITH THE
        SECOND AMENDMENT AND THE DUE PROCESS CLAUSE.. . . . . . . . . 45


CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

# TABLE OF AUTHORITIES

## CASES

Abbot Labs. v. Gardner,
   387 U.S. 136 (1967) ................................................................... 20

Allam v. State,
   830 P.2d 435 (Alaska Ct. App. 1992) ........................................ 32

Allen v. Wright,
   468 U.S. 737 (1984) ................................................................... 19

Allison v. Allison,
   337 N.E.2d 666 (Ohio 1975) ...................................................... 31

Anderson v. Williams,
   104 N.E. 659 (Ill. 1914) ......................................................... 27-28

Bassett v. Bassett,
   521 P.2d 434 (Okla. App. 1974) ................................................. 28

Berg v. Egan,
   979 F. Supp. 330 (E.D. Pa. 1997) .............................................. 44

Blackard v. Blackard,
   426 S.W.2d 471 (Ky. 1968) ........................................................ 27

Blassman v. Markworth,
   359 F. Supp. 1 (N.D. Ill. 1973) .................................................. 31

Bolling v. Sharpe,
   347 U.S. 497 (1954) ................................................................... 43

Broadway v. Beto,
   339 F. Supp. 827 (N.D. Tex. 1971) ............................................ 32

Bullock v. Sprowls,
   54 S.W. 657 (Tex. Civ. App. 1899) ............................................ 27

Burgett v. Barrick,
   25 Kan. 526 (Kan. 1881) ............................................................ 27

Castner v. Walrod,
   83 Ill. 171 (Ill. 1876) ................................................................. 27

<u>Caudillo ex rel. Caudillo v. Lubbock Indep. Sch. Dist.</u>,
    311 F. Supp. 2d 550 (N.D. Tex. 2004). .......................................................................... 29

<u>City of Houston v. FAA</u>,
    679 F.2d 1184 (5th Cir. 1982). .......................................................................... 25

<u>Clark v. Jeter</u>,
    486 U.S. 456 (1988)........................................................................................... 35

<u>Common Cause v. Dep't of Energy</u>,
    702  F.2d 245 (D.C. Cir. 1983). .......................................................................... 20

<u>Cone Corp. v. Florida Dep't of Transp.</u>,
    921 F.2d 1190 (11th Cir. 1991). .......................................................................... 12

<u>Crouch v. Crouch</u>,
    187 S.E.2d 348 (N.C. App. 1972)........................................................................ 27

<u>In re Davidson's Will</u>,
    26 N.W.2d 223 (Minn.  1947)............................................................................. 31

<u>Diamond v. Charles</u>,
    476 U.S. 54 (1986)............................................................................................. 20

<u>District of Columbia v. Heller</u>,
    128 S. Ct. 2783 (2008).................................................................................. passim

<u>Doe v. Archdiocese of Milwaukee</u>,
    700 N.W.2d 180 (Wis. 2005)............................................................................. 27

<u>Drutis v. Rand McNally & Co.</u>,
    499 F.3d 608 (6th Cir. 2007). ............................................................................ 15

<u>Felix v. Milliken</u>,
    463 F. Supp. 1360 (E.D. Mich. 1978)............................................................ 31, 32

<u>Fitz-Gerald v. Bailey</u>,
    58 Miss. 658 (Miss. 1881). ............................................................................... 27

<u>Gaddis v. United States</u>,
    381 F.3d 444 (5th Cir. 2004). ....................................................................... 23-24

<u>Garcia v. Dretke</u>,
    388 F.3d 496 (5th Cir. 2004). ............................................................................ 49

Gilbert Equipment Co. v. Higgins,
    709 F. Supp. 1071 (S.D. Ala. 1989)...................................................... 42-43

Glenn v. State,
    72 S.E. 927 (Ga. App. 1911) ............................................................... 30

Gilmore v. Gonzales,
    435 F.3d 1125 (9th Cir. 2006). ........................................................... 25

Hall Investments, LP v. Lamar Corp.,
    35 Fed. Appx. 386 (5th Cir. 2002)....................................................... 24

Hastey v. Bush,
    2003 WL 22289885 (N.D. Tex. Oct. 6, 2003). ................................... 16

Heller v. District of Columbia,
    698 F. Supp. 2d 179 (D.D.C. 2010). .......................... 25, 35, 36, 46

Hodgkins v. Holder,
    677 F. Supp. 2d 202 (D.D.C. 2010). ............................................. 18, 20

Jones v. Bush,
    122 F. Supp. 2d 713 (N.D. Tex. 2000). .............................................. 16

Jones v. Wells,
    2 Houst. 209 (Del. Sup. Ct. 1860)....................................................... 27

KVUE, Inc. v. Moore,
    709 F.2d 922 (5th Cir. 1983). ............................................................. 20

Kimel v. Florida Bd. of Regents,
    528 U.S. 62 (2000)............................................................................... 43

Little v. KPMG LLP,
    575 F.3d 533 (5th Cir. 2009). ........................................................ 19, 20

Longstreet Delicatessen v. Jolly,
    2008 WL 2815022 (E.D. Cal. Sept. 25, 2007)................................... 20

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992)....................................................................... 12, 17

Marte v. INS,
    562 F. Supp. 92 (S.D.N.Y. 1983)........................................................ 33

McConnell v. Fed. Election Com'n,
    540 U.S. 93 (2003)......................................................................... 12

McDonald v. City of Chicago,
    130 S. Ct. 3020 (2010)........................................................ 23, 24, 42

Memphis Trust Co. v. Blessing,
    58 S.W. 115 (Tenn. 1899)............................................................. 27

Meyers v. Roberts,
    246 N.W.2d 186 (Minn. 1976)...................................................... 31

Mississippi State Democratic Party v. Barbour,
    529 F.3d 538 (5th Cir. 2008). ............................................ 12, 17, 20

Montana Shooting Sports Ass'n v. Holder,
    2010 WL 3926029 (D. Mont. Aug. 31, 2010). .............................. 42

Montana Shooting Sports Ass'n v. Holder,
    2010 WL 3909431 (D. Mont. Sept. 29, 2010). ............................. 42

NRA v. Magaw,
    132 F.3d 272 (6th Cir. 1997). .................................................. 17, 21

Nat'l Treasury Emps. Union v. U.S. Dep't of the Treasury,
    25 F.3d 237 (5th Cir. 1994). ......................................................... 18

New York v. Ferber,
    458 U.S. 747 (1982)...................................................................... 29

Oregon v. Mitchell,
    400 U.S. 112 (1970)............................................................. 30-31, 44

Pederson v. La. State Univ.,
    213 F.3d 858 (5th Cir. 2000). ....................................................... 16

Peters v. Jones,
    35 Iowa 512 (Iowa 1872). ............................................................. 27

Pub. Util. Dist. No. 1 v. FERC,
    272 F.3d 607 (D.C. Cir. 2001). ..................................................... 15

Qutb v. Strauss,
    11 F.3d 488 (5th Cir. 1993). ......................................................... 36

Reisse v. Clarenbach,
    61 Mo. 310 (Mo. 1875)...................................................................... 28

Republican College Council v. Winner,
    357 F. Supp. 739 (E.D. Pa. 1973). .................................................. 31

San Diego County Gun Rights Comm. v. Reno,
    98 F.3d 1121 (9th Cir. 1996). .................................................. 16, 21

Schall v. Martin,
    467 U.S. 253 (1984)...................................................................... 29, 36

Stanton v. Stanton,
    429 U.S. 501 (1977)............................................................................ 31

State v. Callicutt,
    69 Tenn. 714 (Tenn. 1878). .......................................................... 29-30

Stiles v. Blunt,
    912 F.2d 260 (8th Cir. 1990). ........................................................ 44

Taylor v. Johnson,
    257 F.3d 470 (5th Cir. 2001). ....................................................... 45

Town of Southold v. Town of E. Hampton,
    477 F.3d 38 (2d Cir. 2007)............................................................... 25

Trinity Indus. v. Martin,
    963 F.2d 795 (5th Cir. 1992). ........................................................ 17

Turner Broadcasting Sys. v. FCC,
    512 U.S. 622 (1994)........................................................................... 36

United States v. Bledsoe,
    2008 WL 3538717 (W.D. Tex. Aug. 8, 2008) )........................ 34, 39, 41, 47-48

United States v. Bledsoe,
    334 Fed. Appx. 771 (5th Cir. 2009)......................................... 34, 48

United States v. Bledsoe,
    2008 WL 744718 (W.D. Tex. March 20, 2008). ...................... 39, 44

United States v. Brown,
    715 F. Supp. 2d 688 (E.D. Va. 2010). ....................................... 25, 46

United States v. Darrington,
    351 F.3d 632 (5th Cir. 2003). ...................................................... 34

United States v. Emerson,
    270 F.3d 203 (5th Cir. 2001). ................................................ passim

United States v. King,
    532 F.2d 505 (5th Cir. 1976). ................................................ 24, 42

United States v. Knight,
    574 F. Supp. 2d 224 (D. Me. 2008). ......................................... 25

United States v. Lawton,
    366 F.3d 550 (7th Cir. 2004). ...................................................... 46

United States v. Marzzarella,
    595 F. Supp. 2d 596 (W.D. Pa. 2009). ...................................... 24

United States v. Marzzarella,
    614 F.3d 85 (3d Cir. 2010). ..................................................... 34, 47

United States v. Masciandaro,
    648 F. Supp. 2d 779 (E.D. Va. 2009). ...................................... 22

United States v. Moore,
    84 F.3d 1567 (9th Cir. 1996). ...................................................... 10

United States v. Reese
    No. 1:09-CR-02982-JEC-1 (10th Cir. Dec. 10, 2010) ................... 35

United States v. Salerno,
    481 U.S. 739 (1987). ............................................................... 35-36

United States v. Williams,
    616 F.3d 685 (7th Cir. 2010). ...................................................... 34

United States v. Yancey,
    621 F.3d 681 (7th Cir. 2010). .................................................. 24-25

Valley Forge Christian Coll. v. Americans United for Separation of Church & State,
    454 U.S. 464 (1982). ..................................................................... 21

Walker v. Walker,
    17 Ala. 396 (Ala. 1850). .............................................................. 27

Whitt v. Whitt,
      490 S.W.2d 159 (Tenn. 1973) .......................................................................... 27

Womack v. Greenwood,
      6 Ga. 299 (Ga. 1849) ...................................................................................... 27

Wurtzel v. Falcey,
      354 A.2d 617 (N.J. 1976) ................................................................................ 31

## STATUTES, REGULATIONS, AND RULES

27 C.F.R. § 478.96(b). ........................................................................... 11, 45, 46

27 C.F.R. § 478.99(b)(1). ....................................................................... 11, 21, 45

27 C.F.R. §478.124. ............................................................................... 11, 45, 46

Cal. Penal Code § 12072(a)(3)(A). .................................................................. 26

D.C. Code Ann. §§ 7-2502.03, 22-4507. ......................................................... 26

Del. Code Ann. tit. 24, § 903. .......................................................................... 26

Fed. R. Civ. P. 12(b)(6). .............................................................................. 43, 45

Haw. Rev. Stat. Ann. §134-2(d). ..................................................................... 26

430 Ill. Comp. Stat. 65/3(a). ........................................................................... 26

Iowa Code § 724.22. ......................................................................................... 26

Mass. Gen. Laws ch. 140, § 130. ..................................................................... 26

Md. Code Ann., Pub. Safety § 5-134. .............................................................. 26

Miss. Code Ann. § 93-1-5. ............................................................................... 32

N.J. Stat. Ann. § 2C:58-6.1. ............................................................................. 26

Ohio Rev. Code Ann. § 2923.21 ...................................................................... 26

R.I. Gen. Laws §§ 11-47-30, 11-47-35(a). ...................................................... 26

18 U.S.C., chapter 44. ........................................................................................ 4

18 U.S.C. § 371.......................................................................................................... 39

18 U.S.C. § 921.......................................................................................................... 15

18 U.S.C. §§ 921-931. ................................................................................................ 3

18 U.S.C. § 922.................................................................................................... passim

U.S. Const., amend. XIV, § 1. .................................................................................... 43

U.S. Const. amend. XXVI........................................................................................... 33

## LEGISLATIVE HISTORY

131 Cong. Rec. 18205 (1985). .................................................................................. 47

145 Cong. Rec. 18119 (1999). .................................................................................. 38

145 Cong. Rec. 7503 (1999). .................................................................................... 38

63 Fed. Reg. 37740, 37740 (July 13, 1998). ............................................................ 38

H.R. Rep. No. 103-389  (1993)................................................................................. 38

S. Rep. No. 88-1340 (1964). .................................................................................. 4, 5

S. Rep. 89-1866............................................................................................ 4, 5, 6, 8, 10

S. Rep. No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112............. 4, 8, 9, 10, 11, 35, 48

## OTHER SOURCES

Black's Law Dictionary (9th ed. 2009)...................................................................... 23

Crime in the United States 2009, Tables 20 and 38............................................... 40-41

Dana F. Castle, Early Emancipation Statutes: Should They Protect Parents as Well as
     Children?, 20 Family L.Q. 343 (Fall 1986). ................................................... 28

Federal Firearms Act: Hearings Before the Subcomm.  to Investigate Juvenile Delinquency
     of the Sen. Comm. on the Judiciary, 89th Cong. (1965)....................................... 5, 6, 7, 8

Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary, 90th Cong. (1967)................................................ 7, 8

Federal Firearms Regulations Reference Guide 178 (2005)........................................................ 15

Homicide Trends in the U.S............................................................................................................ 40

Juvenile Delinquency: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary, 88th Cong. (1963)............................................ 5, 6, 8

Katherine Hunt Federle, The Second Amendment Rights of Children, 89 Iowa L. Rev. 609 (2004)...................................................................................................................... 29

Keely A. Magyar, Betwixt and Between but Being Booted Nonetheless: A Developmental Perspective on Aging Out of Foster Care, 79 Temp. L. Rev. 557 (2006)................... 27, 32

T.E. James, The Age of Majority, 4 Am. J. Legal Hist. 22 (1960). .............................................. 26

U.S. Department of Justice, Bureau of Justice Statistics (BJS) Special Report, Weapon Use and Violent Crime  (Sept. 2003)............................................................................... 40

## INTRODUCTION

Eighteen-year-old plaintiffs James D'Cruz and Andrew Payne and the National Rifle Association of America, Inc. ("NRA") bring this action to challenge the constitutionality of two provisions of the Gun Control Act of 1968, as amended, which bar persons younger than age 21 from purchasing handguns directly from a federally licensed firearms dealer. Plaintiffs claim that 18 U.S.C. § 922(b)(1) and (c), and corresponding regulations issued by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), "prohibit[] a certain class of law-abiding, responsible citizens from fully exercising the right to keep and bear arms," and thus violate the Second Amendment and the Due Process Clause. Am. Compl. for Declaratory J. and Injunctive Relief ("Compl.") ¶ 3. Plaintiffs seek a declaratory judgment and a permanent injunction, but they have failed to establish standing and to state a claim for which relief can be granted.

Plaintiffs have not met their burden of showing the concrete and particularized injury-in-fact necessary for standing. Contrary to the assertion that the Act's provisions substantially hinder Plaintiffs' asserted right to keep and bear arms and equal protection, the provisions at issue do not prohibit D'Cruz and Payne from possessing or using a handgun, nor do the provisions bar Plaintiffs from purchasing or obtaining such a weapon. Rather, Congress restricted the ability of federally-licensed firearms dealers to sell handguns directly to 18-to-20 year olds. Plaintiffs remain free to obtain handguns in a variety of legal ways and from a variety of legal sources. Accordingly, because D'Cruz and Payne have available opportunities to obtain a handgun and ammunition but have chosen not to pursue those opportunities, they cannot legitimately claim that their inability to purchase a handgun directly from a federally-licensed dealer has caused them any harm, much less cognizable injury-in-fact related to the right to bear

-1-

arms or equal protection.

The NRA similarly has failed to establish standing on its own behalf or on behalf of its members.  Its claims on behalf of its alleged 18-to-20 year old members suffer the same deficiencies cited above.  The NRA also fails to establish injury on the part of its federally-licensed dealer members.  The NRA's conclusory statement that its dealer members will suffer economic injury because they cannot sell directly to 18-to-20 year olds is insufficient to establish standing, particularly where, as here, the dealer members can sell to parents to give to their 18-to-20-year-old children.  No dealers are identified, and there are no allegations regarding the numbers of 18-to-20 year old NRA members who have attempted but been unable to obtain handguns because of the restriction this lawsuit seeks to enjoin.  Moreover, any impact on dealer sales is temporary, because those potential customers who wish to buy handguns directly from a federally-licensed dealer can do upon reaching their twenty-first birthday.  Finally, none of the plaintiffs have shown a sufficient threat of imminent prosecution to obtain pre-enforcement review.  The statutes Plaintiffs challenge do not impose any restrictions directly on 18-to-20-year-old would-be purchasers, and the NRA has not alleged that any of its dealer members has an intent to sell handguns directly to 18-to-20 year olds, much less that any dealer has been threatened with prosecution for doing so.  What Plaintiffs have filed, instead, is a generalized grievance that fails to establish the prerequisites for standing.

Even if Plaintiffs had standing, they still could not prevail.  While there is an individual Second Amendment right to keep and bear arms, subject to certain qualifications and restrictions, neither the Second Amendment nor the equal protection component of the Due Process Clause guarantees a right to purchase handguns from a particular source, which is the specific relief that

Plaintiffs desire here.   Nor do licensed dealers have a Second Amendment right to sell firearms at all, much less to a particular clientele.   At the outset, then, Plaintiffs have failed to state a claim for which relief can be granted.   Further, to the extent that the Second Amendment is implicated at all, the Act's provisions pass constitutional muster.   The laws Plaintiffs challenge do not infringe on their asserted right to keep and bear arms, nor do the laws deny Plaintiffs' right to equal protection of the laws.   Under-twenty-one age qualifications on the purchase or use of firearms have long been understood in this country as compatible with the right of Americans generally.   And as the Supreme Court acknowledged in <u>District of Columbia v. Heller</u>, 128 S. Ct. 2783, 2816-17 (2008), the right to keep and bear arms is "not unlimited."   This action should therefore be dismissed, or judgment granted for Defendants.

## STATUTORY AND REGULATORY BACKGROUND

### I.      Statutory Provisions at Issue

Plaintiffs' suit challenges the constitutionality of two statutory provisions and three regulatory provisions that impose conditions on the commercial sale of firearms, to the extent they pertain to the purchase of handguns and handgun ammunition.   Both statutory provisions are part of the Gun Control Act of 1968, as amended, 18 U.S.C. §§ 921-931 ("the Act").   The first statutory provision, codified at 18 U.S.C. § 922(b)(1), makes it

> unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver . . . any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age.

18 U.S.C. § 922(b)(1).   Under this statute, while licensed dealers can sell a long gun (<u>i.e.</u>, a rifle

or shotgun) to individuals between eighteen to twenty years of age, they may not sell a handgun directly to such individuals.

The second statutory provision, codified at 18 U.S.C. § 922(c)(1), provides that in "any case not otherwise prohibited by [the Act], a licensed importer, licensed manufacturer, or licensed dealer may sell a firearm to a person who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer) only if" the purchaser submits a sworn statement attesting that he or she is not prohibited by 18 U.S.C., chapter 44, or applicable State or local law, from receiving firearms. Id. § 922(c)(1). If the firearm to be purchased is a shotgun or rifle, the purchaser must attest that he or she is eighteen years of age or older; if not, the purchaser must attest that he or she is twenty-one years of age or older. Id.

## II.    Legislative History

Congress enacted these provisions in 1968 following a seven-year investigation of violent crime. In 1953, the Senate established a Subcommittee to Investigate Juvenile Delinquency ("the Subcommittee") within the Judiciary Committee to "investigate contributing causes to juvenile criminality and to develop legislation to alleviate such contributing causes, where appropriate and possible." S. Rep. No. 88-1340, at 2 (1964) (attached as Ex. 1). In 1961, the Subcommittee opened a "full-scale investigation into the availability of firearms to juveniles." Id. The Subcommittee conducted extensive hearings on this issue in January, March, and May of 1963, March and April of 1964, May, June, and July of 1965, and July and August of 1967. S. Rep. No. 90-1097, at 75-76 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2164, 2198; S. Rep. No. 89-1866, at 53 (1966) (attached as Ex. 2). It heard from numerous witnesses both in favor of and

opposed to the proposed legislation.  See Federal Firearms Act: Hearings Before the Subcomm.
to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary, 89th Cong. 685 (1965)
("1965 Hearings") (statement of Sen. Dodd, noting that the subcommittee had heard 23 witnesses
in favor of, and 23 witnesses against, the proposed bill).[1]

Witnesses during the hearings included:

- the deputy commissioner of the New York City Police Department, testifying that "in 1964, there were 2,615 arrests in that city for the illegal possession of dangerous weapons; 1,136 of the arrestees were under 21 years of age, or 43 percent of the total," that "as long as criminals can obtain weapons more easily in other States both through the mails and by personal purchase, the effort to eradicate the illegal traffic in small arms in the State of New York can never be completely successful," and that certain provisions of the proposed legislation, including the under-twenty-one age requirement "would greatly hamper elements of the criminal community and the neocriminals among our young in their efforts to obtain firearms";[2]

- a second deputy commissioner of the New York City Police Department, who testified that of the 1065 felony arrests for possession of dangerous weapons in 1962, "46.3 percent of those arrested were under 21 years of age" and of 1669 misdemeanor arrests for possession of dangerous weapons, 61 percent were under 21; that the corresponding figures for felony and misdemeanor arrests in 1961 were 44.2 and 52.2 percent, respectively; that of 3955 arrests in 1960-62 of persons under 21 for possession of dangerous weapons, felonious assault, robbery, and homicide, "firearms of all descriptions, but particularly handguns, were used in approximately 2,800 instances, or in 70 percent of these crimes"; and in 1960-62, "one out of every four victims in a youth gang homicide was killed by a handgun";[3]

---

[1] *Available at* http://www.lexisnexis.com/congcomp/getdoc?HEARING-ID=HRG-1965-SJS-0054.

[2] S. Rep. No. 89-1866, at 58; 1965 Hearings at 602, 603, 605 (testimony of Deputy Commissioner Leonard E. Reisman).

[3] S. Rep. No. 88-1340, at 15-16; Juvenile Delinquency: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary, 88th Cong. 3437-38, 3444 (1963) ("1963 Hearings") (testimony of Lawrence W. Pierce), *available at* http://www.lexisnexis.com/congcomp/getdoc?HEARING-ID=HRG-1963-SJS-0001.

- a commander in the Chicago Police Department, who testified that in 1964, there were 191 murders in Chicago involving the use of firearms, and that minors under twenty-one years of age accounted for 41, or approximately 20 percent of the total;[4]

- the chief of the Atlanta Police Department, who stated that of 404 incidents of aggravated assault in Atlanta in the last 17 months, "93 of the perpetrators were under 21 years of age" and that "[m]ost of these cases would have ended as a simple altercation, except for the ready availability of the gun";[5]

- a commissioner of the Massachusetts Department of Public Safety, who "cite[d] the out-of-State purchase of firearms by Massachusetts residents as the prime source of the criminal gun in his State," and who presented "specific cases of juveniles and minors" who purchased concealable firearms in a neighboring State that they used in crimes in Massachusetts;[6]

- the deputy chief of the Washington D.C. Metropolitan Police Department, who discussed the fact that although the District of Columbia had stringent firearms laws, violent crimes including homicides were committed in the District with firearms purchased from nearby States (Maryland and Virginia) with lax firearms laws;[7]

- the Commissioner of Internal Revenue, who explained that a "major problem area" regarding the effectiveness of State and local firearms regulation "involves individuals going across State lines to procure the firearms which they could not lawfully procure or possess in their own State," especially concealable weapons such as pistols and revolvers, and that "[t]he greatest growth of crime today is in the area of young people, juveniles and young adults. The easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly, and all responsible law-enforcement officials, and indeed the very esteemed Director of the Federal Bureau of

---

[4] S. Rep. No. 89-1866, at 58-59; 1965 Hearings at 277 (testimony of Carl K. Miller).

[5] S. Rep. No. 89-1866, at 59; 1965 Hearings at 504 (testimony of Herbert T. Jenkins).

[6] S. Rep. No. 89-1866, at 59-60.

[7] 1963 Hearings at 3387 (testimony of Capt. James E. Stargel); id. at 3392, 3394 (testimony of Deputy Chief John B. Layton).

Investigation has recommended that legislation of this character be enacted.";[8]

- the Secretary of the Army, who testified that "[n]o function of the Department of Defense will be impaired by enactment of this legislation," and in particular, the under-twenty-one age requirement would not affect the effectiveness of the Army's civilian marksmanship program, administered with the cooperation of the NRA;[9]

- the managing partner of the Redfield Gun Sight Company of Denver, Colorado, who stated that "there is a great deal of merit" in an under-twenty-one age limitation for handguns and an under-eighteen age limitation for rifles and shotguns;[10]

- the attorney general of South Carolina, who noted that a provision prohibiting the sale of pistols to persons under twenty-one "was designedly incorporated in our State law enacted this year. . . chosen, and deliberately" by the state legislature;[11] and

- the Commissioner of the Massachusetts Department of Public Safety, who noted that "approximately 87 percent of the firearms which have been used in crimes in Massachusetts were over-the-counter purchases in neighboring States."[12]

Additionally, a number of witnesses presented testimony regarding the problem of individuals

evading State requirements for firearms purchases – including underage individuals evading State

---

[8] 1965 Hearings at 67; Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary, 90th Cong. 57 (1967) ("1967 Hearings") (testimony of Sheldon S. Cohen), available at http://www.lexisnexis.com/congcomp/getdoc?HEARING-ID=HRG-1967-SJS-0031.

[9] Id. at 58-61 (testimony of Stephen Ailes). The Department of Defense assigned the Army the responsibility for expressing the Department's views on the bill; see id. at 726.

[10] Id. at 338 (testimony of E.H. Hilliard, Jr.).

[11] Id. at 666-67 (testimony of Daniel R. McLeod).

[12] Id. at 356 (testimony of Richard R. Caples). The Subcommittee also considered written testimony, including a newspaper article quoting the vice president and general manager of Winchester Arms as stating that permissible regulation to correct abuses by firearm users could include "[m]aking the sale of firearms to juveniles subject to parental consent and the public use of firearms by juveniles subject to adequate supervision," id. at 366.

minimum-age requirements – by traveling across State lines, and then using their firearms in criminal activities.[13]

Congress repeatedly reiterated that the bill would not bar minors under twenty-one from possessing firearms, and would not bar parents from obtaining firearms for use by their minor children.[14]  The Senate Judiciary Committee determined that "virtually all States do have statutes regulating the acquisition of firearms by minor children.  It is these State and local statutes which are being circumvented by mail order and are creating the pressing problem before us.").  S. Rep. No. 89-1866, at 6.  The Committee also concluded that "the establishing of minimum ages for (1)

---

[13] See 1963 Hearings at 3375-76 (testimony of James V. Bennett, Director, U.S. Bureau of Prisons); id. at 3405, 3425-26 (testimony of John W. Coggins, Chief, Technical Branch, Alcohol and Tobacco Tax Division, U.S. Department of the Treasury); 1965 Hearings at 3-5, 450, 473 (statements of Sen. Dodd; Howard R. Leary, Commissioner, Philadelphia Police Department; Sen. Dodd, quoting telegram from Charles A. O'Brien, Chief Deputy Attorney General, California); 1967 Hearings at 368, 595 (statements of William L. Cahalan, prosecuting attorney, Wayne County, Michigan; Benjamin C. Stanczyk, judge, Common Pleas Court, Detroit).

[14] See S. Rep. 89-1866, at 58; 1968 U.S.C.C.A.N. at 2167 (both providing that under the Act, "a minor or juvenile would not be restricted from owning, or learning the proper usage of the firearm [since any firearm] which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian").  Senator Thomas Dodd, chairman of the hearings, stated: "[T]here is no intent in this bill to prevent young people from hunting.  Under this bill, a parent could purchase a rifle or a shotgun for his son or daughter. . . But I think the important consideration is parental knowledge that the youngster has the gun.  And that is why we put in the age limitation."  1965 Hearings at 311; see also 1967 Hearings at 39 ("The bill would not prohibit possession or use of firearms by those too young to purchase them.  It is recognized that some parents may wish their minor children, who are sufficiently mature to be entrusted with them, to enjoy the use of firearms for recreational purposes.") (testimony of Treasury Undersecretary Joseph W. Barr); id. at 933 ("I think the intention is pretty clearly set forth, and it has been the same in this bill as it has been from the beginning – namely, that the bill will not permit a dealer to sell a pistol to anyone under the age of 21 or a rifle to anyone under the age of 18.  Now, that does not prohibit a father of a son from going down and buying a pistol or a shotgun and giving it to his son – as I intend to do when my son is 15.") (testimony of Sen. Joseph D. Tydings).

purchase of rifles and shotguns at 18 years, and (2) pistols and revolvers and all other firearms at

21 years, provides the machinery for the States to implement and enforce their own statutes

governing the sale and acquisition of firearms." Id. at 60.

Based on the evidence presented during these hearings, Congress made several legislative

findings, including:

> (1) that the existing Federal controls over the traffic in firearms moving in (or otherwise affecting) interstate or foreign commerce do not adequately enable the States to control the firearms traffic within their own borders through the exercise of their police power;

> (2) that the ease with which any person can acquire firearms other than a rifle or shotgun (including criminals, *juveniles without the knowledge or consent of their parents or guardians . . . .*) is a significant factor in the prevalence of lawlessness and violent crime in the United States;

>       *        *        *        *        *

> (4) that the acquisition on a mail-order basis of firearms other than rifles and shotguns by nonlicensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws and regulations, and local ordinances; [and]

>       *        *        *        *        *

> (6) that there is a causal relationship between the easy availability of firearms other than rifles and shotguns, and juvenile and youthful criminal behavior, and that such firearms have been widely sold *by federally licensed importers and dealers* to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior.

1968 U.S.C.C.A.N. at 2197-98 (emphasis added).

Congress also found that "[i]n contributing to our ever-increasing crime rates, juveniles

account for some 49 percent of the arrests for serious crime in the United States and *minors*

*account for 64 percent* of the total arrests in this category." 1968 U.S.C.C.A.N. at 2165

(emphasis added). The Senate Report also expressly referenced the findings in a 1966 Senate

Judiciary Committee report, which concluded that an under-twenty-one age requirement for

handguns and an under-eighteen requirement for rifles and shotguns was warranted based on

evidence presented to the committee "overwhelmingly demonstrat[ing] that the handgun is the

type of firearm that is principally used in the commission of serious crime" and that rifles and

shotguns "are used substantially less frequently by the lawless" and "their preponderant use [is] in

a lawful and beneficial manner." Id. at 2164 (citing S. Rep. No. 89-1866, at 7). This evidence

included the fact that "hundreds of thousands of shooters . . . enter into formal rifle, pistol, and

shotgun competitive shooting" and millions "use these same type of firearms for informal skeet,

trap, and target shooting." S. Rep. No. 89-1866, at 8. The Committee also noted the armed

forces' need for "skilled riflemen," and the fact that "there are millions of homes where firearms

have a proper place for self-protection." Id. at 9.

> Therefore, Section 922(b)(1) was designed to
>
> provide a uniform and effective means through the United States for preventing the
> acquisition of the specified firearms by persons under such ages. . . . The
> clandestine acquisition of firearms by juveniles and minors is a most serious
> problem facing law enforcement and the citizens of this country. The controls
> proposed in the title are designed to meet this problem and to substantially curtail
> it.

1968 U.S.C.C.A.N. at 2167; see also id. at 2256 (finding that federal legislation is needed to

"increase safety and strengthen local regulation" by, inter alia, "[e]stablishing minimum ages of 18

for the purchase of long guns and 21 for the purchase of handguns."); United States v. Moore, 84

F.3d 1567, 1571 (9th Cir. 1996) ("The report of the Senate Judiciary Committee on the [Act]

listed among the serious national problems addressed by the legislation the acquisition of firearms

by 'juveniles *without the knowledge and consent of their parents or guardians.*'") (emphasis in

-10-

opinion) (quoting S. Rep. No. 90-1097, at 28 (1968)).

Congress was concerned not only with youth access to firearms in general, but with handguns in particular.  It sought to enact "legislation which would not unnecessarily restrict the activities of the more than 15 million hunters in this country."  1968 U.S.C.C.A.N. at 2304.  "The handgun as the most formidable and most frequently used tool of the criminal is well recognized and established."  Id. at 2301; see also id. at 2248, 2247 (arguing that a concealed weapons amendment would "not significantly inconvenience hunters and sportsmen in any way" but was "primarily designed to reduce access to handguns for criminals, juveniles, and fugitives.").

## III.   Regulations at Issue

In addition to challenging two statutory provisions, Plaintiffs also challenge three regulations promulgated under the Act.  The first such regulation is phrased identically to 18 U.S.C. § 922(b)(1).  See 27 C.F.R. § 478.99(b).  The second regulation, 27 C.F.R. § 478.124(a), mandates that a "licensed importer, licensed manufacturer, or licensed dealer shall not sell or otherwise dispose, temporarily or permanently, of any firearm to any person, other than another licensee, unless the licensee records the transaction on a firearms transaction record, Form 4473."  Form 4473 establishes the transferee's identity by asking, among other things, the transferee's name, residence address, date and place of birth, and country of citizenship.  The form also contains a certification that the transferee is not prohibited by law from receiving a firearm.  See 27 C.F.R. § 478.124(c)(1).

The third regulation, 27 C.F.R. § 478.96(b), provides that in situations covered by 18 U.S.C. § 922(c)(1), where a non-licensee purchaser does not appear in person at the licensee's place of business, the purchaser must provide the licensee with a completed Form 4473.

-11-

Although this regulation creates an exception to the face-to-face purchase requirement, the transfer of a handgun can still only be made if the purchaser is a resident of the same State in which the licensee's business premises is located.  See 18 U.S.C. § 922(a)(5) & (b)(3).

## ARGUMENT

I. **THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION.**

To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." Miss. State Democratic Party v. Barbour, 529 F.3d 538, 544 (5th Cir. 2008) (citation omitted).  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (citations and internal punctuation omitted).  Unless the plaintiff has shown that he or she has sustained an invasion of an interest that is legally cognizable – in other words, that is protected by statute or is otherwise recognized by law to exist – no injury in fact exists. See McConnell v. Fed. Election Comm'n, 540 U.S. 93, 227 (2003); Cone Corp. v. Fla. Dep't of Transp., 921 F.2d 1190, 1204 (11th Cir. 1991) ("If the plaintiff is prosecuting a constitutional claim, more-over, the injury must be the deprivation of a constitutional right.").  To establish standing to sue, plaintiffs must identify the invasion of a right that is established and recognized by law to exist.

Plaintiff D'Cruz is an eighteen-year-old who owns a handgun and a rifle.  Compl. ¶¶ 24-25.  He alleges that in addition to the weapons he already owns, he "desires" to buy a handgun

and handgun ammunition specifically from a federally-licensed dealer, and only from such a dealer. Id. ¶ 26. He claims that in September 2010 he visited a firearms dealer, asked if he would be permitted under federal law to buy a handgun, and was told that the dealer would not be able to sell him the weapon. Id. ¶ 27. D'Cruz does not indicate that he filled out an application to purchase a handgun and was denied, or asked the dealer to ignore federal law and sell him the gun anyway. He does not indicate that he has been threatened with prosecution or other federal action for desiring to buy a handgun from a federally-licensed dealer. Nor does he indicate that he has attempted and failed to obtain a second handgun by other legitimate means, for instance, through his parents or by purchasing from an individual who only makes an occasional sale of firearms. Plaintiff Payne, also eighteen, similarly "desires" to purchase a handgun from a licensed dealer but has made no effort to visit a gun dealer, to apply to buy a handgun, nor has he asked a licensed dealer to ignore the law and sell him a handgun anyway. Id. ¶¶ 30-33. Payne does not indicate that he has attempted to purchase or obtain a handgun through other legitimate means and had those avenues foreclosed to him. Id.

The NRA alleges that it is "America's foremost and oldest defender of Second Amendment rights" and includes among its members persons between the ages of eighteen and twenty who similarly "desire" to buy a handgun only from a federally licensed dealer. Compl. ¶¶ 34, 36. The NRA fails to indicate who these members are or whether these members have even visited a federally-licensed dealer, much less attempted to purchase such a weapon. Nor do the individual plaintiffs and the NRA claim that they or its members have been threatened with federal action for their desire to purchase a handgun from a federally-licensed dealer. The NRA also fails to indicate whether the members it purports to represent already have a handgun or have

attempted to obtain such a weapon by other legitimate means.  At most, the NRA claims that the laws at issue limit access to what it considers more convenient and adequate firearms markets. See id.

In addition, the NRA purports to represent the interests of its federally-licensed dealer members and claims, without identifying any members or providing any information to support its conclusory claim, that they have been economically injured because they cannot sell to the temporal class of 18-to-20 year olds.  Id. ¶ 37.  There is no allegation as to the numbers in that class and how many handguns they would otherwise purchase; there is no acknowledgment that that class of persons may purchase rifles and shotguns directly from the dealers, that the restriction is temporary, or that their parents may purchase handguns for them directly from the NRA's dealer members.  The NRA does not claim that its dealer members have a concrete intention to violate the law by selling handguns to 18-to-20 year olds or that they have been threatened with prosecution for otherwise doing so, and therefore they cannot obtain pre-enforcement review.  The NRA also claims that it represents the interests of its dealer members to "seek to vindicate the Second Amendment rights of their customers."  Id.

A.      The Individual Plaintiffs Have Not Met the Requirements for Standing.

The purported injury alleged by the individual plaintiffs is the inability to purchase a handgun or handgun ammunition *directly* from a federally-licensed dealer.  Compl. ¶¶ 26, 32.  However, no court has recognized an individual right to buy a handgun or ammunition from a particular seller.  Plaintiffs cannot contend that their injury is the inability to purchase a firearm or ammunition, or that they have been denied their asserted Second Amendment right to access a weapon for self-defense purposes.  They may purchase a rifle or shotgun directly from a federally-

-14-

licensed dealer and are not barred by federal law from possessing a handgun.  They may obtain a handgun and ammunition in several different ways.  First, their parent or guardian may buy a handgun or handgun ammunition from a licensed firearms dealer and give it to them as a gift.  See Federal Firearms Regulations Reference Guide 178 (2005).[15]  They may also buy a handgun and ammunition from an individual who is selling from his or her private collection or only makes an occasional sale of such items, and who does not have the principal objective of making a profit. See 18 U.S.C. § 921(a)(11), (a)(21)(C).

A plaintiff lacks standing if his or her choices include an alternative that will not cause injury.  See Drutis v. Rand McNally & Co., 499 F.3d 608, 611 (6th Cir. 2007) (retired employees who chose to stay with defined-benefit pension plan instead of employer's new defined-contribution plan lacked standing to challenge new plan because they suffered no injury as a result of the company's conversion to the new plan); Pub. Util. Dist. No. 1 v. FERC, 272 F.3d 607, 617 (D.C. Cir. 2001) (per curiam) (because agency rule gave utility companies a choice between filing a proposal to participate in a particular type of organizational structure or submitting an alternative filing, and "[n]one of the Utilities' injuries will come to fruition if they opt to make an alternative filing," their alleged injuries were "inadequate to give rise to an injury in fact").  Here, because the individual plaintiffs have several available options for obtaining a handgun and handgun ammunition, they have suffered no injury-in-fact.  Indeed, the fact that

---

[15] *Available at* permanent.access.gpo.gov/lps41631/2005/p53004.pdf; see also ATF Industry Circular 79-10 (Aug. 7, 1979) ("A dealer may lawfully sell a firearm to a parent or guardian who is purchasing it for a minor child.  The minor's subsequent receipt or possession of the firearm would not violate Federal law, even though the law does prohibit a dealer's direct sale to the underaged person."), *available at* http://www.ttb.gov/industry_circulars/archives/ 1979/79-10.html.

plaintiff D'Cruz already possesses a handgun (and a rifle), see Compl. ¶ 25, demonstrates that he

has been able to obtain a handgun by other available means and cannot claim an inability to access

the means of self-defense envisioned by the Second Amendment, as interpreted in Heller.  See 128

S. Ct. at 2821-22.

Plaintiffs instead raise a generalized grievance championing the asserted Second

Amendment "rights of millions of responsible, law-abiding American citizens," and seeking

relief that will allegedly benefit all of them.  Compl. ¶ 5.  Courts have routinely rejected such a

generalized grievance of a particular class of citizens as establishing an injury for standing

purposes.[16]  In San Diego County Gun Rights Commission v. Reno, 98 F.3d 1121 (9th Cir. 1996),

two associations and three individuals (including a licensed firearms dealer) brought suit alleging

that they "wish and intend to engage in activities prohibited by" the provision of the Act

prohibiting the transfer or possession of semiautomatic assault weapons.  Id. at 1124, 1127.  The

court dismissed for lack of standing.  See id. at 1131-32 ("[P]laintiffs' allegations of threatened

prosecution and increased prices affect not only the named plaintiffs, but also anyone desiring to

possess semiautomatic assault weapons.  Plaintiffs' alleged harms amount to no more than a

---

[16] "A general interest in seeing that the government abides by the Constitution is not
sufficiently individuated or palpable to constitute [an injury in fact]."  Jones v. Bush, 122 F. Supp.
2d 713, 717 (N.D. Tex. 2000), aff'd, 244 F.3d 134 (5th Cir. 2000).  "In deciding whether
standing exists, a court should carefully consider . . . 'whether the complaint raises abstract
questions amounting to generalized grievances which are more appropriately resolved by the
legislative branches.'"  Hastey v. Bush, Civ. A. No. 503CV0088C, 2003 WL 22289885, at *4
(N.D. Tex. Oct. 6, 2003) (Cummings, J.) (quoting Murray v. City of Austin, 947 F.2d 147, 151
(5th Cir. 1991)).  Where a "[p]laintiff's claims amount to nothing more than 'abstract questions
amounting to generalized grievances," a court "will not attempt to 'create its own jurisdiction by
embellishing otherwise deficient allegations.'"  Id. at *5; see also Pederson v. La. State Univ., 213
F.3d 858, 869 (5th Cir. 2000) ("[C]ourts have refused to adjudicate cases that raise only
generalized grievances.").

generalized grievance shared in substantially equal measure by a large class of citizens, and thus do not warrant the exercise of jurisdiction.") (citation and internal punctuation omitted). Similarly, here, the individual plaintiffs are alleging only that they "wish and intend to engage in activities" prohibited by a different provision of the Act, and the injury they allege consists of a interest shared in equal measure by "millions" of other individuals.

Neither individual plaintiff alleges that he has any actual, concrete plans to purchase a handgun or ammunition from any particular firearms dealer; rather, both state only that they "desire" to do so, without any further explanation. See Compl. ¶¶ 26, 32. As the Supreme Court has explained, "'some day' intentions—without any description of concrete plans, or indeed any specification of *when* the someday will be—do not support a finding of the 'actual or imminent' injury that our cases require." Lujan, 504 U.S. at 564 (emphasis in original); see also NRA v. Magaw, 132 F.3d 272, 293 (6th Cir. 1997) ("Plaintiffs' assertions that they 'wish' or 'intend' to engage in proscribed conduct is not sufficient to establish an injury-in-fact under Article III.") (citing Lujan, 504 U.S. at 564); Barbour, 529 F.3d at 546 ("Without concrete plans or any objective evidence to demonstrate a 'serious interest' [in acting contrary to a statute, plaintiff] suffered no threat of *imminent* injury.") (emphasis in original); Trinity Indus., Inc. v. Martin, 963 F.2d 795, 799 (5th Cir. 1992) ("Allegations of possible future injury do not satisfy the requirement of Art. III."). If a bare allegation of unspecified future conduct were enough to establish Article III standing, federal courts would be inundated with challenges to every governmental or organizational policy brought by plaintiffs stating only that someday, they might want to engage in conduct implicating that policy, without needing to show they have any concrete plans to do so. This is precisely the result the Article III standing requirements are

-17-

intended to avoid.

The fact that plaintiff D'Cruz alleges that in the past, he has "inquired" of a licensed firearms dealer "as to whether he was permitted under federal law to purchase a handgun," Compl. ¶ 27 – but does not allege that he applied nevertheless to purchase a handgun or ammunition or otherwise tried to encourage a licensed dealer to sell him a handgun despite the restrictions – does not establish standing for pre-enforcement review. See Hodgkins v. Holder, 677 F. Supp. 2d 202, 204 (D.D.C. 2010) ("[P]ast refusals of merchants to sell firearms to [plaintiffs] are not enough, without more, to provide the basis for an action pursuant to the Declaratory Judgment Act.") (appeal pending).[17]

In sum, because the individual plaintiffs have not met their burden of showing that they have a concrete and particularized present injury, they lack standing.  The Court should dismiss their claims for lack of subject-matter jurisdiction.

**B.   The Court Should Dismiss the NRA Because It Has Not Shown that Any of Its Members Possess Standing.**

To establish standing to sue as the representative of its members, an association must "show that its members, or any one of them, would have standing individually."  Nat'l Treasury Emps. Union v. U.S. Dep't of the Treasury, 25 F.3d 237, 241 (5th Cir. 1994).  Plaintiffs allege that the NRA's members include individuals between the ages of eighteen and twenty "who desire to purchase handguns and handgun ammunition" and "federally licensed firearms dealers." Compl. ¶¶ 36, 37.  However, as explained above, individuals in this first category of members lack

---

[17] Nor can the individual plaintiffs establish that they or any firearms dealer has received a threat of prosecution because of the individual plaintiffs' desire to purchase a handgun directly from a federally-licensed dealer.  Indeed, the challenged statutory provisions would not impose any criminal sanctions on 18-to-20-year-olds.

standing to sue because they do not allege an injury in fact.  See supra I.A.  As to the second

category, licensed firearms dealers, Plaintiffs allege only that the statute and regulations at issue

here "restrict[] the handgun-buyers market available to these dealers and therefore cause[]

economic injury."  Compl. ¶ 37.  This bare assertion is not sufficient to establish standing.

A plaintiff has the burden to allege concrete injury that is "distinct and palpable," and not

"abstract" or "hypothetical."  Allen v. Wright, 468 U.S. 737, 751 (1984).  "[A]llegations of injury

that is merely conjectural or hypothetical do not suffice to confer standing."  Little v. KPMG

LLP, 575 F.3d 533, 540 (5th Cir. 2009).  In Little, competitor accounting firms sued KPMG –

one partner of which did not have a valid Texas license – alleging economic injury in the form of

lost business.  Id. at 535.  The plaintiffs claimed that if KPMG's Texas registration had been

revoked, KPMG's Texas clients would have replaced KPMG with its competitors, and would

have paid for the competitors' accounting services as they paid KPMG.  Id. at 540.  The Fifth

Circuit affirmed the dismissal of the competitors' action under Rule 12(b)(1), explaining that the

claim of injury "depends on several layers of decisions by third parties. . . and is too speculative to

confer Article III standing."  Id. at 541.

Here, the NRA's claim of present economic injury on behalf of licensed dealers is

conclusory only and similarly speculative, and depends on decisions by third parties not before

the Court.  The NRA does not identify any members who are adversely affected or provide any

financial information to support its bare claim of economic injury.  It is speculation that

individuals between the age of eighteen and twenty who presently wish to obtain a handgun

would prefer to buy from a licensed dealer than from an unlicensed seller.  Nor does this

conclusory claim factor in the fact that parents or others can purchase handguns directly from

licensed dealers as gifts for 18-to-20-year-olds.   At most, then, the firearms dealers who are also

NRA members can only state that it is *possible* that they are currently suffering economic injury.

However, "a possible financial loss is not by itself a sufficient interest to sustain a judicial

challenge to governmental action."  Abbot Labs. v. Gardner, 387 U.S. 136, 153 (1967); Diamond

v. Charles, 476 U.S. 54, 66 (1986) (denying standing to a pediatrician who argued that a State

law would result in fewer abortions being performed, and his pool of his potential fee-paying

clients would thus be enlarged); Longstreet Delicatessen v. Jolly, No. 06-986, 2007 WL

2815022, at *18 (E.D. Cal. Sept. 25, 2007) (allegations of economic harm are insufficient where

plaintiff "has offered no evidence of actual harm suffered other than potential lost sales")

(attached as Ex. 3).  As in Little, the NRA's claims on behalf of licensed firearms dealers are

unduly speculative and hypothetical, and do not give rise to an injury in fact.[18]  Additionally,

"where injury is alleged to occur within a market context, the concepts of causation and

redressability become particularly nebulous and subject to contradictory, and frequently

unprovable, analyses."  Common Cause v. Dep't of Energy, 702 F.2d 245, 251 (D.C. Cir. 1983).

_____

[18] The NRA does not allege fear of prosecution as an alleged injury on behalf of members who are licensed dealers, nor could they obtain pre-enforcement review on that basis because they fail to show any concrete intention to violate the provisions at issue by selling handguns to individuals between eighteen and twenty, or that they have received a concrete threat of prosecution.  See KVUE, Inc. v. Moore, 709 F.2d 922, 928 (5th Cir. 1983) (plaintiff cannot "challenge the constitutionality of a state criminal statute merely because he desires to wipe it off the books or even because he may some day wish to act in a fashion that violates it"); Barbour, 529 F.3d at 545 (to establish standing to assert constitutional injury, a plaintiff "must produce evidence of an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute") (internal punctuation omitted); id. at 545-47 (dismissing challenge to statute prohibiting closed primaries for lack of standing; plaintiff could not "show that it *intends* to hold closed primaries," having neither sought pre-clearance with the Justice Department nor adopted any policy to exclude non-party members from the primary) (emphasis in original); Hodgkins, 677 F. Supp. 2d at 204-06.

Thus, even assuming *arguendo* that injury in fact could be established, Plaintiffs have not shown

that such alleged economic injury is fairly traceable to the Act, as they present no evidence that

18-to-20-year-olds would prefer to buy handguns from a licensed dealer (much less a dealer who

happens to be a member of the NRA) than from a non-licensed seller.  Cf. San Diego Gun Rights

Comm., 98 F.3d at 1130 (even assuming that the Act restricted supply of certain firearms by

banning them, the resulting price increase was traceable to third-party dealers and manufacturers,

and not to the government defendants).  Thus, the NRA cannot show that a favorable decision

would necessarily redress any alleged injury to its members.  The Court should thus dismiss such

claims for lack of subject-matter jurisdiction.[19]

## II.   THE UNDER-TWENTY-ONE AGE QUALIFICATION ON THE PURCHASE OF HANDGUNS IS A LAWFUL REGULATORY MEASURE AND THEREFORE DOES NOT VIOLATE THE SECOND AMENDMENT.

Plaintiffs allege that the under-twenty-one age qualification[20] for the direct purchase of a

handgun from a federally-licensed firearms dealer violates the Second Amendment.  This

---

[19] Plaintiffs' claim of economic injury does not rise to the level of the economic injury to manufacturers and dealers held sufficient in Magaw, where specific products were banned by brand name, model number, and design, and the manufacturers and dealers specifically alleged they had stopped production of those products.  132 F.3d at 281-82.  Additionally, the court determined that a "direct causal connection" existed between the injuries alleged and the statute's prohibitions, id. at 283 n.8.; here, as explained above, plaintiffs fail to demonstrate causation. Moreover, the NRA cannot assert claims on behalf of dealers who "seek to vindicate the Second Amendment rights of their customers," Compl. ¶ 37.  See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, 454 U.S. 464, 474 (1982) (a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (internal quotation marks omitted).

[20] All references to the "under-twenty-one age qualification" refer to 18 U.S.C. § 922(b)(1) and its identically-phrased implementing regulation, 27 C.F.R. § 478.99(b)(1). Plaintiffs' challenges to the remaining statutory provision and two regulatory provisions are examined below, at part V.

argument is meritless.  Both the Supreme Court and the Fifth Circuit acknowledge that well-established regulations on the use of firearms that are compatible with the right to bear arms as historically understood in this country do not implicate the Second Amendment.  Age qualifications for the use of firearms – up to the common law age of majority – have historically been understood as compatible with the right to bear arms.  And the age qualification on the ability to purchase a handgun from a federally-licensed dealer is substantially related to the important – indeed, compelling – governmental interest in protecting public safety and combating violent crime.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  In Heller, after determining that the Second Amendment conferred an individual right to keep and bear arms, the Supreme Court held "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self defense."  128 S. Ct. at 2799, 2821-22.  The holding was relatively narrow, regarding the "core" right of "law-abiding, responsible citizens to use arms in defense of hearth and home."  Id. at 2821; see also United States v. Masciandaro, 648 F. Supp. 2d 779, 787 (E.D. Va. 2009) ("Thus, Heller's narrow holding is explicitly limited to vindicating the Second Amendment 'right of law-abiding, responsible citizens to use arms in defense of hearth and home.'").  Like other constitutional rights, the right to keep and bear arms is "not unlimited."  Heller, 128 S. Ct. at 2816.  The Court identified specific limits deriving from various historical restrictions on possessing and carrying weapons.  Id. ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was

not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

purpose.").  The Court went on to state that "nothing in our opinion should be taken to cast

doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or

laws forbidding the carrying of firearms in sensitive places such as schools and government

buildings, or *laws imposing conditions and qualifications on the commercial sale of arms*."  Id.

at 2816-17 (emphasis added).  These restrictions, as well as others similarly rooted in history,

were left intact by the Second Amendment and by Heller.  128 S. Ct. at 2817 n.26 ("We identify

these presumptively lawful regulatory measures only as examples; our list does not purport to be

exhaustive.").

Similarly, in United States v. Emerson, 270 F.3d 203, 260 (5th Cir. 2001), the Fifth

Circuit held that the Second Amendment "protects the right of individuals, including those not

then actually a member of any militia or engaged in active military service or training, to

privately possess and bear their own firearms . . . that are suitable as personal, individual

weapons."  But the Fifth Circuit noted that its holding "does not mean that those rights may

never be made subject to any limited, narrowly tailored specific exceptions or restrictions for

particular cases that are reasonable and not inconsistent with the right of Americans generally to

individually keep and bear their private arms *as historically understood in this country*."  Id. at

261 (emphasis added).  As examples of such exceptions and restrictions, the Court explained:

"[I]t is clear that felons, *infants* and those of unsound mind may be prohibited from possessing

firearms."  Id. (emphasis added); see also Black's Law Dictionary 847 (9th ed. 2009) (defining

the term "infant" to include a "minor"); Gaddis v. United States, 381 F.3d 444, 454 (5th Cir.

-23-

2004) (using "infant" synonymously with "minor"); Hall Invs, LP v. Lamar Corp., 35 Fed. Appx. 386 (5th Cir. 2002) (same).

The asserted right at issue here is different from that at issue in Heller, the "use [of] arms in defense of hearth and home." 128 S. Ct. at 2821. As explained supra, plaintiff D'Cruz already owns a handgun and a rifle, Compl. ¶ 25, and the Act does not prevent 18-to-20-year-olds as a class from buying rifles and shotguns from a federally-licensed dealer or from possessing a handgun. Nor are the individual plaintiffs prevented from buying a handgun from other available sources. Thus, the right they seek to advance is not the right to obtain or possess a weapon "in defense of hearth and home," but the alleged right to buy a handgun directly from a particular source. However, neither Heller nor McDonald v. City of Chicago, 130 S. Ct. 3020 (2010), discussed the buying and selling of firearms, let alone held this to be at the "core" of the Second Amendment right. In fact, the only reference to restrictions on the buying and selling of firearms was used as an example of a "presumptively lawful" limitation in Heller. See 128 S. Ct. at 2817 n.26; see also United States v. Marzzarella, 595 F. Supp. 2d 596, 603 (W.D. Pa. 2009) (Heller's "implicit sanctioning of laws imposing conditions and qualifications on the commercial sale of arms … is significant."), aff'd, 614 F.3d 85 (3d Cir. 2010); see also United States v. King, 532 F.2d 505, 510 (5th Cir. 1976) (differentiating "keep and bear arms" from "dealing in firearms").

It is also noteworthy that the restriction on purchasing a handgun from a federally-licensed dealer is temporary and will obviously expire once the individual plaintiffs reach the age of twenty-one. Courts have recognized that a temporary ban on possession is an important distinction from the circumstances presented in Heller. See United States v. Yancey, 621 F.3d 681, 686-87 (7th Cir. 2010) (per curiam) (because 18 U.S.C. 922(g)(3) prohibits only

-24-

"*current* drug users" from possessing firearms, it "is far less onerous than [the Act's] provisions affecting felons and the mentally ill") (emphasis in original); <u>United States v. Knight</u>, 574 F. Supp. 2d 224, 226 (D. Me. 2008) ("Unlike <u>Heller</u>, the § 922(g)(8) crime [of possession of a firearm while under a restraining order] is not an outright ban on firearm possession.  Instead, the prohibition lasts only as long as the underlying state court order is in effect.").  Here, there is at most a less-encompassing temporary commercial restriction on certain sources for obtaining a handgun.  Neither <u>Heller</u>, nor any post-<u>Heller</u> case, suggests that such regulation of what Plaintiffs may consider a preferred source for buying a handgun is covered by the Second Amendment, much less a violation thereof.[21]  "Hence, it is unnecessary to scrutinize the constitutionality of a law that does not implicate a constitutional right."  <u>United States v. Brown</u>, 715 F. Supp. 2d 688, 694 (E.D. Va. 2010); <u>see also</u> <u>Heller v. District of Columbia</u> ("<u>Heller II</u>"), 698 F. Supp. 2d 179, 188 (D.D.C. 2010) (heightened scrutiny "will come into play, of course, only in cases in which the law implicates the core Second Amendment right, namely, the right of law-abiding, responsible citizens to use arms in defense of hearth and home") (citation and internal punctuation omitted).

---

[21] The Fifth Circuit's ruling in another constitutional context is instructive.  While there is a constitutional right to travel within the United States, there is no constitutional right to travel by a particular mode of transportation, such as by airplane, even if it might be the most convenient method.  <u>See</u> <u>City of Houston v. FAA</u>, 679 F.2d 1184, 1198 (5th Cir. 1982) (rejecting claim of violation of passengers' constitutional right to travel: "At most, their argument reduces to the feeble claim that passengers have a constitutional right to the most convenient form of travel."). <u>See also</u> <u>Town of Southold v. Town of E. Hampton</u>, 477 F.3d 38, 54 (2d Cir. 2007) ("[T]ravelers do not have a constitutional right to the most convenient form of travel."); <u>Gilmore v. Gonzales</u>, 435 F.3d 1125, 1136-37 (9th Cir. 2006) (there is no right to air travel even if it is the most convenient means).  Similarly, Plaintiffs cannot legitimately claim that the right to keep and bear arms dictates that handgun buyers have access to particular firearms dealers, even if those dealers may be viewed as the most convenient methods for purchase.

Even if the limitation on the purchase of firearms from particular sellers by individuals under twenty-one – the common-law age of majority – were covered by the Second Amendment, it would still be lawful because it is an example of a well-established "condition[] and qualification[] on the commercial sale of arms." Heller, 128 S. Ct. at 2817. Additionally, such a "limited, narrowly tailored" restriction has been "historically understood in this country" as "not inconsistent with the right of Americans generally to individually keep and bear their private arms." Emerson, 270 F.3d at 261.

> **A.    The States Have Long Established Age Qualifications on the Purchase and Use of Firearms, Up to and Including the Common-Law Age of Majority.**

States have long imposed age restrictions on the purchase and use of firearms, and a number of States have chosen twenty-one as their minimum age for the purchase or use of handguns (or all firearms).[22] Congress, in enacting the Act, sought to prevent individuals from circumventing State restrictions, including minimum age requirements, by crossing State lines. See supra at 6-8. Thus, in distinguishing between individuals below and above the age of twenty-one in the course of regulating commercial transactions in firearms, Congress built upon a well-established foundation.

Age twenty-one has been, for centuries, the common-law age of majority. T.E. James, The Age of Majority, 4 Am. J. Legal Hist. 22, 28 (1960). The choice of twenty-one as the

---

[22] California, Delaware, the District of Columbia, Hawaii, Illinois, Iowa, Maryland, Massachusetts, New Jersey, Ohio, and Rhode Island. See Cal. Penal Code § 12072(a)(3)(A); Del. Code Ann. tit. 24, § 903; D.C. Code Ann. §§ 7-2502.03, 22-4507; Haw. Rev. Stat. Ann. § 134-2(d); 430 Ill. Comp. Stat. 65/3(a), 65/4(a)(2)(i); Iowa Code § 724.22; Md. Code Ann., Pub. Safety § 5-134; Mass. Gen. Laws ch. 140, § 130; N.J. Stat. Ann. § 2C:58-6.1; Ohio Rev. Code Ann. § 2923.21; R.I. Gen. Laws §§ 11-47-30, 11-47-35(a).

common-law age of majority was originally "based on that being the age at which a young man

attained sufficient strength and ability to *bear arms*."  Dana F. Castle, Early Emancipation

Statutes: Should They Protect Parents as Well as Children?, 20 Family L.Q. 343, 349 n.36 (Fall

1986) (citing T.E. James, The Age of Majority, 4 Am. J. Legal Hist. 22 (1960)) (emphasis

added).  It was the widely-adopted age of majority in the United States from its founding until the

1970s.  See Keely A. Magyar, Betwixt and Between but Being Booted Nonetheless: A

Developmental Perspective on Aging Out of Foster Care, 79 Temp. L. Rev. 557, 601 (2006)

("Twenty-one has, throughout Western history, often been the dividing line between minority and

majority. . . . It was also the statutory age of majority in most states before 1971, when the

Twenty-Sixth Amendment lowered the minimum voting age from twenty-one to eighteen.").

Before the end of the nineteenth century, nineteen States and the District of Columbia had

enacted under-twenty-one age qualifications for the purchase or use of certain firearms, either

expressly or by forbidding their purchase or use by minors.  See Earliest Known Age-Based State

Restrictions on the Use or Purchase of Firearms (attached as Ex. 4).[23]  And in the early twentieth

---

[23] Alabama and Tennessee (1856), Kentucky (1873), Indiana (1875), Georgia (1876),
Mississippi (1878), Missouri (1879), Delaware and Illinois (1881), Maryland and West Virginia
(1882), Kansas and Wisconsin (1883), Iowa (1884), Nevada (1885), Louisiana and Wyoming
(1890), District of Columbia (1892), North Carolina (1893), and Texas (1897).  The States with
laws prohibiting sale or possession by minors all set the age of majority at twenty-one; see Walker
v. Walker, 17 Ala. 396 (Ala. 1850); Jones v. Wells, 2 Houst. 209 (Del. Super. Ct. 1860);
Womack v. Greenwood, 6 Ga. 299 (Ga. 1849); Peters v. Jones, 35 Iowa 512 (Iowa 1872);
Burgett v. Barrick, 25 Kan. 526 (Kan. 1881); Blackard v. Blackard, 426 S.W.2d 471, 472 (Ky.
1968); Fitz-Gerald v. Bailey, 58 Miss. 658 (Miss. 1881); Crouch v. Crouch, 187 S.E.2d 348, 349
(N.C. Ct. App. 1972); Whitt v. Whitt, 490 S.W.2d 159, 160 (Tenn. 1973); Memphis Trust Co. v.
Blessing, 58 S.W. 115, 117 (Tenn. 1899); Bullock v. Sprowls, 54 S.W. 657, 659-60 (Tex. Civ.
App. 1899); Doe v. Archdiocese of Milwaukee, 700 N.W.2d 180, 188 (Wis. 2005).  Until the
1970s, Illinois, Missouri, and Oklahoma set the age of minority at twenty-one for men, and
eighteen for women.  See Castner v. Walrod, 83 Ill. 171 (Ill. 1876); Anderson v. Williams, 104

-27-

century, three more States enacted under-twenty-one age qualifications for the purchase or use of particular firearms.[24]  Thus, a total of twenty-two States and the District of Columbia chose twenty-one as the minimum age for purchase or use of particular firearms.

The remaining 28 States also enacted minimum-age qualifications on the purchase or use of certain firearms, ranging between the ages of twelve and twenty.[25]  All 50 States and the District of Columbia have thus enacted minimum-age qualifications for the use or purchase of particular firearms.  Additionally, 29 of the 50 States (and the District of Columbia) only placed a minimum-age qualification on the purchase or use of handguns – usually defined as pistols, revolvers, weapons of "like kind or character," or concealable weapons including firearms – rather than on all firearms.[26]

Minimum-age qualifications on the purchase or use of firearms have been universally adopted by the States – at some point, all 50 States and the District of Columbia adopted such limits in one form or another.  The fact that most States established age qualifications only on the

---

N.E. 659, 661 (Ill. 1914); Reisse v. Clarenbach, 61 Mo. 310 (Mo. 1875); Bassett v. Bassett, 521 P.2d 434, 435 (Okla. Civ. App. 1974).

[24] Oklahoma (enacted 1890, but Oklahoma was not admitted as a State until 1907), New Hampshire, and South Carolina (both 1923).

[25] Oregon (1868), Ohio (1880), Florida and Pennsylvania (1881), New Jersey (1882), Michigan, New York, and Rhode Island (1883), Massachusetts (1884), Minnesota, Virginia, and Washington (1889), Vermont (1896),  South Dakota (1903), Utah (1905), Montana (1907), Idaho and Maine (1909), Arizona (enacted 1883, but Arizona was not admitted as a State until 1912), California and Connecticut (1923), New Mexico (1971), Arkansas (1975), Nebraska (1977), Alaska (1978), North Dakota (1985), Hawaii (1988), and Colorado (1993).

[26] Alabama, California, Colorado, Connecticut, District of Columbia, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, North Carolina, North Dakota, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

purchase or use of concealable firearms (rather than long guns) supports Congress's reasonable inference that a majority of States deemed those weapons to be the most dangerous in the possession of minors.  See supra at 4-11.

> **B.**     **The Legislative Power to Set an Age Qualification Within an Established Range for the Exercise of a Right or Privilege Includes the Power to Raise and Lower the Minimum Age Within the Established Range.**

As this Court has noted, "reasonable limits exist upon the rights of minors as compared to adults," even when constitutional rights are at issue.  Caudillo ex rel. Caudillo v. Lubbock Indep. Sch. Dist., 311 F. Supp. 2d 550, 563 (N.D. Tex. 2004); see also New York v. Ferber, 458 U.S. 747, 757 (1982) (Supreme Court has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights"); cf. Schall v. Martin, 467 U.S. 253, 263 (1984) ("[T]he Constitution does not mandate elimination of all differences in the treatment of juveniles.").  The same holds true with respect to the Second Amendment.  See Katherine Hunt Federle, The Second Amendment Rights of Children, 89 Iowa L. Rev. 609, 668 (2004) ("Children, of course, are constitutional persons and thus have constitutional rights; if, as supposed, the Second Amendment guarantees an individual right to keep and bear arms, then that right also would be held by minors.  Nevertheless, the Court has held repeatedly that the rights of minors are not commensurate with those of adults because of their perceived vulnerability, their inability to make informed and mature decisions, and the importance of the parental role in child rearing.").

For example, in State v. Callicutt, 69 Tenn. 714, 714 (Tenn. 1878), the state supreme court upheld a conviction for selling a pistol to a minor against a Second Amendment challenge, explaining that "we do not deem it necessary to do more than say that we regard the acts to

prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only

constitutional as tending to prevent crime but wise and salutary in all its provisions."  Similarly, in

Glenn v. State, 72 S.E. 927 (Ga. Ct. App. 1911), the court, in upholding a minor's conviction for

carrying an unlicensed firearm, explained:

> There are some rights which may be exercised by adults without harm to the state,
> but the same rights exercised by minors might injuriously affect in some way the
> public health, public safety, or public morality.  Unquestionably the possession of a
> pistol or revolver by a minor constitutes a menace to the peace of the public, and
> to the safety of the individuals constituting the public.

Id. at 929.

Furthermore, as recognized by the Supreme Court, the legislative power to set an age

qualification for a right within a prescribed range – even a constitutional right such as voting –

includes the power to raise and lower the minimum age within that range.  See Oregon v.

Mitchell, 400 U.S. 112, 118 (1970) (striking down a portion of federal law lowering the voting

age in state, county, and municipal elections from twenty-one to eighteen);[27] id. at 294-95

("Obviously, the power to establish an age qualification must carry with it the power to choose 21

as a reasonable voting age, as the vast majority of the States have done.")  (Stewart, J., joined by

Burger, C.J. and Blackmun, J., concurring in relevant part); id. at 142 (although eighteen-year-

olds may be "generally considered by American law to be mature enough to contract, to marry, to

drive an automobile, [or] *to own a gun*, . . . . [o]n any of these items, the States, of course, have

---

[27] Although no opinion was delivered for the Court, five justices (Burger, Black, Harlan, Stewart, and Blackmun) concluded that "Congress cannot interfere with the age for voters set by the States in state and local elections," and five justices concluded that because the Constitution expressly gave Congress the power under Article I to regulate federal elections, the law was valid as to those elections.  Id. at 117-18.

leeway to raise or lower the age requirements") (Douglas, J., dissenting in relevant part) (emphasis added); Stanton v. Stanton, 429 U.S. 501, 504 n.4 (1977) (per curiam) (State is "free to adopt either 18 or 21" as the age of majority for child support purposes); Blassman v. Markworth, 359 F. Supp. 1, 5-6 (N.D. Ill. 1973) (States have the power to set "reasonable age minimums for state and local offices," including Illinois' age minimum of twenty-one); Meyers v. Roberts, 246 N.W.2d 186, 189 (Minn. 1976) (age minimum of twenty-one to hold local public office consistent with equal protection); Wurtzel v. Falcey, 354 A.2d 617, 618 (N.J. 1976) (per curiam) (age minimum of twenty-one years for members of legislative assembly compatible with equal protection); see also, e.g., Republican Coll. Council v. Winner, 357 F. Supp. 739, 741 (E.D. Pa. 1973) (State acted within its constitutional discretion by setting twenty-one as drinking age).[28]

---

[28] It is true that, following the passage of the Twenty-Sixth Amendment in 1971, guaranteeing the right to vote to individuals eighteen years of age, many States decided to change the age of majority to eighteen. However, this fact has no *constitutional* significance because majority is a status, and not a fixed or vested right. See Felix v. Milliken, 463 F. Supp. 1360, 1382-83 (E.D. Mich. 1978) (rejecting contention that because Michigan lowered the age of majority to eighteen, the State cannot now again raise the drinking age, having committed itself to a lower age of majority because "the status of majority or minority by its very nature does not of itself involve any vested right"); id. at 1383-84 (rejecting the "proposition that once one falls in the category of 'legal adult,' he/she must forever thereafter be treated as all other adults for all purposes," which "would preclude any classification of adults into any sub-classes for purposes of regulation"); Allison v. Allison, 337 N.E.2d 666, 668 (Ohio 1975) ("The rule is settled beyond a doubt that majority or minority is a status rather than a fixed or vested right and that the legislature has full power to fix and change the age of majority. . . The removal of the disabilities [of minority status] does not result in the creation of any new rights, but merely in the termination of certain personal privileges. There is no vested property right in the personal privileges of infancy.") (citation omitted); In re Davidson's Will, 26 N.W.2d 223, 225 (Minn. 1947) (majority or minority is a status, not a fixed or vested right).

States have long possessed the discretion to determine an appropriate age of majority, and "the states have considerable discretion in either raising or lowering the age requirements with regard to a particular privilege." Felix, 463 F. Supp. at 1383; see also Allam v. State, 830 P.2d 435, 438 (Alaska Ct. App. 1992) ("There is no legal requirement that the same age of majority apply to all activities and circumstances."). In short, nothing prevents States from "un-bundling" the set of rights and privileges that are collectively deemed to constitute adulthood, and establishing different minimum ages for different conduct. Indeed,

> [t]wenty-one continues to be the age of majority for a variety of purposes in states across the country. All fifty states and the District of Columbia prohibit the sale of alcohol to individuals under twenty-one. [Eight] states proscribe or restrict the sale of firearms to individuals under twenty-one years old, and three states outlaw possession of certain firearms by those under twenty-one years old. In three states it is illegal to sell lottery tickets to people under twenty-one years old. In six states, individuals under twenty-one years old may not participate in pari-mutuel betting. In the District of Columbia, drivers under twenty-one are subject to certain restrictions. Two states allow only those twenty-one and older to sit on juries.

Magyar, 79 Temp. L. Rev. at 601-02 (footnotes omitted).[29]

Congress possesses the same discretion regarding age minimums accorded to the States. See Broadway v. Beto, 338 F. Supp. 827, 840 (N.D. Tex. 1971), aff'd, 459 F.2d 483 (5th Cir. 1972) ("Constitutionally, the legislature generally has the power to grant or deny privileges to minors.") (citing George v. United States, 196 F.2d 445, 453 (9th Cir. 1952) (concluding that "[m]inority as a disqualification for participation in . . . the performance of certain public or social

---

[29] Since the article's 2006 publication, the number of States restricting (rather than prohibiting) the sale of firearms to individuals under twenty-one has decreased from nine to eight. See supra at n.22. Additionally, at least one State prohibits individuals under twenty-one from marrying without parental consent; see Miss. Code Ann. § 93-1-5.

functions is recognized in the law of the United States.  Constitutionally the Congress may, as may the State legislatures, deny certain privileges to minors which it grants to others.") (internal citations omitted).  Thus, for example, Congress recently chose twenty-one as the minimum age to apply for a credit card without either a co-signer or proof of independent means to repay debts up to the full line of credit.  See Credit CARD Act of 2009, Pub. L. No. 111-24, § 301, 123 Stat. 1734, 1748 (2009).

And as with the States, nothing in the Constitution or federal law prevents Congress from selecting twenty-one as the age minimum in this instance.  The Constitution establishes only one right that vests at the age of eighteen –  voting.  U.S. Const. amend. XXVI, § 1.  In no way does this amendment require Congress or the States to choose eighteen as the minimum age for any other right or privilege as to which they have discretion to set age qualifications, nor does it imply that the age of eighteen has any special or particular constitutional status for any other purpose.  Thus, in Marte v. INS, 562 F. Supp. 92 (S.D.N.Y. 1983), the court rejected an eighteen-year-old's constitutional challenge to a federal statute restricting immigration by non-citizen parents of U.S. citizens under age twenty-one, explaining:

> [Plaintiff argues] because the age of majority has been lowered in most states from 21 years to 18 years, [the statute's] drawing the line at 21 is improper.  Plaintiff argues that in enacting the 26th amendment, Congress recognized that 18 rather than 21 is the age of majority in modern American society.  While there is a certain element of appeal to this contention, where best to set the age requisites of the Act is the prerogative of Congress.  The ratification of the 26th amendment merely lowered the voting age; it in no way affected the allocation of immigration visas.  If Congress wants to change the age requirement of [the statute], it is free to do so.

Id. at 95 (internal citation omitted).  As with the States, Congress may establish a range of minimum ages for different activities, as long as there is a rational basis for its decisions.

-33-

Moreover, because ten States and the District of Columbia have chosen twenty-one as their

minimum age for the purchase or use of handguns (or all firearms), it is sensible for Congress to

use that age to prevent circumvention of State minimums by underage individuals crossing State

lines.

> **C.     The Age Qualification Is Substantially Related to the Important
> Governmental Interest in Protecting Public Safety and Combating Violent
> Crime.**

Additionally, even if the under-twenty-one age qualification were covered by the Second

Amendment, it withstands scrutiny.  Neither the Supreme Court nor the Fifth Circuit has held that

Second Amendment challenges trigger strict scrutiny.  See United States v. Darrington, 351 F.3d

632, 635 (5th Cir. 2003) (rejecting the contention that "any governmental restrictions on

[the right to bear arms] must meet a constitutional strict scrutiny test," and explaining that

"Emerson is a carefully and laboriously crafted opinion, and if it intended to recognize that the

individual right to keep and bear arms is a 'fundamental right,' in the sense that restrictions on this

right are subject to 'strict scrutiny' by the courts and require 'a compelling state interest,' it

would have used these constitutional terms of art.") (citation omitted).  Most courts, including

courts in this Circuit, have applied an intermediate standard of review to Second Amendment

challenges.  See United States v. Bledsoe, Criminal No. SA-08-CR-13(2)-XR, 2008 WL

3538717, at *4 (W.D. Tex. Aug. 8, 2008) (applying intermediate scrutiny in a Second

Amendment challenge to provision of the Gun Control Act), aff'd on other grounds, 334 Fed.

Appx. 711 (5th Cir. 2009) (both attached as Ex. 5); United States v. Marzzarella, 614 F.3d 85,

97-99 (3d Cir. 2010); United States v. Williams, 616 F.3d 685, 692 (7th Cir. 2010) (citing en

banc decision in United States v. Skoien, 614 F.3d 638 (7th Cir. 2010)) ("In Skoien we declined

to adopt a level of scrutiny applicable to every disarmament challenge, although we hinted that it might look like what some courts have called intermediate scrutiny."); United States v. Reese, __ F.3d __, slip op. at 17-20 (10th Cir. Dec. 10, 2010) (attached as Ex. 6); Heller II, 698 F. Supp. 2d at 188 ("[This] court joins the majority of courts to have considered this issue in holding that intermediate scrutiny is the most appropriate standard of review to apply to [laws implicating the core Second Amendment right].").  Thus, if the Court does not consider the age qualification to be presumptively constitutional, it should adopt the approach of the majority of courts, and apply no more than intermediate scrutiny.

To satisfy intermediate scrutiny, "a statutory classification must be substantially related to an important governmental objective."  Clark v. Jeter, 486 U.S. 456, 461 (1988).  As Congress made clear, the goal of the minimum-age qualification was to protect public safety and combat violent crime.  Congress explained that "[t]he clandestine acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this country," and that its intention in establishing the under-twenty-one age qualification was to "meet this problem and substantially curtail it."  1968 U.S.C.C.A.N. at 2167; see also id. at 2113-14 (explaining that the "principal purposes" of the section of the Act including the minimum-age qualification "are to aid in making it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in the States and their subdivisions in combating the increasing prevalence of crime in the United States").

Protecting public safety and combating crime are well-established *compelling* governmental interests.  See United States v. Salerno, 481 U.S. 739, 748, 750 (1987) (noting that

the Supreme Court has "repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest" and that the government's "general interest in preventing crime is compelling"); Schall, 467 U.S. at 264 ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted.") (citation and internal punctuation omitted).  Additionally, in upholding a curfew under strict-scrutiny review, the Fifth Circuit held that the State of Texas had a "compelling interest in increasing juvenile safety and decreasing juvenile crime."  Qutb v. Strauss, 11 F.3d 488, 493 (5th Cir. 1993); see also id. at 492 (noting that "the Supreme Court has recognized that the state has a strong and legitimate interest in the welfare of its young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely") (citation and internal punctuation omitted).

Several relevant factors should properly influence intermediate scrutiny review as applied here.  First,

> intermediate scrutiny, by definition, permits legislative bodies to paint with a broader brush than strict scrutiny.  The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments varies up or down with the novelty and plausibility of the justification raised.  As a consequence, the degree of fit between the registration scheme in this case and the well-established goal of promoting public safety need not be perfect; it must only be substantial.

Heller II, 698 F. Supp. 2d at 191 (citations and internal punctuation omitted).  Second, in order to advance its compelling interests in combating crime and protecting public safety, Congress may need to make "predictive judgments" about the risk of dangerous behavior.  Such judgments are entitled to "substantial deference" by the courts.  Turner Broadcasting Sys. v. FCC, 512 U.S. 622, 665 (1994).  Moreover, the primary role in making such judgments properly falls to Congress, not

-36-

the courts, because Congress is "far better equipped than the judiciary" to collect, weigh, and evaluate the relevant evidence, and to formulate appropriate firearms policy in response.  Id. at 665-66.

As set forth in detail above, see supra at 4-11, Congress in 1968 enacted restrictions on the commercial purchase of handguns – a firearm commonly used in crime – to an especially at-risk age group, in order to forward its interests in crime prevention and public safety.  Congress enacted the under-twenty-one age qualification based on testimony from police officials and others about the high violent crime rate for individuals under twenty-one, and about the ease and frequency with which underage individuals evaded State minimum-age requirements for firearms purchases by crossing nearby State lines, and using the purchased firearms in criminal activities.  But Congress decided not to prohibit altogether the use of handguns by 18-to-20-year-olds: rather, it chose to condition their commercial sale by federally-licensed sellers to such individuals upon parental consent or from others purchasing only as a gift.[30]  In the years since the Act's passage, the available evidence has only underscored Congress's concerns about the commercial availability of firearms to minors without parental consent.  In the 1990s, Congress reiterated its concern with violent crime committed by young people with firearms.  In enacting what would become 18 U.S.C. § 922(x), Congress determined:

> Handgun violence involving America's youth has grown markedly in recent years. .
> . . . The vast majority of murders committed in the United States are committed
> with firearms, and most with handguns. . . . Nearly 3 out of 4 juvenile murder

---

[30] In this respect, the under-twenty-one age qualification is on the opposite end of the spectrum from the District of Columbia handgun prohibition struck down in Heller.  See 128 S. Ct. at 2818 ("Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban.").

-37-

offenders used guns to commit their crimes in 1990. . . . Juveniles are also disproportionately impacted as handgun victims. Firearm murder is the second leading cause of death – after traffic accidents – for youth between the ages of 15 and 19.

H.R. Rep. No. 103-389, at 4-5 (1993).[31] Moreover, Congress expressed particular concern about the 18 to 20-year-old age group. As one senator noted:

> Firearms trace data collected as part of the Youth Crime Gun Interdiction Initiative (YCGII) paint a disturbing picture of crime gun activity by persons under 21. In the most recent YCGII Trace Analysis Report, the age of the possessor was known for 32,653, or 42.8 percent, of the 72,260 crime guns traced. Of these 32,563 guns, approximately 4,840, or 14.8 percent, were recovered from 18-20 year-olds. Indeed, the most frequent age of crime gun possession was 19 years of age, and the second most frequent was 18 years of age. At the same time, according to the 1997 Uniform Crime Reports, the most frequent age arrested for murder was 18 years of age, and the second most frequent was 19 years of age. Those aged 18-20 accounted for 22 percent of all arrest for murder in 1997.

145 Cong. Rec. 7503 (1999) (statement of Sen. Charles Schumer); see also 145 Cong. Rec. 18119 (1999) ("Studies show that one in four gun murders are committed by people aged 18 to 20.") (statement of Rep. Grace Napolitano).

Congress' concern was borne out by additional statistics. A 1999 report by the U.S. Departments of Justice and Treasury found that:

> [e]ighteen to 20 year olds comprised 14 percent, or one in seven, of all those arrested for violent crime. . . . In 1997, 18, 19 and 20 year olds ranked first, second, and third in the number of gun homicides committed. Of all gun

---

[31] See also Final Rule, 63 Fed. Reg. 37740, 37740 (July 13, 1998) (in enacting what would become Section 922(x) of the Act, "Congress found that criminal misuse of firearms often starts with the easy availability of guns to juvenile gang members. In addition, Congress found that individual States and localities may find it difficult to control this problem by themselves. Therefore, Congress found it necessary and appropriate to assist the States in controlling violent crime by stopping the commerce in handguns with juveniles nationwide and allowing the possession of handguns by juveniles only when handguns are possessed and used under certain limited circumstances.").

homicides where an offender was identified, 24 percent were committed by 18 to 20 year olds.  This is consistent with the historical pattern of gun homicides over the past 10 years.

Among murderers, 18 to 20 year olds were more likely to use a firearm than adults 21 and over. . . .  Similarly, in non-lethal crimes, including assault, rape, and robbery, 18 to 20 year old offenders were more likely to use guns than both younger and older offender age groups.

Gun Crime in the Age Group 18-20 (June 1999) ("June 1999 Report"), at 2.[32]  Id.; see also id. at 3 ("Handguns comprised 85 percent of the crime guns known to be recovered from 18 to 20 year olds in the 27 cities" participating in the Youth Crime Gun Interdiction Initiative).

Citing the June 1999 Report, the Western District of Texas in United States v. Bledsoe, Criminal No. SA-08-CR-13(2)-XR, 2008 WL 744718 (W.D. Tex. March 20, 2008), noted in 2008 that "Congress has decided to allow license holders to sell hunting weaponry (rifles and shotguns) to 18 year olds, but restrict the licensed sale of handguns to 21 year olds.  The theory likely is that handguns are more likely to be used in commission of a crime."  2008 WL 744718, at *3 & n.6 (attached as Ex. 7); see also Bledsoe, 2008 WL 3538717, at *4 (citing the June 1999 Report in concluding that the under-twenty-one age qualification satisfied intermediate scrutiny).[33]

Additional statistics show a similar pattern of violence for this age group as both victims

_____

[32] Available at http://www.psn.gov/pubs/index.aspx#1999.

[33] Bledsoe involved a criminal prosecution of an individual under age twenty-one for conspiring to obtain a firearm by making a false statement during a firearms purchase, in violation of 18 U.S.C. §§ 371 and 922(a)(6).  The defendant moved to dismiss the indictment arguing, inter alia, that she could not be liable for purchasing the gun through a straw purchaser (who falsely represented he was the actual buyer) because the Second Amendment granted her an individual right to possess the firearm, and because the provisions of the Act permitting the purchase of a handgun from another individual at age eighteen, but prohibiting the direct purchase of a handgun from a federally-licensed dealer until age twenty-one violated equal protection.  2008 WL 3538717, at *1-2.

and offenders.  "Younger persons, particularly those age 18-20, had higher rates of victimization

by armed offenders. … The rate of firearms violence was also highest for persons age 18-20.

Their rate (12 per 1,000 persons) was about 40% higher than the rate for persons ages 15 to 17

and 21 and 24."  U.S. Department of Justice, Bureau of Justice Statistics (BJS) Special Report,

Weapon Use and Violent Crime at 4 (Sept. 2003); see also id. at 9 ("Those age 18 to 24 were 3.5

times as likely as persons age 12-17 and about 3 times as likely as those age 25 to 64 to be killed

with a firearm.").[34]  Another BJS report showed that from 1976 to 2005, the "young adults"

group – defined as 18 to 24 years of age – "have historically had the highest offending rates and

their rates nearly doubled from 1985 to 1993.  Since 1993 offending rates for 18-24 year olds

have declined but remain slightly higher than levels prior to the mid 1980's."  They also

"experienced the highest homicide victimization rates."  Homicide Trends in the U.S.: Age

Trends.[35]

Moreover, homicides are most often committed with firearms, especially handguns.  See

Homicide Trends in the U.S.: Weapons Used.[36]  "Handguns were used in 56% of all homicides."

Weapons Use and Violent Crime at 8.  Most recently, an FBI Uniform Crime Report released in

September 2010 shows that for all individuals up to age 24, eighteen- to twenty-year olds have

the highest percentage of arrests (18 - 4.8%; 19 - 5.0%; 20 - 4.6%).  See Crime in the United

States 2009, Table 38: Arrests by Age.[37]  And although eighteen- to twenty-year olds accounted

---

[34] *Available at* http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=570.

[35] *Available at* http://bjs.ojp.usdoj.gov/content/homicide/teens.cfm.

[36] *Available at* http://bjs.ojp.usdoj.gov/content/homicide/weapons.cfm.

[37] *Available at* http://www2.fbi.gov/ucr/cius2009/data/table_38.html.

for only about 4% of the total U.S. population in 2009,[38] they accounted for over 19% of all

murder and non-negligent manslaughter arrests, 14% of all arrests for forcible rape, almost 24%

of all robbery arrests, and 12% of all aggravated assault arrests.  See id.  The same study shows

that handguns are the firearm of choice as murder weapons; when firearms were involved,

handguns were used over 50% of the time (ranging from 52% to 97%) in thirty-three States and

the District of Columbia.  Id. at Table 20:  Murder by State, Types of Weapons.[39]  The continuing

danger from individuals under twenty-one is underscored by the fact that, as noted previously, ten

States and the District of Columbia currently restrict possession of firearms by individuals under

twenty-one.

     This evidence demonstrates that when compared with other age groups, 18-to-20-year-

olds are especially likely to be perpetrators and victims of handgun violence.  As the Western

District of Texas has held, the Act's restriction on their access to handguns is substantially related

to public safety and combating crime.  Bledsoe, 2008 WL 3538717, at *4 ("To assert, as

Defendant's contentions suggest, that regulations governing the sale of handguns for the 18-20

year-old age group do not further a substantial governmental interest is meritless, given the

statistics suggesting that the vast majority of guns confiscated from 18-20 year old criminal

defendants are handguns.").

     In summary, for the reasons stated above, the under-twenty-one age qualification, which

---

[38] This estimate was obtained by dividing the total estimated population in December 2009 for ages 18, 19, and 20 (4,344,942 + 4,484,666 + 4,415,714) by the total estimated  population for all ages in that month (308,200,409), using the most recent U.S. Census data.  See http://www.census.gov/popest/national/asrh/2009-nat-res.html.

[39] *Available at* http://www2.fbi.gov/ucr/cius2009/data/table_20.html.

focuses on a group shown to be especially prone to handgun violence as victims and perpetrators, is substantially related to the indisputably important government interest of protecting the public and reducing violent crime.  It therefore satisfies the requirements of intermediate scrutiny analysis.

## III.    THE NRA HAS FAILED TO STATE A SECOND AMENDMENT CLAIM ON BEHALF OF ITS LICENSED DEALER MEMBERS.

Even assuming *arguendo* that NRA members who are licensed firearms dealers could establish standing – which, as explained above, they cannot – the NRA still cannot assert a Second Amendment claim on their behalf because they do not assert claims on which relief can be granted.  The Second Amendment, as construed in <u>Heller</u>, protects "the right to possess a handgun in the home for the purpose of self-defense."  <u>McDonald</u>, 130 S. Ct. at 3050.  However, "<u>Heller</u> said nothing about extending Second Amendment protection to firearm manufacturers or dealers.  If anything, <u>Heller</u> recognized that firearms manufacturers and dealers are properly subject to regulation by the federal government under existing federal firearms laws."  <u>Mont. Shooting Sports Ass'n v. Holder</u>, No. CV-09-147-DWM-JCL, 2010 WL 3926029, at *22 (D. Mont. Aug. 31, 2010), *adopted by district court*, 2010 WL 3909431 (D. Mont. Sept. 29, 2010) (both attached as Ex. 8).  The Fifth Circuit has rejected the notion that the sale of firearms represents activity protected by the Second Amendment.  <u>See</u> <u>King</u>, 532 F.2d at 510 ("With the argument that the statute violates appellant's right to keep and bear arms we firmly disagree.  He was neither charged with nor convicted of keeping and bearing arms.  He was charged with and convicted of engaging, without a license, in the business of dealing in firearms and of conspiring with others so to do."); <u>see also</u> <u>Gilbert Equipment Co. v. Higgins</u>, 709 F. Supp. 1071, 1080-81

(S.D. Ala. 1989), *aff'd*, 894 F.2d 412 (11th Cir. 1990).  Accordingly, the NRA fails to state a valid Second Amendment claim on behalf of members who are licensed dealers, and the Court should dismiss under Fed. R. Civ. P. 12(b)(6).

## IV.    THE AGE QUALIFICATION DOES NOT VIOLATE THE EQUAL PROTECTION COMPONENT OF THE DUE PROCESS CLAUSE.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall. . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const., amend. XIV, § 1.  Although this clause expressly applies only to the States, the Supreme Court has found that its protections are encompassed by the Due Process Clause of the Fifth Amendment and therefore applicable to the federal government.  Bolling v. Sharpe, 347 U.S. 497 (1954).  Count II of the complaint challenges Sections 922(b)(1) and (c)(1) under the equal protection component of the Due Process Clause, Compl. ¶¶ 41-43, but this challenge is also without merit.  The Constitution permits legislatures to "draw lines on the basis of age when they have a rational basis for doing so at a class-based level."  Kimel v. Florida Bd. of Regents, 528 U.S. 62, 86 (2000).  Indeed, "because an age classification is presumptively rational, the individual challenging its constitutionality bears the burden of proving that the facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker."  Id. at 84 (citation and internal punctuation omitted).

As explained above, the challenged statutes satisfy the requirements of intermediate scrutiny.  By definition, then, they also satisfy the more relaxed standards of rational basis review. The Western District of Texas, holding that the under-twenty-one age classification satisfies the rational basis test, explained:

> Here, Congress has decided to require that those holding federal licenses sell handguns only to persons at least 21 years of age. Ostensibly, those holding federal licenses sell many handguns. Congress has decided to allow non-licensees (ostensibly persons who are not in the business of selling multiple handguns) to sell handguns to a person who is over 18 years of age. Further, Congress has decided to allow license holders to sell hunting weaponry (rifles and shotguns) to 18 year olds, but restrict the licensed sale of handguns to 21 year olds. The theory likely is that handguns are more likely to be used in the commission of a crime.
>
> In addition, the Court notes that much more burdensome age-related legislation has passed constitutional muster.

Bledsoe, 2008 WL 744718, at *3-4 (internal citations and footnote omitted). Indeed, "it is particularly appropriate to apply a deferential standard of review to age requirements affecting young people because such requirements do not result in an absolute prohibition but merely postpone the opportunity to engage in the conduct at issue." Stiles v. Blunt, 912 F.2d 260, 265 (8th Cir. 1990); see also Mitchell, 400 U.S. at 295 n.14 ("[I]t is inconceivable to me that this Court would ever hold that the denial of the vote to those between the ages of 18 and 21 constitutes such an invidious discrimination as to be a denial of the equal protection of the laws. The establishment of an age qualification is not state action aimed at any discrete and insular minority") (Stewart, J., joined by Burger, C.J. and Blackmun, J., concurring in relevant part); Berg v. Egan, 979 F. Supp. 330, 337 (E.D. Pa. 1997) ("First, distinctions between minors and adults are less likely than other distinctions to be irrational or arbitrary because they distinguish between groups of people with different legal rights and responsibilities. Second, unlike the case with race or sex, minority is, of course, cured by the passage of time. Those discriminated against on the basis of youth therefore suffer only a temporary disability.").

The NRA also fails to state an equal protection claim on behalf of members who are licensed firearms dealers because the complaint does not allege that any disparate treatment of

similarly-situated dealers has occurred.  See Taylor v. Johnson, 257 F.3d 470, 473 (5th Cir. 2001)

(to maintain equal protection claim, a plaintiff must show, inter alia, "that he received treatment

different from that received by similarly situated individuals").  Therefore, the NRA does not

assert a Fifth Amendment claim on which relief can be granted on behalf of members who are

licensed dealers, and the Court should dismiss this claim under Fed. R. Civ. P. 12(b)(6).

Accordingly, Plaintiffs' equal protection claim has no merit, and the Court should dismiss

this claim or enter summary judgment on this claim for Defendants.

## V. THE OTHER STATUTORY AND REGULATORY PROVISIONS CHALLENGED BY PLAINTIFFS ARE CONSISTENT WITH THE SECOND AMENDMENT AND THE DUE PROCESS CLAUSE.

18 U.S.C. § 922(b)(1) and 27 C.F.R. § 478.99(b)(1) establish the minimum-age

qualification that Plaintiffs challenge in their complaint.  As explained above, this qualification

does not violate the Second or Fifth Amendments.  However, Plaintiffs also challenge another

statutory provision, and two regulatory provisions, that have at best a tangential relationship to

the age qualification.  See Compl. ¶¶ 39-40, 42-43 (challenging 18 U.S.C. § 922(c) and 27 C.F.R.

§§ 478.124(a),  478.96(b)).  These provisions present no constitutional infirmities.

18 U.S.C. § 922(c)(1) requires that a licensed importer, manufacturer, or dealer who sells

a firearm to an individual who does not appear in person at the seller's place of business (other

than another federal licensee) must obtain a sworn statement from the buyer attesting that he or

she is not prohibited by law from receiving firearms.  27 C.F.R. § 478.124(a) mandates that a

licensed importer, manufacturer, or dealer must record sales and other transfers of firearms on a

standard form, Form 4473 (unless the sale or transfer is to another federal licensee).  Among

other things, this form contains a certification that the buyer or transferee is not prohibited by law

from receiving a firearm.  See 27 C.F.R. § 478.124(c)(1).  Finally, 27 C.F.R. § 478.96(b) provides

that whenever a non-licensee buyer does not appear in person at the licensee's place of business,

the buyer must still provide the licensee with a completed Form 4473, and the buyer must reside

in the same State where the licensee's business premises is located.  See also 18 U.S.C. §§

922(a)(5), (b)(3).

       As an initial matter, the requirements that licensed firearms sellers generally meet face-to-

face with the buyer, and must obtain a Form 4473, are even further removed from the core of the

Second Amendment right identified in Heller and Emerson than the under-twenty-one age

qualification.  These provisions are qualifications on the purchase of firearms but do not, by

themselves, restrict possession.  Because there is no constitutional right to buy firearms by mail,

or to buy them without filing a form, there is no reason to apply heightened scrutiny to these

provisions.  See United States v. Lawton, 366 F.3d 550, 554 (7th Cir. 2004) (stating, prior to

Heller, that assuming arguendo that the Second Amendment protects an individual right to bear

arms, "there can be little doubt about the government's authority to regulate the interstate trade in

firearms and its corresponding power to inquire into the backgrounds of those attempting to

purchase firearms."); see also Brown, 715 F. Supp. 2d at 694 (heightened scrutiny does not apply

to a law that does not implicate the right protected by the Second Amendment); Heller II, 698 F.

Supp. 2d at 188 (same).

       Even assuming that a heightened form of scrutiny were to apply, the general requirement

that licensed sellers conduct face-to-face transactions (and, if it is not face-to-face, to obtain a

sworn statement that the buyer is not prohibited from buying firearms), is substantially related to

the compelling governmental objective of preventing violent crime.  The same is true of the

requirement that each firearms transaction by a licensed seller be recorded.  As one senator has explained:

> That all interstate sales of firearms including handguns must take place over the counter face to face . . . allows the dealer to identify and make inquiries of the purchasers, and thus it prevents sales to felons and others prohibited from acquiring firearms.  Second, all interstate sales of firearms, including handguns, have to be recorded in the dealer's records so that tracing can be readily obtained.

131 Cong. Rec. 18205 (1985) (statement of Sen. Orrin Hatch);[40] see also Marzzarella, 614 F.3d at 100 (finding a "compelling interest [in] preserving serial number tracing" because "[t]he direct tracing of the chain of custody of firearms involved in crimes is one useful means by which serial numbers assist law enforcement.  But serial number tracing also provides agencies with vital criminology statistics-including a detailed picture of the geographical source areas for firearms trafficking and 'time-to-crime' statistics which measure the time between a firearm's initial retail sale and its recovery in a crime as well as allowing for the identification of individual dealers involved in the trafficking of firearms and the matching of ballistics data with recovered firearms.").

It is true that in Bledsoe, when the Western District of Texas addressed the defendant's equal protection argument, it noted that the benefits of over-the-counter transactions seemed lessened by the prohibition on sales to 18-to-20 year olds by dealers, as opposed to all individuals. The court observed that it "appears as though the law would rather an 18 to 20 year old purchase

---

[40] See also id. at 18201 ("All dealers had to sign a form indicating a customer had produced identification showing he was not a resident of another State.  This form, which also identified the firearms sold and gave the purchaser's name, address, and description was retained by the dealer and made available for inspection by [ATF] agents.  All of this provided a Federal framework for the monitoring of interstate firearms sales to help State [and] local efforts to keep arms away from criminals, and to trace weapons when they were used to commit crimes.") (statement of Sen. John Kerry).

a handgun from an unlicensed seller than from a licensed seller.  This appears problematic for several reasons."  Bledsoe, 2008 WL 3538717, at *6.  This statement is dictum because the court ultimately did not decide the issue.  Id. at *7 & n.7; Bledsoe, 334 Fed. Appx. at 711 (same).

In any event, while unlicensed sellers are not prohibited from selling to 18-to-20 year olds, it seems likely that Congress did not consider them to be the major source of firearms for this age group.  This can be inferred from Congress' specific finding that there "is a causal relationship between the easy availability of firearms other than a rifle or shotgun and juvenile and youthful criminal behavior, and that such firearms have been widely sold *by federally licensed importers and dealers* to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior."  S. Rep. 90-1097, at 109; 1968 U.S.C.C.A.N. at 2198 (emphasis added).  Additionally, Congress was concerned with the "*clandestine* acquisition of firearms by juveniles and minors," and others.  1968 U.S.C.C.A.N. at 2167 (emphasis added); see also id. at 28, 1968 U.S.C.C.A.N. at 2114 ("The ready availability; that is, ease with which any person can anonymously acquire firearms (including criminals, *juveniles without the knowledge or consent of their parents or guardians* …) is a matter of serious national concern.") (emphasis added).  As explained previously, parents of eighteen-to-twenty-year-olds may purchase handguns from federal licensees for the use of their sons or daughters.  Although it might seem upon first glance that the Act would create a curious result, the distinction it draws actually serves two purposes: it allows for the purchase of handguns from a licensed dealers through exercise of parental authority, and it attempts to ensure that "clandestine" sales do not take place.  Because these goals provide a rational basis for the classification, the Act does not present any equal protection concerns.  See Garcia v. Dretke, 388 F.3d 496, 499 (5th Cir. 2004) (equal protection claim that does not involve

-48-

a suspect class is analyzed under rational-basis test).

In sum, these statutory and regulatory provisions do not implicate the Second Amendment or violate the equal protection component of the Due Process Clause. Moreover, even assuming *arguendo* that they do implicate conduct protected by the Second Amendment, they satisfy the requirements of intermediate scrutiny, and should be upheld.

## CONCLUSION

Plaintiffs fail to meet the requirements for standing. Therefore, the Court does not have subject matter jurisdiction. Furthermore, Plaintiffs are challenging "presumptively lawful" restrictions that "impos[e] conditions and qualifications on the commercial sale of arms," as described in <u>Heller</u>, 128 S. Ct. at 2817. These laws do not preclude conduct that is protected by the Second Amendment and would pass constitutional muster in any event. Accordingly, the Court should dismiss the case or enter summary judgment for Defendants.

Dated: December 22, 2010

Respectfully submitted,

*OF COUNSEL*:

MELISSA ANDERSON
Bureau of Alcohol, Tobacco,
Firearms & Explosives
99 New York Avenue, N.E.
Washington, D.C. 20226
Tel: (202) 648-7056
Melissa.Anderson@usdoj.gov

TONY WEST
Assistant Attorney General

JAMES T. JACKS
United States Attorney

JOHN R. PARKER
Assistant United States Attorney

　　　/s/ Daniel Riess
SANDRA M. SCHRAIBMAN
Assistant Director
DANIEL RIESS (Texas Bar No. 24037359)
Trial Attorney
U.S. Department of Justice
Civil Division, Rm. 6122
20 Massachusetts Avenue, NW

Washington, D.C. 20530
Telephone: (202) 353-3098
Fax: (202) 616-8460
Email: Daniel.Riess@usdoj.gov
*Attorneys for Defendants*