# EXHIBIT
# 1

| 88TH CONGRESS<br>*2d Session* } | SENATE | { REPORT<br>No. 1340 |
|---|---|---|

# INTERSTATE TRAFFIC IN MAIL ORDER FIREARMS

---

## INTERIM REPORT

OF THE

## COMMITTEE ON THE JUDICIARY
### UNITED STATES SENATE

MADE BY ITS

## SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY

TOGETHER WITH

## INDIVIDUAL VIEWS

PURSUANT TO

# S. Res. 274

88TH CONGRESS, 2D SESSION



AUGUST 7, 1964.—Ordered to be printed

---

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1964

35-008

## COMMITTEE ON THE JUDICIARY

JAMES O. EASTLAND, Mississippi, *Chairman*

OLIN D. JOHNSTON, South Carolina
JOHN L. McCLELLAN, Arkansas
SAM J. ERVIN, Jr., North Carolina
THOMAS J. DODD, Connecticut
PHILIP A. HART, Michigan
EDWARD V. LONG, Missouri
EDWARD M. KENNEDY, Massachusetts
BIRCH BAYH, Indiana
QUENTIN N. BURDICK, North Dakota

EVERETT McKINLEY DIRKSEN, Illinois
ROMAN L. HRUSKA, Nebraska
KENNETH B. KEATING, New York
HIRAM L. FONG, Hawaii
HUGH SCOTT, Pennsylvania

———

### SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY IN THE UNITED STATES
(88th Cong.)

THOMAS J. DODD, Connecticut, *Chairman*

SAM J. ERVIN, Jr., North Carolina
PHILIP A. HART, Michigan
BIRCH BAYH, Indiana
QUENTIN N. BURDICK, North Dakota

HIRAM L. FONG, Hawaii
ROMAN L. HRUSKA, Nebraska
KENNETH B. KEATING, New York

CARL L. PERIAN, *Staff Director*

II

# CONTENTS

| | Page |
|---|---|
| I. Introduction | 1 |
| II. The interstate traffic in mail order weapons | 4 |
| III. The results of the mail order traffic in Los Angeles, New York City, Pittsburgh, and Washington, D.C. | 11 |
| IV. Conclusions and recommendations | 27 |

### APPENDIX

| | |
|---|---|
| Letter from Senator Philip A. Hart, enclosing resolution of the State Bar of Michigan | 29 |

| 88TH CONGRESS | SENATE | | REPORT |
|---|---|---|---|
| 2d Session | | | No. 1340 |

# INTERSTATE TRAFFIC IN MAIL ORDER FIREARMS, A PART OF THE INVESTIGATION OF JUVENILE DELINQUENCY IN THE UNITED STATES

AUGUST 7, 1964.—Ordered to be printed

Mr. DODD, from the Committee on the Judiciary, submitted the following

## INTERIM REPORT

together with

## INDIVIDUAL VIEWS

[Pursuant to S. Res. 274, 88th Cong., 2d sess.]

## I. INTRODUCTION

The following is a report of the subcommittee's inquiry into the interstate traffic in mail-order firearms, especially as it relates to juvenile and young adult criminals. Part I is concerned with an analysis and evaluation of the problems resulting from the indiscriminate sale of firearms and includes the subcommittee's findings obtained through field investigation and public hearings. Also included are various recommendations for the alleviation of these problems by amending the Federal Firearms Act. The report concludes with a descriptive analysis of the legislation proposed by the subcommittee.

By way of brief introduction, it is well to outline the history and intent of Federal firearms legislation in order that we may set the subcommittee's inquiry in its proper perspective.

The weapons industry in our country has grown to the point where 10,000 people are engaged in the production of handguns and rifles. These are second to none in design and quality. Further, there are 16 million law-abiding Americans who use firearms for sport and recreation, and who are able to bear the moral burden of the sensible use of these weapons.

In the early days of our Nation, firearms laws were few, and in fact the second amendment to our Constitution insured the right to bear

1

and keep arms contingent upon the maintenance of a well-trained militia. As our society became more complex, the necessity for enacting varying degrees of control over firearms became apparent. In this regard, the Congress enacted into law in 1934, the National Firearms Act, and in 1938, the Federal Firearms Act. Briefly, these acts were designed to regulate firearms transported and transferred in interstate and foreign commerce. To a large degree these laws were an outgrowth of the lawless years of the 1920's and early 1930's; they were hastily written and consequently reflect inconsistencies and ambiguous language. Periodic efforts to amend these Federal firearms laws have, for the most part been in vain.

The Federal Firearms Act enacted into law in 1938 has been amended only once, and that was in 1961. The act contains provisions relative to the importation, manufacture, sale, interstate shipment, and transfer of firearms as concerns importers, manufacturers, and dealers in firearms, whose business involves the interstate transportation and receipt of such firearms.

This act is primarily designed to deny to the criminal lawful access to these firearms, but violations of the law may also result from infractions on the part of persons who are licensed under the act. In regard to the former, the act defines certain persons who may not ship or receive firearms in interstate or foreign commerce. This not only includes manufacturers and dealers licensed under the act, but also any person shipping or receiving firearms in interstate or foreign commerce.

The one amendment to the act redefined such prohibited persons as persons convicted of a crime punishable by a term of imprisonment exceeding 1 year. The previous definition included persons convicted of crimes of violence.

It should be pointed out here that under the provisions of the act, which prohibits dealers and manufacturers from shipping firearms interstate to persons in the prohibited class, there has never been a conviction obtained by the Government primarily because it must prove that the dealer or manufacturer knew, or had reasonable cause to believe, that the purchaser was in such prohibited class of persons.

This then is an area with which the subcommittee's proposed legislation will deal, and which is discussed in the concluding section of this report.

Before specifically defining the problem with which this report deals, it should be noted that it is the subcommittee's function to investigate contributing causes to juvenile criminality and to develop legislation to alleviate such contributing causes, where appropriate and possible.

In this regard, an area of concern to the subcommittee has been the causal relationship between the availability of firearms and juvenile and youthful criminal behavior. The subcommittee has kept abreast of this problem since 1959, and as the result of a large increase in the mail-order gun business began a full-scale investigation into the availability of firearms to juveniles in March of 1961.

Prior to the initiation of the full-scale inquiry, the subcommittee sent questionnaires to law enforcement authorities throughout the United States, and questioned them regarding the amending of the Federal Firearms Act with the specific aim of more stringent controls over concealable handguns.

An overwhelming majority of the 69 respondents to the questionnaire indicated support of Federal legislation to place enforceable con-

.rols over the interstate transportation of concealable firearms, which enter their jurisdictions for delivery to prospective purchasers.

It is of significance that the 46 respondents who answered affirmatively represented every major urban center which is presently plagued by juvenile and adult crime. It is of further significance that 63 of the 69 respondents favored Federal legislation to control the interstate shipment of concealable firearms into their jurisdictions by inclusion of a provision to preclude delivery, except where notice has been given local authorities prior to delivery of the firearm.

It is therefore evident that local law enforcement is cognizant of the problems resulting from the indiscriminate sale of firearms transported and delivered in interstate commerce. It is their view that Federal legislation designed to control this traffic would be of assistance to law enforcement throughout the country.

Further proof of the seriousness of the problem with which we are dealing are the figures included in the uniform crime reports published by the Federal Bureau of Investigation. The crime rate in the United States shows a steady yearly rise and in the past 5 years grew four times faster than the population. In 1962, serious crime rose 7 percent on a nationwide basis, and when we examine figures for arrests of persons under the age of 18 years, we find a 9-percent increase over 1961. These figures are contained in the preliminary FBI report for 1962. When we examine the report for 1961, we find that an analysis of 3,008 homicides committed that year, reveals the fact that 1,578 were committed with a firearm. This is 52.5 percent of the total and indicates the concern with which we must view the problem of the illicit, criminal use of firearms.

Further statistics for 1961 indicate that some 71 police officers were killed in the line of duty, and of this total, 35 were killed by gunfire.

Persons under the age of 18 years, as a group, accounted for 43 percent of the more serious crimes of murder, forcible rape, robbery, aggravated assaults, burglary, larceny, and auto theft.

Further documentation of the problem resulting from the illicit use of firearms was contained in the testimony of James V. Bennett. He referred to the ever-increasing crime rate in the United States and cited the role that firearms play in this national crime picture:

> In 1960 there were 44,579 robberies of oil stations, business firms, banks, and other establishments in our cities of 25,000 population or more; this total represented a 16.6-percent increase over the previous year. In virtually all of these offenses guns were required. There were over 8,000 homicides in 1959, and nearly 19,000 recorded suicides. The Statistical Digest of the United States shows that in at least half of them guns were the agency of death.
>
> The number of arrests for carrying concealed weapons has increased shockingly from 10,378 in 1950 to 38,120 in 1960. And incidentally, three policemen are shot to death each month, on the average, by persons they are trying to arrest.

Quite naturally there are many and varied contributing causes to juvenile and young adult criminality. It would be a gross inaccuracy to say that "guns cause crime." However, it can be definitely said that a causal relationship does exist between the availability of firearms and the commission of crime by individuals.

What contribution, then, does the availability of firearms make to the overall crime picture in the United States?  In some jurisdictions, the answer is relatively little, but in others they make a substantial contribution.  Testimony before the subcommittee documents this conclusion and will be included in this report.

As our investigation progressed, it became apparent that a major source of firearms to juveniles and young adults was the mail-order common carrier route.  This process involves the ordering of the firearm by mail with delivery by common carrier.  Present Federal law prohibits the delivery of a handgun by mail except to firearms dealers.

It was further determined during the investigation that not only juveniles were availing themselves of this source of firearms, but also young adult and adult felons, narcotic addicts, mental defectives, and others of generally undesirable character.  The term 'undesirable' as used in this report refers to persons with records of misdemeanor arrests over a period of several years.

Thus, the efforts of the subcommittee were channeled into the traffic in mail-order firearms.  Our findings documenting the existence of the problem are the result of (1) subcommittee staff investigations; (2) independent investigations of the Los Angeles, Pittsburgh, New York, Chicago, and Washington, D.C., police departments; (3) public hearings held in January, March, and May 1963.

## II. THE INTERSTATE TRAFFIC IN MAIL-ORDER WEAPONS

The interstate traffic in mail-order firearms has many ramifications on the legitimate trade in firearms which ranges from the importation of these weapons from foreign sources to the eventual sale and delivery of the firearms to the purchaser.  The weapons which were classified as "mail order" are for the most part foreign-produced, inexpensive, and largely inferior to domestically manufactured firearms.  They retail in the price range of $12.95, up to approximately $30.  While it is evident that such weapons are of questionable quality, they are nevertheless extremely deadly.  In fact, they may be as dangerous to the person shooting as the person being shot at because of their poor construction or worn condition.

The design of these firearms is such that they are virtually useless for sporting, target, or hunting purposes.  Experts in the firearms field have so characterized these weapons before the subcommittee.  They are capable of killing, maiming, or injuring.  It is of relevance that the mail-order type firearms are .22-caliber revolvers, .25-caliber pistols, .38-caliber and .45-caliber revolvers.  The .22 caliber and the .25 caliber are usually new weapons, while the .38 and .45 caliber are usually surplus military firearms which have been discarded by foreign governments.

Records of importation of these weapons into the United States are incomplete.  One reason for this is that many of them have been imported into this country as scrap or parts of firearms, which many times is a device used to circumvent tariff regulations.  Research into this problem by the staff of the subcommittee working in conjunction with other Federal agencies indicates that hundreds of thousands, if not millions, of these weapons have been imported into this country during the past 5 years.  In fact, one importer alone imported over 375,000 of these firearms over a 5-year period.

The problem which this flood of weapons creates becomes great not because of the high figures of importation alone, but because of the fact that many of these guns have been diverted into the hands of juveniles, felons, and persons of undesirable and questionable character.

Much of the information in this report resulted from a series of hearings held by the subcommittee.

Public hearings were held in Washington, D.C., on January 29 and 30, March 7, and May 1 and 2, 1963, during which testimony was heard from law enforcement officials from the cities of Los Angeles, Calif.; Washington, D.C.; Pittsburgh, Pa., and New York City, regarding the interstate shipment of concealable firearms into their jurisdictions.

Witnesses include James V. Bennett, Director of the Federal Bureau of Prisons; Capt. James E. Stargel, Metropolitan Police Department; Deputy Chief John B. Layton, Metropolitan Police Department; Lt. Manuel Pena, Sgt. George Carr, Sgt. Kenneth T. Carpenter, of the Los Angeles Police Department; Deputy Police Commissioner Lawrence Pierce, New York City Police Department; Superintendent James W. Slusser, Assistant Superintendent William J. Gilmore, Pittsburgh Police Department; Robert C. Hendon, REA Express; Franklin L. Orth, executive vice president, National Rifle Association; Robert S. Carr, secretary, Ohio Gun Collectors Association; Howard Carter, Jr., and A. Robert Matt, National Shooting Sports Foundation, Inc.

Before referring to the testimony of the above, it would be well to clarify what is meant by the term "mail order" sale of firearms. In the first instance, the term "mail order" is misleading because of the fact that firearms referred to as mail order are in fact delivered to the purchaser by common carrier. Postal regulations prohibit nonlicensed dealers and manufacturers from shipping weapons by the mail service. The firearm is ordered by mail in the following manner. A prospective purchaser first clips an advertisement from a magazine and with a specified deposit he forwards both to the dealer. Upon receipt, the dealer then sends the purchaser an order blank which contains a statement attesting to the fact that he, the purchaser, is over 21 and has never been convicted of a crime of violence. This completed form is returned to the dealer. The statement is in no sense a legal document and its effectiveness is quite limited.

Upon receipt of the order blank and statement, the dealer ships the firearm by common carrier to the purchaser, who, upon receipt of the firearm, pays the c.o.d. charges. Generally it can be said that such deliveries are accomplished with no effective determination of the bona fides of the purchaser.

Substantial, credible information was given the subcommittee regarding the business operations of several mail-order firearms dealers in Los Angeles and surrounding locales by officers of the Los Angeles Police Department. It should be pointed out here that Los Angeles is a major area of dealers in mail-order firearms. Two of the dealers, as testified to by officers of the Los Angeles police, are convicted traffickers in obscene materials. Both convictions were misdemeanors in the State of California and thus did not preclude their entering the mail-order firearms business. One other dealer is a former Los Angeles Police Department officer, who was suspended from the department for prejudicial reasons.

6        INTERSTATE TRAFFIC IN MAIL ORDER FIREARMS

The operations of the dealers discussed by the Los Angeles officers included interlocking corporations set up to import these inexpensive foreign firearms. Sgt. Kenneth Carpenter of the Los Angeles Police Department told the subcommittee:

> Mail-order gun dealers obtain most of their firearms from foreign countries due to their extremely low cost. To protect our domestic market our Government has placed tariff restrictions on the importation of foreign products. However, the intent of these restrictive measures has been bypassed by foreign manufacturers. They are able to supply American dealers with imitations of popular guns and brand name war surplus weapons at prices that are ridiculously low in comparison to those paid by dealers in domestic weapons. They accomplish this by shipping thousands of disassembled guns to this country under the classification of parts and scrap metal. Once here, the parts are assembled or used to build modified copies of brand name guns. By exporting products in this manner, the foreign manufacturer is able to avoid the comparatively high import tax on assembled weapons. Instead, he pays the lower tariff assessed parts and scrap metal. As a result, our country is being flooded with cheap, inferior weapons of many sizes and calibers.
>
> The problem of concealable firearms is further complicated by the complete absence of licensing regulations governing the importation of .22 caliber revolvers and .22 caliber rim fire ammunition. Furthermore, to sell .22 caliber rimfire ammunition, it is not even necessary to obtain a Federal sales license. These unrestricted sales present a serious menace to public safety. In the commission of a crime, a .22 caliber revolver loaded with rimfire ammunition looks just as big and can be just as deadly as a gun of larger caliber.

From the files of the subcommittee we find that during the years 1958–62, four importers of mail-order firearms located in or near the city of Los Angeles, Calif., imported some 250,000 pistols and revolvers of various calibers and makes for sale primarily by the mail-order common carrier route. One dealer alone imported some 74,000 revolvers, which are sold mail order for $12.95. This particular imported firearm is called the vest pocket "Roscoe," a six-shot revolver capable of firing .22 caliber ammunition. This firearm is sold almost exclusively through mail order and has been displayed at subcommittee hearings by the police departments of Los Angeles, Pittsburgh, and Washington, D.C., as having been confiscated from persons in the commission of criminal offenses.

The ordering, sale, and delivery of the firearms under discussion was fully described by Sergeant Carpenter as he outlined in his testimony the operations of those dealers located in and near the city of Los Angeles.

It should be pointed out that the methods of operation under discussion do not apply to the legitimate mail-order houses, whose mail-order business in firearms is subject to strict control by the companies themselves. Such firms require positive proof of identification with an accompanying statement by a law enforcement officer attesting to the bona fides of the prospective purchaser.

In order to traffic in firearms, a dealer must not only be licensed under Federal law, but must also comply with State and local regulations. In Los Angeles, an applicant must apply for a permit from the police commission in the city and then a routine investigation is conducted by the police department. Once this has been satisfactorily completed, the dealer is allowed to operate his business.

In the conduct of his business, the mail-order dealer, as testified to by Sergeant Carpenter, makes use of the so-called mail drop. In referring to the mail drop used by dealer A,[1] Sergeant Carpenter testified:

> *The mail drop.*—To operate these businesses, he employed the services of two local privately owned postal mail drops, one out-of-State postal mail drop, and an advertising firm also operating a mail drop for him. The postal mail drop provided dealer A with the following advantages:
>
> *Customers are led to believe the mail drop is the dealer's established place of business. This fact was evidenced by the steady stream of individuals who entered the location of this dealer's mail drops and expressed a desire to purchase a firearm. Yet, these orders were but a fraction of his total sales, since most of his business came from out of State.
>
> *Mail drops and answering services shield the nefarious dealer from dissatisfied customers who wish to make in-person complaints.
>
> *The drop further affords the dealer use of numerous trade names and addresses. Thus, the customer, once bilked, may unknowingly respond to later magazine ads placed by a company that previously cheated him.
>
> *A dealer benefits from the well-known appeal or lure of a Hollywood address, while actually doing business from an area outside the city of Los Angeles, where enforcement of his activities is less rigid.
>
> *A dealer may operate numerous businesses trading on a national scale with practically no capital outlay. The dealer pays little or no rent since there usually is no established place of business. The customer's remittance serves as working capital.

Postal mail drops are regulated by the Post Office Department. The lessee of a mail drop is required to complete and sign a "Post Office Application for the Delivery of Mail Through Agents." Some of these postal applications signed by dealer A were also signed by an advertising firm employed by dealer A. This authorized the advertising firm to pick up mail addressed to the various companies controlled by dealer A.

The advertising firm employed by Dealer "A" not only developed and placed dealer A's ads, it actually controlled dealer A's operation by—

> *Receiving all orders.
>
> *Receiving all money enclosed with the orders from all mail drops.

---

[1] Identification of dealer A to be found in subcommittee files.

> \*Banking all money in the advertising firm's account.
> \*Forwarding orders to dealer A for filling.
> \*Paying dealer A a percentage of the receipts.
> In fact, the two operations were so completely integrated that it was difficult for either party to discontinue business relationships.

From the foregoing it can be seen that the use of a mail drop affords the mail-order firearms dealer certain advantages, which often leads to the frustration of the efforts of law enforcement and to dissatisfied customers.

In this regard, Sergeant Carpenter stated that the Los Angeles Police Department has encountered difficulties in its attempts to examine the records of a dealer in Los Angeles, who was unavailable whenever police wanted to search his records to trace a firearm used in the commission of a crime. All dealers licensed under the Federal Firearms Act are required to keep accurate records, which are to be made available upon request for inspection by investigators of the Alcohol and Tobacco Tax Division of the U.S. Internal Revenue Service. It is not required by Federal law that such records be made available to local law enforcement. However, it is certainly to the advantage of the legitimate dealer to cooperate with law enforcement in their endeavors to trace firearms used in the commission of crime. Most legitimate dealers do this.

Another instance of the failure to cooperate with law enforcement on the part of a California mail-order firearm dealer was referred to by Deputy Chief Layton of the Metropolitan Police Department, who testified that information was requested of the Retting Co., Culver City, Calif., with regard to a mail-order firearm used in a homicide in Washington, D.C. Layton testified that efforts to obtain verification of the sale of the gun were unsuccessful. Retting is one of the four mail-order dealers who was responsible for the subcommittee's investigation of the mail-order gun business.

While cases such as these are not a violation of Federal law, there is a clear lack of cooperation evidenced by the dealers referred to in the above instances, which must be considered in the overall evaluation of their operations. Such practices certainly are questionable.

The next facet of the mail-order operation described by Sergeant Carpenter concerned the ordering of the gun. This has been fully described in preceding paragraphs and need not be repeated at this point. However, in this regard Sergeant Carpenter pointed out that the certified statements previously referred to are "as worthless as the paper upon which they are written."

This is an area which the subcommittee has studied carefully and the resultant proposals to strengthen Federal law in this area will be discussed in the report.

The advertising employed by most mail order firearms dealers can best be described as lurid and directed at the immature or juvenile reader. Firearms are graphically displayed and described in what are commonly known or referred to as cheap pulp magazines. One advertisement is captioned "Reach," and describes a .38 caliber snub-nosed revolver as being designed for "quick draw" and the "ideal weapon for the plainclothes detectives". The firearm referred to is definitely not one which any duly constituted law enforcement officer would use in his official duties. Another advertisement is

captioned "The Law Man", and contains a picture of a revolver on a card table that also contains a bottle of whisky, a shot glass, a cork, and an open deck of playing cards.

In these and other cases the firearm is portrayed in such a manner as to appeal to persons who might be characterized as emotionally immature, thrill bent, or prone to criminal behavior.

Mr. Franklin Orth, executive vice president of the National Rifle Association, told the subcommittee that his organization as a matter of policy does not accept such advertising, because such firearms are useless for sport or recreation. This lends further credence to the subcommittee's contention that these weapons serve no other purpose than to kill, maim, or injure.

The nature of the mail-order firearms business is such that it affords circumvention of the laws of many States and municipalities. Five of our fifty States and the District of Columbia have incorporated into their law the provisions of the Uniform Firearms Act, which require that a purchaser of a concealable firearm must wait 48 hours before his firearm may physically be given him. During that period of time, a police investigation is conducted on the person requesting purchase of a firearm, and if such investigation is satisfactory he may then receive his firearm from the dealer. In this way, local authorities, while not requiring a permit to own a concealable firearm, do nevertheless have on file a record of all persons purchasing such weapons within their jurisdiction.

Thus, it develops that the mail-order transaction circumvents the provisions of the Uniform Firearms Act, in that there is no waiting period or police investigation of the purchaser prior to his receiving a firearm.

While circumvention of the law is thus accomplished, there is no illegal transaction because of the nature of the delivery of the firearm. This is accomplished by common carrier, and at present there is no Federal requirement that common carriers notify local authorities or that they determine the legitimacy of the purchaser. Thus the mail-order sale of firearms remains within the letter of Federal law in such jurisdictions.

Another example is the State of California, which prohibits the mail-order sale of concealable firearms within the State. Circumvention of California by the mail-order dealer was referred to by Sergeant Carpenter in his testimony:

> Circumvention of California laws. Dealer A, upon receipt of a mail order from a California resident, will enclose a form letter advising this purchaser that, "Since California State law prohibits the mail-order sale of concealable firearms, the purchase order has been forwarded to Dealer A's out-of-State mail drop for handling." What Dealer A has really done was ship the gun ordered in Los Angeles to his out-of-State mail drop, had it rewrapped and shipped back into California to the customer via railway express. In this way Dealer A is able to circumvent the California State laws governing the sale of mail-order firearms.

This practice frustrates the efforts of law enforcement to keep abreast of the traffic in concealable firearms, especially the illicit traffic.

The State of Pennsylvania is one State which has incorporated the provisions of the Uniform Firearms Act in its statutes. In testimony before the subcommittee, Superintendent James Slusser of the Pittsburgh Police Bureau stated that the police have no accurate check on mail-order handguns coming into the city of Pittsburgh.

A poignant example of a mail-order sale of a concealable firearm in circumvention of Pennsylvania law and the resultant criminal behavior is cited below.

An unemployed steelworker in Allentown, Pa., knowing that a mail-order purchase of a concealable firearm would not be registered by local authorities, ordered a mail-order revolver from a dealer in Chicago, Ill., with the specific intent to use the revolver in the robbery of a bank in Allentown. He received the revolver with ammunition and proceeded to hold up, at gunpoint, a branch of the Lehigh Valley Trust Co. in Allentown. He was apprehended a few blocks from the scene of the crime and readily admitted his guilt. This man had a previously unblemished record, but because of the fact that he was unemployed and feared loss of his unemployment compensation, he resorted to criminal behavior.

The availability of the mail-order firearm was certainly a factor in the commission of the crime. It cannot be said that if the gun were not available from a mail-order dealer with relative ease, the crime would not have been committed, for it is entirely possible that the criminal would have sought out some other source. However, it is a fact that the gun was readily available to him and he did avail himself of this source, knowing that there would be no record of his purchase with local authorities.

The important point to emphasize here is that a person bent on criminal behavior, as was this man by his own admission, may readily avail himself of this source of firearms. The mail-order house, then, was the course of least resistance to the purchase of a firearm, and thus was utilized.

To move to another area of the mail-order firearms operation, the subcommittee has received testimony attesting to the fact that mail-order dealers have been the subject of countless complaints from disgruntled customers.

Sergeant Carpenter testified in this regard before the subcommittee in his explanation of dealer A previously referred to:

> Police investigation indicates that his operation alone has been the subject of hundreds and hundreds of complaints. Disgruntled customers have appealed to postal authorities, better business bureaus, the State departments of justice, and various police bunco details throughout the United States. Complaints from customers directed to him personally are frequently ignored. He has given the same treatment to Government investigators when information was requested. When a customer is able to pressure him into refunding his money, the customer is frequently further aggravated by having payment on dealer A's check refused due to nonsufficient funds.[2]
>
> When police investigators questioned him about the multitude of complaints against his operation, he replied

---

[2] Documentary evidence to be found in the files of the subcommittee.

that many times ads were drawn up and published in advance of import shipments. Then, due to failure to import the weapons necessary to fill all the orders, a backlog developed. He also blamed the 1960 steel strike. In one case, he even told a customer the delay was due to his secretary's pregnancy.

Other claims revealed that dealer A frequently sent customers inferior merchandise different from that ordered. In some cases, merchandise was never sent. Furthermore, complaints and documented proof are on file that a considerable number of these weapons are extremely dangerous due to modifications and inferior basic design.

This example is but one of many to demonstrate the inadequacy of our existing laws to control the mail-order sale of concealable firearms.

Dealer A himself admitted that the sale of most commodities and particularly firearms through the mail-order business was immoral, unethical, and that laws should be passed to prevent this sort of activity. Agencies within Los Angeles are still receiving complaints.

The files of the subcommittee contain further documentation that certain mail-order firearms dealers have operated unscrupulously and as a result have been subjected to many complaints by customers.

A Minneapolis mother wrote the subcommittee, commending our efforts in the area of control of mail-order firearms. She indicated that her teenage son had been bilked by a California mail-order dealer and she became aware of this only when the dealer was indicted on 32 counts of mail fraud. Without her knowledge, her son had written to the dealer and ordered a firearm. She expressed the conviction that it was better to have a fraud perpetrated on her son than to have a gun delivered to him.

Another case in the files of the subcommittee concerns an 11-year-old boy, who ordered and received a pen gun from a California mail-order firearm dealer. The boy subsequently wrote to the dealer in the immature handwriting of a fifth grader, indicating that he had tried to fire a .22-caliber shell from the pen gun, but that it misfired and shattered one end of the gun. The boy said he wanted his money refunded or a new gun, but this request was not honored by the dealer.

These instances are only a few of the many which support the contention that the dealers in question are unethical in their operations.

III. THE RESULTS OF THE MAIL-ORDER TRAFFIC IN LOS ANGELES, NEW YORK CITY, PITTSBURGH, AND WASHINGTON, D.C.

What are the results of the virtually unrestricted flow of mail-order firearms throughout our several States and the District of Columbia? We have pointed out that mail-order concealable firearms are not the type which are commonly used in sport and recreation. These firearms would not appeal to hunters or target shooters, or pistol and revolver clubs and associations. However, it has been determined that legitimate, law-abiding citizens have ordered and received mail-order firearms, e.g., for protection of the home. These persons are not included in our analysis of the mail-order traffic in firearms. Our investigation confined itself to this traffic only as it

relates to criminal behavior. In this respect the records show that persons armed with these mail-order firearms have substantially contributed to the overall crime rate in large metropolitan areas.

Testimony from law enforcement officers from the cities of Los Angeles, New York City, Pittsburgh, and Washington, D.C., will be included in this section of the report. Also included is the subcommittee staff investigation of mail-order firearms recipients in Washington and other metropolitan areas.

From the city of Los Angeles, Lt. Manuel Pena submitted several case histories for the record, depicting the tragic results of the use of mail-order firearms. Because these firearms are readily available to juveniles and adults alike, they are often used in the commission of crime.

Lieutenant Pena described one such case before the subcommittee:

> Another case pinpointing mail-order guns to crimes of violence involves bank robberies, grand theft auto, and the shooting of a Los Angeles police officer. Two ex-convicts, Fred Miller, alias "Doc," and a second suspect still at large known as "Little Doc," perpetrated bank robberies in Seattle, Wash., and Los Angeles, Ontario, and Cotati, Calif. While in Los Angeles they also shot a Los Angeles police officer who stopped them for interrogation. Subsequent investigation disclosed these suspects and their associates had long felony records. The guns used in the perpetration of these crimes were obtained through a mail-order gun business, Weapons, Inc., operated in Culver City, Calif., by Martin Retting. Fred Miller had ordered these guns under the name of "Alfred C. Grote".
>
> On September 15, 1959, Weapons, Inc., received the handwritten order requesting two .45-caliber Webley pistols as advertised in Police Cases magazine. This order was signed "Alfred C. Grote, 1562 Glendale Road, Sparks, Nev". A postscript was added stating that "Alfred Grote" had never been convicted of a felony and was not now under indictment. A post office money order for $32 was enclosed.
>
> A form letter was sent to "Alfred C. Grote" by Weapons, Inc., requesting his signature on a form which was worded almost verbatim with the postscript on Grote's letter. This form letter was returned from Sparks, Nev., and the shipment was sent on October 5, 1959. The guns shipped to Grote were two .45-caliber Webley and Scott revolvers, serial Nos. 258051 and 219883.

In referring to the above case and others, Lieutenant Pena stated that they depict but a few of the problems that law enforcement faces with regard to the illicit traffic in firearms, including the mail-order variety. He further indicated that a lack of complete statistics prohibits an accurate analysis of the problem, but that the problem of mail-order gun sales is "critical and should be studied very carefully".

Pena also described the tragic results of the sale of a mail-order gun to a 10-year-year boy:

> A 10-year-old boy from a medium-class, respectable family in a good neighborhood bought a mail-order gun out of his allowance. He paid 50 cents down. He and his chum took

> it to an alley behind his home to play with it. The weapon discharged and shattered the youth's arm. The result—one shattered arm, a long period of expensive hospitalization, distraught parents, and a stack of medical bills.

Pena went on to describe another case in Los Angeles:

> A young married couple left their three children at home doing schoolwork and daily chores while they went to the neighborhood store for groceries. During their absence, a friend of their 14-year-old boy stopped by to see him. When their son opened the door, he found his friend playfully pointing a gun at him. His friend said, "Don't be afraid, it isn't loaded." The gun discharged and killed the boy. This was a mail-order-type gun.

Incidents such as these are not isolated or peculiar to Los Angeles, for death and injury from mail-order firearms have been documented by witnesses appearing before the subcommittee from Pittsburgh, Washington, D.C., and New York City in addition to reports from other police departments and newspapers.

Included in Lieutenant Pena's testimony were references to the starter, or blank revolvers and pistols. These pistols are commonly used at track meets, but such weapons are convertible to lethal firearms, especially the .22 caliber revolver type of starter pistol. These starter pistols and revolvers are commonly sold by mail order and pose problems of grave concern to law enforcement officials. Lieutenant Pena commented on the seriousness of the problem:

> Los Angeles police files are full of cases pointing out that ex-convicts and other stickup artists use imported starter pistols in the perpetration of crimes of robbery and assaults. These are not considered deadly weapons, but only toy pistols. The criminal element prefers this type of weapon because "we can beat the gas chamber even if we have to fire at somebody."
>
> In youth gang activities, juveniles have learned to insert chewing gum into the gas port of a blank starter pistol. They place a phonograph needle or a small sliver of steel inside the gun. The pressure exerted upon the needle by the firing of the blank shell will drive the needle through the hardest of heads. A copper BB pellet has the same effect. The force can drive it through a telephone directory.
>
> These cases are but a few of the crime and injury reports from the Los Angeles police files. Many others are included for your inspection if you so desire.

These starter pistols are advertised in pulp magazines for as little as $6.95 and are very appealing to youngsters as well as adults. Los Angeles is not the only city which has been plagued by converted starter pistols. From New York City, Deputy Commissioner Lawrence Pierce of the New York City Police Department testified that this is becoming an ever-increasing problem in his city.

Strict firearms laws in New York restrict the possession of concealable handguns in the city; however, the converted starter pistols do pose a very real and serious problem. This is especially true as regards juveniles and juvenile gangs in the city.

Commissioner Pierce's testimony is particularly enlightening in this regard and is as follows:

Another area of considerable concern to our department is the matter of starter [blank cartridge] pistols imported into this country from Europe. These are of concern to us because of their extremely low price and the relative ease with which they can be converted into working firearms.

One example of the abuses possible under existing legislation was unearthed by our department when we discovered that one type of starter pistol with plugged barrel was being imported into our State, followed by a second, separate shipment of bored, rifled barrels, threaded at one end. By removing a pin, unscrewing the plugged barrel and replacing it with a bored, rifled barrel and then replacing the pin, the starter pistol was converted into a working, lethal firearm, capable of firing a .22-caliber bullet. This entire conversion took but minutes.

It is our information that these starter pistols are subject to a 12-percent import duty, since they are not considered firearms, while the duty on firearms is 52 percent, which makes it possible for these pistols to be sold for as little as $6.95 retail.

Some years ago we found them used in many serious crimes, ranging from homicide and robbery to gang warfare. As a result, investigation by our department disclosed that locally licensed firearms dealers and gunsmiths in New York City had imported about 40,000 such starter pistols and converted them into firearms, selling them to jobbers and dealers outside the city.

Administrative action by our department against the dealers and gunsmiths involved has effectively, we think, stopped this practice by our licensees in New York City. However, trade sources tell us that this particular pistol is still being imported into this country and that it is a real "hot" item in other parts of the country.

Last year in Brooklyn a 14-year-old girl was accidentally shot by her 17-year-old brother who was playing with a gun in their home. The weapon used was a converted starter pistol, and gentlemen, if any of you are thinking in terms of the starter pistol which the starters at track meets use, and can carry in their vest pockets, let me show you the type of pistol to which I am referring. This is today's starter pistol, which is menacing enough without conversion.

Our investigation of this shooting led us to the source of the firearm used, and we learned of still another method of conversion. We learned that a do-it-yourself gunsmith was making out-of-State bulk purchases of starter pistols at a cost of $5.80 each; he would then, at his residence, disassemble them, and using an electric hand drill mounted in a drill press stand, bore out the plugged barrel and enlarge the cylinder chambers to accommodate .22-caliber cartridges. Reassembled, and with a holster and a box of fifty .22-caliber cartridges, the now lethal firearm was sold to a confederate for $15, the confederate in turn sold this kit on street corners

to members of youth gangs for $20. From the records we seized in connection with this case, we estimate that the conspirators disposed of approximately 100 such firearms.

We have mentioned these cases because we feel that they vividly emphasize the need for Federal action to restrict the ease with which such potential firearms can be imported into this country at nominal cost.

Ten years ago the zipgun was the principal bullet-firing weapon in the arsenal of juveniles and youths. It was a "firearm" peculiar to these groups, and some of them were quite ingenious. But that has all changed now. With the mass importation of these starter pistols, the zipgun is fast losing its popularity. Why spend time to contrive what is at best a crude firearm, when for a few dollars, a more reliable, working firearm can be bought.

In 1962 our ballistics squad examined 271 seized zipguns; in the same year it examined 483 seized starter pistols, 382 or 79 percent of which had been converted to fire live ammunition.

The dangers of the readily available, easily convertible starter pistols are apparent. Concerning the overall problem of the illicit use of firearms in New York City, Commissioner Pierce offered quite startling statistics, especially on juveniles and youths under the age of 21 years. In so doing he specifically mentions the mail-order outlet as a major source of illicit firearms in New York City.

The commissioner said:

In the year 1962, the property clerk of the department received, either as evidence seized in the commission of a crime or in surrender, 4,979 pistols and revolvers; in the year 1961, 4,842 pistols and revolvers were received by him. While some of these firearms had been legally possessed (pistol licensees, retiring police officers, etc.) and were surrendered by their owners because they had no further use for them, the harsh reality is that the greater part of them were illegally possessed. What is of concern to us is that most of these illegal weapons came from out of State, either by direct over-the-counter purchase or mail-order sales.

The same sections of law also prohibit the possession of other dangerous weapons such as blackjacks, slungshots, billets, sandclubs, sandbags, metal knuckles, bludgeons, and prohibit the possession with intent to use the same unlawfully against another, of such articles as daggers, dirks, dangerous knives, razors, stilettos, and imitation pistols.

In the general category of arrests for dangerous weapons, firearms, or any of those just enumerated, as a felony, in 1962 members of the department made 1,065 arrests—an increase of 182 or 20.6 percent over arrests for the same offense in 1961. Arrests for the possession of dangerous weapons as a misdemeanor were 1,669 in 1962—an increase of 152 or 10 percent over arrests for the same offense in 1961.

Attached to this statement as exhibit 1 is a chart showing the breakdown by age grouping of persons arrested in New York City for this specific offense, of possession of dangerous

weapons.   Most startling is the fact that of the 1,065 felony arrests in 1962, 46.3 percent of those arrested were under 21 years of age; of the 1,669 misdemeanor arrests in 1962, 61 percent of those arrested were under 21 years of age.   For the year 1961, the corresponding percentages were 44.2 and 52.2 percent.   These are indeed alarming figures.

The youth division of the department, as its name implies, concerns itself primarily with the activities of juveniles and youths and youth crime.   We have made a statistical analysis of our files for the years 1960 through 1962, concentrating on arrests for the four crimes—dangerous weapons, felonious assault, robbery, and homicide—where the possession of a weapon is most usually an element of the crime or used in its perpetration.

Of 3,955 arrests of persons under 21 years of age for these 4 crimes during this period, firearms of all descriptions, but particularly handguns, were used in approximately 2,800 instances, or in 70 percent of these crimes.

During this same period one out of every four victims in a youth gang homicide was killed by a handgun.

Such figures speak for themselves and need no elaboration.   It is the opinion of the New York City Police Department that mail-order firearms have significantly contributed to the overall problems of crime in that city.

The figures of arrests of persons under the age of 21 are appalling, and especially those relating to the criminal use of firearms.   It is evident that the authority of the Federal Government must be brought to bear upon this interstate traffic which is circumventing the laws of the city of New York.

Another city which has been plagued by the influx of mail-order firearms is Pittsburgh, Pa.   The problem has been one of increasing seriousness since first uncovered in 1958.   It has been of such concern to the Pittsburgh Bureau of Police that in 1962 efforts were made to amend the Uniform Firearms Act of the Commonwealth of Pennsylvania to require that all mail-order handgun deliveries be sent to a local licensed firearms dealer before being delivered to the purchaser.

The efforts of the Pittsburgh Police were in vain.   The proposed legislation was not enacted, primarily because of the protests of citizens who felt that their rights would be infringed upon if the bill were passed.

Supt. James Slusser testified before the subcommittee and indicated that an unofficial source had been developed by the police department to inform them of mail-order handgun deliveries coming into the city.   However, Slusser stated that he does not believe the figures he provided the subcommittee were inclusive.   The Pittsburgh police have no accurate count of the number of mail-order firearms coming into the city.

Slusser provided the subcommittee with statistics from the Crime Laboratory of the city of Pittsburgh and the county of Allegheny concerning handguns processed through the laboratory as the result of being used in the commission of crimes.

The figures supplied by Superintendent Slusser document his contention that the use of mail-order handguns in the commission of criminal acts is increasing significantly in that city.

Another witness from Pittsburgh testifying to the need for controls over the interstate shipment and delivery of mail-order firearms was Asst. Supt. William J. Gilmore, of the Pittsburgh Bureau of Police.

Gilmore cited specific examples of the results of the virtually uncontrolled traffic in mail-order firearms into the city of Pittsburgh. In citing these cases and exhibiting the firearms, Gilmore referred to eight typical cases:

*Case 1.*—In May of 1960, a young male, age 16, purchased a .22-caliber revolver from the Seaport Traders Co., Los Angeles, Calif. A short time after receipt he attempted to steal an automobile and when approached by the owner of the vehicle, this youth flashed the .22-caliber weapon and pointed it at the car owner. When he was later apprehended, he stated that he had tossed the gun away. As a result, I cannot make that particular gun an exhibit. A short time afterward the mother of this boy called the bureau of police and stated that her son had still another gun delivered to his home. Date of this shipment was March 21, 1960. Gun was a .22-caliber derringer pistol which cost $19.75, and was purchased from Winfield Arms Corp., 1006 South Olive Street, Los Angeles, Calif. Here is that gun which is exhibited at this time. (Exhibit 1—.22-caliber derringer pistol.)

Prior to his original offense involving a gun, this boy had been brought before juvenile court authorities on three separate occasions. As recent as last week (he now having attained the age of 18) he was held for court on the charge of larceny of an automobile.

*Case 2.*—In 1962, a young male, age 16, shot a playmate with an out-of-State gun. During the investigation he stated that he bought this .22-caliber gun from the Seaport Traders Co. at a cost of $12.95, and had it shipped to a friend of the family who was 47 years of age. He informed the latter that the package contained the surprise gift of a fishing tackle which would be presented to his father. When the adult received the package he did not open it and turned it over intact to the juvenile. When the courts decided this boy was to be remanded to a detention home for shooting of his companion, he secured .22-caliber ammunition, went to an upstairs room of his home, and loading his father's rifle, he committed suicide.

This out-of-State weapon which started the entire chain of events cannot be exhibited because the defendant, prior to his demise, testified that he had tossed the gun into the Allegheny River in Pittsburgh after initial usage.

*Case 3.*—In January of 1963, a young man, age 20, student of one of our local colleges, upon seeing an advertisement in the magazine Sports Afield forwarded $12 to the Seaport Traders Co., Los Angeles, and in return received a six-shot, .22-caliber revolver and holster. Trademark: Roscoe Vest Pocket, Madison Import Co. Upon receipt, he loaded it with a .22-long-caliber shell. Finding removal difficult, he attempted to expel the cartridge by striking it with a hatchet which resulted in his being wounded in the right cheekbone.

I shall at this time exhibit the gun in question. (Exhibit 2—.22-caliber revolver.)

*Case 4.*—In 1959 a man, age 30, shot and killed another male during an argument. He was later arraigned for second-degree murder, convicted and sentenced from 3½ to 10 years in jail. During the course of investigation, the defendant advised that he had forwarded $28 to the Kent Sporting Goods Co., Los Angeles, Calif., and in return received a .25 automatic Regarmi gun. Federal Bureau of Investigation criminal record of this defendant reveals that in 1949 he was arrested for robbery, larceny of an automobile, and sentenced from 15 to 30 months in the county workhouse. In 1951, he was arrested for assault and battery, ravish with intent to rape, and at that time received a sentence of from 1 to 3 years in jail. In 1959 he was arrested for felonious assault and battery. No disposition listed for this charge. As previously stated, he was arrested on June 13, 1959, in Pittsburgh on a charge of murder. I shall exhibit the gun in question. (Exhibit 3.—.25 automatic Regarmi gun.)

*Case 5.*—This case involves the charge of murder occurring in 1962. Defendant was found guilty of second-degree murder and sentenced from 4 to 15 years. He vouchsafed that in January of 1961 he had sent to a mail-order house in California the sum of $26.95 and received a gun. He was unable to remember the name of the company or make of the weapon. Gun in this case was never recovered. Pennsylvania State Police criminal records show that in 1957 defendant was arrested for felonious assault and battery but was discharged. Arrested in 1959 for the charge of rape; no disposition listed. Arrested in 1960 for violating city ordinance for surety of the peace; fined $50 or 30 days in jail. On January 14, 1962, he was arrested in our city on the charge of murder. This out-of-State gun cannot be exhibited because it was never recovered.

*Case 6.*—This case involves the charge of murder occurring in 1961. Defendant was found guilty and sentenced to life imprisonment for one of the charges of murder. The accused tried to enter a tavern which had been closed and when refused entrance started an argument in front of the tavern. He shot three of the persons standing in front of the tavern, two died and one recovered. The mail-order house type of gun used was a British Enfield .38-caliber revolver, which, at this time, I shall exhibit. (Exhibit 4.—British Enfield .38-caliber revolver.)

*Case 7.*—This exhibit is a mail-order house-type gun, Webley Mark II .45-caliber revolver, turned into the Pittsburgh and Allegheny County Crime Laboratory and used in the crime of armed robbery. (Exhibit 5.—Webley Mark II. 45-caliber revolver.)

*Case 8.*—This exhibit, RG 10 .22-caliber revolver, is also another type of mail-order house gun used in the offense of V.U.F.A., which was also submitted to the Pittsburgh and Allegheny County Crime Laboratory. (Exhibit 6.—RG 10 .22-caliber revolver.)

These cases depict criminal acts and accidental shootings with mail-order firearms. These are facts which specifically pinpoint the problems resulting from the illicit use of these weapons as well as the hazards encountered by those who are untrained in the use of firearms.

Gilmore told the subcommittee that stopgap preventive measures employed by the Pittsburgh Bureau of Police have resulted in the confiscation of mail-order concealable firearms from persons with past criminal records, who ordered and received their firearms without prior determination on the part of anyone concerning their age or criminal background.

Because the Pittsburgh police were unofficially made aware of mail-order deliveries into the city, they were able to prevent the use of these weapons in the commission of crime by their purchasers, many of whom have records with the Pittsburgh police. In pointing out these cases Gilmore said:

> At this time I would like to call your close attention that out-of-State guns are being shipped from mail-order houses to people with criminal records. When we contacted the latter, they voluntarily relinquished their guns. This is an RG 10 .22-caliber revolver. The other is a British Webley .38-caliber revolver with a 2-inch barrel. In this and other specific instances, had we been aware prior to delivery of these guns that the individual in question was contemplating purchase, we could have advised the dealer of his past criminal record and delivery could have been forestalled.
>
> It is apparent that the cases which I cite here today definitely pinpoint that guns are being shipped with no investigation regarding the age of would-be purchasers or whether they have a previous record of wrongdoing. There are, no doubt, other serious crimes in our city which have not been solved by the police and which might also involve sale and shipment of out-of-State guns into the city of Pittsburgh.

Another area of concern to the subcommittee relating to the traffic in firearms is the ease with which anyone may purchase a Federal Firearms Act dealers license. The fee for such a license is $1 and it has been reliably estimated by the National Shooting Sports Foundation that three-fourths of the some 60,000 federally licensed dealers are in fact not bona fide dealers in firearms.

A case in point in this regard was cited by Mr. Gilmore:

> I will comment briefly on issuance of the $1 Federal license to so-termed gun dealers. We had a case where a man, age 23, on December 15, 1960, who while fooling around with a gun in a gasoline service station shot and wounded another man. In our investigation we uncovered a small arsenal of various types of weapons including machineguns and a large quantity of ammunition. The machineguns were all in good working order. There was an ample supply of ammunition for these guns in his possession. This fellow for a meager $1 was issued a Federal license giving him the privilege to traffic in guns. He had no place of business. His entire dealing took place in his residence. The machineguns were turned over to the Federal Alcoholic Tax Unit for prosecution. On

March 28, 1962, he was adjudged guilty and fined $50 and cost of prosecution. On a local charge he was found guilty and is serving probation for 1 year. The large amount of confiscated ammunition was channeled into the U.S. Army's possession. It would appear from this investigation that insufficient attention is paid to applications for Federal firearms licenses. In view of the careless manner in which these particular firearms and ammunition were handled by this individual, I dislike to consider what could happen in the city of Pittsburgh and to other police officers if these guns fell into the hands of criminals who were at bay from police action and pursuit. My own opinion is that the amount or fee of the license is an unimportant factor. Prime consideration is that some clause be incorporated into the Federal statute that a fitting type of investigation be conducted prior to a license being issued. I am certain that if an intelligent investigation was made in the last described case, where the absence of an address for business dealings was noted, this applicant would have been refused.

Representatives of the Metropolitan Police Department in Washington, D.C., were called to testify before the subcommittee on March 7, 1963, with regard to the traffic and problems resulting from the illicit use of concealable weapons.

Deputy Chief John Layton represented Chief Robert Murray at the hearings. Accompanying Chief Layton were Inspector John Sullivan and Capt. James E. Stargel, the commanding officer of Washington's second precinct.

It was in the city of Washington, D.C., that a major phase of the subcommittee inquiry was undertaken and the results of that investigation are included herein.

To properly evaluate the significance of the testimony of the Washington, D.C., Police officials, especially the testimony relating to the second precinct, it is advisable to first describe the subcommittee's staff investigation.

Because of the fact that the District of Columbia is primarily the responsibility of the Federal Government, the subcommittee constantly keeps abreast of the juvenile delinquency problems in the city with the intent of recommending remedial Federal legislation where necessary.

The District of Columbia phase of the overall subcommittee inquiry into the traffic in pistols and revolvers concerned the investigation of the recipients of mail-order firearms by staff investigators. This investigation took place on the streets and in the homes of the recipients of mail-order guns.

The purpose of the investigation was to determine the age, stability, character, and background of the recipients. We were further interested in the areas of the city where the incidences of mail-order gun deliveries were high. Finally we attempted to determine the relationship between the incidence of mail-order gun deliveries and the high crime areas of the city.

Secondary reasons for the investigation include the determination of specific mail-order outlets, reasons why people ordered these weapons by mail rather than purchasing them in their own jurisdiction and finally, a qualitative analysis of these weapons.

The results of this phase of the inquiry were quite startling and alarming.

Our initial step was to subpena the firearm delivery receipts from the REA Express. This agency is the prime common carrier of mail-order guns. The total number of recipients investigated could very well be substantially less than the total number of deliveries, because of the nature of the recordkeeping system at the REA Express. However, it is felt that the persons investigated are a representative sampling of the total.

In all, some 200 recipients were checked out by staff investigators. The results of the investigation indicate that some 25 percent of the total have records of arrest with the Metropolitan Police Department.

The names of the consignees were checked through the Metropolitan Police files subsequent to contact or attempted contact with the consignee by staff investigators. Thus the records check results are accurate, we believe, because positive identifying information was obtained from each recipient or from a relative, friend or neighbor.

The records of arrest of these persons range in seriousness from misdemeanors to felonies including aggravated assaults, assaults on police officers, narcotic violations, assaults with dangerous weapons, and in one case, homicide.

The investigation revealed that many of the recipients lived in the so-called slum, or low-income areas of the city. Many of the consignees who investigators attempted to contact were transient types, having moved, leaving no forwarding address. This made positive identification difficult. However, in all cases this was accomplished by interviews with neighborhood residents who knew the consignee.

Another difficulty concerned the use of a mail drop or an address of a relative or a friend by the consignee. In this sense, a mail drop is an address other than the home of the consignee. However, here again these difficulties were resolved and the consignee was located and interviewed, except where he was a member of the armed services and stationed in other areas of the country. In those cases relatives or friends provided the investigators with the necessary identifying information. The use of a mail drop or an address of a relative or friend was a means employed by those juveniles and minors checked by the subcommittee. In these cases, investigators were informed that the juvenile or minor did not want his parents to know of his purchase.

In the light of the above information it should be pointed out that those consignees who had been convicted of a felony offense and those persons who were under the age of 21 years would not be allowed to purchase a handgun in the District of Columbia.

In view of this, our staff investigation is important in further documenting the fact that mail-order firearms do appeal to the juvenile, minor and other adults with criminal records, primarily because of the anonymity of the method of purchase and delivery.

In the determination of areas of the city where the incidence of mail-order gun deliveries is high, the subcommittee staff investigators found that in five police precincts of the city, the incidence of delivery was higher than in the remaining nine precincts. Those precincts were Nos. 9, 2, 13, 10, and 5. These five precincts had the highest crime rates in the city at the time of the subcommittee investigation.

In view of these facts, the Metropolitan Police Department was requested to forward to the subcommittee statistics for the year 1962 concerning handguns confiscated in those precincts. It was further requested that a breakdown of confiscated guns be made to include the commonly encountered mail-order guns and others of domestic manufacture, which are not normally of the mail-order variety.

The Metropolitan Police Department forwarded statistical information to the subcommittee, which was compiled as follows:

*Analysis of weapons confiscated in 5 high-crime precincts of the District of Columbia*

[Breakdown indicates percentages of mail-order-type weapons confiscated]

Precinct 2; total, 152:
    (a) Mail-order type: 33 _____ 21.7
    (b) Foreign and off brand: 58 (available by mail order) _____ 38.1
    (c) Standard make: 61 _____ ____

    (d)      Total (a) and (b): 91 _____ 59.8

Precinct 5; total, 45:
    (a) Mail-order type: 8 _____ 17.7
    (b) Foreign and off brand: 16 (available by mail order) _____ 35.5
    (c) Standard make: 21 _____ ____

    (d)      Total (a) and (b): 24 _____ 53.2
Precinct 9; total, 90: (a) Mail-order type: 18 _____ 20.0
Precinct 10; total, 53: (a) Mail-order type: 26 _____ 49.0

Precinct 13; total, 36:
    (a) Mail-order type: 7 _____ 19.2
    (b) Foreign and off brand: 8 (available by mail order) _____ 22.2
    (c) Standard make: 21 _____ ____

    (d)      Total (a) and (b): 15 _____ 41.4

A word of explanation is necessary at this point in clarifying the descriptive phrases used in the identification of these firearms. The term "mail-order type" is used, because of the fact that positive identification of the source of firearms is not accomplished in all cases by the police.

The term "foreign" or "off brand" is included in that for the most part these weapons are sold by mail-order outlets. However, some of them are purchaseable in neighboring jurisdictions. Standard-make weapons are domestically manufactured and are not commonly sold mail order. Models of these standard-make revolvers and pistols are available mail order, as the result of being imported into this country from foreign governments, which have discarded them as obsolete. These factors further complicate the precise defining of a mail-order gun.

It is evident from the information supplied by the District police that the mail-order-type gun and the off brand, foreign-manufactured-type gun contribute substantially to the total number of firearms confiscated by police in these five precincts.

Further staff investigation of the mail-order concealable firearms problem in the District of Columbia was conducted with the cooperation of Capt. James E. Stargel of the second precinct. Captain Stargel presented the results of our efforts at the subcommittee's March hearing:

During 1962, 707 assaults with weapons were reported. In connection with these assaults, 570 arrests were made. Incidental to these arrests, 51 handguns were recovered.

The total number of handguns coming into the possession of the second precinct is indicated above.

Stargel then cited six cases, each of which concerned the confiscation of a mail-order-type gun as the result of a criminal act. The cases testified to by Captain Stargel were selected by the subcommittee staff as representative of some 33 such confiscations in the precinct in 1962. The cases are as follows:

C–93345  Rohm  CCR 237–905  2–62–6908

About 2 a.m., July 12, 1962, this gun was seized during a search of premises 1255 6½ Street NW., on a U.S. commissioner's warrant for A–B–C violation. Cefus Harris, Negro, male, 52 years, of above address was arrested by Pvt. T. C. Carr of the second precinct and charged with keeping and selling whisky without a license. Fined $100 in court. Gun held as suspected proceeds of crime.

C–95848  Roscoe 22  CCR 253–536  2–62–7956

James Jackson, Negro, male, 29 years, of 205 Bates Street NW., reports that about 8:45 a.m., September 9, 1962, during an altercation in the street front of the above address he was shot in the stomach with a gun held in the hands of Alvin Polk, Negro, male, 25 years, of 217 Bates Street NW. Jackson was removed to Washington Hospital Center in ambulance 87–A and treated by Dr. Gould of staff for the above gunshot wound; condition undetermined and admitted. Case closed with the arrest of Alvin Polk charged with assault with a deadly weapon by Pvt. J. Davis of the second precinct. The case was reduced to carrying a dangerous weapon in court and Polk received 1 year's probation.

C–96223  Roscoe 22  CCR 249–337  2–62–7474

Pvt. Charles K. Marlak of the second precinct reports that about 4 a.m., August 25, 1962, while walking his beat he observed a Negro male cursing and fighting in the front yard of premises 213 L Street NW. A witness shouted, "He has a gun," at which time the defendant, Earl Price, 45 years, of 1136 New Jersey Avenue NW., pointed a revolver at the above officer who had also drawn his service revolver. During an ensuing struggle, the officer's revolver was discharged, the bullet burying itself in a wall. Price was treated at the District of Columbia General Hospital for laceration of left cheek (not serious) and returned to the second precinct. Earl Price was charged with assault with a deadly weapon and carrying a dangerous weapon. The assault with a deadly weapon was nolled in court and Price received 30 days on the carrying a dangerous weapon.

C–97188  Roscoe 22  CCR 251–562  2–62–7737

Warren Robinson, Negro, male, 30 years, of 42 Bates Street NW., reports that about 10:15 p.m., September 1, 1962, while in the street at North Capitol Street and Florida Avenue, he was shot in the left foot with a gun held in the

hands of Aaron Slade, Negro, male, 24 years, of 1738 Lincoln Road NE. Robinson was transported to the Washington Hospital Center in ambulance 81–A and treated by Dr. Nunos of staff for gunshot wound to left foot (not serious) and released. Same time and place, Otis Moore, Jr., Negro, male, 31 years, of 12 R Street NW., reports a shot was fired at him by Aaron Slade; shot not taking effect. Aaron Slade was charged with two counts of carrying a dangerous weapon by Pvts. P. S. Monaco and R. L. Graham of the second precinct. Slade was found guilty as charged on January 31, 1963, and sentence is pending awaiting probation report.

C–98614    Rohm 22    CCR 274–493    2–62–10789

Judson Boyd, Negro, male, 30 years, of 1219 Jackson Street NE., reports that about 10 p.m., November 24, 1962, during an altercation on the corner of Fifth and Rhode Island Avenue NW., he was shot in the abdomen with a gun held in the hands of James Boyd, Negro, male, 27 years, of 43 Warner Street NW., Boyd was transported to Washington Hospital Center in ambulance 85–A and treated by Dr. Frandel of staff for the above gunshot wound and transferred to District of Columbia General Hospital and admitted in critical condition. James Boyd was charged with assault with a deadly weapon and the case was dismissed in court.

C–95466    Rohm 22    CCR 251–194    2–62–7670

Doris Williams, Negro, female, 23 years, of 913 M Street NW., apartment 11, reports that about 7:15 p.m., August 31, 1962, during an argument with her husband, Paul Williams, Negro, male, 43 years, of same address, in an alley alongside of 915 M Street NW., Paul Williams drew a gun and stated he was going to shoot her. When Paul Williams was arrested at 111 M Street NW., he had in his possession a .22-caliber Rohm revolver, serial No. 505434. Paul Williams was charged with assault with a deadly weapon and carrying a dangerous weapon. The assault with a deadly weapon was nolled in court and no papers were issued on the carrying a dangerous weapon.

In addition to the above information, Stargel included in his testimony the results of an investigation of mail-order gun consignees in his precinct. The names were supplied him by the staff of the subcommittee, after developing information that a substantial number of consignees had criminal records in different parts of the city.

Officers under Stargel's command attempted to contact 48 such consignees and at the time of the hearing 27 successful contacts had been made. In his summary of this inquiry, Stargel testified:

> Twenty-seven of these purchasers have been located or accounted for. Nine of these, because of their records, would not have been permitted to purchase or possess a gun. Four of these weapons have been turned over to the police.

Once again, the appeal of the mail-order gun to the felon is apparent from Captain Stargel's testimony. The overall problem of the illicit use of concealable firearms in the District of Columbia was referred to by Deputy Chief Layton, who said:

> With reference to the relationship of the availability of concealed weapons to the overall crime picture, we find that of 93 murders committed in the District of Columbia during 1962, 26 involved the use of pistols.

In examining the Metropolitan Police Department's annual report for fiscal year 1962, the subcommittee staff notes that some 15 different types of weapons were used in the commission of homicide. Of this total, the use of a pistol accounts for the highest single method of commission of homicide. Chief Layton went on to testify:

> During fiscal year 1962, of a total of 2,079 robbery cases reported in the District of Columbia, 276 or 13 percent involved the use of a pistol.
>
> For the same period, 2,985 cases of assault with a dangerous weapon were reported in which 393 pistols were used or, again 13 percent.

Once again, examination of the annual report by the staff indicated that there are 38 categories of weapons used in the commission of this type of crime. Here the highest incidence of use was the knife with pistols falling to second place.

Chief Layton went on to cite examples, by case description of sources of illicit concealable firearms in Washington, D.C.

With reference to mail-order outlets, he testified:

> Inquiry of officials and search of files reveals two cases where there was the possibility of mail-order purchase of weapons as follows:
>
> January 7, 1959:
>
> Defendant: Turner, Emory A. M. N 43
> Decedent: Brown, Jesse E. M. N 67
>
> About 6:30 p.m., Friday, January 7, 1959, decedent responded to the ringing of the front doorbell at 51 Tuckerman Street NW., opened the front door and was shot and killed by an unknown assailant. Ballistic examination of the fatal slug disclosed that it had been fired from a Webley-Scott revolver, a .38 caliber, a foreign import. A relative of the deceased relative's estate was suspected in this case. But it was not until a year later that sufficient evidence was developed to arrest him. It was then learned that the killer obtained the gun, using a fictitious name, by express from a dealer in California. A cheap magazine with a pencil checkmark of an advertisement for this gun was found in the home. Efforts to obtain verification from the dealer, the Retting Co., Culver City, Calif., were unsuccessful.

　　　*　　　　*　　　　*　　　　*

> From January 22, 1961, through May 22, 1961, arrests were made of 14 individuals who had been organized under the name of the LeDroit Ramblers, Inc. This gang had prowled the streets for months committing robbery by violent means. Their apprehension resulted in clearance of 15 holdups, 30 yoke robberies, 8 pocketbook snatchings, and 5 miscellaneous attempted robberies. The "officers" of the club, eight in number, all had carried firearms; however, only one pistol, a .38-caliber Cuskaro, a Spanish-make revolver, was recovered.

> A newspaper or magazine clipping of an advertisement for a German-make .22-caliber automatic, purchasable for $6.95 from Best Values, Dept. K581, 403 Market, Newark, N.J., was found at the gang's hangout.

With reference to the problems of mail-order concealable firearms in the District of Columbia at the present time, Deputy Chief Layton testified that in April of 1962, an arrangement was worked out by the REA Express whereby all mail-order gun deliveries are held in abeyance until the Metropolitan Police have been notified and an appropriate investigation of the consignee has been completed. This was accomplished to conform to the Uniform Firearms Act provisions of the statutes of the District of Columbia.

Another tragedy in the Washington area from the indiscriminate sale of a mail-order handgun to a juvenile is found in the report of a subcommittee investigator:

> In November of 1961, a 16-year-old boy accidentally shot and killed his 14-year-old playmate while examining a recently purchased mail-order .38-caliber revolver. This incident occurred in a suburb of Washington and a subcommittee staff investigator interviewed the youngster concerning the purchase of the revolver.
>
> The boy indicated that he had seen the advertisement for the gun in a magazine and decided to send for it. He indicated that he was over 21 years of age when he ordered it, and the dealer forwarded the gun to him via REA Express. The boy indicated that he showed no other identification upon receipt of the gun than the REA Express delivery notice which had been left at his home. His parents knew nothing of the purchase until the accidental shooting, which happened at the decedent's home. A police investigation revealed no evidence of foul play, but a young boy's life was taken needlessly. Had the proper safeguards been in force insuring the legitimacy and maturity of the purchaser, it is quite evident that the dead boy would be alive today.

To determine the legitimacy of all mail-order consignees on a nationwide basis, as was done in the District of Columbia, would involve extensive time and effort. In view of this, a random sampling of mail-order purchases throughout the United States was made using the subpenaed records of a mail-order dealer in California. Requests were sent to chiefs of police in the jurisdictions in which the consignee, selected for sampling, resided. In all, some 36 returns, were received by the subcommittee. In six cases, the replies are of significance to the subcommittee inquiry.

Those jurisdictions include, Atlanta, Ga.; Canton, Ohio; Houston, Tex.; New Philadelphia, Ohio; and Philadelphia, Pa. Two of the cases concerned Canton, Ohio.

In five of the six cases, a juvenile was involved and in the sixth an adult felon.

These cases emphasize the fact that the problems resulting from the indiscriminate sale of mail-order guns are not peculiar to any one jurisdiction. They are, as documented in this report, nationwide.

## IV. CONCLUSIONS AND RECOMMENDATIONS

A summary of the subcommittee's findings are as follows:

(1) Mail-order firearms are in the main foreign imports, relatively inexpensive and inferior in design and quality to domestically manufactured firearms.

(2) The yearly volume of importation of these firearms is large and rapidly increasing.

(3) Figures available indicating the total number of these firearms imported are generally inaccurate, but reliable estimates put them in the 5 to 7 million range between 1959 through 1963.

(4) The sale of mail-order firearms is accomplished with little or no precautions as to the determination of the age and bona fides of the purchaser, especially by a certain group of dealers who have only recently entered the mail-order business.

(5) Because of the anonymity afforded the purchaser in a mail-order transaction, these firearms appeal to juveniles, adult criminals, or crime bent juveniles or adults.

(6) Juveniles, minors, convicted felons, and undesirable adults have increasingly availed themselves of this source of firearms.

(7) The indiscriminate sale of these firearms has resulted in accidental tragedies including loss of life and serious injury.

(8) These firearms have been used in the commission of serious crimes.

The need for Federal remedial legislation is apparent. As a general statement, it can be said that all of the witnesses who testified recommended Federal legislation to prevent the shipment and delivery in interstate commerce of mail-order firearms to juveniles under the age of 18 years; that proper safeguards be written into the Federal Firearms Act to preclude shipment of these firearms to convicted felons, narcotic addicts, and chronic lawbreakers; and an increase in the Federal Firearms Act dealers' license fee. These recommendations were also supported by a group of industry representatives who met with the subcommittee staff on four separate occasions to develop remedial legislation.

To accomplish the above, the following legislative proposal was developed. With regard to insuring the legitimacy of the purchaser as to age and background, it was decided that a sworn affidavit accompany each package containing a concealable firearm which is to be shipped in interstate commerce or a reasonable variation thereof.

The format adopted for inclusion in the subcommittee bill would substantially be as follows:

A prospective purchaser of a mail-order firearm would be required to execute a statement, sworn to by a notary public, attesting (1) to his true name and address; (2) that he is 18 years of age or over; (3) that he is not a person prohibited by the act from shipping or receiving firearms in interstate or foreign commerce; (4) that there are no provisions of local law or regulation which would preclude shipment and delivery of a firearm into such jurisdiction; and (5) that he is enclosing the true name, address, and title of the principal law enforcement officer of the locality in which he resides.

The prospective purchaser would forward the affidavit in duplicate to the dealer or manufacturer, who would be required to forward one copy to the named law enforcement officer by registered mail with return receipt requested, before shipping the firearm.

The dealer or manufacturer could only then ship the firearm after having received proper notice from the Post Office Department of the delivery of the registered letter.

It would be unlawful to transmit such a statement by mail in interstate or foreign commerce, knowing such a statement to be false. This approach places the burden of proof of responsibility on the purchaser where it rightly belongs.

As a further insurance that such firearms will not be delivered to persons under the age of 18 years, the bill would make it unlawful for a common or contract carrier to deliver a firearm to such a person.

The bill further specifically requires that firearms manufacturers and dealers give written notice to the carriers of shipments containing such firearms. This provides an additional safeguard of the carrier personnel having knowledge of gun shipments.

If these provisions are enacted into law by the Congress, it is felt that the traffic in mail-order firearms to juveniles under the age of 18 years will be stopped entirely and the traffic to adult felons and undesirables will be substantially reduced.

The subcommittee amendment is further designed to eliminate certain fringe elements and non-bona-fide firearms dealers. In that regard, the recommendations to increase the license fee for dealers have been included. The present fee of $1 would be increased to $10, and the fee for pawnbrokers would be increased to $50.

In addition to the above substantive content of the amendment, there are further language changes which clarify present inconsistencies in the Federal Firearms Act, but which need not be dealt with in this report.

It is the opinion of the subcommittee that this proposal to amend the Federal Firearms Act is one which merits the careful consideration of the Congress.

The bill is not overly restrictive on the rights of law-abiding citizens to own and use firearms for sport or recreation, yet its substance would do much to alleviate many of the problems documented in this report concerning the indiscriminate sale and resultant criminal use of mail-order firearms.

The bill was drafted with the aid of our domestic firearms manufacturing industry, firearms dealers and collectors, the National Rifle Association, as well as the Federal agencies concerned with the administration and enforcement of the bill. It is to the credit of our arms industry that they recognized the problems with which we are confronted and worked with the subcommittee on this legislation.

# INDIVIDUAL VIEWS OF MR. HART

U.S. SENATE,
*Washington, D.C., May 26, 1964.*

Hon. THOMAS J. DODD,
*U.S. Senate, Washington, D.C.*

DEAR TOM: Thank you for making available to me the working draft of the interim report of the Subcommittee to Investigate Juvenile Delinquency on the Interstate Traffic in Mail-Order Firearms.

While I have no suggestions with respect to the material in section I through III, I believe I should record the fact that I am not in full agreement with the conclusions and recommendations. My view is that the legislation should be confined to handguns.

The resolution of the State Bar of Michigan, which I enclose, appears to me to be well taken and I submit it in elaboration of my position.*

Sincerely,

PHILIP A. HART.

*[Longhand notation: Not on the constitutional issue however.]

### RESOLUTION

Whereas the State Bar of Michigan is an integrated bar and speaks officially through its duly elected commissioners; and

Whereas the citizens of this State look to the bar for guidance on the import of legislation at any level; and

Whereas proposed amendments to the Dodd bill (S. 1975) now before Congress contemplate certain additional restrictions on the sale of firearms for hunting; and

Whereas Michigan is one of the leaders in the sale of hunting licenses, and the restrictions proposed would hamper persons engaged in this outdoor recreational sport and thus adversely affect the best interests of the State; and

Whereas the State bar feels that the proposed amendments to the Dodd bill are not in the best interests of our citizens and are an invasion of their constitutional rights in that—

1. The State bar believes that such legislation will not be a deterrent to crime but will constitute a useless annoyance to our citizens and an unnecessary restriction on the exercise of their basic legal rights;

2. The proposed legislation is in violation of the second amendment to the United States Constitution and the right to bear arms is a basic right. We believe that the right granted under the second amendment is one granted to the individual and not to the militia as an organization. (*United States of America* v. *Jack Miller*, 83d Law Ed., 1206.)

It is the view of the State Bar of Michigan that any law restricting rights granted under the second amendment is not a function

29

of Congress but that any necessary regulation should be made by State statute under the police power which rests in the States and not in the Federal Government; and

Whereas the Dodd bill prior to November 22 was directed only to concealable firearms and directed to the misuse thereof; and

Whereas said bill as amended is directed to sporting firearms, all rifles and shotguns: Now, therefore, be it

*Resolved*, That the State Bar of Michigan oppose any amendments proposed to be made to S. 1975 since November 22, 1963: It is further

*Resolved*, That congressional representatives of this State be notified of this action.

PHILIP A. HART.

O