# EXHIBIT

# 2

## Part 1 of 3

# Calendar No. 1835

| 89th Congress | SENATE | Report |
|---|---|---|
| 2d Session | | No. 1866 |

## FEDERAL FIREARMS AMENDMENTS OF 1966

October 19, 1966.—Ordered to be printed

Mr. Hruska, from the Committee on the Judiciary, submitted
the following

# REPORT

together with

## INDIVIDUAL VIEWS

[To accompany S. 3767]

The Committee on the Judiciary, to which was referred the bill
(S. 3767) to amend the Federal Firearms Act, having considered the
same, reports favorably thereon, without amendment, and recommends
that the bill do pass.

### Purpose

The purpose of the proposed legislation is to amend existing Federal firearms control law to—

> (1) regulate more effectively interstate commerce in firearms
> so as to reduce the likelihood that they fall into the hands of the
> lawless or those who might misuse them;
> (2) assist the States and their political subdivisions to enforce
> their firearms control laws and ordinances;
> (3) help combat the skyrocketing increase in the incidence of
> serious crime in the United States.

It is not the purpose of this bill to interfere with the legitimate
uses of firearms by the millions of law-abiding citizens who acquire,
transport and possess them for hunting and other recreational pursuits, self-protection, and other lawful purposes.

### Major Provisions of S. 3767

1. No carrier in interstate or foreign commerce may deliver any
handgun to any person under 21 years of age.

2. No manufacturer or dealer may ship any handgun in interstate
or foreign commerce to any person, except a licensed manufacturer
or dealer, unless that person submits to the shipper a sworn statement
that he

2          FEDERAL FIREARMS AMENDMENTS OF 1966

(a) is at least 21 years of age;

(b) is not prohibited by Federal or State law or local ordinance from receiving or possessing the handgun;

(c) discloses the title, true name and address of the principal law enforcement officer of the locality to which the handgun will be shipped.

In addition, no manufacturer or dealer may sell a handgun over-the-counter to out-of-state residents unless a sworn statement is submitted by the prospective recipient containing the same information required of the mail-order purchaser.

3. Prior to the shipment of a handgun under provisions of the act, the manufacturer or dealer must forward a copy of the customer's sworn statement by registered or certified mail (return receipt requested) to the law enforcement officer named in the statement containing a full description (excluding serial number) of the handgun to be shipped, and must receive a return receipt evidencing delivery of the letter, or notice that the law enforcement officer has refused to accept the letter. A dealer then must delay delivery to the purchaser for 7 days after he has received the return receipt or notice of refusal.

The Governor of any State may designate any official in his State to receive notification of handgun purchases for his State or any part thereof in lieu of notification to local law enforcement officers.

4. The act of a manufacturer or dealer shipping any firearm (including rifles and shotguns) in interstate commerce to any person in any State where the receipt of the firearm by such person would violate any statute of that State is prohibited.

5. The act of knowingly making a false statement, furnishing false or deceiving identification to any licensed dealer or manufacturer for the purpose of obtaining a firearm is prohibited.

6. The act of transporting into or receiving a firearm by a resident of any State from outside the State if it were unlawful for him to purchase or possess a firearm in his own State is prohibited.

7. No manufacturer or dealer may deliver any package containing a firearm to any carrier for shipment in interstate commerce without prior written notice to the carrier.

8. A person must be at least 21 years of age to obtain a Federal firearms license as dealer, manufacturer, or pawnbroker. The applicant must not be prohibited from receiving a firearm by the provisions of the act. The applicant must not have failed to disclose any material fact or made false statements in connection with the application.

9. The fee for a manufacturer's or pawnbroker's license shall be $50 a year; for a dealer's license $25 for the first year and $10 for each renewal year.

10. Ammunition, ammunition components, and minor parts of a firearm (such as springs, sights, and accessories) are removed from the application of the Federal Firearms Act.

11. Firearms manufactured prior to 1899 are considered as antique firearms and, as such, are exempted from the provisions of the act.

12. The existing penalty provisions of the Federal Firearms Act (a maximum fine of $5,000 and a maximum term of imprisonment of 2 years) are increased to maximums of $10,000 and 10 years, but all sentenced offenders are made eligible for parole as the U.S. Board of Parole may determine.

On September 22 of this year, the committee by a vote of 10 to 5, reported this bill to the Senate favorably.

## STATEMENT

Over the past 4 years the Committee on the Judiciary has become increasingly concerned over the rise in lawlessness and violent crime in the United States and the relationship between the apparent easy availability of firearms and criminal behavior. Initial investigative hearings were conducted by a subcommittee in 1963 and 1964 into the adequacy of existing Federal firearms control laws. Further hearings followed in 1965.

The public hearings demonstrated that the interstate mail-order sale of firearms to criminal elements posed a significant problem to law enforcement officials throughout the United States and necessitated legislation to strengthen existing Federal control statutes.

The earlier hearings produced evidence that criminals and other undesirable elements have seized upon the inadequacies of existing Federal law by availing themselves of mail-order firearms. The availability through this source thus circumvents State and local laws, giving rise to serious law enforcement problems at the State and local level.

The 1965 hearings brought out further deficiencies in the present firearms statutes.

Not only is mail order a means of circumventing State and local law, but the over-the-counter sale of firearms, primarily handguns, to persons who are not residents of the locale in which the dealer conducts his business, affords similar circumvention. This problem is most prevalent in, but not limited to, those States where stringent firearms regulations are in effect and the purchaser is not able to purchase a firearm in accord with the laws of his State. As a result, a would-be purchaser travels to a neighboring State with less stringent controls and purchases the firearm which is then misused in his residence State. This problem was outlined by law-enforcement officers throughout the country.

Firearms purchased in the above manner have been utilized in the commission of crime in substantial numbers. For example, the Massachusetts State Police have traced 87 percent of the concealable firearms used in crimes in Massachusetts to out-of-State purchases.

The lack of adequate Federal controls over this aspect of the commerce in firearms affords circumvention and violation of the laws of several of the States similar to the mail-order methods of purchase.

It is difficult for the States to cope with this aspect of the problem without additional help by the Federal Government.

## THE NEED FOR LEGISLATION

There has been a great nationwide concern over the steadily increasing rate of crime in this country. Much attention, perhaps too much attention, has been directed at the role of firearms in crime, with too little attention given to the many sociological aspects which are the basic causes of our crime problem. It would appear, however, from testimony presented to this committee, that there are some respects in which the existing Federal Firearms Act should be strengthened.

4          FEDERAL FIREARMS AMENDMENTS OF 1966

After reviewing all of the evidence adduced during the hearings, it is the opinion of the committee that the enactment of legislation that would indiscriminately place further restrictions on the acquisition of all types of firearms would be unwarranted. Rather, in seeking to reduce the criminal use of firearms, the legislation should especially concern itself with the particular type of weapon that is predominantly used by the criminal.

Despite the fact that the vast majority of all handguns are used for legitimate sporting purposes, the committee concluded that this firearm was the most troublesome and difficult factor in the unlawful use of firearms. Its size, weight, and compactness make it easy to carry, to conceal, to dispose of, or to transport. All these factors make it the weapon most susceptible to criminal use.

In particular, it was learned upon investigation that the most serious firearms problem facing most enforcement agencies has been the widespread availability of handguns through mail-order channels. The record shows that the sale of mail-order handguns in the large urban complexes may have stimulated crime and juvenile delinquency and that State, county, and municipal laws and ordinances have been unable to cope with the problem because of their jurisdictional limits. The extension of the Federal law proposed in S. 3767 is in keeping with the long-accepted role of the Federal Government in restricting interstate commerce in weapons, drugs, and other commodities dangerous to life.

### THE PROBLEM: HANDGUNS

The handgun as the most formidable and most frequently used tool of the criminal is well recognized and established by first, the existence in many States of laws controlling it; and, second, by statistics showing its dominance as the weapon used in unlawful activities.

*State control of handguns*

While there is 1 State that requires an identification card for the purchase of a rifle or shotgun and 22 States that prohibit the carrying of a loaded rifle or shotgun in a moving vehicle, compare the much greater extent of control over handguns by the States. These controls are of two classes—the positive and the negative. In those States with positive handgun controls:

Twenty-three States require a license to sell at retail.

Twenty-nine States require a license to carry a handgun on or about the person.

Eight States require a permit or its equivalent to purchase a handgun.

Ten States prescribe a waiting period between purchase and delivery of a handgun.

Eighteen States require a license to carry a handgun in a vehicle.

As to States with negative controls:

Twenty-one States prohibit the carrying of a handgun concealed on the person.

Four States require registration of handguns.

Twenty-two States prohibit carrying a loaded handgun—and in some instances other firearms—in a vehicle.

In addition, many municipalities have similar ordinances.

The committee is of the opinion that the lawmakers of each State are best able to determine the conditions and needs within their own borders and to pass appropriate legislation in regard to the use of handguns. Thus, the committee endeavored to draft legislation which would give State and local officials notice of the flow of handguns into their jurisdiction so as to enable them to regulate their use as dictated by applicable local laws.

*Statistics on firearms used in crimes*

Federal Bureau of Investigation statistics delineate the handgun as the firearms problem.

The 1965 FBI Uniform Crime Reports state that 57 percent of the willful killings during that year were committed with firearms. Thus, out of a total of 9,850 such killings, firearms were used in 5,634 cases. Writing to Senator Roman L. Hruska on July 27, 1966, FBI Director J. Edgar Hoover supplemented the Reports. Indicating that handguns were used in 70 percent of the murders committed with firearms, the Director stated:

"Based on the submission of police reports under the uniform crime reporting program, 70 percent of the murder by gun in this country is committed with a handgun, 20 percent by the use of a shotgun, and 10 percent with a rifle or other firearm. This will supplement the data available to you in Uniform Crime Reports—1965."

In regard to aggravated assaults, approximately 17 percent of the total (206,600) were committed with firearms. However, Mr. Hoover advised that,

"There is no available breakdown of the type of firearms used in these attacks."

In 1965, there were 118,900 robberies. Of this figure, 38 percent, or about 45,000, were armed robberies committed with firearms. In regard to this category, Mr. Hoover stated in the above-mentioned letter:

Although we do not make a regular collection of the type of weapon used in armed robbery, from special surveys in the past we have determined about two-thirds are firearms and most of these the handgun.

From these statistics, as well as the treatment accorded handguns by State and city statutes and ordinances, it is quite clear that the principal offender in the unlawful use of firearms is the handgun.

*Inadequacy of existing Federal law*

It was the intent of the Congress in enacting the Federal Firearms Act of 1938 (as amended) to control the movement of all firearms in interstate commerce. This law;

(a) Requires the licensing of manufacturers and importers of, and dealers in, firearms, ammunition and components thereof;

(b) Provides restrictions on the movement of all firearms and pistol ammunition in interstate or foreign commerce;

(c) Prohibits convicted felons, persons under indictment and fugitives from justice from shipping, transporting or receiving firearms or ammunition in interstate or foreign commerce;

6          FEDERAL FIREARMS AMENDMENTS OF 1966

(*d*) Prohibits the shipment, transportation, or receipt of stolen firearms or ammunition, or firearms from which the serial number has been removed, obliterated, or altered;

(*e*) Requires all licensed manufacturers, importers, and dealers to maintain complete records of the production, receipt, and disposition of all firearms.

A provision of this Federal firearms law makes it mandatory for any federally licensed firearms manufacturer or dealer to observe the purchase-permit requirement of any State which has such a requirement for the purchase of a firearm. Here, however, it is important to note that only 8 of the 50 States enacted a purchase-permit requirement, and in all cases with respect to the purchase of a pistol or revolver. At the same time, virtually all States do have statutes regulating the acquisition of firearms by minor children. It is these State and local statutes which are being circumvented by mail order and are creating the pressing problem before us.

The committee has drafted legislation to effectively plug this loophole by providing that a federally licensed manufacturer or dealer, in shipping a pistol or revolver by common carrier, must notify the carrier that the package being transported contains a pistol or revolver. The law then places the responsibility on the common carrier to knowingly make no delivery of such a package to a person who is a minor or otherwise prohibited from receiving or possessing a handgun.

It is believed that this, in addition to the sworn affidavit requirement provided in S. 3767 and the notification to local law enforcement authorities, will provide the necessary and timely information to State and local enforcement officials to enable them to enforce the applicable laws in their respective jurisdictions.

These provisions will serve to give greatest assurance that State and local laws can be effectively enforced, without the necessity of encroaching unduly upon the longstanding rights and privileges of the millions of firearms owners, collectors, and users who put them to legal, wholesome, and beneficial use.

*What S. 3767 does not do*

The subject bill does not have special provisions which apply to imported firearms, destructive devices, or rifles and shotguns.

Imported firearms have been singled out by proponents of highly restrictive firearms control legislation for embargoes in some cases and unusual requirements such as meeting recognized safety standards in others. However, the testimony before the committee indicated clearly that imported firearms are not inherently evil because of their origin. They are brought into this country in as wide a range of price and variety as are their domestically manufactured counterparts. To be sure, they should be subject to the same controls and restrictions which apply to all firearms, but no reason could be ascertained to apply embargoes and unusual restrictions against them. In any event, any such restrictions fall beyond the jurisdiction or competency of this committee since questions of foreign trade and relations policy are involved. Properly these matters should be considered by the Senate Committees on Finance and Foreign Relations. Detailed comments on imported firearms follow later in this report.

The subject bill does not deal with the so-called destructive devices such as bazookas, rockets, mines, heavy field artillery and the like.

S. 3767 is intended to amend the Federal Firearms Act of 1938, which primarily governs interstate and foreign commerce in firearms used for sporting purposes. The National Firearms Act of 1934, the so-called Machinegun Act, has effectively controlled interstate commerce in machineguns, other automatic weapons, and sawed-off rifles and shotguns by imposing heavy ($200) transfer taxes on each sale and a national registration system of all such weapons.

While the destructive devices are not a substantial factor in the commission of serious crimes (only a handful of cases were made known to the committee in which these weapons were actually used in the commission of the 86,000 firearms crimes committed in 1965), neither are there any significant sporting purposes for which they are suited.

Both Senators Dodd and Hruska have introduced bills to bring destructive devices within the scope of the National Firearms Act. These bills are pending in the Senate Committee on Finance. These bills should be given early consideration.

The subject bill does not impose special procedures or restrictions on the long gun, although many of the bill's provisions apply to all firearms. The evidence before the committee has overwhelmingly demonstrated that the handgun is the type of firearm that is principally used in the commission of serious crime. Thus, it is the subject of special provisions which require the submission of a sworn statement by the purchaser and waiting periods before delivery can be effected by the dealer or manufacturer. Also, persons under the age of 21 cannot obtain handguns by interstate mail-order shipment. Rifles and shotguns are exempted from these additional requirements, since they are used substantially less frequently by the lawless and because of their preponderant use in a lawful and beneficial manner.

## Enforcement of Existing Federal Law

Experience and testimony before this committee indicate that the operation of the Federal Firearms Act over the years has demonstrated certain weaknesses which call for correction. The object of S. 3767 is to remove these weaknesses in the interest of more effective and efficient law enforcement.

Many of the problems which some persons ascribe to the present Federal firearms statutes are, in reality, not the fault of the law itself but a result of the yet unsolved problem of uniform and effective administration of the criminal law. This problem has several factors, not the least of which are overworked and understaffed enforcement agencies and similarly overworked but frequently too lenient prosecutors and courts. The record shows that indictments and convictions under the existing Federal firearms statutes have been relatively few, and the comparative rarity of successful action in the courts by the Federal Government have contributed to a compounding of the problems of reasonable and effective firearms regulation.

Apparently, in a number of instances, the public authorities are not fully utilizing the tools available to them at present under Federal law. Testimony has been presented to this committee that a State conservation agency, in the course of apprehending individuals in violation of game laws or in routine checking, has had occasion to turn over to Federal enforcement personnel weapons in violation of the

National Firearms Act.   To its knowledge, this conservation agency has never heard of a Federal prosecution resulting from those seizures. Further, testimony before this committee has brought out that in a number of instances Federal agents have apprehended individuals in serious violation of the Federal firearms laws but that no action has resulted from the arrest of these individuals.   This is a matter of concern to this committee and ought to be considered in evaluating the desirability and necessity for additional firearms controls.

A police official of a large American city testified before this committee that in the first 6 months of 1965, police officers "stopped and searched and found 256 persons carrying, in most instances, handguns. The arrested persons were charged with carrying a concealed weapon and warrants were applied for in all these cases.   However, due to frailties in the law, only 81 warrants were issued."

Another police official testified that even though his State has a law requiring permits for the purchase of handguns, serious difficulty was encountered with persons obtaining handguns by mail order from out-of-State dealers.   These sales apparently are in violation of section 2(c) of the Federal Firearms Act (15 U.S.C. 902(c)).   Yet, no evidence was presented to the committee that these violations were prosecuted.

This committee is fully aware that the foregoing examples could be amplified many times.   If this be the case, and the evidence points in that direction, then this committee believes that the solution to the problem of firearms in crime lies not in highly restrictive legislative controls but in the understanding and proper handling of all operative factors in the field of crime and criminal administration.

### LAWFUL USE OF FIREARMS

As detailed earlier in this report, specific needs for amendment of the Federal Firearms Act have been demonstrated in the hearings before the committee.   The subject bill, S. 3767, has effectively addressed itself to these problems which must be resolved.   Yet, in the drafting of the reported bill, the committee has been scrupulously careful to avoid any undue restrictions upon the legitimate, proper, and beneficial use of firearms, for when taken in the entire context and on balance, the place and role of privately owned and used firearms are necessary and wholesome as they have always been in the history of this Nation.   Their legitimate role should be maintained.

Any legislation intended to deal with those who unlawfully use firearms must be made to concentrate on them as effectively as possible without encroaching upon the vast preponderance of the public who use firearms in a lawful and beneficial manner.

In seeking to protect the constitutionally guaranteed right of our citizenry to keep and bear arms for lawful purposes, the committee was considering a factor in our society of no mean proportion.   Best estimates indicate that there are, within the United States, over 100 million privately owned firearms in the possession of over 20 million citizens.

The committee considered the hundreds of thousands of shooters who enter into formal rifle, pistol, and shotgun competitive shooting, and the millions who use these same types of firearms for informal skeet, trap, and target shooting.   Not only does this use of firearms provide a healthy recreational activity, but it provides, as a valuable

national asset, a great number of young men who are, prior to their entering our Armed Forces, familiar with firearms and skilled in their use. In Vietnam, as in every armed conflict, it is evident that, in spite of spectacular advances in weaponry systems, we are still faced with a need for skilled riflemen. The plain fact that preinduction firearms training produces more capable and effective soldiers was recently made clear by a Department of Defense study.

The study, which was conducted for the Department of the Army by the Arthur D. Little, Inc., a private industrial and management research firm, undertook to review completely the Army's civilian marksmanship program conducted by the National Board for the Promotion of Rifle Practice.

A brief summary of the findings of that evaluation follows:

> The results of our study indicate that the civilian markmanship program * * * contributes significantly to the development of rifle marksmanship proficiency and confidence in the ability to use a rifle effectively in combat on the part of those who participate in the program or benefit indirectly from it.
>
> We believe that those aspects of the DCM program which relate to the broader interest and participation in rifle shooting among the youth of our country (primarily club activities) should be emphasized more and pursued even more effectively to reach a greater percentage of those young men likely to enter military service.

This study indicates clearly that a continuation and implementation of the program is necessary for the defense of our country.

The committee was cognizant of the many collectors of legitimate firearms of all types; the students of firearms history and development who are just as serious about their respectable hobby as those who collect stamps, automobiles, or works of art.

While in no way advocating that individuals take the law into their own hands, the committee is aware that there are millions of homes where firearms have a proper place for self-protection.

Finally, the committee endeavored to draft legislation which would not unnecessarily restrict the activities of the more than 15 million hunters in this country. Hunting provides a healthy outdoor recreation which can be enjoyed throughout the lifetime of an active adult. This activity is an effective instrument of wildlife management utilized by Federal and State wildlife managers. In addition, these sportsmen fund, in large part, Government programs of wildlife management through the purchase of hunting licenses, and through the allocated Federal excise taxes paid upon the sales of sporting arms and ammunition.

Furthermore, the recent report by the U.S. Department of the Interior, Bureau of Sport Fisheries and Wildlife, is noteworthy. Its 1965 National Survey of Fishing and Hunting revealed that during this period, 13,583,000 hunters spent a total of $1,121,135,000 in pursuit of their sports. They took 169,377,000 trips in spending 185,819,000 recreation days afield. They traveled 8,659,034,000 passenger miles, principally by auto, to reach and return from hunting areas. Collectively and individually, hunting supports a significant portion of the economy.

The lawful and legitimate use of firearms by our citizenry is a widespread and worthwhile activity which must not be unnecessarily impaired. The committee believes that this bill preserves the freedom of activity for these more than 20 million lawful firearms users while effectively confronting the infinitesimal fraction of this number which represents those who use firearms in an antisocial manner.

## DESTRUCTIVE DEVICES

During last year's firearms hearings, much attention was devoted to the so-called destructive devices—rockets, mortars, bazookas, grenades, mines, bombs, missiles, field artillery, and the like. Imports of such military hardware were featured at the hearings as a major reason for authorizing an embargo on military surplus of all kinds and other categories of firearms.

While these devices do not appear to be used significantly in the commission of serious crime, it was not contended by any of the sportsmen's groups whose representatives testified in opposition to S. 1592 that there were legitimate sporting uses for them. One of the larger importers of firearms recommended that import licenses be denied such military ordnance under section 414 of the Mutual Security Act, as amended. The Munitions Control Office of the State Department advises that it no longer permits imports of this type.

Serious objections were raised to the inclusion in the Federal Firearms Act of prohibitions designed to take this or any other category of firearms out of commerce. This law was enacted primarily for the regulation of commerce in firearms generally used for sporting purposes—rifles, shotguns, and handguns. The National Firearms Act of 1934 (ch. 53 of the Internal Revenue Code of 1954) has long been the vehicle for removing from commerce weapons which are peculiarly susceptible to criminal use and not generally used for recreation. This act provides for the registration and prohibitory taxes on the transfer of automatic weapons such as machineguns and sawed-off rifles and shotguns. Also included are firearms mufflers and silencers. The National Firearms Act appears to have regulated effectively so-called gangster-type weapons in the years since its enactment. Persuasive testimony at the hearings brought out the advantages of preserving the essential difference between the two acts. Obviously, it would be more effective to restrict commerce in all destructive devices, not merely imports, and to subject all prohibited weapons to the same enforcement and regulatory machinery.

*Imports*

The committee gave a good deal of consideration to the question of whether the Federal Firearms Act should be amended to authorize the Secretary of the Treasury to place embargoes on certain categories of imported firearms and special restrictions on others. The conclusion reached by a majority of the committee was that the purposes of the bill could be adequately accomplished through regulation of domestic commerce in firearms and that no clear basis had been established at the hearings to define types of firearms which particularly aggravated the crime problem and which were not also readily available from domestic sources. The committee felt strongly that discriminatory treatment of commerce and interference with consumer preference without a clear showing of overriding necessity should be

avoided.   Proposals to cut off certain imports and to ban mail-order sales of rifles made to military specifications were among the provisions which the committee rejected as unnecessary and discriminatory. This prevailing view is well expressed in a letter dated April 20, 1966, circulated to the full committee from one of its members who thus gave notice of his reservations while nonetheless voting to submit the subcommittee bill to the full committee.

As pointed out in the above section on so-called destructive devices, considerable attention was attracted at the hearings to the rather shocking idea that anyone can buy a bazooka, antitank gun, or other high-caliber military ordnance.   Taking destructive devices out of commerce is no justification whatsoever for an embargo on imports because (a) imports of these devices have already been cut off by the State Department under existing law, and (b) the need is for restrictions which reach destructive devices already in the United States. Pending bills to amend the National Firearms Act to include destructive devices will far more effectively accomplish the desired objective.

The proposed import restrictions would have given the Secretary of the Treasury unusually broad discretion to decide whether a particular type of firearm is generally recognized as particularly suitable for, or readily adaptable to, sporting purposes.   If this authority means anything, it permits Federal officials to differ with the judgment of sportsmen expressed in the more familiar manner through consumer preference in the marketplace.   It is plain that the proponents of an embargo anticipated cutting off large quantities of imported firearms.   Quite obviously such large-scale imports would not exist in the absence of important consumer preference.   This committee is not prepared to make the unlikely assumption without evidence that substantial markets for imported products are composed of irresponsible or criminal citizens.   No justifiable criteria have been proposed for the Secretary of the Treasury to discriminate between various categories of imported firearms; on the contrary, the statements of the proponents of embargoes would encourage the Secretary to use this broad discretion to curtail the availability of firearms in general within the practical limitations of domestic politics. The fact that Treasury witnesses expressed no sensitivity to this problem further suggests the need for caution.

The hearings failed to establish inherent differences, which might bear on criminal use, between military and sporting small arms or between firearms manufactured abroad or in the United States. Despite a general tendency toward lower prices for imports and military surplus, the hearings revealed a considerable overlap with the retail prices of equally lethal domestic sporting firearms.   Furthermore, the hearings brought out the important role over the last 10 years of imported military surplus, largely bolt action rifles, in making inexpensive hunting and shooting equipment more widely available as a stimulant to outdoor sports and also to thousands of small businesses (gunsmiths, manufacturers of accessories and parts, sporterizers of surplus rifles, makers of ammunition and ammunition loading equipment and retailers).

The conclusion is inescapable that the purpose of proposing any embargo would be twofold: (a) remove lower cost firearms from the market, and (b) discriminate against imports because they are politically vulnerable and might enlist the support of competing domestic manufacturers.   The majority of the committee rejects on principle

the discriminatory implications of both justifications in a bill designed
to meet the problem of crime in the United States. It is both im-
practical and unfair to legislate against low prices. Where should the
line be drawn? Why should low-income sportsmen, frequently
farmers and other country people to whom hunting is most important,
bear the burden of Federal intervention in the marketplace?

The committee considered a proposal which originated quite recently
on a subject not covered at the hearings. It would give the Secretary
of the Treasury broad discretion to embargo imports on the grounds
that they might be unsafe to the user. The injection of this issue may
reflect the difficulty in finding plausible grounds for curbing imports.
To establish Federal safety regulations in firearms is a complex step
which should be carefully studied. It could require elaborate regula-
tory machinery. Why should safety standards be applied to imported
firearms and not to the much larger commerce in new and used domes-
tic firearms?

The device of an embargo on international trade raises complex
questions with regard to U.S. treaty obligations. It could prejudice
the future bargaining positions of our country if we oppose the misuse
by other countries of public safety justifications for otherwise un-
acceptable protectionist moves. Import restrictions considered by
the committee would require the Treasury Department to overlap a
State Department import licensing system authorized by section 414
of the Mutual Security Act, as amended, which is working well and
makes full use of the overseas investigatory facilities of the State De-
partment. Such duplication would waste Government man-hours
and unduly burden those affected by the overlapping regulation; no
necessity for this inherently undesirable approach has been demon-
strated.

For these reasons, it seemed plain to the majority of the com-
mittee that the foreign source of a firearm is no basis to outlaw it
because, like a similar domestic firearm, it might be used in a crime.
If nondiscriminatory restrictions on mail-order distribution and
firearms dealers are adequate methods of firearms control for domestic
products, they are adequate for imports. To declare imports some-
how more evil than its comparable domestic product is not only
illogical; it would be misunderstood by many as inspired by the col-
lateral purpose of protecting American industry from foreign com-
petition. Any such misunderstanding would jeopardize passage of
the bill and the credibility and standing of any law which might
finally be enacted.

### Existing Federal Laws Relating to Firearms

#### A. NATIONAL FIREARMS ACT OF 1934, AS AMENDED

(a) Imposes a tax and registration on the making or transfer,
among other weapons, of all fully automatic firearms and all short-
barrel rifles and shotguns.

(b) Provides that all manufacturers and importers of, and dealers
and pawnbrokers in, the foregoing kinds of firearms must pay an
annual occupational tax.

### B. FEDERAL FIREARMS ACT OF 1938, AS AMENDED

(a) Requires the licensing of manufacturers and importers of, and dealers in, firearms, ammunition and components thereof;

(b) Provides certain restrictions on the movement of firearms and ammunition in interstate or foreign commerce;

(c) Prohibits convicted felons, persons under indictment, and fugitives from justice from shipping, transporting, or receiving firearms or ammunition in interstate or foreign commerce;

(d) Prohibits the shipment, transportation, or receipt of stolen firearms or ammunition, or firearms from which the serial number has been removed, obliterated or altered.

### C. MAILING OF CONCEALABLE FIREARMS (18 U.S.C. 1715)

(a) Prohibits the mailing of concealable firearms (i.e., handguns) except to officers of the Active or Reserve Forces; to law-enforcement officers whose duty is to serve warrants of arrest or commitment, to employees of the postal service; and to watchmen engaged in guarding any Government property;

(b) Permits the mailing of concealable firearms to or between firearms manufacturers and dealers.

### D. WEAPONS ABOARD AIRCRAFT (49 U.S.C. 1472(1))

(a) Prohibits the carrying on or about the person while aboard an aircraft engaged in air transportation of a concealed deadly or dangerous weapon;

(b) Permits the carrying of such weapon aboard such aircraft by any law-enforcement officer authorized to carry arms, or by any person authorized by regulations issued by the Administrator of the Federal Aviation Agency.

### E. MUTUAL SECURITY ACT OF 1954 (22 U.S.C. 1934)

(a) Gives authority to the President to control the export and import of arms, ammunition, implements of war, and technical data related thereto.

(b) Requires all persons engaging in these transactions to register with the U.S. Government, pay registration fees, and secure import licenses for all such materials imported into this country.

### SECTIONAL ANALYSIS OF THE PROVISIONS OF S. 3767

#### SECTION 1

Section 1 of S. 3767 amends section 1 of the Federal Firearms Act (52 Stat. 1250) by restating and clarifying existing definitions contained in the act and adding several new definitions.

The definition of "person" is unchanged. The terms "interstate or foreign commerce," "firearm," "manufacturer," "dealer," and "fugitive from justice," have been restated and clarified. The term "ammunition" has been deleted. The terms "State," "pawnbroker," "Secretary," "crime of violence," and "indictment" are new.

*Paragraph (1)*

The definition of the term "person" in paragraph (1) of the bill is unchanged from the existing law (15 U.S.C. 901(1)).

*Paragraph (2)*

Paragraph (2) of section 1 of the bill adds a new definition "State" to simplify and clarify later provisions of the bill and the existing law. The Canal Zone is included in the definition. Previously it was excluded. Also included are the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa, the principal Commonwealth and possessions of the United States.

*Paragraph (3)*

Paragraph (3) restates the existing definition of "interstate or foreign commerce" (15 U.S.C. 901(2)). However, language has been removed that has been defined in paragraph (2) above.

*Paragraph (4)*

Paragraph (4) restates the definition of "firearm" and revises it to exclude from the act antique firearms made in 1898 or earlier. Also mufflers and silencers for firearms are removed from the definition.

The year 1898 was selected as the "cutoff" date on the basis of testimony presented to Congress by several gun collectors organizations and to be consistent with the regulations on importation of firearms issued by the Department of State pursuant to section 414 of the Mutual Security Act of 1954.

Mufflers and silencers for firearms are excluded from coverage since these items are included presently in the National Firearms Act (Ch. 53 of the Internal Revenue Code of 1954). This act provides for heavy transfer taxes and registration of all such items.

Also excluded from the present definition of the term "firearm" is "any part or parts" of a firearm. Experience in the administration of the Federal Firearms Act has indicated that it is impractical to treat each small part as if it were a firearm. The revised definition substitutes the words "frame or receiver" for the words "any part or parts."

Added to the term "firearm" are weapons which "may be readily converted to" a firearm. The purpose of this addition is to include specifically any starter gun designed for use with blank ammunition which will or which may be readily converted to expel a projectile or projectiles by the action of an explosive. Such so-called starter pistols have been found to be a matter of serious concern to law enforcement officers.

*Paragraph (5)*

The definition of the term "handgun" in paragraph (5) is a new provision. This definition is necessary because of later provisions of the bill which have application solely to these firearms. There is no intention that handguns be exempted from any of the other provision of the bill since a handgun is a firearm within the meaning of paragraph (4) above.

The term includes "pistols," "revolvers" and "any other weapons originally designed to be fired by the use of a single hand" which are made to be fired by the use of a single hand and which are designed to fire or are capable of firing fixed cartridge ammunition.

*Paragraph (6)*

The definition of the term "manufacturer" is a restatement of existing law (15 U.S.C. 901(4)) except that references to ammunition, cartridge cases, primers, bullets, or propellant powder" have been striken.

This deletion was made because experience in the administration of the Federal Firearms Act has showed that it is extremely difficult to control interstate and foreign commerce in ammunition.

The requirement that the manufacturer be "in the business of" manufacturing or importing firearms has been added to the definition to conform with a similar provision in the definition of "dealer."

*Paragraph (7)*

The definition of the term "dealer" is a restatement of existing law (15 U.S.C. 901(5)) except that references to "ammunition, cartridge cases, primers, bullets, or propellant powder" have been stricken as in the definition of "manufacturer" above.

The word "special" has been stricken from the definition since a gunsmith or other person in the business of repairing firearms should be required to comply with the provisions of the Federal Firearms Act if he fits only barrels which do not fall into "special" category.

The words "or breech mechanism" have been stricken because they are unnecessary to a complete description of the functions performed by a person in the business of repairing firearms.

Other minor rephrasing of the language in the definition has been made to clarify the existing language.

*Paragraph (8)*

The definition of the term "pawnbroker" is a new provision. Pawnbroker dealers are covered under the provisions of the existing law in the same manner as other dealers. The purpose of this definition is to provide a basis for a separate classification of pawnbroker dealers.

Under this bill pawnbrokers would be subject to a higher license fee than other dealers.

*Paragraph (9)*

The definition of the term "Secretary" contained in paragraph (14) is a new provision. The purpose of this definition is to eliminate the necessity of repeating "Secretary of the Treasury or his delegate" in several sections of the act.

*Paragraph (10)*

The definition of the term "crime of violence" is new. The term includes "voluntary manslaughter, murder, rape, mayhem, kidnaping, robbery, burglary, housebreaking, extortion accompanied by threats of violence, assault with a dangerous weapon, assault with intent to commit any offense punishable by imprisonment for more than 1 year, arson punishable as a felony, or an attempt to commit any of the foregoing offenses."

Prior to an amendment of October 3, 1961 (75 Stat. 757), the term "crime of violence" was included in the act. However, the 1961 amendment substituted the term "crime punishable by imprisonment for a term exceeding 1 year" for the term formerly used.

On September 15, 1965, another amendment (79 Stat. 788) was enacted which gave persons convicted of "a crime punishable by imprisonment for a term exceeding 1 year (other than a crime involving

the use of a firearm or other weapon or a violation of the act or the National Firearms Act)" the privilege of applying to the Secretary of the Treasury for "relief from the disabilities under this act incurred by reason of such conviction" and the Secretary was authorized to grant relief. However, this privilege was not extended to persons who were indicted for felony crimes.

The effect of the 1965 amendment was to place certain convicted persons in a position to obtain relief from the prohibitions of the act, whereas certain persons under indictment could not.

Under these circumstances it was determined that a return to the previous concept of a crime of violence should be effected to remove the obvious disparity of treatment.

*Paragraph (11)*

The definition of the term "indictment" is a new provision. Inasmuch as a person under indictment for certain crimes is proscribed from shipping or receiving firearms in interstate or foreign commerce, and a license under the act will not be issued to such a person, the definition will serve a useful purpose in making it clear that an "information" charging a crime is the same as an indictment charging a crime. This definition is in accord with the opinion of the court in *Quinones* v. *United States*, 161 F. 2d 79.

*Paragraph (12)*

The definition of the term "fugitive from justice" is a restatement of existing law (15 U.S.C. 901(6)) with reference to "Territory, the District of Columbia, or possession of the United States" omitted in accordance with the definition of "State" in paragraph (2) above.

*"Ammunition"*

The definition of the term "ammunition" has been stricken from the existing law (15 U.S.C. 901(7)), to exclude all ammunition from the coverage of the Federal Firearms Act.

Under existing law, the term included pistol and revolver ammunition. However, an evaluation of the evidence developed in the hearings before the committee showed that it is difficult to control effectively interstate and foreign commerce in conventional firearms ammunition used for sporting, recreational, and other lawful purposes and that the act was not enforced in this regard.

### SECTION 2

Section 2 of the Federal Firearms Act (15 U.S.C. 902) would be restated, revised and six new subsections added. References to ammunition have been eliminated in subsections (a), (b), (d), (e), and (g). Subsection (c) has been substantially revised and broadened. Subsections (f) and (i) have been restated and language stricken which has been declared unconstitutional. Subsections (j) through (o) are new.

*Subsection (a)*

Subsection (a) of section 2 of existing law (15 U.S.C. 902(a)) has been restated except that the words "or ammunition" have been stricken.

*Subsection (b)*

Subsection (b) of section 2 of existing law (15 U.S.C. 902(b)) has been restated except that the words "or ammunition" have been stricken and minor changes have been made for clarity.

*Subsection (c)*

Subsection (c) of section 2 of existing law (15 U.S.C. 902(c)) has been revised and its scope broadened so that it is an unlawful act within the meaning of the act for any Federal licensee to knowingly ship or transport directly or indirectly in interstate or foreign commerce any firearm (including rifles and shotguns as well as handguns) to any person in any State in violation of any State law which has application to the shipment.

The existing provision has application only to State firearms control laws which require purchase permits. Fewer than 10 States have such laws, whereas most States have firearms laws which impose controls and restrictions on the receipt, transportation or possession of firearms in a variety of ways.

This provision has been broadened to assist the States in the control of firearms commerce within their respective borders by insuring that channels of interstate and foreign commerce will not be used to circumvent applicable State laws.

It is not the intention of the subsection to impose absolute criminal liability on Federal licensees. It is contemplated that an affirmative defense would be allowed so that any person charged with a violation of this section may establish that he took reasonable efforts to ascertain that the shipment would not be in violation of the applicable State laws.

*Subsection (d)*

Subsection (d) of section 2 of the existing law (15 U.S.C. 902(d)) has been restated and modified. The words "or ammunition" have been stricken.

The term "crime of violence" has been inserted in lieu of a "crime punishable by imprisonment exceeding 1 year." This change substitutes language similar to that in section 2(d) of the Federal Firearms Act which was eliminated by the amendment of October 3, 1961 (75 Stat. 757). The 1961 amendment substituted the words "crime punishable by imprisonment for a term exceeding 1 year." The reason for the return to the previous language was stated in discussion of the definition of "crime of violence" in section 1(10).

The words "territories, possessions, or the District of Columbia" have been stricken as they fall within the meaning of the term "State" as defined in section 1(2) of the bill.

*Subsection (e)*

Subsection (e) of section 2 of the existing law (15 U.S.C. 902(e)) has been restated and modified by substituting crime "of violence" for the words "punishable by imprisonment for a term exceeding one year" and by striking the words "or ammunition."

*Subsection (f)*

Subsection (f) as changed by section 2 of the bill is a restatement of existing law (15 U.S.C. 902(f)). The restatement eliminates the words "and the possession of a firearm or ammunition by any such person

18      FEDERAL FIREARMS AMENDMENTS OF 1966

shall be presumptive evidence that such firearm or ammunition was shipped or transported or received, as the case may be, by such person in violation of this act," since the presumption is meaningless in view of the decision of the Supreme Court in *Tot* v. *United States*, 319 U.S. 463.

*Subsection (g)*

Subsection (g) as changed by section 2 of the bill is a restatement of existing law (15 U.S.C. 902(g)) and has been revised by striking the words "or ammunition" and making minor changes for clarity.

*Subsection (h)*

Subsection (h) as changed by section 2 of the bill is a restatement of existing law (15 U.S.C. 902(h)) and the words "or ammunition" stricken wherever they appear.   Also, minor changes have been made for clarity.

*Subsection (i)*

Subsection (i) as changed by section 2 of the bill is a restatement of existing law (15 U.S.C. 902(i)).   The restatement also deletes the words "and the possession of any such firearm shall be presumptive evidence that such firearm was being transported, shipped, or received, as the case may be, by the possessor in violation of this act" since the presumption is meaningless in view of the decision of the Supreme Court in *Tot* v. *United States*, 319 U.S. 463.

*Subsection (j)*

Subsection (j) as changed by section 2 of the bill is a new provision which would make it unlawful for any licensee under the act knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, any package containing a firearm, without written notice to the carrier that a firearm is being transported or shipped.   This provision is correlated to the provisions of section 2(c).   Testimony before the committee disclosed the existence of a practice of surreptitiously shipping firearms, without notice or disclosure, to circumvent requirements of Federal or State law.

*Subsection (k)*

Subsection (k) prohibits a common or contract carrier from delivering in interstate or foreign commerce any firearm to any person knowing or having reasonable cause to believe that such person is under 21 years of age.

*Subsection (l)*

Subsection (l) as added by section 2 of the bill is a new provision that would establish a procedure whereby the channels of interstate and foreign commerce could not be used to circumvent applicable State laws and local ordinances.   It would make it a violation of the Federal Firearms Act for any licensee to ship any handgun in interstate or foreign commerce to any person other than another licensed manufacturer or dealer unless the prospective recipient has submitted a sworn statement to the manufacturer or dealer containing material information pertaining to the sale.   The dealer must then forward a copy of the statement to the appropriate local law enforcement officer or designated State official by registered or certified mail, receive a return receipt evidencing delivery of the letter or notice of refusal to accept the

letter, and wait at least 7 days after return of the receipt or refusal before making delivery of the handgun to the recipient.

*Paragraph (1)*

Paragraph (1) of such subsection (l) provides that the sworn statement to be submitted to the dealer or manufacturer by the prospective recipient shall be in such form as prescribed by the Secretary of the Treasury and shall contain the following information: (1) That the recipient is at least 21 years or more of age; (2) that he is not prohibited by the Federal Firearms Act from receiving a handgun in interstate or foreign commerce; (3) that there are no provisions of applicable State law or local ordinance which would be violated by the purchaser's receipt or possession of the handgun; and (4) the title, name, and official address of the principal law enforcement officer where the handgun is to be shipped.

*Paragraph (2)*

Paragraph (2) of such subsection (l) provides that prior to shipment of the handgun to the purchaser, the dealer, or manufacturer shall forward to the appropriate local law enforcement or State official a description of the handgun (not including serial number) and a copy of the sworn statement by registered or certified mail. Also, the dealer must receive a return receipt evidencing delivery of the letter containing the description of the handgun and the copy of the sworn statement or a notice of refusal to accept the letter in accordance with the applicable regulations of the Post Office Department.

*Paragraph (3)*

Paragraph (3) of such subsection (l) would impose a 7-day waiting period following receipt of the notification of the local law enforcement officer's acceptance or refusal before the manufacturer or dealer could make delivery to the consignee.

In addition, subsection (l) provides (1) that the Governor of any State may designate any official in his State to receive the notification to local law enforcement officials required by this subsection and that the Secretary shall publish such designation in the Federal Register; and (2) that the Governor of any State may request that the Secretary discontinue the required notification to local law enforcement officials in his State or any part thereof and upon publication in the Federal Register, the request shall be in effect for 5 years, unless withdrawn by the Governor and so published in the Federal Register.

*Subsection (m)*

Subsection (m) as added by section 2 of the bill is a new provision prohibiting licensees under the act from selling a handgun to an unlicensed individual who is a resident of a State, other than that in which the manufacturer's or dealer's place of business is located without compliance with the provisions of subsection (l) above. The subsection is intended to deal with the serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities. The hearings before the committee have demonstrated the ease with which residents of a particular State, which has laws regulating the purchase of firearms, can circumvent such laws by procuring a firearm in a neighboring jurisdiction which has no such controls on the purchase of firearms. The hearings have also shown

that this is a means by which criminal and lawless elements obtain firearms.

This provision allows such handgun purchases to be made, but only after compliance with the detailed procedures set forth in subsection (l) above.

### Subsection (n)

Subsection (n) of section 2 of the bill is a new provision that would make it unlawful for any person, in purchasing or otherwise obtaining or attempting to purchase or otherwise obtain a firearm from a licensed manufacturer or licensed dealer under this act, knowingly to make any written or oral false statement or to knowingly supply any false or spurious information or identification intended or calculated to deceive such licensee with respect to such person's identity, age, address, or criminal record (if any), or with respect to any other material fact pertinent to the lawfulness of a sale or other disposition of a firearm by a licensed manufacturer or licensed dealer.

### Subsection (o)

Subsection (o) of section 2 as contained in the bill is a new provision that would make it unlawful for any person to bring into or receive in the State where he resides a firearm purchased or otherwise obtained outside that State if it is unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.

The intent of this provision is to assist the States and their political subdivisions in the enforcement of applicable firearms control laws and ordinances by imposing Federal felony sanctions upon those who utilize channels of interstate or foreign commerce to circumvent or evade these laws and ordinances.

### SECTION 3

Section 3 of the bill would restate and revise section 3 of the Federal Firearms Act (15 U.S.C. 903). All references to ammunition would be stricken along with references to territories and possessions.

Subsection (a) of the existing law would be revised and the fee schedules for manufacturers, dealers, and pawnbrokers set forth in separate paragraphs. The fees for manufacturers and dealers would be increased. The fee for pawnbroker dealers is new. Subsection (b) of the existing law would be revised and three new requirements for obtaining a Federal license established. The applicant must be at least 21 years of age, must not be prohibited from transporting firearms under the provisions of the act, and must not have made false statements or misrepresented material facts in connection with his application. Subsection (c) of the bill is a new provision intended to substitute for section 3(c) of the existing law. Subsection (d) is a restatement of the recordkeeping requirement of existing law with minor changes.

### Subsection (a)

Subsection (a) of the bill is intended to make it clear that no person shall engage in business as a manufacturer of firearms, or as a dealer in firearms until he has filed an application with, and received a license to do so from the Secretary. In order to regulate effectively interstate and foreign commerce in firearms it is necessary that all persons en-

gaging in these businesses be licensed.   Similar provisions were upheld in *Hanf* v. *United States* (235 F. 2d 710, cert. den. 352 U.S. 880), as reasonably necessary to effective control of interstate and foreign commerce under comparable conditions.

Subsection (a) also provides that the application for a license shall be in such form and contain such information as the Secretary of the Treasury shall by regulation prescribe.   It is the intent of this provision to authorize the Secretary to require the submission of information reasonably relevant to the determination as to whether the applicant is entitled to a license under the standards prescribed in subsection (b). Since the Secretary has the responsibility for determining whether the license should be issued, he must necessarily have the authority to require the submission by the applicant of information relevant to his determination as to the applicant's eligibility.   Authority to prescribe the form of the license application has been exercised by the Secretary since the Federal Firearms Act was enacted in 1938.

Subsection (a) also increases license fees presently contained in section 3(a) of the Federal Firearms Act and adds a new fee for pawnbrokers.   The annual fee for manufacturers (including importers) would be doubled from $25 to $50.   Fees for dealers (including gunsmiths) would be increased from $1 to $10, except that a one-time fee of $25 would be levied for the first renewal date following the effective date of the bill or for the first year the dealer is engaged in business. This additional charge would help to defray the costs of the investigation necessary to determine if the applicant has met the licensing requirements contained in section 3(b) of the bill.

A separate license with a higher license fee is also provided for pawnbroker dealers.   A "pawnbroker" is defined in paragraph (8) of section 1 of the bill.   It is noted that under the National Firearms Act (26 U.S.C. ch. 53) pawnbroker dealers are charged a higher rate of occupational tax than other dealers.

Since all references to ammunition would be removed from the act by the bill, the substantial number of persons who deal only in ammunition will not be required to obtain a license under the act. Thus, ammunition reloaders and ammunition dealers will not be affected by the bill.

*Subsection (b)*

Subsection (b) establishes three conditions under which no licenses shall be issued by the Secretary of the Treasury or his disignee. An application for a license shall be denied if the applicant is "under 21 years of age," if he is "prohibited by the provisions of the act from transporting, shipping, selling, or receiving firearms in interstate or foreign commerce," and if the applicant has "willfully failed to disclose any material information required, or made any false statement as to any material fact, in connection with his application."

*Subsection (c)*

Subsection (c) as contained in the bill replaces the provisions of existing law contained in section 3(c) of the act (15 U.S.C. 903(c)) and reflects the construction of existing law as contained in current regulations (26 CFR, pt. 177).

The requirement of existing law, concerning the posting of a bond by a licensee convicted of a violation of the act in order to continue operations pending final disposition of the case on appeal, serves no

useful purpose, and has been omitted. Further, the provisions of this subsection have been revised to simplify administration. Since the licensee is required to reapply each year for a license, the information on the application relating to his indictment and/or conviction will be adequate. Also, the license itself can, as at present, contain a warning that the licensee cannot continue operations once his conviction has become final (other than as provided in section 10 of the existing law).

As under existing law and regulations, a new license will not be issued to a person under indictment for, or who has been convicted of, an offense punishable by imprisonment for a term exceeding 1 year. However, a licensed manufacturer or licensed dealer may continue operations pursuant to his existing license (provided that prior to the expiration of the term of the existing license timely application is made for a new license), during the term of such indictment and until any conviction pursuant to the indictment becomes final, whereupon he shall be subject to all provisions of this act, and operations pursuant to such license shall be discontinued. If a bona fide application for relief is filed under section 10 of the act, operations may continue until such application is acted upon.

*Subsection (d)*

Subsection (d) would restate and revise section 3(d) of the Federal Firearms Act (15 U.S.C. 903(d)). References to ammunition would be removed from the existing law. The word "permanent" would be stricken from the recordkeeping requirement of the subsection, since the Secretary of Treasury is given specific authority to prescribe regulations for the implementation of this requirement. The length of time for which the records should be kept and maintained by licensees under the provisions of the act and other administrative details would be left to the discretion of the Secretary. Thus, the word "permanent" becomes meaningless. It is anticipated that any regulations issued under that authority granted by this subsection of the bill would be reasonable and in accordance with good commercial practice and custom.

## SECTION 4

Section 4 of the bill would restate section 4 of the Federal Firearms Act (15 U.S.C. 904), strike the references to ammunition and to territories, possessions and the District of Columbia, and renumber and revise several provisions of the section for clarity.

*Subsection (a)*

Subsection 4(a) of the bill would restate portions of section 4 of the Federal Firearms Act (15 U.S.C. 904) and make several modifications thereof. Ammunition would be removed as elsewhere in the bill. The words "territory, or possession, or the District of Columbia," would be stricken consistent with their deletion in other sections of the bill. Other revisions would be made by renumbering and rephrasing provisions of the section for clarity without changing the meaning of existing law.

*Subsection (b)*

Subsection 4(b) of the bill would restate the remainder of section 4 of the Federal Firearms Act (15 U.S.C. 904) and would make certain

modifications. All references to ammunition would be deleted. The Secretary of "Defense or his designee" would be substituted for the Secretary of "War". The words "receipt or" would be added to the last sentence of the section to clarify the provision contained therein and other technical revisions made for the same purpose without altering the meaning of existing law.

### SECTION 5

Section 5 of the bill would restate section 5 of the Federal Firearms Act, add an element of reasonable cause to the provision which makes it unlawful for an applicant for a license or exemption to make a false statement in connection with the application, increase the maximum penalties provided for in the act from $2,000 to $10,000 and from 2 years to 10 years, provide for parole of sentenced offenders as the board of parole shall determine, remove the reference to ammunition contained in subsection (b), and update the reference to the Internal Revenue Code.

*Subsection (a)*

Subsection (a) of section 5 of the bill would restate the existing law (15 U.S.C. 905(a)) and make several changes. The words "or having reasonable cause to know" would be added to the provision which sets forth the unlawful act of making a false statement in connection with an application for a license or an exemption under the provisions of the Federal Firearms Act.

The maximum penalty provisions for violation of the Federal Firearms Act would be increased from $5,000 to $10,000 and 2 years to 10 years to serve as a further deterrence to potential violators of the act. It is anticipated that this change will have the effect of increasing compliance with the act's provisions.

All sentenced violators are made eligible for parole "as the board of parole shall determine." Thus, the opportunity will be available to keep hardened criminals away from the law-abiding community for a substantial period of time, but at the same time provide flexibility to correctional officials so that they may work with those who show significant potential for rehabilitation.

*Subsection (b)*

Subsection (b) of section 5 of the bill would restate subsection (b) of section 5 of the existing law (15 U.S.C. 905(b)) and make minor changes. The reference to ammunition would be deleted. The reference to the Internal Revenue Code would be changed to reflect the recodification of the code which was accomplished in 1954.

### SECTION 6

Section 6 of the bill would amend the Federal Firearms Act by adding a new section 11 which would provide that nothing contained in the act shall be construed as "modifying or affecting the requirements" of the provisions of the Mutual Security Act of 1954 which deal with "the manufacture, exportation, and importation of arms, ammunition, and implements of war."

Section 414 of that act gives authority to the President to control the export and import of arms, ammunition, implements of war, and technical data related thereto. It also requires all persons engaging

in these transactions to register with the U.S. Government, pay registration fees, and secure import licenses-for all such materials imported into this country.

### SECTION 7

Section 7 of the bill would establish the date at which time the amendments and changes made by the bill become effective. The effective date would be "the first day of the sixth month beginning after the date of enactment" of the amendments. It is felt that this period of time will be sufficient for the promulgation and dissemination of any regulations necessary to implement the amendments to the act made by the bill and would afford ample opportunity for comment of persons who would be affected by the regulations.

### SECTION 8

Section 8 of the bill would set forth a short title for the bill, "Federal Firearms Amendments of 1966."

### CHANGES IN EXISTING LAW

In compliance with subsection 4 of rule XXIX of the Standing Rules of the Senate, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

### THE FEDERAL FIREARMS ACT

That as used in this Act—

(1) The term "person" includes an individual, partnership, association, or corporation.

(2) *The term "State" includes each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, the Canal Zone, and American Samoa.*

[(2)] (*3*) The term "interstate or foreign commerce" means commerce between any State [, Territory, or possession (not including the Canal Zone), or the District of Columbia,] and any place outside thereof; or between points within the same State, [, Territory, or possession (not including the Canal Zone), or the District of Columbia] but through any place outside thereof; or within any [Territory or] possession or the District of Columbia.

[(3)] (*4*) The term "firearm", *except when the context otherwise requires*, means any weapon, *manufactured after the year 1898*, by [whatever] *whatsoever* name known, which *will, or* is designed to, *or which may be readily converted to,* expel a projectile or projectiles by the action of an explosive [and a firearm muffler or firearm silencer, or any part or parts of such weapon] *or the frame or receiver of any such weapon.*

(5) *The term "handgun" means any pistol or revolver originally designed to be fired by the use of a single hand and which is designed to fire or capable of firing fixed cartridge ammunition, or any other firearm originally designed to be fired by the use of a single hand.*

[(4)] (*6*) The term "manufacturer" means any person engaged in the [manufacture or importation of firearms, or ammunition

or cartridge cases, primers, bullets, or propellent powder] *business of manufacturing or importing firearms* for purposes of sale or distribution [; and the]. *The* term "licensed manufacturer" means any such person licensed under the provisions of this Act.

[(5)] *(7)* The term "dealer" means any person engaged in the business of selling firearms [or ammunition or cartridge cases, primers, bullets or propellent powder,] at wholesale or retail, or any person engaged in the business of repairing such firearms or of manufacturing or fitting [special] barrels, stocks, *or trigger* mechanisms [, or breech mechanisms] to firearms, *or any person who is a pawnbroker. The* [and the] term "licensed dealer" means any [such person] *dealer who is* licensed under the provisions of this Act.

*(8) The term "pawnbroker" means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm as security for the repayment of money loaned thereon.*

*(9) The term "Secretary" means the Secretary of the Treasury or his designee.*

*(10) The term "crime of violence" includes voluntary manslaughter, murder, rape, mayhem, kidnaping, robbery, burglary, housebreaking, extortion accompanied by threats of violence, assault with a dangerous weapon, assault with intent to commit any offense punishable by imprisonment for more than one year, arson punishable as a felony, or an attempt to commit any of the foregoing offenses.*

*(11) The term "indictment" includes an indictment or any information in any court of the United States or in any court of any State under which a crime of violence may be prosecuted.*

[(6)] *(12)* The term "fugitive from justice" means any person who has fled from any State [, Territory, the District of Columbia, or possession of the United States] to avoid prosecution for a crime [punishable by imprisonment for a term exceeding one year] *of violence* or to avoid giving testimony in any criminal proceeding.

[(7) The term "ammunition" shall include only pistol or revolver ammunition.   It shall not include shotgun shells, metallic ammunition suitable for use only in rifles, or any .22 caliber rimfire ammunition.]

SEC. 2. (a) It shall be unlawful for any manufacturer or dealer, except a manufacturer or dealer having a license issued under the provisions of this Act, to transport, ship, or receive any firearm [or ammunition] in interstate or foreign commerce.

(b) It shall be unlawful for any person to receive any firearm [or ammunition] transported or shipped in interstate or foreign commerce in violation of [subdivision] *subsection* (a) of this section, knowing or having reasonable cause to believe such [firearms] *firearm* [or ammunition] to have been transported or shipped in violation of [subdivision (a) of this section] *said subsection.*

(c) It shall be unlawful for any licensed manufacturer or *licensed* dealer to [transport or ship] *ship or transport, or cause to be shipped or transported,* any firearm in interstate or foreign commerce [to any person other than a licensed manufacturer or dealer in any State the laws of which require that a license be obtained for the purchase of such firearm, unless such license is exhibited to such manufacturer or dealer

by the prospective purchaser], *to any person in any State where the receipt by such person of such firearm would be in violation of any statute of such State unless the licensed manufacturer or licensed dealer establishes that he was unable to ascertain with reasonable effort that the shipment would be in violation of such State law.*

(d) It shall be unlawful for any person to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm [or ammunition] to any person knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States [, Territories, possessions, or the District of Columbia of a crime punishable by imprisonment for a term exceeding one year] *or in any court of any State of a crime of violence* or is a fugitive from justice.

(e) It shall be unlawful for any person who is under indictment or who has been convicted of a crime [punishable by imprisonment for a term exceeding one year] *of violence*, or who is a fugitive from justice to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm [or ammunition].

(f) It shall be unlawful for any person who *is under indictment or who* has been convicted of a crime [punishable by imprisonment for a term exceeding one year] *of violence*, or *who* is a fugitive from justice, to receive any firearm [or ammunition] which has been shipped or transported in interstate or foreign commerce [, and the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or recieved, as the case may be, by such person in violation of this Act.].

(g) It shall be unlawful for any person to transport or ship or cause to be transported or shipped in interstate or foreign commerce any stolen firearm [or ammunition], knowing, or having reasonable cause to believe, [same] *such firearm* to have been stolen.

(h) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any firearm [or ammunition] or to pledge or accept as security for a loan any firearm [or ammunition] moving in or which is a part of interstate or foreign commerce, and which while so moving or constituting such part has been stolen, knowing, or having reasonable cause to believe, [the same] *such firearm* to have been stolen.

(i) It shall be unlawful for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered [, and the possession of any such firearm shall be presumptive evidence that such firearm was transported, shipped, or received, as the case may be, by the possessor in violation of this Act.].

(j) *It shall be unlawful for any manufacturer or dealer knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed manufacturers or licensed dealers, any package or other container in which there is any handgun without written notice to the carrier that such handgun is being transported or shipped.*

(k) *It shall be unlawful for any common or contract carrier to deliver, or cause to be delivered, in interstate or foreign commerce any handgun to any person with knowledge or with reasonable cause to believe that such person is under twenty-one years of age.*

(*l*)  *It shall be unlawful for any licensed manufacturer or licensed dealer to ship any handgun in interstate or foreign commerce to any person other than another licensed manufacturer or licensed dealer unless:*

(*1*)  *such person has submitted to such manufacturer or dealer a sworn statement in such form and manner as the Secretary shall by regulation prescribe, containing the following information: (A) that such person is twenty-one years or more of age; (B) that he is not a person prohibited by this Act from receiving a handgun in interstate or foreign commerce; (C) that there are no provisions of law, regulations, or ordinances applicable to the locality to which the handgun will be shipped, which would be violated by such person's receipt or possession of the handgun; and (D) the title, name, and official address of the principal law enforcement officer of the locality to which the handgun will be shipped;*

(*2*)  *such manufacturer or dealer has, prior to the shipment of such handgun, forwarded by registered or certified mail (return receipt requested) to (A) the local law enforcement officer named in the sworn statement, or (B) the official designated by the Governor of the State concerned under this subsection, a description of the handgun to be shipped (including the manufacturer, the caliber, the model and type of such handgun, but not including serial number identification), and one copy of the sworn statement, and has received a return receipt evidencing delivery of such letter, or such letter has been returned to such manufacturer or dealer due to the refusal of the named law enforcement officer or designated official to accept such letter in accordance with United States Post Office Department regulations; and*

(*3*)  *such manufacturer or dealer has delayed shipment for a period of at least seven days following receipt of the notification of the local law enforcement officer's or designated official's acceptance or refusal of such letter.*

*A copy of the sworn statement and a copy of the notification to the local law enforcement officer or designated official along with evidence of receipt or rejection of that notification shall be retained by the licensee as a part of the records required to be kept under section 3(d).   For purposes of paragraph (2)(B), the Governor of any State may designate any official in his State to receive such notification for such State or any part thereof in lieu of the notification required by paragraph 2(A) and shall notify the Secretary of the name, title, and business address of such official and the Secretary shall publish in the Federal Register the name, title, and address of such official.   Upon such publication, notification to the local law enforcement officers required under paragraph (2)(A) of this subsection will not be required for a period of five years from the date of such publication unless the request is withdrawn by the Governor of such State and such withdrawal is published in the Federal Register.*

(*m*)  *It shall be unlawful for any licensed manufacturer or licensed dealer to sell or deliver for sale any handgun to any person other than another licensed manufacturer or licensed dealer who is not a resident of the State in which such manufacturer's or dealer's place of business is located and in which the sale or delivery for sale is made, unless such manufacturer or dealer has, prior to sale, or delivery for sale of the handgun, complied with the provisions of subsection (1)(b) of this section.*

(*n*)  *It shall be unlawful for any person in connection with the acquisition or attempted acquisition of a firearm from a licensed manufacturer or licensed dealer to—*

>  *(1) knowingly make any false or fictitious statement, written or oral; or*
>  *(2) knowingly furnish or exhibit any false, fictitious, or misrepresented identification with the intention to deceive such manufacturer or dealer with respect to any fact material to the lawfulness of the sale or other disposition of a firearm by a licensed manufacturer or licensed dealer under the provisions of this section.*

 *(o) It shall be unlawful for any person to transport or receive in the State where he resides a firearm purchased or otherwise obtained by him outside the State where he resides if it would be unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.*

 SEC. 3. (a) Any manufacturer or dealer desiring a license to transport, ship, or receive firearms [or ammunition] in interstate or foreign commerce shall [make] *file an* application [to] *for such license with* the Secretary [of the Treasury, who shall prescribe by rules and regulations the information to be contained in such application. The applicant shall, if a manufacturer, pay a fee of $25 per annum and, if a dealer, shall pay a fee of $1 per annum], *in such form and containing such information as the Secretary shall by regulation prescribe. Each such applicant shall be required to pay a fee for obtaining such license as follows:*

>  *(1) If a manufacturer of firearms, a fee of $50 per annum;*
>  *(2) If a dealer (other than a pawnbroker) in firearms, a fee of $10 per annum, except that for the first renewal following the effective date of the Federal Firearms Amendments of 1966 or for the first year he is engaged in business as a dealer such dealer will pay a fee of $25;*
>  *(3) If a pawnbroker, a fee of $50 per annum.*

 (b) Upon *filing by a qualified applicant of a proper application and the* payment of the prescribed fee, the Secretary [of the Treasury] shall issue to such applicant [a license] *the license applied for,* which shall, *subject to the provisions of this Act,* entitle the licensee to transport, ship, *sell* and receive firearms [and ammunition] in interstate [and] *or* foreign commerce [unless and until the license is suspended or revoked in accordance with the provisions of this Act: *Provided,* That no license shall be issued to any applicant within two years after the revocation of a previous license] *during the period stated in the license.* No license shall be issued pursuant to this Act—

>  *(1) to any applicant who is under twenty-one years of age;*
>  *(2) to any applicant, if the applicant (including, in the case of a corporation, partnership, or association, any individual who, directly or indirectly, has the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is prohibited by the provisions of this Act from transporting, shipping, selling or receiving firearms in interstate or foreign commerce; or*
>  *(3) to any applicant who has willfully failed to disclose any material information required, or made any false statement as to any material fact, in connection with his application.*

 [(c) Whenever any licensee is convicted of a violation of any of the provisions of this Act, it shall be the duty of the clerk of the court to notify the Secretary of the Treasury within forty-eight hours after such conviction and said Secretary shall revoke such license: *Provided,* That in the case of appeal from such conviction the licensee may

furnish a bond in the amount of $1,000, and upon receipt of such bond acceptable to the Secretary of the Treasury he may permit the licensee to continue business during the period of the appeal, or should the licensee refuse or neglect to furnish such bond, the Secretary of the Treasury shall suspend such license until he is notified by the clerk of the court of last appeal as to the final disposition of the case.】

(c) *The provisions of section 2 (d), (e), and (f) of this Act shall not apply in the case of a licensed manufacturer or licensed dealer who is under indictment for a crime of violence: Provided, That such manufacturer or dealer gives notice to the Secretary by registered or certified mail of his indictment within thirty days of the date of the indictment. A licensed manufacturer or licensed dealer who has given notice of his indictment to the Secretary, as provided in this subsection, may continue operation pursuant to his existing license during the term of such indictment, and until any conviction pursuant to the indictment becomes final, whereupon he shall be fully subject to all provisions of this Act, and operations pursuant to such license shall be discontinued.*

(d) 【Licensed dealers】 *Each licensed manufacturer and licensed dealer* shall maintain such 【permanent】 records of *production,* importation, *notification,* shipment, *sale* and other disposal of firearms 【and ammunition】 as the Secretary 【of the Treasury shall】 *may by regulation* prescribe.

Sec. 4. (a) The provisions of this Act shall not apply with 【respect】 *respect*—

(1), to the transportation, shipment, receipt, or importation of any 【firearm or ammunition,】 *firearms* sold or shipped to, or issued for the use 【of, (1)】 *of (A)* the United States or any department, independent establishment, or agency thereof; 【(2)】 *(B)* any State 【Territory, or possession, or the District of Columbia,】 or any department, independent establishment, agency, or any political subdivision thereof; 【(3)】 *(C)* any duly commissioned officer or agent of the United States, a State, 【Territory, or possession, or the District of Columbia,】 or any political subdivision thereof; 【(4) or to】 *(D)* any bank, 【public carrier, express】 *common or contract carrier, express company,* or armored-truck company organized and operating in good faith for the transportation of money and valuables, *which is granted an exemption by the Secretary;* or 【(5)】 *(E)* 【to】 any research laboratory designated 【by the Secretary of the Treasury: *Provided,* That such bank, public carriers, express, and armored-truck companies are granted exemption by the Secretary of the Treasury; nor】 *as such by the Secretary; or*

(2) to the transportation, shipment, or receipt of 【any】 antique or unserviceable firearms 【, or ammunition,】 possessed and held as 【curios or museum pieces: *Provided,* That nothing herein】 *a curio or museum piece.*

(b) *Nothing* contained in this 【section】 *Act* shall be construed to prevent shipments of firearms 【and ammunition】 to institutions, organizations, or persons to whom 【such】 firearms 【and ammunition】 may be lawfully delivered by the Secretary of 【War,】 *Defense or his designee,* nor to prevent the *receipt or* transportation of such firearms 【and ammunition so delivered】 by their lawful possessors while they are engaged in military training or in competitions.

Sec. 5. (a) Any person violating any of the provisions of this Act or any rules and regulations promulgated hereunder, or who makes

30        FEDERAL FIREARMS AMENDMENTS OF 1966

any statement in applying for the license or exemption provided for in this Act, knowing *or having reasonable cause to know* such statement to be false, shall, upon conviction thereof, be fined not more than [$2,000] *$10,000*, or imprisoned for not more than [five] *ten* years, or both, *and shall become eligible for parole as the Board of Parole shall determine.*

(b) Any firearm [or ammunition] involved in any violation of the provisions of this Act or any rules or regulations promulgated thereunder shall be subject to seizure and forfeiture, and all provisions of [Title 26] *the Internal Revenue Code of 1954* relating to the seizure, forfeiture, and disposition of firearms, as defined in section [2733 of Title 26] *5848(1) of said Code* shall, so far as applicable, extend to seizures and forfeitures incurred under the provisions of this Act.

*        *        *        *        *        *        *

SEC. 10. A person who has been convicted of a crime punishable by imprisonment for a term exceeding one year (other than a crime involving the use of a firearm or other weapon or a violation of this Act or of the National Firearms Act) may make application to the Secretary of the Treasury for relief from the disabilities under this Act incurred by reason of such conviction, and the Secretary of the Treasury may grant such relief if it is established to his satisfaction that the circumstances regarding the conviction, and the applicant's record and reputation, are such that the applicant will not be likely to conduct his operations in an unlawful manner, and that the granting of the relief would not be contrary to the public interest. A licensee conducting operations under this Act, who makes application for relief from the disabilities incurred under this Act by reason of such a conviction, shall not be barred by such conviction from further operations under his license pending final action on an application for relief filed pursuant to this section. Whenever the Secretary of the Treasury grants relief to any person pursuant to this section, he shall promptly publish in the Federal Register notice of such action, together with the reasons therefor.

*SEC. 11. Nothing in this Act shall be construed as modifying or affecting the requirements of section 414 of the Mutual Security Act of 1954, as amended, with respect to the manufacture, exportation, and importation of arms, ammunition, and implements of war.*