# EXHIBIT

# 2

## Part 2 of 3

## INDIVIDUAL VIEWS OF MESSRS. DODD, BAYH, KENNEDY OF MASSACHUSETTS, TYDINGS, FONG, JAVITS, SMATHERS, AND LONG OF MISSOURI

It became obvious late in the session that the controversial aspects of the firearms legislation proposed by the Juvenile Delinquency Subcommittee gave the administration bill little chance of being reported out of the full committee in this Congress. In view of that fact, even though a majority of the committee voted for S. 1592 initially, the committee finally voted to report S. 3767 favorably, and we did this with the intention of substituting S. 1592 for S. 3767 once the bill came to a vote on the Senate floor.

Eight of the sixteen members of the Judiciary Committee have signed these individual views, more than signed any other views contained in this report.

In our view, the report on S. 3767 raises serious questions.

The most important point is that this report has not been signed by a majority of the members of the Judiciary Committee.

It has not even been signed by all of the opponents of the administration's firearms control bill, S. 1592.

It should be noted that the report on S. 3767 was submitted to the members for approval shortly before it was to be printed. Thus, time did not permit much more than a brief analysis of the findings set out and the basis of those findings.

It is significant that the opponents' report does not even mention the major change contained in S. 3767, one which would weaken the present Federal Firearms Act (i.e., the return to the "crime of violence" standard as a substitute for the existing "felony" standard). Further, the record reflects no need for this change. This aspect of the bill is discussed subsequently.

There are several specific areas in the report on S. 3767 which are in direct contradiction to the facts and to the testimony presented before the Subcommittee To Investigate Juvenile Delinquency.

### COMMITTEE ACTION

The facts are as follows: In voting on the major provisions of S. 1592, i.e. the inclusion of handguns, the inclusion of rifles and shotguns, the inclusion of import controls and the inclusion of destructive device controls, the committee vote was nine to five in favor of their inclusion.

It was the extended opposition of several members of the committee which led the supporters of S. 1592 to propose reporting S. 3767 from the committee as a means of getting some kind of gun bill to the Senate floor. They did this with the full intention of offering S. 1592 as a substitute for S. 3767.

31

*Rifles and shotguns*

The opponents' report claims that upon review of the testimony before the Juvenile Delinquency Subcommittee there is no justification for restrictions on rifles and shotguns. It ignores the testimony of Commander Leary of the Philadelphia Police Department, Deputy Comdr. Leonard Reisman of the New York Police Department, and Attorney General Sills of New Jersey. (Their testimony is referred to in the individual views of Senator Dodd.)

It ignores the fact that 1,690 persons were murdered and many thousands wounded with rifles and shotguns last year and that this figure represents a steady increase over the last 3 years.

*Imported firearms*

Under the title "What S. 3767 Would Not Do," the opponents' report completely ignores the testimony of law enforcement witnesses who enthusiastically supported S. 1592's ban on imported military surplus handguns and other foreign-made firearms, not suitable for lawful use. Completely overlooked is the evidence presented by Chief Herbert Jenkins, of Atlanta, Ga., Chief Curtis Brostron, of St. Louis, Mo., Attorney General Thomas Lynch, of California, Attorney General McLeod, of South Carolina, that great numbers of firearms used in crimes in their jurisdiction were in this category. (The individual views go into detail on this point.)

The report indicates that the same restrictions should be applied to imported firearms as are applied to domestic firearms and using this "equality" argument it denounces any embargo on imported firearms. This argument completely overlooks the existing Federal law, implemented by regulations, which prohibits the sale of domestic military surplus firearms to the public. (They *may* be obtained under limited and special circumstances under the civilian marksmanship program of the Department of Defense.) The report denounces embargoes on the one hand, yet later, as a partial rationale for excluding destructive devices from his bill, it indicates that the State Department, under the authority granted by the Mutual Security Act of 1954, as amended, can in fact embargo the importation of destructive devices.

The opponents' report further alleges that the Federal Firearms Act primarily governs interstate and foreign commerce in firearms used for sporting purposes. This is an unusual interpretation. The Federal Firearms Act covers all firearms, by definition, and to say otherwise represents a consummate failure to appreciate the legislative history of this law. The report states further that the National Firearms Act has effectively controlled firearms covered by that act. This area is covered later in the individual views and, summarily the national act does not proscribe shipment and receipt by and to felons or fugitives. It merely imposes a transfer tax on transactions, and compliance with those provisions results in a lawful transfer. A felon could lawfully acquire a national act weapon under the language of that specific act. A prime example of the application of the national act concerns the recent case in Washington State, where a mental incompetent acquired, lawfully, a fully operable German machinegun, by paying the $200 transfer tax.

*Civilian marksmanship program*

The opponents' report cites a report of the Arthur D. Little Co. on the Office of the Director of Civilian Marksmanship (DCM) program which operates under the auspices of the National Board for the Promotion of Rifle Practice.

Based on this study, the opponents' report concludes:

> The plain fact that preinduction firearms training produces more capable and effective soldiers was recently made clear by a Department of Defense study.

Again this statement is not in keeping with the facts. First, the study did not show that such preinduction training produced more capable or effective soldiers. In fact, it stated that only 3 percent (385 men) of the 12,800 basic trainees surveyed at 4 basic training centers had previous DCM-affiliated club firearms training.

This is a rather insignificant number of the total number of trainees surveyed to make such a sweeping statement. More important, one of the crucial questions left unanswered by this study is the performance of both groups under combat conditions.

We *can* say that the study strongly suggests that the program is not doing what it is supposed to do, i.e., train significant numbers of young men in rifle proficiency before entering military service, so that they will be better marksmen in combat.

This statement is in direct contradiction to the testimony of the Department of Defense on S. 1592. In addition, we must point out that DCM-trained men are apparently not entering military service (3 percent of the trainees in a sampling of 12,800). One of the reasons for this is that a significant 42 percent of the members of the DCM clubs are over 25, an age after which the likelihood of being drafted drastically diminishes.

## COMPARISON OF S. 1592 AND S. 3767

S. 1592, the administration firearms control bill, was carefully studied by the Juvenile Delinquency Subcommittee during 11 days of hearings during May, June, and July of 1965 and then reported, as amended, to the full committee on May 19 of 1966.

It has been endorsed by the administration, by the American Bar Association, and by the International Association of Chiefs of Police. The bill has been supported editorially by virtually every leading newspaper in the country. Fully 70 percent of the people, according to a recent Gallup poll, favor enactment of legislation that would be much more restrictive than S. 1592 in controlling firearms in this country.

We believe that the need for the amendments to the Federal Firearms Act embodied in S. 1592, as amended by the subcommittee, has more than adequately been documented through testimony and other factual information coming to the attention of the subcommittee.

We do not consider that S. 3767 is a substitute for S. 1592. Its scope is much too narrow and limited. Its claimed effectiveness is very questionable. S. 3767 does not provide the controls that our hearings have demonstrated are necessary, if we are to effectively regulate the acquisition of firearms as a means of arresting the rising

crime rate. S. 3767 falls far short of the positive controls that the enactment of S. 1592 would bring about.

For example, S. 3767 does not propose any control at all over the indiscriminate sale of rifles and shotguns yet there were 1,690 murders committed in 1965 with these firearms. The hearing record on S. 1592 indicates that rifles and shotguns are misused, especially in those areas where there are stringent controls on the acquisition and the use of pistols and revolvers.

*Mail-order controls*

S. 3767 does not prohibit the mail-order sale of handguns to individuals as does S. 1592. The method of regulation envisioned in S. 3767 is a requirement that an affadavit be filed. This approach was rejected by the subcommittee because the provisions of S. 1592 would be much more effective. By cutting out these mail-order sales, we would assist the States materially in controlling handgun sales within their own borders.

S. 3767 retains the controls now in the Federal Firearms Act over the interstate movement of shotguns and rifles, but they are only a record-keeping requirement and a proscription on shipment and receipt by and to felons. In addition, the bill would eliminate many of the present controls over the interstate movement of mufflers and silencers. And S. 3767 does not include destructive devices, which has long been considered a serious omission in the act. S. 1592 would correct this omission.

The hearings clearly establish the need for additional controls over mail-order sales of all firearms and certain other devices. There is nothing in the hearing record to justify the elimination of mufflers and silencers, articles which have no legitimate use, and there is a need to control destructive devices as is proposed in S. 1592.

S. 1952 would authorize the mail-order shipment of rifles and shotguns subject to affidavit controls.

It would retain mufflers and silencers within the control of the Federal Firearms Act and it would extend these controls to destructive devices.

More significantly, the interstate movement of handguns, destructive devices, and ammunition for such devices, would be limited to licensees by S. 1592. Nonlicensed persons would be prohibited from making mail-order purchases of such weapons.

*Importations*

S. 3767 would not affect imported weapons, in spite of a wealth of testimony reflecting the need for the controls provided for in S. 1592. The record compiled on S. 1592 contains more than adequate documentation of the problems and dangers inherent in the unlimited importation of firearms.

S. 1592 is concerned with the importation of destructive devices, ammunition for such devices and surplus military weapons. It would prohibit the importation of destructive devices and ammunition therefor, and would place only reasonable restrictions on the importation of surplus military weapons.

*Licensing*

S. 3767 provides for the licensing of manufacturers and dealers receiving or shipping firearms in interstate or foreign commerce, as does the present statute. The criteria used for the issuance of a

license under the bill are that the applicant (1) must be at least 21 years of age, (2) is not prohibited by the act from shipping or receiving firearms in interstate or foreign commerce, and (3) has not willfully failed to disclose a material fact or made a false statement in his application.   An example readily illustrates the weakness in these proposed licensing features of the bill.   Assuming that requirement Nos. (1) and (3) are met, S. 3767 would not prevent the issuance of a license to one convicted of a violation of this very act, the National Firearms Act, the Narcotics Act, or many other felonies. Moreover, the privilege granted by a license could be suspended only in the event the licensee were finally convicted of a crime of violence. Thus the Government might be placed in the embarrassing position of having to authorize firearms operations by a person convicted of prior violations of the Federal firearms laws.

The licensing problem is treated in detail in S. 1592.   That bill would require anyone engaged in the business of manufacturing, importing or dealing in firearms to obtain a license.   That require-ment is substantially broader than merely requiring a dealer or manufacturer shipping or receiving firearms in interstate or foreign commerce to obtain a license as does S. 3767.   The criteria for issuing a license under S. 1592 are keyed to the age of the applicant, whether the applicant will actually engage in the firearms business, whether he may lawfully ship or receive firearms in interstate or foreign com-merce under the act, and whether, in view of the past record and reputation of the applicant, he is likely to conduct his business lawfully.

In short, S. 1592, contemplates that the privilege of engaging in the firearms business should be extended only to those legitimately entitled to the confidence of society.   Moreover, the licensing provisions of S. 1592 recognize the right of one who has been denied a license to obtain a hearing as well as judicial review of the administrative deci-sion depriving him of a license.   It should also be noted that under S. 1592, certain business-type felony convictions will not result in the "felony" sanctions.   Finally, if a person convicted of certain other felonies is, in fact, entitled to the confidence of society, under section 10 of the act, he could be granted relief at the discretion of the Secretary of the Treasury.

*Substituting "crime of violence" criteria for so-called "felony" criteria used in the present act and in S. 1592*

As just outlined, S. 3767 does not contain the licensing standards set forth in S. 1592.   Thus, under that bill it would be possible for a convicted gambler or racketeer to become licensed under the Federal Firearms Act.   There is another major flaw in S. 3767 which would allow an evasion of the major intent of the act.   In reverting to the pre-1961 preclusionary term "crime of violence" rather than retaining the term "crime punishable by imprisonment for a term exceeding 1 year", S. 3767 would not preclude a person who had violated a pro-vision of the National or Federal Firearms Act from being licensed under the Federal act as a dealer, manufacturer or importer of firearms. This clearly is outside of the intent of the present act.

Under S. 3767, the Treasury Department would have to issue a license to a person who had violated the National Firearms Act or the Federal Firearms Act.   It is this type of violator that the present act has tried to get at and since passage of the 1961 amendment (changing crime of violence to crime punishable by a term of imprisonment

exceeding 1 year), there have been many denials of licenses to persons
who have, in the past, violated one or both acts.

In view of the importance of this proposed change, we feel it is
necessary to review the history of this part of the Federal Firearms Act.
The "crime of violence" criteria appeared in the original Federal
Firearms Act.  However, the criteria of "crime punishable by im-
prisonment for a term exceeding 1 year"—the felony criteria—was
substituted by Public Law 87–342.  Both Senate Report 364 (87th
Cong., 1st sess.) and House Report 1202 (87th Cong., 1st sess.) on
S. 1750, which became Public Law 87–342, stated:

> Over the past few years the infiltration of racketeering
> into our society and the exploding crime rate have increas-
> ingly become a cause for national concern.  New laws are
> needed to give the Federal Bureau of Investigation additional
> jurisdiction to assist local authorities in the common assault
> against crime.  S. 1750, introduced at the request of the
> Attorney General as an integral part of an anticrime legisla-
> tive program, would be such a law.
>
> Additionally, it would make it more difficult for the
> criminal elements of our society to obtain firearms.
>
> The Attorney General's letter proposing the enactment
> of this legislation, a letter from the Comptroller General, as
> well as a letter from the executive vice president of the
> National Rifle Association of America urging such an enact-
> ment, are printed below.

In considering H.R. 9570 (89th Cong., 1st sess.), which later
became Public Law 89–184, the Congress again looked at the crime
of violence criteria in relation to the felony criteria.  That public
law added section 10 (15 U.S.C. 910) to the Federal Firearms Act
and through the provisions of that section, the Secretary is authorized
to grant relief to felons (other than those who used a firearm or
other weapon to commit a felony or were convicted of violating the
Federal or National Firearms Act) under certain circumstances.
Both Senate Report 666 (89th Cong., 1st sess.) and House Report 708
(89th Cong., 1st sess.) stated:

> Prior to 1961 the Federal Firearms Act prohibited such
> interstate traffic in firearms and ammunition only in the case
> of a person indicted for, or convicted of, a "crime of violence."
> The 1961 legislation changed this to the language indicated
> above; that is, substantially to any crime meeting the defini-
> tion of a felony under Federal law (18 U.S.C. 1(1)).
>
> * * * However, your committee has concluded from an
> examination of this case that, under certain circumstances,
> it would be desirable to authorize the Secretary of the Treas-
> ury to grant relief from the disabilities imposed under the
> Federal Firearms Act in the case of felony convictions.
> Relief from the disabilities is provided, however, only where
> it is established to the Secretary's satisfaction that the cir-
> cumstances regarding the conviction and the applicant's
> record and reputation are such that he will not be likely to
> conduct his operations in an unlawful manner and that the
> granting of the relief will not be contrary to the public
> interest.  Among the factors which would be given primary

consideration in the case of a corporation is the absence of
culpability of any person, at the time the application is filed,
having the power to direct or control the management of the
corporation.

The Secretary of the Treasury is not given permission to
grant such relief if the crime involves the use of a firearm
or other weapon or a violation of the Federal Firearms Act,
or the National Firearms Act.

The record of hearings on S. 1592 shows no need to return to the
crime of violence criteria. Yet, S. 3767 proposes such action. More-
over, the manner in which this criteria would be incorporated in the
act by S. 3767 would create inconsistencies. Under the licensing
provisions, as amended, a person convicted of a violation of the act,
the National Firearms Act, a narcotics violation, or many other
felonies would be entitled not only to continue a firearms business
under an outstanding license but also to obtain a new license under
the act in that the act would not prohibit foreign or interstate ship-
ments or receipts by such persons. In addition, the provisions of
section 10 of the act (15 U.S.C. 910) would, for all practical purposes,
become meaningless.

S. 1592 retains the "felony" criteria. It is used in relation to un-
lawful acts. The licensing provisions incorporate this criteria and
expand on it. Moreover, it should be noted that in those instances
where this criteria may prove to be unjust the person affected may
obtain relief pursuant to section 10 of the act under stated circum-
stances.

*Implementation of State firearms laws*

Section 902(c) of S. 3767 is written so as to be largely ineffective as
a means of regulating the interstate movement of firearms.

It reads:

> It shall be unlawful for any licensed manufacturer or
> licensed dealer to ship or transport, or cause to be shipped or
> transported, any firearm in interstate or foreign commerce,
> to any person in any State where the receipt by such person
> of such firearm would be in violation of any statute of such
> State unless the licensed manufacturer or licensed dealer
> establishes that he was unable to ascertain with reasonable
> effort that the shipment would be in violation of such State
> law.

This provision would be of doubtful value in assisting the States to
enforce their own gun laws for the following reasons: (1) It applies
only to interstate shipment and would not prevent a felon or fugitive
from buying a gun from a dealer, over the counter, in his own State;
(2) it would punish shipment by licensees to purchasers in States where
it would be unlawful for the buyer to receive a firearm; whereas most
prohibitive State gun laws proscribe purchase, ownership, possession,
transportation, and so forth, by criminals or other specified classes.
They do not prohibit receipt. Most States would have to enact
special legislation penalizing receipt of firearms in order to benefit
from the proposed control; and (3) the "unless" clause would make it
very difficult to establish an offense under this provision. This is the
very problem now faced by the Treasury Department under the present
act.

38       FEDERAL FIREARMS AMENDMENTS OF 1966

The language of the "unless" clause is faulty in that it relieves the dealer of criminal liability because the substantive offense is based on receipt in violation of State law rather than possession.

In the opinion of the Treasury Department this subsection would be as ineffective as is the present subsection 902(c) of the Federal Firearms Act, under which not a single conviction has been obtained since enactment of the act in 1938.

A further consideration is the fact that many political subdivisions of a State have enacted local laws or ordinances controlling the sale, transfer, or possession of firearms in their respective jurisdictional areas. This subsection would not assist authorities in such local areas in the enforcement of control provisions.

On the other hand, S. 1592 offers assistance to State and local authorities in controlling the movement of firearms into a State or political subdivision of a State. This, in fact, is one of the acute problems which the bill is designed to correct. In the case of handguns, and certain other types of weapons, this would be effected by limiting interstate shipments to those between licensees and prohibiting such weapons from being shipped interstate to nonlicensed persons. Moreover, S. 1592 would prohibit over-the-counter sales of handguns and certain other types of weapons to out-of-State residents. It specifically proscribes the sale of any firearm where the receipt or possession of the weapon would be in violation of any State or local law, regulation, or ordinance, and further, prohibits any one from bringing a firearm into his State of residence from another State if it would be unlawful for him to purchase or possess the firearm in the State of his residence or political subdivision thereof where he resides. It includes no proviso similar to that in S. 3767 which would render these prohibitions unenforceable.

*Destructive devices*

S. 3767 does not define nor provide special regulations over the acquisition of "destructive devices," weapons which are basically armaments of war. Thus, under S. 3767 any teenager could acquire through the mail order route an antitank gun in the same manner that he would acquire a .22 caliber rifle. We believe that destructive devices should be regulated in accordance with the provisions of S. 1592, which provides for strict controls over their acquisition.

The apparent rationale for failure to include "destructive devices" in S. 3767 is that such weapons should be covered only by the National Firearms Act rather than by the Federal Firearms Act, which S. 3767 would amend.

We do not concur with that rationale.

The National Firearms Act (1934) is intended to regulate and control the possession of automatic weapons under the taxing power. It is similar to the intent of the Marihuana Tax Act, that is to control, through taxing measures, certain commodities. The commodities controlled under the National Firearms Act are the gangster's weapons of the thirties, machineguns, sawed-off shotguns, etc.

The act requires the payment of a transfer tax of $200 on automatic weapons and of $5 on the other weapons covered in the act, which tax is paid by the transferor. If the taxing provisions of the act are complied with then the covered weapons may be lawfully obtained. Thus, a felon who complied with the transfer tax provision could lawfully purchase a machinegun, under the act.

The act does not proscribe sale to a felon or acquisition by a felon through movement in interstate commerce. However, the Federal Firearms Act (1938), which covers all firearms, does proscribe the interstate shipment and receipt of all firearms, including the National Act weapons, by and to felons and fugitives. Thus there is no rationale for including "destructive devices" in the National Act only. It is obvious that such weapons should be included in the Federal Firearms Act, if we are to control their interstate movement and acquisition adequately and effectively.

In summary, S. 3767 is quite limited and would not be as positive a crime deterrent as S. 1592. Further, in urging enactment of his bill, Senator Hruska has never made clear the inconveniences or extreme burdens of law-abiding sportsmen that S. 1592 would effect. All of our 50 States now have a substantial number of federally licensed dealers, thus any responsible person could purchase the firearm of his choice through such dealers with minor inconvenience of identifying himself, filling out a form and complying with the laws of his State.

If we hope to enact effective firearms legislation, then we cannot accept Senator Hruska's ineffective compromise. This is borne out through a perusal of the legislative history of the National and Federal Firearms Acts, both of which were watered down versions of the original proposals, and which have led to the tragic situation in this country today where any juvenile, criminal, or demented person can buy a gun with unbelievable ease.

A comparative analysis of S. 1592 and S. 3767 follows:

| S. 1592 | S. 3767 |
|---|---|
| Definition section: | |
| Defines firearms to include destructive devices, mufflers, and silencers. | No similar provision. |
| Defines specifically destructive devices (to provide for special regulation). | No similar provision. |
| Defines short barreled shotgun (to provide for special regulation). | No similar provision. |
| Defines short barreled rifle (to provide for special regulation). | No similar provision. |
| Defines importer specifically. | No similar provision. |
| Defines crime punishable by imprisonment for a term exceeding 1 year to exclude antitrust and similar violations. (The Federal Firearms Act was amended in 1961 to provide the felony criteria rather than more limited "crime of violence" which was in the original act, passed in 1938.) | Defines "crime of violence" in lieu of definition cited in column 1. (This is a reversion to the pre-1961 definition and is inconsistent with the Attorney General's amendment of that year defining "crime punishable by imprisonment for a term exceeding one year." Thus under Senator Hruska's bill a convicted racketeer or gambler could be licensed to ship or receive firearms in interstate commerce.) |

**40**      FEDERAL FIREARMS AMENDMENTS OF 1966

| S. 1592 | S. 3767 |
|---|---|
| Unlawful acts (Federal licensees, importers, manufacturers, and dealers): | |
| Prohibits the interstate mail-order sale of handguns. | Regulates mail-order sale of handguns through affidavit provisions. (Not as effective as provision in S. 1592.) |
| Regulates through affidavit provision interstate mail-order sale of rifles and shotguns. | No similar provision. |
| Prohibits the sale of handguns to nonresidents of the licensee's place of business (State). | Regulates through affidavit provision this type of sale. (Not as effective as S. 1592.) |
| Prohibits the sale of handguns to persons under 21 and of rifles and shotguns to persons under 18 in over-the-counter transactions. | No similar provision. |
| Prohibits the over-the-counter sale of firearms by licensees without identifying purchasers. | No similar provision. |
| Prohibits the sale of firearms over the counter in violation of State and local law. | No similar provision. |
| Prohibits delivery of handguns to persons under 21 and rifles and shotguns to persons under 18 by common or contract carriers and Post Office Department. (This does not apply to licensees only.) | No similar provision with regard to rifles and shotguns on the carriers or Post Office Department. |
| Licensing: | |
| Licenses all manufacturers, importers, and dealers in firearms engaged in business. (Power to license is consistent with the commerce clause of Constitution.) | No similar provision. Retains present Federal Firearms Act terminology for licensing, transportation, or receipt in interstate or foreign commerce. |
| Sets forth licensing standards to insure bona fide status of licensees and compliance with the act. | No similar provision. |
| Importation of firearms: | |
| Prohibits importation of military surplus and other foreign-made nonsporting handguns as well as destructive devices and National Firearms Act weapons. (Allows importation of new foreign-made quality firearms suitable for sporting purposes and military surplus rifles and shotguns in the same category.) | No similar provision. |
| Regulation of destructive devices and National Firearms Act | |

FEDERAL FIREARMS AMENDMENTS OF 1966            41

| S. 1592 | S. 3767 |
|---|---|
| weapons, short barreled rifles and shotguns, machineguns, etc.: | |
| Provides for stringent controls over sale of these firearms. | No similar provision. |
| Recordkeeping provisions: | |
| Provides for adequate record-keeping and periodic examination of these records to insure compliance with the act. Provides for making available to State and local officials pertinent record information for use in law enforcement. | Retains wording of present Federal Firearms Act. |

In urging enactment of the stronger and more effective S. 1592, we recognize the fact that stringent firearms laws are a deterrent to firearms misuse. All one need do is examine the figures compiled by the Federal Bureau of Investigation relative to gun murders in the several States to conclude that strong gun laws do work.

First, in those geographic areas of the country with strong gun laws, the percentages of gun murders are low when compared with areas with either minimal or no gun controls. In the Northeast with generally strong gun controls, 38 percent of the murders were committed with guns in 1965. Nationally the average was 57 percent. In the Western, North Central and Southern States where gun controls are minimal the percentages of gun murders were 60, 61, and 66 percent respectively.

Second, in specific States with effective firearms regulation the disparity is even more pronounced when comparing strong gun control States with the minimal gun control States.

Below are percentages of gun murders in individual States for the 4-year period 1962–65.

| States with stringent gun laws: | States with weak gun laws: |
|---|---|
| New York, 32 percent. | Colorado, 59 percent. |
| Massachusetts, 35 percent. | Louisiana, 62 percent. |
| New Jersey, 39 percent. | New Mexico, 64 percent. |
| Pennsylvania, 43 percent. | Arizona, 66 percent. |
| | Montana, 68 percent. |
| | Texas, 69 percent. |
| | Nebraska, 70 percent. |

We acknowledge the fact that there are many and varied contributing causes to crime, all of which must be considered in any evaluation of the problem. Thus, the above figures are made more meaningful when it is realized that the densely populated States have low percentages when compared with the less densly populated States, because a major factor affecting the incidence of crime is population density.

While S. 1592 would be a much more effective means of regulation, as compared with S. 3767, it would not interfere with the purchase of firearms by law-abiding, responsible adult Americans. When one weighs the ultimate saving of human life, which we believe is the hallmark of S. 1592, with the slight inconvenience that the bill would

impose upon sportsmen and other responsible Americans in purchasing firearms, then we believe that the enactment of S. 1592 is the only responsible course to follow.

There follows the text of the amended S. 1592 along with a statement of purpose, the extent of the program with which the bill deals, its scope of coverage with rationale based on testimony before the subcommittee and a section-by-section analysis of S. 1592.

### S. 1592

#### A BILL To amend the Federal Firearms Act

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act may be cited as the "State Firearms Control Assistance Amendments of 1966".*

#### FINDINGS AND DECLARATION

SEC. 2. (a)  The Congress hereby finds and declares—

(1)  *that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control the firearms traffic within their own borders through the exercise of their police power;*

(2)  *that the ease with which any person can acquire firearms (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States;*

(3)  *that only through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the businesses of importing, manufacturing, or dealing in firearms, can this grave problem be properly dealt with, and effective State and local regulation of the firearms traffic be made possible;*

(4)  *that the acquisition on a mail-order basis of firearms by nonlicensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws and regulations, and local ordinances;*

(5)  *that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensee's place of business is located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms;*

(6)  *that there is a causal relationship between the easy availability of firearms and juvenile and youthful criminal behavior, and that firearms have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior;*

(7)  *that the United States has become the dumping ground of the castoff surplus military weapons of other nations, and that such weapons, and the large volume of relatively inexpensive pistols and revolvers (largely worthless for sporting purposes), imported into the*

*United States in recent years, has contributed greatly to lawlessness and to the Nation's law enforcement problems;*

*(8) that the lack of adequate Federal control over interstate and foreign commerce in highly destructive weapons (such as bazookas, mortars, antitank guns, etc., and destructive devices such as explosive or incendiary grenades, bombs, missiles, etc.) has allowed such weapons and devices to fall into the hands of lawless persons, including armed groups who would supplant lawful authority, thus creating a problem of national concern;*

*(9) that the existing licensing system under the Federal Firearms Act does not provide adequate license fees or proper standards for the granting or denial of licenses, and that this has led to licenses being issued to persons not reasonably entitled thereto, thus distorting the purposes of the licensing system.*

*(b) The Congress further hereby declares that the purpose of this Act is to cope with the conditions referred to in the foregoing subsection, and that it is not the purpose of this Act to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap shooting, target shooting, personal protection, or any other lawful activity, and that this Act is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this Act.*

*Sec. 3. The first section of the Federal Firearms Act (52 Stat. 1250) is amended to read as follows:*

*"Section 1. Definitions.—(a)  As used in this Act—*

*"(1) The term 'person' includes an individual, partnership, association, or corporation.*

*"(2) The term 'interstate or foreign commerce' means commerce between any State or possession (not including the Canal Zone) and any place outside thereof; or between points within the same State or possession (not including the Canal Zone), but through any place outside thereof; or within any possession or the District of Columbia.  The term 'State' shall include the Commonwealth of Puerto Rico, the Virgin Islands, and the District of Columbia.*

*"(3) The term 'firearm', except where the context otherwise requires, means any weapon (including a starter gun), by whatsoever name known, which will, or is designed to, or which may be readily converted to, expel a projectile or projectiles by the action of an explosive; the frame or receiver of any such weapon; or any firearm muffler or firearm silencer; or any destructive device.*

*"(4) The term 'destructive device' means any explosive or incendiary (A) bomb or (B) grenade or (C) mine or (D) rocket or (E) missile or (F) similar device; and the term shall also include any type of weapon by whatsoever name known which will, or is designed to, or which may be readily converted to expel a projectile or projectiles by the action of an explosive, the barrel or barrels of which have a bore of one-half inch or more in diameter.*

*"(5) The term 'short-barreled shotgun' means a shotgun having a barrel or barrels of less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.*

44        FEDERAL FIREARMS AMENDMENTS OF 1966

"(6) *The term 'short-barreled rifle' means a rifle having a barrel or barrels of less than sixteen inches in length, and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six inches.*

"(7) *The term 'importer' means any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution; and the term 'licensed importer' means any such person licensed under the provisions of this Act.*

"(8) *The term 'manufacturer' means any person engaged in the manufacture of firearms or ammunition for purposes of sale or distribution; and the term 'licensed manufacturer' means any such person licensed under the provisions of this Act.*

"(9) *The term 'dealer' means (A) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (B) any person engaged in the business of repairing such firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker. The term 'licensed dealer' means any dealer who is licensed under the provisions of this Act.*

"(10) *The term 'pawnbroker' means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm or ammunition as security for the payment or repayment of money.*

"(11) *The term 'indictment' includes an indictment or an information in any court of the United States or of any State or possession under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.*

"(12) *The term 'fugitive from justice' means any person who has fled from any State or possession (A) to avoid prosecution for a crime punishable by imprisonment for a term exceeding one year, or (B) to avoid giving testimony in any criminal proceeding.*

"(13) *The term 'antique firearm' means any firearm of a design used before the year 1870 (including any matchlock, flintlock, percussion cap, or similar early type of ignition system) or replica thereof, whether actually manufactured before or after the year 1870: but not including any weapon designed for use with smokeless powder or using rim-fire or conventional center-fire ignition with fixed ammunition.*

"(14) *The term 'Secretary' or 'Secretary of the Treasury' means the Secretary of the Treasury or his delegate.*

"(15) *The term 'ammunition' means ammunition for a destructive device; it shall not include shotgun shells or any other ammunition designed for use in a firearm other than a destructive device.*

"(b) *As used in this Act—*

"(1) *The term 'firearm' shall not include an antique firearm.*

"(2) *The term 'destructive device' shall not include—*

    "(A) *a device which is not designed or redesigned or used or intended for use as a weapon; or*

    "(B) *any device, although originally designed as a weapon, which is redesigned for use as a signaling, line throwing, safety or similar device; or*

    "(C) *any shotgun (other than a short-barreled shotgun); or*

    "(D) *any nonautomatic rifle (other than a short-barreled rifle)*

generally recognized as particularly suitable for use for the hunting of big game; or

"(E) surplus obsolete ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of 10 U.S.C. 4684(2), 4685, or 4686; or

"(F) any other device which the Secretary finds is not likely to be used as a weapon.

"(3) The term 'crime punishable by imprisonment for a term exceeding one year' shall not include any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate."

SEC. 4. Section 2 of the Federal Firearms Act is amended to read as follows:

"SEC. 2. UNLAWFUL ACTS.—(a) It shall be unlawful—

"(1) for any importer, manufacturer, or dealer, except an importer, manufacturer, or dealer having a license issued under the provisions of this Act, to engage in the business of importing, manufacturing, or dealing in firearms or ammunition, or to transport, ship, or receive any firearm or ammunition, in interstate or foreign commerce; or

"(2) for any importer, manufacturer, or dealer licensed under the provisions of this Act to ship, transport, or cause to be shipped or transported, in interstate or foreign commerce, any firearm to any person other than a licensed importer, licensed manufacturer, or licensed dealer, except that—

"(A) this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from returning a firearm to the sender (including a replacement firearm of the same kind, make, and type);

"(B) this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from shipping, or causing to be shipped, for conveyance in the mails, a firearm to any officer, employee, agent, or watchman eligible under the provisions of section 1715 of title 18 of the United States Code to receive through the mails, for use in connection with their official duty, pistols, revolvers, and other firearms capable of being concealed on the person;

"(C) this paragraph shall not apply in the case of a shotgun or rifle (other than a short-barreled shotgun or a short-barreled rifle) of a type and quality generally recognized as particularly suitable for lawful sporting purposes, and not a surplus military firearm, which is shipped, transported, or caused to be shipped or transported, in interstate or foreign commerce by an importer, manufacturer, or dealer licensed under the provisions of this Act to any person who has submitted to such importer, manufacturer, or dealer a sworn statement, in duplicate, in such form and manner as the Secretary shall by regulations prescribe, attested to by a notary public, to the effect that (1) such person is eighteen years or more of age, (2) he is not a person prohibited by this Act from receiving a shotgun or rifle in interstate or foreign commerce, (3) there are no provisions of law, regulations, or ordinances applicable to the locality to which the shotgun or rifle will be shipped which would be violated by such person's receipt or possession of a

shotgun or rifle, and (4) that (Title _____, Name
_____, and Official Address _____)
(blanks to be filled in with the title, true name, and address)
are the true name and address of the principal law enforcement
officer of the locality to which the shotgun or rifle will be shipped.
It shall be unlawful for an importer, manufacturer, or dealer,
licensed under the provisions of this Act, to ship, transport,
or cause to be shipped or transported, in interstate or foreign
commerce any such shotgun or rifle unless such importer, manu-
facturer, or dealer has, prior to the shipment of such shotgun
or rifle forwarded by United States registered mail (return
receipt requested) to the local law enforcement officer named in
the sworn statement, the description (including (1) manufac-
turer thereof, (2) the caliber or gage, (3) the model and type of
shotgun or rifle but not including serial number identification)
of the shotgun or rifle to be shipped, and one copy of the sworn
statement, and has received a return receipt evidencing deliver
of the registered letter or such registered letter has been returned
to the importer, manufacturer, or dealer due to the refusal of the
named law enforcement officer to accept such letter as evidenced
in accordance with United States Post Office Department regu-
lations, and has delayed shipment for a period of at least
seven days following receipt of the notification of the local law
enforcement officer's acceptance or refusal of the registered letter.
A copy of the sworn statement and a copy of the notification to
the local law enforcement officer along with evidence of receipt
or rejection of that notification, all as prescribed by this sub-
paragraph, shall be retained by the licensee as a part of the
records required to be kept under section 3(g): Provided, That
(i) the Governor of any State may designate any official in his
State to receive the notification to local law enforcement officers
required in this subparagraph.    The Secretary shall be notified
of the name and title of the official so designated and his business
address and shall publish the title, name, and address of that
official in the Federal Register.    Upon such publication,
notification of local law enforcement officers required in this
subparagraph shall be made to the official designated; and (ii)
the Governor of any State may request the Secretary to discon-
tinue in his State or any part thereof the notification to local
law enforcement officers required in this subparagraph.    Upon
publication of the request in the Federal Register, the notifica-
tion to the law enforcement officers in the area described in the
request will not be required for a period of five years unless the
request is withdrawn by the Governor and the withdrawal is
published in the Federal Register; and

"(D) nothing in this paragraph shall be construed as applying
in any manner in the District of Columbia, the Commonwealth of
Puerto Rico, or any possession of the United States differently
than it would apply if the District of Columbia, the Common-
wealth of Puerto Rico, or the possession were a State of the
United States; or

"(3) for any person in connection with the acquisition or attempted
acquisition of a firearm from a licensed importer, licensed manu-
facturer, or licensed dealer to—

"(A) *knowingly make any false or fictitious statement, written or oral, or*

"(B) *knowingly furnish or exhibit any false, fictitious, or misrepresented identification;*

*intended or calculated to deceive such importer, manufacturer, or dealer with respect to any fact material to the lawfulness of the sale or other disposition of a firearm by a licensed importer, licensed manufacturer, or licensed dealer under the provisions of subsections (b) and (c), or*

"(4) *for any person to transport into or receive in the State where he resides a firearm purchased or otherwise obtained by him outside the State where he resides if it would be unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.*

"(b) *It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or otherwise dispose of any firearm to any person—*

"(1) *without ascertaining through reliable means of identification customarily used in good commercial practice (which shall be noted in the licensee's records) the identity, date of birth (in the case of an individual), and place of residence (or place of business in the case of a corporation or other business entity) of such person; or*

"(2) *who (in the case of an individual) he knows or has reasonable cause to believe is under twenty-one years of age (except for a shotgun or rifle), and under eighteen years of age in the case of a shotgun or rifle; or*

"(3) *who he knows or has reasonable cause to believe does not reside in (or in the case of a corporation or other business entity, who does not have a place of business in) the State in which the importer's, manufacturer's, or dealer's place of business is located; except that this paragraph shall not apply in the case of a shotgun or rifle (other than a short-barreled shotgun or short-barreled rifle); or*

"(4) *who by reason of any State or local law, regulation, or ordinance applicable at the place of sale or other disposition may not lawfully receive or possess such firearm.*

*This subsection shall not apply in the case of transactions between licensed importers, licensed manufacturers, and licensed dealers, nor in the case of transactions involving rifles or shotguns which are subject to the provisions of subparagraph (C) of section 2(a)(2).*

"(c) *It shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell or otherwise dispose of any firearm or ammunition to any person (other than a licensee) knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States or of any State or possession of a crime punishable by imprisonment for a term exceeding one year or is a fugitive from justice.*

"(d) *It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or who is a fugitive from justice, to ship, transport, or cause to be shipped or transported, any firearm or ammunition in interstate or foreign commerce.*

"(e) *It shall be unlawful for any person who is under indictment or who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, or is a fugitive from justice, to receive*

any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

"(f) It shall be unlawful for any person knowingly to deposit, or cause to be deposited for mailing or delivery by mail, or knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, any package or other container in which there is any firearm, without written notice that a firearm is being transported or shipped.

"(g) It shall be unlawful for any common or contract carrier to deliver, or cause to be delivered, in interstate or foreign commerce, any firearm to any person who does not exhibit or produce evidence of a license obtained under section 3 of this Act—

    "(1) knowing or having reasonable cause to believe that such person is under twenty-one years of age (except for a rifle or shotgun) and under eighteen years of age in the case of a rifle or shotgun; or

    "(2) with knowedge or with reasonable cause to believe that the receipt or possession of the firearm by the person to whom it is delivered would be in violation of the laws or ordinances of the State (or political subdivision thereof) in which the delivery is made; and

No firearm will be delivered in the United States mails under such circumstances as would be unlawful if done by a common or contract carrier.

"(h) It shall be unlawful for any person to transport or ship, or cause to be transported or shipped, in interstate or foreign commerce, any stolen firearm, or stolen ammunition knowing, or having reasonable cause to believe, same to have been stolen.

"(i) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition or pledge or accept as security for a loan any stolen firearm or stolen ammunition, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing, or having reasonable cause to believe, the same to have been stolen.

"(j) It shall be unlawful for any person to transport, ship, or knowingly receive, in interstate or foreign commerce, any firearm from which the importer's or manufacturer's serial number, as the case may be, has been removed, obliterated, or altered.

"(k) It shall be unlawful for any person to import or bring into the United States or any possession thereof any firearm in violation of the provisions of this Act, or to import or bring into the United States or any possession thereof any ammunition.

"(l) It shall be unlawful for any person to knowingly receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this Act."

SEC. 5. Section 3 of the Federal Firearms Act is amended to read as follows:

"SEC. 3. (a) No person shall engage in business as a firearms or ammunition importer, manufacturer, or dealer until he has filed an application with, and received a license to do so from, the Secretary. The application shall be in such form and contain such information as the Secretary shall by regulations prescribe. Each applicant shall be required to pay a fee for obtaining such license (for each place of business) as follows:

    "(1) If a manufacturer—

      "(A) of destructive devices, a fee of $1,000 per annum;

"(B) of firearms (other than destructive devices), a fee of $500 per annum.

"(2)  If an importer—

"(A) of destructive devices, a fee of $1,000 per annum;

"(B) of firearms (other than destructive devices), a fee of $500 per annum.

"(3)  If a dealer—

"(A) in destructive devices, a fee of $1,000 per annum;

"(B) who is a pawnbroker (dealing in firearms other than destructive devices), a fee of $250 per annum;

"(C) who is not a dealer in destructive devices or a pawnbroker, a fee of $10 per annum; except that for the first renewal following the effective date of the State Firearms Control Assistance Amendments of 1966 or for the first year he is engaged in business as a dealer such dealer will pay a fee of $25.

The fee for an importer or manufacturer of, or a dealer in, ammunition for a destructive device shall be the same as for an importer or manufacturer of, or a dealer in, destructive devices.  However, a person who has obtained a license covering destructive devices shall not be required to obtain an additional license with respect to ammunition for destructive devices.

"(b)  Upon filing by an applicant of the prescribed application and payment of the prescribed fee, the Secretary shall (except as provided in subsection (c)), issue to such applicant the license applied for, which shall, subject to the provisions of this Act and other applicable provisions of law, entitle the licensee to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce during the period stated in the license.

"(c)  Any application submitted under subsections (a) and (b) of this section shall be disapproved and the license denied if the Secretary, after notice and opportunity for hearing, finds that—

"(1) the applicant is under twenty-one years of age; or

"(2) the applicant (including in the case of a corporation, partnership, or association, any individual possessing directly or indirectly, the power to direct or cause the direction of the mangement and policies of the corporation, partnership, or association) is prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under the provisions of subsection (d) or (e) of section 2 of this Act; or is, by reason of his business experience, financial standing, or trade connections, not likely to commence business operations during the term of the annual license applied for or to maintain operations in compliance with this Act; or

"(3) the applicant has willfully violated any of the provisions of this Act or the regulations issued thereunder; or

"(4) the applicant has willfully failed to disclose any material information required, or made any false statement as to any material fact, in connection with his application; or

"(5) the applicant does not have, or does not intend to have or to maintain, in a State or possession, business premises for the conduct of the business.

"(d)  The provisions of sections 2 (d) and (e) of this Act shall not apply in the case of a licensed importer, licensed manufacturer, or licensed dealer who is indicted for a crime punishable by imprisonment for a term exceeding one year.  A licensed importer, licensed manufacturer, or

*licensed dealer may continue operations, pursuant to his existing license (provided that prior to the expiration of the term of the existing license timely application is made for a new license), during the term of such indictment and until any conviction pursuant to the indictment becomes final, whereupon he shall be fully subject to all provisions of this Act and operations pursuant to such license shall be discontinued (unless an application for relief has been filed under section 11).*

*"(e) No person shall import or bring any firearm into the United States or any possession thereof, except that the Secretary may authorize a firearm to be imported or brought in if the person importing or bringing in the firearm establishes to the satisfaction of the Secretary that the firearm—*

> *"(1) is being imported or brought in for scientific or research purposes, or is for use in connection with competition or training pursuant to chapter 401 of title 10 of the United States Code; or*
>
> *"(2) is an unserviceable firearm (not readily restorable to firing condition), imported or brought in as a curio or museum piece; or*
>
> *"(3) is—*
>
>> *"(A) of a type and quality that meets recognized safety standards,*
>>
>> *"(B) generally recognized as particularly suitable for, or readily adaptable to, sporting purposes,*
>>
>> *"(C) in the case of surplus military firearms, a rifle or shotgun, and*
>>
>> *"(D) of a type that does not fall within the definition of a firearm as defined in section 5848(1) of the Internal Revenue Code of 1954; or*
>
> *"(4) was previously taken out of the United States or a possession by the person who is bringing in the firearm.*

*Provided, That the Secretary may permit the conditional importation or bringing in of a firearm for examination and testing in connection with the making of a determination as to whether the importation or bringing in of such firearm will be allowed under this subsection.*

*"(f) No licensed importer, licensed manufacturer, or licensed dealer shall sell or otherwise dispose of a destructive device, a machine gun (as defined in section 5848 of the Internal Revenue Code of 1954), a short-barreled shotgun, or a short-barreled rifle, to a nonlicensee unless he has in his possession a sworn statement executed by the principal law enforcement officer of the locality wherein the purchaser or person to whom it is otherwise disposed of resides, attesting that there is no provision of law, regulation, or ordinance which would be violated by such person's receipt or possession thereof and that he is satisfied that it is intended by such person for lawful purposes. Such sworn statement shall be retained by the licensee as a part of the records required to be kept under subsection (g).*

*"(g) Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, and sale or other disposition, of firearms and ammunition at such place, for such period and in such form as the Secretary may by regulations prescribe. Such importers, manufacturers, and dealers shall make such records available for inspection at all reasonable times, and shall submit to the Secretary such reports and information with respect to such records and the contents thereof as he shall by regulations prescribe. The Secretary or his delegate may enter during business hours the premises*

*(including places of storage) of any firearms or ammunition importer, manufacturer, or dealer for the purpose of inspecting or examining any records or documents required to be kept by such importer or manufacturer or dealer under the provisions of this Act or regulations issued pursuant thereto, and any firearms or ammunition kept or stored by such importer, manufacturer, or dealer at such premises. Upon the request of any State or possession or political subdivision thereof, the Secretary of the Treasury may make available to such State, or possession, or any political subdivision thereof, any information which he may possess or which he may obtain by reason of the provisions of this Act with respect to the identification of persons within such State, or possession, or political subdivision thereof, who have purchased or received firearms or ammunition, together with a description of the firearms or ammunition so purchased or received.*

*"(h) Licenses issued under the provisions of subsection (c) of this section shall be kept posted and kept available for inspection on the business premises covered by the license.*

*"(i) Licensed importers and licensed manufacturers shall identify (or cause to be identified), in such manner as the Secretary shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer."*

SEC. 6. *Section 4 of the Federal Firearms Act is amended to read as follows:*

*"*SEC. 4. EXCEPTIONS TO APPLICABILITY OF THE ACT.—*The provisions of this Act shall not apply with respect to the transportation, shipment, receipt, or importation of any firearms or ammunition imported for, or sold or shipped to, or issued for the use of (1) the United States or any department, independent establishment, or agency thereof; or (2) any State, or possession, or any department, independent establishment, agency, or any political subdivision thereof."*

SEC. 7. *Section 5 of the Federal Firearms Act is amended by striking out subsection (b) and inserting in lieu thereof new subsections (b) and (c) reading as follows:*

*"(b) Any person who—*

*"(1) with intent to commit therewith an offense punishable by imprisonment for a term exceeding one year; or*

*"(2) with knowledge or with reasonable cause to believe that an offense punishable by imprisonment for a term exceeding one year is intended to be committed therewith;*

*ships, transports, or receives a firearm in interstate or foreign commerce shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense.*

*"(c) Any firearm or ammunition involved in, or used or intended to be used in, any violation of the provisions of this Act, or any rules or regulations promulgated thereunder, or any violation of the provisions of title 18, United States Code, chapter 84, or sections 111, 112, 372, 871, or 1114, shall be subject to seizure and forfeiture and all provisions of the Internal Revenue Code of 1954 relating to the seizure, forfeiture, and disposition of firarms, as defined in section 5848(1) of said Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this Act."*

SEC. 8. *The Federal Firearms Act is amended by renumbering sections 6, 7, 8, 9, and 10 as sections 7, 8, 9, 10, and 11, respectively, and inserting after section 5 the following new section:*

52      FEDERAL FIREARMS AMENDMENTS OF 1966

"SEC. 6. APPLICABILITY OF OTHER LAWS.—

"(a) Nothing in this Act shall be construed as modifying or affecting any provision of—

"(1) the National Firearms Act (chapter 53 of Internal Revenue Code of 1954); or

"(2) section 414 of the Mutual Security Act of 1954, as amended (section 1934 of title 22 of the United States Code (relating to munitions control)); or

"(3) Section 1715 of title 18 of the United States Code (relating to nonmailable firearms).

"(b) Nothing in this Act shall confer any right or privilege to conduct any business contrary to the law of any State, or be construed as relieving any person from compliance with the law of any State."

"SEC. 9. Section 8 of the Federal Firearms Act (relating to rules and regulations) is amended to read as follows:

"SEC. 8. RULES AND REGULATIONS.—The Secretary may prescribe such rules and regulations as he deems reasonably necessary to carry out the provisions of this Act. The Secretary shall give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing such regulations."

SEC. 10. The amendments made by this Act shall become effective on the first day of the third month beginning not less than ten days after the date of enactment of this Act; except that the amendments made by section 5 of this Act to section 3(a) of the Federal Firearms Act shall not apply to any importer, manufacturer, or dealer licensed under the Federal Firearms Act on the effective date of this Act until the expiration of the license held by such importer, manufacturer, or dealer on such date.

The principal purposes of this proposed bill, S. 1592, are to aid in making it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in combating the increasing prevalence of crime in the United States.

The ease with which any person can anonymously acquire firearms (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotic addicts, mental defectives, armed groups who would supplant duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern.

We believe that the existing Federal controls over interstate and foreign commerce in firearms are not sufficient to enable the States to effectively cope with the firearms traffic within their own borders through the exercise of their police power. Only through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the business of importing, manufacturing, or dealing in firearms, can this problem be dealt with, and effective State and local regulation of the firearms traffic be made possible. S. 1592 would provide this needed control.

It would provide Federal controls over—

(1) The interstate traffic in mail-order firearms;
(2) Out-of-State purchases of concealable firearms;
(3) Acquisition of firearms by juveniles and minors;
(4) Rifles and shotguns;
(5) Importation of nonsporting and military surplus firearms;
(6) Highly destructive weapons (e.g., bazookas, mortars, antitank guns, explosives, or incendiary grenades, bombs, etc.);

(7) Licensing of importers, manufacturers, and dealers;
(8) Recordkeeping provisions;
(9) Making interstate transportation, shipment, or receipt of a firearm with intent to commit a felony therewith, a Federal offense.

It is not the purpose of S. 1592 to place any undue or unnecessary restrictions or burdens on responsible law-abiding citizens with respect to the acquisition, possession, transportation, or use of firearms appropriate to the purposes of hunting, trapshooting, target shooting, personal protection, or any other lawful activity. It is not intended to discourage or eliminate the private ownership of such firearms by law-abiding citizens for lawful purposes, or to provide for the imposition, by regulations, of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of the bill.

We believe that there is a serious problem of firearms misuse in the United States based on our extensive inquiries into the problem.

For 4 years prior to the introduction of S. 1592, on March 22, 1965, the Subcommittee to Investigate Juvenile Delinquency had been conducting an investigation into the interstate traffic in mail-order firearms, especially to juveniles, youthful offenders, and adult criminals.

In January, March, and May of 1963, and in March and April of 1964, public hearings were held by the subcommittee and the testimony proved conclusively that the interstate traffic in mail-order firearms to the above persons was a serious problem to law enforcement throughout the United States. The consensus of those who testified at the hearings was that this problem could only be effectively attacked through the enactment of Federal legislation.

During the 1963 and 1964 hearings, testimony revealed the existance of the following conditions because of the mail-order gun business:

Juveniles, minors, convicted felons, and undesirable adults have increasingly availed themselves of the mail-order source of firearms.

These firearms have been used extensively in the commission of serious crimes.

The indiscriminate sale of these firearms has resulted in accidental tragedies including loss of life and serious injury.

Because of the anonymity afforded the purchaser in a mail-order transaction, these firearms appeal to juveniles, youthful offenders, and adult criminals.

The sale of mail-order firearms is accomplished with little or no concern as to the age, background and competence of a purchaser, especially by a certain group of dealers who entered the mail-order business in recent years.

Firearms sold through the mails are primarily foreign made or imported military surplus firearms, relatively inexpensive and often inferior in design and quality.

The yearly volume of importation of these firearms is approximately 1 million a year.

The $1 fee and lack of minimum standards for obtaining Federal firearms dealers' licenses has resulted in flagrant abuse of the intent of the Federal Firearms Act.

The failure of certain dealers to keep adequate records as required by the regulations (26 C.F.R. Part 177) and to cooperate with State

and local law-enforcement officials is a detriment to effective law
enforcement.

> The interstate traffic in mail-order firearms often circumvents
> State and local law, and it is virtually impossible for the States
> to control this traffic in the maintenance of domestic law and
> order.

Furthermore, during the period between the 1964 hearings and the
introduction of S. 1592 on March 22, 1965, substantial evidence on
the problem of increasing firearms misuse was developed by the sub-
committee concerning (1) the interstate traffic in all firearms, including
rifles and shotguns and certain destructive devices, (2) the importation
of firearms, (3) the effectiveness of laws in certain States and locales
as a deterrent to firearms misuse and their lethal capabilities.

In addition to reaffirming the existence of the problem areas referred
to in the foregoing paragraphs, many witnesses testified in the 1965
hearings regarding another aspect of the interstate firearms traffic.

Not only is mail order a means of circumventing State and local
law, but the over-the-counter sale of firearms, primarily handguns, to
persons who are not residents of the locale in which the dealer con-
ducts his business, affords similar circumvention. This problem is
most prevalent in, but not limited to, those States where stringent
firearms regulations are in effect and the purchaser is not able to
purchase a firearm under the laws of his State. As a result, a would-be
purchaser travels to a neighboring State with less stringent controls
and purchases the firearm which, many times it was demonstrated,
was misused in his State or residence. This problem was outlined by
law enforcement officers throughout the country.

Firearms purchased in the above manner have been used in the
commission of a substantial number of crimes. For example, the
Massachusetts State Police have traced 87 percent of the concealable
firearms used in crimes in Massachusetts to out-of-State purchases.

The lack of adequate Federal controls over this aspect of the
interstate traffic in firearms leaves open to people a method of violating
the laws of their own States similar to the mail-order sales route.

Again, as with mail order, the records show that juveniles, youthful
offenders, and adult criminals have purchased firearms in this manner
and subsequently used them in crimes.

It is virtually impossible for the States to cope with this aspect of the
problem without additional controls by the Federal Government.

While we conceded that the more serious problem in firearms misuse
concerns the pistol and revolver, the fact remains that of the total
number of firearms murders each year, some 30 percent are perpe-
trated by persons armed with rifles and shotguns.

Furthermore, law enforcement officials have testified to the need for
and supported the concept of additional regulations over the acquisi-
tion of such weapons.

The capabilities and lethal nature of the firearm are readily ap-
parent, when one examines the figures compiled by the Federal Bureau
of Investigation and included in their uniform crime reports. During
1963, 56 percent of the 8,500 murders were perpetrated by persons
armed with firearms. In 1964, 55 percent of the 9,250 murders were
traced to firearms misuse. In 1965, 57 percent of the 9,850 murders
were committed by persons armed with guns. Furthermore, a firearm
is seven times more lethal than all other weapons combined.

In gun murders involving emotional provocation, the evidence indicates that if the gun were not available at the spur of the moment, many such murders could well have resulted only in a minor assault. However, because guns are readily available and are lethal by nature, our homicide statistics have soared.

The testimony before our subcommittee has also pointed to the fact that the majority of bank robberies involved the use of a firearm and were it not for the easy availability of guns, the chances for a successful perpetration of this particular crime would be substantially reduced.

In his statement opening the 1965 hearings, the subcommittee chairman cited the volume of firearms which had been imported during the 2-year period 1963–64. In that 2-year period, 2,167,754 firearms were imported, with pistols and revolvers numbering 859,758 of the total.

Law enforcement officials testified that foreign imports account for a significant percentage of the total number of firearms seized pursuant to their use in the commission of crimes. The percentage ranged from a low of 18 percent in Washington, D.C., to a high of 80 percent in Atlanta, Ga. The .22-caliber revolver has been singled out by law enforcement generally as being a particular problem in that it is inexpensive and easily obtainable.

The extent of the problem is clear, we believe, and the need for enactment of S. 1592 is apparent.

In documenting the thoroughness of our inquiry, we feel that it is important to cite those Federal, State, and local officials who appeared before the subcommittee calling upon the Federal Government to enact remedial legislation, and specifically S. 1592.

They are—

Nicholas deB. Katzenbach, Attorney General of the United States.

Henry H. Fowler, Secretary of the Treasury.

Sheldon M. Cohen, Commissioner of Internal Revenue.

Stephen Ailes, Secretary of the Army.

James V. Bennett, consultant, Federal Bureau of Prisons, Department of Justice.

Thomas C. Lynch, attorney general, State of California.

Arthur J. Sills, attorney general, State of New Jersey.

Daniel R. McLeod, attorney general, State of South Carolina.

Richard R. Caples, commissioner of public safety, State of Massachusetts, accompanied by Lt. John Collins and Sgt. Edward Higgins, Massachusetts State Police.

John B. Layton, Chief of Police, Washington, D.C.

Herbert T. Jenkins, chief of police, Atlanta, Ga.

Curtis Brostron, chief of police, St. Louis, Mo., accompanied by Maj. Adolph Jamobsmeyer.

Howard R. Leary, commissioner of police, Philadelphia, Pa., accompanied by Chief Inspector Harry Fox.

Leonard Reisman, deputy commissioner, New York City Police Department.

Carl K. Miller, commander, Chicago Police Department.

Merton Howe, captain, Los Angeles Police Department.

Jesse Gonzales, sergeant, Los Angeles Police Department.

56        FEDERAL FIREARMS AMENDMENTS OF 1966

PRESIDENT'S STATEMENT ON FIREARMS CONTROL

President Johnson in his message to the Congress March 8, 1965, described crime as a "malignant enemy in America's midst of such extent and seriousness that the problem is now one of great national concern." He identified as a significant factor in the rise of violent crime the ease with which any person can acquire a firearm. He also stressed the need for increased Federal control over interstate shipment of firearms and the importance of curbing the importation of surplus military weapons as well as other used firearms.

The President recommended the enactment of legislation amending the Federal Firearms Act to "make it more feasible for the States to impose more effective controls over firearms within their own boundaries," and more specifically, to correct abuses in mail order sales, to provide suitable licensing standards for persons engaged in activities licensed under the act, and to restrict the sale of firearms by licensees to persons of mature age. As a complement to Federal firearms control legislation, he urged public officials to review State and local laws "in this critical field with a view to keeping lethal weapons out of the wrong hands."

S. 1592, as originally introduced, was designed to accomplish the Federal objectives outlined by the President.

The scope of S. 1592 is broad. However, we believe that the need for each of the provisions of the bill has been thoroughly documented by the testimony given before the subcommittee. There follows the scope of coverage of the bill with rationale.

*The interstate traffic in mail order firearms*

S. 1592 would have the effect of channeling interstate and foreign commerce in firearms, except for sporting-type rifles and shotguns (not to include military surplus), through federally licensed importers, manufacturers, and dealers, thereby prohibiting the commercial mail order traffic in firearms (other than rifles and shotguns) to unlicensed persons; and with respect to interstate mail order transactions in sporting-type rifles and shotguns would require a purchase affidavit, and notice to a law enforcement officer at the place where the rifle or shotgun is to be shipped. This will enable the States to more effectively control the firearms traffic within their own jurisdictions under the police power granted to them by the Constitution.

The testimony and the record reflect the concern of law enforcement officials throughout the country over the vast proliferation of mail order firearms in interstate commerce.

This traffic is a means which affords circumvention and contravention of State and local laws governing the acquisition of firearms. It is characterized by ready availability, minimal cost, and anonymity of purchase. The result has been an ever-increasing abuse of this source of firearms by juveniles, minors, and adult criminals.

In the District of Columbia, the subcommittee, with the cooperation of the Metropolitan Police Department, determined that 25 percent of the recipients of mail-order firearms had criminal records ranging in seriousness from habitual drunkenness to murder.

In testifying before the subcommittee on June 2, 1965, Commander Carl K. Miller, Chicago Police Department, referred to the results of an investigation of 4,069 consignees of mail-order firearms in Chicago, who had purchased and received their firearms from just 3 California-

based mail-order firearms dealers. He indicated that 948 consignees had arrest records. Of the 948 arrestees, 13 were arrested for murder, 58 for robbery, 42 for burglary, 111 for various types of assaults, 83 for carrying concealed weapons, and 426 for disorderly conduct.

In addition, 229 were arrested for various other crimes including larceny, larceny from auto, gambling, resisting arrest, causing a disturbance with a gun, narcotics investigation, and sex offenses.

In testifying on June 3, 1965, Attorney General Arthur J. Sills, of New Jersey, cited the results of a State police survey conducted to determine if purchase permits had been obtained by residents in New Jersey who had received mail-order firearms from two California mail-order firearms dealers. In summary, Attorney General Sills testified that, of the 154 guns sold and mailed by the 2 dealers, 61 were sold and mailed without permits being issued. Further, it was determined that 26 persons with criminal records were among those who had purchased the 61 firearms from the 2 mail-order outlets. This subcommittee cooperated with the New Jersey authorities by furnishing the names of consignees of mail-order handguns to the New Jersey State Police. The laws of New Jersey require a permit to purchase a handgun.

Deputy Commissioner Leonard E. Reisman, New York City Police Department, testified on July 1, 1965, that since 1950, the police department, in accord with the provisions of the Sullivan law of New York, has checked out 2,676 deliveries of concealable firearms by common carrier into New York. While some 1,200 were proper shipments, the police department disapproved 1,439 deliveries because they were consigned to persons who would not have been authorized to receive them under the laws of the State of New York. Thus, even where there are the most stringent State laws, attempts are being made to circumvent the law through the delivery of mail-order firearms to unauthorized persons.

Police Commissioner Howard Leary, of Philadelphia, testified on June 8, 1965, and referred to a survey of mail-order gun consignees in Philadelphia. Again, this survey was conducted in cooperation with the subcommittee. Commissioner Leary stated that of the 300 guns received by Philadelphians via mail order, 54 of them had police records. Furthermore, 15 of them had been arrested previously for crimes involving the use of firearms. He went on to indicate that, thus far, in 1965, 160 handguns were mail-ordered to Philadelphians, and 16 of them had previous arrest records.

In endorsing S. 1592, Attorney General Thomas C. Lynch, of the State of California, cited the mail-order source of firearms as a contributing and compounding factor to crime and the problem of law enforcement throughout his State.

Chief of Police Herbert T. Jenkins, Atlanta, Ga., in referring to the increasing number of firearms which come into the custody of the Atlanta Police Department each year, indicated that the traffic in illegal firearms has doubled in the last 5 years. He blamed mail-order sources as a major contributing factor in this increase.

In addition, examples of mail-order firearms purchased and received in circumvention of the law and subsequently used in the commission of crime, were cited by the following law enforcement officials who appeared in support of S. 1592 before the subcommittee during the 1965 public hearings:

John B. Layton, chief of police, Washington, D.C.

Howard R. Leary, commissioner, police department, Philadelphia, Pa.

Curtis Brostron, chief of police, St. Louis, Mo.

Carl K. Miller, commander, Chicago Police Department.

Merton W. Howe, captain, commander of robbery division, Los Angeles Police Department.

In summary, the record is replete with testimony documenting the existence of a serious mail-order gun problem. This traffic affords easy circumvention and contravention of State and local law and leads to the frustration of law enforcement in its efforts to combat crime.

### *Acquisition of firearms by juveniles and minors*

S. 1592 would bar federally licensed importers, federally licensed manufacturers, and federally licensed dealers from selling or otherwise disposing of any firearms to any person who (in the case of an individual) he knows, or has reasonable cause to believe, is under 21 years of age (except for a shotgun or rifle) and under 18 years of age in the case of a shotgun or rifle. The bill would place similar restrictions on interstate carriers regarding delivery of firearms to such persons. Thus, the bill would provide a uniform and effective means throughout the United States for preventing the acquiring of the specified firearms by persons under such ages. However, under the bill, a minor or juvenile would not be restricted from owning, or learning the proper use of the firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian.

The clandestine acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this country.

Deputy Commissioner Leonard Reisman, of the New York City Police Department, testified that in 1964, there were 2,615 arrests in that city for the illegal possession of dangerous weapons; 1,136 of the arrestees were under 21 years of age, or 43 percent of the total. The commissioner stated that by far the most popular instruments of violence among these young people are firearms of all types.

Capt. Merton W. Howe, Los Angeles Police Department, testified that in the crimes of armed robbery and aggravated assault, the increase of gun misuse by juveniles is graphically illustrated by a comparison of 1956 and 1964 figures. In 1956, there were only 26 incidents of juvenile armed robbery by gun. However, in 1964, the figure jumped to 58 incidents. In 1956, there were 31 incidents of juvenile aggravated assaults by gun, whereas in 1964, the figure jumped to 157.

Chief Curtis Brostron, St. Louis Police Department, testified that in 1964, 21 youths, ages 14 to 26 years, committed murders with firearms, and that one of these was the double shotgun slaying of his parents by a 15-year-old boy.

Comdr. Carl K. Miller, Chicago Police Department, testified that in 1964 there were 191 firearms murders in Chicago. Of this total, the perpetrator in 3 cases was a 13-year-old juvenile; in 2 cases a 14-year-old; and 7 cases a 15-year-old, and in 11 cases a 16-year-old. Thus, 23 of the 191 gun murders were committed by juveniles under 17 years of age.

Commander Miller further indicated that minors were involved as principals in 18 of the murders. Six were 17 years of age, six were 18 years of age, five were 19, and one was age 20.

Thus, of 191 gun murders in the city of Chicago, minors under 21 years of age accounted for 41, or approximately 20 percent of the total.

Police Commissioner Howard R. Leary, Philadelphia, Pa., cited the incidence of juvenile misuse of firearms in that city during 1964. He testified that guns played an important role in Philadelphia's juvenile crime picture.   A total of 199 juveniles under 18 years of age were arrested in 1964 charged with crimes involving firearms, including homicides, robberies, assaults, carrying concealed weapons, and violation of Pennsylvania's Uniform Firearms Act.  He indicated further that 203 firearms were confiscated from teenagers by the juvenile aid division in 1964.   The results of this traffic were exemplified by the fact that four teenage gang clashes resulted in two 17-year-olds, one 18-year-old, and one 20-year-old being killed by firearms on Philadelphia's highways.

Chief Herbert T. Jenkins, Atlanta Police Department, in referring to the misuse of firearms in the crime of aggravated assault, testified that of the 404 such assaults in the last 17 months, 93 of the perpetrators were under 21 years of age.  He concluded:

> Most of these cases would have ended as a simple altercation, except for the ready availability of the gun.

Attorney General Daniel R. McLeod, South Carolina, included in his testimony the comments of law enforcement officials in South Carolina, who responded to his request for information in preparation for his appearance before the subcommittee.   The reply of the chief of police of Greenville, S.C., is relevant:

> For your information and file, during the year 1964, 42 teenage males and 3 teenage females were arrested and charged with carrying, shooting, pointing, or having in possession, firearms in the city of Greenville.
>
> During the first 6 months of 1965, we have already arrested for the same offenses as mentioned above 26 male teenagers and 2 female teenagers.

The statistics documenting the misuse of firearms by juveniles and minors in this section of the report take on added significance when one considers the fact that in each of the jurisdictions referred to the lawful acquisition of concealable firearms by these persons was prohibited by statute.

The testimony conclusively refutes the myth that criminals steal firearms rather than purchase them in illicit channels.   While it is conceded that some criminal firearms are stolen, the fact is that the record reflects illicit purchases are made either through mail order or by over-the-counter purchase in nonresident jurisdictions.

Specific cases exemplifying illicit purchases by juveniles and minors in the above manner were included in the record by several witnesses who appeared before the subcommittee.

Commissioner Richard R. Caples, of the Massachusetts Department of Public Safety, cites the out-of-State purchase of firearms by Massachusetts residents as the prime source of the criminal gun in his State.  His statement was documented by records covering the past

10 years.  He also included in the record specific cases of juveniles
and minors who journeyed to neighboring States, purchased conceal-
able firearms, and subsequently used them in crimes in Massachusetts.

A case in point concerned a 16-year-old juvenile who traveled to
Maine on numerous occasions, purchased 16 firearms, including 3
handguns, and subsequently sold them to Cambridge, Mass., youths
who used them in crimes.

Chief John B. Layton, Metropolitan Police Department, District
of Columbia, cited the recent case of a shooting in the city's sixth pre-
cinct.  Juvenile investigators determined that the gun involved, a
.22-caliber pistol, had been purchased by an 18-year-old on the same
day in nearby Silver Spring, Md.  Further investigation determined
that the same dealer in Silver Spring, in a 3- or 4-month period, had
sold 11 pistols and two .22-caliber blank pistols to persons under 21
years of age.  All of those involved resided in the 6th and 12th pre-
cincts which border the Silver Spring area.

Minors under 21 years of age are prohibited by the laws of the
District of Columbia from purchasing pistols and revolvers.

Capt. Merton W. Howe, Los Angeles Police Department, Robbery
Division, cited two cases which involved juveniles and mail-order guns:

> Two of the most tragic cases that come to mind from
> mail-order guns involve juveniles.

One case involved the shooting by a 16-year-old boy of his best
friend.  He claimed that he did not know that the gun was loaded.
The second concerned a 16-year-old boy, who shot himself with a
mail-order gun after having been reprimanded by his father.

Deputy Commissioner Leonard Reisman, New York City Police
Department, testified about the case of a do-it-yourself gunsmith who
made out-of-State purchases of starter pistols and converted them to
lethal firearms.  These death weapons were being sold to youth gang
members on street corners for $20.

The cases cited clearly show the two major sources of firearms for
juveniles: Mail-order houses and over-the-counter purchases in States
with weak gun laws.

We believe that these two prime sources of firearms to juveniles
and minors involving interstate commerce, mail-order, and out-of-
State, over-the-counter purchases should be regulated in accord with
the provisions of S. 1592.

By prohibiting the mail-order traffic in concealable firearms entirely
and restricting the over-the-counter purchase of concealable firearms
by nonresidents, and by regulating the mail-order traffic in shotguns
and rifles, the problem will be substantially alleviated.  In addition,
the establishing of minimum ages for (1) purchase of rifles and shot-
guns at 18 years, and (2) pistols and revolvers and all other firearms
at 21 years, provides the machinery for the States to implement and
enforce their own statutes governing the sale and acquisition of fire-
arms.

### Out-of-State purchase of concealable firearms

S. 1592 would prohibit a federally licensed importer, federally li-
censed manufacturer, or federally licensed dealer from selling or other-
wise disposing of a firearm (other than a shotgun or rifle) to any per-
son whom he knows, or has reasonable cause to believe, does not re-
side in (or in the case of a corporation or other business entity, who

does not have a place of business in) the State in which the importer's, manufacturer's, or dealer's place of business is located.

It would also make it unlawful for any person to bring into or receive in the State where he resides a firearm purchased outside that State in those cases where it would be unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.

The provisions of S. 1592, which prohibit a licensee from disposing of pistols and revolvers to persons who are not residents of the State in which he conducts his business is justified by the record of the subcommittee's 1965 hearings.

The record is replete with testimony documenting the fact that the purchase of firearms by persons in other than their resident State is a serious contributing factor to crime. Testimony further indicates that large numbers of criminals and juveniles have availed themselves of this source of firearms in order to circumvent the laws of their respective jurisdictions.

The subcommittee, in conjunction with the Treasury Department, surveyed the records of selected firearms dealers in the Maryland suburban area of Washington, D.C. The results are most certainly alarming. It was determined that two dealers whose records were examined sold to a significant number of District residents. Those two dealers are located in a Maryland county where regulations controlling over-the-counter sales are minimal. (A county ordinance was subsequently enacted.)

The records of Apple Hardware, Inc., in Chillum, Md., show that 58 percent of their handgun sales during 1964 and early 1965 were to residents of the District of Columbia. Subsequent criminal records checks on these purchasers reveal that 40 percent of them have criminal records in this city.

The records of the Suitland Trading Post in Suitland, Md., show that 40 percent of their firearms sales during 1964 and early 1965 were to residents of the District of Columbia. Subsequent criminal records checks have revealed that 23 percent of the purchasers have records in the District of Columbia.

The results referred to need no elaboration. Circumvention of the laws of the District of Columbia was easily effected by these purchases.

This situation is not peculiar or confined to the Washington, D.C., area.

The most complete documentation of the State level of this aspect of the problem was included in the testimony of Commissioner Richard R. Caples, of Massachusetts. He testified that over a 10-year period, the Massachusetts State Police had traced 87 percent of the guns used in crime in that State to purchases in neighboring States. He further stated that of some 4,506 firearms which were traced, only 6 were determined to have been stolen.

He included for the record some 60 cases which concerned the purchase of firearms in neighboring States which were subsequently used in crimes in Massachusetts.

One case concerned an unknown person who purchased nine snubnosed revolvers from several dealers in New Hampshire, using fictitious names and addresses. Subsequently, two of the revolvers were found in the possession of a Boston resident (George McLaughlin), who, at

the time of the sales, was being sought for murder and was considered by the FBI to be 1 of the 10 most wanted criminals in this country.

The remaining cases presented by Commissioner Caples are equally serious in nature.

Attorney General Sills, of New Jersey, also testified about the purchase of firearms in other States and their subsequent illegal entry into New Jersey.

He stated that of 1,815 arrests for the illegal carrying of concealed weapons (handguns) only 15 of the guns involved had been purchased legally, that is with the permit to purchase which is required in New Jersey. Only six had been registered voluntarily, after purchase outside of that State.

Attorney General Sills referred to a cooperative effort on the part of New Jersey and Maryland authorities who surveyed the purchase of handguns by 27 New Jersey residents in Maryland. The 27 persons purchased 65 handguns from 3 retail stores in Aberdeen, Md. Eight of the purchasers used fictitious names and/or addresses, and five of these used the same fictitious address. One of the five who used that fictitious address, Hector Gomez, was later found to have a lengthy police record for such offenses as extortion, robbery, assault, and attempted rape. He purchased 12 handguns in one store and 3 from another store in a period of 12 days.

Mr. Sills endorsed the provisions of S. 1592, which would prohibit the sale of handguns to nonresidents.

In addition, the following officials cited specific cases which involved out-of-State and nonresident purchases of concealable firearms contrary to the local law and which were subsequently used in the commission of crimes of violence. None of the examples referred to in this section concerned mail-order sources. These examples are separate and distinct from those cited in the section on the interstate traffic in mail-order firearms.

Chief John B. Layton, District of Columbia.

Captain Merton Howe and Sgt. Jess Gonzales, Los Angeles Police Department.

Commissioner Howard Leary, Philadelphia.

Further, Chief Curtis Brostron, of St. Louis, and Chief Herbert Jenkins, of Atlanta, Ga., referred to the easy availability of firearms from out of State as a contributing factor to firearms used in crime.

We believe that the problem outlined above is sufficient to warrant the enactment of the provisions of S. 1592 which would prohibit the sale of handguns to nonresidents of a given State.

*Rifles and shotguns*

The control would be exercised through the filing of an affadavit by the purchaser of a mail-order gun. The dealer would be required to forward a copy of this affadavit to the law enforcement officials in the purchaser's area of residence. This would give police officials a chance to check and see if the purchaser is legally entitled to have a rifle or shotgun, under that jurisdiction's statutes.

But in general, rifles and shotguns are distinguished from pistols and revolvers in S. 1592, and are given favored treatment.

Testimony reflects that the inclusion of rifles and shotguns in S. 1592 is one of the most controversial aspects of the bill, and we believe it necessary therefore, to devote a section of these views to clarifying the need for including them. While the major problem

facing law enforcement is the control of concealable firearms, the fact remains that the record also shows a substantial misuse of rifles and shotguns.

It would be unwise to exclude these firearms from coverage entirely. Such an exclusion simply cannot be justified on the basis of available information. The position which we have taken with regard to rifles and shotguns is to provide moderate but effective regulation over their acquisition.

Federal Bureau of Investigation crime statistics for 1963, show that 30 percent of the firearms murders in the United States were carried out by persons armed with rifles and shotguns. This represented a loss of lives numbering some 1,400. The 1964 figures reflect that 30 percent of the 5,090 gun murders, or 1,527 deaths, were committed with rifles and shotguns. And in 1965, 1,690 persons were murdered with rifles and shotguns.

The 30 percent figure does not always hold true in large metropolitan cities on the basis of statistics on rifle and shotgun murders given to us by representatives from a number of urban areas. The percentage of rifle and shotgun murders is much higher in rural areas than in the cities, a fact which those who oppose their inclusion in S. 1592 have consistently failed to acknowledge. FBI statistics show that 52.8 percent of the rural gun murders are by rifle and shotgun.

Thus, the problem of firearms misuse is not confined to the cities. Rather it is national in scope.

Further evidence of the need for the inclusion of the long arms is a subcommittee inquiry into the mail order sales of rifles and shotguns by Klein's Sporting Goods, Chicago, Ill., a reputable and respected firm in the business of selling mail-order firearms.

From the subpenaed files of Klein's Sporting Goods, the subcommittee in cooperation with local police in several jurisdictions has determined that mail-order rifles and shotguns have been sent to persons with criminal arrest records in Chicago, Ill.; in Dallas, Tex.; in Philadelphia, Pa.; in Los Angeles, Calif.; in the State of New Jersey; and in the State of New York.

The crimes of these mail-order purchasers of rifles and shotguns range in seriousness from misdemeanors to felonies and include assault, assault and battery, assault with a deadly weapon, assault and battery on a police officer, larceny, sex offenses, and narcotics and dangerous drug offenses.

The incidence of sale of mail-order rifles and shotguns to persons with criminal records is not as frequent as is the case with regard to pistols and revolvers. However, we do find that such firearms sales to persons with criminal records ranged between 10 and 15 percent of total sales in the jurisdictions mentioned above.

In addition, the record shows the concern of law enforcement with regard to rifles and shotguns and the need for regulation.

In referring to efforts at the State level to regulate the acquisition of long arms, Deputy Commissioner Leonard Reisman, of New York, cited statistics which show that there were 490 crimes in 1963, where the weapon used was a rifle or shotgun. This figure included 37 homicides.

In supporting the inclusion of rifles and shotguns in S. 1592, Attorney General Arthur J. Sills, of New Jersey, referred to his efforts at the State level to enact controls over these firearms. In citing the

need for S. 1592, and complementary State regulation, he referred to specific instances of rifle and shotgun murders, wherein the weapons had been purchased and subsequently misused by persons who could not have done so had the proper regulation been in effect.

Further specific references to rifle and shotgun murders were cited by Commissioner Richard R. Caples, of Massachusetts; Chief Herbert T. Jenkins, of Atlanta, Ga.; and Chief Curtis Brostron, of St. Louis, Mo.

And finally, Commissioner Howard R. Leary, of Philadelphia, testified:

> We have noticed a greater tendency, as police pressure on methods of securing of handguns is stepped up, for felons to use shotguns and rifles to hold up and threaten the public. In fact, we had a wave of holdups of public transportation vehicles by a team, who used rifles to hold at bay a busload of citizens while the robbery of the driver was being completed.

The record is, we believe, quite clear. Rifles and shotguns are misused in the commission of crimes of violence in great enough frequency to warrant regulation over their acquisition.

Importation of nonsporting and military surplus firearms:

S. 1592 would curb the flow of surplus military weapons and other foreign made firearms into the United States which are not particularly suitable for target shooting, hunting, or for any other lawful purpose.

The provisions concerning the importation of firearms would not interfere with the importation of currently produced firearms, such as rifles, shotguns, pistols, or revolvers of recognized quality which are used for hunting, recreational purposes, or personal protection.

The importation of certain foreign-made and military surplus nonsporting firearms has an important bearing on the problem which S. 1592 is designed to alleviate.

During 1963 and 1964, 2,167,754 firearms were imported into the United States. This includes 859,758 pistols and revolvers, the majority of which were either inexpensive, small caliber firearms or military surplus. Of the 1,307,996 rifles and shotguns imported, the majority were military surplus.

The problem which this flow of firearms creates has become great, not because of the high import figures alone, but because of the fact that many of these weapons have gotten into the hands of juveniles and felons.

The subcommittee's inquiry has shown that at least 75 percent of the mail order guns sold in the United States are imported in one manner or another.

Law enforcement officials testified that foreign imports account for a significant percentage of the total number of firearms coming into their possession as the result of having been used in the commission of crime. The figure ranged from a low of 18 percent of the total in Washington, D.C., to a high of 80 percent in Atlanta, Ga.

Attorney General Thomas C. Lynch, of California, testified:

> Imported surplus weapons have proved especially troublesome in connection with juveniles. Thousands of firearms not suitable for lawful sporting purposes have been dumped onto the market here at prices which attract juveniles.

Attorney General Lynch then went on to cite the problem of juvenile misuse of imported .22 caliber starter pistols which are converted to fire .22 caliber ammunition. He indicated that over the past 8 years, hundreds of felonies had been committed by youngsters armed with these weapons.

Deputy Commissioner Leonard Reisman, New York City Police Department, also testified about the experiences of New York City with regard to the imported starter pistol. He cited the case of one type of pistol which was imported into New York with a plugged barrel. Separate shipments of rifled barrels followed which were used to replace the plugged barrels. Converting the blank starter pistols to lethal firearms took a matter of minutes.

This problem, however, is not limited to the convertible starter pistols.

Chief Herbert T. Jenkins, Atlanta Police Department, testified that 80 percent of the confiscated firearms now in the possession of his department are foreign-made imports, with an average value of about $10. He indicated further that the misuse of the small-caliber firearms (usually .22 caliber) pose one of the greatest problems to law enforcement in Atlanta.

Chief Curtis Brostron, St. Louis Police Department, testified that his department's crime laboratory processes each day at least one German-made .22 caliber revolver which sells for $10 to $15.

Captain Merton W. Howe, Los Angeles Police Department, testified that in 1963, 46.7 percent of the firearms which were destroyed by the department under authority conferred by the California Penal Code, were foreign made.

In 1964, the figure based on a sampling of about 25 percent of the total was 47 percent.

Attorney General McLeod, of South Carolina, testified that the inexpensive, imported .22 caliber revolver, designed as a starter pistol but readily converted to a lethal firearm, has been a problem of serious proportions to law enforcement officials in South Carolina. He indicated that he has reliable information that one dealer alone converted 20,000 Rohm starter pistols to lethal .22 caliber firearms.

With regard to these weapons, the Attorney General stated:

> This gun, and others of its characteristics, should not be permitted to be imported or manufactured in this country, and so far as S. 1592 meets this problem, we are in accord with it.

The incidence of foreign-made firearms coming into the possession of police departments is truly significant.

Furthermore, the following excerpt from Senate Report 1340, 88th Congress, 2d session, is particularly noteworthy.

With reference to the interstate mail-order traffic in imported firearms, the report states on page 4:

> It is of relevance that the mail-order-type firearms are .22 caliber revolvers, .25 caliber pistols, .38 caliber, and .45 caliber revolvers. The .22 caliber and the .25 caliber are usually new weapons, while the .38 and .45 caliber are usually surplus military firearms which have been discarded by foreign governments.

*Highly destructive weapons*

S. 1592 would extend the coverage of the Federal Firearms Act to include highly destructive devices, such as explosive or incendiary bombs, grenades, and mines.   And it would establish stricter controls than those presently in the act over interstate and foreign commerce in such devices as large-caliber, military-type weapons (bazookas, mortars, and antitank guns).   They are now treated the same way as rifles and shotguns, i.e., records of sales must be kept.

The stark realities of the ease with which these weapons can be and are purchased were described in a statement opening hearings on June 2, 1965, when the chairman of the Subcommittee To Investigate Juvenile Delinquency read into the Record circumstances surrounding the purchase of several mortars and bazookas by a subcommittee consultant, who at the time was a provisional member of the paramilitary organization, the Minutemen.

The concern of law enforcement officials throughout the country over this traffic in heavy armament was made clear by Attorney General Thomas C. Lynch, of California; Attorney General Arthur J. Sills, of New Jersey; Deputy Commissioner Leonard Reisman, of New York, and Capt. Merton W. Howe and Sgt. Jesse Gonzales, of the Los Angeles Police Department.

Several representatives of the sporting fraternity indicated in testimony that the definition of "destructive devices," in S. 1592 was too inclusive and would include certain antique firearms and certain large-bore sporting firearms.   Based on these objections, the subcommittee amended this definition to exclude these firearms from coverage.

*Licensing of importers, manufacturers, and dealers*

S. 1592 would prescribe meaningful licensing standards and denial hearing procedures designed to assure that licenses would be issued only to responsible, law-abiding persons actually engaged in or intending to engage in business as importers, manufacturers, or dealers in firearms.   License fees, to be increased by the bill, would provide sufficient funds to partially defray the cost of investigation of applicants and would tend to discourage license applications by persons who do not intend to engage in the business for which the license is sought.

The absence of specific standards from the present Federal Firearms Act and the minimal fees in the act have resulted in an abuse of the intent of the act.

Secretary of the Treasury Henry H. Fowler told the subcommittee:

> Since a bureau of my Department is responsible for the administration of the Federal Firearms Act, I am particularly anxious that the changes proposed in the bill with respect to the issuance of licenses to manufacture, import, and deal in firearms be adopted.

Under the existing law, anyone other than a felon can, upon the mere allegation that he is a dealer and payment of a nominal fee of $1, demand and obtain a license.

This situation invites irresponsible individuals to obtain licenses, thus facilitating the acquisition of these weapons by criminals and other undesirables.

Secretary Fowler, in answering a question posed by Senator Hiram Fong, testified that of the 99,544 outstanding licenses in 1964:

> It is our estimate that less than half of the licensed dealers are actually engaged in the business as dealers and that more than half are persons who are using the simple device of becoming a licensee for their own personal nonbusiness purpose.

Further strong support for the need for increased license fees for dealers, manufacturers, and importers and the inclusion of specific standards to obtain licenses was given by Attorney General Nicholas deB. Katzenbach; Commissioner Sheldon S. Cohen, of the Internal Revenue Service; Commissioner Richard R. Caples, of Massachusetts; Deputy Commissioner Leonard Reisman of New York City, and by Capt. Merton W. Howe, of the Los Angeles Police Department.

### Recordkeeping provisions

S. 1592 would place more emphasis on the recordkeeping responsibilities of licensees by requiring that reliable means be used by the licensee to verify information submitted to him by the purchaser, and by specifically providing for the inspection of records required to be maintained by licensees.

It would also authorize the release of pertinent information obtained from the licensee's records, to State and local authorities, to assist them in law enforcement activities.  In addition, the bill would make it possible to require, by regulations, the submission of reports concerning the operations of lisensees.

Because of the controversy which arose during the hearings concerning section 3(g) under S. 1592, relating to the recordkeeping of acquisition and disposition of firearms and destructive device ammunition by licensees, it is necessary to devote a section of this report to these provisions of the bill.

Section 3(g) requires no more recordkeeping by licensees than is presently required by section 903(d) of the Federal Firearms Act, as implemented by regulations (26 CFR pt. 177), with the exception of including destructive device ammunition.

Section 3(g) does require that such records be made available for inspection or examination by the Secretary or his delegate during normal business hours.  It is further required that licensees shall submit such reports and information with respect to the records and the contents thereof as the Secretary shall by regulation prescribe.

This is a reasonable means of determining periodically the licensees' compliance with the recordkeeping provisions of the bill.  It is not designed as, nor intended to be, a means of national registration of firearms.

It is further provided for in this section that the Secretary may make available to a State, possession, or political subdivision thereof, any information that he is authorized to obtain concerning the identity of purchasers of firearms and the types of firearms purchased.  This provision is included as an aid to effective law enforcement.

The record on S. 1592 is quite clear that the maintenance of complete records of acquisition and disposition of firearms by licensees is an essential element contributing to effective and sound law enforcement at the Federal, State, and local levels of government.

Making interstate transportation, shipment, or receipt of a firearm, with intent to commit a felony therewith, a Federal offense.

The evidence presented at the hearings showed a need for a change in the Federal Firearms Act to provide a penalty for shipping, transporting, or receiving a firearm in interstate or foreign commerce with intent to commit a felony therewith or with knowledge or with reasonable cause to believe that a felony offense is intended to be committed therewith.

The subcommittee agreed to provide that this be a Federal offense and that it be punishable by a fine of not more than $10,000, or imprisonment of not more than 10 years, or both.

In view of the constitutional question that has been raised with regard to S. 1592, we include the following brief analysis of the intent and interpretation of the second amendment.

A number of witnesses at the hearings argued that S. 1592 is unconstitutional because it would interfere with individual rights guaranteed by the second amendment to the Constitution.  The amendment provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

It is noteworthy that enactment of the National Firearms Act of 1934, as well as the Federal Firearms Act, was opposed on the same grounds and that these statutes were attacked in the courts as being violative of the second amendment.  The courts have uniformly ruled to the contrary, and their decisions make it plain that the amendment presents no obstacle to the enactment and enforcement of S. 1592.

The decisions hold that the second amendment, unlike the first, was not adopted with the individual rights in mind, but is a prohibition upon Federal action which would interfere with the organization of militia by the States of the Union.

Obviously, Federal firearms legislation does not hamper the present-day militia; that is, the National Guard, and the courts have held accordingly (see *United States* v. *Miller*, 307 U.S. 174 (1939); *Cases* v. *United States*, 131 F. 2d 916 (1st Cir. 1942), cert. denied, sub nom *Velasquez* v. *United States*, 319 U.S. 770 (1943); *United States* v. *Tot*, 131 F. 2d 261 (3d Cir. 1942, reviewed on other grounds, 319 U.S. 463 (1943); *United States* v. *Adams*, 11 F. Supp. 216 (S.D. Fla. 1935)).

It is sometimes contended that, aside from the second amendment, there is a natural right to bear arms, or a right stemming from a State constitution.  However, it is well settled that there is nothing inherent in any such right that renders it absolute.  The overwhelming majority of State cases hold that the legislature may prescribe regulations and limitations with regard to the carrying of weapons.  It is clear, for example, that a State law prohibiting the carrying of revolvers without a license, or forbidding possession of concealed weapons, does not violate either the Federal or State constitution.  And it is clear also that no body of citizens other than the organized State militia, or other military organization provided for by law, may be said to have a constitutional right to bear arms.

In summary, the decided cases, both at the Federal and State levels, reveal no constitutional barrier to the passage of S. 1592.  To the contrary, they afford ample precedent for its validity.

It is of some importance here to point out that the American Bar Association was not impressed by the allegation that this legislation would violate the constitutional rights of citizens. Although this argument was made in the course of the proceedings, the house of delegates of the association at its 1965 annual meeting in Miami Beach, Fla., overwhelmingly (i.e., by a vote of 184 to 26) endorsed the enactment of this bill. The association reaffirmed its position on August 8, 1966, at its convention in Montreal when it adopted a resolution urging the Congress to adopt S. 1592.

THOMAS J. DODD.
BIRCH BAYH.
EDWARD M. KENNEDY.
JOSEPH D. TYDINGS.
HIRAM L. FONG.
JACOB K. JAVITS.
GEORGE A. SMATHERS.
EDWARD V. LONG.