# EXHIBIT

# 2

## Part 3 of 3

SECTION-BY-SECTION ANALYSIS OF S. 1592, AS AMENDED

*Section 1*

This section, which was added to the bill by the subcommittee, would include an informative short title and provide that this act (which amends the Federal Firearms Act) may be cited as the State Firearms Control Assistance Amendments of 1966.

*Section 2*

This section, which was added to the bill by the subcommittee, would incorporate into the bill a statement of "findings and declaration."

In view of the misconceptions which have arisen concerning the nature and purpose of the bill, it is deemed desirable to include in the bill a definitive declaration of the bill's purpose and of the findings which justify its enactment.

*Subsection (a)*

Subsection (a) of section 2 contains findings and declarations as to the existence of the conditions with which the bill is designed to deal and of the action necessary to cope with those conditions. Each of these findings is fully supported by the evidence of record before the subcommittee.

Paragraph (1) is the basic finding and declaration that the existing Federal controls over the traffic in firearms moving in (or otherwise affecting) interstate or foreign commerce do not adequately enable the States to control the firearms traffic within their own borders through the exercise of their police power.

Paragraph (2) is the basic finding and declaration that the ease with which any person can acquire firearms (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States.

The subcommittee through its own investigations and by the evidence presented to the subcommittee by the Nation's leading law-enforcement officers, has established this fact beyond reasonable doubt.

Paragraph (3) is the basic finding and declaration that only through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the businesses of importing, manufacturing, or dealing in firearms, can the grave problem of firearms getting into the wrong hands be properly dealt with, and effective State and local regulation of the firearms traffic be made possible.

Paragraph (4) is a specific finding that the acquisition on a mail-order basis of firearms by nonlicensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws and regulations, and local ordinances.

This specific finding is documented by the evidence summarized in the August 7, 1964, Interim Report on Interstate Traffic in Mail Order Firearms (S. Rept. 1340, 88th Cong., 2d sess.) and by the further evidence submitted with regard to S. 1592 in the 89th Congress and summarized in the general statement regarding the bill under the discussion of the scope of coverage of the bill. (See p. 8.)   The documentation of the existence of the problem of the interstate traffic in mail-order firearms is so complete that the Attorney General of the United States has described it to the committee as resulting in "unarguable evils."

Paragraph (5) is a specific finding and declaration that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensee's place of business is located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms.

The evidence of record before the committee fully supports this finding and declaration.   (See summary in the general discussion of the scope of coverage of the bill under the subheading "Out of State Purchase of Concealable Firearms," p. 12.)   The existence of this problem has been so well established that even the principal opponents of S. 1592 who appeared before the subcommittee conceded the existence of this problem in the course of their subsequent appearances before the House Committee on Ways and Means.

Paragraph (6) is a specific finding and declaration that there is a causal relationship between the easy availability of firearms and juvenile and youthful criminal behavior, and that firearms have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent, juveniles and minors prone to criminal behavior.

The subcommittee in the course of its investigation and hearing has fully established the basis for this finding and declaration.   The subcommittee expressed its concern with regard to the causal relationship between the availability of firearms and juvenile and youthful criminal behavior in the interim report on August 7, 1964 (S. Rep. 1340, 88th Cong., 2d sess.), relating to the "Interstate Traffic in Mail Order Firearms."

This finding and declaration has been further supported by the evidence presented before the subcommittee in the 89th Congress during hearings on S. 1592.   (See the summarization under the bill subheading on "Acquisition by Juveniles and Minors" in the general discussion of the scope of coverage of the bill.)

Paragraph (7) is a specific finding and declaration that the United States has become the dumping ground of the castoff surplus military weapons of other nations, and that such weapons, and the large volume of relatively inexpensive pistols and revolvers (largely worthless for sporting purposes), imported into the United States in recent years have contributed greatly to lawlessness and to the Nation's law enforcement problems.

This finding and declaration is fully supported by the evidence developed by the investigation of the subcommittee and by testimony before the subcommittee by the Attorney General of the United States, the attorneys general of California, New Jersey, and South Carolina, and by the police officials of Atlanta, Chicago, Los Angeles, New

**72**     FEDERAL FIREARMS AMENDMENTS OF 1966

York City, Philadelphia, St. Louis, and the District of Columbia. (See summary under subheading "Importation of Nonsporting and Military Surplus Firearms," in general discussion of the bill relating to scope of coverage.)

Paragraph (8) is a specific declaration and finding that the lack of adequate Federal control over interstate and foreign commerce in highly destructive weapons (such as bazookas, mortars, antitank guns, etc., and destructive devices such as explosive or incendiary grenades, bombs, missiles, etc.) has allowed such weapons and devices to fall into the hands of lawless persons, including armed groups who would supplant lawful authority, thus creating a problem of national concern.

This finding and declaration is fully supported by the investigations of the subcommittee and by the evidence presented at the hearings before the subcommittee.

The concern of Federal, State, and city law enforcement officers over this problem was made clear at the hearings before the subcommittee. (See summary under subheading "Highly Destructive Weapons" in general discussion of the scope of coverage of the bill.)

Paragraph (9) is a specific finding and declaration that the existing licensing system under the Federal Firearms Act does not provide adequate license fees or proper standards for the denial of licenses, and that this has led to licenses being issued to persons not reasonably entitled thereto, thus distorting the purposes of the licensing system.

This finding and declaration is fully supported by investigations of the subcommittee and by the evidence presented by Federal, State, and city law enforcement officials at the hearings before the subcommittee. (See summary under subheading "Licensing of Importers, Manufacturers, and Dealers" in general discussion of the scope of coverage of the bill.)

*Subsection (b)*

Subsection (b) of section 2 is designed and intended to remove certain public misconceptions as to the nature of the bill and is a general declaration that the purpose of the bill is to cope with the conditions referred to in the findings in subsection (a), and that it is not the purpose of the bill to place any undue or unnecessary restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap shooting, target shooting, personal protection, or any other lawful activity, and that the bill is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by regulations of any procedures or requirements other than those reasonably necessary to implement, and effectuate the provisions of the Federal Firearms Act (as it would be amended by S. 1592).

*Section 3*

This section (which was sec. 1 of the bill as introduced) would restate and amend section 1 of the Federal Firearms Act (52 Stat. 1250) which contains the definition of the meaning of certain terms used in the act. This section, as amended by the subcommittee, would be divided into subsection (a) (containing definitions of terms) and subsection (b) (containing exclusions as to the application of certain terms as used in the act).

*Subsection (a)*

The definition of the term "person" in paragraph (1) is existing law (15 U.S.C. 901(1)).

The definition of the term "interstate or foreign commerce" is a restatement of existing law (15 U.S.C. 901(2)). "Territory" is omitted since there is no territory at the present time. The last sentence of this definition is inserted to clarify the status of the act in Puerto Rico, the Virgin Islands, and the District of Columbia.

The definition of the term "firearm" in paragraph (3) is a restatement and revision of the provisions of existing law (15 U.S.C. 901(3)). The revised definition has been extended to include any weapon (including a starter gun) by whatsoever name known "which will," or "which may be readily converted to," expel a projectile or projectiles by the action of an explosive. This represents a much-needed clarification and strengthening of existing law designed to prevent circumvention of the purposes of the act. As under existing law, the definition also includes weapons "designed to" expel a projectile or projectiles by the action of an explosive, and firearm mufflers and firearm silencers.

The present definition of the term "firearm" includes "any part or parts" of a firearm. It has been impractical to treat each small part of a firearm as if it were a weapon. The revised definition substitutes the words "frame or receiver" for the words "any part or parts."

In addition, the definition of the term "firearm" is extended to include any "destructive device" as defined in the proposed new definition of this term contained in paragraph (4) of section 1(a). The effect of this inclusion is to make the provisions of the act applicable to all such destructive devices.

The subcommittee amended the definition of a "firearm" to specifically include any starter gun designed for use with blank ammunition which will or which may be readily converted to expel a projectile or projectiles by the action of an explosive, in order to make it unequivocally clear that such starter pistols are firearms within the meaning of the Federal Firearms Act. Such so-called starter pistols which may be converted to fire a projectile by boring a hole through an obstruction in the barrel, substitution of a barrel which will permit the firing of a projectile, or otherwise converted to fire a projectile have been a matter of serious concern to law-enforcement officers.

The definition of the term "destructive device" contained in paragraph (4) is a new provision.

The subcommittee has restated this definition for the purpose of clarifying its application.

As amended, the term "destructive device" means any explosive or incendiary (a) bomb or (b) grenade or (c) mine or (d) rocket or (e) missile or (f) similar device; and the term also includes any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile or projectiles by the action of an explosive, the barrel or barrels of which have a bore of one-half inch or more in diameter.

The restated exceptions to the application of the term "destructive device" are contained in paragraph (2) of subsection (b).

The first part of the definition of destructive device would bring under the coverage of the Federal Firearms Act certain highly destructive weapons not now covered by the act. The part of the defini-

**74**     **FEDERAL FIREARMS AMENDMENTS OF 1966**

tion including firearms which have a bore of one-half inch or more in diameter would not extend the coverage of the present act (since existing law now applies to all firearms as defined in the act), but would rather subject such military-type weapons which have no recognized use for lawful sporting purposes to the restrictive controls provided under the bill for traffic in destructive devices.

The definition of the term "short-barreled shotgun" contained in paragraph (5) is a new provision.  The definition describes a shotgun of the type which is subject to the provisions of the National Firearms Act (ch. 53 of the Internal Revenue Code of 1954).  The purpose of the definition is to provide a convenient means of reference to weapons of this type.

The definition of the term "short-barreled rifle" contained in paragraph (6) is a new provision.  The definition describes a rifle of the type which is subject to the provisions of the National Firearms Act (ch. 53 of the Internal Revenue Code of 1954).  The purpose of the definition is to provide a convenient reference to weapons of this type.

The definition of the term "importer" is a new provision.  Under existing law (15 U.S.C. 901(4)), the term "manufacturer" includes a person engaged in importation of firearms or ammunition for purposes of sale or distribution.  It appears obvious that separate classifications should be provided for importers and manufacturers in order to more appropriately effectuate the purposes of the act.

The definition of the term "manufacturer" is a restatement of existing law (15 U.S.C. 904(4)) except that the references to importation have been deleted.

The definition of the term "dealer" is a restatement of existing law (15 U.S.C. 901(5)) with certain revisions.  The definition also makes it clear that "pawnbrokers" are a type of dealer.  This reflects proposed changes in other provisions of the act which would place pawnbrokers handling firearms in a special category and provide for higher license fees for procurement of licenses by pawnbroker dealers.

The definition of the term "pawnbroker" is a new provision.  Pawnbroker dealers are covered under the provisions of the existing act in the same manner as other dealers.  The purpose of this definition is to provide a basis for a separate classification of pawnbroker dealers.  Under the provisions of the National Firearms Act (26 U.S.C. ch. 53), pawnbrokers are separately classified and charged a higher rate of special (occupational) tax than other dealers.

The definition of the term "indictment" is a new provision.  Inasmuch as a person under indictment for certain crimes is proscribed from shipping or receiving firearms in interstate or foreign commerce, and a license under the act will not be issued to such a person, the definition will serve a useful purpose in making it clear that an "information" charging a crime is the same as an indictment charging a crime.  This definition is in accord with the opinion of the court in *Quinones* v. *United States*, 161 F. 2d 79.

The definition of the term "fugitive from justice" is a restatement of existing law (15 U.S.C. 901(6)) with reference to "Territory" omitted since there is at the present time no such "Territory."

The definition of the term "antique firearm" contained in paragraph (13) is a new definition added by the subcommittee to the bill.  The purpose is to provide by this definition (and par. (1) of subsec. (b)) for the exclusion of bona fide antique firearms (and replicas thereof) from the coverage of the Federal Firearms Act.  As included in the

bill, the term "antique firearm" means any firearm of a design used before the year 1870 (including any matchlock, flintlock, percussion cap, or similar early type of ignition system) or replica thereof, whether actually manufactured before or after the year 1870 (but not including weapons designed for use with smokeless powder or using rimfire or conventional center-fire ignition with fixed ammunition).

Certain suggestions were made to the subcommittee to the effect that ready availability of ammunition on a commercial basis should be one of the principal criteria considered in determining whether a firearm was an antique. Under this concept, firearms using fixed ammunition and of a design developed after the year 1870, would be classed as antiques based on availability of ammunition. The subcommittee after careful study rejected this approach for two principal reasons: First, there are devices commercially available by which firearms can be adapted to fire ammunition other than that which the firearm was designed to fire. Second, there would be an inherent and undesirable uncertainty in this type of classification, dependent upon whether or not ammunition was (or was not) at any given time, readily available on a commercial basis.

The definition of the term "Secretary" or "Secretary of the Treasury" contained in paragraph (14) is a new provision. The purpose of this definition is to eliminate the necessity of repeating "Secretary of the Treasury or his delegate" in several sections of the act.

The definition of the term "ammunition" contained in paragraph (15) was amended by the subcommittee to exclude from the coverage of the Federal Firearms Act all ammunition, other than ammunition for a destructive device.

As revised, the term "ammunition" means ammunition for a destructive device. The term does not include shotgun shells or any other ammunition designed for use in a firearm other than a destructive device.

Under existing law (15 U.S.C. 901(7)), the term included pistol and revolver ammunition. However, an evaluation of the evidence developed in the hearings before the subcommittee showed that it is difficult to effectively control interstate and foreign commerce in conventional firearms ammunition used for sporting, recreational, and other lawful purposes. Therefore, the subcommittee decided to limit the coverage of the act, insofar as ammunition is concerned, to ammunition for highly destructive weapons. Strict controls can be effectively exercised in this area since there is no significant normal legitimate commerce in such ammunition (other than for military purposes which are exempt from coverage under sec. 4 of the Federal Firearms Act).

*Subsection (b)*

Subsection (b) is new. It contains exceptions to the applicability of certain terms as used in the Federal Firearms Act (as it would be amended by the bill).

Paragraph (1) provides that as used in the Federal Firearms Act, the term "firearm" shall not include an antique firearm. The term "antique firearm" is defined in paragraph (13) of subsection (a). The effect this provision has is to make the Federal Firearms Act inapplicable to antique firearms.

An exception was provided in existing law for firearms held and possessed as an antique or curio but the Act contained no definition

of an "antique firearm." S. 1592, as introduced, proposed to delete this exception. The evidence presented at the hearings demonstrated the need for a properly defined and delineated exception for antique firearms. It was pointed out that in other countries which exercise strict controls over the traffic in firearms exemption from such controls is made for firearms which can properly be classified as antiques.

Paragraph (2) of subsection (b) is a new provision which contains exceptions to the applicability of the term "destructive device." The subcommittee has restated these exceptions and has specifically enumerated items not intended to be covered.

All antique firearms would be excluded by paragraph (1) since antique firearms are excluded from the application of the definition of "firearms."

As restated, this paragraph would provide that as used in the Federal Firearms Act the term "destructive device" would not include—

    (A) a device which is not designed or redesigned or used or intended for use as a weapon; or

    (B) any device, although originally designed as a weapon which is redesigned for use as a signaling, line throwing, safety or similar device; or

    (C) any shotgun (other than a short-barreled shotgun); or

    (D) any nonautomatic rifle (other than a short-barreled rifle) generally recognized or particularly suitable for use for the hunting of big game; or

    (E) surplus obsolete ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of 10 U.S.C. 4684(2), 4685, or 4686; or

    (F) any other device which the Secretary finds is not likely to be used as a weapon.

The exceptions contained in paragraph (2) are drafted in the same manner as the exceptions contained in 26 U.S.C. 5179(a) (relating to registration of stills) and section 5205(a)(2) (relating to stamps on containers of distilled spirits). Therefore, the decisions of the courts (*Queen* v. *United States*, 77 F. 2d 780; certiorari denied, 295 U.S. 755; and *Scherr* v. *United States*, 305 U.S. 251) to the effect that the Government is not required to allege or prove matter contained in an exception would be applicable. Establishment by a person that he came within the exception would be a matter of affirmative defense. Thus, an explosive device shown to be designed and intended for lawful use in construction or for other industrial purposes would be excepted. However, if the device were designed or used or intended for use, as a weapon, it would be subject to the provisions of the act.

A provision has been made in this paragraph that the Secretary may exclude from the application of the definition of "destructive device" any device which he finds is not likely to be used as a weapon. This provision makes it possible to deal with situations which may arise where there is no reasonable likelihood that the device will be used as a weapon.

Paragraph (3), which relates to the application of the term "crime punishable by imprisonment for a term exceeding one year" as used in the Federal Firearms Act, is a new provision. This provision was placed in subsection (b), rather than in subsection (a), since it merely excludes certain offenses from the application of this language as used in the Federal Firearms Act.

Prior to October 4, 1961, the Federal Firearms Act included provisions which made it unlawful for a person convicted of a crime of violence (as defined) in any court of the United States, a State or possession, to transport, ship, or receive any firearm in interstate or foreign commerce. S. 1750 (87th Cong., 1st sess.) amended the act by striking the definition of "crime of violence" and by striking that term wherever it appeared in the act and inserting in lieu thereof the term "crime punishable by imprisonment for a term exceeding one year." S. 1750 was introduced at the request of the Attorney General as an integral part of an anticrime legislative program. See House Report 1202 (87th Cong., 1st sess.). The felony criteria for prohibiting the transporting, shipping, or receiving of firearms incorporated in the act by S. 1740 has been retained to date.

However, the definition of "crime punishable by imprisonment for a term exceeding one year" proposed in the bill would modify the felony criteria by excluding antitrust-type violations. It may be noted that antitrust-type violations are not felonies under Federal law. However, a limited number of States have statutes making such offenses felonies. The definition would provide uniform treatment of such offenses, both State and Federal.

## Section 4

Section 4 of the bill (sec. 2 of the bill as introduced) would amend section 2 of the Federal Firearms Act (15 U.S.C. 902), which relates to prohibited acts, to read as contained in the bill.

## Subsection (a)

The subcommittee has rearranged and restated the provisions of subsection (a) of section 2 of the act as contained in the bill. This subsection is, in general, intended to aid in coping with the problems referred to in paragraphs (1) through (4) of the "Findings and Declaration" contained in subsection (a) of section 2 of the bill, including the problem of the interstate traffic in mail-order firearms.

The subsection, as amended by the subcommittee, would apply only with respect to the activities of persons engaging in the firearms business. Thus, there would be no possibility that a hunter, a person engaging in shooting competitions, a person moving his household belongings from one State to another, a person sending his firearm to another State for service, would be burdened or restricted in such activity by the provisions of this subsection.

As a related change, the subcommittee has amended section 5 of the Federal Firearms Act to provide a specific penalty for the shipment, transportation, or receipt of a firearm in interstate or foreign commerce with intent to commit therewith an offense punishable by imprisonment for a term exceeding 1 year (see sec. 7 of the bill for the detailed discussion of this new penalty provision).

Subsection (a) is derived in part from the provisions of existing law contained in subsection (a) and (b) of section 2 of the Federal Firearms Act (15 U.S.C. 902 (a) and (b)). Such provisions of existing law make it unlawful for any importer, manufacturer, or dealer, except an importer, manufacturer, or dealer licensed under the act, to transport, ship, or receive any firearm in interstate or foreign commerce, or for any person to receive any firearm transported or shipped in interstate or foreign commerce, by an unlicensed importer, manutransport, ship, or receive any firearm in interstate or foreign comfacturer, or dealer.

Subsection (a), as amended by the subcommittee, is aimed primarily at the activities of persons engaging in the business of importing, manufacturing, or dealing in firearms (or ammunition for destructive devices).

The effect of subsection (a), as amended, with respect to commercial transactions, is substantially the same as the effect of the subsection as contained in the bill as introduced. It would have the effect of channeling interstate and foreign commerce in firearms to licensed importers, licensed manufacturers, and licensed dealers, thereby prohibiting the commercial mail-order traffic in firearms (other than rifles and shotguns subject to the provisions of paragraph (2)(C)) to unlicensed persons. This will help the States to effectively control the firearms traffic within their own jurisdiction under the exercise of their police power granted to them under the Constitution.

Paragraph (1) of subsection (a) provides that it shall be unlawful for any importer, manufacturer, or dealer, except an importer, manufacturer, or dealer having a license issued under the provisions of the Federal Firearms Act to engage in the business of importing, manufacturing, or dealing in firearms (or ammunition for destructive devices) or to transport, ship, or receive any firearm (or ammunition for destructive devices) in interstate or foreign commerce.

This paragraph is essentially existing law, except for the specific prohibition against engaging in business without having first obtained a license under the provisions of the Federal Firearms Act. This new language is keyed to the provisions of the first sentence of subsection (a) of section 3 of the Federal Firearms Act as contained in the bill, and the purpose of the basic requirement is discussed in the analysis of that provision.

Paragraph (2) of subsection (a) provides, in general, that it shall be unlawful for any importer, manufacturer, or dealer licensed under the provisions of the Federal Firearms Act to ship, transport, or cause to be shipped or transported, in interstate or foreign commerce, any firearm to any person other than a licensed importer, licensed manufacturer, or licensed dealer.

The effect of paragraph (2) is to channel the commercial traffic in firearms in interstate and foreign commerce through licensees in the various States so that the State into which a firearm is shipped will have authority to effectively control the transactions between the Federal licensees and the ultimate purchasers under the police power granted to the States by the Constitution.

The provisions of this paragraph would not, of course, be applicable in respect to transactions with the persons excepted under the provisions of section 4 of the act (15 U.S.C. 904), such as Federal or State agencies. No specific exception is made in this section for the transactions with such persons, since such transactions are covered by section 4 of the Federal Firearms Act (as contained in sec. 6 of the bill).

However, four specific exceptions have been provided in the bill to the provisions of paragraph (2).

The first exception in subparagraph (A) provides that paragraph (1) of subsection (a) shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from returning a firearm to the sender (including a replacement firearm of the same kind, make, and type). This provision is intended to accommodate interstate shipments of firearms for service or repair and to allow a dissatisfied

customer to have a substitute firearm of the same kind, make, and type shipped to such customer by a licensee.

The second exception in subparagraph (B) of paragraph (2) of subsection (a) provides that paragraph (1) of subsection (a) shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from shipping, or causing to be shipped, for conveyance in the mails, a firearm to any officer, employee, agent, or watchman eligible under the provisions of section 1715 of title 18 of the United States Code to receive through the mails, for use in connection with their official duty, pistols, revolvers, and other firearms capable of being concealed on the person. This will allow interstate shipments by mail of firearms by licensees to persons who are, under existing law, authorized to receive through the mails firearms capable of being concealed on the person for use in connection with their official duties.

The third exception in subparagraph (C) of paragraph (2) of section 2(a) of the act as contained in the bill exempts from the prohibition against shipment or transportation in interstate or foreign commerce of firearms by licensees to nonlicensed persons rifles and shotguns which are suitable for sporting purposes but which are not military surplus. The exemption is conditioned on the obtaining of an affidavit from the prospective consignee attesting to the legality of the shipment and receipt of the firearm. The provision also makes it unlawful for a licensee to ship or transport in interstate or foreign commerce to a nonlicensed person such rifle or shotgun, without first notifying the principal law enforcement officer of the locality to which the rifle or shotgun is to be shipped. These controls are designed to assure against commercial interstate mail-order shipment to persons ineligible under Federal or applicable State law to receive a rifle or shotgun, and to advise interested local law enforcement officers of the transaction in order that they may have an opportunity to establish the prospective recipient's qualifications under State law for receipt or possession of a rifle or shotgun and to take any action deemed appropriate.

In addition, subparagraph (C) provides (1) that the Governor of any State may designate any official in his State to receive the notification to local law enforcement officials required by this subparagraph and that the Secretary shall publish such designation in the Federal Register; and (2) that the Governor of any State may request that the Secretary discontinue the required notification to local law enforcement officials in his State or any part thereof and upon publication in the Federal Register, the request shall be in effect for 5 years, unless withdrawn by the Governor and so published in the Federal Register.

The fourth exception in subparagraph (D) of paragraph (2) of subsection (a) of section 2 of the act as contained in the bill is the exception for the District of Columbia, the Commonwealth of Puerto Rico, and the possessions of the United States. This provides that nothing in paragraph (2) shall be construed as applying in any manner in the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, or a possession, differently than it would apply if such place were a State of the United States. This provision is intended to make it clear that the prohibitions of this paragraph are not intended, by reason of the definition of the term "interstate or foreign commerce," to apply to over-the-counter sales, or transportation within such places.

The decisions of the courts (*Queen* v. *United States*, 77 F. 2d 780, cert. den. 295 U.S. 755; and *Scherr* v. *United States*, 305 U.S. 251) to the effect that the Government is not required to allege or prove matter contained in an exception would be applicable to the exceptions contained in paragraph (2) of this subsection. Establishment by a person that he came within the exception would be a matter of affirmative defense.

Paragraph (3) of subsection (a) of section 2 of the act as contained in the bill would make it unlawful for any person, in purchasing or otherwise obtaining or attempting to purchase or otherwise obtain a firearm from a licensee licensed under this act, knowingly to supply any false or spurious information or identification intended or calculated to deceive such licensee with respect to such person's identity, age, address or criminal record (if any), or with respect to any other material fact pertinent to the lawfulness of a sale or other disposition of a firearm by a licensed importer, licensed manufacturer, or licensed dealer under the provisions of subsections (b) and (c) of section 2 of the act.

Paragraph (4) of section 2(a) of the act as contained in the bill is a new provision which would make it unlawful for any person to bring into or receive in the State where he resides a firearm purchased outside that State if it is unlawful for him to purchase or possess such firearm in the State (or political subdivision thereof) where he resides.

### Subsection (b)

Subsection (b) of section 2 of the act, as contained in the bill, is a new provision which is intended to regulate the over the counter disposition of firearms by federally licensed importers, manufacturers, and dealers, to persons other than licensees under the act.

The subcommittee has made certain amendments to this subsection to set forth more specifically the procedures intended to be followed and the exact nature of the acts which are prohibited.

In order for the records of disposition required to be kept by licensees to have significant value or validity, it is essential that the licensees be required to ascertain by reliable means of identification the age and identity of the purchaser and the address of the place where he resides.

Paragraph (1) of subsection (b), as amended by the subcommittee, would make it unlawful for any licensee under the Federal Firearms Act to sell or otherwise dispose of any firearm to any person without ascertaining through some reliable means of identification, such as a motor vehicle driver's license, or other comparable document (which is required to be noted in the licensee's records), the identity, date of birth (in the case of an individual) and place of residence (or place of business in the case of a corporation or other business entity) of such person.

It is intended that the place of residence to be established under this provision be the place where the person is actually residing, other than on a transient basis.

Under paragraph (2) of subsection (b), as amended by the subcommittee, it would be unlawful for a federally licensed importer, federally licensed manufacturer, or federally licensed dealer, to sell or otherwise dispose of any firearm to any person who (in the case of an individual) he knows or has reasonable cause to believe is under 21

years of age (except for a shotgun or rifle) and under 18 years of age in the case of a shotgun or rifle.

The subcommittee amendment to paragraph (2) inserted the words "knows or has reasonable cause to believe." This change does not relieve the licensee from the requirement of ascertaining the age of the purchaser as provided in paragraph (1) of subsection (b).

The provisions of paragraph (2) of subsection (b) of section 2 of the act, as contained in the bill, provide uniform and effective means throughout the United States for preventing the purchasing of the specified, firearms by persons under such ages. The procuring of firearms by juveniles (often without the knowledge or consent of their parents or guardians) has become a matter of national concern. The tragic consequences of this situation have been fully brought out in the proceedings of the subcommittee.

Under this provision a minor or juvenile would not be restricted from owning or learning the proper usage of a firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian.

The subcommittee amended paragraph (3) of subsection (b) of section 2 of the act, as contained in the bill, by substituting the words "does not reside in" for the words "is not a resident of" to make it clear that this provision is to be construed as referring to actual place of residence rather than the legal or voting residence. However, it is not intended that premises occupied only on a transient basis be considered the place of residence for the purpose of this subsection.

As amended by the subcommittee, the provisions of paragraph (3) prohibiting licensees under the act from selling a firearm (other than a shotgun or rifle) to an unlicensed individual who is a resident of a State, other than that in which the importer's, manufacturer's, or dealer's place of business is located, is intended to deal with the very serious problem of individuals going across State lines to procure firearms which they could not lawfully procure or possess in their own State and without the knowledge of their local authorities. The hearings before the subcommittee have fully demonstrated the ease with which residents of a particular State, which has laws regulating the purchase of firearms, can circumvent such laws by procuring a firearm in a neighboring jurisdiction which has no such controls on the purchase of firearms. The hearings have also shown that this is a common means by which criminal and lawless elements obtain firearms.

Paragraph (4) of the subsection would make it unlawful for any federally licensed importer, manufacturer, or dealer to sell or otherwise dispose of any firearm to any person who, by reason of State or local law, regulation, or ordinance, applicable to the place of sale or other disposition, may not lawfully receive or possess such firearm.

The conditions imposed by this subsection on the operations of persons licensed under the act are deemed to be reasonable conditions on the privilege granted to them, and necessary to effective control of interstate and foreign commerce in firearms, and to protect the public welfare.

## Subsection (c)

Subsection (c) of section 2 of the act, as contained in the bill, is a new provision which, like subsection (b), deals with the activities of

licensed importers, licensed manufacturers, and licensed dealers. This subsection would make it unlawful for any such importer, manufacturer, or dealer to sell or otherwise dispose of any firearm or ammunition to any person (other than a licensee) knowing, or having reasonable cause to believe, that such person is under indictment or has been convicted in any court of the United States, or of a State (as defined in par. (2) of sec. 1(a) of the act, as contained in the bill) or possession, of a crime punishable by imprisonment for a term exceeding 1 year, or who is a fugitive from justice. In other words, licensees would be prohibited from knowingly disposing of firearms or ammunition to felons, fugitives from justice, or persons under indictment for a felony. The subcommittee deleted from subsection (c) of section 2 of the act, as contained in the bill originally introduced, the final clause thereof which would have made it unlawful for a licensed importer, licensed manufacturer, or licensed dealer to ship or transport any firearm in interstate or foreign commerce to any person who could not have lawfully received such firearm under the provisions of subsection (a) of section 2 gf the act, as contained in the bill originally introduced. A provision to achieve a comparable purpose is now found in subsection (a)(2) of section 2 of the act, as contained in the amended bill.

## Subsection (d)

Subsection (d) of section 2 of the act, as contained in the bill, is existing law (15 U.S.C. 902(e)) except that the words "in any court" have been inserted to conform the language of subsection (e).

## Subsection (e)

Subsection (e) of section 2 of the act, as contained in the bill, is a restatement of existing law (15 U.S.C. 902(f)) revised to include persons under indictment. The omission of these persons from existing law appears to have been an inadvertent omission since such persons are, under existing law (15 U.S.C. 902(e)), prohibited from shipping or transporting firearms in interstate or foreign commerce. Also, the presumption contained in existing law has been eliminated, since it was declared unconstitutional by the Supreme Court in *Tot* v. *United States*, 319 U.S. 463.

## Subsection (f)

Subsection (f) of section 2 of the act as contained in the bill is a new provision which would make it unlawful for any person (including a licensee under the act) knowingly to deposit, or cause to be deposited for mailing, or delivery by mail, or knowingly to deliver, or cause to be delivered, to any common or contract carrier for transportation or shipment in interstate or foreign commerce, any package or other container in which there is any firearm, without written notice to the Postmaster General or his delegate or to the carrier (as the case may be) that a firearm is being transported or shipped. This provision is correlated to the provisions of section 2(g) of the act as contained in the bill. Further, the testimony before the subcommittee disclosed the existence of a practice of surreptitiously shipping firearms, without notice or disclosure, to circumvent requirements of Federal or State law.

*Subsection (g)*

The subcommittee has amended subsection (g) of section 2 of the act as contained in the bill since the amendments made to subsection (a) require a restatement of the provisions applicable to carriers.

As amended, subsection (g) of section 2 of the act as contained in the bill contains two paragraphs.

Paragraph (1) prohibits a common or contract carrier from delivering in interstate or foreign commerce any firearm to any person knowing or having reasonable cause to believe that such person is under 21 years of age (or under 18 years of age in the case of a rifle or shotgun).

Paragraph (2) prohibits a common or contract carrier from delivering a firearm in interstate or foreign commerce to any person with knowledge or with reasonable cause to believe that the receipt or possession of the firearm by the person to whom it is delivered would be in violation of the laws or ordinances of the State (or political subdivisions thereof) in which the delivery is made.

A similar requirement is also provided with respect to delivery of firearms in the U.S. mails.

The provisions of this subsection are in furtherance of the purposes of the bill to restrict acquisition of firearms by juveniles and minors and to aid the States and their political subdivisions in achieving effective firearms controls.

*Subsection (h)*

Subsection (h) of section 2 of the act as contained in the bill is existing law (15 U.S.C. 902(g)) and relates to the transportation or shipment of stolen firearms.

*Subsection (i)*

Subsection (i) of section 2 of the act as contained in the bill is a restatement of existing law (15 U.S.C. 902(h)). The language has been revised to correspond with other comparable provisions of Federal law pertaining to the receipt or sale of stolen property "moving as, or which is a part of, or which constitutes interstate or foreign commerce," (see 18 U.S.C. 2313 relating to sale or receipt of stolen vehicles). This change will make it clear that the provisions apply to stolen firearms or ammunition transported in interstate or foreign commerce, after having been stolen, as well as to firearms and ammunition stolen in the course of movement in interstate or foreign commerce.

*Subsection (j)*

Subsection (j) of section 2 of the act as contained in the bill is a restatement of existing law (15 U.S.C. 902(i)) relating to firearms from which the manufacturer's serial number has been removed, obliterated, or altered. The restatement makes applicable the provisions of the subsection to an importer's serial number, as well as the manufacturer's, since importers and manufacturers are separately classified under the provisions of the bill. The restatement also deletes the words "and the possession of any such firearm shall be presumptive evidence that such firearm was being transported, shipped, or received as the case may be, by the possessor in violation of this act" since the presumption is meaningless in view of the decision of the Supreme Court in *Tot* v. *United States*, 319 U.S. 463.

### Subsection (k)

Subsection (k) of section 2 of the act as contained in the bill is a new provision which would make it unlawful for any person to import or bring into the United States, or any possession thereof, any firearm in violation of the provisions of this act or to import or bring into the United States or any possession thereof any ammunition for a destructive device. This provision is correlated to the provisions relating to importation of firearms contained in section 3(e) of the act as contained in the bill.

### Subsection (l)

Subsection (l) of section 2 of the act as contained in the bill is a new provision which would make it unlawful for any person to knowingly receive any firearm or ammunition which has been imported or brought into the United States, or any possession thereof, in violation of the provisions of this act. This subsection also is correlated to the provisions of section 3(e) of the act as contained in the bill relating to importation.

### Section 5

Section 5 of the bill (which was sec. 3 of the bill as introduced) would amend section 3 of the Federal Firearms Act (15 U.S.C. 903) which relates to licensing of importers, manufacturers, and dealers, and to recordkeeping by licensees.

### Subsection (a)

Subsection (a) of section 3 of the act, as contained in the bill, is a restatement and revision of existing law (15 U.S.C. 903(a)).

The first sentence of subsection (a) is intended to make it clear that no person shall engage in business as an importer of firearms, or as a manufacturer of firearms, or as a dealer in firearms (or ammunition for destructive devices) until he has filed an application with, and received a license to do so from the Secretary. In order to effectively regulate interstate and foreign commerce in firearms (and ammunition for destructive devices) it is necessary that all persons engaging in these businesses be licensed. Similar provisions were upheld in *Hanf* v. *United States*, 235 F. 2d 710, cert. den. 352 U.S. 880, as reasonably necessary to effective control of interstate and foreign commerce under comparable conditions.

The legislative record before the subcommittee concerning the traffic in firearms amply demonstrates that the licensing of all persons engaged in the business of importing, manufacturing, or dealing in firearms is an appropriate and necessary means to the attainment of the legitimate end of effective control over the interstate traffic in firearms. A full discussion of the constitutional basis for this provision (and other provisions) is contained in the memorandum submitted by the Attorney General of the United States, Nicholas deB. Katzenbach, when he testified before the subcommittee on May 19, 1965. This memorandum is included in the record of the hearings following the testimony of the Attorney General.

The second sentence of subsection (a) provides that the application for a license shall be in such form and contain such information as the Secretary of the Treasury shall by regulations prescribe. It is the intent of this provision to authorize the Secretary to require the submission of information reasonably relevant to the determination as to whether the applicant is entitled to a license under the standards

prescribed in subsection (c). Since the Secretary has the responsibility for determining whether the license should be issued, he must necessarily have the authority to require the submission by the applicant of information relevant to his determination as to the applicant's eligibility. Authority to prescribe the form of the license application has been exercised by the Secretary since the Federal Firearms Act was enacted in 1938, and the evidence presented to the subcommittee demonstrated that only information relevant to the issuance of a license has been required on the prescribed application form.

The provision that applicants shall be required to pay a fee for obtaining their license "for each place of business" is merely a clarification of existing law, since existing law is now so construed (see 26 CFR 177.33). It is intended that the license cover only the specific place of business for which it is issued.

Under existing law, an importer is required to obtain a license as a manufacturer. The bill provides a separate classification for importers, and under subsection (a) an importer would be required to obtain a license as such.

Under existing law, the applicant, if a manufacturer or importer, paid a fee of $25 per annum, and, if a dealer, a fee of $1 per annum. These fees are completely unrealistic and, in the case of dealers represent only a fraction of the cost of processing an application and issuing a license. Further, the information presented at the public hearings held by the subcommittee established the fact that many persons holding licenses as dealers under the Federal Firearms Act are not bona fidely engaged in business as such, but nevertheless have due to the nominal license fees and the absence of statutory standards for the issuance of licenses, obtained licenses. This information is summarized in the general discussion of the provisions of the bill regarding the scope of coverage under the subheading "Licensing of Importers, Manufacturers, and Dealers." In order for the licensing system under the act to serve its intended purpose, it is essential that this situation be corrected.

Under the provisions of subsection (a) of section 3 of the act as contained in the bill the license fees would be increased to a figure which would make it unlikely that any person not bona fidely engaged in business as an importer, manufacturer, or dealer would attempt to obtain a Federal Firearms Act license. The increased license fees would be such as to not only cover the cost of processing an application and issuing the license, but would partially defray the cost of conducting the investigation contemplated by the provisions of section 3(c) of the act as contained in the bill to determine the qualifications of the applicant and whether or not he would be likely to conduct his operations in compliance with the act.

A separate classification and higher fees are provided in the case of a manufacturer or importer of, or a dealer in, "destructive devices" as defined in paragraph (4) of subsection (a) of section 1 of the act, as contained in the bill. Since "destructive devices" are not ordinary articles of commerce, it is anticipated that very few such licenses will be issued. The purpose of this separate classification and higher fee with respect to such devices is to make more effective the stringent controls imposed under the bill with regard thereto.

A separate license with a higher license fee is also provided for pawnbroker dealers. A "pawnbroker" is defined in section 1(a) of the bill. It may be noted that under the National Firearms Act (26 U.S.C. ch.

53) pawnbroker dealers are charged a higher rate of occupational tax than other dealers.

The bill provided a fee of $100 per annum for dealers (other than dealers in destructive devices and pawnbrokers). The evidence presented at the hearings before the subcommittee showed that the $100 dealer fee would work a hardship on small dealers, particularly dealers in sporting ammunition and dealers in sporting rifles and shotguns.

The amendment to the bill eliminating ammunition (other than ammunition for destructive devices) means that the substantial number of persons who deal only in ammunition will not be required to obtain a license under the act. Thus, ammunition reloaders and ammunition dealers will not be affected by the bill.

The subcommittee further amended the bill to provide a basic license fee of $10 per annum for dealers (other than pawnbrokers and dealers in destructive devices). This will materially reduce the burden on small dealers while retaining a fee sufficiently high to discourage filing of applications by persons not genuinely engaged in business as dealers in firearms.

It is contemplated that investigations will be conducted to determine suitability of licensees and prospective licensees under the new licensing standards discussed below in subsection (c). Because the annual license fee for dealers (other than pawnbrokers or dealers in destructive devices) is being reduced to $10 and in order to partially defray the expense of a one-time investigation of such dealers the subcommittee has provided that for the first renewal following the effective date of the amendments to the Federal Firearms Act made by this bill or for the first year he engages in business such a dealer will pay a license fee of $25.

It is deemed that the fees provided in the bill as amended by the subcommittee will be adequate for the purposes intended and will partially defray the costs of investigation of applications and of administration of the Federal Firearms Act, as amended by the bill.

*Subsection (b)*

Subsection (b) of section 3 of the act as contained in the bill is a restatement and revision of the provisions of existing law (15 U.S.C. 903(b)). Existing law provides that upon payment of the prescribed fee the Secretary of the Treasury shall issue to such applicant a license which shall entitle the licensee to transport, ship, or receive firearms and ammunition in interstate or foreign commerce unless and until the license is suspended or revoked in accordance with the provisions of the act. It will be noted that in existing law there are no specific conditions on the issuance of a license other than the payment of the prescribed fee. However, in view of the existing proscriptions in section 2 of the act against the shipment, transportation, or receipt in interstate or foreign commerce in firearms or ammunition by a person who is a fugitive from justice, or who has been convicted of, or who is under indictment for, any offense punishable by imprisonment for a term exceeding 1 year, the act has consistently been construed as precluding the issuance of licenses to such persons since it would be illegal for them to engage in the transactions covered by the license. (See 26 CFR, pt. 177.)

The revision of section 3(b) makes it clear that the privileges granted to the licensee are not unlimited or unconditional but are subject to the provisions of this act and other applicable provisions

of law, and also that an application for a license (including a renewal application as well as an original application) may be denied under the conditions set forth in section 3(c) of the act as contained in the bill.

*Subsection (c)*

Subsection (c) of section 3 of the act as contained in the bill is basically a new provision, except to the extent that it incorporates the construction of existing law to the effect that a license will not be issued to a person who is prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under the provisions of section 2 of the act (i.e., a person who has been convicted of, or who is under indictment for, a felony, or who is a fugitive from justice).

The existing provisions of the Federal Firearms Act, regarding the issuance of licenses, represent an anomaly to the general practice with regard to the issuance of licenses or permits in that the act contains no standards for the issuance or denial of a license, such as are contained in other comparable acts. (See 26 U.S.C. 5271(c) and 5712, and 27 U.S.C. 204(a)(2).)

Further, the existing weak provisions of the act do not grant any discretion with regard to the issuance of licenses to importers, manufacturers, and dealers, but rather provide that upon payment of the prescribed nominal fee that the Secretary of the Treasury "shall" issue the license applied for.

Since under existing law it would be unlawful for an importer, manufacturer, or dealer to ship or receive firearms in interstate or foreign commerce without a license, it is necessary to issue licenses upon the allegation of applicants that they "intend" to engage in such business. However, under existing law there is no specific statutory basis for denying an application submitted by a person who is not yet engaged in the firearms business and who does not intend to engage in the business with respect to which he is submitting an application for a license. While there may be implied authority in existing law to deny applications under such conditions, there are significant legal and administrative problems involved in taking such action under existing law.

In view of the magnitude of this problem (e.g., Secretary Fowler estimated that possibly 50,000 licenses had been issued to persons who may not be engaged in the business covered by the license) as developed at the hearings, it is essential that there be no doubt as to the authority of the Secretary of the Treasury or his delegate to deny license applications in cases where the applicant is not engaged in the applicable business, and does not intend to engage in such business. Therefore, the subcommittee has restated the provisions of paragraph (2) of subsection (c) to make it completely clear that the Secretary of the Treasury or his delegate may deny an application for a license where the applicant is not engaged in the business and there is good cause to believe that he will not engage in the business during the term of the license applied for.

The hearing record shows that the nominal license fees and other inadequacies of existing law have resulted in an untenable situation which urgently needs correction and it is noted that Secretary of the Treasury Henry H. Fowler in his appearance before the subcommittee on May 19, 1965, stated, that as the head of the Department responsible for the administration of the Federal Firearms Act that he was

"particularly anxious that the changes proposed in the bill with respect to the issuance of licenses to manufacture, import, and deal in firearms be adopted." The Attorney General of the United States, Nicholas deB. Katzenbach, who testified before the subcommittee on the same date, stated that the changes in the licensing provisions provided in the bill were intended to "give reasonable discretion to the Secretary of the Treasury as to who should be licensed to manufacture, import, or deal in the deadly weapons with which the Federal Firearms Act is concerned," and "to bring about a higher level of responsibility in the firearms trade."

Subsection (c) of section 3 of the act as contained in the bill eliminates the anomalous situation with respect to the licensing system contained in existing law and sets forth specific standards under which an application shall be disapproved and the license denied, after notice and opportunity for hearing.

The standards provided in subsection (c) are very similar to the standards provided in 26 U.S.C. 5271(c) (relating to permits to procure, deal in, or use specially denatured distilled spirits); 26 U.S.C. 5712 (relating to permits for manufacturers of tobacco products); and to 27 U.S.C. 204 (relating to wholesale dealers in liquors, importers of liquors, etc.) under which the Treasury Department has issued over 25,000 permits. The principal standard in all three of the statutes cited is the implied standard recognized by the Supreme Court in the *Ma-King* case (*Ma-King* v. *Blair*, 271 U.S. 479).

The record and reputation of the applicant as well as relevant and significant association with persons with a criminal record or reputation would be the principal basis for finding that the applicant is not likely to maintain operations in compliance with the Federal Firearms Act. (See *Seaway Beverages, Inc.* v. *Dillon, et al.*, 319 F. 2d 722, cert. den. 375 U.S. 923; and *Pincourt* v. *Palmer*, 190 F. 2d 390, which construe the language of the standards set forth in par. (2).)

The hearing and appeal procedures provided by the Administrative Procedure Act (act of June 11, 1946, 5 U.S.C. 1001 et seq.) would, as in the case of the permits provided for in title 26, United States Code, sections 5271 and 5712, be applicable with respect to license proceedings under the Federal Firearms Act.

The provisions of paragraph (2) relating to individuals possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association, are necessary to preclude felons or other individuals who could not obtain a license as an individual from using a corporation or other business organization to conduct their operations. In the past, individuals convicted of a felony have formed corporations for the purpose of continuing their firearms operations.

The provisions of paragraph (5) would preclude the issuance of licenses to applicants who do not have, or do not intend to have or maintain, bona fide business premises for the conduct of the business. This provision will be a definite aid in limiting licensees under the Federal Firearms Act to persons bona fidely engaged in business, and assuring that there will be an appropriate place that is subject to proper inspection where the required records will be maintained.

The information developed at the public hearings held by the subcommittee disclosed a definite need for such a provision. It was shown that in some cases importers or dealers maintained no regular place of business which could be found, and conducted their operations

through post office boxes, mail drops, answering services, etc., or from a vehicle, vessel, or aircraft which moved from place to place.

It is not intended that a building also used as a dwelling be precluded from being the place of business. However, in such cases the part of the building intended as the business premises should be designated as such and the records maintained in the designated area available for inspection as provided in subsection (g).

*Subsection (d)*

Subsection (d) of section 3 of the act as contained in the bill replaces the provisions of existing law contained in section 3(c) of the act (15 U.S.C. 903(c)) and reflects the construction of existing law as contained in current regulations (26 CFR part 177).

The requirement of existing law, concerning the posting of a bond by a licensee convicted of a violation of the act in order to continue operations pending final disposition of the case on appeal, serves no useful purpose, and has been omitted. Further, the provisions of this subsection have been revised to simplify administration. Since the licensee is required to reapply each year for a license, the information on the application relating to his indictment and/or conviction will be adequate. Also, the license itself can, as at present, contain a warning that the licensee cannot continue operations once his conviction has become final (other than as provided in sec. 11).

As under existing law and regulations, a new license will not be issued to a person under indictment for, or who has been convicted of, an offense punishable by imprisonment for a term exceeding 1 year. However, a licensed importer, licensed manufacturer, or licensed dealer may continue operations pursuant to his existing license (provided that prior to the expiration of the term of the existing license timely application is made for a new license), during the term of such indictment and until any conviction pursuant to the indictment becomes final, whereupon he shall be subject to all provisions of this act, and operations pursuant to such license shall be discontinued. If a bona fide application for relief is filed under section 11, operations may continue until such application is acted upon.

*Subsection (e)*

Subsection (e) of section 3 of the act as contained in the bill is a new provision designed to bring under control the flow of surplus military weapons and other firearms being imported or brought into the United States which are not particularly suitable for target shooting, hunting, or any other lawful purpose.

The operations of certain importers of and dealers in such firearms has reflected a flagrant disregard of the public interest.

The interim report made by the subcommittee with respect to the "Interstate Traffic in Mail-Order Firearms" (S. Rept. 1340, 88th Cong., 2d sess.) pointed out that such firearms are a principal source of supply to juvenile delinquents and other lawless elements. This report also indicated that many of these firearms were in such poor condition, or of such poor workmanship, that their use would be hazardous.

The further evidence now of record before the committee fully supports and justifies the halting of this senseless flow of imported surplus military and non-sporting-type firearms which have found their way into the hands of criminal and lawless elements across the United States. Many of the Nation's leading law enforcement officials have

testified regarding the wide usage of such firearms in the commission of crimes and of their serious and destructive effect on law enforcement.   They have also testified as to the unsafe character to the user of many such firearms, particularly the converted starter pistols, the rebored weapons, and the firearms with insufficient safety features. The testimony concerning the problems created by the importation of such firearms is more fully set forth in the general discussion of the provisions of the bill relating to scope of coverage under the subheading dealing with the "Importation of Nonsporting and Military Surplus Firearms."

One particularly disturbing facet of the traffic in military surplus firearms involves the importation of antitank guns, bazookas, mortars, and similar larger caliber weapons.   One importer told the subcommittee that he alone had imported over 4,000 such weapons.   These firearms have not been imported for national defense purposes, but for indiscriminate sale to anyone with the purchase price, including lawless elements.

Under the provisions of subsection (e), no person could import or bring firearms into the United States or a possession thereof, except upon authorization by the Secretary.   Such authorization would not be issued under the provisions of this subsection unless it was established to the satisfaction of the Secretary that certain conditions designed to protect the public interest had been met.

These provisions would not prohibit the importation of currently produced firearms which are in safe firing condition and which are particularly suitable for sporting purposes; nor would they prohibit the importation of military surplus rifles or shotguns as long as they meet adequate safety standards, are suitable for, or readily adaptable to, sporting purposes and are not "firearms" as defined in the National Firearms Act.   Therefore, there would be no interference with the bringing in of rifles or shotguns, or of pistols or revolvers (not military surplus), of recognized quality which are used for hunting and other recreational purposes or for personal protection.

Also firearms could be brought in for scientific or research purposes, or for use in connection with competition or training pursuant to chapter 401 of title 10 of the United States Code; or if they were unserviceable (not readily restorable to firing condition) and were intended as curios or museum pieces.   Also any antique firearm (as defined) could be brought in since such firearms are excluded from the coverage of the Federal Firearms Act.   A firearm which had previously been taken out of the United States (or a possession) could be brought back in by the person who took it out.   This is to accommodate travelers, hunters, and American personnel stationed in foreign countries.

*Subsection (f)*

Subsection (f) of section 3 of the act as contained in the bill is a new provision relating to the sale or other disposition of destructive devices, machineguns, short-barreled shotguns, and short-barreled rifles by licensee to nonlicensees.   This provision is imposed as a condition on the privilege granted the licensee to engage in interstate or foreign commerce with respect to such firearms.   Since these are not ordinary articles of commerce, it is not expected that there will be any significant volume of transactions falling within the application of the subsection.   However, it is deemed to be in the public interest to place

adequate controls over the disposition of these highly destructive weapons by licensees to nonlicensed persons.

*Subsection (g)*

Subsection (g) of section 3 of the act as contained in the bill is a restatement and revision of the recordkeeping requirements of existing law (15 U.S.C. 903(d)). Under existing law and regulations (26 CFR 177.51), licensees are required to maintain complete and adequate records reflecting the importation, production, and disposition at wholesale and retail of firearms, and the records are required to be kept available for inspection by internal revenue officers during regular business hours (26 CFR 177.54).

The restatement of the recordkeeping requirements contained in this subsection would make clear in the statute the requirement that the records be made available for inspection at all reasonable times, and the authority of the Secretary or his delegate to enter during business hours the premises of the licensee for inspection purposes.

The subsection also makes clear the authority of the Secretary, by regulations, to require the submission of reports concerning the operations of licensees.

Particularly as to manufacturing and importing operations the submission of information as to the number and types of firearms manufactured and imported might prove to be desirable and in the public interest. The hearings held regarding the bill have demonstrated the difficulty of readily obtaining reliable information in this regard. Also there may be other situations in which the submission of information could be of significant value, as for example retail sales of firearms in unusual quantities which might be destined for armed groups who would supplant lawful authority or for illicit exportation for purposes for which an export license could not be obtained.

There is no provision of S. 1592 which requires, provides for, or authorizes the Secretary or his delegate to institute a national firearms registration procedure under the Federal Firearms Act, and it is not intended that S. 1592 be used as the statutory basis for the national registration of firearms.

If it should be deemed necessary or desirable to provide for the national registration of firearms (other than as provided in the National Firearms Act; 26 U.S.C. ch. 53), it is intended that such registration be by specific congressional authorization and not pursuant to any regulatory discretion granted under the terms of this bill.

It has been existing practice to make available to State and local law enforcement officers information obtained from the required records of licensees for law enforcement purposes (e.g., tracing the ownership of a firearm found at the scene of the crime). The subsection would provide specific statutory authority for this practice.

It may be noted that the entry and inspection provisions contained in this subsection are similar to those provided in 26 U.S.C. 5146 with regard to the premises of liquor dealers. If there is to be proper enforcement of the Federal Firearms Act, it is essential that there be clear statutory authority to enter the premises where the business is carried on in order to inspect the records which are required to be maintained pursuant to the act.

*Subsection (h)*

Subsection (h) of section 3 of the act as contained in the bill is a new provision which would require licenses issued to importers, manufacturers, and dealers under the provisions of this section to be kept posted and available for inspection on the business premises covered by the license.

*Subsection (i)*

Subsection (i) of section 3 of the act as contained in the bill is a new provision. Existing law (15 U.S.C. 902(i)) makes it unlawful for any person to transport, ship, or knowingly receive in interstate or foreign commerce, any firearm from which the manufacturer's serial number has been removed, obliterated, or altered. Under the statutory authority to prescribe regulations to carry out the provisions of the act (15 U.S.C. 907), the Secretary has prescribed regulations requiring the identification of firearms (26 CFR 177.50). Subsection (i) would include in the act specific statutory authority for the Secretary to require licensed importers and licensed manufacturers to identify firearms in the manner prescribed by regulations.

*Section 6*

Section 6 of the bill (which was sec. 4 of the bill as introduced) amends section 4 of the Federal Firearms Act. Section 4 of the act as contained in the bill is a restatement of existing law (15 U.S.C. 904). However, the section as contained in the bill eliminates certain of the exceptions in existing law.

Section 4 of the act as contained in the bill contains the exception in existing law (15 U.S.C. 904) applicable in respect to transportation, shipment, receipt, or importation of firearms or ammunition imported for or sold or shipped to, or issued for the use of (1) the United States or any department, independent establishment, or agency thereof, or (2) any State or possession, or the District of Columbia, or any department, independent establishment, agency, or any political subdivision thereof. Such transactions are completely exempt from all provisions of the act.

The exemptions in existing law for certain nongovernmental activities have been omitted. Such omission does not mean that firearms or ammunition (for destructive devices) cannot be shipped to, or procured by, the omitted persons. Rather, it means that the omitted persons will be required to conduct their transactions and operations in conformity with the terms of the Federal Firearms Act. There appears to be no substantial reason why this cannot be done.

The Department of Defense has advised the subcommittee that the Department "strongly recommends the enactment of S. 1592" and that "no function of the Department of Defense will be in any way impaired by this legislation" (this includes the civilian marksmanship program conducted under the auspices of the Secretary of the Army).

*Section 7*

Section 7 of the bill (which was sec. 5 of the bill as introduced) amends section 5 of the Federal Firearms Act (15 U.S.C. 905(b)).

No change has been made in subsection (a), the existing penalty provision of the Federal Firearms Act.

The subcommittee has amended section 7 of the bill by redesignating subsection (b), which relates to forfeiture, as subsection (c) and inserting a new subsection (b) which would provide that any person who

(1) with intent to commit therewith an offense punishable by imprisonment for a term exceeding 1 year; or (2) with knowledge or with reasonable cause to believe that an offense punishable by imprisonment for a term exceeding 1 year is intended to be committed therewith; ships, transports or receives a firearm in interstate or foreign commerce shall be fined not more than $10,000 or imprisoned not more than 10 years, or both, for each such offense.

The provisions of the new subsection (b) would provide a severe penalty for shipping, transporting, or receiving a firearm in interstate or foreign commerce with intent, or with knowledge or reasonable cause to believe, that a felony offense is intended to be committed therewith.

This is basically an extension of the penalty imposed under the present act regarding the shipment, transportation or receipt in interstate or foreign commerce of firearms by persons convicted of an offense punishable by imprisonment for a term exceeding 1 year.

The 10-year maximum penalty appears clearly warranted in the cases to which subsection (b) would be applicable and it is important that persons be deterred from shipping, transporting, or receiving firearms in interstate or foreign commerce under the conditions which would be covered by this subsection. However, this provision would not have the effect of unduly burdening the agencies involved in criminal justice activities at the Federal level, as would certain other proposals relating to subsequent criminal misuse of a firearm which at any previous time had moved in interstate or foreign commerce. The effect of the "subsequent misuse" approach would be to give apparent Federal jurisdiction in the case of an inordinately large number of criminal cases involving crimes of an essentially local nature.

*Subsection (c)*

Subsection (c) of section 5 of the act as contained in the bill is a restatement and revision of existing law (15 U.S.C. 905(b)). This subsection would extend the existing forfeiture provisions of the Federal Firearms Act, which provide for the forfeiture of firearms and ammunition involved in violations of the act to cover firearms and ammunition "involved in, or used or intended to be used in," violation of the act or of certain provisions of title 18 of the United States Code pertaining to threats to, or assaults on, law-enforcement officers, members of the judiciary, etc.

Under existing law, firearms involved in violations of the Federal Firearms Act (15 U.S.C. 901 et seq.) or the National Firearms Act (26 U.S.C., ch. 53) are subject to forfeiture. However, these provisions are inadequate to cover many cases involving firearms used in offenses against the laws of the United States pertaining to assaults on, or threats against, law enforcement officers and public officials.

The subcommittee made one change in the redesignated subsection (c) dealing with forfeiture of firearms. This amendment added to the enumerated provisions of title 18, United States Code, the violation of which makes a firearm subject to seizure and forfeiture, chapter 84 of title 18. Chapter 84 of title 18 contains the recently enacted provisions concerning, in general, assassination or attempted assassination of the President of the United States and certain other persons. The subcommittee deems the inclusion of chapter 84 necessary to avoid the possibility of future situations involving attempted

commercial exploitation of the fact that a firearm was used in an assassination or an attempted assassination.   It has come to the subcommittee's attention that a deplorable and regrettable situation in this respect has already developed with regard to the rifle reported by the Warren Commission to have been used in the assassination to which that report was directed.

The procedures applicable to seizure, forfeiture, and disposition would be the same as for firearms seized for violation of the Federal Firearms Act (i.e., the provisions of the Internal Revenue Code of 1954, applicable in respect of National Firearms Act firearms, would apply).

The enactment of the provisions contained in this section of the bill is deemed to be clearly a matter in the national interest.

*Section 8*

Section 8 of the bill (sec. 6 of the bill as introduced) would renumber sections 6, 7, 8, 9, and 10 of the Federal Firearms Act as sections 7, 8, 9, 10, and 11, respectively, and insert after section 5 a new section.

The new section 6 of the act as contained in the bill relates to the applicability of other laws.   This section is merely for the purpose of making it completely clear that nothing in the Federal Firearms Act shall be construed as modifying or affecting any provision of the National Firearms Act, section 414 of the Mutual Security Act of 1954, or section 1715 of title 18 of the United States Code.   Also subsection (b) of section 6 makes it clear that nothing in the Federal Firearms Act is intended to confer any right or privilege to conduct any business contrary to the law of any State, or to be construed as relieving any person from compliance with the law of any State.

*Section 9*

The first sentence of section 9 of the bill is a restatement of existing law (15 U.S.C. 907) concerning the authority of the Secretary of the Treasury to prescribe such rules and regulations as he deems reasonably necessary to carry out the provisions of the Federal Firearms Act.

The subcommittee has amended this section of the existing Federal Firearms Act (relating to the issuance of regulations) by adding at the end thereof a new sentence which would specifically provide that the Secretary shall give reasonable public notice, and afford interested parties opportunity for hearing, prior to prescribing regulations to carry out the provisions of the Federal Firearms Act.   This would mean that any new regulations issued to effectuate the provisions of the bill would only be issued after such public notice and opportunity for hearing.   Thus, all interested parties will have full opportunity to be heard before any regulations implementing the provisions of the Federal Firearms Act, as amended by the bill, are issued.

The subcommittee deems this specific statutory requirement for a hearing desirable in view of the wide public interest in the procedural details to be prescribed by regulations to implement the provisions of the statute.

It is expected that the Treasury Department will give full consideration to the views of interested parties and to the legitimate interests of those who may be affected by the procedures to be prescribed.

The language of the notice and hearing provision included in the subcommittee amendment is identical to the language contained in

section 5 of the Federal Alcohol Administration Act (27 U.S.C. 205) under which the Treasury Department issues regulations relating to the labeling and advertising of alcoholic beverages.

*Section 10*

Section 10 of the bill contains the effective date provisions and corresponds to section 8 of the bill as introduced.

In view of the notice and hearing requirements regarding the issuance of regulations which the subcommittee has provided for in section 9 of the bill, the subcommittee has deemed it advisable to amend the effective date provisions to provide time for the issuance of implementing regulations as provided for in the bill. Under this section of the bill, as amended by the subcommittee, the amendments to the Federal Firearms Act contained in the bill would, in general, be effective as of the first day of the third month which begins not less than 10 days after the date of enactment. However, the amendments made by the bill to section 3(a) of the Federal Firearms Act (relating to the obtaining of licenses by importers, manufacturers, and dealers) would not apply to any importer, manufacturer, or dealer licensed under the Federal Firearms Act as of the effective date until the expiration of the license held by such importer, manufacturer or dealer on such date.

In effect this means that a licensee will not have to obtain a new license, by reason of the amendments to the Federal Firearms Act made by this bill, until the licensee's existing annual license expires. This will permit an orderly processing of license applications over the course of the year following the effective date of amendments to the Federal Firearms Act made by this bill.

THOMAS J. DODD.
GEORGE A. SMATHERS.
EDWARD V. LONG.
BIRCH E. BAYH.
EDWARD M. KENNEDY.
JOSEPH D. TYDINGS.
HIRAM L. FONG.
JACOB K. JAVITS.

ADDITIONAL VIEWS OF MR. KENNEDY OF MASSACHUSETTS

Although I am pleased that some legislation regulating the sale of firearms has finally been reported from the Judiciary Committee, I intend to support a motion on the Senate floor to substitute Senator Dodd's bill S. 1592, for the bill reported, S. 3767.  S. 3767 is a compromise measure supported by some members as the only way to get any kind of gun control legislation out of the committee.  But it is not an adequate substitute for S. 1592, and in my judgment there is no justification for passing legislation weaker in impact or narrower in scope than S. 1592.

Indeed it is amazing to me that we continue to tolerate a system of laws which makes it ridiculously easy for any criminal, madman, drug addict, or child to obtain lethal firearms which can be used to rain violence and death on innocent people.  I recognize that S. 1592 is not a panacea; that effective gun regulation will require State action and that gun controls will not by themselves eliminate violence.  But I think we have a responsibility to do what we can to minimize the bloodshed and death resulting from firearms abuse.  And S. 1592 represents a responsible first step.  S. 1592 establishes a Federal framework within which State regulation of firearms can be made effective.  It does this by, inter alia, banning interstate mail order traffic in handguns, restricting the over-the-counter purchase of handguns by nonresidents, regulating mail-order traffic in shotguns and rifles by an affidavit procedure, establishing minimum ages of 18 for the purchase of rifles and 21 for the purchase of pistols, and seeking to curb the flow of nonsporting and military surplus firearms which have poured into this country from abroad in recent years and been dumped on the market at low prices attractive to juveniles.  It is a serious attempt to deal with the problems revealed by the testimony taken at the many hearings the Juvenile Delinquency Subcommittee held on this question.

S. 3767 on the other hand leaves out regulation of rifles altoghter, and permits anyone, no matter how young, to buy a rifle by mail order or a pistol over the counter.  S. 3767 would also permit the sale of handguns, by interstate mail order and to nonresidents over the counter, provided an affidavit is filled out.  This is not adequate.  There is no justification for replacing a ban on mail-order handgun sales by an affidavit procedure.  An affidavit procedure is simply not as effective as an outright ban.  Affidavits may be ignored by local law enforcement officers or the information on them may go unchecked for accuracy.  Consequently, employing the affidavit procedure will not insure that handguns will not be sold to those who have no right to them.

Similarly, in the face of the evidence of substantial misuse of rifles and shotguns, particularly in areas where handguns are regulated, I can see no justification for leaving mail-order rifle and shotgun sales totally unregulated.

Furthermore, S. 3767 would do nothing to stop the torrent of cheap imports flooding our country with unsafe and military surplus weapons. In contrast, under S. 1592, imported military surplus handguns are banned, and imported military surplus rifles are permitted only if they meet recognized safety standards and are suitable for lawful sporting purposes.  The purpose of this restriction is to stop the United States from being the dumping ground for weapons of death from abroad.  Since the flow of cheap and unsafe guns from abroad increases the danger of gun violence to the American people, I think it altogether appropriate to legislate to slow that flow.

Opponents of S. 1592 base their opposition on what they claim to be the unnecessary burdens caused the average gun buyer by this legislation.  But this legislation will not in any substantial way burden any person who has a legitimate purpose in obtaining a firearm.  And I do not believe that the minor burdens this bill may impose can possibly justify any further watering down of its gun controls.

Why would it be so burdensome to have to order guns by mail within your State?  Or to actually visit a weapons shop or department store to purchase firearms?  Or to be restricted in buying a pistol to buying it in the State of your residence?  Or to be 21 to buy a pistol from a federally licensed dealer over the counter?  Why should anyone under 18 be permitted to buy a rifle by mail order or over the counter?  What is so burdensome about requiring the buyer of a rifle by mail order from out of State to fill out a simple affidavit?  After all, S. 3767 would impose that burden for handguns.  Is it really so great a burden to put upon a rifle buyer?  If imposing this slight inconvenience would result in even only a few less than the present 1,700 rifle murders a year, I think it would be worth it.

I believe we owe it to the people of this country to try and make a decent start in reducing the dangers of gun violence, and passage of S. 1592 would mark such a beginning.

EDWARD M. KENNEDY.

## ADDITIONAL VIEWS OF MR. TYDINGS

I opposed S. 3767 and I voted against it in the Judiciary Committee, because I believe it is totally inadequate to protect the American public from the nearly unlimited traffic in lethal weapons which threatens us today.

.I realize that other Senators who share my opinion of this bill nonetheless voted for it in order to get some firearms bill to the floor, where it can be strengthened by amendment.   I have joined those Senators in the views they express against S. 3667 in this report and I join them in rejecting the views expressed in this report in favor of S. 3767.   I will vigorously support the amendments which will be offered on the Senate floor to strengthen this bill.

How much longer will the people of the United States be subjected to indiscriminate slaughter at the hands of criminals and lunatics who have nearly unlimited access to weapons of death?   That is the question squarely facing the Congress.

JOSEPH D. TYDINGS.

98

## Individual Views of Mr. Hart

With others of the committee, I voted to report S. 3767 in the belief that the Senate should be put into position to act in this area of great concern. The country does face a serious problem in the sale and distribution of firearms, and our colleague from Connecticut, Senator Dodd, long has urged the Congress to recognize the problem and act.

I believe we should prohibit the interstate sale of handguns and large, operable, military weapons. However, I do not agree that mail-order restrictions should apply to sporting shoulder arms weapons difficult to conceal. The criminal who felt the need for a shoulder arm would not be seriously inconvenienced by mail-order restrictions. Even in many States that have strict regulations on handgun purchases, over-the-counter sales of shoulder arms are unrestricted.

Philip A. Hart.

99

## Individual Views of Mr. Scott

We need realistic, enforcible Federal regulation of the interstate sale of firearms.  Two areas are most urgently in need of prompt action: (1) sales of handguns, which are most liable to use and abuse by criminals, and (2) mail-order purchases of all weapons because of their susceptibility to crimes, most horribly illustrated by the assassination of President Kennedy.

I cannot, however, without some reservations, support either S. 1592 or S. 3767.

S. 1592 has several desirable provisions.  But I would be more favorably disposed to that bill if it were stripped of section 2, its statement of findings—which by inference lumps millions of law-abiding citizens together with criminals and the worst kind of extremists—and if its regulation of "destructive devices" would be treated separately in the National Firearms Act of 1934.

S. 3767 does not go far enough, chiefly because I believe that the interstate mail-order sale of rifles and shotguns, as well as handguns, should be regulated.

I offered, during the Judiciary Committee's executive session consideration of various firearms control bills, a measure patterned after S. 14, a bill which Senator Dodd introduced on January 6, 1965.  I believe it meets the areas of major concern.

My bill would (by amendment of the Federal Firearms Act):

1. Require the manufacturer or dealer, before making shipment of a firearm, to obtain from the purchaser a sworn statement in duplicate that—

   (a) Such a person is at least 18 years of age.

   (b) Such person is not under indictment, has not been convicted of a crime punishable by a term exceeding 1 year, and is not a fugitive from justice.

   (c) There are no provisions of local law which would be violated by his possession of the firearm.

   (d) Provides the true name and address of the principal law enforcement officer of the locality to which the firearm will be shipped.

2. Require the manufacturer, prior to shipment of a firearm, to send to the local law enforcement officer by registered mail a description of the firearm (but not its serial number identification), one copy of the purchaser's statement, and obtain return receipt from such officer for the registered letter.  The dealer must wait for 7 days after receiving receipt, before making delivery of the firearm.

3. Require the shipper of a firearm to deliver a written notice of the content of the shipment, to the common or contract carrier.

4. Make it unlawful for the carrier to deliver any firearm to a person with knowledge or reasonable cause to believe that such person is under 18 years of age.

5. Exempt antique firearms.

100

6. Provide that it is not the intent of Congress to—
   (*a*) Regulate shipments of firearms to the exclusion of State laws.
   (*b*) Supersede State laws, unless inconsistent with the bill.
   (*c*) Make lawful any act if such act is unlawful under State law.

My bill also incorporates certain technical and clarifying amendments to the act, for example (1) license fees in the case of dealers are increased from $1 to $25 for the first year and $10 for subsequent years, and in the case of manufacturers and pawnbrokers from $25 to $50; (2) deletes obsolete references to "territories"; (3) eliminates ammunition and small firearms parts from coverage of the act since Treasury has found provisions relating thereto impractical to administer; (4) makes clear that the act would not be construed so as to affect section 414 of the Mutual Security Act of 1954.

The imminent adjournment of the 89th Congress precludes further action on firearms control legislation. When Congress reconvenes in January, I shall continue my efforts to help enact effective legislation, geared to meet a serious problem.

HUGH SCOTT.

O