UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| JAMES D'CRUZ, NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; KENNETH E. MELSON, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives; ERIC HOLDER, in his official capacity as Attorney General of the United States, <br><br> Defendants. | CASE NO: 5:10-cv-00140-C |

**Application of *Amici Curiae* Brady Center to Prevent Gun Violence, Graduate Student Assembly and Student Government of the University of Texas at Austin, Mothers Against Teen Violence, Students for Gun-Free Schools in Texas and Texas Chapters of the Brady Campaign To Prevent Gun Violence to File an Amicus Brief in Support of Defendants**

Through undersigned counsel, the Brady Center to Prevent Gun Violence, Graduate

Student Assembly and Student Government of the University of Texas at Austin, Mothers

Against Teen Violence, Students for Gun-Free Schools in Texas and Texas Chapters of the

Brady Campaign to Prevent Gun Violence apply to the Court for leave to file a brief as *amici*

*curiae* in this case for the facts and reasons stated below.  The proposed brief is attached hereto

as Exhibit A for the convenience of the Court and counsel.  Defendants do not take any position

regarding this *amicus* brief.  Plaintiffs have indicated that they are opposed to the filing of this

*amicus* brief.

The Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit

organization dedicated to reducing gun violence through education, research, and legal advocacy.

Through its Legal Action Project, the Brady Center has filed numerous briefs *amicus curiae* in cases involving both state and federal gun laws.

Graduate Student Assembly and Student Government serve as the official voice of 62,000 students at the University of Texas at Austin, the flagship institution of the University of Texas System. Student Government has a clear interest in preserving student safety and preventing suicide, both of which are implicated by increased access to firearms by young people. Many graduate students work, live, and teach on University of Texas's several campuses, and Graduate Student Assembly is concerned that increased access to firearms by undergraduates may compromise workplace safety.

Mothers Against Teen Violence is a Texas organization that works to provide information, education, and advocacy for teen violence prevention, public health, and public safety. Mothers Against Teen Violence recognizes the dangers posed by teenagers and people under the age of 21 purchasing firearms and opposes lifting restrictions on the sale of arms to such persons.

Students for Gun-Free Schools in Texas is an Austin-based organization founded by survivors of the Virginia Tech shooting, as well as family and friends of victims. The organization pursues proactive measures for safer campuses, and is concerned about the risk of concealed, loaded firearms on and around schools and college campuses.

Texas Chapters of the Brady Campaign to Prevent Gun Violence is a grassroots organization that strives to educate Texans about gun violence. The Texas Chapters of the Brady Campaign also work to enact sensible gun laws in Texas and to monitor gun bills being considered by the Texas House and Senate.

District courts have inherent power to grant third parties leave to file briefs as *amici curiae*, particularly regarding issues that have potential ramifications beyond the parties directly

involved or if *amici* provide "another perspective" that can help the court beyond the help that the lawyers for the parties are able to provide. *See City of Dallas v. Hall*, 2008 WL 2622809, at *3 (N.D. Tex. 2008). Here, *amici* bring a broad and deep perspective to the issues raised by this case and have a compelling interest in the federal courts' interpretation of Second Amendment issues. *Amici* thus respectfully submit the attached brief to assist the Court with the constitutional issues in this case, including important matters of first impression under the Second Amendment. The proposed brief provides an overview of recent and longstanding Supreme Court Second Amendment jurisprudence, discusses the policy implications of recognizing a broad right to purchase firearms from federally licensed dealers, particularly by teenagers and young adults between the ages of 18 and 21, and addresses an open question that has resulted from this jurisprudence—namely, what the appropriate standard of review for Second Amendment claims should be and how lower courts have answered that question thus far. The brief also discusses the emerging trend in lower courts towards using a two-pronged approach to Second Amendment claims that asks (1) whether the law or regulation at issue implicates protected Second Amendment activity, and if so, (2) whether it passes the appropriate standard of review. The brief then applies this two-pronged approach to Second Amendment issues in the case at hand, employing case law, sociological data, and legal commentary to place 18 U.S.C. §§ 922(b)(1) and 922(c), and 27 C.F.R. §§ 478.99(b)(1), 478.124(a), and 478.96(b) in the larger context of Second Amendment issues. The brief concludes that (1) these provisions do not implicate protected Second Amendment activity because the Supreme Court has only recognized a Second Amendment right to possess and carry guns in the home, and (2) that even if they did implicate protected Second Amendment activity, they would survive the appropriate level of review – the reasonable regulation test that over forty states have adopted – because they are a valid exercise of the state's police powers to enact legislation designed to protect public

safety.  *Amici*, therefore, respectfully submit the attached brief to assist the Court in deciding the complex and significant issues raised in this matter.

## CONCLUSION

For the foregoing reasons, *amici curiae* the Brady Center to Prevent Gun Violence, Graduate Student Assembly and Student Government of the University of Texas at Austin, Mothers Against Teen Violence, Students for Gun-Free Schools in Texas, and Texas Chapters of the Brady Campaign to Prevent Gun Violence respectfully request that the Court grant leave to file the attached *amicus* brief.

Dated: December 28, 2010

Respectfully submitted,

_____ s/ _____
Scott Medlock (Texas Bar No. 24044783)
1405 Montopolis Dr.
Austin, TX 78741
Phone: (512) 474-5073
Facsimile: (512) 474-0726
E-mail: smedlock@texascivilrightsproject.org

Adam K. Levin
Tracy L. Hresko
S. Chartey Quarcoo
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
E-Mail:  adam.levin@hoganlovells.com

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005

Attorneys for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2010, I filed this Application of *Amici Curiae* Brady Center to Prevent Gun Violence, Graduate Student Assembly and Student Government of the University of Texas at Austin, Mothers Against Teen Violence, and Texas Chapters of the Brady Campaign To Prevent Gun Violence to File an Amicus Brief in Support of Defendants through the Court's CF/ECF system, which will electronically serve this document on both Plaintiffs' and Defendants' attorneys as follows:

Fernando M Bustos
Law Offices of Fernando M. Bustos, P.C.
P.O. Box 1980
Lubbock, TX 79408-1980
fbustos@bustoslawfirm.com

Charles J Cooper
Cooper and Kirk PLLC
1523 New Hampshire Ave NW
Washington, DC 20036
ccooper@cooperkirk.com

Drew L Harris
Office of the Texas Attorney General - Gen Lit Div
300 West 15th St
11th Floor
Austin, TX 78701
drew.harris@oag.state.tx.us

Jesse Panuccio
Cooper and Kirk PLLC
1523 New Hampshire Ave NW
Washington, DC 20036
jpanuccio@cooperkirk.com

David H Thompson
Cooper & Kirk PLLC
1523 New Hampshire Ave NW
Washington, DC 20009
dthompson@cooperkirk.com

s/
_____
Scott Medlock (Texas Bar No. 24044783)

## CERTIFICATE OF CONFERENCE

I hereby certify that on December 1, 2010, I conferenced with Defendants' counsel, and on December 20, 2010, I conferenced with Plaintiffs' counsel.  Defendants do not take any position regarding this *amicus* brief.  Plaintiffs have indicated that they are opposed to the filing of this *amicus* brief.

_____s/_____<br>Scott Medlock (Texas Bar No. 24044783)

# Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| JAMES D'CRUZ, NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; KENNETH E. MELSON, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives; ERIC HOLDER, in his official capacity as Attorney General of the United States, <br><br> Defendants. | **CASE NO: 5:10-cv-00140-C** |

**BRIEF OF *AMICI CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE, GRADUATE STUDENT ASSEMBLY AND STUDENT GOVERNMENT OF THE UNIVERSITY OF TEXAS AT AUSTIN, MOTHERS AGAINST TEEN VIOLENCE, STUDENTS FOR GUN-FREE SCHOOLS IN TEXAS, AND TEXAS CHAPTERS OF THE BRADY CAMPAIGN TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS**

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................... 1

INTEREST OF *AMICI* ............................................................................................ 4

ARGUMENT ............................................................................................................. 5

    I.    FEDERAL LAW REGULATING THE AGE TO PURCHASE HANDGUNS FROM GUN DEALERS DOES NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY ......................................... 5

        A.    18 U.S.C. §§ 922(b)(1) and 922(c), and 27 C.F.R. §§ 478.99(b)(1), 478.124(a), and 478.96(b) Do Not Implicate Protected Second Amendment Activity Because They Do Not Impact The Right to Possess Firearms in The Home Protected in *Heller* and *McDonald*........... 6

        B.    The Second Amendment Right Should Not Be Extended to Prevent the Government from Imposing Conditions and Qualifications on Who May Acquire Firearms. ................................................................. 11

            1.    The acquisition of firearms by individuals under 21 poses unique threats to public safety. ...................................................... 11

            **2.**    Congress specifically recognized the threats posed by the acquisition of firearms by individuals under the age of 21 ............ 14

    II.    EVEN IF 18 U.S.C. §§ 922(b)(1), 922(c), 27 C.F.R. §§ 478.99(b)(1), 478.124(a), AND 478.96(b) DID IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY, THEY WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY ......................................................... 17

        A.    The Reasonable Regulation Test is the Appropriate Standard of Review. ................................................................................... 18

        B.    The Provisions at Issue Are Constitutionally Permissible Because They are Reasonable Regulations. .......................................... 21

CONCLUSION ...................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*District of Columbia v. Heller,*
128 S. Ct. 2783 (2008) .......................................................................................... passim

*Dorr v. Weber,*
--- F.Supp.2d --- , 2010 WL 1976743 (N.D. Iowa 2010) ................................3, 9, 10

*Glenn v. State,*
72 S.E. 927 (Ga. App. Ct. 1911) ......................................................................10

*Gonzales v. Oregon,*
546 U.S. 243 (2006) ...........................................................................................23

*Gonzalez v. Village of West Milwaukee,*
No. 09CV0394, 2010 WL 1904977 (E.D. Wis. May 11, 2010) ..............................8

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) .......................................................................................3, 10

*Huddleston v. United States,*
415 U.S. 814 (1974) ............................................................................................. passim

*In re Bastiani,*
881 N.Y.S.2d 591 (N.Y. Co. Ct. 2008) ......................................................................9

*In re Factor,*
2010 WL 1753307 (N.J. Sup. Ct. Apr. 21, 2010) ....................................................9

*Kennedy v. Louisiana,*
128 S. Ct. 2641 (2008) .......................................................................................18

*Louisville Gas Co. v. Coleman,* 277 U.S. 32, 41 (1928) ...............................................11

*Lowery v. United States,*
3 A.3d 1169 (D.C. 2010) .......................................................................................7

*Mack v. United States,*
No. 08-CF-603, 2010 WL 4340932 (D.C. Ct. App. Nov. 4, 2010) .........................8

*Masters v. State,*
653 S.W.2d 944 (Tex. App. Ct. 1983) ....................................................................19

*Mathews v. Eldridge,*
 424 U.S. 319 (1976)..................................................................................18

*McDonald v. City of Chicago,*
 130 S. Ct. 3020 (2010)................................................................. passim

*Nordyke v. King,*
 319 F.3d 1185 (9th Cir. 2003) .................................................................19

*Oregon v. Mitchell,*
 400 U.S. 112 (1970)..............................................................................3, 10

*People v. Dawson,*
 934 N.E.2d 598 (Ill. App. Ct. 2010) ........................................................8

*People v. Perkins,*
 880 N.Y.S.2d 209 (N.Y. Sup. Ct. 2009) ..................................................9

*People v. Williams,*
 --- N.E.2d ---- 2010 WL 4967880 ............................................................8

*Riddick v. U.S.,*
 995 A.2d 212 (D.C. 2010) .........................................................................9

*Robertson v. City & County of Denver,*
 874 P.2d 325 (Colo. 1994)..........................................................9, 18, 20

*Schweiker v. Wilson,*
 450 U.S. 221 (1981).................................................................................11

*Sims v. U.S.,*
 963 A.2d 147 (D.C. 2008) .........................................................................9

*State v. Cole,*
 665 N.W. 2d 328 (Wis. 2003)..................................................................22

*State v. Dawson,*
 159 S.E.2d 1 (N.C. 1968) .........................................................................20

*State v. Hamdan,*
 665 N.W.2d 785 (Wis. 2002).....................................................................20

*State v. Knight,*
 241 P.3d 120 (Kan. Ct. App. 2010) ..........................................................8

*State v. Sieyes,*
 225 P.3d 995 (Wash. 2010)...............................................................10, 23

*Swait v. University of Nebraska*,
  No. 8:08CV404, 2008 WL 5083245 (D. Neb. Nov. 25, 2008)...............................................9

*Teng v. Town of Kensington*,
  No. 09-cv-8-JL, 2010 WL 596526...........................................................................................9

*Terry v. Ohio*,
  392 U.S. 1 (1968)...................................................................................................................18

*Trinen v. City of Denver*,
  53 P.3d 754 (Colo. Ct. App. 2002) .......................................................................................20

*Turner Broad. Sys., Inc. v. FCC*,
  520 U.S. 180 (1997)...............................................................................................................21

*United States v. Bledsoe*,
  2008 WL 3538717 (W.D.Tex. Aug. 8, 2008)...................................................................3, 23

*United State v. Peters*,
  403 F.3d 1263 (11th Cir. 2005) ............................................................................................21

*United States v. Cardoza*,
  129 F.3d 6 (1st Cir. 1997)...................................................................................................2, 9

*United States v. Emerson*,
  270 F.3d 203 (5th Cir. 2001) ................................................................................................19

*United States v. Engstrum*,
  609 F. Supp. 2d 1227 (D. Utah)............................................................................................23

*United States v. Hart*,
  No. 09-10376-WGY, 2010 WL 2990001 (D. Mass. July 30, 2010)........................................8

*United States v. Hayes*,
  129 S. Ct. 1079 (2009)........................................................................................................4, 6

*United States v. Marzzarella*,
  595 F. Supp. 2d 596 (W.D. Pa. 2009), *aff'd* 614 F.3d 85 (2010) ......................................8, 23

*United States v. Masciandaro*,
  648 F. Supp. 2d 779 (E.D. Va. 2009) ...................................................................................23

*United States v. McCane*,
  573 F.3d 1037 (10th Cir. 2009) ............................................................................................23

*United States v. Miller*,
  604 F. Supp. 2d 1162 (W.D. Tenn. 2009).........................................................................21, 23

*United States v. Morsette*,
  622 F.3d 1200 (9th Cir. 2010) ...........................................................................8

*United States v. Rene E.*,
  583 F.3d 8 (1st Cir. 2009) ...........................................................................3, 7, 8, 9

*United States v. Rozier*,
  598 F.3d 768 (11th Cir. 2010) ...........................................................................8

*United States v. Rybar*,
  103 F.3d 273 (3d Cir. 1996) ...........................................................................3, 9, 20

*United States v. Tooley*,
  717 F. Supp. 2d 580 (S.D. W. Va. 2010) ...........................................................8, 9

*United States v Walker*,
  709 F. Supp. 2d 460 (E.D. Va. 2010) .................................................................9

*Walker v. State*,
  --- S.W.3d ----, 2010 WL 4028439 (Tex. Ct. App. 2010) ......................................7

*Wilt v. Texas Dept. Of Public Safety*,
  2004 WL 1459375 (Tex. App. Ct. 2004) ..............................................................19

## STATUTES

430 Ill. Comp. Stat. 65/3(a) ...........................................................................12

430 Ill. Comp. Stat. 65/4(a)(2)(i) ...................................................................12

18 U.S.C. § 922(x) ...........................................................................................2

18 U.S.C. § 922(b)(1) ........................................................................... passim

18 U.S.C. §§ 922 (c) ............................................................................ passim

18 U.S.C. § 922(g)(9) .......................................................................................6

18 U.S.C. §§ 923(d)(1) ...................................................................................15

27 C.F.R. § 478.99(b)(1) .................................................................................17

27 C.F.R. § 478.124(a) ......................................................................... passim

27 C.F.R. § 478.96(b) ........................................................................... passim

Cal. Penal Code § 12072(a)(3)(A) ...........................................................................12

D.C. Code Ann. § 7-2502.03 ...................................................................................12

D.C. Code Ann. § 22-4507 .......................................................................................12

Del. Code Ann. tit. 24, § 903 ...................................................................................12

Haw. Rev. Stat. Ann. § 134-2(d) .............................................................................12

Mass. Gen. Laws ch. 140, § 130 ..............................................................................12

Md. Code Ann., Pub. Safety § 5-134 .......................................................................12

N.J. Stat. Ann. § 2C:58-6.1 ......................................................................................12

Ohio Rev. Code Ann. § 2923.21 ..............................................................................12

Omnibus Crime Control and Safe Streets Act of 1968..............................................15

R.I. Gen. Laws §§ 11-47-30, 11-47-35(a) ...............................................................12

OTHER AUTHORITIES

Adam Ortiz, *Adolescence, Brain Development, and Legal Culpability*, AMERICAN BAR
    ASSOCIATION ...................................................................................................1, 13

Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 686-87, n.
    12 (2007)...............................................................................................................18

Bureau of Alcohol, Tobacco & Firearms, Crime Gun Trace Reports (2000), at 6-7 (2002)
    and Bureau of Alcohol, Tobacco & Firearms, Crime Gun Trace Reports (1999), at 6-7
    (2000) ....................................................................................................................13

D.W. Webster, *et al.*, *Effects of State-Level Firearm Seller Accountability Policies on
    Firearm Trafficking* ...............................................................................................22

D.W. Webster, *et al.*, *Relationship Between Licensing, Registration, and Other State Gun
    Sales Laws and the Source State of Crime Guns* ....................................................22

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An
    Analytical Framework and a Research Agenda*, 56 UCLA LAW REVIEW 1443, 1458
    (2009)....................................................................................................................20

Justice, *Crime in the United States* ....................................................................1, 12

Justice, *Gun Crime in the Age Group 18-20* (June 1999), at 2-3, 4.......................................1,12,13

Matthew Miller, *et al.*, *Guns at College* ................................................................................13, 14

S. Rep. No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N 2112...................................14, 15, 16

Second Amendment .................................................................................................... passim

Texas Constitution ......................................................................................................19

U.S. Census Bureau, *U.S. Population Projections* ...................................................................1, 13

U.S. Const., Amend. 26 (ratified July 1, 1971) ........................................................................3, 10

United States Military Academy Regulations, Section II, 1-6(b)(1) ...........................................14

Weil & Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Handguns* ................................................................................................................................22

## INTRODUCTION

The Second Amendment right to keep and bear arms is unique among constitutional rights in the risks that it presents.  Gun possession and use subject others to a serious risk of harm and, as federal law recognizes, these risks are further intensified when teenagers and young persons under 21 are permitted to acquire firearms.

Teens and young people under 21 often lack the same ability as adults to "govern impulsivity, judgment, planning for the future, [and] foresight of consequences."[1]  Arrests for murder, nonnegligent homicides and other violent crimes peaks from ages 18 to 20.[2]  Even though 18-20 year olds make up only about 5% of the population, they account for about 20% of homicide and manslaughter arrests.[3]  "Among murderers, 18 to 20 year olds were more likely to use a firearm than adults 21 and over."[4]  In recognition of what federal law enforcement considers to be "[t]he significant role that 18 to 20 year olds have in gun crime and violence in our Nation,"[5] federal law strikes a reasonable balance by regulating firearm sales by gun dealers to this age group.  It prohibits the commercial sale of handguns and certain other particularly dangerous weapons, such as pistol-grip shotguns, by gun dealers directly to teens and young persons under 21, while allowing law-abiding adults to purchase such firearms as gifts for them.[6]

---

[1]   Adam Ortiz, *Adolescence, Brain Development, and Legal Culpability*, AMERICAN BAR ASSOCIATION, JUVENILE JUSTICE CENTER at 2 (January 2004).

[2] U.S. Department of Justice, *Crime in the United States*, Arrests, by Age, 2009, at Table 38, accessible at http://www2.fbi.gov/ucr/cius2009/data/table_38.html.

[3] *Id.*; U.S. Census Bureau, *U.S. Population Projections*, State Interim Population Projections by Age and Sex: 2004 – 2030, Annual projections by single year of age, accessible at http://www.census.gov/population/www/projections/projectionsagesex.html.

[4] U.S. Department of the Treasury and U.S. Department of Justice, *Gun Crime in the Age Group 18-20* (June 1999), at 2-3.

[5] *Id*. at 4.

[6] 18 U.S.C. § 922(b)(1).

Persons 18-20 years old may also purchase shotguns and rifles from licensed dealers and may

purchase handguns from private sellers.[7]

Plaintiffs ask this Court to hold that the government may not restrict 18 year-olds from

acquiring firearms directly from a particular source – federally licensed dealers.  Such a ruling

would strike at the heart of federal efforts to set reasonable conditions on handgun sales "to

insure that … weapons could not be obtained by individuals whose possession of them would be

contrary to the public interest."  *Huddleston v. United States*, 415 U.S. at 825.  It would severely

hinder decades-long federal efforts to stem the acquisition of firearms by gangs whose 18-year-

old members would have new access to the vast handgun inventories of gun shops.  In light of

these longstanding conditions on gun dealer sales, the Supreme Court has held that the Second

Amendment protects a limited "right of law-abiding, responsible citizens to use arms in defense

of hearth and home," *District of Columbia v. Heller*, 128 S. Ct. 2783, 2821 (2008), but also made

clear that "nothing in [its] opinion should be taken to cast doubt on . . . laws imposing conditions

and qualifications on the commercial sale of arms." *Id.* at 2816-17.

The Supreme Court has long recognized the validity – and prudence – of restricting

commercial sales of firearms "to keep firearms out of the hands of those not legally entitled to

possess them because of age, criminal background, or incompetency." *Huddleston v. United

States*, 415 U.S. at 824 (internal quotations omitted).  Circuit courts have, as well.  *See United

States v. Cardoza*, 129 F.3d 6, 12 (1st Cir. 1997) (recognizing Congress's authority to restrict

youth "demand for firearms (possession), and the sale or transfer designed to meet that

---

[7] The Gun Control Act of 1968 regulated such gun dealer sales, but did not set age limits for
sales by unlicensed sellers, as "the focus of the federal scheme is the federally licensed firearms
dealer…." because "[t]he principal agent of federal enforcement is the dealer." *Huddleston v.
United States*, 415 U.S. 814, 824-25 (1974).  Congress later set an additional across-the-board
limit on possession by and transfer of handguns to anyone under 18 that applied to private
sellers, with certain exceptions.  18 U.S.C. § 922(x).

demand"); *United States v. Rybar*, 103 F.3d 273, 279-82 (3d Cir. 1996) (Alito, J., dissenting) (compiling history of federal restrictions on firearms transfers). Courts post-*Heller* have continued to uphold federal restrictions on gun sales to underage persons. *See, e.g.*, *United States v. Rene E.*, 583 F.3d 8, 12-15 (1st Cir. 2009) (noting "presumptive" lawfulness of regulations prohibiting gun sales to underage persons); *United States v. Bledsoe*, 2008 WL 3538717, *4 (W.D. Tex. Aug. 8, 2008) (holding that the assertion that "regulations governing the sale of handguns for the 18-20 year-old age group do not further a substantial governmental interest is meritless").

Such age limitations also do not violate equal protection, as the Supreme Court has held "that age is not a suspect classification under the Equal Protection Clause." *Gregory v. Ashcroft¸* 501 U.S. 452, 470 (1991); *see also Dorr v. Weber*, --- F.Supp.2d --- , 2010 WL 1976743, *8, *10 (N.D. Iowa 2010) (denying Second Amendment and Equal Protection challenges by 18-year-old seeking concealed weapon license). Indeed, even the fundamental right to vote did not apply to 18-year-olds until a separate constitutional amendment granted that right.[8]

An extension of the Second Amendment to deny the Government's ability to restrict 18 to 20 year olds from acquiring handguns from gun shops would thus endanger public safety, be unsupported by precedent, and run counter to *Heller* and *McDonald*'s "assurances" that "reasonable firearms regulations" remain permissible. It would also contradict the Supreme Court's longstanding recognition that the exercise of protected activity must be balanced against legitimate public interests, chief among which is public safety. *McDonald*, 130 S. Ct. at 3047;

---

[8] *See Oregon v. Mitchell*, 400 U.S. 112, 123 (1970) (there was not "[a]ny doubt about the powers of Congress to regulate congressional elections, including the age and other qualifications of the voters."); U.S. Const., Amend. 26 (ratified July 1, 1971).

*Heller*, 128 S. Ct at 2816-17, 2871 & n. 26.  Federal law restricting the ability of teens and young

persons to acquire handguns from gun shops is precisely such a reasonable regulation.[9]

### INTEREST OF *AMICI*

*Amicus* Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-

profit organization dedicated to reducing gun violence through education, research, and legal

advocacy.  Through its Legal Action Project, the Brady Center has filed numerous *amicus curiae*

briefs in cases involving both state and federal gun laws including in the U.S. Supreme Court

cases *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), *United States v. Hayes*, 129 S. Ct.

1079 (2009), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010).  *Amicus* brings a broad

and deep perspective to the issues raised here and has a compelling interest in ensuring that the

Second Amendment does not impede reasonable government action to prevent gun violence.

*Amici* Graduate Student Assembly and Student Government serve as the official voice of

62,000 students at the University of Texas at Austin, the flagship institution of the University of

Texas System.  Student Government has a clear interest in preserving student safety and

preventing suicide, both of which are implicated by increased access to firearms by young

people.  Many graduate students work, live, and teach on University of Texas's several

campuses, and Graduate Student Assembly is concerned that increased access to firearms by

undergraduates may compromise workplace safety.

*Amicus* Mothers Against Teen Violence is a Texas organization that works to provide

information, education, and advocacy for teen violence prevention, public health, and public

safety.  Mothers Against Teen Violence recognizes the dangers posed by teens and young people

under the age of 21 purchasing firearms and opposes lifting restrictions on the sale of arms to

such persons.

---

[9] *Amici* also concur with Defendants that Plaintiffs lack standing.

*Amicus* Students for Gun-Free Schools in Texas is an Austin-based organization founded by survivors of the Virginia Tech shooting, as well as family and friends of victims. The organization pursues proactive measures for safer campuses, and is concerned about the risk of concealed, loaded firearms on and around schools and college campuses.

*Amici* Texas Chapters of the Brady Campaign to Prevent Gun Violence is a grassroots organization that strives to educate Texans about gun violence. The Texas Chapters of the Brady Campaign also work to enact sensible gun laws in Texas as well as prevent dangerous gun bills from being passed by the Texas House and Senate.

## ARGUMENT

In analyzing the pending motion to dismiss, *amici* respectfully suggest that the Court hold that, for at least two principal reasons, federal law regulating age limits for handgun sales by gun dealers is constitutional. First, the conditions and qualifications it imposes on the sale of firearms to teenagers and young persons do not implicate protected Second Amendment activity. Second, even if they did, they are reasonable regulations that further important governmental interests established by Congress.

## I.   FEDERAL LAW REGULATING THE AGE TO PURCHASE HANDGUNS FROM GUN DEALERS DOES NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY.

The contested statutes, 18 U.S.C. §§ 922(b)(1) and 922(c), and 27 C.F.R. §§ 478.99(b)(1), 478.124(a), and 478.96(b), do not implicate protected Second Amendment activity because Plaintiffs have no general Second Amendment right to acquire handguns from licensed dealers.

**A.     18 U.S.C. §§ 922(b)(1) and 922(c), and 27 C.F.R. §§ 478.99(b)(1), 478.124(a), and 478.96(b) Do Not Implicate Protected Second Amendment Activity Because They Do Not Impact The Right to Possess Firearms in The Home Protected in *Heller* and *McDonald*.**

The Supreme Court's decision in *Heller* recognized that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 128 S. Ct. at 2821.  The Court stressed that the right is "not unlimited" and that a (non-exhaustive) host of gun laws remain "presumptively lawful."  *Id.* at 2816-17.  Specifically, the Court noted that "nothing in [its] opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms." *Id.*  Moreover, the Court noted that individuals who do not satisfy statutory conditions and qualifications may be "disqualified from the exercise of Second Amendment rights."  *See id.* at 2822.   This is consistent with the Court's recognition in *Huddleston* that Congress imposed such restrictions to prevent "widespread traffic in firearms and their general availability to those whose possession thereof was contrary to the public interest."  415 U.S. at 824 (internal quotations omitted).[10]

The Court in *McDonald* incorporated the Second Amendment to the states, but did not broaden the right recognized in *Heller*.  On the contrary, the Court "repeat[ed]" the "assurances" it made in *Heller* regarding its limited effect on other gun laws.  130 S. Ct. at 3047 (internal citation omitted).

Ignoring the Court's extensive and careful language limiting the right to keep and bear arms, Plaintiffs imply that the *Heller* Court actually embraced a right of 18-year olds to (a) purchase handguns and (b) purchase them from a particular source – federally licensed dealers

---

[10] The narrow scope of the Court's ruling in *Heller* was also apparent in the Court's 2009 opinion in *United States v. Hayes*, 129 S. Ct. 1079 (2009), in which the Court upheld a broad reading of 18 U.S.C. § 922(g)(9) – which prohibits possession of firearms by persons convicted of misdemeanor crimes of domestic violence – without even mentioning the Second Amendment.

chosen by Congress as "[t]he principal agent of federal enforcement" of laws restricting gun

sales to underage persons. *Huddleston* at 824-25. *See* Amended Complaint ¶¶ 4, 18-22. The

*Heller* opinion did no such thing. Indeed, Plaintiffs cannot explain why Justice Scalia would be

so explicit about the fact that the Second Amendment was "not unlimited" and that a (non-

exhaustive) host of gun laws remained "presumptively lawful," yet keep his supposed ruling that

the Second Amendment protected a right to buy firearms from a particular source hidden and

implicit, leaving courts with (at most) supposed tea leaves on which to find a broad right to

purchase handguns. *Id.* at 2817 n. 26.

Fundamental tenets of judicial restraint counsel this Court not to reach for an

interpretation of *Heller* that would cast aside longstanding judicial support for federal restrictions

on both the transfer and acquisition of firearms – especially given *Heller*'s explicit embrace of

those restrictions and its repeated statements limiting its holding to use and possession in the

home. When reviewing the constitutionality of a statute, lower courts should "presume that the

statute is valid and that the legislature acted reasonably in enacting the statute." *Walker v. State*, -

-- S.W.3d ----, 2010 WL 4028439 at *5 (Tex. Ct. App. 2010).

Here, no court has read *Heller* as conferring the broad right Plaintiffs seek of teenagers

and young persons under 21 to acquire firearms from a federally licensed dealer. The Second

Amendment does not guarantee individuals a right to acquire guns through particular channels,

or to do so unencumbered by statutory conditions and qualifications. *See, e.g.*, *United States v.

Rene E.*, 583 F.3d at 17 ("[W]e disagree [with plaintiff] that the Supreme Court's decision in

*Heller* had any effect" on Congress's power to regulate the transfer of handguns through

commerce); *Lowery v. United States*, 3 A.3d 1169, 1175-76 (D.C. 2010) (restrictions on who

could register, and by extension lawfully possess, handguns were unaffected by *Heller*).

Nor have courts extended *Heller* to find that restrictions on who may qualify to acquire

firearms – including restrictions based on age, mental health, and criminal background – harm

protected Second Amendment activity.  *See United States v. Rozier*, 598 F.3d 768, 770 (11th Cir.

2010) (stating that, post-*Heller*, the "initial question" remains whether one is "qualified" to

exercise Second Amendment rights); *Rene E.*, 583 F.3d at 12 (upholding gun conviction based

on "longstanding tradition of prohibiting juveniles from both receiving and possessing

handguns"); *United States v. Marzzarella*, 595 F. Supp. 2d 596, 603 (W.D. Pa. 2009) (noting

"significan[ce]" of *Heller*'s "sanctioning of laws imposing conditions and qualifications on the

commercial sale of arms and laws prohibiting presumptively risky individuals from possessing

firearms"), *aff'd* 614 F.3d  85 (3d Cir. 2010).  Instead, courts have repeatedly held that the right

recognized in *Heller* is confined to possession of guns in the home. *See, e.g., United States v.

Morsette*, 622 F.3d 1200, 1202 (9th Cir. 2010) ("*Heller* and *McDonald* concern the right to

possess a firearm in one's home for self-defense."); *People v. Williams*, --- N.E.2d ---- 2010 WL

4967880, at * 2 (Ill. App. Ct. 2010) ("both *Heller* and *McDonald* made clear that the only type of

firearms possession they were declaring to be protected under the second amendment was the

right to possess handguns in the home for self-defense purposes"); *State v. Knight*, 241 P.3d 120,

133 (Kan. Ct. App. 2010) ("It is clear that the [*Heller*] Court was drawing a narrow line

regarding violations solely to use of a handgun in the home for self-defense purposes.").[11]

---

[11] *See also e.g.*, *People v. Dawson*, 934 N.E.2d 598 (Ill. App. Ct. 2010) ("*Heller* specifically
limited its ruling to interpreting the [second] amendment's protection of the right to possess
handguns in the home, not the right to possess handguns outside of the home in case of
confrontation"); *Mack v. United States*, No. 08-CF-603, 2010 WL 4340932, at *9 (D.C. Ct. App.
Nov. 4, 2010) (neither *Heller* nor *McDonald* "endorse[d] a right to carry weapons *outside* the
home"); *United States v. Tooley*, 717 F. Supp. 2d 580, 596 (S.D. W. Va. 2010) ("[P]ossession of
a firearm outside of the home or for purposes other than self-defense in the home are not within
the 'core' of the Second Amendment right as defined by *Heller*."); *Gonzalez v. Village of West
Milwaukee*, No. 09CV0394, 2010 WL 1904977, at *4 (E.D. Wis. May 11, 2010) ("The Supreme
Court has never held that the Second Amendment protects the carrying of guns outside the
home."); *United States v. Hart*, No. 09-10376-WGY, 2010 WL 2990001, *3 (D. Mass. July 30,

Further, this understanding of the Second Amendment as subject to conditions and

qualifications on who may acquire arms pre-dates *Heller*. The Supreme Court has long upheld

Congress's authority to regulate and restrict access to the firearms market, particularly on the

basis of age. *See Huddleston*, 415 U.S. at 823 (recognizing Congress's authority to impose a

vast array of restrictions on the sale of firearms, including prohibitions on the sale of firearms to

persons under 21). Lower courts have emphasized the historical foundations of these

restrictions, *see Rybar*, 103 F.3d at 279-82 (charting evolution of federal restrictions since the

1934), their longstanding constitutionality, *see Rene E.*, 583 F.3d at 14 (citing 1878 Tennessee

Supreme Court decision upholding age restriction on pistol sales), and their rightful application

to underage persons, *United States. v. Cardoza*, 129 F.3d at 12 (upholding restriction on the sale

and possession of handguns to underage persons).

---

2010) ("*Heller* does not hold, nor even suggest, that concealed weapons laws are unconstitutional."); *Dorr v. Weber*, No. C 08-4093-MWB, 2010 WL 1976743, at *8 (N.D. Iowa May 18, 2010) (*Robertson* remains the law, and "a right to carry a concealed weapon under the Second Amendment has not been recognized to date"); *Teng v. Town of Kensington*, No. 09-cv-8-JL, 2010 WL 596526, at * 5 (D.N.H. Feb. 17, 2010) ("Given that *Heller* refers to outright prohibition on carrying concealed weapons" as "presumptively lawful". . . far lesser restrictions of the sort imposed here (i.e., requiring that Teng complete a one-page application and meet with the police chief to discuss it) clearly do not violate the Second Amendment.") (internal citation omitted); *Sims v. U.S.*, 963 A.2d 147, 150 (D.C. 2008) (Second Amendment does not "compel the District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined."); *Riddick v. U.S.*, 995 A.2d 212, 222 (D.C. 2010) (same); *In re Factor*, 2010 WL 1753307, *3 (N.J. Sup. Ct. Apr. 21, 2010) ("[T]he United States Supreme Court has not held or even implied that the Second Amendment prohibits laws that restrict carrying of concealed weapons."); *Swait v. University of Nebraska*, No. 8:08CV404, 2008 WL 5083245, at *3 (D. Neb. Nov. 25, 2008) ("States can prohibit the carrying of a concealed weapon without violating the Second Amendment"); *People v. Perkins*, 880 N.Y.S.2d 209, 210 (N.Y. Sup. Ct. 2009); *In re Bastiani*, 881 N.Y.S.2d 591, 593 (N.Y. Co. Ct. 2008) (applicant was "permitted to possess her weapon for many sports related undertakings in addition to possession in her home. Nothing in *Heller* grants the applicant more than what she already has."). *See also United States v. Tooley*, 717 F. Supp. 2d 580, 596 (S.D. W. Va. 2010) ("possession of a firearm outside of the home or for purposes other than self-defense in the home are not within the 'core' of the Second Amendment right as defined by Heller."); *United States v Walker*, 709 F. Supp. 2d 460, 466 (E.D. Va. 2010) (holding that defendant is far "removed from the core constitutional right of the Second Amendment" because "his stated purpose for possession of the firearm is hunting rather self-defense").

Plaintiffs' Equal Protection challenge, like their Second Amendment claim, runs counter to precedent. The Supreme Court has made clear "that age is not a suspect classification under the Equal Protection Clause." *Gregory v. Ashcroft*¸ 501 U.S. 452, 470 (1991). Courts have rejected Second Amendment and Equal Protection challenges to laws restricting the access of young persons under 21 to handguns. *See Dorr v. Weber*, --- F.Supp.2d --- , 2010 WL 1976743, *8, *10 (N.D. Iowa 2010) (denying Second Amendment and Equal Protection challenges by 18-year-old seeking license to carry concealed weapon); *State v. Sieyes*, 225 P.3d 995, 1004-1006 (Wash. 2010) (rejecting Second Amendment challenge to ban on 17-year-old possessing firearms); *see also Glenn v. State*, 72 S.E. 927 (Ga. App. Ct. 1911) (no right of minor to keep and bear arms). Indeed, a constitutional amendment was necessary to give persons under 21 the right to vote, even though voting is a fundamental right. *See Oregon v. Mitchell*, 400 U.S. 112, 123 (1970) (there was not "[a]ny doubt about the powers of Congress to regulate congressional elections, including the age and other qualifications of the voters."); U.S. Const., Amend. 26 (ratified July 1, 1971).[12] Thus, the Supreme Court has recognized that the judiciary should defer to Congress when it sets reasonable limits, such as those based on age:

> When a legal distinction is determined … between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn…. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark.

---

[12] Plaintiffs' suggestion that their eligibility for military service renders them qualified to purchase handguns is inapposite. Gun access in the highly regulated context of military service, under extensive training, supervision, and command of adults, is a far cry from gun access in the public domain. And Plaintiffs have objected to restrictions on the commercial sale of firearms to persons under 21. That issue is not present in the military context, where plaintiffs would use government-owned weapons under the command of military officers.

*Schweiker v. Wilson*, 450 U.S. 221, 238 n.23 (1981), quoting *Louisville Gas Co. v. Coleman*, 277 U.S. 32, 41 (1928) (Holmes, J., dissenting).

The provisions at issue here do not impede the ability of individuals to keep handguns "in defense of hearth and home." *Heller*, 128 S. Ct. at 2821. Indeed, Plaintiff D'Cruz himself admits that, under these laws, he "is the lawful owner . . . of a handgun." Amended Complaint ¶ 25. Federal law also does not prohibit Plaintiffs from acquiring handguns through law-abiding adults or from private sellers. These provisions are consistent with the Supreme Court's holdings in *Heller* and *McDonald* and the Court should thus find that the contested statutes are constitutional.

Simply put, Plaintiffs have no constitutional grounds upon which to state a claim. Neither the Second Amendment, nor the Equal Protection Clause, provide individuals a right to purchase handguns from a particular source. Thus, the federal government's imposition of conditions and qualifications on those purchases do not implicate protected activity.

**B.     The Second Amendment Right Should Not Be Extended to Prevent the Government from Imposing Conditions and Qualifications on Who May Acquire Firearms.**

There are profound public safety rationales for imposing conditions and qualifications on who may acquire firearms. The widespread traffic of firearms – to teenagers and young persons under 21, in particular – poses a number of issues and challenges not presented by mere possession of firearms in the home.

**1.     The acquisition of firearms by individuals under 21 poses unique threats to public safety.**

The purchase of firearms by teens and young persons under 21 – particularly persons in the age group 18 to 20 – poses a unique set of threats to the general public that is not present

when older persons purchase firearms.  That is why federal law and state laws[13] prohibit licensed

gun dealers from selling handguns and handgun ammunition to anyone under 21.  Indeed, the

federal government has focused its gun law enforcement on 18 to 20 year olds because of "[t]he

significant role that 18 to 20 year olds have in gun crime and violence in our Nation . . . ."[14]

Federal handgun sale age restrictions have provided the government with an important

tool for more than four decades to restrict teen criminals and gang members' access to the vast

handgun inventory of gun shops nationwide.  This is crucial given that handguns have

"comprised 85 percent of the crime guns known to be recovered from 18 to 20 year olds," and

"[a]mong murderers, 18 to 20 year olds were more likely to use a firearm than adults 21 and

over."[15]  Likewise, "in non-lethal crimes, including assault, rape, and robbery, 18 to 20 year old

offenders were more likely to use guns than both younger and older offender age groups."[16]

Arrests for murder, nonnegligent homicides and other violent crimes peaks from ages 18

to 20,[17] such that "18, 19, and 20 year olds ranked first, second, and third in the number of gun

homicides committed.  For each of these ages, the number of homicides exceeded the number for

any ages older or younger than 18 to 20."[18]  Even though 18-20 year olds make up only about

---

[13] *See* California (Cal. Penal Code § 12072(a)(3)(A)); Delaware (Del. Code Ann. tit. 24, § 903); District of Columbia (D.C. Code Ann. §§ 7-2502.03; 22-4507); Hawaii (Haw. Rev. Stat. Ann. § 134-2(d)); Illinois (430 Ill. Comp. Stat. 65/3(a), 65/4(a)(2)(i)); Iowa (I.C.A. § 724.22(2)); Maryland (Md. Code Ann., Pub. Safety § 5-134); Massachusetts (Mass. Gen. Laws ch. 140, § 130); New Jersey (N.J. Stat. Ann. § 2C:58-6.1); Ohio (Ohio Rev. Code Ann. § 2923.21); Rhode Island (R.I. Gen. Laws §§ 11-47-30, 11-47-35(a)).

[14] U.S. Department of the Treasury and U.S. Department of Justice, *Gun Crime in the Age Group 18-20* (June 1999), at 4.

[15] *Id.* at 2-3.

[16] *Id.*

[17] U.S. Department of Justice, *Crime in the United States*, Arrests, by Age, 2009, at Table 38, accessible at http://www2.fbi.gov/ucr/cius2009/data/table_38.html.

[18] *Gun Crime in the Age Group 18-20*, at 6.

5% of the population, they account for about 20% of homicide and manslaughter arrests.[19]  This pattern "is consistent with the historical pattern of gun homicides," according to federal law enforcement.[20]  Overall, criminal gun possession is highest for persons in this age group and peaks between ages 19 to 21.[21]

Studies show the dangers of allowing teens and young persons age 18 to 20 to acquire firearms, because "[t]he evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable." Adam Ortiz, *Adolescence, Brain Development, and Legal Culpability*, AMERICAN BAR ASSOCIATION, JUVENILE JUSTICE CENTER at 2 (January 2004).  Studies on this topic suggest, moreover, that "age 21 or 22 would be closer to the 'biological' age of maturity." *Id.*

Studies have also shown that college-aged gun owners are more likely to engage in behavior that puts themselves and others at risk of injury.  *See* Matthew Miller, *et al.*, *Guns at College*, J. AM. COLLEGE HEALTH, Vol. 48, Issue 1 (1999).  For instance,

> Having a working firearm at college was more likely if the student had, since the term began, been arrested for DUI, damaged property as a result of alcohol ingestion, or driven an automobile after consuming five or more alcoholic drinks in the months before the survey.  Seven percent of the students who engaged in any of these alcohol-related behaviors had guns, compared with 3% of those who had not had an externality-related driving/drinking episode.  Among owners of guns, 36% engaged in at least one of these behaviors, compared with 19% of the student respondents who did not own a gun.

---

[19] *Crime in the United States*, Arrests, by Age, 2009, at Table 38,; U.S. Census Bureau, *U.S. Population Projections*, State Interim Population Projections by Age and Sex: 2004 – 2030, Annual projections by single year of age, accessible at http://www.census.gov/population/www/projections/projectionsagesex.html.

[20] *Gun Crime in the Age Group 18-20*, at 2.

[21] *See* Bureau of Alcohol, Tobacco & Firearms, Crime Gun Trace Reports (2000), at 6-7 (2002) and Bureau of Alcohol, Tobacco & Firearms, Crime Gun Trace Reports (1999), at 6-7 (2000).

*Id.* This study concludes that "[t]hese alcohol-related behaviors suggest that college gun owners are more likely than those who do not own guns to engage in activities that put themselves and others at risk for severe or life threatening injuries," and notes that these behaviors suggest "an inability to contain aggressive impulses," and "poor judgment and indifference to the effect one's actions have on the well-being and safety of others." *Id.*[22]

In light of data showing that 18 to 20 year olds are overwhelmingly more likely to commit deadly and violent handgun crimes and studies that consistently show that individuals under the age of 21 have less of a capacity to control their impulsivity, make good decisions, and appreciate the consequences of their actions than individuals over the age of 21, the federal Government is well justified in having laws that restrict the ability of young adults to easily acquire handguns.

### 2.    Congress specifically recognized the threats posed by the acquisition of firearms by individuals under the age of 21.

The legislative history of the provisions at issue (a) underscores that Congress specifically recognized the threat posed by acquisition by individuals under the age of 21 and (b) belies Plaintiffs' attempt to misconstrue the regulations as offensive to the Second Amendment. When Congress restricted the commercial sale of handguns to person under 21 in 1968, it was particularly concerned with "the clandestine acquisition of firearms by juveniles and minors." S. Rep. No. 90-1097, at 51 (1968), *reprinted in* 1968 U.S.C.C.A.N 2112, 2167.   It further determined that the "ease with which any person can anonymously acquire firearms (including . . . juveniles or minors without knowledge or consent of their parents)" contributed to the

---

[22] Even the United States Military Academy treats anyone under age 21 differently with respect to firearms, generally prohibiting the carrying of handguns by anyone under the age of 21, even though their students are likely more responsible and familiar with firearms than the general population.  *See* United States Military Academy Regulations, Section II, 1-6(b)(1) ("No pistols or handguns may be registered or carried by anyone under the age of twenty-one (21) to include Cadets.").

"increasing prevalence of crime in the United States." *Id.* at 28, 1968 U.S.C.C.A.N. at 2114; *see also Huddleston*, 415 U.S. at 824 (discussing same).

Plaintiffs' request that the Court exempt individuals between 18 and 20 from this regulatory scheme thus does not hold water for several reasons.  Congress clearly premised its regulatory scheme on the reality that gun acquisition by young people under 21 poses unique risks.  As originally passed in the Omnibus Crime Control and Safe Streets Act of 1968, § 922(b)(1) restricted one overarching group – persons under 21.  Pub. L. No. 90-351, § 922(b)(1), 82 Stat. 197, 230 (1968) (current version at 18 U.S.C. § 922(b)(1) (1994)) ("The sale by a licensee of any firearm, other than a shotgun or rifle, to anyone less than 21 years is prohibited.").  Not until the act was amended to add shotguns and rifles did it include further restrictions on 18 year-olds specific to those arms.  Moreover, Congress specifically provided that licensed dealers must be "twenty one years of age or over."  18 U.S.C. §§ 923(d)(1); *see also* S. Rep. No. 90-1097, at 170, 1968 U.S.C.C.A.N. at 2292 (noting need to "strengthen" dealer license qualifications by imposing 21 year age requirement).  And the provisions' legislative history is replete with references to the risks posed by both "juveniles" *and* "minors" – a distinction that would be unnecessary if the "risk" it described was limited to individuals below 18.  *See, e.g.,* S. Rep. No. 90-1097,  at 49, 1968 U.S.C.C.A.N. at 2165 ("In contributing to our ever increasing crime rates, juveniles account for some 49 percent of the arrests for serious crimes in the United States *and minors* account for 64 percent of total arrests in this category.").[23]  Plaintiffs would nevertheless have this Court ignore Congress's specific purpose, and carve out new rights for young persons ages 18 to 20.  The Court should not do so.

---

[23] *See also id.* ("In addition, juveniles and minors have utilized the anonymity of the mails to order and receive firearms by common carrier in circumvention and contravention of State and local law.").

Further, Plaintiffs' protests that federal regulation of licensed dealers relegates young persons to an "irregular secondary market" put the cart before the horse. Plaintiffs imply that Congress established a "two-tier" regulatory scheme – one for licensed dealers and one for non-licensed dealers (restricting persons 18 to 20 to purchasing handguns from the latter). *See* Amended Complaint ¶ 22. This is not so. To reign in the widespread traffic of firearms, Congress created new rules to govern what it considered the conduit of that traffic – the licensed dealer. *See Huddleston*, 415 U.S. at 824 ("[I]t is apparent that the focus of the federal scheme is the federally licensed firearms dealer, at least insofar as the Act directly controls access to weapons by user."); *see also* S. Rep. No. 90-1097, at 170, 1968 U.S.C.C.A.N. at 2292 (emphasizing need to strengthen heretofore weak regulations of licensed dealers). While it is true that unlicensed sellers have exploited loopholes in our firearms laws to become an unduly large and dangerous source of guns for criminals and other prohibited persons, there is little evidence that Congress *intended* to create an unregulated firearms market that would undercut the goals of the Gun Control Act to restrict access to firearms. Plaintiffs perplexingly suggest that the emergence of unlicensed dealers, acting outside Congress's regulatory scheme, now mandates that the Court narrow that scheme (and, no less, to exempt persons 18 to 20 from existing restrictions). But this makes no sense. If the existence of a less-regulated "secondary market" creates an imbalance between the commercial channels available to them, that supports extending the federal prohibition to include sales *by all dealers* of handguns to teenagers and young persons under 21. It does not support supplanting Congress's clearly stated purpose to restrict sales of firearms to those young persons.

The laws at issue here prevent a number of risks to the public without implicating the Second Amendment activity protected in *Heller*. They are not, moreover, complete prohibitions

on the purchase or possession of firearms by young adults.  They allow for individuals under the age of 21 to acquire handguns from their parents or guardians or private sellers, keep handguns in their homes and cars, and possess and purchase long guns.  18 U.S.C. §§ 922(b)(1) and 922(c), and C.F.R. §§ 478.99(b)(1), 478.124(a), and 478.96(b), therefore, are consistent with the Supreme Court's ruling in *Heller* and do not implicate protected Second Amendment activity.

## II.   EVEN IF 18 U.S.C. §§ 922(b)(1), 922(c), 27 C.F.R. §§ 478.99(b)(1), 478.124(a), AND 478.96(b) DID IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY, THEY WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY.

In choosing a level of scrutiny appropriate for Second Amendment challenges, courts need not – and should not – limit themselves to the choices utilized in First Amendment jurisprudence:  strict scrutiny, intermediate scrutiny, or rational basis review.  While these levels of scrutiny may seem to be the easiest and most obvious options in picking a standard of review, key differences between the First and Second Amendments suggest that using one of these three levels of scrutiny is *not*, in fact, an appropriate choice.  The exercise of Second Amendment rights creates unique risks that threaten the safety of the community and can be far more lethal than even the most dangerous speech.  While "words can never hurt me," guns are designed to inflict grievous injury and death.  To protect the public from the risks of gun violence – unlike the more modest risks posed by free speech – the government must be free to enact reasonable regulations of gun sales.  Otherwise, the exercise of Second Amendment rights could infringe on the most fundamental rights of others – the preservation of life.

The Supreme Court, moreover, has not limited itself to these three levels of scrutiny in the past, but has instead fashioned a wide variety of standards of review that are tailored to

specific constitutional inquiries.[24]  For all these reasons, a standard of review specific to

the Second Amendment context is warranted here, particularly given the Supreme Court's

recognition that an individual's right to bear arms must be evaluated in light of the government's

interest in promoting public safety.  To that end, *amici* respectfully suggest that this Court apply

the test that state courts throughout the country have crafted and utilized for over a century in

construing the right to keep and bear arms:  the "reasonable regulation" test.

### A.      The Reasonable Regulation Test is the Appropriate Standard of Review.

While courts are just beginning to grapple with a private right to arms under the federal

Constitution, courts have construed analogous state provisions for over a century.  Over forty

states have constitutional right-to-keep-and-bear-arms provisions, many of which protect broader

rights than the Second Amendment.  Yet despite significant differences in the political backdrop,

timing, and texts of these provisions, the courts in these states have, with remarkable unanimity,

coalesced around a single standard for reviewing limitations on the right to bear arms:  the

"reasonable regulation" test.  *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich.

L. Rev. 683, 686-87, n. 12 (2007) (describing "hundreds of opinions" by state supreme courts

with "surprisingly little variation" that have adopted the "reasonableness" standard of review for

right-to-bear-arms cases).  Under the reasonable regulation test, a state "may regulate the

exercise of [the] right [to bear arms] under its inherent police power so long as the exercise of

that power is reasonable." *Robertson v. City & County of Denver*, 874 P.2d 325, 328, 333 n. 10

(Colo. 1994).

---

[24] *See, e.g.*, *Kennedy v. Louisiana*, 128 S. Ct. 2641, 2649 (2008) (affirming that the Eighth
Amendment's prohibition of cruel and unusual punishment should be measured by an "evolving
standards of decency" test); *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (holding
that determinations of procedural due process require a balancing of three competing interests);
*Terry v. Ohio*, 392 U.S. 1, 30 (1968) (upholding a "stop and frisk" under the Fourth Amendment
where an officer had "reasonable grounds" to believe a suspect was armed and dangerous).

Even though the right to bear arms provision in the Texas Constitution is broader than the Second Amendment, Texas courts have recognized that the right to keep and bear arms is subject to reasonable regulation. *See Wilt v. Texas Dept. Of Public Safety*, 2004 WL 1459375 (Tex. App. Ct. 2004) (noting that federal Government and states "may impose reasonable regulations on gun ownership."). Indeed, Texas courts have stated that:

> [O]ur State Constitution limits that right by *implicitly mandating the Legislature to enact reasonable regulations concerning the keeping and bearing of such arms* in order that the Legislature prevent disorder in our society. * * * The need for reasonable regulation of the wearing of arms by the Legislature is no less needed in today's modern world as in the development of our State's frontier generations ago. As long as that need exists, *the Legislature will be normally charged with its Constitutional duty to regulate the carrying of weapon*, a duty we cannot and will not deny it.

*Masters v. State*, 653 S.W.2d 944, 946 (Tex. App. Ct. 1983) (emphasis added).

The "reasonable regulation" test protects Second Amendment activity without unduly restricting the government from protecting the public from gun violence. The test, which was specifically designed for cases construing the right to keep and bear arms and has been adopted by the vast majority of states, remains the standard of review best-suited for Second Amendment cases after *Heller* and for the case at hand. Further, pre-*Heller* courts that recognized an individual, non-militia-based right to keep and bear arms under the Second Amendment agreed that "reasonable" firearms restrictions remained permissible. *See, e.g.*, *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001) (right is subject to "reasonable" restrictions if they are "not inconsistent with the right . . . to individually keep and bear . . . private arms."); *Nordyke v. King*, 319 F.3d 1185, 1193 (9th Cir. 2003) ("We would make progress if the Supreme Court were to establish a doctrine of an individual Second Amendment right subject to reasonable government regulation.") (Gould J., specially concurring).

The reasonable regulation test is a more heightened form of scrutiny than the rational basis test that the majority opinion in *Heller* rejected (and is more demanding than the "interest balancing" test suggested by Justice Breyer in dissent) because it does not permit Congress to prohibit all firearm ownership, even if there is a rational basis to do so. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA LAW REVIEW 1443, 1458 (2009). Laws and regulations governing the use and possession of firearms must thus meet a higher threshold under the reasonable regulation test than they would under rational basis review.

Although the reasonable regulation test may be more deferential than intermediate or strict scrutiny, it is not toothless. Under the test, laws that "eviscerate," *State v. Hamdan*, 665 N.W.2d 785, 799 (Wis. 2002), render "nugatory," *Trinen v. City of Denver*, 53 P.3d 754, 757 (Colo. Ct. App. 2002), or result in the effective "destruction" of a Second Amendment right, *State v. Dawson*, 159 S.E.2d 1, 11 (N.C. 1968), must be struck down. Laws that are reasonably designed to further public safety, by contrast, are upheld. *See, e.g.*, *Robertson v. City & County of Denver*, 874 P.2d at 328, 330 n. 10 ("The state may regulate the exercise of [the] right [to bear arms] under its inherent police power so long as the exercise of that power is reasonable."); *Jackson*, 68 So.2d at 852 (same).

The reasonable regulation test gives an appropriate amount of deference to legislative directives. As noted above, there is a profound governmental interest in regulating the transfer and acquisition of firearms. *Huddleston*, 415 U.S. at 824 (recognizing Congress's interest in curbing the widespread traffic in firearms); *Rybar*, 103 F.3d at 280 (noting legislative history indicating that "increasing rate of crime and lawlessness and the growing use of firearms clearly attest to a need to strengthen Federal regulation of interstate firearms traffic") (citation omitted);

*United State v. Peters*, 403 F.3d 1263, 1276-77 (11th Cir. 2005) (approving prohibition on sale of firearms to felons "as a valid exercise of Congress['s]" authority").  Regulations on the acquisition of firearms are an essential exercise of that authority.

While individuals and organizations may differ on the net risks posed by guns in our society, such disagreement underlines that firearm regulation is best suited for the legislative arena, not the courts.  *See United States v. Miller*, 604 F. Supp. 2d 1162, 1172 n. 13 (W.D. Tenn. 2009) ("[D]ue to the intensity of public opinion on guns, legislation is inevitably the result of hard-fought compromise in the political branches.").  Indeed, legislatures are designed to make empirical judgments about the need for and efficacy of regulation, even when that regulation affects the exercise of constitutional rights.  *See, e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (legislatures are "far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon legislative questions.").

The risks posed by invalidating or unduly restricting legislative judgments on firearms regulations is severe, and courts should review such legislative judgments with an appropriate amount of deference.  Here, too, therefore, the reasonable regulation test is better situated than either intermediate or strict scrutiny to defer to legislative judgments.  It allows for the federal Government to enact laws that recognize that individuals 21 and over have a different capacity to use guns safely, and recognizes the strong interest of the Government in protecting its citizens rather than being overly focused on a narrow means-end nexus of the challenged regulation.

**B.     The Provisions at Issue Are Constitutionally Permissible Because They are Reasonable Regulations.**

18 U.S.C. §§ 922(b)(1) and 922(c), and C.F.R. §§ 478.99(b)(1), 478.124(a), and 478.96(b) pass the reasonable regulation test and demonstrate the required fit between the law and the interest served.  In fact, Courts have repeatedly recognized a compelling "interest in

protecting the public from the hazards involved with certain types of weapons, such as guns,"
*State v. Cole*, 665 N.W. 2d 328, 344 (Wis. 2003), particularly given "the danger [posed by the]
widespread presence of weapons in public places and [the need for] police protection against
attack in these places." *Id.* (internal quotations omitted).

Indeed, as discussed above, there is strong sociological and statistical evidence which
suggests that restrictions that make it more difficult for someone to carry a gun in public reduce
both the number of gun deaths and criminal access to firearms. *See, e.g.*, D.W. Webster, *et al.*,
*Relationship Between Licensing, Registration, and Other State Gun Sales Laws and the Source
State of Crime Guns*, 7 INJURY PREVENTION 184 (2001); D.W. Webster, *et al.*, *Effects of State-
Level Firearm Seller Accountability Policies on Firearm Trafficking*, 86 J. URBAN HEALTH:
BULLETIN OF THE N.Y. ACAD. OF MED. 525 (2009); Weil & Knox, *Effects of Limiting Handgun
Purchases on Interstate Transfer of Handguns*, 275 J. AM. MED. ASSOC. 1759 (1996). Moreover,
as noted above, these provisions do not amount to an outright ban on young adults possessing or
carrying firearms and thus do not even approach the blanket prohibition on handgun ownership
that the Supreme Court struck down in *Heller*. *See Heller*, 128 S. Ct. at 2788. Plaintiffs remain
free to own handguns and exercise the right, enunciated in *Heller*, to keep and use those guns for
self-defense in the home. Under the laws they challenge, they may even continue to acquire
handguns. The provisions at issue merely prevent teens and young adults from acquiring
handguns from licensed dealers until they reach the age of 21. This is a reasonable restriction
designed to ensure that individuals who carry concealed weapons can do so safely and
responsibly. Congress has decided that this is a reasonable way to protect public safety. The
Court should not second-guess that judgment.

In sum, 18 U.S.C. §§ 922(b)(1) and 922(c), and C.F.R. §§ 478.99(b)(1), 478.124(a), and 478.96(b) are both reasonable and not unduly restrictive of individuals' Second Amendment right to keep guns in their home.  They are thus a valid exercise of the federal Government's "police powers to legislate as to the protection of the lives, limb, health, comfort, and quiet of all persons" and pass the reasonable regulation test.[25]  *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotations omitted).

## CONCLUSION

Federal age limits on handgun purchases do not implicate protected Second Amendment activity and, even if they did, limiting teens and young persons age 18 to 20 from acquiring handguns directly from gun shops amounts to reasonable, justified, and permissible regulation. While Plaintiffs may disagree with these well-established restrictions, their recourse is through the legislative process, not the judiciary.

This Court is obligated to uphold legislation where there is a reasonable basis to do so; it should not usurp the functions of Congress by declaring a new Second Amendment right that the Supreme Court has not acknowledged and by striking down a law that so plainly satisfies the Government's interest in protecting public safety.  For all the foregoing reasons, the Court should find that 18 U.S.C. §§ 922(b)(1) and 922(c), and C.F.R. §§ 478.99(b)(1), 478.124(a), and 478.96(b) are constitutional.

---

[25] 18 U.S.C. § 922(b)(1) and 922(c), and C.F.R. §§ 478.99(b)(1), 478.124(a), and 478.96(b) also would survive intermediate (or even strict) scrutiny were the Court to apply that standard of review because it is substantially related to an important government interest.  Indeed, a number of courts have found that the protection of the public from gun violence is an important government interest, *see, e.g.*, *Heller II*, 698 F. Supp. 2d at 186; *Miller*, 604 F.Supp.2d at 1171; *Bledsoe*, 2008 WL 3538717 at *4, and have upheld statutes that impose much broader restrictions on an individual's ability to possess and carry firearms. *See, e.g.*, *Marzzarella*, 614 F.3d at 95; *Heller II*, 698 F. Supp. 2d at 197; *State v. Sieyes*, 225 P.3d 995, 995 (Wash. 2010); *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1233 (D. Utah); *United States v. McCane*, 573 F.3d 1037, 1050 (10th Cir. 2009); *United States v. Masciandaro*, 648 F. Supp. 2d 779, 789-91 (E.D. Va. 2009).

Dated: December 28, 2010           Respectfully submitted,

_____ s/ _____

Scott Medlock (Texas Bar No. 24044783)
1405 Montopolis Dr.
Austin, TX 78741
Phone: (512) 474-5073
Facsimile: (512) 474-0726
E-mail: smedlock@texascivilrightsproject.org

Adam K. Levin
Tracy L. Hresko
S. Chartey Quarcoo
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
E-Mail: adam.levin@hoganlovells.com

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005

Attorneys for *Amici Curiae*