## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

|  |  |  |
|---|---|---|
| JAMES D'CRUZ; ANDREW PAYNE; NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; KENNETH E. MELSON, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives; ERIC HOLDER, in his official capacity as Attorney General of the United States, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 5:10-cv-00140-C |

**<u>BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

**<u>ORAL ARGUMENT REQUESTED</u>**

Fernando M. Bustos
State Bar No. 24001819
LAW OFFICES OF FERNANDO M. BUSTOS, P.C.
P.O. Box 1980
Lubbock, TX 79408-1980
Tel: (806) 780-3976
Fax: (806) 780-3800
Email: fbustos@bustoslawfirm.com

Charles J. Cooper*
David H. Thompson*
Jesse Panuccio*
Pete Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C.  20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com
*Admitted *pro hac vice*.

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ...........................................................................................1

BACKGROUND ............................................................................................5

I.      REGULATORY BACKGROUND ..........................................................6

II.     PLAINTIFFS' BACKGROUND ............................................................9

ARGUMENT ..............................................................................................12

I.      PLAINTIFFS PLAINLY HAVE STANDING TO CHALLENGE SECTION 922(B)(1).. ....................12

        A.      Controlling Precedent Makes Clear That Section 922(b)(1) May Be
                Challenged by Firearms Dealers, 18 to 20 Year Olds, or Both. ...........................12

        B.      Section 922(b)(1) Imposes a Judicially Cognizable Burden.................................16

        C.      Plaintiffs Have Demonstrated Concrete Injury.....................................................20

II.     THIS COURT SHOULD EMPLOY THE APPROACH APPLIED IN *HELLER*, WHICH CONSISTS OF
        TEXTUAL ANALYSIS AND HISTORICAL INQUIRY ATTUNED TO THE PARTICULAR FIREARMS
        REGULATION BEING CHALLENGED. .................................................................23

III.    THE SECOND AMENDMENT PRESERVES THE FUNDAMENTAL RIGHTS OF ALL
        LAW-ABIDING ADULTS, INCLUDING THOSE BETWEEN THE AGES OF 18 AND 20. ...............24

        A.      Text and History: The Second Amendment's Operative Clause ..........................24

        B.      Text and History:  The Second Amendment's Prefatory Clause..........................38

IV.     THE SECOND AMENDMENT PRESERVES THE RIGHT TO ACQUIRE ARMS.............................39

        A.      The Second Amendment Was Originally Understood to Secure the
                Right to Acquire Arms..........................................................................................40

        B.      Congress May Not Circumvent a Constitutional Right to Possession
                by Banning Acquisition. .......................................................................................43

        C.      That the Government Has Banned Only the Licensed Commercial Sale
                of Handguns Does Not Render Section 922(b)(1) Constitutional. ........................47

i

V.      SECTION 922(B)(1) MUST BE STRUCK DOWN IF THIS COURT CONDUCTS A
        "LEVELS-OF-SCRUTINY" ANALYSIS. ..................................................................55

        A.      If a Levels-of-Scrutiny Analysis Were To Be Applied to the Laws Challenged
                Here, Only Strict Scrutiny Would Be Consistent With The Supreme Court's
                Decision in *Heller*. ............................................................................... 55

        B.      Under *Heller*, Intermediate Scrutiny Is Unacceptable For Laws, Like
                Those Challenged Here, That Infringe the Core Second Amendment Right
                of Armed Self-Defense by Law-Abiding Citizens...................................................58

        C.      A "Reasonable Regulation" Standard is Flatly Inconsistent With *Heller*. ............61

        D.      Section 922(b)(1) Fails Any Level of Heightened Scrutiny. ...............................62

                1.      The Congressional Rationale For § 922(b)(1) Is Fatally Infected By
                        Congress' Total Disregard For The Second Amendment.........................63

                2.      The Legislative History of § 922(b)(1) Focused On The Threat of
                        Gun Violence Presented By Felons, Drug Addicts and the Mentally
                        Ill, Rather Than Any Threat Supposedly Presented By Law-Abiding
                        Young Adults. ................................................................................64

                3.      The Legislative History of § 922(b)(1) Failed to Distinguish Between
                        the Threat of Gun Violence Posed By Juveniles Under 18 and Young
                        Adults Aged 18-20. ........................................................................65

                4.      The Government's Reliance on the Legislative History of Failed Bills
                        From the 1990s Provides No Support for Section 922(b)(1), Which
                        Was Enacted Three Decades Earlier.....................................................67

                5.      A Comparison of §922(b)(1) with §922(x) Underscores the Poverty of
                        the Government's Proffered Rationale For Restricting the Second
                        Amendment Rights of Law-Abiding Adults Aged 18-20.........................69

VI.     SECTION 922(B)(1) VIOLATES 18-TO-20 YEAR OLDS' EQUAL PROTECTION RIGHTS ...........71

CONCLUSION...................................................................................................75

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Adarand Constructors v. Pena*, 515 U.S. 200 (1995) ............................................72, 73

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir. 2010) ...........................54

*Appalachian Res. Dev. Corp. v. McCabe*, 387 F.3d 461 (6th Cir. 2004) .....................13

*Bellotti v. Baird*, 443 U.S. 622 (1979) ................................................................ 25, 36

*Bolling v. Sharpe*, 347 U.S. 497 (1954) ...................................................................71

*Brinkley v. Hill*, 981 F. Supp. 423 (S.D. W. Va. 1997) .................................................38

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................................72

*Burdick v. Takushi*, 504 U.S. 428 (1992) ..................................................................58

*Carey v. Brown*, 447 U.S. 455 (1980) ......................................................................71

*Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977) ..............................3, 14, 17, 30, 44, 45, 53

*Citizens United v. FEC*, 130 S. Ct. 876, 898 (2010) ....................................................46

*City of Akron v. Akron Ctr. for Reproductive Health*, 462 U.S. 416 (1983) ................54

*City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993) ...........................54

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ..........................................................43, 71

*Clark v. Jeter*, 486 U.S. 456 (1988) ....................................................................62, 72

*Consumer Prod. Safety Comm'n v. GTE Sylvania*, 447 U.S. 102 (1980) .....................68

*Craig v. Boren*, 429 U.S. 190 (1976) ...................................................13, 14, 19, 22, 74, 75

*Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 330 (5th Cir. 1981) ........14, 17, 54

*Dep't Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) ...................20

*District of Columbia v. Heller*, 554 U.S. 570 (2008).................................... *passim*

*Doe v. Bolton*, 410 U.S. 179 (1973)....................................................................13, 15

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ................................................................44

*Eldred v. Ashcroft*, 537 U.S. 186 (2003)...................................................................27

*FCC v. Pacifica Found.*, 438 U.S. 726 (1978) ...........................................................36

*FEC v. Akins*, 524 U.S. 11 (1998)............................................................................23

*Fiallo v. Bell*, 430 U.S. 787 (1977)...........................................................................37

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) .............................................................5, 71

*Friends of the Earth, Inc. v. Laidlaw Env'tl Servs., Inc*, 528 U.S. 167 (2000)...............20

*Ginsberg v. New York*, 390 U.S. 629 (1968) .............................................................36

*Glenn v. State*, 72 S.E. 927 (Ga. Ct. App. 1911) ......................................................32

iii

*Granholm v. Heald*, 544 U.S. 460 (2005) ...................................................................37

*Gratz v. Bollinger*, 539 U.S. 244 (2003) .................................................................62

*Griswold v. Connecticut*, 381 U.S. 479 (1965) ...................................................44, 45

*H.L. v. Matheson*, 450 U.S. 398, 405-07 (1981) .......................................................18

*Hatten v. Rains*, 854 F.2d 687 (5th Cir. 1988) ........................................................37

*Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148 (D.C. Cir. 2004) ......................33

*Hodgkins v. Holder*, 677 F. Supp.2d 202 (2010) ......................................................23

*Hodgson v. Minnesota*, 497 U.S. 417 (1990) ..........................................................74

*Huddleston v. United States*, 415 U.S. 814 (1974) ..................................................1, 32

*Island-Trees Union Free School Dist. v. Pico*, 457 U.S. 853, 866-67 (1982) ...........................46

*Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) ...................................................45

*Lambert v. Wicklund*, 520 U.S. 292 (1997) ...........................................................36

*Lamont v. Postmaster General,* 381 U.S. 301 (1965) ...............................................4, 46

*Lawrence v. Texas*, 539 U.S. 558 (2003) .............................................................45

*LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005) .......................................................72

*Lehr v. Robertson*, 463 U.S. 248 (1983) .............................................................37

*Lovell v. City of Griffin*, 303 U.S. 444 (1938) .......................................................43

*Martin v. City of Struthers*, 319 U.S. 141, 143-44 (1943) ...........................................46

*Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200 (7th Cir. 1984) ..............................43

*Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307 (1976) .....................................72

*McConnell v. FEC*, 540 U.S. 93 (2003) ...............................................................46

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) ...............1, 4, 39, 40, 47, 55, 57, 58, 59

*National Rifle Association v. Magaw*, 132 F.3d 272 (6th Cir. 1997) ...................................22

*New York v. Ferber*, 458 U.S. 747 (1982) ............................................................36

*Nunn v. Georgia*, 1 Ga. 243 (1846) ...............................................................25, 43

*Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502 (1990) ....................................36

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ............................................................37

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007),
   *aff'd by Heller*, 554 U.S. 570 (2008) ..........................................................23, 27

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ............................55, 62

*Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 462 U.S. 476 (1983) .........................36, 54

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992) ...............................................25, 36, 50

*Planned Parenthood v. Danforth*, 428 U.S. 52 (1976) ...........................................18, 25, 51

*Prince v. Massachusetts*, 321 U.S. 158 (1944) ........................................................36

*Reliable Consultants Inc. v. Earle*, 538 F.3d 355 (5th Cir. 2008) ....................14, 17, 45

*Richard v. Hinson*, 70 F.3d 415 (5th Cir. 1995) .....................................................56

*Roe v. Wade*, 410 U.S. 113 (1973)...................................................................15, 22

*Roper v. Simmons*, 543 U.S 551 (2005)..................................................................35

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) .............................56, 72

*San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (1996)....................22

*Schall v. Martin*, 467 U.S. 253 (1984)....................................................................36

*Seegars v. Ashcroft*, 396 F.3d 1248 (D.C. Cir. 2005) ...............................................23

*Solid Waste Agency v. Corps of Engineers*, 531 U.S. 159 (2001) ..............................68

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975)................................74

*State v. Callicutt*, 69 Tenn. 714 (1878).............................................................32, 33

*State v. Sieyes*, 225 P.3d 995 (Wash. 2010)............................................................32

*Taylor v. Johnson*, 257 F.3d 470 (5th Cir. 2003)......................................................56

*Truax v. Raich*, 239 U.S. 33 (1915) ..............................................................15, 16, 18

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997)..........................................58, 59

*Ullmann v. United States*, 350 U.S. 422 (1956)........................................................57

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*,
    517 U.S. 544 (1996)......................................................................................21

*United States v. Anderson*, 559 F.3d 348 (5th Cir. 2009)...........................................23

*United States v. Blakeney*, 44 Va. 405 (Va. 1847).....................................................31

*United States v. Bledsoe*, 2008 U.S. Dist. LEXIS 60522 (W.D.Tex. Aug. 8, 2008),
    *aff'd*, 334 Fed. App'x 711 (5th Cir. 2009)......................................................70

*United States v. Bledsoe*, 334 F. App'x 711 (5th Cir. 2009) .........................................9

*United States v. Cardoza*, 129 F.3d 6 (1st Cir. 1997).................................................32

*United States v. Carolene Prods. Co.*, 304 U.S. 144 (1938) .................................38, 56

*United States v. Carter*, 801 F.2d 78(2d Cir. 1986)..................................................49

*United States v. Coil*, 442 F.3d 912 (5th Cir. 2006) ..................................................14

*United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003)..............................23, 24, 72

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001)........................................31, 42

*United States v. Emerson*, 46 F. Supp. 2d 598 (N.D. Tex. 1999)...................................5

*United States v. Engstrum*, 609 F. Supp. 2d 1227 (D. Utah 2009)...............................23

*United States v. Everist*, 368 F.3d 517 (5th Cir. 2004)..............................................59

*United States v. Grace*, 461 U.S. 171 (1983)...................................................................54

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)....................................43, 53, 58, 60, 71

*United States v. Meienberg*, 263 F.3d 1177 (10th Cir. 2001)........................................14

*United States v. Miller*, 604 F. Supp. 2d 1162 (W.D. Tenn. 2009) ..................................23, 26, 29

*United States v. Miller*, 307 U.S. 174 (1939) .................................................................26, 29, 42

*United States v. Orum*, 106 Fed. App'x 972 (6th Cir. 2004)........................................48

*United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000)..............................53

*United States v. Reese*, __ F.3d __, No. 10-2030 (10th Cir. 2010)...............................60

*United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009) ....................................................32

*United States v. Romani*, 523 U.S. 517 (1998) ............................................................68

*United States v. Scroggins*, 599 F.3d 433 (5th Cir. 2010) ...........................................24

*United States v. Shan*, 361 Fed. App'x 182 (2d Cir. 2010) ........................................48

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010)...............................................24

*United States v. Stevens*, 130 S. Ct. 1577 (2010).................................................46, 58

*United States v. Virginia*, 518 U.S. 515 (1996) .........................................................62

*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010).............................................60

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982)...............................................................................................56

*Vincenty v. Bloomberg*, 476 F.3d 74 (2d. Cir. 2007) ................................................46

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)......................................................................................15, 18, 46

*Weinberger v. Rossi*, 456 U.S. 25 (1982) .................................................................68

*Weinberger v. Weisenfeld*, 420 U.S. 636 (1975)........................................................72

*Williams v. Attorney General of Alabama*, 378 F.3d 1232 (11th Cir. 2004) ................45

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ..............................56

## <u>Constitutional and Legislative Materials</u>

U.S. Const. art. I, § 8.....................................................................................................26

10 U.S.C. § 311(a) .........................................................................................................3

10 U.S.C. § 505(a) ........................................................................................................35

18 U.S.C. § 2(a) .............................................................................................................9

18 U.S.C. § 371 ..............................................................................................................9

18 U.S.C. § 921(a)(11)(A) ...........................................................................................7, 48

18 U.S.C. § 921(a)(11) (C) .........................................................................................7, 48

18 U.S.C. § 921(a)(21)(C) ....................................................................7, 48

18 U.S.C. § 922(a)(1)(A) ....................................................................7, 48

18 U.S.C. § 922(a)(5) ...............................................................................8

18 U.S.C. § 922(b)(1) ..................................................................1, 6, 7, 48

18 U.S.C. § 922(c) ....................................................................................6

18 U.S.C. § 922(c)(1) ...............................................................................6

18 U.S.C. § 922(t)(1) ................................................................................7

18 U.S.C. § 922(t)(3) ................................................................................7

18 U.S.C. § 922(u) ....................................................................................8

18 U.S.C. § 922(x) ....................................................................................6

18 U.S.C. § 922(x)(3) ..............................................................................69

18 U.S.C. § 922(x)(1)-(3) ........................................................................49

18 U.S.C. § 923 .........................................................................................1

18 U.S.C. § 924(b) ....................................................................................8

18 U.S.C. § 924(i)(1) ................................................................................8

50 U.S.C. § 453(a) ....................................................................................3

50 U.S.C. § 454(a) ....................................................................................3

50 U.S.C. App'x §§ 453-54 .....................................................................35

27 C.F.R. § 478.96(b) ...............................................................................6

27 C.F.R. § 478.99(b)(1) ..........................................................................6

27 C.F.R. § 478.124(a) .............................................................................6

145 Cong. Rec. H 6571 (1999) ...............................................................68

145 Cong. Rec. S 4279 (1999) ................................................................67

S. Rep. No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2169................63, 64, 65, 69

*Lowering the Voting Age to 18*, S. Rep. 92-26 (March 8, 1971) .......................31, 34, 35

2 ANNALS OF CONGRESS 2145-46 ...................................................27, 28

1 Stat. 271 ..................................................................................2, 26, 29

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a)(2),
82 Stat. 197, 225MISS. CODE ANN. § 93-1-5(d)........................64, 65, 69, 70

MISS. CODE ANN. § 93-1-5(d) .............................................................38

TEX. FAM. CODE § 101.003(a)...............................................................34

TEX. FAM. CODE § 151.001(a)...............................................................34

VA. STAT. AT LARGE, 2 HENING 403 (1823)........................................42

## **Other**

1 BLACKSTONE COMMENTARIES ...............................................................................29

*A Pennsylvanian*, THE PENNSYLVANIA GAZETTE (Philadelphia, Feb. 20, 1788),
    *reprinted in* Les Adams, THE SECOND AMENDMENT PRIMER (1996) ......................26

Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683 (2007) ................61

BLACK'S LAW DICTIONARY (9th ed. 2009) ................................................................. 33

BLACK'S LAW DICTIONARY (7th ed. 1999)...................................................................65

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, FEDERAL FIREARMS
    REGULATIONS REFERENCE GUIDE (2005) ..........................................................8, 9

California Dept. of Justice, Handgun Safety Study Guide 24 (2004), *available at*
    http://ag.ca.gov/firearms/forms/pdf/hscsg.pdf .......................................................53

CURWEN, SOME CONSIDERATIONS ON THE GAME LAWS (1796) ....................................41

Dep't of the Treasury & Dep't of Justice, *Gun Crime in the Age Group 18-20* (1999) ...............68

Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*,
    *in* GUN CONTROL AND THE CONSTITUTION 66 (Robert J. Cottrol ed., 1994) ..........................28

*Early Emancipation Statutes:  Should They Protect Parents as Well as Children?*,
    20 FAMILY L.Q. 343 (Fall 1986) .........................................................................30

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:*
    *An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443 (2009) ............58

FBI, *Crime in the United States 2009*, Table 38:  Arrests by Age, *available at*
    http://www2.fbi.gov/ucr/cius2009/data/table_38.html#overview ......................................74

FBI, *National Instant Criminal Background Check System*, *at* http://www.fbi.gov/about-
    us/cjis/nics/nics ...................................................................................................

*Federal Firearms Act:  Hearings on S. 1, Amendment 90 to S. 1, S. 1853, and S. 1854*
    *Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. On the*
    *Judiciary*, 90th Cong., 1ˢᵗ Sess. (1967) ...........................................63, 64, 65, 66, 67

FEDERAL FIREARMS REGULATIONS REFERENCE GUIDE (2005)................................49, 50

HOMER H. CLARK, THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 8.1
    (2d ed. 1988) ....................................................................................................33

J. Bishop, Commentaries on Written Laws and Their Interpretation § 51, p. 49 (1882)...............39

JAMES KENT, 2 COMMENTARIES ON AMERICAN LAW 203 (1826) ...................................37

JOHN GALVIN, THE MINUTEMEN (1989).  ...............................................................42

Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms:*
    *The Common Law Tradition*, 10 HASTINGS CONST. L.Q. 285 (1983) ....................................40

Larry Barnett, *The Roots of Law*, 15 AM. U.J. GENDER SOC. POL'Y & L. 613 (2007) .................69

*Letter to Destutt de Tracy* (Jan. 26, 1811), *in* THE PORTABLE THOMAS JEFFERSON
(M. Peterson ed. 1975)............................................................................... 26

NICS Background Checks, *available at* http://www.fbi.gov/about-us/cjis/nics/reports/state-
totals_1998-2010-2 .......................................................................................8

NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)............................26

PEREGRINE BINGHAM, THE LAW OF INFANCY & COVERTURE  (1824) ...........................................29

Rossi-USA Ammunition Guide, *available at* http://www.rossiusa.com/ammoguide.cfm ............53

*Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF
GEORGE WASHINGTON  (John C. Fitzpatrick, ed. 1938) ........................................28

Smith & Wesson, Product Safety Information, *available at* http://www.smith-
wesson.com/webapp/wcs/stores/servlet/Category3_750001_750051_757978_-1_Y.............53

STEPHEN P. HALBROOK, THAT EVERY MAN BE ARMED (1994).....................................................41

STEPHEN P. HALBROOK, THE FOUNDER'S SECOND AMENDMENT:
ORIGINS OF THE RIGHT TO BEAR ARMS (2008) ........................................40, 41, 42

T.E. James, *The Age of Majority*, 4 AM. J. LEGAL HIST. 22 (1960)..................................30

THOMAS COOLEY, A TREATISE ON CONSTITUTIONAL LIMITATIONS (1868) ...................................34

Thomas Jefferson, 6 Writings (P. Ford ed. 1895).....................................................3, 41

THOMAS MCINTYRE COOLEY, GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE
UNITED STATES OF AMERICA (1880)..............................................................24, 31

Total NICS Background Checks, *available at* http://www.fbi.gov/about-us/cjis/nics/
reports/total-nics-background-checks ...................................................................7, 8

U.S. Census Bureau, *Monthly Postcensal Resident Population, by single year of age,
sex, race, and Hispanic origin*, July 1, 2009 data, *available for download at*
http://www.census.gov/popest/national/asrh/2009-nat-res.html...............................74

## INTRODUCTION

The Second Amendment preserves the fundamental, individual right to keep and bear arms.  *See District of Columbia v. Heller*, 554 U.S. 570, 592, 595 (2008); *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026, 3042 (2010).  The Supreme Court has thus declared that a ban on the possession of handguns—"an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose" of self-defense—is flatly unconstitutional.  *Heller*, 554 U.S. at 628-29.

And given that there is a right to possess handguns for self-defense and other lawful purposes, it follows that there must be a right to readily acquire such arms.  A restriction on procurement is the functional equivalent of a restriction on possession, and thus cannot withstand constitutional scrutiny.  This case concerns exactly such a restriction.  Federal licensing law comprehensively regulates every aspect of the gun business, and with respect to "access to weapons by users," "the focus of the federal scheme is the federally licensed firearms dealer." *Huddleston v. United States*, 415 U.S. 814, 825 (1974).  Federal law also provides for licenses for gun importers, gun manufacturers, and some classes of gun collectors.  *See* 18 U.S.C. § 923.  Pursuant to 18 U.S.C. § 922(b)(1) and its implementing regulations, all licensed firearms dealers ("FFLs") are prohibited from selling handguns or handgun ammunition to law-abiding adults between the ages eighteen and twenty.  In other words, federal law prohibits this class of citizens from obtaining handguns or ammunition from anyone engaged in the business of selling them, while leaving open as an alternative only unlicensed, unreliable channels, such as garage sales or gifts.  By banning 18-to-20 year olds' access to the entire licensed handgun market, the federal government places a heavy, and unconstitutional, burden on their right to keep and bear arms.

1

In this suit, Plaintiffs—law-abiding adults who are eighteen to twenty years old and the National Rifle Association, which sues on behalf of other, similarly situated members as well as still other members who are FFLs and would sell handguns and ammunition to otherwise qualified 18-to-20 year olds but for the challenged prohibition—challenge this infringement of their rights.  We maintain that the case can be decided without further proceedings: as a matter of law, the ban on licensed sales cannot stand and the Court should grant summary judgment in Plaintiffs' favor.  To resolve this case, we respectfully contend that it is necessary for the Court to answer three questions:

(1)    Does the Second Amendment apply to all law-abiding adults, or does it leave some law-abiding adults without protection simply on account of their age?

(2)    Does the Second Amendment secure a right to acquire the very arms that the people have a right to keep and bear?

(3)    Following *Heller*, what is the appropriate analytical framework for review of restrictions on Second Amendment rights?

As to the first question, the Second Amendment protects all law-abiding adults, including 18-to-20 year olds.  Indeed, just months after ratification of the Second Amendment, Congress enacted the Militia Act of 1792, expressly requiring all able-bodied men to enroll in the militia and to arm themselves upon turning 18.  *See* 1 Stat. 271.  This Act reflected the widespread understanding that citizens reached the age for militia membership by 18.  Finding 18-to-20 year olds to have anything less than full Second Amendment rights cannot be squared with this understanding, for "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms" was the *very "reason that right [to keep and bear arms] was codified in a written Constitution*."  *Heller*, 554 U.S. at 599 (emphasis added).  And this founding-era understanding clinches the matter regardless of future generations' actions, for "Constitutional

rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 634-35.

Further, at eighteen years of age, law-abiding citizens in this country are considered adults with respect to the exercise of fundamental rights enumerated in the Constitution. The Government cannot point to a single such right for which a ban comparable to the one at issue here would be permissible. Indeed, the federal government legislatively designates citizens in this age group to be members of the national militia, 10 U.S.C. § 311(a), and mandates their registration for the draft so that they may be conscripted to bear arms and die in the service of their country, 50 U.S.C. §§ 453(a), 454(a). Yet, because some 18-to-20 year olds commit handgun crimes, the Government bans *all* 18-to-20 year olds from purchasing handguns in the marketplace for self-defense or any other lawful purpose. This flat prohibition sweeps in all persons in the age bracket, regardless of circumstance: combat veterans, off-duty soldiers, heads of households, firemen, single women living alone in dangerous neighborhoods, hunters with years of firearms experience, decorated competitive shooters, and any average citizen who desires to exercise the fundamental right of self-defense that lies at the very core of the Second Amendment.

As to the second question, the Framers plainly would have viewed a right to acquire arms as part and parcel of the right to keep and bear those arms. *See, e.g.*, THOMAS JEFFERSON, 6 WRITINGS 252-53 (P. Ford ed. 1895) ("Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them."). Further, the Supreme Court has confirmed, repeatedly and across constitutional contexts, the basic principle that substantial restrictions on procuring the items necessary to exercise a fundamental right are tantamount to substantial restrictions on the exercise of the right. *See, e.g.*, *Carey v. Population Servs. Int'l*, 431 U.S. 678, 689 (1977) ("Limiting the distribution of nonprescription contracep-

tives to licensed pharmacists clearly imposes a significant burden on the right of the individuals to use contraceptives if they choose to do so."); *Lamont v. Postmaster General*, 381 U.S. 301 (1965) (restriction on addressee's right to receive literature in the mail "amounts … to an unconstitutional abridgement of the addressee's First Amendment rights").

And with respect to the final question, *Heller* sets the course for reviewing this (and all) Second Amendment challenges: this Court must determine whether the law in question contravenes the constitutional right as originally understood.  If so, the law cannot stand.  Despite *Heller*'s clarity on this point—its deployment of a thoroughly rigorous and clear-eyed view of the proper mode of constitutional analysis—lower courts have applied a wide variety of tests and frameworks to post-*Heller* challenges.  Most often, courts have said that some form of intermediate scrutiny applies.  There is no warrant for this in *Heller* or *McDonald*.  Even if *Heller*'s framework is to be rejected, protection of this fundamental right demands strict scrutiny.  The Second Amendment is not to "be singled out for special—and specially unfavorable—treatment."  *McDonald*, 130 S. Ct. at 3043.

Eschewing the *Heller* framework, the Government argues that the ban on licensed sales should be evaluated under intermediate scrutiny—and that its goal of crime prevention is sufficient to justify the ban under that test.  In other words, the Government's claim is that because the percentage of 18-to-20 year olds who commit handgun crimes is higher than the percentage of those over 21 who commit handgun crimes, *all* adults who are 18-to-20 can be stripped of their constitutional rights.  But this is not how fundamental rights work under the Constitution: "the Second Amendment … is the very *product* of an interest balancing by the people" and "necessarily takes certain policy choices off the table."  *Heller*, 554 U.S. at 635-36.  "[W]hat it means to take rights seriously is that one will honor them even when there is significant social cost in

4

doing so." *United States v. Emerson*, 46 F. Supp. 2d 598, 609-10 (N.D. Tex. 1999), *rev'd on other grounds*, 270 F.3d 203 (5th Cir. 2001).

In all events, the Government rebuts its own contention that the ban on licensed sales is necessary to staunch the clandestine flow of handguns to 18-to-20 year olds, arguing in the next breath that this ban is permissible because it leaves open alternative avenues through which 18-to-20 year olds can acquire handguns—namely, from unlicensed, irregular sellers or as gifts.  As demonstrated below, neither of these purported alternatives is sufficient to alleviate the unconstitutional burden created by the ban on licensed sales, although the Government's reliance on these channels does eviscerate the supposed policy rationale for restricting sales by FFLs.

Indeed, the Government's position is untenable.  If, as the Government sometimes contends, the ban on licensed sales significantly restricts access to handguns, then it cannot stand. If, as the Government alternatively contends, it leaves open perfectly sufficient means of access, then it is fatally underinclusive and belies any claim that a significant governmental interest justifies the law.  *Florida Star v. B.J.F.*, 491 U.S. 524, 541-42 (1989) (Scalia, J., concurring)  ("a law cannot be regarded as protecting an interest 'of the highest order,' and thus as justifying a restriction … when it leaves appreciable damage to that supposedly vital interest unprohibited").  The Court need not resolve the factual question because the Government loses either way.

In short, the answers to these three questions lead ineluctably to the result that we respectfully submit should obtain here:  this Court should find Section 922(b)(1) unconstitutional under both the Second and Fifth Amendments.

## BACKGROUND

Plaintiffs challenge federal statutes and regulations that ban licensed sales of handguns or handgun ammunition to law-abiding adults between the ages of eighteen and twenty.

# I.  REGULATORY BACKGROUND

The statutes and regulations that implement this ban, and thus are the subject of this lawsuit, are:

- 18 U.S.C. § 922(b)(1), which states: "It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver … any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age."

- 18 U.S.C. § 922(c), which prescribes that "a licensed importer, licensed manufacturer, or licensed dealer may sell a firearm to a person who does not appear in person at the licensee's business premises … only if" the person signs a sworn statement attesting "that, in the case of any firearm other than a shotgun or a rifle, I am twenty-one years or more of age."

- 27 C.F.R. § 478.99(b)(1), which provides: "A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall not sell or deliver (1) any firearm or ammunition…, if the firearm, or ammunition, is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe is less than 21 years of age."

- 27 C.F.R. §§ 478.124(a), 478.96(b), which require that federal firearms licensees obtain a signed copy of Form 4473 before transferring a handgun to a purchaser.  Form 4473 states that the information provided therein "will be used to determine whether [the transferee is] prohibited under law from receiving a firearm" and instructs licensees that it is "unlawful for a licensee to sell any firearm other than a shotgun or rifle to any person under the age of 21."[1]

Plaintiffs challenge each of these statutes and regulations to the extent they bar FFLs from transferring handguns or handgun ammunition to law-abiding, otherwise qualified adults who are at least eighteen years of age but not yet twenty-one years of age.[2]  For ease of reference, Plaintiffs will collectively refer to these laws as "Section 922(b)(1)."

---

[1] Plaintiffs do not challenge 18 U.S.C. § 922(x), which prohibits anyone, not just FFLs, from transferring handguns to individuals under 18 and also prohibits individuals under 18 from possessing handguns, subject to specified exceptions.

[2] The Government appears to misapprehend Plaintiffs' challenge to 18 U.S.C. § 922(c)(1) and 27 C.F.R. §§ 478.124(a), 478.96(b).  The Government argues that Plaintiffs are challenging

Each of these laws operates in reference to FFLs.  Title 18, Section 922(a)(1)(A) of the U.S. Code requires any person who "engage[s] in the business of importing, manufacturing, or dealing in firearms" to obtain a federal firearms license.  A firearms "dealer," in turn, is any person who, inter alia, "engage[s] in the business of selling firearms at wholesale or retail," including pawnbrokers.  18 U.S.C. § 921(a)(11)(A), (C).  A person "engage[s] in the business" of selling firearms—and thus must obtain a federal firearms license—if he "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms."  *Id.* § 921(a)(21)(C).  In other words, anyone who engages in the firearms business must become an FFL—and Section 922(b)(1) therefore forecloses 18-to-20 year olds from gaining access to the entire licensed market for handguns and handgun ammunition.

The scope of the licensed market for firearms (that is, the market subject to the ban on sales to 18-to-20 year olds) is revealed by queries submitted by FFLs to the National Instant Criminal Background Check System—a step that FFLs must take before selling a firearm.  18 U.S.C. § 922(t)(1).  The number of queries represents attempts by customers to purchase a firearm.  In 2010, FFLs conducted more than 14 million NICS background checks.  *See* Total NICS Background Checks, *available at* http://www.fbi.gov/about-us/cjis/nics/reports/total-nics-background-checks.  From 2000 to the end of 2010, FFLs ran over *114 million* NICS background checks.  *Id.*  In Texas, FFLs ran nearly one million NICS background checks in 2010.  *See* NICS

---

"the requirements that licensed sellers generally meet face-to-face with the buyer, and must obtain a Form 4473" (i.e., that we are asserting a "constitutional right to buy firearms by mail, or to buy them without filing a form").  DOJ Br. 46.  Whatever the merits of those general requirements, Plaintiffs do not challenge them here.  We challenge the ban on transfers to 18-to-20 year olds, however that ban is effectuated by federal law.  *See* Doc. 14 (Amended Cmplt.) ¶¶ 44-48.  As explained above, Section 922(c)(1) and 27 C.F.R. §§ 478.124(a), 478.96(b), all implement Section 922(b)(1)'s ban—and to that extent they are unconstitutional.

Background Checks, *available at* http://www.fbi.gov/about-us/cjis/nics/reports/state-totals_1998-2010-2.[3]

While Section 922(b)(1) operates directly on FFLs, other federal laws fix liability on an 18-to-20 year old buyer should he or she complete a purchase of a handgun or handgun ammunition from an FFL. First, 18 U.S.C. § 922(u) renders "[i]t … unlawful for a person to … unlawfully take or carry away from the person or the premises of a person who is licensed to engage in the business of importing, manufacturing, or dealing in firearms, any firearm in the licensee's business inventory that has been shipped or transported in interstate or foreign commerce." Because the transfer of handguns and handgun ammunition to an 18-to-20 year old adult is unlawful, the carrying away of such handgun or ammunition by such an adult is therefore a felony under Section 922(u). *See* 18 U.S.C. § 924(i)(1) ("A person who knowingly violates section 922(u) shall be fined under this title, imprisoned not more than 10 years, or both.").

Second, under 18 U.S.C. § 924(b), "[w]hoever … with knowledge or reasonable cause to believe that an offense punishable by imprisonment for a term exceeding one year is to be committed therewith, … receives a firearm or any ammunition in interstate or foreign commerce shall be fined …, or imprisoned not more than ten years, or both." Thus, if an 18-to-20 year old

---

[3] The Government points out that Section 922(b)(1) leaves open two avenues by which an 18-to-20 year old may acquire a handgun. First, someone could give a handgun to an 18-to-20 year old. But this must be a *bona fide* gift and not a straw purchase; the giving party cannot use the receiving party's funds or receive any *quid pro quo*. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, FEDERAL FIREARMS REGULATIONS REFERENCE GUIDE 165 (2005). Second, an 18-to-20 year old can buy a handgun from someone who is not in the business of selling firearms for profit and who therefore is not an FFL—such as an acquaintance who happens to be selling a spare handgun. Under 18 U.S.C. § 922(a)(5), it is illegal "for any person [other than a licensed dealer] to transfer, sell, trade, give, transport, or deliver any firearm to any person … who the transferor knows or has reasonable cause to believe does not reside in … the State in which the transferor resides." Thus, to the extent an 18-to-20 year old can buy a used handgun and resale ammunition from a casual, irregular, unlicensed seller, that market is restricted by law solely to in-state sales.

"receives" a handgun or handgun ammunition through purchase from an FFL, he or she is subject to felony prosecution under Section 924(b) because he or she would know (or should have known) that the FFL was committing a felony by transferring the handgun or ammunition.

Third, 18-to-20 year old buyers can also be prosecuted as accessories or coconspirators to violations of Section 922(b)(1).  *See* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."); 18 U.S.C. § 371 ("If two or more persons conspire … to commit any offense against the United States, … and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.").  *Cf. United States v. Bledsoe*, 334 F. App'x 711 (5th Cir. 2009) (affirming conviction of 19-year-old for conspiring with a straw purchaser to make false representations to an FFL in an attempt to evade Section 922(b)(1)); BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, FEDERAL FIREARMS REGULATIONS REFERENCE GUIDE 165 (2005) ("The actual purchaser who utilized the straw purchaser to acquire a firearm has unlawfully aided and abetted or caused the making of the false statements.").

## II.    PLAINTIFFS' BACKGROUND

Rebekah Jennings is a nineteen-year-old resident of Boerne, Texas.  Jennings Decl. ¶ 2, App. 5.[4]  She is a decorated competitive pistol shooter, having been a member of the U.S. Olympic Development Team and the Texas State Rifle Association's Junior Team.  *Id.* ¶ 4, App. 5-6.  Indeed, she has broken several national records for competitive pistol shooting.  *Id.*  She has logged thousands of hours practicing the use of handguns, *id.* ¶ 5, App.6, and is thus much better

---

[4]  Rebekah Jennings and Brennan Harmon are currently proposed plaintiffs, as they have moved to join this case as party plaintiffs.  Because both are members of Plaintiff NRA, their declarations are relevant regardless of their party status.  *See* Jennings Decl. ¶ 3, App. 5; Harmon Decl. ¶ 3, App. 11.  We refer to them as plaintiffs throughout this brief.

versed than most adults over the age of 21 in the safe and proficient handling of handguns and handgun ammunition.   Nonetheless, Ms. Jennings does not own a pistol of her own, and must rely on her father to loan her his pistols for practice and competition.  *Id.* ¶ 6, App. 6.  Ms. Jennings desires to purchase her own handgun from an FFL, both for her self-protection and to further her interest in competitive pistol shooting.  *Id.*¶¶ 7-8, App. 6.

Brennan Harmon is a nineteen-year-old resident of San Antonio, Texas, where she lives alone in an apartment.  *See* Harmon Decl. ¶ 2, App. 11.  There have been shooting incidents in apartment complexes that neighbor Ms. Harmon's apartment.  *Id.* ¶ 10, App. 12.  Ms. Harmon's family owns several firearms, and her father has instructed her in their proper and safe handling.  *Id.* ¶¶ 4-5, App. 11-12.  Ms. Harmon currently owns a rifle and a shotgun, but she does not own a handgun and she finds the long guns insufficient for self-defense.  *Id.* ¶¶ 6-7, App. 12.  Ms. Harmon also enjoys target shooting, both as recreation and as a way to ensure proficiency with firearms.  *Id.* ¶ 8, App. 12. Ms. Harmon therefore desires to own a handgun for self-defense and other lawful purposes, and she would purchase one from an FFL if such a transaction were not prohibited under Section 922.  *Id.* ¶¶ 9, 13, App.12, 13-14.

Andrew Payne is an eighteen-year-old resident of Lubbock, Texas.  Payne Decl. ¶ 1, App. 18.  Mr. Payne and his father visit shooting ranges for recreation and to gain proficiency in the effective and safe use of firearms, including handguns.  *Id.* ¶ 3, App. 18.  Mr. Payne does not own handgun, but he would purchase a handgun and handgun ammunition if such a transaction were not illegal under Section 922(b)(1).  *Id*. ¶¶ 5, 8-9, App. 19, 20.

James D'Cruz has moved to withdraw as a named plaintiff in this suit because he has recently withdrawn from Texas Tech and has relocated to Florida.  D'Cruz Decl. ¶ 3, App. 31.  Because Mr. D'Cruz is a member of Plaintiff NRA, however, his experience will continue to be

relevant even if his motion to withdraw is granted.  *See* D'Cruz Decl. ¶ 4, App. 31.  Mr. D'Cruz is 18 years old, is an award-winning marksman, and is well trained in the safe and proper handling of firearms.  D'Cruz Decl. ¶¶ 1, 5-6, App. 31, 32.  But for Section 922(b)(1), he would purchase a handgun from an FFL for self-defense and for use in target practice.  D'Cruz Decl. ¶ 13, App. 34.

The National Rifle Association is a membership organization committed to protecting and defending the fundamental right to keep and bear arms, as well as the safe and responsible use of firearms for self-defense and other lawful purposes.  Many of the NRA's members are 18-to-20 years old, or will enter that age bracket during the pendency of this litigation.  *See* Marcario Decl. ¶ 5, App. 2 (stating that the NRA currently has at least 11,000 members who are ages 18 to 20, and at least 9,000 members who are ages 15 to 17, including both life and annual members).  Under Section 922(b)(1), these members are unable to purchase a handgun or handgun ammunition from an FFL.

One representative NRA member in this class is Halie Fewkes, a nineteen-year-old resident of Washington. Fewkes Decl. ¶ 2, App. 24.  She lives in Pullman, where she attends college.  *Id*.  Ms. Fewkes is well acquainted with the proper and safe use of firearms through personal study and the instruction of her father.  *Id.* ¶ 4, App. 24.  She plans to live in an off-campus apartment next semester, and she would like to purchase a new handgun to keep in that apartment for self-defense purposes and for use in target shooting.  *Id.* ¶ 5, App. 25.  Section 922(b)(1), however, prevents her from purchasing a handgun from a licensed dealer.  She is not

aware of anyone she knows selling a used firearm, and she is uncomfortable with the idea of engaging in a face-to-face transaction with an unlicensed stranger. *Id.* ¶ 12, App. 26.[5]

The NRA's licensed dealer members are also harmed by Section 922(b)(1), as the law prohibits them from making profitable handgun sales and handgun ammunition sales to otherwise-qualified 18-to-20 year olds.  Roger Koeppe and Paul White are two such members; they own and operate FFLs in Houston, Texas and Richmond, Utah, respectively. *See* Koeppe Decl. ¶¶ 2-3, App. 71; White Decl. ¶¶ 2-3, App. 68.

## ARGUMENT

### I.    PLAINTIFFS PLAINLY HAVE STANDING TO CHALLENGE SECTION 922(B)(1).

A well-settled body of precedent from the Supreme Court and the Fifth Circuit makes clear that both the firearms dealers subject to Section 922(b)(1)'s criminal prohibition and the 18-20 year olds whose constitutional rights are burdened by the statute have standing to challenge that provision's constitutionality.  These and other controlling precedents also foreclose the Government's arguments that Section 922(b)(1) does not inflict any judicially cognizable burden because it does not absolutely and permanently bar anyone all access to firearms.  Finally, contrary to the Government's assertions, Plaintiffs in this case have plainly demonstrated concrete injury sufficient to satisfy Article III.

### A.    Controlling Precedent Makes Clear That Section 922(b)(1) May Be Challenged by Firearms Dealers, 18-to-20 Year Olds, or Both.

Under controlling precedent, it is absolutely clear that *either* a potential vendor *or* a potential purchaser has standing to challenge a restriction on the vendor that burdens the purchas-

---

[5] Ms. Fewkes is an illustrative example.  We have attached declarations from other NRA members in a similar profile. *See* Anastas-King Decl., App. 37; Whitman Decl., App. 46.

er's constitutional rights.  The Government's contrary arguments simply cannot be reconciled with these precedents.

1. As the Supreme Court explained in *Craig v. Boren*, "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function."  429 U.S. 190, 195 (1976) (collecting cases).  In *Craig*, for example, the Supreme Court held that a licensed vendor of low-alcohol beer had standing to challenge an Oklahoma statute that barred the vendor from selling such beer to 18-to-20 year old men but allowed its sale to 18-to-20 year old women.  As the Court explained:

> The legal duties created by the statutory sections under challenge are addressed directly to vendors such as appellant.  She is obliged either to heed the statutory discrimination, thereby incurring a direct economic injury through the constriction of her buyers' market, or to disobey the statutory command and suffer, in the words of Oklahoma's Assistant Attorney General, 'sanctions and perhaps loss of license.'  This Court repeatedly has recognized that such injuries establish the threshold requirements of a 'case or controversy' mandated by Art. III.

*Id*. at 194 (internal citations omitted).[6]  The Court further held that "[a]s a vendor with standing to challenge the lawfulness of [the sales restriction], appellant Whitener is entitled to assert those

---

[6] The Court's description of the vendor's injury in *Craig* makes clear that the Government errs in repeatedly suggesting that firearms dealers lack standing to challenge Section 922(b)(1) unless they actually violate the statute and risk prosecution or declare an unconditional intent to sell handguns to individuals under 21 regardless of whether the statute is invalidated. *See, e.g*., DOJ Br. 2, 14, 18, n.17, 20 n.18.  Indeed, *Craig* expressly rejected any such requirement.  *See id*. at 197 n.5.  Similarly, in *Doe v. Bolton*, the Supreme Court found that the physicians against whom Georgia's criminal abortion statutes "directly operate[d]" asserted "a sufficiently direct threat of personal detriment" to have standing to challenge those statutes, "despite the fact that the record [did] not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes."  410 U.S. 179, 188 (1973).  As the Court explained, absent any indication that these laws were "moribund," the physicians "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."  *Id*.  In this case the Government does not, and cannot, claim that Section 922(b)(1) is "moribund," or that it would not seek to enforce that statute against a firearms dealer who violated it.  *See, e.g*., *Appalachian Res. Dev. Corp. v. McCabe*, 387 F.3d 461 (6th Cir. 2004) (re-

13

concomitant rights of third parties that would be 'diluted or adversely affected' should her constitutional challenge fail and the statutes remain in force." *Id.* at 195.  "Otherwise," explained the Court, "the threatened imposition of governmental sanctions might deter appellant Whitener and other similarly situated vendors from selling 3.2% beer to young males, thereby ensuring that 'enforcement of the challenged restriction against the [vendor] would result indirectly in the violation of third parties' rights." *Id.*

Both the Supreme Court and the Fifth Circuit have repeatedly applied this rationale to hold that vendors and service providers have standing to challenge sales and similar restrictions that burden their would-be customers' constitutional rights. *See, e.g., Carey,* 431 U.S. at 681-84 (holding that "corporation primarily engaged in the mail-order retail sale of nonmedical contraceptive devices" had standing to challenge a statute that made it a crime, *inter alia,* "for anyone other than a licensed pharmacist to distribute contraceptives to persons 16 or over" and could assert the privacy rights of its would-be customers); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 330, 333-34 (5th Cir. 1981) (holding that plaintiffs who wished to open an abortion clinic had standing to challenge an adverse zoning decision and could assert the rights of their would-be clients); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 740,  743 (5th Cir. 2008) (vendor had standing to challenge statute criminalizing the sale of "a device designed or marketed for sexual stimulation" and could assert the constitutional rights of its customers); *see generally id.* ("Other Supreme Court cases hold that businesses can assert the rights of their customers and that restricting the ability to purchase an item is tantamount to restricting the item's use."); *United States v. Coil*, 442 F.3d 912, 915 n.2 (5th Cir. 2006) ("The Supreme Court has

---

viewing revocation of appellant's firearms licenses for selling handgun ammunition to an 18 year old in violation of Section 922(b)(1)); *United States v. Meienberg*, 263 F.3d 1177 (10th Cir. 2001) (reviewing criminal conviction for violation of Section 922(b)(1)).

consistently upheld the standing of vendors to challenge the constitutionality of statues on their customers' behalf where those statutes are directed at the activity of the vendors."). Under these precedents there can be no question that firearms dealers who are directly subject to Section 922(b)(1)'s criminal prohibitions have standing to challenge that statute as a violation of their would-be 18 to 20 year old customers' Second Amendment and Equal Protection rights.

2.   Nor is a vendor or service provider directly subject to the restriction the only party who can challenge laws such as these. To the contrary, the Supreme Court has repeatedly upheld the ability of the individuals whose constitutional rights are burdened by such restrictions to sue as well. In *Doe v. Bolton*, for example, the Supreme Court held that not only "Georgia-licensed doctors consulted by pregnant women" but also a pregnant woman herself had standing to challenge a statute criminalizing the provision of most abortions, even though "[t]he physician [was] the one against whom these criminal statues directly operate[d]." 410 U.S. 179, 187-88 (1973); *see also Roe v. Wade*, 410 U.S. 113, 124 (1973) (holding that "a pregnant single woman thwarted by the Texas criminal abortion laws, had standing to challenge those statutes"). Similarly, in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, the Court allowed a challenge to a statute prohibiting pharmacists from advertising their prices for prescription drugs brought "not by one directly subject to its prohibition, that is, a pharmacist, but by prescription drug consumers who claim they would greatly benefit if the prohibition were lifted and advertising freely allowed." 425 U.S. 748, 749, 753 (1976); *see also id.* at 757 (recognizing a "right to receive the advertising" that "may be asserted by these appellees"). And in a closely analogous context, the Supreme Court allowed an employee who was a legal alien to raise an equal protection challenge to a criminal statute barring employers from hiring more than a fixed quota of aliens. *Truax v. Raich*, 239 U.S. 33 (1915). The Court forcefully rejected the

argument that "the servant cannot complain for the master, and that it is the master who is sub-
ject to prosecution and not the complainant," *id*. at 38:

> But the act undertakes to operate directly upon the employment of aliens and if
> enforced would compel the employer to discharge a sufficient number of his em-
> ploye[e]s to bring the alien quota within the proscribed limit.  It sufficiently ap-
> pears that the discharge of the complainant will be solely for the purpose of meet-
> ing of the requirements of the act and avoiding threatened prosecution under its
> provisions.  It is, therefore, idle to call the injury indirect or remote.

*Id*. at 38-39.  These cases plainly disprove the Government's repeated suggestion that 18-to-20

year olds lack standing to challenge Section 922(b)(1) because they—like the employee in

*Truax*, the consumer in *Virginia State Board of Pharmacy*, and the pregnant women in *Doe* and

*Roe*—have not been threatened with, and indeed may not even be subject to, prosecution under

the statute that burdens their constitutional rights.  *See* DOJ Br. 2, 13, 18 n.17.[7]

### B.        Section 922(b)(1) Imposes a Judicially Cognizable Burden.

Citing precedents holding only that a plaintiff lacks standing to challenge a program in

which he is not required to participate, *see* DOJ Br. 15, the Government argues that Section

922(b)(1) inflicts no judicially cognizable injury on any of the Plaintiffs because it does not per-

manently and absolutely bar anyone all access to firearms.  In particular, the Government argues

that the Plaintiffs suffer no injury because 18-to-20 year olds may lawfully obtain handguns from

casual, irregular sellers or as gifts, because these individuals can purchase handguns from li-

censed dealers once they turn 21, and because these individuals may purchase long guns from

such dealers before that time, *see id*. 1-2, 12-15, 21.  The Government does not deny, however,

that the statute prevents 18-to-20 year olds from purchasing handguns from those engaged in the

---

[7] In all events, despite the Government's assertion that "the challenged statutory provi-
sions would not impose any criminal sanctions on 18-to-20-year olds," DOJ Br. 18 n.17, as we
explained above it is far from clear that an 18-to-20 year old who somehow persuaded a firearms
dealer to violate Section 922(b)(1)'s clear mandate would not be subject to criminal prosecution.

business of selling firearms.  And under controlling precedent, a restriction of this sort plainly inflicts judicially cognizable injury both on the 18-to-20 years olds who wish to acquire handguns in this manner and on licensed firearms dealers who would otherwise sell to them.

      1. The precedents discussed above demonstrate that the fact that a statute such as Section 922(b)(1) does not bar all access to a product or service does not immunize it from judicial attack.  Thus in *Carey*, a mail-order retailer was held to have standing to challenge a statute barring it from selling contraceptives to individuals over 16 as a violation of its would-be customers' constitutional rights, even though those individuals could legally obtain contraceptives under the statute from a licensed pharmacist.  *See* 431 U.S. at 682.  As the Court explained:

> Limiting the distribution of nonprescription contraceptives to licensed pharmacists clearly imposes a significant burden on the right of the individuals to use contraceptives if they choose to do so.  The burden is, of course, not as great as that under a total ban on distribution.  Nevertheless, the restriction of distribution channels to a small fraction of the total number of possible retail outlets renders contraceptive devices considerably less accessible to the public, reduces the opportunity for privacy of selection and purchase, and lessens the possibility of price competition.

*Id*. at 689 (citation omitted).  Similarly, in *Deerfield Medical Center*, the Fifth Circuit held that plaintiffs who wished to establish a *single* abortion clinic had standing to challenge an adverse zoning decision as a violation of their would-be patient's constitutional rights, despite evidence that "other abortion facilities" were located in " 'nearby' communities."  661 F.2d at 336; *see also id*. ("it cannot seriously be disputed that a woman's deliberation over whether to have an abortion, and her ability to exercise her right to an abortion once that decision is made, would be adversely affected if abortion facilities were restricted to the most unattractive, inaccessible and inconvenient areas of a city"); *Reliable Consultants*, 517 F.3d at 741 (holding that vendor had standing to challenge to a statute prohibiting the sale of sexual devices as a violation of its cus-

tomers' rights even though the challenged statute did "not prohibit the use or possession of sexual devices for any purpose").

Conversely, in *Virginia State Board*, prescription-drug consumers were permitted to challenge a statute prohibiting pharmacists from advertising pricing information even though the consumers could lawfully obtain such information by other methods, including by simply calling pharmacies and asking. *See* 425 U.S. at 752; *see also id*. at 757 n.15 ("We are aware of no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means, such as seeking him out and asking him what it is. Nor have we recognized any such limitation on the independent right of the listener to receive the information sought to be communicated."). And in *Truax*, the alien employee was allowed to challenge the employment quota even though it did not completely eliminate his employment opportunities—it did not apply at all to businesses with five or fewer employees and it permitted larger employers to fill up to twenty percent of their positions with aliens. *See* 239 U.S. at 42.

Under these and many similar precedents, the argument that Section 922(b)(1)—which prohibits those in the business of selling firearms from selling handguns to 18-to-20 year olds—does not even impose a judicially cognizable burden because those individuals may lawfully obtain handguns from casual, irregular sellers borders on frivolous. And the related claim that the statute imposes no cognizable injury because parents may lawfully purchase handguns and give them to *adults* between 18 and 21 cannot be reconciled with Supreme Court precedents allowing challenges to laws conditioning the exercise of even *minors'* constitutional rights on parental consent (or even notification). *See, e.g., Planned Parenthood v. Danforth*, 428 U.S. 52, 58, 62 (1976) (holding that physician providers had standing to challenge law requiring unmarried women under 18 to obtain parental consent for abortions); *H.L. v. Matheson*, 450 U.S. 398, 405-

18

07 (1981) (holding that 15 year-old girl had standing to challenge parental notification require-ment for abortions, though only as it applied to her).

2.   The Government's claim that Section 922(b)(1) does not inflict judicially cognizable injury because it imposes only a temporary disability that does not bar anyone from purchasing a handgun after he or she turns 21 likewise contradicts binding precedent, for the restriction on the sale of low-alcohol beer challenged in *Craig* also applied only until the would-be purchaser turned 21.   Indeed, the Supreme Court held in *Craig* that the claim of one of the original plain-tiffs became moot when he turned 21 after the Supreme Court noted probable jurisdiction, but that did not stop the Court from finding that a licensed vendor of low-alcohol beer had standing to challenge the restriction on the sale of such beer to 18-to-20 year old men as an infringement of those individuals' constitutional rights.   *See* 429 U.S. at 192-93.

3.   Finally, the Government's claim that Section 922(b)(1) imposes no judicially cogniza-ble burden because 18-to-20 year olds may purchase long guns from licensed dealers cannot be reconciled with the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008).   As the Court in that case explained:

> It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed.   It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense:   It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police.   Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

*Id*. at 629.   While the Court in *Heller* addressed a complete ban on possession and use of handguns as opposed to a sales restriction, its analysis surely forecloses the Government's claim that the availability of long guns eliminates any cognizable injury from a restriction on handguns.

### C.   Plaintiffs Have Demonstrated Concrete Injury.

Plaintiffs respectfully submit that, under the authorities set forth above, the allegations in the amended complaint more than suffice to establish their standing to challenge the constitutionality of Section 922(b)(1).   If there is any doubt on this score, however, it is  foreclosed by the declarations that Plaintiffs have submitted in connection with this motion for summary judgment. *See Department of Commerce v. United States House of Representatives*, 525 U.S. 316, 330 (1999) (looking to affidavits to determine standing at summary judgment stage); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc*, 528 U.S. 167, 177, 181-82 (2000) (looking to affidavits submitted at summary judgment stage to determine standing).

1.   Plaintiffs Jennings, Harmon, and Payne do not own handguns, but each of them desires to obtain one for lawful purposes including self-defense.   Jennings Decl. ¶¶ 6-8, App. 6; Harmon Decl. ¶¶ 6, 9, App. 12; Payne Decl. ¶¶ 4-5, App. 19.   Indeed, they all have identified a specific handgun they would purchase now from an FFL if lawfully permitted to do so.   Jennings Decl. ¶ 10, App. 7; Harmon Decl. ¶ 13, App. 13, 14; Payne Decl. ¶ 10, App. 20.   The FFLs Harmon and Payne would purchase their handguns from have refused to sell them handguns in the past because they are under 21.   Harmon Decl. ¶ 13, App.13-14; Payne Decl. ¶ 10, App. 20.   The individual Plaintiffs also have reservations about buying from an unlicensed seller, including concerns about risks related to the safety and quality of used handguns and the quality of ammunition available from such sources, and they thus prefer to purchase a handgun from a licensed dealer.   Jennings Decl. ¶¶ 11-12, App. 7-8; Harmon Decl. ¶ 15, App. 14-15; Payne Decl. ¶¶ 11-

13, App. 20-21.  And they have reasons to doubt their ability even to find an unlicensed seller

from whom they could buy a handgun, much less one they would feel comfortable transacting

with.  Jennings Decl. ¶¶ 13-14, App. 8; Harmon Decl. ¶¶ 16-18, App. 15-16; Payne Decl. ¶¶ 14-

15, App. 21.  Furthermore, they have not received a handgun as a gift from their parents, nor do

they believe they should have to rely on their parents to obtain one.  Jennings Decl. ¶ 15, App. 9;

Harmon Decl. ¶ 14, App. 14; Payne Decl. ¶ 16, App. 22.

2.  As the Government appears to concede, the NRA likewise has standing "to sue as the

representative of its members" if it can " 'show that its members, or any one of them, would have

standing individually.' "  DOJ Br. 18 (quoting *National Treasury Employees Union v. U.S. Dep't

of the Treasury*, 25 F.3d 237, 241 (5th Cir. 1994)).[8]  This requirement is likewise plainly satis-

fied.  In addition to Jennings, Harmon, and Payne—each of whom is an NRA member, *see* Jen-

nings Decl. ¶ 3, App. 5; Harmon Decl. ¶ 3, App. 11; Payne Decl. ¶ 2, App. 18—several other

similarly situated NRA members between the ages of 18 and 20 have submitted declarations de-

monstrating that they have been injured by Section 922(b)(1)'s ban on licensed handgun sales.

*See* D'Cruz Decl., App. 33; Fewkes Decl., App. 25; Anastas-King Decl., App. 39; Whitman

Decl., App. 47.

It is not just 18-to-20 year olds who are injured by Section 922(b)(1), but also licensed

dealers who but for the law would profit from selling handguns to individuals in that age range.

The NRA has many members that fit this profile as well.  Paul White, for example, owns and

operates My Favorite Gun Store, an FFL in Richmond, Utah.  White Decl. ¶ 3, App. 68.  Be-

---

[8] In addition, associational standing requires that (1) the interests the organization seeks
to vindicate are "germane to the organization's purpose," and (2) "neither the claim asserted nor
the relief requested requires the participation of individual members in the lawsuit."  *United
Food & Commercial Workers Union Local 751 v. Brown Group, Inc*., 517 U.S. 544, 553 (1996).
These requirements are plainly satisfied here, where the NRA seeks declaratory and injunctive
relief to vindicate Second Amendment rights, and the Government does not contend otherwise.

cause of Section 922(b)(1), he has lost profits by refusing to sell handguns to law-abiding 18-to-20 year olds, and were it not for the law he would sell handguns to adults in that age range—including Mr. Whitman—so long as they were otherwise qualified to purchase. *Id.* ¶¶ 10-12, App. 69-70.  Like White, Roger Koeppe owns and operates an FFL—he does business under the name of Armory Management and Supply Services and is located in Houston, Texas.  Koeppe Decl. ¶ 3, App. 71.  And, also like White, Koeppe has lost profits from refusing to sell handguns to 18-to-20 year olds because of Section 922(b)(1), and he would sell handguns to law-abiding, otherwise qualified adults in that age range were it legal to do so.  *Id.* ¶¶ 10-11, App. 72-73.

3.  It is thus absolutely clear that Plaintiffs have standing to sue as, and on behalf of, 18-to-20 year olds "thwarted by the [Federal] criminal . . . laws" prohibiting licensed dealers from selling them handguns, *Roe*, 410 U.S. at 124, and also on behalf of vendors "obliged either to heed the statutory discrimination, thereby incurring a direct economic injury through the constriction of [their] buyers' market, or to disobey the statutory command and suffer . . . sanctions and perhaps loss of license," *Craig*, 429 U.S. at 194 (quotation marks omitted).  None of the authorities cited by the Government has held that similarly detailed accounts of injury are insufficient to establish standing, let alone done so in a case such as this one where binding precedent makes clear that either a vendor or a would-be purchaser has standing to challenge a criminal law "addressed directly to vendors" that operates to "dilute[] or adversely affect[]" the would-be purchaser's "concomitant" constitutional rights.  *Id.* at 194-95.[9]

_____

[9] In *San Diego County Gun Rights Committee v. Reno*, for example, the plaintiffs alleged only that they " 'wish[ed] and intend[ed]' to engage in unspecified conduct prohibited by the Act."  98 F.3d 1121, 1124 (1996).  Further, under the collective-rights view of the Second Amendment then prevailing in the Ninth Circuit, the plaintiffs lacked standing to assert a Second Amendment challenge.  *See id.* at 1124-25; *see also National Rifle Association v. Magaw*, 132 F.3d 272, 294 & n.15 (6th Cir. 1997) (explaining that the plaintiffs did not allege that the law violated the Second Amendment and thus forced them "to forego constitutionally protected ac-

4.  Finally, although it is no doubt true that Section 922(b)(1) infringes the rights of millions of Americans, the Government's claim that Plaintiffs therefore assert only a generalized grievance, *see* DOJ Br. 2, 16, is wide of the mark.  As the Supreme Court has explained, "where a harm is concrete, though widely shared, the Court has found 'injury in fact.' " *FEC v. Akins*, 524 U.S. 11, 24 (1998).  Any other rule would allow the Government to immunize concrete, specific constitutional injuries from judicial scrutiny simply by committing them in gross.

## II.   THIS COURT SHOULD EMPLOY THE APPROACH APPLIED IN *HELLER*, WHICH CONSISTS OF TEXTUAL ANALYSIS AND HISTORICAL INQUIRY ATTUNED TO THE PARTICULAR FIREARMS REGULATION BEING CHALLENGED.

In *Heller*, the Supreme Court eschewed the elaborate tiers of scrutiny analysis employed in areas such as equal protection law in favor of a textual and historical inquiry attuned to the particular firearms regulation at issue.  *See* 554 U.S. at 628-29.   As the Chief Justice, a member of the *Heller* majority, remarked during oral argument, any inquiry into levels of scrutiny would have been both atextual and unhelpful.  *See* Tr. of Oral Argument at 44, *Heller*, 554 U.S. 570.  Although some lower courts have nonetheless imported the levels-of-scrutiny framework post-*Heller*,[10] the Fifth Circuit has not resolved the question, at least with respect to cases that concern the Second Amendment's application to law-abiding adults.  *See United States v. Anderson*, 559 F.3d 348, 352 & n.6 (5th Cir. 2009) (following *United States v. Darrington*, 351 F.3d 632 (5th

---

tivity").  The only case cited by the Government that even arguably supports its standing arguments on these facts and in this context is the district court decision in *Hodgkins v. Holder*, where the district court grudgingly though faithfully applied D.C. Circuit precedent that it, like the D.C. Circuit itself, acknowledged was in substantial tension "with Supreme Court precedent and precedent from other circuits."  677 F. Supp.2d 202, 204-05 (2010); *see also Seegars v. Ashcroft*, 396 F.3d 1248, 1252-1254 (D.C. Cir. 2005) (same); *Parker v. District of Columbia*, 478 F.3d 370, 374-75 (D.C. Cir. 2007) (same).  This Court should not follow such diffident and dubious authority.

[10] *Compare, e.g., United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231-32 (D. Utah 2009) (applying strict scrutiny), *with United States v. Miller*, 604 F. Supp. 2d 1162, 1171 (W.D. Tenn. 2009) (applying intermediate scrutiny on theory that Second Amendment rights are not fundamental).

Cir. 2003), to reject challenge to felon-in-possession law, citing *Heller*'s statement that it should

not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by fe-

lons"); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) (same); *Darrington*, 351

F.3d at 635 (holding that felons are "exclude[d] … as a class from the Second Amendment's pro-

tection").   But no expedition into what another court has called the " 'levels of scrutiny' quag-

mire" is required here.   *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (*en banc*).

This Court can, and should, decide this case with the methods of textual analysis and historical

inquiry employed by the Supreme Court in *Heller*.

### III.   THE SECOND AMENDMENT PRESERVES THE FUNDAMENTAL RIGHTS OF ALL LAW-ABIDING ADULTS, INCLUDING THOSE BETWEEN THE AGES OF 18 AND 20.

The Second Amendment provides:  "A well regulated Militia, being necessary to the se-

curity of a free State, the right of the people to keep and bear Arms, shall not be infringed."  In

*Heller*, the Supreme Court engaged in a textual and historical analysis to determine that the

Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of

confrontation."  554 U.S. at 592.  A similar analysis demonstrates that this right fully vests at age

18.  Like the Supreme Court, "we will begin our textual analysis with the operative clause, [and

then] return to the prefatory clause to ensure that our reading of the operative clause is consistent

with the announced purpose."  *Id*. at 578.

#### A.     Text and History: The Second Amendment's Operative Clause

***"Right of the People."***  As used in the Bill of Rights, "the people" have always been un-

derstood in a broad sense.  Indeed, "in all the enumerations and guaranties of rights the whole

people are intended."  THOMAS MCINTYRE COOLEY, GENERAL PRINCIPLES OF CONSTITUTIONAL

LAW IN THE UNITED STATES OF AMERICA 267-68 (1880).  As the Supreme Court has explained,

"[i]ts uses suggest that 'the people' protected by the Fourth Amendment, and by the First and

Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth

Amendments, refers to a class of persons who are part of a national community or who have oth-

erwise developed sufficient connection with this country to be considered part of that communi-

ty." *Heller*, 554 U.S. at 580 (quotation marks and brackets omitted).

The use of "the people," in other words, indicates that "the Second Amendment right is

exercised individually and belongs to all Americans." *Id.* at 581; *Nunn v. Georgia*, 1 Ga. 243,

250 (1846) ("The right of the whole people, old and young, men, women, and boys, and not mili-

tia only, to keep and bear arms of every description, and not such merely as are used by the mili-

tia, shall not be infringed, curtailed, or broken in upon, in the smallest degree.") (quoted appro-

vingly, *Heller*, 554 U.S. at 612-13) (emphasis omitted).  To be sure, the constitutional rights of

*children* are subject to some restrictions that would be impermissible for legal *adults*, such as the

Plaintiffs in this case.  *See, e.g.*, *Planned Parenthood v. Casey*, 505 U.S. 833, 898 (1992) (opi-

nion of O'Connor, Kennedy, & Souter, J.); *Bellotti v. Baird*, 443 U.S. 622, 647-48 (1979) (opi-

nion of Powell, J.); *Planned Parenthood v. Danforth*, 428 U.S. 52, 72-75 (1976).  Contrary to the

Government's contentions, *see* DOJ Br. 29, both framing-era history and modern practice make

absolutely clear that 18-to-20 year olds are not to be treated as children for purposes of the

Second Amendment.

*"To Keep and Bear Arms."*  It is thus clear that 18-to-20 year olds enjoy Second

Amendment rights; all that is left to determine is whether they enjoy these rights on equal terms

with other law-abiding adults.  History from the founding plainly demonstrates that they do.

We begin with the militia.  Although the Supreme Court in *Heller* established that the

substance of the Second Amendment right extends beyond a right to keep and bear arms for mili-

tary purposes, the founding generation's understanding of the militia is highly probative for de-

termining whether 18-to-20 year olds have full Second Amendment rights.  As the Court explained, " 'the Militia comprised all males physically capable of acting in concert for the common defense.' "  *Heller*, 554 U.S. at 595 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)); *see also* NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ("The militia of a country are the able bodied men organized into companies, regiments and brigades ….") and *Letter to Destutt de Tracy* (Jan. 26, 1811), *in* THE PORTABLE THOMAS JEFFERSON 520, 524 (M. Peterson ed. 1975) ("the militia of the State, that is to say, of every man in it able to bear arms") (both quoted in *Heller*, 554 U.S. at 595-96).  Members of the militia, in other words, were presumptively capable of keeping and bearing arms and hence *entitled* to do so.  *See A Pennsylvanian*, THE PENNSYLVANIA GAZETTE (Philadelphia, Feb. 20, 1788), *reprinted in* Les Adams, THE SECOND AMENDMENT PRIMER 121 (1996) ("The militia of these free commonwealths, entitled and accustomed to their arms, when compared to any possible army must be tremendous and irresistible.").

There is no doubt that 18-to-20 year olds were understood to be part of the militia—and hence to have the capacity, indeed the obligation, to keep and bear arms—at the time the Second Amendment was ratified.  This is readily apparent from Congress's initial effort to "provide for organizing, arming, and disciplining, the militia."  U.S. Const. art. I, § 8.  On May 8, 1792, months after ratification of the Second Amendment, Congress exercised this grant of power in an Act that provided, among other things, that "each and every free able-bodied white male citizen of the respective States, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia."  1 Stat. 271 (hereinafter, "Militia Act of 1792").  While Congress was under no obligation to organize the *entire* militia, its constitutional authority only extended to

26

militia members, *i.e.*, those physically capable of bearing arms.  *See Heller*, 554 at 596.  As a contemporaneous act of Congress, the Militia Act of 1792 thus provides strong evidence that Second Amendment rights fully vest *at the latest* by age 18. *See Parker v. District of Columbia*, 478 F.3d 370, 387 (D.C. Cir. 2007), *aff'd by Heller*, 554 U.S. 570 ("[M]any of the members of the Second Congress were also members of the First, which had drafted the Bill of Rights.  But more importantly, they were conversant with the common understanding of both the First Congress and the ratifying state legislatures as to what was meant by 'Militia' in the Second Amendment."); *see also Eldred v. Ashcroft*, 537 U.S. 186, 213 (2003) ("this Court has repeatedly laid down the principle that contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given the Constitution's provisions") (quotation marks and brackets omitted).

The Militia Act of 1792's legislative history lends further support for marking 18 as the age at which Second Amendment rights fully vest.  In 1790, Secretary of War Henry Knox submitted a militia plan to Congress.  The proposal embodied  the principle that "all men of the legal military age should be armed," and provided that "[t]he period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen."  2 ANNALS OF CONGRESS 2145-46. Acknowledging that "military age has generally commenced at sixteen," Secretary Knox drew the line at 18 because "the youth of sixteen do not commonly attain such a degree of robust strength as to enable them to sustain without injury the hardships incident to the field."  *Id*. at 2153.

This theme that those under 18 were generally less capable of bearing arms was not limited to Secretary Knox.  Representative Wilson, for example, argued that "from sixteen to eigh-

teen [was] too early a period" for militia service because "[m]any at that tender age fell sacrifices to sickness and fatigue." *Id*. at 1851.  Once reaching age 18, however, these disabilities no longer obtained.  Indeed, Representative Jackson argued "that from eighteen to twenty-one was found to be the *best* age to make soldiers of." *Id*. at 1860 (emphasis added).

Eighteen is also the age that George Washington recommended as the age of militia enrollment.  In an enclosure to a 1783 letter to Alexander Hamilton (in his capacity as chairman of the Committee of the Continental Congress on the Peace Establishment), General Washington wrote that, "[i]t may be laid down as a primary position, and the basis of our system, that every Citizen who enjoys the protection of a free Government, owes … his personal service to the defence of it, and consequently that the Citizens of America … from 18 to 50 Years of Age should be borne on the Militia Rolls" and "so far accustomed to the use of [Arms] that the Total strength of the Country might be called forth at a Short Notice on any very interesting Emergency." *Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938).

Looking to the States, militia laws passed shortly before the Second Amendment was ratified provide additional evidence that the right to keep and bear arms fully vests at age 18.  Minimum enrollment ages ranged from 16 to 18.[11]  There was thus a consensus in the States that, by age 18, individuals were able to, and hence entitled to, bear arms.  This early State practice is consistent with the practice of the colonies.  "From the earliest times the duty to possess arms was imposed on the entire colonial populace, with actual militia service contemplated for every male of 15, 16, or 18 through 45, 50, or 60 (depending on the colony)."  Don B. Kates Jr., *Hand-*

---

[11]  States passing laws with a minimum age of 18:  Delaware, Pennsylvania, South Carolina, Virginia. States passing laws with a minimum age of 16:  Connecticut, Georgia, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Rhode Island, Vermont. *See* Early State Militia Laws, App. 82-91.

*gun Prohibition and the Original Meaning of the Second Amendment*, *in* GUN CONTROL AND THE CONSTITUTION 66, 77 n. 46 (Robert J. Cottrol ed., 1994).

Furthermore, militia membership presupposed firearm possession, because "when called for service these men were expected to appear bearing arms supplied by *themselves*." *Miller*, 307 U.S. at 179 (emphasis added). This is reflected in the Militia Act of 1792, which required each enrollee regardless of age "within six months [of enrollment, to] provide himself with a good musket or firelock." 1 Stat. 271. Several state laws contained similar provisions.[12] These requirements provide strong evidence that Second Amendment rights fully vest at 18, for they demonstrate that by that age individuals not only were entrusted with using firearms in connection with organized militia activities but were expected to keep and maintain those arms as private citizens.

The Government's sole answer to this founding-era evidence is the fact that 21 was the common-law age of majority. But as the militia laws show, when the Bill of Rights was written and ratified an individual was not automatically deemed to lack all legal rights and obligations just because he was considered a minor. At common law, minimum age requirements were "different for different purposes." 1 BLACKSTONE COMMENTARIES *463. At age 14, for example, individuals were deemed to have reached the age of discretion and could be "capitally punished for any offense." *Id*. at *463-64; *see also* PEREGRINE BINGHAM, THE LAW OF INFANCY & CO-VERTURE 114 (1824) ("The age of fourteen is the common standard, at which both males and females are, by our law, obnoxious to capital punishments; for the law presumes them at those years to be 'doli capaces,' and capable of discerning between good and evil; and therefore subjects them to capital punishments, as much as if they were of full age.").

---

[12] *See, e.g.*, militia laws of Connecticut, New Jersey, New York, Rhode Island, and Vermont, App. 82, 87-88, 90.

The mere fact that an individual had not attained the age of majority, in other words, was not by any means dispositive of the individual's capacity to exercise a particular right. And indeed, the Supreme Court has repeatedly vindicated the constitutional rights of individuals under 21. In *Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977), for example, the Supreme Court struck down a New York law making it a crime "for anyone other than a licensed pharmacist to distribute contraceptives to persons 16 or over," *id.* at 681. Analyzing this restriction as a "prohibition of the distribution of nonmedical contraceptives to adults except through licensed pharmacists," the Court held that it infringed the right of women to make "individual decisions in matters of childbearing." *Id.* at 687-88. This case, unlike in *Carey*, involves an enumerated constitutional right, and almost immediately after that right was enshrined in the Constitution, 18-to-20 year olds were not only permitted but expressly *required* by federal law to obtain firearms.

The Government does attempt to draw a connection between the common-law age of majority and capability to bear arms, citing a law review article for the proposition that "the common-law age of majority was originally 'based on that being the age at which a young man attained sufficient strength and ability to bear arms.' " DOJ Br. 26-27 (quoting Dana F. Castle, *Early Emancipation Statutes: Should They Protect Parents as Well as Children?*, 20 FAMILY L.Q. 343, 349 n.36 (Fall 1986), which in turn cites T.E. James, *The Age of Majority*, 4 AM. J. LEGAL HIST. 22 (1960)). But as even a quick glance at the Government's source for this claim demonstrates, in England the age of majority increased from 15 to 21 during the Middle Ages, and "[s]ome writers have alleged that [this change] was due to the increase in the weight of arms," *i.e.* the increase in the weight of armor worn by knights. James, *The Age of Majority*, 4 AM. J. LEGAL HIST. at 26. Surely the fact that, when the Second Amendment was ratified, 18-to-20 year olds were legislatively designated as members of the militia and hence by *definition* were

understood to have sufficient "strength and ability" to bear arms is more germane to the interpretation of that Amendment than how much a suit of armor weighed during the Middle Ages.  *See United States v. Blakeney*, 44 Va. 405, 411 (Va. 1847) ("The common law of England … never interfered with the free and voluntary enlistment [into military service] of minors capable of bearing arms, and could not have done so without usurpation."); *cf. Lowering the Voting Age to 18*, S. Rep. 92-26 at 5 ("There is no magic to the age of 21. … In the eleventh century 21 was the age at which most males were physically capable of carrying armor.  But the physical ability to carry armor in the eleventh century clearly has no relation to the intellectual and emotional qualifications to vote in twentieth century America.").

The Government deems restrictions on the sale of firearms to common-law minors to be among the "longstanding prohibitions" that *Heller* suggested would likely pass constitutional muster.  554 U.S. at 626-27.[13]  But there are several problems with this argument.  First, in its comprehensive survey of such laws the Government identifies only *two* that were enacted before the Civil War, both from 1856.  *See* DOJ Br. 27 n.23.  Such laws, in other words, have not nearly the pedigree of the founding-era laws expressly recognizing 18-to-20 year olds as members of

---

[13]   The Fifth Circuit's statement in *Emerson* that "infants … may be prohibited from possessing firearms" does not resolve this case.  *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001).  The Court's passing statement cannot be taken as a considered judgment on the Second Amendment rights of 18-to-20 year olds who technically would have been considered infants at the founding but who also would have been required to keep and bear arms in connection with militia service.  Indeed, *Emerson*'s discussion of the militia strongly suggests that 18-to-20 year olds have full Second Amendment rights:  "the militia, *the assurance of whose continuation and the rendering possible of whose effectiveness Miller says were purposes of the Second Amendment*, referred to the generality of the civilian male inhabitants throughout their lives from teenage years until old age and to their personally keeping their own arms."  *Id.*  at 226 (emphasis added); *see also id.* at 236 ("the people, *from whom the militia must be taken*, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose") (quoting COOLEY, GENERAL PRINCIPLES ON CONSTITUTIONAL LAW 271 (Little, Brown, 1880; 1981 Rothman & Co. reprint) (emphasis added)).  At any rate, the individual plaintiffs in this case, as well as the vast majority of 18-to-20 year olds in this Nation, are not infants but are legal adults that have reached the age of majority.

the militia and requiring them to obtain firearms.  Surely these later enactments cannot be given

greater interpretive weight than contrary evidence contemporaneous with ratification of the

Second Amendment, for "Constitutional rights are enshrined with the scope they were under-

stood to have when the people adopted them."  *Heller*, 554 U.S. at 634-35; *see also id.* at 614

("discussions [that] took place 75 years after the ratification of the Second Amendment … do not

provide as much insight into its original meaning as earlier sources").

Second, as the Government acknowledges, 19 of the 20 jurisdictions that enacted under-

21 age restrictions on the purchase of firearms before the year 1900 focused on *concealable*

weapons to the exclusion of other guns, *compare* DOJ Br. 27 n.23 *with id.* at 28 n.26.  This dis-

tinction plainly is untenable after *Heller*, *see* 554 U.S. at 629 (rejecting argument that "it is per-

missible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long

guns) is allowed").

Similarly, the two cases cited by the Government were decided long before *Heller* and

cannot be squared with it.[14]  *Glenn v. State*, 72 S.E. 927 (Ga. Ct. App. 1911)—which, as an ini-

tial matter, concerned an individual who as "under the age of 18 years" at the time of the offense,

*id.* at 928—rested on the plainly erroneous view that the right to bear arms simply is "not appli-

cable to the modern pistol or revolver." *Id.* at 929.  And *State v. Callicutt*, 69 Tenn. 714 (1878),

reasoned that Tennessee's right-to-arms provision was limited to "the right of citizens … to bear

_____

[14] The Brady Center's additional cases addressing age restrictions on handgun sales and possession are simply inapposite.  *See United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009) (rejecting Second Amendment challenge to 18 U.S.C. § 922(x)(2), which restricts handgun possession by individuals *under* 18); *United States v. Cardoza*, 129 F.3d 6 (1st Cir. 1997) (rejecting argument that 18 U.S.C. § 922(x) exceeds Congress's Commerce Clause authority); *State v. Sieyes*, 225 P.3d 995, 997 (Wash. 2010) (rejecting Second Amendment challenge to state law restricting firearm possession by individuals *under* 18).  And while the Brady Center claims that *Huddleston v. United States*, 415 U.S. 814 (1974), "recogniz[ed] Congress's authority to … prohibit[] … the sale of firearms to persons under 21," Brady Ctr. Br. 9, *Huddleston* does not even mention the Second Amendment, much less apply it to an age restriction.

arms for their common defense," relying expressly on the case of *Aymette v. State*, *id.* at 716—a case the Supreme Court described as adopting an "odd reading of the right [to keep and bear arms, that] is, to be sure, *not* the one we adopt."  *Heller*, 554 U.S. at 613 (emphasis added).[15]

While these points suffice to refute the Government's reliance on the common-law age of majority, there is a more fundamental problem with the Government's submission:  18-to-20 year olds *are no longer considered minors*.  *See* BLACK'S LAW DICTIONARY (9th ed. 2009) ("age of majority" is "[t]he age, usu. defined by statute as 18 years, at which a person attains full legal rights, esp. civil and political rights such as the right to vote").  Indeed, "during the 1970's all except five states reduced the age of majority to eighteen."  HOMER H. CLARK, THE LAW OF DO-MESTIC RELATIONS IN THE UNITED STATES § 8.1 (2d ed. 1988).  Earlier laws that imposed disabil-ities on 18-to-20-year-old minors, and that generally explicitly tied those disabilities to those in-dividuals' minority status, in other words, have little bearing on what disabilities may properly be placed on 18-to-20-year-old *adults*.  *Cf. Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1155 (D.C. Cir. 2004) (Roberts, J.) ("the concern that the state not treat *adults* like children surely does not prevent it from treating *children* like children") (emphasis added).

It would be particularly perverse to hold that the Government can treat 18-to-20-year-old adults as children in the context of the Second Amendment.  "[T]he inherent right of self-defense [is] central to the Second Amendment right," and "the home [is] where the need for defense of self, family, and property is most acute."  *Heller*, 554 U.S. at 628.  Although the details vary from state to state, because 18 is the age at which the states have overwhelmingly established as the age of majority, that is also generally the age at which individuals in our society may estab-

---

[15] Contrary to the Government's suggestion, there is no indication that the law was chal-lenged under the Second Amendment to the Federal Constitution. Rather, the law was challenged under the Tennessee Constitution. *Callicutt*, 69 Tenn. at 716.

lish their own households and shoulder the responsibility for protecting themselves, their families, and their property.  *See, e.g.*, TEX. FAM. CODE § 151.001(a) ("parent of a child" has "rights and duties" including "the right … to designate the residence of the child"; "the duty of care, control, protection, and reasonable discipline of the child"; and "the right to consent to the child's marriage"); *id*. § 101.003(a) (defining "child or minor" as "a person under 18 years of age who is not and has not been married or who has not had the disabilities of minority removed for general purposes").  Citizens whom society vests with such responsibilities must be afforded the right to exercise constitutional means of performing them effectively, including the right to keep and bear arms.

Treating 18-to-20 year olds as children for purposes of the Second Amendment would also be inconsistent with the profound rights and responsibilities the Constitution vests in individuals in that age group.  The Twenty-Sixth Amendment grants them the right to vote, and in a republican form of government "[a]s a practical fact the sovereignty is vested in those persons who by the constitution of the State are allowed to exercise the elective franchise."  THOMAS COOLEY, A TREATISE ON CONSTITUTIONAL LIMITATIONS 29 (1868).  The right to vote is thus a marker of full membership in the political community, and extending the right to vote to a group recognizes that its members possess "the intelligence and the freedom of will essential to the proper exercise of the right."  *Id*.  Indeed, the Twenty-Sixth Amendment was proposed and ratified against the backdrop of a growing recognition that by the age of 18 "citizens … bear all or most of an adult citizen's responsibilities."  *Lowering the Voting Age to 18*, S. Rep. 92-26 at 6 (March 8, 1971).  Of particular importance was the liability of 18-to-20 year olds to be conscripted to bear arms, fight, and potentially die for their country in the Vietnam War.  *See id.* ("Nearly 1 million [18-to-20 year olds] are serving their country in the Armed Forces.  And tens

34

of thousands of young people have paid the supreme sacrifice in the Indochina War over the past five years."). Given that they "willingly shouldered" such grave responsibilities, it was "wrong to deprive [18-to-20-year-old] citizens of the vote" and thus deprive them of "full participation in our political system." *Id.* Today, of course, 18 remains the age at which young men become liable for military service, 50 U.S.C. App'x §§ 453-54, and it is also the age at which individuals may enlist in the armed forces without parental consent, 10 U.S.C. § 505(a).

While the Twenty-Sixth Amendment extends our Nation's full political rights to 18-to-20 year olds, the Eighth Amendment subjects them to liability for the death penalty, our Nation's most profound form of criminal punishment, and one reserved for those whose "extreme culpability makes them the most deserving of execution." *Roper v. Simmons*, 543 U.S 551, 568 (2005) (quotation marks omitted). In holding that 18-year-olds may constitutionally be subject to capital punishment, the Supreme Court expressly recognized the connection between that age and the onset of adulthood. *See Roper*, 543 U.S at 574 ("The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest."). And in holding that individuals younger than 18 may *not* be punished by death, the Court emphasized "differences between juveniles under 18 and *adults*." *Id.* at 569 (emphasis added). While those differences do not suddenly "disappear when an individual turns 18," by permitting 18-year-olds to be subject to the death penalty the Court recognized that 18-year-olds are sufficiently mature that "their irresponsible conduct" may be "as morally reprehensible as that of" older adults. *Id.* at 570, 574 (quotation marks omitted).

The Government rightly points out that the "Supreme Court has 'sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have op-

erated in the sensitive area of constitutionally protected rights.' "  DOJ Br. 29 (quoting *New York v. Ferber*, 458 U.S. 747, 757 (1982)).  But the legislation sustained by *Ferber* and the cases cited therein protected *children under 18*.  *See Ferber*, 458 U.S. at 749 (upholding statute "which prohibit[ed] persons from knowingly promoting sexual performances by children under the age of 16"); *FCC v. Pacifica Found.*, 438 U.S. 726, 750 (1978) (upholding broadcast regulation because broadcasting is uniquely accessible to children, even those too young to read"); *Ginsberg v. New York*, 390 U.S. 629, 631 (1968) (upholding "New York criminal obscenity statute which prohibit[ed] the sale to minors under 17 years of age of material defined to be obscene on the basis of its appeal to them whether or not it would be obscene to adults"); *Prince v. Massachusetts*, 321 U.S. 158, 160-61 (1944) (upholding law providing that "[n]o boy under twelve and no girl under eighteen shall sell, expose or offer for sale any newspapers, magazines, periodicals or any other articles of merchandise of any description, or exercise … any other trade, in any street or public place").[16]

This is not surprising, as the doctrine that the constitutional rights of children are not necessarily coextensive with those of adults rests in large part on the complementary rights and responsibilities parents have with respect to their minor children.  *See, e.g., Bellotti*, 443 U.S. at 637 ("the guiding role of parents in the upbringing of their children justifies limitations on the freedom of minors"); *Schall v. Martin*, 467 U.S. 253, 265 (1984) ("Children, by definition, are not assumed to have the capacity to take care of themselves.  They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as *parens patriae*.  In this respect, the juvenile's liberty interest may, in appropriate circumstances, be sub-

---

[16] *See also Lambert v. Wicklund*, 520 U.S. 292 (1997) (upholding regulations on abortion access by women under 18); *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) (same); *Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502 (1990) (same); *Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 462 U.S. 476 (1983) (same).

ordinated to the State's *parens patriae* interest in preserving and promoting the welfare of the child.") (citations and quotation marks omitted).  This is in keeping with the traditional common-law rule that "the rights of parents result from their duties.  As they are bound to maintain and educate their children, the law has given them a right to such authority."  JAMES KENT, 2 COMMENTARIES ON AMERICAN LAW 203 (1826); *see also Lehr v. Robertson*, 463 U.S. 248, 257 (1983) ("the rights of the parents are a counterpart of the responsibilities they have assumed").  This reasoning simply does not apply to 18-to-20 year olds who are legal adults and no longer subject to parental protection and control.

The Government also points to a number of cases that have affirmed the constitutionality of laws establishing minimum age requirements up to the age of 21 for purposes of child support, eligibility for government office, drinking alcohol, and allocation of immigration visas.  *See* DOJ Br. 31-32.  But these cases simply stand for the unremarkable proposition that the government may set reasonable age restrictions on activities that do not implicate fundamental constitutional rights.[17]  *See Granholm v. Heald*, 544 U.S. 460, 488-89 (2005) (acknowledging that a state could "choose[] to ban the sale and consumption of alcohol altogether"); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.") (quotation marks omitted); *Hatten v. Rains*, 854 F.2d

---

[17] The Government also cites *Oregon v. Mitchell*, 400 U.S. 112 (1970), which held that Congress possessed the power to fix the age of voting in national elections at 18 but lacked the power to compel States to set the minimum voting age to 18 in State elections.  But this decision was rooted on the one hand in "the breadth of power granted to Congress to make or alter election regulations in national elections," and on the other hand in the Constitution's "clear indication that the Framers intended the States to determine the qualifications of their own voters for state officers." *Id.* at 122, 125 (Opinion of Black, J.).  The specifically reserved power to regulate these elections is the exact opposite of the power withheld from the government to infringe upon the private exercise of enumerated fundamental rights.  In any event, *Mitchell* was met almost immediately with the proposal and ratification of the Twenty-Sixth Amendment.  In context it thus cuts in *favor* of finding 18-to-20 year olds to be adults for purposes of exercising fundamental constitutional rights.

687, 693 (5th Cir. 1988) ("There is no fundamental right to be a candidate."); *Brinkley v. Hill*, 981 F. Supp. 423, 442 (S.D. W. Va. 1997) ("there is no fundamental right to child support").[18]

### B.    Text and History:  The Second Amendment's Prefatory Clause

While the foregoing demonstrates that the right to keep and bear arms fully vests at age 18, if any doubt were to remain it would be banished by the Second Amendment's prefatory clause.  The preface to the amendment —"A well regulated Militia, being necessary to the security of a free State," Const., Amend. II—"announces the purpose for which the right was codified:  to prevent elimination of the militia." *Heller*, 554 U.S. at 599.  In other words, "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right … was codified in a written Constitution." *Id*.

The Second Amendment's prefatory clause, to be sure, cannot be read to "limit or expand the scope of the operative clause," but "[l]ogic demands that there be a link between the stated purpose and the command." *Id*. at 577, 578.  And given the Second Amendment's stated purpose, logic demands that its protections extend *at least* to those the founding generation understood to make up the militia, for it would make little sense to establish a constitutional right to keep and bear arms for the purpose of ensuring an armed militia that did not extend protection to the militia itself. *See id*. at 580 ("the 'militia' in colonial America consisted of a *subset* of 'the

---

[18] Two other age restrictions mentioned by the Government without case support bear comment.  First, as we are well past the *Lochner* era, it is of little moment that "Congress recently chose twenty-one as the minimum age to apply for a credit card without a co-signer or proof of independent means to repay debts up to the full line of credit."  DOJ Br. 32-33; *see United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1938) ("regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators").  Second, the Government claims that Mississippi "prohibits individuals under twenty-one from marrying without parental consent."  DOJ Br. 32 n.29.  Not so.  The relevant ages are 17 years for males and 15 years for females. *See* MISS. CODE ANN. § 93-1-5(d).

people' ") (emphasis added); *cf. id.* at 578 (" 'It is nothing unusual in acts for the enacting part to go *beyond* the preamble ….' ") (quoting J. Bishop, Commentaries on Written Laws and Their Interpretation § 51, p. 49) (1882)) (emphasis added, alterations omitted).  Indeed, a contrary interpretation would destroy the "perfect[]" fit the Supreme Court found between the Second Amendment's preface and operative clause.  *Id*. at 598.

As we have explained, law-abiding, able-bodied 18-to-20 year olds were plainly within the founding-era's understanding of the militia.  Against this backdrop, any contention that Second Amendment rights do not fully vest at age 18 is untenable.

## IV.   THE SECOND AMENDMENT PRESERVES THE RIGHT TO ACQUIRE ARMS.

The Supreme Court has affirmed "that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense."  *McDonald*, 130 S. Ct. at 3026.  *See also Heller*, 554 U.S. at 592 ("we find that [the Second Amendment] guarantee[s] the individual right to possess and carry weapons in case of confrontation").  As noted earlier, the *Heller* Court struck down the District of Columbia's complete ban on handgun possession because it "amount[ed] to a prohibition on an entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose" of self-defense.  *Id*. at 628.  Section 922(b)(1) prohibits the licensed sale of handguns to a category of law-abiding adults.  It thus imposes an extraordinary burden on the acquisition of the very arms law-abiding citizens have a fundamental right to keep and bear.  Just as surely as the Second Amendment preserves the right *to possess and use* firearms for self defense and other lawful purposes, it preserves the right *to acquire* the very arms essential for these purposes.

39

### A.    The Second Amendment Was Originally Understood to Secure the Right to Acquire Arms.

As explained above, *Heller* dictates that if a restriction contravenes the scope of the Second Amendment as originally understood by those who framed and ratified it, the restriction cannot stand.  As a matter of original understanding, there is no question that a dramatic restriction on the acquisition of arms would have been seen as an impermissible infringement on the right to "keep … arms."

The Supreme Court has explained that the "historical background" of the Second Amendment informs its meaning because it, "like the First and Fourth Amendments, codified a *pre-existing* right."  *Id.* at 592.  And in both *Heller* and *McDonald*, the Court specifically cited the history of disarmament in England and the colonies as causally linked to the jealous protection of the individual right to keep and bear arms.  *See id.* at 593-94; *McDonald*, 130 S. Ct. at 3037.  That history is replete with examples of how the right to keep and bear arms had been infringed, including restrictions on the acquisition or purchase of arms.  STEPHEN P. HALBROOK, THE FOUNDER'S SECOND AMENDMENT: ORIGINS OF THE RIGHT TO BEAR ARMS 329-30 (2008).

"Between the Restoration and the Glorious Revolution, the Stuart Kings" used disarmament as a means of "suppress[ing] political dissidents."  *Heller*, 554 U.S. at 592.  One such measure employed by Charles II was a restriction on the traditional freedom to trade in arms.  "[T]he royal government launched a campaign to control firearms at the source.  Gunsmiths were ordered to produce a record of all weapons they had manufactured over the past six months together with a list of their purchasers. In future they were commanded to report every Saturday night to the ordnance office the number of guns made and sold that week.  Carriers throughout the kingdom were required to obtain a license if they wished to transport guns, and all importation of firearms was banned."  Joyce Lee Malcolm, *The Right of the People to Keep and Bear*

*Arms: The Common Law Tradition*, 10 HASTINGS CONST. L.Q. 285, 299-300 (1983).  These

types of measures, the *Heller* Court noted, led to the demand for an "assurance from William and

Mary, in the Declaration of Right (which was codified as the English Bill of Rights), that Protes-

tants would never be disarmed." *Heller*, 554 U.S. at 593.  And "[t]his right has long been un-

derstood to be the predecessor to our Second Amendment." *Id.*

"[O]f course, what the Stuarts had tried to do to their political enemies, George III had

tried to do to the colonists." *Id.* at 594.  King George's oppressions included a "ban on import of

arms and ammunition…," and "the patriots perceived that the right to bear arms [was] being in-

fringed when British troops … used entrapment to ferret out persons seeking to obtain arms."

HALBROOK, FOUNDERS at 329-30.[19]  These measures, among others, "provoked polemical reac-

tions by Americans invoking their rights as Englishmen to keep arms," and show the scope of

what this generation thought was protected under those rights. *Heller*, 554 U.S. at 594.  The

right to acquire and buy firearms was thus seen as part and parcel of the right to keep and bear

them.  As Thomas Jefferson put it: "Our citizens have always been free to make, vend, and ex-

port arms.  It is the constant occupation and livelihood of some of them."  Thomas Jefferson, 6

Writings 252-53 (P. Ford ed. 1895).[20]

---

[19] *See also id.* at 53, 58-74 (discussing English "embargo against import of arms into the
colonies" and American efforts to evade it because "in the worldview of the patriots, possession
of arms by the populace was necessary for both individual and common defense"); *id.* at 55-56
(noting punishment for illegal purchase of firearm); STEPHEN P. HALBROOK, THAT EVERY MAN
BE ARMED 63 & n.51 (1994) (noting that "[r]eports of seizures of arms by the British, and of at-
tempts of Americans to obtain arms, fill the newspapers of the mid-1770s," and citing examples
such as " 'Arms, export from Great Britain prohibited,' " " 'Pistols … forbidden … for sale' ")
(citing 2 L. Cappon & S. Duff., Virginia Gazette Index 1736-1780 (1950)).

[20] *See also* CURWEN, SOME CONSIDERATIONS ON THE GAME LAWS 54 (1796) ("but if the
Bulk of the people were actually meant to be disarmed … where is to be found that law, which
contains this prohibition? … Who has been deprived by [the law] of keeping arms for his own
defence?  What law forbids the veriest pauper, *if he can raise a sum sufficient for the purchase of
it*, from mounting his Gun on his Chimney Piece, with which he may not only defend his Person-

The early history of the militia is also instructive.  As detailed above, the militia was made up of males capable of bearing arms, and membership in the militia presupposed firearm possession.  *See Emerson*, 270 F.3d at 234-36 ("'[I]n all the colonies … the militia systems … implied the general obligation of all adult male inhabitants to possess arms' … The militia consisted of the people *bearing their own arms*.") (emphasis added) (quoting *Miller*, 307 U.S. at 179).[21]  If these men were required to arm themselves, it follows *a fortiori* that they had to have a means of doing so, and thus that a prohibition on regular commercial trade in firearms with such militiamen would not have been tolerated.  *Emerson*, 270 F.3d at 235 ("If the people were disarmed there could be no militia….").

That the original understanding of the right to keep and bear arms would not tolerate such restrictions on acquiring firearms is also confirmed by negative implication.  The Government has not cited a single Founding-era law that even approaches the ban on licensed handgun sales imposed by Section 922(b)(1).  And even the *Heller* dissent, which cited what it said were "important examples of the kinds of gun regulation that citizens would then have thought compatible

---

al Property from the Ruffian, but his Personal Rights, from the invader of them….") (emphasis added) (*quoted in Heller*, 554 U.S. at 583 n.7, as persuasive authority for the original meaning of "Keep … arms"); VA. STAT. AT LARGE, 2 HENING 403 (1823) ("It is ordered that all persons have hereby liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony, and that the Indians of the Easterne shore have like and equall liberty of trade or otherwayes with any other our friends and neighboring Indians."); HALBROOK, FOUNDERS' at 62 ("A New Hampshire patriot … describe[d] the import ban as a violation of the right to keep and bear arms."); *id.* at 65 ("A Philadelphian wrote to a member of Parliament … 'The late Proclamation forbidding the exportation of gun-powder and firearms to American seemed intended to take away from the colonies the power of defending themselves by force.").

[21] A company of Minutemen who lacked their own arms, and instead had to meet at an armory to wait in line for distribution of weapons, would have been of little use when the alarm bell was wrung at Lexington and Concord.  The militia who fought that day used their own personal firearms.  In contrast, the military stores that the Redcoats marched to Concord to seize were items that couldn't be carried personally, such as cannons and tons of lead shot and gunpowder.  *See* JOHN GALVIN, THE MINUTEMEN 54, 140, 144 (1989).

with the 'right to keep and bear arms,' " could not find any restrictions on firearms sales that were remotely comparable to the laws at issue here.  554 U.S. at 682-87.[22]

### B. Congress May Not Circumvent a Constitutional Right to Possession by Banning Acquisition.

It is a foundational principle of constitutional law (not to mention of logic) that where the exercise of a constitutional right requires the acquisition of a good or service, a ban on acquisition of that good or service is tantamount to a ban on exercise of the right.  Accordingly, the Third Circuit has recently explained that a law "prohibiting the commercial sale of firearms" is "a result [that] would be untenable under *Heller*."  *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010).  *See also Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200, 1204 (7th Cir. 1984) (recognizing that banning the commercial sale of firearms would amount to the functional equivalent "a handgun ban" and would thus be impermissible in the face of a right "allow[ing] … citizens to possess handguns.").[23]  One cannot "keep … arms" if one cannot lawfully acquire them: a severe restriction on acquisition is a functional ban on possession.

---

[22] Plaintiffs have been able to find only one example of such a ban, enacted two generations after the Founding.  In 1837, Georgia enacted a law that stated: "[I]t shall not be lawful for any merchant or vender of wares or merchandise in this State, or any other person or persons whatever, to sell, or to offer to sell, or to keep or to have about their persons or elsewhere … pistols."  *Nunn v. Georgia*, 1 Ga. 243, 246 (1846).  But in *Nunn*, the Georgia Supreme Court struck down the law as applied to open carriage.  The court held that "[a] statute which, under the pretence of regulating, amounts to a destruction of the right … would be clearly unconstitutional."  *Id.* at 249.  "The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description … shall not be infringed, curtailed, or broken in upon, in the smallest degree…."  *Id.* at 251.  So this short-lived statute from a single state can hardly be viewed as persuasive evidence that the right to keep and bear arms tolerates a ban on sales.

[23] While restrictions on the time, place, and manner of firearms sales (such as reasonable safety, zoning, and theft-prevention requirements) would likely pass constitutional muster, *see Heller* 554 U.S. 626-27, severe restrictions on the acquisition of firearms are simply not permissible.  *Cf. Lovell v. City of Griffin*, 303 U.S. 444 (1938) (total ban on distribution of literature is unconstitutional); *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (time, place, and manner re-

This principle—that a restriction on distribution of an item necessary to the exercise of a constitutional right is tantamount to an impermissible restriction on exercise of the right—has been articulated by the Supreme Court many times, and was clearly explained in *Carey v. Population Services International*, 431 U.S. 678 (1977).  That case concerned not an outright ban on contraceptives, but merely a significant restriction on their sale:  the statute made it  "a crime … for anyone other than a licensed pharmacist to distribute contraceptives to persons 16 or over." *Id.* at 681.  The Court noted that prior cases established "the constitutionally protected right of decision in matters of childbearing" and the "freedom to choose contraception" under that right. *Id.* at 688.  As the Court explained: "A total prohibition against sale of contraceptives … would intrude upon individual decisions in matters of procreation and contraception as harshly as a direct ban on their use….  This is so not because there is an independent 'fundamental right of access' … but because such access is essential to exercise of the constitutionally protected right." *Id.* at 687-88.  And the partial ban at issue in that case was likewise infirm, because it "clearly impose[d] a significant burden on the right of … individuals to use contraceptives." *Id.* at 689. Other cases are to the same effect.  *See Griswold v. Connecticut*, 381 U.S. 479 (1965) (striking down ban on assisting another's use of contraceptives because decision to possess and use contraception is a due process right); *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) (striking down ban on distribution of contraceptives because right to use contraception is protected by due process); *id.* at 464 (White, J., concurring) ("Just as in *Griswold*, where the right of married persons to use contraceptives was diluted or adversely affected by permitting a conviction for giving

---

strictions "are subject to attack on the ground that they simply prohibit too much protected speech").

advice as to its exercise, … so here, to sanction a medical restriction upon distribution of a contraceptive not proved hazardous to health would impair the exercise of the constitutional right.").

The Fifth Circuit recently reaffirmed this principle.  In *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008), the Court addressed a Texas statute that "criminalize[d] the selling, advertising, giving, or lending of a device designed or marketed for sexual stimulation." *Id.* at 741.  The Court explained that "bans on commercial transactions involving a product can unconstitutionally burden individual substantive due process rights." *Id.* at 743 & nn. 21-22 (citing *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965); *Carey*, 431 U.S. at 683-91.  The Court found that pursuant to *Lawrence v. Texas*, 539 U.S. 558 (2003), there is a "right to engage in private intimate conduct of [one's] choosing," which includes the use of a sexual device. *Id.* at 744.  Because the ban on sales "heavily burden[ed] a constitutional right," it could not stand. *Id.*[24]

First Amendment cases are equally instructive in this regard.  The Supreme Court has recognized that there is both a right to speak and to hear—a right to distribute speech, but also an independent right to seek out and receive speech and information.  *See, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) ("It is now well established that the Constitution protects the right

---

[24] The Fifth Circuit denied en banc rehearing in *Reliable Consultants* over the dissents of seven judges.  But these dissenting judges did not question the principle that where a fundamental right is at stake, a ban on sale, distribution, or acquisition is impermissible because it is tantamount to a ban on possession or use.  Instead, the dissenting judges explained that *Lawrence* did not establish the underlying fundamental right to use, and that where rational basis review is warranted, the state is free to impose a commercial ban even if it could not rationally impose a ban on private possession.  *See Reliable Consultants Inc. v. Earle*, 538 F.3d 355, 360-62 (5th Cir. 2008) (Garza, J., dissenting from denial of rhr'g).  Indeed, the *Reliable Consultants* dissenters specifically cited to the Eleventh Circuit's reasoning in a similar case that came out the other way.  *See id.* at 360-61 (citing *Williams v. Attorney General of Alabama*, 378 F.3d 1232 (11th Cir. 2004).  The *Williams* Court rejected the notion that there was a fundamental right to use sexual devices, but it explained that if there were such a right, a prohibition on the distribution of such devices would be unconstitutional.  *See* 378 F.3d at 1242 ("Because a prohibition on the distribution of sexual devices would burden an individual's ability to use the devices, our analysis must be framed not simply in terms of whether the Constitution protects a right to *sell* and *buy* sexual devices, but whether it protects a right to *use* such devices.").

to receive information and ideas.") (quotation marks omitted); *Island-Trees Union Free School Dist. v. Pico*, 457 U.S. 853, 866-67 (1982) (plurality) (recognizing that "the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom"); *Citizens United v. FEC*, 130 S. Ct. 876, 898 (2010).

Accordingly, restrictions on distribution of speech are unconstitutional not just because they infringe on the speaker's right, but also because they infringe on the recipient's right to acquire, hear, or possess speech.  *See Martin v. City of Struthers*, 319 U.S. 141, 143-44 (1943) (invalidating restriction on door-to-door distribution of literature because the First Amendment protects the "right to receive" literature and thus protects "the right of the individual householder to determine whether he is willing to receive [a] message"); *Lamont v. Postmaster General*, 381 U.S. 301 (1965) (restriction—even in absence of a complete ban—on addressee's right to receive literature in the mail "amounts … to an unconstitutional abridgement of the addressee's First Amendment rights"); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.* 425 U.S. 748, 757 (1976) (in suit brought by consumers of prescription drugs, invalidating restriction on advertising by pharmacists because "there is a … right to receive the advertising"); *United States v. Stevens*, 130 S. Ct. 1577 (2010) (invalidating on its face a restriction on sale and/or possession of depictions of animal cruelty).  *See also McConnell v. FEC*, 540 U.S. 93, 252 (2003) (Scalia, J., concurring in part and dissenting in part) ("The right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise.").  Indeed, in *Vincenty v. Bloomberg*, 476 F.3d 74 (2d. Cir. 2007), the Second Circuit confronted a New York City ordinance that "prohibit[ed] the sale of … aerosol spray paint containers and broad tipped indelible markers" to adults between the ages of eighteen

and twenty. *Id.* at 76. Because this restriction "hinder[ed] … access to the materials … need[ed] for … lawful artistic expression," it could not stand under the First Amendment. *Id.* at 89.

The fundamental right preserved by the Second Amendment stands on equal footing with other constitutional rights. *See Heller*, 554 U.S. at 634-35; *McDonald*, 130 S. Ct. at 3043. Thus, just as in other constitutional contexts, where the government may not effectively ban sales as a proxy for banning possession, here the government may not severely burden the right to keep and bear arms by drastically restricting the means of acquiring them.

### C.   That the Government Has Banned Only the Licensed Commercial Sale of Handguns Does Not Render Section 922(b)(1) Constitutional.

The Government does not dispute the bedrock principle that a drastic restriction on acquisition is tantamount to an impermissible infringement on possession. Nor does the Government contend that the original understanding of the Second Amendment permits such restriction on gun purchases by law-abiding adults. Instead, the Government attempts a dodge. It claims that Plaintiffs do not "seek to advance … the right to obtain or possess a weapon 'in defense of hearth and home,' but [rather] … to buy a handgun directly from a particular source." DOJ Br. 24. *See also id.* at 14, 25. The Government thus attempts to reduce the claim in this case to a complaint that Section 922(b)(1) simply eliminates one of many possible channels of acquisition of firearms. And the right to acquire handguns through a particular channel, the Government says, is not protected by the Second Amendment. *See* DOJ Br. 25.

The Government answers its own claim, for it is at war with the very justification the Government asserts in support of the law: that the licensed sales ban keeps handguns out of the hands of a group of adults whom the Government deems, as an undifferentiated whole, especially dangerous and not capable of, or entitled to, exercise of the right to keep and bear arms. *See* DOJ Br. 34-41 (explaining that Section 922(b)(1) is meant to reduce crime by creating a "restric-

47

tion on [this group's] access to handguns").  As the Government freely concedes, "while unlicensed sellers are not prohibited from selling to 18-to-20 year olds, it seems likely that Congress did not consider them to be the major source of firearms for this age group."  *Id.* at 48.  The Government cannot have it both ways.  As the Government readily admits—indeed, trumpets—Congress enacted Section 922(b)(1) to substantially restrict this group's ability to acquire handguns and ammunition.  And that is *exactly* what Section 922(b)(1) does.

Examination of the law shows that it inflicts a severe restriction on, and will usually be a complete foreclosure of, the ability to acquire a handgun and ammunition for self-defense and other lawful purposes.  Section 922(b)(1) prohibits "any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver" any handgun or handgun ammunition to law-abiding adults between the ages of eighteen and twenty.  Under 18 U.S.C. § 922(a)(1)(A) *every* person who "engage[s] in the business of importing, manufacturing, or dealing in firearms" must obtain a federal firearms license.  18 U.S.C. § 921(a)(11)(A), (C).  And a person "engage[s] in the business" of selling firearms if he "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms."  *Id.* § 921(a)(21)(C).  In other words, virtually everyone who regularly sells firearms must have a license and therefore falls within the reach of Section 922(b)(1).  This broadly written criminal statute is vigorously enforced:  anyone who styles himself a mere unlicensed "collector" yet stands ready to sell more than a single handgun on a single occasion does so at his peril.  *See, e.g.*, *United States v. Shan*, 361 Fed. App'x 182, 183 (2d Cir. 2010) (conviction for selling without a license where "defendant sold two firearms within roughly one month and … had a source of supply for other weapons"); *United States v. Orum*, 106 Fed. App'x 972, 974 (6th Cir. 2004) (conviction for selling without a li-

cense where defendant "frequented flea markets and guns shows where he displayed and sold firearms" and "actually sold … three different firearms on two different occasions"); *United States v. Carter*, 801 F.2d 78, 81-82 (2d Cir. 1986) ("The government need not prove that dealing in firearms was the defendant's 'primary business.'  Nor is there a 'magic number' of sales that need be specifically proven.  Rather, the statute reaches 'those who hold themselves out as a source of firearms.'  Consequently, the government need only prove that the defendant 'has guns on hand or is ready and able to procure them for the purpose of selling them from [time] to time to such persons as might be accepted as customers.' ") (citations omitted).

The Government (when not asserting the effectiveness of Section 922(b)(1) in restricting the market as the justification for the ban) insists that sufficient alternative channels of acquisition are available to Plaintiffs.  But these supposed alternatives are meager and insufficient substitutes for the FFL market.[25]

First, the Government casts the licensed sales ban as a "parental consent" regime, whereby "commercial sale by federally-licensed sellers" to 18-to-20 year olds is permitted "upon parental consent."  DOJ Br. 37.  This is demonstrably false.[26]  An FFL may not sell a handgun to an

---

[25] The Government states that 18-to-20 year olds "may purchase a rifle or shotgun directly from a federally-licensed dealer."  DOJ Br. 14-15.  True, but to the extent this is an argument meant to save Section 922(b)(1), it is foreclosed by *Heller*, which made clear that access to long guns is not a constitutionally acceptable substitute for access to handguns.  *See* 554 U.S. at 629 ("It is no answer to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed.").

[26] Indeed, in providing a source for this representation, the Government does not even point to a source dealing with the relevant laws.  And it fails to accurately report the laws that source does discuss.  The Government cites the FEDERAL FIREARMS REGULATIONS REFERENCE GUIDE (2005) at page 178, which discusses permissible transactions surrounding parents and "a juvenile (less than 18 years of age)."  The Reference Guide explains that while parents may purchase "*firearms*" as a gift for juveniles, *handgun* receipt and possession by juveniles may only occur with the express "written permission of a parent or guardian" for the time period necessary to carry out limited purposes.  *See also* 18 U.S.C. § 922(x)(1)-(3).  In other words, the Reference Guide simply does not show that a "parent or guardian may buy a handgun or handgun ammuni-

18-to-20 year old simply upon securing parental consent.  Nor may a parent take his or her 18-to-20 year old child's money and buy the handgun for the child.  The *only* transaction that is permitted under the law is a bona fide gift, whereby the parent, or other bona fide donor, uses his or her own money to buy the handgun for the 18-to-20 year old and does not receive any quid pro quo in return.[27]

Accordingly, the Government's contention boils down to an argument that Plaintiffs' Second Amendment rights are fully vindicated so long as their parents will give them a handgun. This regime, of course, is cold comfort to those who do not have living parents, who are estranged from their parents, who do not live in the same state as their parents, or whose parents are legally ineligible, financially unable, or, for whatever reason, unwilling to purchase a handgun for their son or daughter as a gift.  *See, e.g.,* Fewkes Decl. ¶ 9, App. 26; D'Cruz Decl. ¶ 18, App. 35.  *Casey*, 505 U.S. at 894 ("The proper focus of constitutional inquiry is the group for

---

tion from a licensed firearms dealer and give it to them" as a gift.  DOJ Br. 15.  If "them" is meant to refer to Plaintiffs and other 18-to-20 year old adults, the Reference Guide at page 178 does not speak to that subject.  If "them" is meant to refer to juveniles, it simply does not say what the government thinks it says.

[27] As the ATF's Reference Guide explains:

In some instances, a straw purchaser is used because the actual purchaser is prohibited from acquiring the firearm.  That is to say, the actual purchaser is a felon or is within one of the other prohibited categories of persons who may not lawfully acquire firearms…. Because of his or her disability, the person uses a straw purchaser who is not prohibited from purchasing a firearm from the licensee…. the straw purchaser violates Federal law by making false statements on Form 4473 to the licensee with respect to the identity of the actual purchaser of the firearm, as well as the actual purchaser's residence address and date of birth. The actual purchaser who utilized the straw purchaser to acquire a firearm has unlawfully aided and abetted or caused the making of the false statements.  The licensee selling the firearm under these circumstances also violates Federal law if the licensee is aware of the false statements on the form….  Where a person purchases a firearm with the intent of making a gift of the firearm to another person, the person making the purchase is indeed the true purchaser. There is no straw purchaser in these instances.

ATF REFERENCE GUIDE at 165.

whom the law is a restriction, not the group for whom the law is irrelevant.").  And even if an 18-to-20 year old is successful in securing his or her parents' munificence with respect to a handgun purchase, there would remain the problem of ammunition.  The 18-to-20 year old would have to rely on the continued generosity of his or her parents every time he needed additional ammunition.

But even putting these dispositive facts aside, this is simply not how *individual* constitutional rights work.  Law-abiding adults do not need the consent of other citizens to exercise their fundamental rights.  *See, e.g.*, *Planned Parenthood v. Danforth*, 428 U.S. 52, 69 (1976) ("the State cannot delegate to a spouse a veto power which the State itself is absolutely and totally prohibited from exercising") (quotation marks omitted).

Second, the Government argues that 18-to-20 year olds "may … buy a handgun and ammunition from an individual who is selling from his or her private collection or only makes an occasional sale of such items, and who does not have the principal objective of making a profit." DOJ Br. 15.  This is, if we are charitable, only a half-truth.  Section 922(b)(1) expressly outlaws handgun transfers to 18 to 20 year-olds not only by any "licensed dealer," but also by any "licensed *collector.*" (emphasis added).  As the cases discussed above show, even occasional sales by collectors without licenses can lead to criminal conviction.   Furthermore, the Government's recommendation of the unregulated, unlicensed, under-the-radar market as the appropriate venue for handgun purchase by 18-to-20 year olds is at war with the very purpose of the FFL regime (screening out those who should not have firearms) and with the supposed purpose of Section 922(b)(1).  *See* DOJ Br. 35 ("Congress explained that '[t]he clandestine acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this

country,' and that its intention in establishing the under-twenty-one age qualification was to 'meet this problem and substantially curtail it.'").

In any event, the Government has not submitted any evidence that this market of one-off gun sales offers anything other than irregular and unreliable access to handguns and ammunition. To the contrary, the Government expressly contends that "Congress did not consider them to be the major source of firearms for this age group." DOJ Br. 48.  Unsurprisingly, none of the Plaintiffs has found this mode of random scrounging for second-hand firearms from unlicensed individual gun owners to be a satisfactory avenue for acquiring reliable, safe, and popular hand-guns.  *See* Jennings Decl. ¶¶ 11-12, App. 7-8; Harmon Decl. ¶ 15, App. 14-15; Payne Decl. ¶¶ 11-13, App. 20-21.  *See also* Annette Elliot Decl. ¶¶ 5-6, App. 76 (explaining that there are rarely if ever non-FFLs selling modern handguns at gun show tables); Steven Elliot Decl. ¶ 5, App. 80 (same).  Moreover, purchases of used handguns made through such backdoor channels do not come with any of the guarantees of the commercial market.  There is no assurance of quality, of safety, of regular availability, of varied inventory, or of competitive pricing.  *See* White Decl. ¶ 6, App. 69; Koeppe Decl. ¶ 6, App. 72.  And once a handgun is obtained in such an *ad hoc* trans-action from a particular gun owner, a buyer must hope that that he can track down an ever-changing cast of other gun owners who will happen to have, and to be willing to part with, spare ammunition of the precise caliber needed for the gun—because a *repeat* seller of ammunition, like a repeat seller of guns, must be licensed.  Even if he could locate a willing gun owner with an excess of the precise ammunition he required, the would-be purchaser could but hope that such resale ammunition was still in a usable, safe condition and had not been adulterated or cor-

roded in any way.[28]  Relegating Plaintiffs to this irregular, unreliable, and potentially unsafe

trade in second-hand firearms and ammunition is simply not consistent with the robust protection

of the right to keep and bear arms afforded by the Second Amendment.

If Section 922(b)(1) does what the Government says—sharply limits access to handguns

and ammunition—then it is not just a harmless ban on a particular source of acquisition.  It is, at

best, a severe restriction on the ability to acquire a handgun (and ammunition) and thus is tanta-

mount to a severe restriction—effectively a ban—on the right to keep and bear arms.   The fact

that it leaves, theoretically, some random, occasional alternate channels of acquisition open does

not save the statute from invalidation.  "It is of no moment that the statute does not impose a

complete prohibition.  The distinction between laws burdening and laws banning speech is but a

matter of degree."  *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 812 (2000).  *See*

*also Marzzarella*, 614 F.3d at 94 (in Second Amendment case, explaining that "infringements on

protected rights can be, depending on the facts, as constitutionally suspect as outright bans");

*Carey*, 431 U.S. at 689 ("Limiting the distribution … to licensed pharmacists clearly imposes a

significant burden on the right of the individuals to use contraceptives if they choose to do so.

The burden is, of course, not as great as that under a total ban on distribution.  Nevertheless, the

restriction of distribution channels to a small fraction of the total number of possible retail outlets

---

[28] *See* California Dept. of Justice, Handgun Safety Study Guide 24 (2004), *available at* http://ag.ca.gov/firearms/forms/pdf/hscsg.pdf ("Never shoot ammunition that is old, dirty, cor- roded or wet, or ammunition that cannot be fully identified."); Smith & Wesson, Product Safety Information, *available at* http://www.smith- wesson.com/webapp/wcs/stores/servlet/Category3_750001_750051_757978_-1_Y ("Never use non-standard, reloaded, or 'handloaded' ammunition which has not been subjected to internal ballistic pressure testing."); Rossi-USA Ammunition Guide, *available at* http://www.rossiusa.com/ammoguide.cfm ("Use only high quality, original, factory- manufactured ammunition.  Do not use cartridges that are dirty, wet, corroded, bent or damaged …. The use of reloaded, 'remanufactured,' hard-loaded, or other nonstandard ammunition voids all warranties…. Dirt, corrosion, or other foreign matter on a cartridge can impede complete chambering and may cause the cartridge case to burst upon firing.").

renders contraceptive devices considerably less accessible to the public, reduces the opportunity

for privacy of selection and purchase, and lessens the possibility of price competition."); *City of*

*Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 427-28 (1993) (rejecting argument that ban

on "one method of distribution" of speech was permissible under the First Amendment because it

did not "interefer[e] with alternative means of access to the audience"); *Deerfield Med. Ctr.*, 661

F.2d at 336 ("it cannot seriously be disputed that a woman's deliberations over whether to have

an abortion, and her ability to exercise her right to an abortion once that decision is made, would

be adversely affected if abortion facilities were restricted to the most unattractive, inaccessible

and inconvenient areas of a city"); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1062 n.5

(9th Cir. 2010)  (fact that law allowed practice of tattooing by family members or neighbors did

not save total ban on commercial sale of tattoos from invalidation under the First Amendment).[29]

All told, then, the Government is simply wrong to point to these limited alternatives to

the licensed firearms market as sufficient to vindicate the Second Amendment right to acquire

arms—a notion that, as shown, is at war with the purported justification for Section 922(b)(1).

But suppose, for argument's sake, that gifts and occasional second-hand sales by unlicensed gun

owners provide 18-to-20 year olds with access to handguns that is comparable to that provided

by the commercial market.  If that is true, then, as discussed more fully below, Section 922(b)(1)

is fatally underinclusive and is an irrational and arbitrary restriction that cannot pass muster

---

[29] *See also City of Akron v. Akron Ctr. for Reproductive Health*, 462 U.S. 416, 434-35
(1983) (holding hospitalization requirement (i.e. ban on outpatient facilities) for abortion uncons-
titutional because it created "additional cost" by potentially "forc[ing] women to travel to find
available facilities"); *Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 462 U.S. 476 (1983)
(same); *United States v. Grace*, 461 U.S. 171, 180-81 (1983) (rejecting argument that ban on
speech on particular sidewalks was permissible under the First Amendment because "there
[were] sufficient alternative areas" for such speech).

"[u]nder any of the standards of scrutiny that … appl[y] to enumerated constitutional rights."

*Heller*, 554 U.S. at 628.

## V.     SECTION 922(B)(1) MUST BE STRUCK DOWN IF THIS COURT CONDUCTS A "LEVELS-OF-SCRUTINY" ANALYSIS

### A.     If a Levels-of-Scrutiny Analysis Were To Be Applied to the Laws Challenged Here, Only Strict Scrutiny Would Be Consistent With The Supreme Court's Decision in *Heller*.

The foregoing textual and historical analysis is dispositive under *Heller*'s framework. But even if it were appropriate to employ level of scrutiny analysis, the debate that remains open after *Heller* and *McDonald* is not between strict and intermediate scrutiny, but between strict scrutiny and the framework applied in *Heller* itself.  *Heller* and *McDonald* mandate that any level of scrutiny analysis begin with the recognition that the individual right to bear arms in self-defense is a *fundamental* enumerated right.  *McDonald* declared that this right was considered "fundamental by those who drafted and ratified the Bill of Rights," 130 S. Ct. at 3037, and that "the Framers and ratifiers of the Fourteenth Amendment" likewise "counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty," *id.* at 3042.[30]

It is equally well established that "strict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution." *Perry Educ. Ass'n v. Perry*

---

[30] *See also id.* at 3036 (the "decision in *Heller* points unmistakably to [an affirmative] answer" to the question of "whether the right to keep and bear arms is fundamental to our scheme of ordered liberty") (emphasis omitted); *id.* at 3037 ("the right to bear arms was fundamental to the newly formed system of government"); *id.* at 3041 ("Evidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental."); *id.* at 3038 n.17 ("Abolitionists and Republicans were not alone in believing that the right to keep and bear arms was a fundamental right"); *id.* at 3040 (holding that the 39th Congress's "efforts to safeguard the right to keep and bear arms demonstrate that the right was still recognized to be fundamental"); *id.* at 3041 ("In debating the Fourteenth Amendment, the 39th Congress referred to the right to keep and bear arms as a fundamental right deserving of protection."); *id.* at 3059 (Thomas, J., concurring in part and in judgment) (agreeing that "the right to keep and bear arms … is 'fundamental' to the American 'scheme of ordered liberty.' ").

*Local Educators' Ass'n*, 460 U.S. 37, 54 (1983).  Although it did not have occasion to hold strict

scrutiny applicable to regulations impinging on the core of the Second Amendment, the *Heller*

Court reaffirmed that there is " 'narrower scope for operation of the presumption of constitutio-

nality … when legislation appears on its face to be within a specific prohibition of the Constitu-

tion, such as those of the first ten amendments.' " 554 U.S. at 628 n.27 (quoting *United States v.*

*Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)).  *See also San Antonio Indep. Sch. Dist. v.*

*Rodriguez*, 411 U.S. 1, 16 (1973) (when a law interferes with enumerated "fundamental constitu-

tional rights," it is subject to "strict judicial scrutiny"); *id.* at 17 (if a law "impinges upon a fun-

damental right explicitly or implicitly protected by the Constitution, [it] thereby requir[es] strict

judicial scrutiny"); *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 n.14 (1985)

("governments are entitled to attack problems piecemeal, save where their policies implicate

rights so fundamental that strict scrutiny must be applied"); *Taylor v. Johnson*, 257 F.3d 470,

473 (5th Cir. 2003) ("rights are fundamental if their source, explicitly or implicitly, is the Consti-

tution," and "[s]trict scrutiny is appropriate" when a law "implicates … a fundamental right")

(quotation marks omitted); *Richard v. Hinson*, 70 F.3d 415, 417 (5th Cir. 1995) ("Strict scrutiny

is required" if a law "impinges upon a fundamental right explicitly or implicitly protected by the

Constitution.").

To conclude, as some courts have in the wake of *Heller*, that Second Amendment rights

deserve some lesser protection than other fundamental rights is to conclude, contrary to what *is*

explicit in *Heller* and *McDonald*, that Second Amendment rights exist on some sort of lower pla-

teau.  But no enumerated constitutional right is "less 'fundamental' than" others, and there is "no

principled basis on which to create a hierarchy of constitutional values …."  *Valley Forge Chris-*

*tian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484

(1982). "To view a particular provision of the Bill of Rights with disfavor inevitably results in a constricted application of it. This is to disrespect the Constitution." *Ullmann v. United States*, 350 U.S. 422, 428-29 (1956). Accordingly, the Court in *McDonald* "reject[ed]" the argument "that the Second Amendment should be singled out for special—and specially unfavorable— treatment." 130 S. Ct. at 3043. *See also id.* at 3044 (plurality) (rejecting argument that the Second Amendment right should be "treat[ed] … as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees").

Thus, if a level-of-scrutiny analysis is to apply to the Government's ban on FFL handgun sales to 18-to-20 year olds, it should be strict scrutiny, which the challenged statute plainly could not survive. Contrary to Justice Breyer's argument in *Heller*, 554 U.S. at 687-88 (Breyer, J., dissenting), the Court's underlying logic is entirely consistent with its dictum that certain types of restrictions, such as possession of firearms by felons, are "presumptively lawful," *Heller*, 554 U.S. at 626-27 & n.26. The *Heller* Court was simply offering the preliminary observation that such laws appear to fall outside the scope of the Second Amendment right to bear arms, just as perjury and obscenity have always been understood to be outside the scope of the First Amendment right to free speech. *See id.* at 635 ("The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different."). The Court had no occasion to prematurely map the scope of the Second Amendment: "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* In his concurring opinion in *McDonald*, Justice Scalia explained that "[t]he traditional restrictions [on the right to keep and bear arms] go to show the scope of the right, not its lack of fundamental

character." *McDonald*, 130 S. Ct. at 3056 (Scalia, J., concurring).  Strict scrutiny in the First

Amendment context, after all, is not foreclosed by the recognition that there are reasonable limits

on the scope of the right.  *See United States v. Stevens*, 130 S. Ct. 1577, 1584-86 (2010) (catego-

ries of speech not protected by First Amendment are based on historical exemptions at time of

the Framing and not judicial interest balancing).[31]

> **B.      Under *Heller*, Intermediate Scrutiny Is Unacceptable For Laws, Like Those
>          Challenged Here, That Infringe the Core Second Amendment Right of
>          Armed Self-Defense by Law-Abiding Citizens.**

*Heller* forecloses the Government's argument that laws that burden core Second

Amendments right should be subject to "no more than intermediate scrutiny."  DOJ Br. 35.   In

his dissent in *Heller*, Justice Breyer argued that the proper standard of review should be drawn

from "cases applying intermediate scrutiny" in the First Amendment context, such as *Turner*

*Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997).  554 U.S. at 704 (Breyer, J., dissenting); *see also*

*id.* at 689-90, 696.  He contended that "[t]here is no cause here to depart from the standard set

forth in *Turner*." *Id.* at 705.[32]  Justice Breyer called his test "interest-balancing," rather than in-

termediate scrutiny, not because he was adopting a less demanding test, but because of his view

that the government's interest in regulating firearms—some version of protecting the safety and

lives of the public—would always be important or compelling.  In Justice Breyer's view, the

---

[31]  *See, e.g., United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) ("[W]e think
the better reading, based on the text and the structure of *Heller*, is … that these longstanding li-
mitations [*e.g.* for possession by felons] are exceptions to the right to bear arms."); Eugene Vo-
lokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework
and a Research Agenda*, 56 UCLA L. REV. 1443, 1449 (2009) ("Sometimes, a constitutional
right isn't violated by a restriction because the restriction is outside the terms of the right as set
forth by the constitution.").

[32]  It is equally revealing that Justice Breyer invoked *Burdick v. Takushi*, 504 U.S. 428
(1992).  *See Heller*, 554 U.S. at 690 (Breyer, J., dissenting).  That is the case on which the Unit-
ed States, appearing as an *amicus* in *Heller*, principally relied in unsuccessfully urging the Court
to adopt intermediate scrutiny.  *See* Brief of United States in No. 07-290, at 8, 24, 28.

government interest would always be sufficient and application of the test would involve a

search for the appropriate degree of fit—that is, interest-balancing.  *See id.* at 689 ("I would

simply adopt such an interest-balancing inquiry explicitly.").  Thus Justice Breyer's proposed

interest-balancing test was nothing other than intermediate scrutiny, and the Supreme Court re-

jected it, however it might be labeled:

> We know of no other enumerated constitutional right whose core protection has
> been subjected to a freestanding "interest-balancing" approach. The very enume-
> ration of the right takes out of the hands of government—even the Third Branch
> of Government—the power to decide on a case-by-case basis whether the right is
> *really worth* insisting upon. A constitutional guarantee subject to future judges'
> assessments of its usefulness is no constitutional guarantee at all. … The Second
> Amendment, … [l]ike the First, … is the very *product* of an interest balancing by
> the people—which Justice Breyer would now conduct for them anew.  And what-
> ever else it leaves to future evaluation, it surely elevates above all other interests
> the right of law-abiding, responsible citizens to use arms in defense of hearth and
> home.

*Heller*, 554 U.S. at 634-35 (emphasis in original).  *See also McDonald*, 130 S. Ct. at 3050 (plu-

rality) ("[W]hile [Justice Breyer's] opinion in *Heller* recommended an interest-balancing test, the

Court specifically rejected that suggestion.").  Therefore, *Heller* forbids the application of mere

intermediate scrutiny to a regulation, such as that here, that impinges upon the core Second

Amendment right of armed self-defense.

The lower-court decisions the Government relies upon for its intermediate-scrutiny ar-

gument plainly cannot trump the Supreme Court's decision in *Heller*.  And while it is true that

the Fifth Circuit has not "held that Second Amendment challenges trigger strict scrutiny," DOJ

Br. 34, neither has it held that strict scrutiny does not apply to challenges that implicate the core

Second Amendment rights of law-abiding adults.  The Fifth Circuit, in other words, has not ans-

wered the question one way or the other.  *See, e.g.*, *United States v. Everist*, 368 F.3d 517, 519

n.1 (5th Cir. 2004) (rejecting Second Amendment challenge to felon-in-possession law, and not-

ing that "[w]e need not decide whether the Second Amendment's boundaries are properly defined through strict scrutiny analysis")

Furthermore, *all* of the Government's appellate authorities for applying intermediate scrutiny concerned laws regulating firearms in the hands of felons, wife-beaters, and those who traffic in illegal guns, not the Second Amendment rights of the law-abiding citizens who are subject to the laws challenged here. *See United States v. Marzzarella*, 614 F.3d 85, 96-97 (3d Cir. 2010) (applying intermediate scrutiny to uphold a ban on possessing firearms with obliterated serial numbers, but explaining that Second Amendment rights, like First Amendment rights, are "susceptible to several standards of scrutiny depending upon the type of law challenged and the type of [conduct] at issue"); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (rejecting challenge to categorical ban on possession of firearms by convicted felons without "determining … the precise test applicable to [other types of] gun restrictions"); *United States v. Reese*, __ F.3d __, No. 10-2030, slip op. at 19 (10th Cir. 2010) (holding that "intermediate scrutiny [was] appropriate *for the statute challenged*," which prohibited possession of firearms by anyone subject to a domestic violence restraining order) (emphasis added) (slip op. attached as Ex. 6 to DOJ Br.).   Indeed, the reasoning in both *Marzzarella* and *Reese* suggests that the Third and Tenth Circuits would reject intermediate scrutiny for laws that substantially burden the rights of the law-abiding citizen.  *See Marzzarella*, 614 F.3d at 97 (drawing analogy to First Amendment context, and applying intermediate scrutiny because challenged law was more akin to a "time, place, and manner" regulation than a "limitation[] on  the exercise of protected conduct"); *Reese*, slip op. at 20 (applying intermediate scrutiny because challenged law was applicable only to a "narrow class[] of persons who, based on their past behavior, are more likely to engage in domestic violence").

60

Thus, even if the decisions from other circuits cited by the Government were binding on this Court – and of course they are not – those decisions in any event distinguish themselves. Therefore nothing in those decisions prevents this Court from following the direction set by the Supreme Court in *Heller*, which rejected intermediate scrutiny or similar forms of interest-balancing for claims involving state regulations of law-abiding citizens' core Second Amendment right to armed self-defense.

### C.     A "Reasonable Regulation" Standard is Flatly Inconsistent With *Heller*.

The Brady Center argues for another form of relaxed judicial review the Supreme Court was offered in *Heller*:  the "reasonable regulation" standard that some state courts apply under their own constitutional provisions concerning firearms.  *See* Brady Ctr. Br. 18; Brief of Law Professors Erwin Chemerinsky and Adam Winkler as *Amici Curiae* in Support of Petitioner District of Columbia, in *Heller,* No. 07-290, at 7. *See also* Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683 (2007).   But the Supreme Court ignored this standard, although it was favorably cited by the dissent.  *See Heller,* 554 U.S. at 691 (Breyer, J., dissenting). Professor Winkler freely admits that the state-court "reasonable regulation" standard is equivalent to "rational basis" scrutiny:  "in ordinary practice both standards are extremely deferential. Rational basis review has been characterized as 'virtually none in fact' because nearly every law subject to it survives judicial scrutiny.  Similarly, nearly all laws survive the reasonable regulation standard. … Like rational basis, the reasonable regulation standard tends to be, more than anything else, shorthand for broad judicial deference." Winkler, *supra*, 105 MICH. L. REV. at 718-19.  Indeed, Professor Winkler concedes that "[s]tate courts commonly use the rational basis and reasonable regulation language interchangeably." *Id.* at 718 n.198; *see also id.* at 687 n.12 (collecting cases).  This road is therefore plainly barred by *Heller*, which explicitly rejected ap-

plication of any standard of review requiring mere reasonableness or rationality: "Obviously, the [rational basis] test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms…. If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." 554 U.S. at 628 & n.27.

### D.      Section 922(b)(1) Fails Any Level of Heightened Scrutiny.

As we have explained above, if this Court opts to engage in a level-of-scrutiny analysis, strict scrutiny is the appropriate standard to apply. The age restriction at issue here simply cannot satisfy the "most searching examination," *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003), entailed by application of this "most exacting scrutiny," *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  Indeed, Section 922(b)(1) is so poorly tailored to any substantial Government objective that it fails even the Government's preferred intermediate scrutiny analysis.  While intermediate scrutiny, unlike strict scrutiny, does not require the Government to select the *least* restrictive alternative to achieve its stated purpose, it does require that a restriction be "narrowly tailored to serve a significant government interest." *Perry Educ. Ass'n*, 460 U.S. at 45.  In other words, a restriction must be "*substantially* related to the achievement" of the government's objective, *United States v. Virginia*, 518 U.S. 515, 533 (1996) (emphasis added).  Only the government's genuine objectives will do, not "*post hoc*" rationales "invented … in response to litigation," and intermediate scrutiny does not permit the government to "rely on overbroad generalizations" to allocate benefits and burdens.  *Id.*

### 1.     The Congressional Rationale For § 922(b)(1) Is Fatally Infected By Congress' Total Disregard For The Second Amendment.

As an initial matter, it is hardly surprising that Section 922(b)(1) fails heightened constitutional scrutiny, for the Congress that enacted it failed to perceive any constitutional issue at all. In 1968, the Legislative Branch was in thrall to the very misunderstanding of the Second Amendment that was rejected by the Supreme Court in *Heller* and *McDonald*, and Congress dismissed the very notion of Second Amendment rights as "preposterous." *See Federal Firearms Act:  Hearings on S. 1, Amendment 90 to S. 1, S. 1853, and S. 1854 Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. On the Judiciary*, 90th Cong., 1st Sess., at 60 (1967) ("the *Hearing*")  (testimony of IRS Commissioner Cohen) (citing memoranda from Attorneys General Katzenbach and Clark). The Senate defended the bill with the airy assertion that "the second amendment, unlike the first, was not adopted with the individual rights in mind, but is a prohibition upon Federal action which would interfere with the organization of militia by the states of the Union." S. Rep. No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2169 ("Senate Report").  "[I]t is clear that no body of citizens other than the organized State militia, or other military organization provided for by law, may be said to have a constitutional right to bear arms." *Id.*  This dismissive misconception of the Second Amendment permeated the congressional debates.[33]  Therefore, whatever deference a court might otherwise accord to a congressional judgment that its enactment is constitutional is not a major factor in this case.

---

[33] *See e.g. Hearing* at 64 (Report of the President's Comm'n on Law Enforcement and Admin. of Justice) (Second Amendment is "a prohibition against Federal interference with State militia and not as  a guarantee of an individual's right to keep or carry firearms."); *id.* at 39 (statement of Joseph Barr, Undersecretary of the Treasury) ("This amendment was not adopted with individual rights in mind but rather was considered a protection to the militia of the various States."); *id.* at 1073-74 (James Bennett of the ABA) (dismissing "mumbo jumbo about the right to bear arms [a]s only one part of the smokescreen thrown up by the NRA").

### 2. The Legislative History of § 922(b)(1) Focused On The Threat of Gun Violence Presented By Felons, Drug Addicts and the Mentally Ill, Rather Than Any Threat Supposedly Presented By Law-Abiding Young Adults.

Hearings on the bill that eventually became Section 922 were held in the mid-1960s before the Subcommittee to Investigate Juvenile Delinquency of the Senate Committee on the Judiciary.  *See* Senate Report at 2164; *Hearing*.   Despite the name of the subcommittee, the nearly 1,200-page hearing does not really focus on the issue of juvenile delinquency, but instead lumps juveniles in with groups which naturally commend themselves as candidates for exclusion from gun ownership:  convicted felons, narcotics addicts, and the mentally ill.  The statute identifies the problem as "the ease with which any person can acquire firearms other than a rifle or shotgun (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, armed groups who would supplant duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest)."  Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a)(2), 82 Stat. 197, 225.[34] The vast majority of the testimony did not distinguish between "juveniles" and others who should be denied guns, and therefore *a fortiori* made no attempt to justify the particular imposition on the rights of those aged 18 to 20.[35]

---

[34] Similarly, the Senate stated that the "principal purpose[]" of the proposed legislation was "keep[ing] firearms out of the hands of those not legally entitled to possess them because of age, criminal background or incompetency." Senate Report at 2113.  *See also, e.g., id.* at 2114, 2164, 2198.

[35] *See, e.g., Hearing* at 44 (statement of Sheldon Cohen, IRS Comm'r) (the problem is "easy availability of firearms to juvenile offenders, professional criminals, and to others who would use them unlawfully"); *id.* at 47 ("juveniles, aliens, or mental incompetents"); *id.* at 49 ("felons, mental defectives, juveniles"); *id.* at 333 (statement of Attorney General Ramsey Clark) ("known dangerous criminals, mental defectives, angry spouses, habitual drunkards, children and drug addicts"); *id.* at 433 (statement of Sen. Dodd) ("the incompetent, the criminal, the juvenile *id.* at 879 (testimony of Sen. Tydings) ("hoodlums, juveniles, narcotics addicts, or that type").

**3.      The Legislative History of § 922(b)(1) Failed to Distinguish Between the Threat of Gun Violence Posed By Juveniles Under 18 and Young Adults Aged 18-20.**

Even where the legislative history does focus on the problem presented by minors (in that era, those under age 21), it displays an abiding confusion over which age group (juveniles or all minors) supposedly presents the problem, instead casting blame generally on firearms sales "to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior."  *See* 82 Stat. at 225-26.  The Senate Report similarly defined the problem as the "causal relationship between the easy availability of firearms … and juvenile and youthful criminal behavior." Senate Report at 2198.  Both Congressmen and witnesses used the terms "juveniles" and "minors" without defining them, often treating both the terms and the different age groups they identify (under-18 and under-21, respectively), as fungible classifications.  *See, e.g.,* Senate Report at 2164-67; *Hearing* at 65 (Exhibit to testimony of IRS Comm'r Cohen) (Report of the President's Commission on Law Enforcement and Administration of Justice).  Where the proponents of Section 922(b)(1) did distinguish the terms, it was clear that their most frequent reference—"juveniles"—meant those under 18.[36]  This is consistent with the conventional legal definition of "juvenile" as one "who has not reached the age (usually 18) at which one should be treated as an adult by the criminal justice system."  BLACK'S LAW DICTIONARY at 871 (7th ed. 1999).

Thus, the legislative hearings that spawned Section 922(b)(1) usually failed to distinguish between the problems presented by "juveniles" under 18 and "minors" aged 18-20.  The consequence is that all the statistics and rationales put forth in support of Section 922(b)(1)'s limit on handgun sales that use the term "juveniles" can be disregarded, insofar as they denote problems

---

[36] *See, e.g., Hearing* at 57 (testimony of IRS Comm'r Cohen) (seems to distinguish between "juveniles and young adults"); *id.* at 59 (describing a "16-year-old" as a "juvenile"); *id.* at 409-10 (testimony of Charles Livermore) (discussing statistics on mail-order sales of handguns to "juvenile delinquents").

associated with those under the age of 18, who are unaffected by the Second Amendment challenge in this case.  Similarly, even the statistics and discussions in the legislative history that refer to "minors" must at least be discounted, insofar as that term encompasses not only the threats supposedly presented by those whose rights are asserted here—those aged 18-20—but also the threats posed by the far larger, and far more erratic, group under the age of 18 whose ability to buy handguns would not be affected by this constitutional challenge.[37]

When Congress did distinguish between children under 18 and individuals over 18 but nonetheless still minors, it identified the most acute problem as gun availability to "*children*" *or* "*youngsters*" *under 18.*  When statements in the legislative history specify an age group, young teenagers bear the brunt of criticism.  For example, Governor Richard Hughes of New Jersey, who testified on behalf of the bill in the wake of the urban riots of 1967, challenged opponents by asking whether they would agree "to a 15-year-old mentally unbalanced child buying a dangerous weapon by mail through the permission of the Congress of the United States."  *Hearing* at 1019.  Senator Tydings summed up his support for the sales restrictions this way:  "When you make it just as simple as writing a 5-cent post card and putting $12 in the mail for a deranged kid or child of 15 or 14" to obtain "a mail-order gun with no restriction whatsoever, you just are putting the means right in their hands."  *Id.* at 877.  Simply enforcing, or even increasing, criminal penalties against illegal gun transactions was insufficient because a "juvenile, a 16-year-old,

---

[37] Attorney General Ramsey Clark, a strong proponent of the bill, explained that revealed that the crime statistics cited in support of the bill pertained primarily to those *under 18* rather than to those aged 18-20. General Clark testified that "It seems incredibly careless to me that we let children under 18 buy rifles and pistols if they choose to do so. I do not believe that is tolerable under conditions in the United States today. If they are going to have such firearms, it ought to be under parent or guardian supervision and care." *Hearing* at 940.  *See also id.* at 941 (crime statistics placed in record by Sen. Tydings fail to track the age limits of the Senate bill, instead breaking crime down into the age groups "11-17," "18-24," and "25 and over").

doesn't worry about a potential 5-year or 10-year criminal sentence.  He doesn't really have the wherewithal to take that all into account.  He should not have the weapon in the first place.  We won't have to worry about whether we sentence him to 5 or 10 years." *Hearing* at 59 (testimony of IRS Comm'r Cohen).  *See also id.* at 11 (testimony of Frederick Ludwig, on behalf of the Queens District Attorney in New York City) ("how do we know whether a 16-year-old or a 15-year-old boy possesses a rifle or shotgun?"); *id.* at 333 (statement of Attorney General Ramsey Clark) (discussing gun purchases by "children"); *id.* at 409 (statement of Charles Livermore, Ex-ec. Director, Chicago Comm'n on Youth Welfare) (discussing gun purchases by "youngsters" and crime statistics on weapons offenses by "juveniles"); *id.* at 411 (gun sales to "children").

Whatever the precise degree of heightened scrutiny applied here, these statistics and ra-tionales about the problem of juvenile crime are hardly a solid foundation for a statute that dis-tinguishes between 18-year-olds and 21-year-olds with respect to an enumerated, fundamental, individual right.  The Constitution requires a much tighter fit.

**4.    The Government's Reliance on the Legislative History of Failed Bills From the 1990s Provides No Support for Section 922(b)(1), Which Was Enacted Three Decades Earlier.**

Perhaps aware of the shortcomings of the legislative history of Congress' 1968 enactment of § 922(b)(1), the Government instead emphasizes the legislative history of bills proposed in the 1990s that were never enacted.  The congressional statements cited by the Government "ex-press[ing] particular concern about the 18 to 20-year-old age group" and the "additional statis-tics" by which the Government says this concern was "borne out" were not presented during the hearings on § 922(b)(1), but were instead presented and compiled some 30 years later in connec-tion with *unsuccessful* efforts to pass legislation amending Section 922(x) to ban 18-to-20 year olds *outright* from possessing handguns or buying them from *any* source.  DOJ Br. 38-39; *see,*

*e.g.,* 145 Cong. Rec. S 4279 (1999) (introducing unenacted bill that "would ban sales by unlicensed individuals of handguns … to persons under the age of 21" and "would ban possession of these deadly weapons by persons under 21") (statement of Sen. Charles Schumer); 145 Cong. Rec. H 6571 (1999) (calling for legislation "raising the national age of handgun ownership from 18 to 21") (statement of Rep. Grace Napolitano); Dep't of the Treasury & Dep't of Justice, *Gun Crime in the Age Group 18-20* at 1 (1999) (supporting the unenacted Youth Gun Crime Enforcement Act of 1999, which would have generally "raise[d] the minimum age for possession of a handgun from 18 to 21 and bar[red] all handgun transfers to anyone in that age group").

   The Government's anachronistic treasure hunt for helpful legislative history is barred by the Supreme Court's "oft-repeated warning that 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.' " *Consumer Prod. Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 117 (1980).  Thus in *Weinberger v. Rossi*, 456 U.S. 25, 35 (1982), the Court unanimously rejected "postenactment legislative history" that supposedly "reiterated" a congressional policy, warning that "[s]uch *post hoc* statements" by a subsequent Congress or committee have no bearing on the justification proffered for a previously enacted statute.  As Justice Scalia has explained, the "Constitution puts Congress in the business of writing new laws," not reinterpreting or manufacturing *post hoc* rationales for old ones.  *United States v. Romani*, 523 U.S. 517, 536 (1998) (Scalia, J., concurring in part and concurring in the judgment). This is particularly true here, where the Government quotes legislative musings that were made while Congress was considering laws that were never enacted.  "Failed legislative proposals are a particularly dangerous ground" on which to rest analysis of a prior statute.  *Solid Waste Agency v. Corps of Engineers*, 531 U.S. 159, 169-70 (2001) (citation and quotation marks omitted).  The "history of legislation-that-never-was" simply has no place in interpreting or justifying different

68

legislation that was enacted decades before; those attempting to invoke such materials "should be laughed out of court." *Romani*, 523 U.S. at 536, 535 (Scalia, J., concurring).

>    **5.    A Comparison of §922(b)(1) with §922(x) Underscores the Poverty of the Government's Proffered Rationale For Restricting the Second Amendment Rights of Law-Abiding Adults Aged 18-20.**

The Government's position is vexed by the fact that Section 922(b)(1) *outlaws licensed sales* of handguns to those aged 18-20, whereas Section 922(x) *authorizes* handgun *use and possession* by those very same 18-20-year-olds, and outlaws only the sale or transfer (by FFLs or otherwise) of handguns to juveniles (defined as those under age 18).[38]  If pistols in the hands of those aged 18-20 are such a threat to life and public safety, why does the same statute that bans licensed commercial sale of such weapons simultaneously legalize their possession and use by the very same class of individuals?

Congress enacted Section 922(b)(1) to restrict the "clandestine acquisition of firearms by juveniles and minors."  Senate Report at 2167.  *See also* 82 Stat. 197, 225.  To whatever extent the statute was a legitimate means of advancing this goal in 1968, when the common-law age of majority of 21 prevailed, it is not even *rational*—let alone legitimate—today, when 18-to-20 year olds are legal adults.  *See* Larry Barnett, *The Roots of Law*, 15 AM. U.J. GENDER SOC. POL'Y & L. 613, 681 (2007) (appendix collecting State revisions of age of majority laws in the 1970s).

 Section 922(b)(1)'s restriction on licensed firearms sales is not, like some bauble unearthed in a time capsule, a mere curiosity.  For the combined effect of Section 922(x)'s authorization of handgun possession by those 18 to 20 with Section 922(b)(1)'s ban on handgun sales to that group through highly regulated, federally licensed channels, means that Congress now has a policy that it is perfectly fine for those aged 18-20 to have handguns, *so long as they get them*

---

[38] Section 922(x) goes on to provide a host of exceptions allowing handgun possession and use by juveniles in particular circumstances.  *See* § 922(x)(3).

*through unregulated channels*, be it a gift from a relative or a quick cash purchase out of the

trunk of a car in a darkened parking lot.  Thus, contrary to what we are told was the purpose of

Section 922(b)(1), the statute now g*uarantees* that this class of adults will procure their handguns

by "clandestine" means.  By cutting off access to the regular commercial handgun market to an

entire class of law-abiding adults, Section 922(b)(1) wars with its original purpose which, Con-

gress took pains to explain, was "not … to place any undue or unnecessary Federal restrictions or

burdens *on law-abiding citizens* with respect to the acquisition, possession, or use of firearms

appropriate to the purpose of hunting, trap shooting, target shooting, personal protection, or any

other lawful activity, [nor] to discourage or eliminate the private ownership or use of firearms by

*law-abiding citizens* for lawful purposes."  82 Stat. 197, 226 (emphasis added).

 As the Government concedes (DOJ Br. 47-48), the only federal court to address this issue

in the wake of *Heller* was troubled by it:

> The way these statutes interact, it appears as though the law would rather an 18 to
> 20 year old purchase a handgun from an unlicensed seller than from a licensed
> seller. This appears problematic for multiple reasons. Presumably, the licensed
> seller has greater resources to research a handgun buyer's personal and criminal
> background in order to more accurately assure that the handgun will not be used
> for illegal purposes. Given that the government has exacting regulatory control
> over a federally licensed firearms dealer, but has little control over the manner in
> which individual firearms sellers perform their transactions, these age discrepan-
> cies do seem troubling. Unfortunately, the legislative history concerning this mat-
> ter is not very useful in resolving this dilemma, leaving unanswered why Con-
> gress chose to create such age discrepancies.

*United States v. Bledsoe*, 2008 U.S. Dist. LEXIS 60522 (W.D.Tex. Aug. 8, 2008), at *19-

20, *aff'd,* 334 Fed. App'x 711 (5th Cir. 2009).

 The total disconnect between the purpose of Section 922(b)(1) and the reality of the cur-

rent federal handgun regime may be largely an artifact of time:  Section 922(b)(1) was enacted in

1968 when the age of majority was 21, whereas Section 922(x) was enacted in 1994 when that

age had been lowered to 18.  But the discrepancy is more than a mere anachronism, and the resulting infringement of the rights of those aged 18-20 is not only an issue for consideration under the Equal Protection Clause.  Rather, the lack of substantial tailoring of the legislative means to the legislative purpose proves that the purported interest is not sufficient to justify the law.  The Government insists that Section 922(b)(1) is intended to prevent clandestine handgun sales, but in it fact it encourages them, and "a law cannot be regarded as protecting an interest 'of the highest order,' and thus as justifying a restriction … when it leaves appreciable damage to that supposedly vital interest unprohibited." *Florida Star v. B.J.F.*, 491 U.S. 524, 541-42 (1989) (Scalia, J., concurring).   "If a regulation fails to cover a substantial amount of conduct implicating the asserted compelling interest, its underinclusiveness can be evidence that the interest is not significant enough to justify the regulation." *Marzzarella*, 614 F.3d at 99.  *See also Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) ("[T]he facial underinclusiveness of § 794.03 raises serious doubts about whether Florida is, in fact, serving, with this statute, the significant interests which appellee invokes in support of affirmance."); *Carey v. Brown*, 447 U.S. 455, 465 (1980) ("The apparent overinclusiveness and under inclusiveness of the statute's restriction would seem largely to undermine appellant's claim that the prohibition of all nonlabor picketing can be justified by reference to the State's interest in maintaining domestic tranquility."); *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) ("the notion that a regulation of speech may be impermissibly *underinclusive* is firmly grounded in basic First Amendment principles").

## VI.   SECTION 922(B)(1) VIOLATES 18-TO-20 YEAR OLDS' EQUAL PROTECTION RIGHTS

Because Section 922(b)(1)'s ban on federally licensed handgun sales burdens 18-to-20 year olds' fundamental right to keep and bear arms, it is subject to strict scrutiny under Fifth Amendment, a standard that we have explained the law cannot meet.

The Fifth Amendment's due process guarantee includes an equal protection component, *see Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954), and "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment," *Buckley v. Valeo*, 424 U.S. 1, 93 (1976); *see also Adarand Constructors v. Pena*, 515 U.S. 200, 217 (1995); *Weinberger v. Weisenfeld*, 420 U.S. 636, 638 n.2 (1975).

Equal protection analysis requires strict scrutiny of "classifications affecting fundamental rights." *Clark v. Jeter*, 486 U.S. 456, 461 (1988); *see also Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976) ("equal protection analysis requires strict scrutiny of a legislative classification … when the classification impermissibly interferes with the exercise of a fundamental right"); *LeClerc v. Webb*, 419 F.3d 405, 415 (5th Cir. 2005) ("strict scrutiny is employed when a governmental body creates a classification that burdens a fundamental right"). The right to keep and bear arms is plainly fundamental; not only is it "explicitly … guaranteed by the Constitution," *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33 (1973), but as we discussed at length earlier, the Supreme Court has also expressly held that it is a fundamental right. And Section 922(b)(1)'s ban on FFL handgun sales to 18-to-20 year olds creates a classification that burdens those individuals' right to keep and bear arms.

The Government's argument that rational basis review applies to Plaintiffs' equal protection claim is meritless. That argument is grounded in the fact that age is not a suspect classification. *See* DOJ Br. 43. But a classification is subject to strict scrutiny if it "interferes with the exercise of a fundamental right *or* operates to the peculiar disadvantage of a suspect class."

72

*Murgia*, 427 U.S. at 312 (emphasis added). It is the former infirmity, not the latter, that is implicated here.[39]

The Government's attempt to justify Section 922(b)(1)'s ban on the reality that some adults between the ages of 18 and 20 commit crimes is likewise meritless. DOJ Br. 35, 37. A responsible, law-abiding adult's membership in a particular *group* cannot form the basis for a classification that infringes that adult's fundamental "*individual* right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592 (emphasis added); *cf. Adarand* 515 U.S. at 227 ("the Fifth and Fourteenth Amendments to the Constitution protect *persons*, not *groups*" and thus "a *group* classification long recognized as in most circumstances irrelevant and therefore prohibited … should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed") (emphasis in original, quotation marks omitted).

Are there more criminals in the 18-to-20 bracket than in other age brackets? Perhaps, but resolution of that factual issue is not necessary to the resolution of this case. For if that fact were sufficient to justify disarming the entire population of 18-to-20 year olds, then the government could disarm other demographic groups simply because some number of that cohort commits handgun crimes at a higher rate than the general population. The most obvious examples might be differentially higher gun-violence rates by males or by the poor. Could these groups therefore be generally disarmed? The answer is plainly no.

---

[39] It is also of no moment that the Fifth Circuit held in *United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003), that an equal protection challenge to the Federal felon-in-possession prohibition is subject to rational basis review. This holding was grounded in the Fifth Circuit's understanding that felons are simply "*exclud[ed]* … from the Second Amendment's protection, *id.* at 635 (emphasis added). 18-to-20-year olds fall squarely within that protection.

Moreover, the Government's *argument* regarding the problem of handgun violence among the 18-to-20 year-old cohort ignores a critical *fact* that the Government readily admits: "[y]ounger persons, particularly those age 18-20, ha[ve] higher rates of victimization by armed offenders."  DOJ Br. 39-40.  As *Heller* explained, self-defense is "the *central component* of the right itself," 554 U.S. at 599.  *See also id.* at 628 ("the inherent right of self-defense has been central to the Second Amendment right").  Accordingly, even if we ignore *Heller*'s admonition that the interest balancing was settled by ratification of the Second Amendment, the Government's rebalancing completely fails to weigh the fact that, based on the Government's own statistics, 18-to-20 year olds have a greater need for armed self-defense.  *See also, e.g.*, Harmon Decl. ¶ 10, App. 12.

This fact points to another problem with Section 922(b)(1): vast, and thus fatal, overinclusiveness.  Indeed, only a miniscule fraction of 18-to-20 year olds engage in criminal violence: FBI and Census Bureau data indicates that fewer than 1% of 18-to-20 year olds were arrested for violent crimes in 2009.[40]  The Government thus classifies all 18-to-20 year olds and strips them of their fundamental rights because of the sins of the few.  That is not how rights work under our Constitution.  *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) ("deeply etched in our law [is the theory that] a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand"); *Hodgson v.*

---

[40] The calculation proceeds as follows, with an adjustment for the number of 18-to-20 year olds to reflect the portion of the total U.S. population covered by the FBI arrest statistics:

66,357 violent crime arrests ÷ (13,212,495 x .781) 18-to-20 year olds = .0064, or **0.64%**

*See* FBI, *Crime in the United States 2009*, Table 38:  Arrests by Age, *available at* http://www2.fbi.gov/ucr/cius2009/data/table_38.html#overview; U.S. Census Bureau, *Monthly Postcensal Resident Population, by single year of age, sex, race, and Hispanic origin*, July 1, 2009 data, *available for download at* http://www.census.gov/popest/national/asrh/2009-nat-res.html.

*Minnesota*, 497 U.S. 417, 446-47 (1990) (" 'The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition.' ") (quoting *Parham v. J.R.*, 442 U.S. 584, 603 (1979)).

This is amply demonstrated by *Craig v. Boren*, 429 U.S. 190 (1976), in which the Supreme Court struck down an Oklahoma law that prohibited the sale of " 'nonintoxicating' 3.2% beer" to under-21-year-old men but permitted sales to women 18 and over.  The Court rejected Oklahoma's attempt to rely on statistics showing that 18-to-20-year-old men were over *ten times* more likely (2% vs. .18%) than their female counterparts to have been arrested for "alcohol-related driving offenses."  *Id.* at 192, 201-02.  Although "such a disparity is not trivial in the statistical sense," the Court reasoned that "it hardly can form the basis for employment of a gender line as a classifying device."  *Id.*; *see also id.* at 202 ("Certainly if maleness is to serve as a proxy for drinking and driving, a correlation of 2% must be considered an unduly tenuous 'fit' ".).  Because "the principles embodied by the [fundamental right to keep and bear arms] are not to be rendered inapplicable by statistically measured but loose-fitting generalities," *id.* at 208-09, Section 922(b)(1) must be struck down under the Fifth Amendment as well as the Second.

## CONCLUSION

For these reasons, this Court should DENY the Government's Motion to Dismiss, Or, In The Alternative, For Summary Judgment, and GRANT Plaintiffs' Motion for Summary Judgment.

Dated January 28, 2011                    Respectfully submitted,


                                          s/ Charles J. Cooper
Fernando M. Bustos                        Charles J. Cooper*
State Bar No. 24001819                    David H. Thompson*

75

LAW OFFICES OF FERNANDO M. BUSTOS, P.C.
P.O. Box 1980
Lubbock, TX 79408-1980
Tel: (806) 780-3976
Fax: (806) 780-3800
Email: fbustos@bustoslawfirm.com

Jesse Panuccio*
Pete Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C.  20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com
*Admitted *pro hac vice*.

*Counsel for Plaintiffs*

### *Certificate of Service*

On January 28, 2011, I electronically submitted the foregoing document with the clerk of court for the U.S. District, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all counsel and/or *pro se* parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5 (b)(2).

s/Charles J. Cooper
Charles J. Cooper
