**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | |
|---|---|
| **REBEKAH JENNINGS, BRENNAN HARMON, ANDREW PAYNE, and NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.,**<br><br>      **Plaintiffs,**<br><br>  **vs.**<br><br>**BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; KENNETH E. MELSON, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and ERIC H. HOLDER, Jr., in his official capacity as Attorney General of the United States,**<br><br>      **Defendants.** | **Case No. 5:10-cv-00140-C** |

**DEFENDANTS' COMBINED REPLY BRIEF IN SUPPORT OF THEIR MOTION TO
DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.   PLAINTIFFS HAVE NOT DEMONSTRATED CONCRETE OR
     PARTICULARIZED INJURY SUFFICIENT TO ESTABLISH
     ARTICLE III STANDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.   Federal Firearms Licensees Have Not Satisfied the Constitutional
          Minimum Sufficient to Confer Article III Standing, and May Not
          Challenge Section 922(b)(1) on Behalf of Potential Purchasers. . . . . . . . . . . . . . 4

     B.   The Three Individual 18-to-20-Year-Old Plaintiffs Lack Standing
          to Sue Because They May Lawfully Obtain Handguns and
          Handgun Ammunition by Other Means and Avoid Injury. . . . . . . . . . . . . . . . . . 10

          1.   Plaintiffs Suffer No Direct Injury and Present Only a
               Generalized Grievance Which May Not Be Adjudicated By
               This Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          2.   The First Amendment and Privacy "Access" Cases on Which
               Plaintiffs Rely Do Not Support Their Standing Arguments. . . . . . . . . . . . 14

II.  THE AGE QUALIFICATION ON THE COMMERCIAL SALE OF ARMS BY
     FEDERALLY-LICENSED DEALERS IS A "PRESUMPTIVELY LAWFUL"
     REGULATORY MEASURE UNDER HELLER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     A.   No Court Has Ever Held that the Second Amendment Includes a Right
          to "Acquire and Buy" Arms, and Plaintiffs Present No Evidence That
          the Second Amendment Was Ever Understood to Protect Such a Right. . . . . . . . . 19

     B.   The Under-21 Age Qualification on the Purchase of Particular Firearms
          from Licensed Dealers Does Not Operate as the Functional Equivalent
          of a Complete Ban on the Possession of Firearms by All Individuals. . . . . . . . . . . 21

     C.   First Amendment and Right-to-Privacy Decisions Involving Total Bans
          on Sale or Possession Are Not Applicable Here. . . . . . . . . . . . . . . . . . . . . . . . . 23

III. CONDITIONS ON THE COMMERCIAL SALE OF ARMS TO INDIVIDUALS
     UNDER 21 COMPORT WITH THE HISTORICAL UNDERSTANDING OF
     THE SECOND AMENDMENT RIGHT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

A.    The States Have Long Established Minimum Age Restrictions on the Purchase and Use of Firearms, Up to and Including Age 21. . . . . . . . . . . . . . . . . . 30

B.    Because the Issue in <u>Heller</u> and <u>McDonald</u> Was the Individual Right to Keep and Bear Arms Unconnected with Service in a Militia, the Relevance of Militia Statutes Is Questionable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

C.    In Any Event, Congress and the States Have Traditionally Possessed Discretion to Set Age Limits for Participation in Military Service. . . . . . . . . . . . . 38

       1.    The 1792 Militia Act Did Not Create a Vested Right in Individuals to Bear Arms as Part of a Militia at a Particular Age. . . . . . . . . 43

       2.    Colonial and Early State Militia Laws Neither Established a Vested Right in Individuals Under 21 to Serve in a Militia Nor Presupposed Their Possession of Firearms. . . . . . . . . . . . . . . . . . . . . . . . . . 47

D.    Plaintiffs' Remaining Arguments Are Policy Arguments, the Resolution of Which Is Within Legislative Discretion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

IV.    SECTION 922(B)(1) SURVIVES ANY LEVEL OF CONSTITUTIONAL MEANS-END SCRUTINY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    A.    If the Court Were to Determine that Section 922(b)(1) Burdens Conduct Protected by the Second Amendment, It Should Apply No More Than Intermediate Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    B.    The Age Qualification for Purchasing Handguns from Licensed Dealers Is Substantially Related to the Important Governmental Interest in Protecting Public Safety and Combating Violent Crime. . . . . . . . . . . . . . . . . . 58

V.    SECTION 922(B)(1) DOES NOT SUBSTANTIALLY BURDEN PLAINTIFFS' SECOND AMENDMENT RIGHT TO KEEP AND BEAR ARMS AND THUS DOES NOT VIOLATE EQUAL PROTECTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

# TABLE OF AUTHORITIES

## CASES

Abbott Labs. v. Gardner,
  387 U.S. 136 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

Adkins v. Kaspar,
  393 F.3d 559 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74

Allam v. State,
  830 P.2d 435 (Alaska Ct. App. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Allison v. Allison,
  337 N.E.2d 666 (Ohio 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Anderson v. City of Hermosa Beach,
  621 F.3d 1051 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Anderson v. Celebrezze,
  460 U.S. 780 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Anheuser-Busch, Inc. v. Schmoke,
  101 F.3d 325 (4th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Apache Bend Apartments v. United States,
  987 F.2d 1174 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Aymette v. State,
  21 Tenn. 154 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

Babbitt v. United Farmworkers Nat'l Union,
  442 U.S. 289 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

Barnes v. Mississippi,
  992 F.2d 1335 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Beaudry v. Beaudry,
  312 A.2d 922 (Vt. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Beecham v. Henderson Cty.,
  422 F.3d 372 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  73

Blassman v. Markworth,
  359 F. Supp. 1 (N.D. Ill. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 50

Blount v. SEC,
    61 F.3d 938 (D.C. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Broadway v. Beto,
    338 F. Supp. 827 (N.D. Tex. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Broadrick v. Oklahoma,
    413 U.S. 601 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Buckley v. Valeo,
    424 U.S. 1 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Bullock v. Carter,
    405 U.S. 134 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Bykofsky v. Borough of Middletown,
    401 F. Supp. 1242 (M.D. Pa. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Carey v. Brown,
    447 U.S. 455 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Carey v. Population Servs. Int'l,
    431 U.S. 678 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Chavez v. Hous. Auth. of El Paso,
    973 F.2d 1245 (5th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Christenson v. Cty. of Boone,
    483 F.3d 454 (7th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

City of Akron v. Akron Ctr. for Reprod. Health,
    462 U.S. 416 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

City of Cincinnati v. Discovery Network,
    507 U.S. 410 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

City of Houston v. FAA,
    679 F.2d 1184 (5th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

City of Ladue v. Gilleo,
    512 U.S. 43 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 67

Consumer Prod. Safety Comm'n v. GTE Sylvania,
    447 U.S. 102 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Cook v. Reno,
    74 F.3d 97 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Craig v. Boren,
    429 U.S. 190 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Deerfield Med. Ctr. v. City of Deerfield Beach,
    661 F.2d 328 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

District of Columbia v. Heller,
    554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Dronenburg v. Zech,
    741 F.2d 1388 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Educ. Media Co. v. Swecker,
    602 F.3d 583 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Eisenstadt v. Baird,
    405 U.S. 438 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 24

Erznoznik v. City of Jacksonville,
    422 U.S. 205 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Felix v. Milliken,
    463 F. Supp. 1360 (E.D. Mich. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Ferguson v. Skrupa,
    372 U.S. 726 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Fire Equip. Mfrs. Ass'n v. Marshall,
    679 F.2d 679 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Forsyth v. Barr,
    19 F.3d 1527 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Friends of the Earth, Inc. v. Laidlaw Envtl. Serv.,
    528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Gary v. City of Warner Robins,
    311 F.3d 1334 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

George v. United States,
    196 F.2d 445 (9th Cir. 1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

GeorgiaCarry.Org. Inc. v. Georgia,,
    __ F. Supp. 2d __, 2011 WL 240108  (M.D. Ga. Jan. 24, 2011). . . . . . . . . . . . . . . . . . . . . . 33, 57

Gilbert Equip. Co. v. Higgins,
    709 F. Supp. 1071 (S.D. Ala. 1989).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Gilligan v. Morgan,
    413 U.S. 1 (1973).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,
    546 U.S. 418 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74

Gray v. Sanders,
    372 U.S. 368 (1963).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

Griswold v. Connecticut,
    381 U.S. 479 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 24

H.L. v. Matheson,
    450 U.S. 398 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 25

Harris v. McRae,
    448 U.S. 297 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Heller v. District of Columbia ("Heller II"),
    698 F. Supp. 2d 179 (D.D.C. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Hiley v. Barrett,
    155 F.3d 1276 (11th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69

Hodgkins v. Holder,
    677 F. Supp. 2d 202 (D.D.C. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

Houston Chronicle Pub. Co. v. City of League City,
    488 F.3d 613 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 70

Houston v. Moore,
    18 U.S. 1 (1820).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

Huddleston v. United States,
    415 U.S. 814 (1974).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59

Jacobson v. Massachusetts,
    197 U.S. 11 (1905).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Johnson v. Pomeroy,
     294 Fed. Appx. 397 (10th Cir. 2008)............................................... 73

Jones v. Jones,
     72 F.2d 829 (D.C. Cir. 1934)...................................................... 39

Kendall v. Employees Ret. Plan of Avon Prods.,
     561 F.3d 112 (2d Cir. 2009)...................................................... 14

Kitty Hawk AirCargo Inc. v. Chao,
     418 F.3d 453 (5th Cir. 2005)...................................................... 7

Kramer v. Union Free School Dist. No. 15,
     395 U.S. 621 (1969)............................................................. 41

Kreis v. Sec'y of Air Force,
     866 F.2d 1508 (D.C. Cir. 1989).................................................. 45

Lamont v. Postmaster Gen.,
     381 U.S. 301 (1965)............................................................. 27

Lassiter v. Northampton Cty. Bd. of Elections,
     360 U.S. 45 (1959)............................................................. 42

Little v. KPMG,
     575 F.3d 533 (5th Cir. 2009)..................................................... 7

Longstreet Delicatessen v. Jolly,
     No. 06-986, 2007 WL 2815022 (E.D. Cal. Sept. 25, 2007)........................... 8

Lovell v. City of Griffin,
     303 U.S. 444 (1938)............................................................. 27

Lujan v. Defenders of Wildlife,
     504 U.S. 555 (1992)............................................................. 4

Lyng v. Castillo,
     477 U.S. 635 (1986)............................................................. 73

Marte v. INS,
     562 F. Supp. 92 (S.D.N.Y. 1983).................................................. 41

Martin v. City of Struthers,
     319 U.S. 141 (1943)............................................................. 27

Martin v. Parrish,
  805 F.2d 583 (5th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Mass. Bd. of Ret. v. Murgia,
  427 U.S. 307 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

McDonald v. Bd. of Elections Comm'n,
  394 U.S. 802 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

McDonald v. City of Chicago,
  130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Montana Shooting Sports Ass'n v. Holder,
  2010 WL 3926029 (D. Mont. Aug. 31, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Morrissey v. Perry,
  137 U.S. 157 (1890). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Nat'l Ass'n of Gov't Emps. v. Barrett,
  968 F. Supp. 1564 (N.D. Ga. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.,
  470 U.S. 451 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Nat'l Rifle Ass'n v. Magaw,
  132 F.3d 272 (6th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Navegar, Inc. v. United States,
  103 F.3d 994 (D.C. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

Nieszner v. Mark,
  684 F.2d 562 (8th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Niles v. Univ. Interscholastic League,
  715 F.2d 1027 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Nunn v. State,
  1 Ga. 243 (Ga. 1846). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Okpalobi v. Foster,
  244 F.3d 405 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Olympic Arms v. Buckles,
  301 F.3d 384 (6th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

In re Opinion of the Justices,
    39 Mass. 571 (1838). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

Oregon v. Mitchell,
    400 U.S. 112 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 51

Owen v. State,
    31 Ala. 387 (Ala. 1858). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Pacifica Found. v. FCC,
    438 U.S. 726 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

Pederson v. Louisiana State Univ.,
    213 F.3d 858 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Perpich v. Dep't of Defense,
    496 U.S. 334 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

Peruta v. County of San Diego,
    __ F. Supp. 2d __, 2010 WL 5137137 (S.D. Cal. Dec. 10, 2010). . . . . . . . . . . . . . . . . . . .  57

Peterson v. LaCabe,
    2011 WL 843909 (D. Colo. March 8, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

Planned Parenthood v. Camblos,
    155 F.3d 352 (4th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Planned Parenthood v. Casey,
    505 U.S. 833 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 75

Planned Parenthood v. Danforth,
    428 U.S. 52 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 25

Plante v. Gonzalez,
    575 F.2d 1119 (5th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  73

Powers v. Ohio,
    499 U.S. 400 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Reliable Consultants, Inc. v. Earle,
    517 F.3d 738 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 24

Roark & Hardee LP v. City of Austin,
    522 F.3d 533 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Roper v. Simmons,
    543 U.S. 551 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Rourke v. U.S. Fid. & Guar. Co.,
    1 S.E. 2d 728 (Ga. 1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

San Diego Cty. Gun Rights Comm. v. Reno,
    98 F.3d 1121 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Shawiak v. City of Phoenix,
    252 Fed. Appx. 828 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Singleton v. Wulff,
    428 U.S. 106 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Skinner v. Oklahoma ex rel. Williamson,
    316 U.S. 535 (1942). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Solid Waste Agency of N. Cook Cty v. U.S. Army Corps of Eng'rs,
    531 U.S. 159 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Sonnier v. Quarterman,
    476 F.3d 349 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

State v. Callicutt,
    69 Tenn. 714 (1878). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

State v. Chandler,
    5 La. Ann. 489 (La. 1850). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

State v. Howard,
    308 A.2d 366 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

State v. Sieyes,
    225 P.3d 995 (Wash. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Stiles v. Blunt,
    912 F.2d 260 (8th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

T & M Jewelry v. Hicks ex rel. Hicks,
    189 S.W.3d 526 (Ky. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 68-69

Tashjian v. Republican Party of Conn.,
    479 U.S. 208 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Truax v. Raich,
  239 U.S. 33 (1915). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

Turner Broad. Sys. v. FCC,
  512 U.S. 622 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   70

Turner Broad. Sys. v. FCC,
  520 U.S. 180 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   55

In re United States,
  578 F.3d 1195 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   56

United States v. Bledsoe,
  Criminal No. SA-08-CR-13(2)-XR, 2008 WL 3538717 (W.D. Tex. Aug. 8,
  2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Bredimus,
  352 F.3d 200 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

United States v. Chester,
  628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

United States v. Coil,
  442 F.3d 912 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

United States v. Dukes,
  479 F.2d 324 (5th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41

United States v. Emerson,
  46 F. Supp. 2d 598 (N.D. Tex. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

United States v. Emerson,
  270 F.3d. 203 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

United States v. Engstrum,
  609 F. Supp. 2d 1227 (D. Utah 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

United States v. Estate of Romani,
  523 U.S. 517 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   65

United States v. Grace,
  461 U.S. 171 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

United States v. King,
  532 F.2d 505 (5th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

United States v. Knight,
    574 F. Supp. 2d 224 (D. Me. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57

United States v. Lewitzke,
    176 F.3d 1022 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   69

United States v. Marzzarella,
    595 F. Supp. 2d 596 (W.D. Pa. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19, 20

United States v. Marzzarella,
    614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Miller,
    307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

United States v. Moore,
    84 F.3d 1567 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

United States v. Olson,
    473 F.2d 686 (8th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

United States v. Playboy Entmt Grp.,
    529 U.S. 803 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

United States v. Reese,
    627 F.3d 792 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Salerno,
    481 U.S. 739 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60

United States v. Skoien,
    614 F.3d 638 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Stevens,
    130 S. Ct. 1577 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

United States v. Virginia,
    518 U.S. 515 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   67, 70

United States v. Williams,
    616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   53, 56

United States v. Yancey,
    621 F.3d 681 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   55-56, 57

United States v. Ziegenhagen,
    420 F. Supp. 72 (E.D. Wis. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   69

United Transp. Union v. ICC,
    891 F.2d 908 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

Valley Nat'l Bank of Phoenix v. Glover,
    159 P.2d 292 (Ariz. 1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

Vincenty v. Bloomberg,
    476 F.3d 74 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

Virginia State Board of Pharm. v. Virginia Citizens Consumer Council,
    425 U.S. 748 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16, 27

Wal-Mart Stores, Inc. v. Tamez,
    960 S.W.2d 125 (Tex. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   61

Walsh v. Louisiana High School Athletic Ass'n,
    616 F.2d 152 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74

Warth v. Seldin,
    422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

Weinberger v. Rossi,
    456 U.S. 25 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   65

Williams v. Rhodes,
    393 U.S. 23 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   71

Wilson v. Cook Cty.,
    ___ N.E.2d ___, 2011 WL 488753 (Ill. App. Ct. Feb. 9, 2011) . . . . . . . . . . . . . . . . . . . . .   57-58

Zablocki v. Redhail,
    434 U.S. 374 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   73

## **STATUTES**

10 U.S.C. § 505(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

18 U.S.C. § 921 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   passim

18 U.S.C. § 921(a)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

18 U.S.C. § 921(a)(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

18 U.S.C. § 921(a)(21)(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 67, 68

18 U.S.C. § 922(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 922(g)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   56

18 U.S.C. § 922(g)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

18 U.S.C. § 922(g)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 57

18 U.S.C. § 922(k). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   56

18 U.S.C. § 922(x). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   66

National Firearms Act, 26 U.S.C. § 5801 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

Second Militia Act of 1792, 1 Stat. 271. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## RULES AND REGULATIONS

27 C.F.R. § 478.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

Army Reg. 190-14 (March 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

U.S. Dep't of Defense Directive 5210.56 (Nov. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

## STATE CODES

Ala. Code § 12-16-60. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

Ala. Code § 28-11-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

Ala. Code § 28-11-13. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

Ala. Code. § 26-1-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

Alaska Stat. § 11.76.105. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

Cal. Penal Code § 12072(a)(3)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

Conn. Gen. Stat. § 29-36f. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

D.C. Code Ann. §§ 7-2502.03, 22-4507. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Del. Code Ann. tit. 24, §§ 901, 903. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Haw. Rev. Stat. Ann. § 134-2(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Ill. Comp. Stat. 65/3(a), 65/4 (a)(2)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Iowa Code § 724.22. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Md. Code Ann., Pub. Safety § 5-134. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Mass. Gen. Laws ch. 140, § 130. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Miss. Code Ann. § 1-3-27. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

Miss. Code Ann. § 13-5-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

Mo. Rev. Stat § 494.425(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

Neb. Rev. Stat. § 25-1601(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

Neb. Rev. Stat. § 43-2101. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

N.H. Rev. Stat. § 457:4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

N.J. Stat. Ann. § 2A:170-51.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

N.J. Stat. Ann. § 2C:58-6.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

N.M. Stat. Ann. § 30-7-2.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

N.Y. Penal Law § 400.00(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Ohio Rev. Code Ann. § 2923.21. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

R.I. Gen. Laws § 11-47-35(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

S.D. Codified Laws § 32-12-11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

## UNITED STATES CONSTITUTION

U.S. Const. art. I, § 8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S. Const. amend. XXVI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

## LEGISLATIVE MATERIALS

Annals of Cong. (1793). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47, 49

Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency
    of the Sen. Comm. on the Judiciary, 89th Cong. 277 (1965). . . . . . . . . . . . . . . . . . . . . . . .  64

Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency,
    Sen. Comm. on the Judiciary, 90th Cong. 666-67 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . 64

S. Rep. No. 90-1097, *reprinted in* 1968 U.S.C.C.A.N. 2112. . . . . . . . . . . . . . . . . . . . . . . 59, 63

## MISCELLANEOUS

42 Am. Jur. 2d Infants § 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Ashutosh Bhagwat, The Test That Ate Everything: Intermediate Scrutiny in First Amendment
    Jurisprudence, 2007 U. Ill. L. Rev. 783 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

Black's Law Dictionary (9th ed. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 44

Joseph Blocher, Categoricalism and Balancing in First and Second Amendment Analysis,
    84 N.Y.U. L. Rev. 375 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Holly Brewer, By Birth or Consent: Children, Law, and the Anglo-American Revolution in
    Authority (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

Alan Brownstein, How Rights Are Infringed: The Role of Undue Burden Analysis in
    Constitutional Doctrine, 45 Hastings L.J. 867 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 73

Patrick J. Charles, The 1792 National Militia Act, the Second Amendment, and
    Individual Militia Rights, 9 Geo. J.L. & Pub. Poly 1 (forthcoming 2011). . . . . . . . . . . . . 38, 44

George Chase, ed., The American Students' Blackstone (2d ed. 1884). . . . . . . . . . . . . . . . . . .  32

Thomas M. Cooley, Treatise on Constitutional Limitations (5th ed. 1883). . . . . . . . . . . . . . . . .   35

Clayton E. Cramer, Concealed Weapons Laws of the Early Republic (1999). . . . . . . . . . . . . . .   32

Clayton E. Cramer, For the Defense of Themselves and the State: The Original Intent
    and Judicial Interpretation of the Right to Keep and Bear Arms (1994). . . . . . . . . . . . . . . . . 35

Clayton Cramer, Still Ticking, http://www.claytoncramer.com/popular/StillTicking.html. . . . . . . 35

Michael D. Doubler, Civilian in Peace, Soldier in War (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

James Alan Fox et al., The Will to Kill: Making Sense of Senseless Murder (2005). . . . . . . . . . . . 60

House of Representatives, On the Militia Bill, December 24, 1790, *reprinted in*
    The Federal Gazette and Philadelphia Daily Advertiser (Philadelphia), January 10, 1791. . . . . 46

James Kent, Commentaries on American Law (O. Holmes ed., 12th ed. 1873). . . . . . . . . . . . . . . 32

John K. Mahon, History of the Militia and the National Guard (1983). . . . . . . . . . . . . . . . . . . . . .   44

National Adolescent Health Information Center, 2007 Fact Sheet on Violence:
    Adolescents & Young Adults . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60

Herbert L. Osgood, The American Colonies in the Seventeenth Century (1904). . . . . . . . . . . . . . 48

John McAuley Palmer, America in Arms: The Experience of the United States with
    Military Organization (1941). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense,
    56 UCLA L. Rev. 1443 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

Adam Winkler, Fundamentally Wrong About Fundamental Rights,
    23 Const. Comment. 227 (Summer 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   54

Adam Winkler, Scrutinizing the Second Amendment, 105 Mich. L. Rev. 683. . . . . . . . . . . . 54, 72

## INTRODUCTION

During a seven-year investigation of violent crime by the U.S. Senate Subcommittee to Investigate Juvenile Delinquency, many witnesses presented testimony about the high violent crime rate for individuals under 21. Congress also heard testimony about the ease and frequency with which underage individuals evaded State minimum-age requirements (including under-21 age requirements) for firearms purchases by crossing nearby State lines, and buying firearms that they later used in criminal activities. To further its compelling interest in combating violent crime, and to supplement the States' ability to control firearms sales to individuals below the prescribed minimum age, Congress restricted the ability of federally-licensed firearms dealers to sell handguns directly to 18-to-20 year olds. Congress acted appropriately by enacting 18 U.S.C. § 922(b)(1), a law designed to preserve public safety, and to assist States with the enforcement of minimum age requirements for the purchase of handguns.[1]

As explained in Defendants' opening brief, Plaintiffs' constitutional challenge to this law has no merit. First, Plaintiffs have failed to satisfy their burden of showing the concrete and particularized injury-in-fact necessary for standing. Second, Section 922(b)(1) is presumptively constitutional because it is a law imposing a qualification on the commercial sale of arms. Third, even assuming that the statute were not presumptively lawful, it is constitutional because it is a form of longstanding regulation that is both reasonable and consistent with the right to keep and bear

---

[1] Twelve States and the District of Columbia have chosen 21 as their minimum age for the purchase or use of handguns (or all firearms): California, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Iowa, Maryland, Massachusetts, New Jersey, New York, Ohio, and Rhode Island. See Cal. Penal Code § 12072(a)(3)(A); Conn. Gen. Stat. § 29-36f; Del. Code Ann. tit. 24, §§ 901, 903; D.C. Code Ann. §§ 7-2502.03, 22-4507; Haw. Rev. Stat. Ann. § 134-2(d); 430 Ill. Comp. Stat. 65/3(a), 65/4(a)(2)(i); Iowa Code § 724.22; Md. Code Ann., Pub. Safety § 5-134; Mass. Gen. Laws ch. 140, § 130; N.J. Stat. Ann. § 2C:58-6.1; N.Y. Penal Law § 400.00(1)(a); Ohio Rev. Code Ann. § 2923.21; R.I. Gen. Laws § 11-47-35(a). Additionally, New Mexico's minimum age for handgun possession is 19. N.M. Stat. Ann. § 30-7-2.2.

arms as historically understood in the United States, and because it substantially relates to the important government interest in combating violent crime and preserving public safety. As explained further below, Plaintiffs' responsive brief does virtually nothing to diminish any of these arguments. Accordingly, the Court should dismiss this action, or enter judgment for Defendants.

## ARGUMENT

### I. PLAINTIFFS HAVE NOT DEMONSTRATED CONCRETE OR PARTICULARIZED INJURY SUFFICIENT TO ESTABLISH ARTICLE III STANDING.

Plaintiffs' standing arguments misconstrue well-settled precedent and fail to rectify the jurisdictional weaknesses discussed at length in Defendants' opening brief. As an initial matter, Plaintiff National Rifle Association, Inc. ("NRA") asserts that its members who are federal firearms dealers have standing to challenge Section 922(b)(1) simply because these dealers are subject to that provision's criminal prohibitions. But Plaintiffs fail to pinpoint any credible or imminent threat of prosecution against these dealers, and thus do not satisfy the case or controversy requirement of Article III. In addition, and as discussed further below, the firearms dealers' alleged economic harm – the loss of potential earnings from handguns sold to 18-to-20-year-old consumers – is too speculative to confer standing. Because these firearms dealers are unable to assert concrete or particularized injury on their own behalf, they do not have standing to challenge a restriction that "burdens the purchaser's constitutional rights." Pl. Opp. at 12-13.

Similarly misleading is Plaintiffs' discussion of standing with respect to the individual 18-to-20 year olds who desire to purchase a handgun from federal firearms dealers. As emphasized in Defendants' opening brief, these individuals may lawfully obtain handguns through other means, including from their parents who may lawfully purchase handguns and give them to their children as

bona fide gifts.[2]  See United States v. Moore, 84 F.3d 1567, 1571 (9th Cir. 1996) ("There is no

reported case in which a minor's parent has been deemed an illegal 'straw' purchaser for the minor.

[ATF's] interpretations of the [Gun Control Act, 18 U.S.C. 921 et seq. ("1968 Act")] have always

acknowledged parental purchases as an exception to the ban on sales to minors."); ATF Chief

Counsel Op. 23362 (Dec. 5, 1983), App. 3-5.[3]  Indeed, none of the individual plaintiffs maintain

that his or her parents cannot or will not purchase handguns on his or her behalf.  Rather, these

individuals assert that their parents "have not done so," and that they "do not believe [they] should

have to ask [their] parents' permission."  See, e.g., Jennings Decl. ¶ 15.  As such, Plaintiffs' alleged

injury should be characterized not as an inability to "keep and bear arms for the purpose of

self-defense," McDonald v. City of Chicago, 130 S. Ct. 3020, 3026 (2010) – the core Second

Amendment right recognized in District of Columbia v. Heller, 554 U.S. 570 (2008) – but as an

_____

[2] Defendants' opening brief at one point referred to this avenue of indirect acquisition as a parental-consent regime; see Def. Mot. at 37.  Defendants did not intend this characterization to suggest that persons under 21 may purchase handguns directly from a licensed dealer with parental consent, but were instead referring to the explanation made earlier, id. at 15, that parents or guardians may buy handguns to gift to their children or wards between the ages of 18 and 20.

[3] Furthermore, Plaintiffs may buy a handgun and ammunition from an individual who is selling from his or her private collection or only makes an occasional sale of such items, and who does not have the principal objective of making a profit.  See 18 U.S.C. § 921(a)(11), (a)(21)(C).  Plaintiffs' characterization of Defendants' description of the law on this point as, "if we are charitable, only a half-truth," Pl. Opp. at 51, is mistaken, and appears to be based on a misunderstanding.  "Licensed dealers" and "licensed collectors" may not transfer handguns to individuals under 21.  18 U.S.C. § 922(b)(1).  But "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms" is not a "dealer."  Id. § 921(a)(21)(C).  Such persons are not "dealing," and do not need to be licensed.  Similarly, a "collector" is defined narrowly as a "person who acquires, holds, or disposes of firearms as curios or relics," id. § 921(a)(13), meaning firearms that are only "of special interest to collectors by reason of some quality other than is associated with firearms intended for sporting use or as offensive or defensive weapons."  27 C.F.R. § 478.11.  "Collector" does not refer generally to any person with a private collection of firearms.

inability to obtain a handgun wholly independently, without parental participation.  Because

Plaintiffs have not shown they are unable to obtain a handgun through this alternative procedure,

they have access to the means of self-defense guaranteed by the Second Amendment.  See id.

> **A.** **Federal Firearms Licensees Have Not Satisfied the Constitutional Minimum Sufficient to Confer Article III Standing, and May Not Challenge Section 922(b)(1) on Behalf of Potential Purchasers.**

Plaintiffs argue that federal firearms dealers may challenge Section 922(b)(1) because "a

potential vendor . . . has standing to challenge a restriction on the vendor that burdens the

purchaser's constitutional rights."  Pl. Opp. at 12-13.  However, the line of precedent on which

Plaintiffs rely focuses solely on the prudential considerations a court must evaluate in deciding

whether it has subject matter jurisdiction and not on the constitutional injury-in-fact requirement.

For example, in Craig v. Boren, 429 U.S. 190 (1976), the Court focused on the issue of third-party

standing only after it decided that the plaintiffs asserted direct injury, satisfying the constitutional

minimum for standing – which the NRA, asserting claims on behalf of member dealers, is unable to

do.  See id. at 193-94 (collecting cases) (discussing plaintiff's economic harm through constriction

of the buyers' market and Oklahoma's Assistant Attorney General's threat of "sanctions and

perhaps loss of license").  According to the Court, "[n]o prudential objective thought to be served by

limitations of jus tertii standing" would be furthered in declining to hear that case, as "the lower

court already ha[d] entertained the constitutional challenge and the parties have sought resolution of

the constitutional issue."  Id. at 190.

"[T]he irreducible constitutional minimum of standing" includes the requirement of an

"injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized,

and (b) actual or imminent, not conjectural or hypothetical."  Lujan v. Defenders of Wildlife, 504

U.S. 555, 560 (1992) (citations and internal quotation marks omitted).  Every plaintiff must show an injury-in-fact in order to establish standing, even where he or she is attempting to assert the constitutional rights of third parties.  See Powers v. Ohio, 499 U.S. 400, 410-11 (1991); see also Singleton v. Wulff, 428 U.S. 106, 112 (1976) (applying the injury-in-fact requirement to physicians seeking Medicaid payments even though they were asserting the constitutional rights of third-party patients claiming that they had a constitutional right to obtain abortions); Griswold v. Connecticut, 381 U.S. 479, 481 (1965) (concluding that physicians' convictions on state criminal charges of disseminating birth-control advice constituted an injury sufficient to support standing for them to challenge the state statutes they had violated, even though they were asserting the constitutional rights of privacy of the persons to whom they had given the advice).

        To obtain pre-enforcement review, courts in this circuit require far more than the facts the NRA alleges here.  In Roark & Hardee LP v. City of Austin, 522 F.3d 533, 533-34 (5th Cir. 2008), for example, the Fifth Circuit held that bar owners had standing to challenge certain prohibitions on smoking in enclosed public spaces.  The bar owners were knowingly violating the ordinance by permitting customers to smoke, and the threat of enforcement was real, as some owners were actually noticed for violations and charged under the ordinance.  See id. at 543.  Other circuits have applied similar reasoning to deny standing to firearms dealers and manufacturers challenging commercial restrictions on the sale of assault weapons.  The Sixth Circuit, for instance, explicitly rejected "[p]laintiffs' assertions that they 'wish' or 'intend' to engage in proscribed conduct" as sufficient to confer standing.  Nat'l Rifle Ass'n v. Magaw, 132 F.3d 272, 293 (6th Cir. 1997).  The Ninth Circuit requires plaintiffs to specify a "particular time or date on which [they] intend to violate the [statute,]" because "the acts necessary to make plaintiffs' injury – prosecution under the

challenged statute – materialize are almost entirely within plaintiff's own control." San Diego Cty. Gun Rights Comm. v. Reno, 98 F.3d 1121, 1127 (9th Cir. 1996); accord Navegar, Inc. v. United States, 103 F.3d. 994, 1001 (D.C. Cir. 1997) (gun manufacturers were permitted to challenge statutory bans on specific models and/or brands of firearms the manufacturers were currently producing); Hodgkins v. Holder, 677 F. Supp. 2d 202, 204-05 (D.D.C. 2010) (applying Navegar to deny standing to persons prohibited from purchasing firearms under federal gun control restrictions).[4]

Nothing in Plaintiffs' Second Amended Complaint or the affidavits submitted in support of their summary judgment motion demonstrates these dealers' intention to sell handguns to individuals between the ages of 18 and 20.  In fact, the affidavits make clear that the dealers have refused to sell handguns and handgun ammunition to individuals between the ages of 18 and 20, and would do so *only* upon a determination that Section 922(b)(1) was unconstitutional and no longer enforceable.  See Koeppe Decl. ¶¶ 10-11.

Plaintiffs' alternative basis for standing rests on a theory of "economic injury" based on the new allegations set forth in their Amended Complaint and the declarations filed in support of their

---

[4] In the pre-enforcement context, a plaintiff must allege both an intention to engage in conduct prohibited by a federal statute and a credible threat of prosecution that is more than speculative.  See Babbitt v. United Farmworkers Nat'l Union, 442 U.S. 289, 298-99 (1979); San Diego Cty., 98 F.3d at 1127-28 (the mere possibility of criminal sanctions applying does not of itself create a case or controversy).  Because the NRA, asserting claims on behalf of its dealer members, has failed to allege more than a desire to engage in conduct proscribed by federal firearms laws, the Court need not consider whether these dealers face a concrete threat of prosecution under federal law.  Nevertheless, Plaintiffs' argument and supporting affidavits assert no specific threat to prosecute the NRA member-dealers for any particular act at any particular time or place.  Therefore, these dealers have no basis for pre-enforcement standing, which may only be found where a plaintiff is personally threatened with criminal penalties, or where a statute specifically targets the plaintiff for prosecution.  See Navegar, 103 F.3d. at 1001; Hodgkins, 677 F. Supp. 2d at 204.

summary judgment motion.  See Pl. Opp. at 21-22.  Plaintiffs allege that federal firearms dealers

would, but for the law, "profit from selling handguns" to individuals in the 18-20 age range, id. at

21, and that such loss of economic opportunity is sufficient to establish standing.  See id. at 22

(arguing that dealers Paul White and Roger Koeppe have "lost profits from refusing to sell handguns

to 18-to-20 year olds because of Section 922(b)(1), and [they] would sell handguns to law-abiding,

otherwise qualified adults in that age range were it legal to do so.") (internal citations omitted).

Labeling the dealers' injury "economic," however, does not change the speculative nature of

their alleged harm.  Though recognized as a legally protected interest, economic harm, like any

harm, must still be "concrete and particularized" for standing purposes, and "a possible financial

loss is not by itself a sufficient interest to sustain a judicial challenge to governmental action."

Abbott Labs. v. Gardner, 387 U.S. 136, 153 (1967); see also Little v. KPMG, 575 F.3d 533, 540-41

(5th Cir. 2009) (competitor's claimed injury of lost business arising from public-accounting firm's

alleged fraudulent procurement of Texas license and registration was too speculative to confer

Article III standing to bring action against firm).

Here, the NRA, on behalf of dealer members, presents only anecdotal evidence that 18-

to-20-year-old individuals, "while shopping for other items (such as long guns), . . . often browse

the handgun inventory and comment that they would buy [a handgun] if they were permitted under

the law."  See, e.g., Koeppe Decl. ¶ 10.  These customers' secondhand remarks represent, at best,

speculative evidence.  See Pl. Opp. at 21-22.  At the summary judgment stage, such allegations are

not sufficient.  See Kitty Hawk AirCargo Inc. v. Chao, 418 F.3d 453, 459 (5th Cir. 2005) (noting

that plaintiff cited nothing in the record beyond a conclusory statement in an affidavit to support

standing and stating that, at the summary judgment stage, the plaintiff cannot rest on "mere

allegations" but must "set forth specific facts validating his right to standing").

In addition, the dealers have provided no details as to the number of individuals, aged 18-20, who have committed to purchasing handguns from federally-licensed dealers, nor have they estimated the number of handguns each individual would purchase.  Potential 18-to-20-year-old customers have certainly provided no compensation or any assurances that they would fulfill their alleged promises.  The dealers have further failed to describe the pricing for the handguns they desire to sell, and have provided no details regarding the cost of purchasing and receiving these firearms from manufacturers.  Without these facts, it is difficult, if not impossible, to determine whether the dealers have, in fact, lost any potential profits.  Accordingly, the Court would have to assume a number of factors not in evidence to conclude that Section 922(b)(1) has caused the NRA member-dealers any economic injury.[5]  Longstreet Delicatessen v. Jolly, No. 06-986, 2007 WL 2815022, at *18 (E.D. Cal. Sept. 25, 2007) ("Plaintiff . . . has made allegations of economic harm but has offered no evidence of actual harm suffered other than by potential lost sales.") (Def. Mot., Ex. 3); see also United Transp. Union v. ICC, 891 F.2d 908, 912 (D.C. Cir. 1989) ("When considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties). . . ").

In any event, Plaintiff NRA overstates the economic basis for standing by arguing that the loss of market opportunity or potential profit automatically entitles the NRA to bring suit on behalf of its dealer members.  See Pl. Opp. at 22 (claiming it is "absolutely clear" that vendors may bring suit as such plaintiffs "incur a direct economic injury through the constriction of [their] buyers'

---

[5] Nor does Plaintiffs' conclusory evidence take into account the fact that parents or others can purchase handguns directly from licensed dealers as gifts for 18-to-20-year-olds.

market") (citing <u>Craig</u>, 429 U.S. at 194).  Contrary to Plaintiffs' interpretation of <u>Craig v. Boren</u>, economic harm confers standing only where a plaintiff suffers a tangible pecuniary loss of current business.  The provision at issue in <u>Craig</u> prohibited 18-to-20-year-old males from purchasing certain alcoholic beverages.  As the Supreme Court noted, the law operated to constrict the market of potential purchasers, and caused a tangible financial loss to those vendors who were – at the time the challenged provision was passed – able to sell such beverages to 18-to-20-year-old male consumers.  429 U.S. at 192-97.  Conversely, the NRA member-dealers in this case are trying to gain access to a particular sector of the market that is not currently available, and allege a hypothetical loss of profits because they are unable to do so.  Their inability to reap a theoretical profit on future sales, without any allegation of concrete financial injury to their current business, represents only a "possible financial loss" that does not suffice to establish standing.  <u>Abbott Labs.</u>, 387 U.S. at 153.[6]

Plaintiffs also attempt to conflate the constitutional and prudential requirements for standing by emphasizing decisions in which vendors were permitted to challenge criminal statutes affecting the rights of would-be purchasers.  <u>See</u> Pl. Opp. at 13-15.  The vendors at issue in each of the cases Plaintiffs cite, however, independently satisfied the constitutional minimum required by Article III, either because they faced a credible, imminent threat of prosecution under the provision, or because they suffered a tangible economic loss as a result.  <u>See, e.g., Carey v. Population Servs. Int'l</u>, 431

_____

[6] The Fifth Circuit noted as much in <u>Okpalobi v. Foster</u>, 244 F.3d 405, 426 (5th Cir. 2001), finding that abortion providers would suffer direct economic harm as a result of a provision imposing on them liability, in tort, for any damage or complications occasioned by an abortion.  According to the Court, the challenged law forced providers to discontinue offering legal abortions to patients because of the risk of unlimited civil liability.  <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> <u>Navegar</u>, 103 F.3d at 1001 (permitting manufacturers to challenge only those provisions that targeted weapons plaintiffs were producing at the time the Crime Control Act went into effect).

U.S. 678, 681-84 (1977) (plaintiff was violating the law by engaging in mail-order retail sale of non-medical contraceptive devices and suffered concrete threat of prosecution for doing so); Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 330, 333-34 (5th Cir. 1981) (plaintiffs denied license to open abortion clinic due to adverse zoning decision suffered concrete financial harm); Reliable Consultants, Inc. v. Earle, 517 F.3d 738, 740, 742 (5th Cir. 2008) (vendor plaintiff was consciously violating the law by selling sexual devices that were criminalized by challenged statute and was likely to be prosecuted thereunder); United States v. Coil, 442 F.3d 912, 915 n.2 (5th Cir. 2006) (criminal case in which plaintiff was prosecuted for violating the allegedly unconstitutional provision).

Unlike the plaintiffs in these cases, the NRA member-dealers' alleged loss of profits is too speculative to confer standing. Nor can these dealers, who allege only a desire to engage in conduct proscribed by federal firearms laws, obtain pre-enforcement review thereof. Because the NRA cannot satisfy the constitutional injury-in-fact requirement, they are unable to challenge the constitutionality of Section 922(b)(1) on their customers' behalf and their claims must be dismissed for lack of jurisdiction.

**B.     The Three Individual 18-to-20-Year-Old Plaintiffs Lack Standing to Sue Because They May Lawfully Obtain Handguns and Handgun Ammunition By Other Means and Avoid Injury.**

Plaintiffs contend that "the Supreme Court has repeatedly upheld the ability of the individuals whose constitutional rights are burdened by [Section 922(b)(1)] to sue as well." Pl. Opp. at 15. This argument, as applied to the three 18-to-20-year-old plaintiffs in this suit, overlooks the distinction between a *personal* "injury in fact" – the touchstone of a live case or controversy – and a "generalized grievance" more appropriately decided by the representative branches of

government.  See Pederson v. Louisiana State Univ., 213 F.3d 858, 869 (5th Cir. 2000); Apache

Bend Apartments v. United States, 987 F.2d 1174, 1176 (5th Cir. 1993).

> **1.      Plaintiffs Suffer No Direct Injury and Present Only A Generalized
> Grievance Which May Not Be Adjudicated By This Court.**

As discussed at length in Defendants' opening brief, "standing is a jurisdictional requirement

that focuses on the party seeking to get his complaint before a federal court and not on the issues he

wishes to have adjudicated."  Cook v. Reno, 74 F.3d 97, 98-99 (5th Cir. 1996) (internal punctuation

omitted); see also Warth v. Seldin, 422 U.S. 490, 499 (1975) (plaintiffs must "assert [their] own

legal rights and interests,'" and "cannot rest [their] claim to relief on the legal rights or interests of

third parties.").  In keeping with this principle, courts may not adjudicate "abstract questions of wide

public significance," Apache Bend Apartments, 987 F.2d at 1176 (internal punctuation omitted),

which amount to "'generalized grievances,' . . . shared in substantially equal measure by all or a

large class of citizens."  Pederson, 213 F.3d at 869 (internal citation and punctuation omitted); see

also Apache Bend Apartments, 987 F.2d at 1176 ("The prudential principle barring adjudication of

generalized grievances is closely related to the constitutional requirement of personal injury in fact,

and the policies underlying both are similar.") (citation omitted).  This Court's jurisdiction, then,

depends upon whether the 18-to-20-year-old plaintiffs have asserted an infringement of *their*

individual rights under the Second Amendment.  See Apache Bend Apartments, 987 F.2d at 1176

("The judicial power to adjudicate constitutional questions is reserved for those instances in which it

is necessary for the vindication of individual rights.").

The three individual plaintiffs in this suit inappropriately frame their injury as an inability to

purchase a handgun or handgun ammunition, or as a denial of their Second Amendment right to

possess a handgun for self-defense purposes.  See Def. Mot. at 14-15.  Contrary to their

representations, as a matter of law, these three plaintiffs are not prohibited from possessing

handguns under federal law, and may ask their parent or guardian to purchase a handgun or handgun

ammunition from a licensed firearm dealer to provide to them as a gift.

Thus, the three individual plaintiffs cannot claim that they are unable to obtain a handgun "to

keep and bear arms for the purpose of self-defense." McDonald, 130 S. Ct. at 3026; see also Heller,

554 U.S. at 592 ("[W]e find that [the Second Amendment] guarantee[s] the individual right to

possess and carry weapons in case of confrontation."). Rather, Plaintiffs are prohibited from

purchasing a handgun directly from the dealer of their choosing, without being the recipient of a

gift. However, neither Heller nor McDonald discussed the buying and selling of firearms, let alone

held this to be at the "core" of the Second Amendment right; indeed, Heller made clear that "laws

imposing conditions and qualifications on the commercial sale of arms" were "presumptively

lawful." 554 U.S. at 626-27.

The individual plaintiffs' supporting declarations do little to address the flaws in their

standing argument. Plaintiff Jennings, for example, does not assert that her parents are unable or

unwilling to gift her a handgun but merely that "they have not done so." See Jennings Decl. ¶ 15.

She does not claim to have asked her parents for such a gift, because she "does not believe [she]

should have to ask [her] parents' (or anyone else's) permission to exercise [her] right to armed self

defense." See id. Plaintiffs Brennan Harmon and Andrew Payne make substantively identical

statements, see Harmon Decl. ¶ 14; Payne Decl. ¶ 16,[7] as does declarant Grant Anastas-King, see

---

[7] Plaintiff Harmon owns a rifle and shotgun, Harmon Decl. ¶ 6, and Plaintiff Payne owns two long guns. Payne Decl. ¶ 5.

Anastas-King Decl. ¶ 16.[8]   Declarant Josh Whitman offers a slightly more nuanced rationale, claiming that he does not want to rely on his father to gift him a handgun "as both the timing of the purchase and type of handgun would be his choosing, not mine."  Whitman Decl. ¶ 16.  Mr. Whitman's logic is flawed, however, as there is nothing to stop him from making a gift request of a specific firearm, just as he might make a gift request of any other specific item.  More fundamentally, nothing in Heller or McDonald suggests that the Second Amendment guarantees the three individual plaintiffs a right to purchase the specific handgun of their choosing from a particular source.

Finally, although a former plaintiff (and present declarant) alleges that his parents "have indicated that they will not buy me the new handgun I want," D'Cruz Decl. ¶ 18, he acknowledges that his parents have already bought him a handgun and ammunition as a gift for his eighteenth birthday, id. ¶ 10, and that he also owns a rifle, id.; moreover, he does not actually contend that he has asked his parents to buy him a handgun.  In short, none of these individuals claims that he or she has *asked* his or her parents to gift him or her a handgun, much less that they have refused to do so.  Instead, at most, Plaintiffs contend that their individual preference would be to purchase a handgun directly from a licensed dealer, and would prefer not to ask their parents to purchase a handgun for them as a gift.  In sum, none of the three plaintiffs – and none of the five other individuals submitting affidavits – provide evidence showing that Section 922(b)(1) operates as a ban on the possession of handguns or ammunition.[9]

---

[8] Another declarant claims that she "do[es] not believe" her parents will buy her a handgun as a gift, Fewkes Decl. ¶ 9, but she neither explains the basis for this belief, nor actually claims that she has asked her parents to buy her a handgun.

[9] Similarly, although one plaintiff and two declarants contend that they would not deem it convenient for their parents repeatedly to gift handgun ammunition to them, see Payne Decl. ¶

Plaintiffs thus lack standing to sue, as they have an available alternative means of obtaining handguns and handgun ammunition for the purpose of self-defense.  See Fire Equip. Mfrs. Ass'n v. Marshall, 679 F.2d 679, 682 n.5 (7th Cir. 1982) ("[P]etitioners cannot allege an injury from one of the options where they can choose another which causes them no injury"); see also Def. Mot. at 15 (citing cases).  The existence of a viable alternative is significant, because "Article III standing ultimately turns on whether a plaintiff gets something other than moral satisfaction if the plaintiff wins."  Kendall v. Emps. Ret. Plan of Avon Prods., 561 F.3d 112, 122 (2d Cir. 2009) (internal citation and punctuation omitted).

Given that the 18-to-20 year olds in this case are able to obtain and possess a handgun despite the operation of Section 922(b)(1), they are not asserting their own Second Amendment rights in this case.  Indeed, by their own admission, Plaintiffs have brought suit to champion the asserted Second Amendment "rights of millions of responsible, law-abiding American citizens."  Second Am. Compl. ¶ 5.  In short, Plaintiffs raise the precise type of generalized grievance that Article III guards against.[10]

### 2.    The First Amendment and Privacy "Access" Cases on Which Plaintiffs Rely Do Not Support Their Standing Arguments.

Though the three individual plaintiffs can lawfully obtain handguns and handgun

---

16, Fewkes Decl. ¶ 9, D'Cruz Decl. ¶ 18, nothing in federal law prevents a parent or guardian from purchasing handgun ammunition in larger quantities rather than resupplying ammunition over time.

[10] Plaintiffs may not challenge Section 922(b)(1) *except* as it applies to the individual plaintiffs and the 18-to-20-year-old declarants on whose behalf the NRA purports to assert claims.  See Broadrick v. Oklahoma, 413 U.S. 601, 610 (1973) ("[A] person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court. A closely related principle is that constitutional rights are personal and may not be asserted vicariously.") (citations omitted).

ammunition, they nevertheless claim that they have standing because "the fact that a statute such as Section 922(b)(1) does not bar all access to a product or service does not immunize it from judicial attack." Pl. Opp. at 17.  In support of this proposition, Plaintiffs rely on Supreme Court and Fifth Circuit precedent exploring the scope of the right to privacy under the First Amendment.  See Pl. Opp. at 17 (citing Carey, 431 U.S. at 682; Deerfield Medical Ctr., 661 F.2d at 336).  The excerpts Plaintiffs highlight, however, are derived from those sections of each decision exploring the merits of plaintiffs' claim rather than plaintiffs' standing to sue.  In Carey, for example, the Court decided that a mail-order retailer had standing, on economic grounds, to challenge a statute barring plaintiff from selling contraceptives to individuals over 16.  See 431 U.S. at 682-83.  Only then did the Court move on to discuss the merits of the retailer's claim –  the portion of the opinion Plaintiffs discuss to support their standing argument.[11]

In ruling on the merits of the plaintiffs' claims in Carey, the Supreme Court held that limiting access to contraception imposes a significant burden on the right of an individual to decide whether or not to use birth control.  See Carey, 431 U.S. at 689; see also Deerfield Medical Ctr., 661 F.2d at 336 ("[I]t cannot seriously be disputed that a woman's *deliberations over whether to have an abortion* . . . would be adversely affected if abortion facilities were restricted to the most unattractive, inaccessible and inconvenient areas of the city") (emphasis added).  The holdings in Carey and Deerfield are wholly dependent on the nature and scope of the right to privacy itself: "the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the *decision whether to bear or beget a child*."

---

[11] Similarly, and as discussed above, the plaintiffs in Deerfield Medical Center asserted an independent and personal injury-in-fact, as they were denied a license to open an abortion clinic due to an adverse zoning decision.  661 F.2d at 333-34.

Eisenstadt v. Baird, 405 U.S. 438, 453 (1972) (emphasis added); accord Skinner v. Oklahoma ex

rel. Williamson, 316 U.S. 535 (1942); Jacobson v. Massachusetts, 197 U.S. 11, 29 (1905).  The

Court's analysis is driven "not [by] an independent fundamental 'right of access to contraceptives,'

but because such access is essential to [the] exercise of the constitutionally protected right of

decision in matters of childbearing that is the underlying foundation of" the privacy line of cases.

Carey, 431 U.S. at 688-89.  The Second Amendment involves no such private decision-making

process, and Plaintiffs mistakenly interpret the above caselaw to equate a right to possess firearms

with an unlimited ability to acquire them.  See Pl. Opp. at 17-18, 43.[12]

And though Plaintiffs maintain that Supreme Court precedent forecloses Defendants'

argument that the individual plaintiffs may avoid injury by asking their parents to purchase

handguns from federal firearms licensees, see Pl. Opp. at 17-18, this argument is without merit.  The

cases Plaintiffs rely on all deal with parental-consent requirements for abortion procedures and are

distinguishable.  In Planned Parenthood v. Danforth, 428 U.S. 52, 53, 75 (1973), for example, the

---

[12] The additional cases Plaintiffs cite are similarly inapposite.  See Pl. Opp. at 17-18
(citing Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, 425 U.S. 748, 752
(1976); Truax v. Raich, 239 U.S. 33, 35-36 (1915)).  In Virginia State Board, prescription drug
consumers were permitted to challenge, on First Amendment grounds, a statute prohibiting
pharmacists from advertising pricing information even though consumers could learn the
information through other means.  425 U.S. at 752.  In the context of the First Amendment,
however, "the protection afforded is to the communication, to its source and to its recipients
both."  Id. at 756.  Plaintiffs offer no basis for applying the Court's analysis – which pertains
exclusively to freedom of speech – to their claims under the Second Amendment.

The issue of standing was never addressed in Truax v. Raich.  In that case, the plaintiff
was discharged by his employer due to the application of a statutory quota that allowed certain
businesses to permit no more than twenty percent of its employees to be immigrant aliens.  See
239 U.S. at 35-36.  Presumably, Mr. Raich suffered an injury-in-fact by virtue of his discharge.
As to the merits, the Court deemed the fact that the statute did not constitute a "'a total
deprivation of the right of the alien to labor'" immaterial, id. at 42, because permitting a
restriction of twenty percent would "suggest no limit to the state's power of excluding aliens
from employment."  Id. at 43.

Court deemed unconstitutional a "blanket parental consent law," because it "impose[d] a special-consent provision, exercisable by a person other than the woman and her physician, as a prerequisite to a minor's termination of her pregnancy and does so without a sufficient justification for the restriction."[13]  As in Carey, the Court's analysis focused on the sensitive and personal "decision of the physician and his patient to terminate [a] patient's pregnancy," id. at 74, and thus bears little, if any relevance to the standing of the 18-to-20-year-old plaintiffs in this litigation. Furthermore, while the Court in H.L. v. Matheson, 450 U.S. 398 (1981), found that an "unmarried minor living with and dependent upon her parents" had standing to challenge a Utah parental consent law, the Court held that "a statute setting out a mere requirement of parental notice when possible does not violate the constitutional rights of an immature, dependent minor." Id. at 409 (rejecting plaintiff's contention that the mere requirement of parental notice unduly burdens the right to seek an abortion).  The Court also held that the unmarried minor lacked standing to challenge the overbreadth of the parental consent laws, as she "did not allege or proffer any evidence that either she or any member of her class is mature or emancipated." See id. at 406. Accordingly, the plaintiff lacked "'the personal stake in the controversy needed to confer standing' to advance the overbreadth argument." Id. (quoting Harris v. McRae, 448 U.S. 297, 320 (1980))

Plaintiffs' analogy to the "access" and "parental consent" issues examined in the context of the First Amendment is unpersuasive, given the fundamental differences between the right to privacy as defined by the Supreme Court and the right to bear arms.  Law-abiding individuals have a right to possess a "handgun[] held and used for self-defense in the home." Heller, 554 U.S. at 636.

---

[13] Notably, the Court held that physicians had standing to assert the rights of unmarried women under 21 because the physicians had asserted a sufficiently concrete threat of prosecution under the challenged state statutes.  Danforth, 428 U.S. at 62.

Because the 18-to-20-year-old plaintiffs in this suit may obtain handguns and handgun ammunition, and because there is no federal bar to their possession of these weapons, they cannot allege an injury-in-fact under the Second Amendment.[14]

## II.   THE AGE QUALIFICATION ON THE COMMERCIAL SALE OF ARMS BY FEDERALLY-LICENSED DEALERS IS A "PRESUMPTIVELY LAWFUL" REGULATORY MEASURE UNDER <u>HELLER</u>.

In <u>Heller</u>, after determining that the Second Amendment conferred an individual right to keep and bear arms, the Supreme Court made clear that "the right secured by the Second Amendment is not unlimited," 554 U.S. at 626, and identified several "exceptions," <u>id.</u> at 635, that it characterized as "permissible" "regulations of the right."  <u>Id.</u>  The Court stated: "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or *laws imposing conditions and qualifications on the commercial sale of arms*."  <u>Id.</u> at 626-27 (emphasis added).  The Court further cautioned that "[w]e identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."  <u>Id.</u> at 627 n.26.

Because the age qualification for buying handguns from licensed dealers is a regulatory measure imposing a condition and qualification on the commercial sale of arms, it is presumptively lawful under <u>Heller</u>.  See <u>Montana Shooting Sports Ass'n v. Holder</u>, 2010 WL 3926029, at *17, 21 (D. Mont. Aug. 31, 2010) (Def. Mot., Ex. 8) ("The federal firearms laws at issue here [National

---

[14] Additionally, the NRA lacks standing because "an association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right."  <u>See</u> <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.</u>, 528 U.S. 167, 181 (2000). Because the individual members of these organizations lack standing to sue, for the reasons discussed <u>supra</u> at I.A & B, the NRA cannot satisfy the requirements of Article III.

Firearms Act and Gun Control Act, 26 U.S.C. § 5801 et seq. and 18 U.S.C. § 921 et seq.] do just what Heller considered appropriate – they impose conditions and qualifications on the manufacture and sale of arms."); see also United States v. Marzzarella, 595 F. Supp. 2d 596, 603 (W.D. Pa. 2009) (upholding statute prohibiting trafficking of firearm with altered serial number because, inter alia, "[i]t is part of a regulatory scheme designed to impose and enforce a specific condition on the commercial sale of arms"), aff'd, 614 F.3d 85 (3d Cir. 2010).  The age qualification does not prohibit the sale or possession of firearms; rather, it is a three-year restriction on a particular means of obtaining handguns for a particular group of individuals.  As such, it represents a reasonable, limited condition on the commercial sale of firearms that should be deemed presumptively lawful.

Plaintiffs respond with two primary arguments.  First, they contend that the Court should invent a new Second Amendment right to "acquire and buy" arms.  Pl. Opp. at 39-43.  Second, Plaintiffs argue that a temporary restriction on the commercial sale of a particular category of weapons from a specified category of sellers operates as the functional equivalent of a complete ban on sale or possession.  Id. at 43-55.  Neither contention is persuasive.

> **A.    No Court Has Ever Held That the Second Amendment Includes a Right to "Acquire and Buy" Arms, and Plaintiffs Present No Evidence That the Second Amendment Was Ever Understood to Protect Such a Right.**

Plaintiffs ask this Court to create a new constitutional right – the "right to acquire and buy firearms," Pl. Opp. at 41.  Their contention that the Second Amendment protects such a right cannot be squared with Heller's finding that conditions and qualifications on the commercial sale of arms are presumptively lawful.  Neither Heller nor McDonald discussed the buying and selling of firearms, let alone held this to be at the "core" of the Second Amendment right.  In fact, the only reference to restrictions on the buying and selling of firearms was used as an example of a

-19-

"presumptively lawful" limitation in <u>Heller</u>.  <u>See</u> 554 U.S. at 626-27 & n.26; <u>see also</u> <u>Marzzarella</u>, 595 F. Supp. 2d at 603 (<u>Heller</u>'s "implicit sanctioning of laws imposing conditions and qualifications on the commercial sale of arms … is significant.").

Nor can Plaintiffs' argument be reconciled with the Fifth Circuit's decision in <u>United States v. King</u>, 532 F.2d 505, 510 (5th Cir. 1976), rejecting a claim that a defendant's conviction for conspiracy to engage in the business of dealing in firearms without being licensed to do so violated the Second Amendment.  Plaintiffs' argument is also inconsistent with <u>Gilbert Equip. Co. v. Higgins</u>, 709 F. Supp. 1071, 1080 (S.D. Ala. 1989), <u>aff'd</u>, 894 F.2d 412 (11th Cir. 1990), which upheld the denial of an importation permit for semiautomatic shotguns, despite the applicant's argument that "before arms may be 'kept' under the second amendment, arms must be produced and acquired."  <u>See</u> <u>id.</u> at 1080-81 ("[Plaintiff] is not being denied its right to bear arms, but is simply being prevented from importing into this country arms that are not particularly suitable or readily adaptable to a sporting purpose.").  <u>Heller</u> did nothing to disturb this caselaw.

Moreover, <u>Heller</u> in no way implied that the Second Amendment was originally understood to protect an individual right to "acquire and buy" firearms.  The measures that <u>Heller</u> characterized as "provok[ing] polemical reactions by Americans invoking their rights as Englishmen to keep arms," 554 U.S. at 594, were *disarmament* measures, not regulations of the commercial sale of arms.  <u>See</u> <u>id.</u> at 592-94 (discussing "disarming [of political] opponents," "general disarmament of [geographical] regions," and "disarm[ing] the inhabitants of the most rebellious areas [of the American colonies").  Plaintiffs have not presented any actual statements from the Founding generation indicating that the regulation of the commercial sale of arms – as opposed to import

bans, military embargos, and seizures of arms – violated the Anglo-American right to bear arms.[15]

Instead, Plaintiffs rely solely on "negative implication," Pl. Opp. at 42, and inference.  The Court

should decline Plaintiffs' invitation to invent a new constitutional right to "acquire and buy" arms.

See Dronenburg v. Zech, 741 F.2d 1388, 1396 (D.C. Cir. 1984) ("If it is in any degree doubtful that

the Supreme Court should freely create new constitutional rights, we think it certain that lower

courts should not do so.").

**B.     The Under-21 Age Qualification on the Purchase of Particular Firearms from Licensed Dealers Does Not Operate as the Functional Equivalent of a Complete Ban on the Possession of Firearms by All Individuals.**

In an attempt to conflate the statute at issue with the District of Columbia law struck

down in Heller, Plaintiffs contend that Section 922(b)(1) is "effectively a ban" on the possession of

handguns and ammunition.  Pl. Opp. at 53.  But the present law is not remotely akin to the District's

former law, which prohibited *every* law-abiding citizen from possessing handguns in his or her

home, or from rendering operable any lawful firearm he or she possessed at home.  By contrast, the

present law does not ban the possession of handguns, nor does it place any restrictions on the

legitimate possession of firearms in the home.  Rather, it is a temporary restriction on the direct sale

of handguns by a particular type of seller (licensed firearms dealers) to a particular class of

---

[15] Plaintiffs' quotation from Thomas Jefferson, Pl. Opp. at 41, is taken from a letter – written when Jefferson was Secretary of State – to the British envoy to the United States, who had complained that a French agent had bought firearms in America with the intent to transport them to France (with whom Britain was at war).  Letter of Thomas Jefferson to George Hammond, May 15, 1793, *available at* http://www.gutenberg.org/files/16783/16783-h/ 16783-h.htm#2H_4_01486.  Jefferson was making a statement of fact, and offering a diplomatic explanation to avoid an international incident, not interpreting the Second Amendment or the traditional right to bear arms.  And although Heller did include a quote from a Mr. Curwen in a string cite, 554 U.S. at 583 n.7, it did so only to support the proposition that to "[k]eep arms was simply a common way of referring to possessing arms, for militiamen *and everyone else*," id. at 583 (emphasis in original), and not as evidence that the Second Amendment purports to protect a right to "acquire and buy" arms.

individuals (those under 21 years of age).  As another court in this Circuit has explained, such laws

warrant different treatment:

> The statutes used to indict Defendant in no way proscribe gun possession generally
> among all people.  Those statutes, instead, regulate the age and manner in which an
> individual may purchase certain types of firearms.  The Supreme Court suggests that
> [18 U.S.C.] § 922 does not fall within the same class of statutes proscribing gun
> possession, such as the statute in question in Heller.  "Few laws in the history of our
> nation have come close to the severe restriction of the District's handgun ban."

United States v. Bledsoe, Criminal No. SA-08-CR-13(2)-XR, 2008 WL 3538717, at *3 (W.D. Tex.

Aug. 8, 2008) (quoting Heller, 554 U.S. at 629) (Def. Mot., Ex. 5); see also State v. Sieyes, 225

P.3d 995, 1005 & n.21 (Wash. 2010) (upholding law limiting circumstances under which

individuals under 18 could possess firearms, despite defendant's "broadsided argument" that the law

represented an "absolute prohibition[] on gun possession by minors," because the statute "is not an

absolute prohibition" on possession).

    In fact, unlike the law at issue in Heller, Section 922(b)(1) permits individuals between 18

and 20 to possess handguns and ammunition.  As explained above, the parent or guardian of an

individual aged 18 to 20 may buy a handgun or handgun ammunition from a licensed firearm dealer

and give it to him or her as a gift.  That Section 922(b)(1) does not operate as a ban on possession by

Plaintiffs is made clear by the fact that a former plaintiff possesses a handgun, and that the

individual plaintiffs present no evidence that they have been unable to obtain a handgun and

ammunition through the route of parental purchase from a licensed dealer.  See supra I.B.  And

Plaintiffs cannot legitimately claim that the right to keep and bear arms dictates that handgun buyers

under 21 must have access to particular firearms dealers, even if those dealers may be viewed as the

most convenient methods for purchase.  See City of Houston v. FAA, 679 F.2d 1184, 1198 (5th Cir.

1982) (rejecting claim that passengers' inability to travel by airplane represented a violation of the

constitutional right to interstate travel; "At most, their argument reduces to the feeble claim that passengers have a constitutional right to the most convenient form of travel.").

Lacking any direct evidence that Section 922(b)(1) operates in practice as a ban on the individual plaintiffs' possession of handguns, Plaintiffs are left only with their subjective characterization of the relevant laws, conjecture, and arguments by analogy. Pl. Opp. at 43-55. "Needless to say, unsubstantiated assertions are not competent summary judgment evidence." Forsyth v. Barr, 19 F.3d 1527, 1533 (5th Cir. 1994). Furthermore, as explained below, Plaintiffs' analogies to decisions involving total bans in the context of the First Amendment and the constitutional right to privacy are fundamentally flawed.

### C. First Amendment and Right-to-Privacy Decisions Involving Total Bans on Sale or Possession Are Not Applicable Here.

Plaintiffs argue that a restriction on the commercial sale of a particular category of weapons from a specified category of sellers operates as the functional equivalent of a complete ban on sale or possession, Pl. Opp. at 43-55, and rely on analogies to Supreme Court and Fifth Circuit cases analyzing the scope of the constitutional rights of privacy and free speech, id. at 44-47, 53-54. These cases in no way suggest that the age qualification for purchasing handguns from a licensed dealer is unconstitutional. Instead, they struck down laws that were tantamount to complete bans on these constitutional rights *for all individuals*. As explained above, Section 922(b)(1) is a temporary restriction on the ability to purchase handguns from licensed dealers for a particular group of individuals (18-to-20 year olds), and Plaintiffs present no evidence that it operates in practice as a ban on possession or purchase for the individual plaintiffs.[16]

---

[16] Moreover, the dicta cited by Plaintiffs from United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010), cert. denied, 131 S. Ct. 958 (2011), a Second Amendment case, dealt with a ban on *possession* of a particular class of firearms – those with an obliterated serial number. The

Even when fundamental constitutional rights are at issue, "not every law which makes a right more difficult to exercise is, ipso facto, an infringement of that right." Planned Parenthood v. Casey, 505 U.S. 833, 873 (1992); see also Anderson v. Celebrezze, 460 U.S. 780, 788 (1983) ("Although. . . rights of voters are fundamental, not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates.").[17] This is equally true as to the right to bear arms. See Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense, 56 UCLA L. Rev. 1443, 1461 (2009) ("[T]he mantra that not all regulations are prohibitions has been commonplace in American right-to-bear arms law for over 150 years, with only a few departures.") (citing Owen v. State, 31 Ala. 387 (Ala. 1858)). And the cases Plaintiffs cite represent decisions that have struck down laws that were tantamount to total bans.

For example, the commercial restriction struck down in Carey – cited by Plaintiffs – prohibited the distribution of non-medical contraceptives to *all adults* except through licensed pharmacists. 431 U.S. at 686.[18] Although the Court invalidated a blanket prohibition on the

_____

Third Circuit expressed concern about the defendant's contention that "by preventing him from *possessing* this particular handgun *in his home*, [the law] unconstitutionally limited his ability to defend himself." 614 F.3d at 94 (emphasis added). By contrast, Section 922(b)(1) does not prevent individuals under 21 from possessing handguns, much less possessing them in their homes. And 18-to-20 year olds may buy rifles and shotguns directly from licensed dealers to bear for protection in their homes.

[17] Additionally, although the right to interstate travel is a fundamental right, United States v. Bredimus, 352 F.3d 200, 209-10 (5th Cir. 2003), there is no constitutional right to travel by a particular mode of transportation, such as by airplane, even if it might be the most convenient method. See Def. Mot. at 25 n.21 (citing cases).

[18] The other right-to-privacy cases cited by Plaintiffs also involve total bans on use or distribution, unlike the statute at issue here. See Griswold, 381 U.S. at 480 (state ban on use of contraceptives); Eisenstadt, 405 U.S. at 441-42 (total ban on distribution of contraceptives to unmarried persons); Reliable Consultants, 517 F.3d at 744 ("[U]nder this statute it is even illegal

-24-

distribution of contraceptives to individuals under 16, <u>Carey</u> acknowledged that legislatures may

regulate the commercial sale of contraceptives without violating the right to privacy:

> That the constitutionally protected right of privacy extends to an individual's liberty
> to make choices regarding contraception does not, however, automatically invalidate
> every state regulation in this area. The business of manufacturing and selling
> contraceptives may be regulated in ways that do not infringe protected individual
> choices. And even a burdensome regulation may be validated by a sufficiently
> compelling state interest.

<u>Id.</u> at 685-86.

By contrast, the statute at issue here is not a blanket prohibition on distribution, possession,

or even sales to a particular age group. And the Court in <u>Carey</u> never stated that something less than

a blanket prohibition on distribution would be unconstitutional; indeed, it acknowledged that "the

law has generally regarded minors as having a lesser capability for making important decisions" and

that "the scope of permissible state regulation is broader as to minors than as to adults." <u>Id.</u> at 693

n.15, 695 n.17.[19] Later right-to-privacy cases confirm this principle. For example, even though the

Supreme Court has held that the right to obtain an abortion is a fundamental constitutional right,

both the Supreme Court and Courts of Appeals have upheld significant restrictions on its

availability to younger individuals. <u>See</u>, <u>e.g.</u>, <u>H.L.</u>, 450 U.S. at 407, 413 (upholding law requiring

---

to 'lend' or 'give' a sexual device to another person.").

[19] Plaintiffs' reliance on <u>Danforth</u>, Pl. Opp. at 51, is similarly misplaced. The cited
passage states that a *spouse* cannot exercise a veto power over a woman's decision to obtain an
abortion, but the Supreme Court has since affirmed that *parental* notification and consent
requirements are constitutional. <u>See Casey</u>, 505 U.S. at 895 ("Those enactments, and our
judgment that they are constitutional, are based on the quite reasonable assumption that minors
will benefit from consultation with their parents and that children will often not realize that their
parents have their best interests at heart. We cannot adopt a parallel assumption about adult
women."). And as we explain below, Congress and state legislatures have considerable
discretion with respect to the set of privileges that are collectively deemed to constitute
adulthood, including the discretion to establish different minimum ages for different conduct,
including the ability to purchase firearms directly from a licensed dealer.

unemancipated minor to notify parents "if possible" before obtaining an abortion, despite the fact that "the requirement of notice to parents may inhibit some minors from seeking abortions"); Barnes v. Mississippi, 992 F.2d 1335, 1341-43 (5th Cir. 1993) (unemancipated minor may not obtain an abortion without the consent of both parents or court approval); Planned Parenthood v. Camblos, 155 F.3d 352, 367-84 (4th Cir. 1998) (en banc) (minor may not obtain an abortion without informing parent twenty-four hours before procedure).

Similarly, not all laws that affect First Amendment rights are unconstitutional, especially if they involve the rights of younger individuals. To the extent it provides useful analogies, First Amendment jurisprudence shows why the age qualification for purchasing handguns from a licensed dealer is constitutional. First, the Heller exception for conditions and qualifications on the commercial sale of arms "has a First Amendment analogue in the subcategory of commercial speech." Joseph Blocher, Categoricalism and Balancing in First and Second Amendment Analysis, 84 N.Y.U. L. Rev. 375, 422 (2009). "And just as commercial speech receives lessened protection on account of its distance from the core values of the First Amendment, Heller might signal that commercial arms sales are sufficiently removed from the Second Amendment's core value. . . as to receive lower protection." Id.; see also United States v. Chester, 628 F.3d 673, 682 (4th Cir. 2010) (noting, in context of analogy between First and Second Amendments' standards of scrutiny, that "a law regulating commercial speech is subject to a more lenient intermediate standard of scrutiny in light of its subordinate position in the scale of First Amendment values") (citation and internal punctuation omitted).[20]

---

[20] None of the laws struck down in the First Amendment cases cited by Plaintiffs, Pl. Opp. at 43 n.23, 46, are even remotely akin to the age qualification for purchasing handguns from a licensed dealer. Notably, most of these cases invalidated laws that completely foreclosed an entire medium of expression to *all* persons or banned possession of certain media to *all*

Second, legislatures receive greater leeway when a regulation of speech affects only younger individuals.  The Supreme Court has recognized that "[t]he First Amendment rights of minors are not co-extensive with those of adults."  Erznoznik v. City of Jacksonville, 422 U.S. 205, 214 n.11 (1975) (citation and internal punctuation omitted); see also id. at 212 ("It is well-settled that a State or a municipality can adopt more stringent controls on communicative materials available to youths than on those available to adults."); Pacifica Found. v. FCC, 438 U.S. 726, 749-50 (1978) (government's interest in the "well-being of its youth" justified special treatment of indecent broadcasting received by adults as well as children).  Thus, to the extent that First Amendment cases are relevant here, they support Defendants' arguments, rather than undermine them.[21]

---

individuals.  See Lovell v. City of Griffin, 303 U.S. 444, 447 (1938) (ordinance prohibiting the distribution of "circulars, handbooks, advertising, or literature of any kind" within city limits); City of Ladue v. Gilleo, 512 U.S. 43, 54 (1994) (ordinance forbidding homeowners to "display virtually any 'sign' on their property"); Martin v. City of Struthers, 319 U.S. 141, 142 (1943) (ordinance prohibiting distributors of "handbills, circulars or other advertisements" to knock on doors or ring doorbells of any residence to distribute their literature); United States v. Stevens, 130 S. Ct. 1577, 1582 (2010) (law criminalizing any "commercial creation, sale, or possession of certain depictions of animal cruelty"); Lamont v. Postmaster Gen., 381 U.S. 301, 302 (1965) (law permitting the Postal Service to destroy mail it deems "communist political propaganda" unless the recipient affirmatively requested delivery).  The state law struck down in Virginia State Board, 425 U.S. at 750, although it applied to pharmacists rather than all individuals, completely foreclosed an entire medium of expression by forbidding pharmacists to publish, advertise, or promote the price of prescription drugs.  And Plaintiffs' description of Vincenty v. Bloomberg, 476 F.3d 74, 77 (2d Cir. 2007), neglects to mention that the law at issue in that case was a criminal prohibition of sale or possession of aerosol spray paint cans or broad-tipped indelible markers to individuals under 21.  The age qualification is not a ban on possession of handguns, nor is it a ban on all sales of handguns to individuals under 21.

[21] Plaintiffs object that this line of cases should be understood as applying only to individuals under 18.  Pl. Opp. at 36-37.  But the cases themselves do not establish any such bright-line rule, instead speaking broadly of "youths" and "minors" as opposed to "adults."  See also Martin v. Parrish, 805 F.2d 583, 585 (5th Cir. 1986) (applying Supreme Court case enabling high schools to ban students' "vulgar" speech to university setting); Educ. Media Co. v. Swecker, 602 F.3d 583, 590-91 (4th Cir. 2010) (upholding facial challenge under First Amendment to prohibition of certain types of alcohol advertisements in any "college student publication," defined as "campus publications targeted at students under twenty-one," as "narrowly tailored to

Finally, Plaintiffs rely on language from decisions involving First Amendment rights and the constitutional right to privacy, Pl. Opp. at 53-54, to support the proposition that some laws implicating these rights may be unconstitutional if they do not leave available adequate alternatives for their expression.  This reliance is misplaced because in most of those cases, the laws found unconstitutional either banned or nearly banned a form of protected communication, or protected activity, as to *all* individuals.[22]

In sum, because Plaintiffs fail to show that Section 922(b)(1) operates in practice as a total ban on the individual plaintiffs' possession or purchase of handguns – and because it does not ban

---

serve the [State's] interest of establishing a comprehensive scheme attacking the problem of underage and dangerous drinking by college students"), cert. denied, 131 S. Ct. 646 (2010); Anheuser-Busch, Inc. v. Schmoke, 101 F.3d 325, 327, 330 (4th Cir. 1996) (upholding ordinance prohibiting placement of stationary, outdoor advertising that advertised alcoholic beverages in certain areas of Baltimore; ordinance was "designed to promote the welfare and temperance of minors exposed to advertisements for alcoholic beverages by banning such advertisements in particular areas where children are expected to walk to school or play in their neighborhood").

[22] See United States v. Playboy Entm't Grp., 529 U.S. 803, 806-07, 823 (2000) (effect of law was to "eliminate altogether the transmission of [sexually-oriented programming] outside the safe harbor period in affected cable service areas. . . [F]or two-thirds of the day no household in those service areas could receive the programming, whether or not the household of the viewer wanted to do so."), id. at 823 (characterizing law as "nationwide daytime speech ban"); Carey, 431 U.S. at 686-91 (prohibition of distribution of contraceptives to all adults except through licensed pharmacists); City of Cincinnati v. Discovery Network, 507 U.S. 410, 418 (1993) (city's "categorical prohibition on the use of newsracks [on public property] to disseminate commercial messages"); Deerfield Med. Ctr., 661 F.2d at 336 (city zoning decision preventing the establishment of an abortion clinic in an area zoned for business operations would "forestall the availability of abortion facilities in Deerfield Beach for an indefinite amount of time" and "discourage any future efforts by other enterprises to locate an abortion clinic within the city limits"); Anderson v. City of Hermosa Beach, 621 F.3d 1051, 1066 (9th Cir. 2010) (zoning code that banned tattoo parlors "completely foreclosed a venerable means of communication that is both unique and important") (citation and internal punctuation omitted); City of Akron v. Akron Ctr. for Reprod. Health, 462 U.S. 416 (1983) (ban on performance of abortions after first trimester outside of hospitals); United States v. Grace, 461 U.S. 171 (1983) (total ban on specified communicative activity – display of "flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement" – in U.S. Supreme Court building and on its grounds) (internal punctuation omitted).

their purchase of other weapons from licensed dealers – their analogies to lines of constitutional cases involving total bans on forms of protected communication or protected activities fail.

### III.  CONDITIONS ON THE COMMERCIAL SALE OF ARMS TO INDIVIDUALS UNDER 21 COMPORT WITH THE HISTORICAL UNDERSTANDING OF THE SECOND AMENDMENT RIGHT.

The Court's inquiry may end once it finds that the age qualification for purchasing handguns from a licensed dealer is a law that "impos[es] conditions and qualifications on the commercial sale of arms," and is thus presumptively lawful under Heller, 554 U.S. at 626-27 & n.26.  Contrary to Plaintiffs' characterization, Pl. Opp. at 31, Heller did not require that such laws be "longstanding" to be presumptively lawful.  Although it did *characterize* other exempt laws ("prohibitions on the possession of firearms by felons and the mentally ill") as "longstanding," it did not require this as an independent condition of legality.  See 554 U.S. at 626.

However, if any further analysis is needed, the law passes muster under the two-step inquiry suggested by Heller.  Because Heller "suggests a two-pronged approach to Second Amendment challenges to federal statutes," United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010), cert. denied, 131 S. Ct. 958 (2011), in the wake of that decision, many Courts of Appeals have followed a two-step doctrinal approach to cases potentially implicating the Second Amendment.  See Marzzarella, 614 F.3d at 89; United States v. Reese, 627 F.3d 792, 800 (10th Cir. 2010); Chester, 628 F.3d at 680.  Under this approach, a reviewing court first asks "whether the challenged law imposes a burden on conduct falling within the Second Amendment's guarantee." Marzzarella, 614 F.2d at 89.  If the law at issue does not impose a burden on conduct falling within the Second Amendment's guarantee, the Court's inquiry is complete.  "If it does, [the Court] evaluate[s] the law under some form of means-end scrutiny." Id. "If the law passes muster under that standard, it is

constitutional [and] "[i]f it fails, it is invalid." Id.

Here, as demonstrated in Defendants' opening brief, Def. Mot. at 27-29, the age qualification for purchasing handguns from a licensed dealer does not impose a burden on conduct falling within the Second Amendment's guarantee because such laws have been historically understood as consistent with the right to bear arms. Laws imposing conditions on the commercial sale of firearms to individuals under 21 *are* longstanding, and are consistent with "the right of Americans generally to individually keep and bear their private arms as historically understood in this country." United States v. Emerson, 270 F.3d 203, 261 (5th Cir. 2001). Such laws thus "accord[] with the historical understanding of the scope of the [Second Amendment] right." Heller, 554 U.S. at 625. In any event, as explained below, Section 922(b)(1) passes muster under any level of constitutional scrutiny.

### A.     The States Have Long Established Minimum Age Restrictions on the Purchase and Use of Firearms, Up to and Including Age 21.

Beginning in 1856, the States enacted minimum age qualifications on the lawful possession of firearms. See Def. Mot. at 27 n.23 & Ex. 4. In that year, Alabama and Tennessee became the first States to pass such laws, criminalizing the selling of certain weapons, including pistols, to individuals under 21. Id. At the time, both State constitutions contained provisions protecting an individual right to bear arms. See Def. Mot., Ex. 4 at 1, 17. Before 1900, nineteen States and the District of Columbia had enacted under-21 age qualifications for the purchase or use of certain firearms. See Def. Mot. at 27 & n.23. Twelve of these States and the District of Columbia had Second Amendment analogues in their respective constitutions when they enacted these

-30-

qualifications.  See Def. Mot, Ex. 4.[23]  And in the early twentieth century, three more States enacted under-21 age qualifications for the purchase or use of particular firearms,[24] two of which had State constitutional provisions protecting the right to bear arms.[25]  See id.  Thus, a total of twenty-two States and the District of Columbia chose 21 as the minimum age for purchase or use of particular firearms, and fourteen of these States (and the District of Columbia) had State constitutional analogues to the Second Amendment.

Moreover, all fifty States and the District of Columbia have enacted minimum-age qualifications for the use or purchase of particular firearms, see Def. Mot. at 28 & n.25, and at the time they enacted their minimum-age qualifications, thirty-five of the fifty States (and the District of Columbia) had constitutional provisions securing the right to keep and bear arms. See Def. Mot., Ex. 4.[26]  Finally, twenty-nine of the fifty States (and the District of Columbia) only placed a minimum-age qualification on the purchase or use of handguns – usually defined as pistols, revolvers, or weapons that were concealable – rather than on all firearms.  See Def. Mot. at 28 & n.26.

This analysis suggests several conclusions.  First, between 1856 and 1923, a total of twenty-

---

[23] Alabama, Georgia, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Tennessee, Texas, and Wyoming.  Because the District of Columbia is a federal enclave, it is directly constrained by the Second Amendment.

[24] Oklahoma (enacted 1890, but Oklahoma was not admitted as a State until 1907), New Hampshire, and South Carolina (both 1923).

[25] Oklahoma and South Carolina.

[26] Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi, Missouri, Montana, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Wyoming.

two States and the District of Columbia imposed an under-21 age qualification on the purchase or use of certain firearms.  Plaintiffs' suggestion that these laws are not as "longstanding" as the type of laws Heller established as presumptively lawful, see Pl. Opp. at 31, is mistaken.  "The first federal statute disqualifying felons from possessing firearms was not enacted until 1938 . . . .  Moreover, legal limits on the possession of firearms by the mentally ill also are of 20th Century vintage. . . ."  Skoien, 614 F.3d at 640-41.  Additionally, prohibitions on carrying concealed weapons, which Heller also recognized as presumptively lawful, 554 U.S. at 626, do not date to 1791 but to the 1810s, see Clayton E. Cramer, Concealed Weapons Laws of the Early Republic 2-3 (1999), and at least some States did not enact such prohibitions until the twentieth century.  See, e.g., State v. Howard, 308 A.2d 366, 368 (N.J. 1973) (New Jersey's "first statute, barring the carrying of concealed weapons . . . was enacted in 1905.").

Moreover, the Supreme Court has recognized that in analyzing the scope of the right protected by the Second Amendment, courts are not limited to examining only Founding Era cases and materials.  Thus, in analyzing whether prohibitions on carrying concealed weapons fell outside the scope of the Second Amendment's protection, the Court in Heller explained:

> Like most rights, the right secured by the Second Amendment is not unlimited. . . .
> For example, the majority of the 19th-century courts to consider the question held
> that prohibitions on carrying concealed weapons were lawful under the Second
> Amendment or state analogues.  See, e.g., State v. Chandler, [5 La. Ann. 489, 489-90
> (La. 1850)]; Nunn v. State, [1 Ga. 243, 251 (Ga. 1846)]; see generally [2 J. Kent,
> Commentaries on American Law *340, n.2 (O. Holmes ed., 12th ed. 1873)]; The
> American Students' Blackstone 84, n.11 (G. Chase ed. 1884).

Heller, 554 U.S. at 626; see also id. at 613 (discussing Aymette v. State, 21 Tenn. 154 (1840)).  In concluding that such prohibitions did not violate the Second Amendment, the Court based its analysis on cases decided between 1840 and 1850, and commentators writing in the 1820s and

1870s.[27]  Additionally, the Court considered "discussion[s] of the Second Amendment in Congress and in public discourse" made "[i]n the aftermath of the Civil War" relevant to its examination of the historical understanding of the Second Amendment right; while acknowledging that these discussions "do not provide as much insight into its original meaning as earlier sources," it explained that because "those born and educated in the early 19th century faced a widespread effort to limit arms ownership by a large number of citizens[,] their understanding of the origins and continuing significance of the Amendment is instructive." Id. at 614.

The larger point is that "exclusions need not mirror limits that were on the books in 1791." Skoien, 614 F.3d at 641.  "Heller "tell[s] us that statutory prohibitions on the possession of weapons by some persons are proper – and, importantly for current purposes, that the legislative role did not end in 1791.  That *some* categorical limits are proper is part of the original meaning, leaving to the peoples' elected representatives the filling in of details." Id. at 640 (emphasis in original); accord Reese, 627 F.3d at 802; GeorgiaCarry.Org, Inc. v. Georgia, _ F. Supp. 2d _, 2011 WL 240108, at *7 (M.D. Ga. Jan. 24, 2011) (attached as Ex. 1).  In any event, the State laws imposing under-21 age qualifications on the purchase or use of firearms are older than the categories characterized by Heller as "longstanding."

The second conclusion this analysis suggests is that because minimum-age qualifications on the purchase or use of firearms have been adopted by all fifty States and the District of Columbia, though a clear majority of States had constitutional provisions protecting the right to bear arms at the time of adoption, the States viewed these minimum-age qualifications as "not inconsistent with

---

[27] The first cited commentator is James Kent, who published his four-volume Commentaries between 1826 and 1830; the second cited footnote was not written by Blackstone but by George Chase, who published his first edition of Blackstone's Commentaries in 1876-77.

the right of Americans generally to individually keep and bear their private arms." Emerson, 270 F.3d at 261.

Third, the fact that most States established age qualifications only on the purchase or use of concealable firearms (rather than long guns) supports a reasonable inference that a majority of States considered those weapons to be the most dangerous in the possession of younger individuals. Plaintiffs' contention that "this distinction plainly is untenable after Heller," Pl. Opp. at 32, is incorrect.  Heller held that "the District's *ban* on handgun *possession* in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."  554 U.S. at 635 (emphasis added).  But in the paragraph immediately after this holding, the Court made clear that it was not ruling out all regulation of handguns, to the exclusion of other firearms: "We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many amici who believe that prohibition of handgun ownership is a solution.  The Constitution leaves the District of Columbia a *variety of tools* for combating that problem, *including some measures regulating handguns*, see supra, at 2816-2817, and n.26."  Id. at 636 (emphasis added).  The Court's reference was to the list of "presumptively lawful regulatory measures" that includes "laws imposing conditions and qualifications on the commercial sale of arms."  Id. at 626-27 & n.26.  Thus, a law imposing a qualification on the commercial sale of handguns such as the age qualification for purchasing handguns from a licensed dealer remains valid after Heller.

The compatibility of the right to bear arms with an under-21 age qualification for the purchase or use of firearms can also be seen by examining nineteenth-century commentary on the right to bear arms.  Both the Supreme Court and Fifth Circuit have acknowledged the importance of

judge and professor Thomas Cooley's analysis to the public understanding of the Second Amendment, see Heller, 554 U.S. at 616-18; Emerson, 270 F.3d at 235-36, 258-59, and Plaintiffs' brief cites Cooley's work several times.  See Pl. Opp. at 24, 31, 34.  Any notion that Cooley considered the right to bear arms to be incompatible with restrictions on the use of firearms by individuals under 21 is dispelled by the fact that in the final edition of his most famous treatise published in his lifetime, Cooley included in a list of permissible exercises of State police power: "That the State may prohibit the sale of arms to minors."  Thomas M. Cooley, Treatise on Constitutional Limitations 740 n.4 (5th ed. 1883) (citing State v. Callicutt, 69 Tenn. 714 (1878)), App. 18.[28]

> Additionally, an Individual Rights scholar cited previously by this Court[29] has explained:
>
> I can tell you from my research into Colonial gun culture that minors, as young as 12, in many cases, were commonly allowed to go hunting.  This does not, however, mean that they were therefore considered to enjoy the *right* to keep and bear arms.  In light of the many limitations that our laws placed on minors in other areas, I have considerable confidence that the Framers would have considered *some* regulation of minors carrying firearms constitutional.

Clayton Cramer, Still Ticking, http://www.claytoncramer.com/popular/StillTicking.html (last visited April 6, 2011) (emphasis in original).[30]

---

[28] Cooley expressly noted that "the federal *and State* constitutions . . . provide that the right of the people to bear arms shall not be infringed."  Id. at 429 (emphasis added), App. 9.

[29] See United States v. Emerson, 46 F. Supp. 2d 598, 602, 606 (N.D. Tex. 1999) (citing Clayton E. Cramer, For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms (1994)).

[30] See also id. ("There is a pretty clear distinction that our laws have forever made between adults and minors, based on the indisputable fact that minors generally lack the maturity of adults.  You can find plenty of exceptions, of course: very responsible, very mature 16 year olds, and astonishingly irresponsible, immature 25 year olds.  Picking 18 years old as the dividing line for adulthood (or 21 with respect to alcohol and handguns) is completely arbitrary, and there are going to be people on both sides of that line who are in the 'wrong' group.  But

In sum, then, restrictions on the ability of individuals under 21 to purchase handguns are both longstanding and compatible with the constitutional guarantee of the right to keep and bear arms.

Plaintiffs respond that the Second Militia Act of 1792, 1 Stat. 271 ("Militia Act"), and early State militia laws, created a "vested right" to bear arms in individuals over 18 years of age. Pl. Opp. at 25-29. But Plaintiffs' historical argument is based on a faulty syllogism: namely, that (1) if in or about 1791, Congress or the States prescribed 18 as the minimum age for militia service, then (2) they created a "vested right" in 18 year olds to serve in the militia, and thus (3) neither Congress nor the States can now prohibit the direct sale of handguns to 18-to-20 year olds by licensed dealers. Neither (2) nor (3) follows from (1).

> **B.      Because the Issue in <u>Heller</u> and <u>McDonald</u> Was the Individual Right to Keep and Bear Arms Unconnected with Service in a Militia, the Relevance of Militia Statutes is Questionable.**

Plaintiffs fail to recognize that the issue in <u>Heller</u> was not the constitutional scope of the right to carry arms in the context of militia service. <u>See</u> <u>Heller</u>, 554 U.S. at 577 ("[Heller] argues that [the Second Amendment] protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home."); <u>id.</u> at 579 n.5 (the right to bear arms "is still an individual right, and not one conditioned upon membership in some defined 'assembly,' as [Justice Stevens] contends the right to bear arms is conditioned upon membership in a defined militia"); <u>id.</u> at 593 ("It was clearly an individual right, having nothing whatever to do with service in a militia."). Instead, both <u>Heller</u> and <u>McDonald</u> dealt with whether possession of a handgun for self-defense in the home is a right

---

that's life and law: writing a clear-cut statute sometimes gives you less than perfect results.").

protected by the Second Amendment.  <u>Heller</u>, 554 U.S. at 598-99, 635-36; <u>McDonald</u>, 130 S. Ct. at 3036.[31]

<u>Heller</u> did examine the prefatory "well-regulated militia" language of the Second Amendment, 554 U.S. at 595-99, but explained that this language "does not suggest that preserving the militia was the only reason Americans value the ancient right," <u>id.</u> at 599.  Plaintiffs thus err by conflating "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," <u>id.</u> at 635, which was at issue in <u>Heller</u>, with the right of participating in the common defense as part of a national or State militia.  <u>Cf.</u> <u>Emerson</u>, 270 F.3d at 241 (noting that in the proposed amendment by the Pennsylvania convention that ratified the Constitution, "'bear arms' clearly pertains to private, civilian wearing or carrying of arms and the power of the state to organize, arm and discipline the militia is in a separate section, indicating that the Anti-Federalists viewed these issues as distinct"); <u>Emerson</u>, 46 F. Supp. 2d at 601 ("The right exists independent of the existence of the militia.").  None of the three individual plaintiffs allege that he or she has enrolled, has attempted to enroll, or has been denied access to "keep and bear arms" in a national or State militia.  And because Section 922(b)(1) in no way prevents Plaintiffs from enrolling in the federally-organized and State-trained militia, it does not violate a "well-regulated militia" right to "keep and bear arms."

Moreover, it is consistent with the historical understanding of the right to bear arms to consider individuals under 21 suitable for the duty to bear arms under militia leadership, training, and control, but to have no qualms about restricting their purchase of firearms in a non-militia

---

[31] Notably, the majority's opinions in <u>McDonald</u> did not recite the "well-regulated militia" language even once, not even as dicta.  <u>See</u> 130 S. Ct. at 3026-50 (plurality opinion); <u>id.</u> at 3050-58 (Scalia, J., concurring); <u>id.</u> at 3058-88 (Thomas, J., concurring).

setting.  Even during the Founding Era, the bearing of arms in the militia was "well regulated" and did not entail members using firearms unchecked without supervision.  While "'a well-regulated Militia' refers *not* to a special or select subset or group taken out of the militia as a whole [it did refer] to the condition of the militia as a whole, namely being well disciplined and trained." Emerson, 270 F.3d at 234-35 (emphasis in original); see also Heller, 554 U.S. at 597 ("[W]ell-regulated" implies "proper discipline and training.").[32]

### C.   In Any Event, Congress and the States Have Traditionally Possessed Discretion to Set Age Limits for Participation in Military Service.

Plaintiffs' reasoning is flawed, in that they assume that if at a particular time, a legislature selected 18 as the minimum age for militia service, it has thereby created a "vested right" in the incidents of militia service in 18-year-olds that cannot be changed by later legislation.  But this is not how vested rights work.  "Vested" means "[h]aving become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute."  Black's Law Dictionary 1699 (9th ed. 2009).  A "vested right" is "[a] right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent."  Id. at 1438.  And "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise."  Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry., 470 U.S. 451, 465-66 (1985).

It is well settled and "beyond a doubt that majority or minority is a status rather than a fixed

---

[32] See also Patrick J. Charles, The 1792 National Militia Act, the Second Amendment, and Individual Militia Rights, 9 Geo. J.L. & Pub. Pol'y 1, 3 (forthcoming 2011) ("The right to 'keep and bear arms' in a 'well-regulated militia' was not a license to individually train or discharge firearms.") (citing militia statutes), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1705564.

or vested right and that the legislature has full power to fix and change the age of majority." Allison v. Allison, 337 N.E.2d 666, 668 (Ohio 1975); see also Morrissey v. Perry, 137 U.S. 157, 159 (1890) ("The age at which an infant shall be competent to do any acts or perform any duties . . . depends wholly on the legislature."); Felix v. Milliken, 463 F. Supp. 1360, 1383 (E.D. Mich. 1978) ("[T]he status of majority or minority by its very nature does not of itself involve any vested right."); Beaudry v. Beaudry, 312 A.2d 922, 925 (Vt. 1973) ("The term 'minor' . . . does not necessarily imply any particular age limit.  At most, the term embraces any person who has not yet arrived at the age of majority prescribed by law, for minority is a status created by law and is subject to statutory limitation and exception."); Valley Nat'l Bank of Phoenix v. Glover, 159 P.2d 292, 301 (Ariz. 1945) (right of a minor to disaffirm a contract "is in no sense a vested right.  If the legislature has the power to decrease the age of majority, which it has, it follows that contracts which may be entered into by a person of such legal age are valid.").

As a corollary, "statutes setting different ages at which a person may engage in an activity or be treated as an adult are within the province of the legislature."  42 Am. Jur. 2d Infants § 6; see also Jones v. Jones, 72 F.2d 829, 830 (D.C. Cir. 1934) (observing that at common law, individuals were deemed infants until age 21, but noting that "the Legislature may regulate the age of majority for infants in all cases, or for specified purposes only."); Allam v. State, 830 P.2d 435, 438 (Alaska Ct. App. 1992) ("There is no legal requirement that the same age of majority apply to all activities and circumstances."); Rourke v. U.S. Fid. & Guar. Co., 1 S.E. 2d 728, 731 (Ga. 1939) ("The legislature has ample power to regulate the age of minority or majority, and it may prescribe a longer period of minority for some purposes than for others.").

Indeed, Plaintiffs expressly acknowledge that "[a]t common law, minimum age requirements

were 'different for different purposes.'" Pl. Opp. at 29 (quoting 1 Blackstone Commentaries *463).

That legislatures retain the authority to prescribe different minimum age requirements for different

purposes is explained in Felix v. Milliken:

> [I]n Craig v. Boren, 429 U.S. 190 (1977), the Supreme Court indicated that the question whether to raise or lower the age of majority relative to a particular privilege was an issue of state law. Thus, the view clearly emerges that the states have *considerable discretion* in either *raising or lowering the age requirements* with regard to a *particular privilege*.
>
> \*       \*       \*       \*       \*       \*       \*
>
> Additionally, what is termed the "legal age of majority" is not in effect a defined status that is always identifiable and always changeless. On the contrary, the age of majority is a *series of related decisions* by the state removing the disability of infancy *in the areas specified. For example, the right to vote might be given* and the *capacity to enter into binding contracts withheld*.

Felix, 463 F. Supp. at 1383-84 (internal citations omitted) (emphasis added).

In short, because majority is a legal status, State legislatures may provide for the attainment

of adult status for different rights at different ages: for example, the right to drive at age 14,[33] to

marry at age 14,[34] purchase tobacco at age 19,[35] drink alcohol at age 21, and to serve as a juror at age 19

or 21.[36] It is true that for many purposes, States choose to bestow adolescents with the status of

legal children until a bright-line age of majority confers adult status, but nothing requires a State to

set that age at 18.[37] And because nothing requires a State to choose a bright-line majority age for all

---

[33] See S.D. Codified Laws § 32-12-11.

[34] See N.H. Rev. Stat. § 457:4 (age 13 for females).

[35] See Ala. Code §§ 28-11-2, 28-11-13; Alaska Stat. § 11.76.105; N.J. Stat. Ann. § 2A:170-51.4.

[36] See Ala. Code § 12-16-60 (age 19); Miss. Code Ann. § 13-5-1 (age 21); Mo. Rev. Stat § 494.425(1) (age 21); Neb. Rev. Stat. § 25-1601(1) (age 19).

[37] See Ala. Code § 26-1-1 (age 19); Miss. Code Ann. § 1-3-27 (age 21); Neb. Rev. Stat. § 43-2101 (age 19).

the privileges that constitute adulthood, States may bestow adult status either before the age of majority (e.g., driving, marriage), or after (e.g., purchasing alcohol). State legislatures may set 18 as the minimum age for the exercise of one right, and 21 as the minimum age for the exercise of another right, even important civil rights such as the right to serve on a jury, United States v. Dukes, 479 F.2d 324, 326 (5th Cir. 1973), or the right to hold state public office, Blassman v. Markworth, 359 F. Supp. 1, 5-6 (N.D. Ill. 1973). And as with the States, so with Congress. Federal law has not created a bright-line "age of majority," and does not define who is a child, or "minor" in legal terms. See Marte v. INS, 562 F. Supp. 92, 95 (S.D.N.Y. 1983); Broadway v. Beto, 338 F. Supp. 827, 840 (N.D. Tex. 1971), aff'd, 459 F.2d 483 (5th Cir. 1972); George v. United States, 196 F.2d 445, 453 (9th Cir. 1952).[38]

This same principle applies equally to fundamental rights. The right to vote is a fundamental right, see Tashjian v. Republican Party of Conn., 479 U.S. 208, 217 (1986), but prior to the Twenty-Sixth Amendment, nothing *constitutionally* prevented legislatures from setting the minimum age to vote at 21. Oregon v. Mitchell, 400 U.S. 112, 118 (1970) (striking down a portion of federal law lowering the voting age in state, county, and municipal elections from 21 to 18); id. at 294-95 ("Obviously, the power to establish an age qualification must carry with it the power to choose 21 as a reasonable voting age, as the vast majority of the States have done.") (Stewart, J., joined by Burger, C.J. and Blackmun, J., concurring in relevant part).[39]

---

[38] Defendants are not contending in this motion that Congress or the States could set the minimum age for purchase of firearms at an age above 21.

[39] See also Gray v. Sanders, 372 U.S. 368, 380-81 (1963) (observing that "[m]inors, felons, and other classes may be excluded" from the right to vote); Kramer v. Union Free Sch. Dist. No. 15, 395 U.S. 621, 625 (1969) ("The requirements of [a state statute] that school district voters must . . . be at least 21 years of age are not challenged. Appellant agrees that the States have the power to impose reasonable citizenship, age, and residency requirements on the

Though Plaintiffs try to minimize Mitchell's significance by noting that the decision rested to some degree on discretion afforded to the States in state elections, Pl. Opp. at 37 n.17, this does not diminish the fact that in Mitchell, "[d]enial of the right to vote to those under age twenty-one was implicitly upheld as constitutional," despite the fact that it is recognized as a "very fundamental right." Bykofsky v. Borough of Middletown, 401 F. Supp. 1242, 1266 (M.D. Pa. 1975). Moreover, while "[t]he States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised," Lassiter v. Northampton Cty. Bd. of Elections, 360 U.S. 45, 50 (1959), the same is true with respect to determining minimum ages for the exercises of privileges and activities that constitute adulthood.

As explained in Defendants' opening brief, both Congress and State legislatures currently set 21 as the minimum age for the exercise of a number of privileges that constitute adulthood. Def. Mot. at 32-33. Because the ability to purchase firearms is *one* of the privileges that, along with others, collectively constitute adulthood and majority, nothing prevents Congress or the States from setting the minimum age for purchase of firearms at 21, rather than 18. Because they retain this discretion, there is no vested right to purchase handguns from a licensed dealer at 18, rather than 21. See Mitchell, 400 U.S. at 142 (although 18 year olds may be "generally considered by American law to be mature enough to contract, to marry, to drive an automobile, [or] to *own a gun*, . . . . [o]n any of these items, the States, of course, have leeway to raise or lower the age requirements") (Douglas, J., dissenting in relevant part) (emphasis added).

Indeed, twelve States and the District of Columbia continue to choose 21 as the minimum age for purchase or use of certain firearms, or all firearms. Thus, there is still a need for the age

_____

availability of the ballot.").

qualification for purchasing handguns from a licensed dealer, which was enacted to help States that

chose 21 as the minimum age for purchase of handguns to enforce their laws by preventing

underage individuals from crossing State lines to evade the minimum-age requirement.

### 1.   The 1792 Militia Act Did Not Create a Vested Right in Individuals to Bear Arms as Part of a Militia at a Particular Age.

The Constitution bestows Congress with the authority to "provide for the organizing,

arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the

Service of the United States, reserving to the States . . . the Authority of training the Militia

according to the discipline prescribed by Congress." U.S. Const. art. I, § 8. This constitutional

provision, however, was not intended to remove all power from the States to organize, arm, and

discipline their respective militias. See Emerson, 270 F.3d at 249 n.57 (noting that in Houston v.

Moore, 18 U.S. 1 (1820), "the Supreme Court held that states retain the power to organize, arm, and

discipline their militias provided that the exercise thereof is not repugnant to the authority of the

Union"); Perpich v. Dep't of Defense, 496 U.S. 334, 353-54 & n.29 (1990).

This concurrent authority held especially true when defining who was capable of bearing

arms in the militia, as in the Militia Act. Importantly, the Act provided that "each and every free

able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age

of eighteen years, and under the age of forty-five years (*except as is herein after excepted*)

shall severally and respectively be enrolled in the militia." Militia Act § 1, 1 Stat. 271 (emphasis

added). In the very next section, the Act made clear that "all persons who now are or may hereafter

be exempted by the laws of the respective states, shall be, and are hereby exempted from militia

duty, *notwithstanding their being above the age of eighteen*, and under the age of forty-five years."

Id. § 2, 1 Stat. 272 (emphasis added). Consistent with their concurrent authority over the militia,

then, the Act left the States broad discretion to exempt entire classes of people, including 18-to-20 year olds.[40]   Indeed, when the governor of Massachusetts requested legal advice on this precise issue, the Massachusetts Supreme Judicial Court concluded: "[I]t is competent for the State legislature by law to exempt from enrolment in the militia, all persons under twenty-one and over thirty years of age."   In re Opinion of the Justices, 39 Mass. 571, 576 (1838).   And a number of States chose to enroll only individuals over 21 in their respective militias.[41]

As a result of these States' exemptions, individuals under 21 were no longer enrolled in their States' militias.[42]   Such exemptions are at odds with the notion that the Militia Act created a vested right for 18-to-20 year olds to serve in a militia.   By definition, a vested right has "become a completed, consummated right for present or future enjoyment; not contingent; unconditional," and "so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent."   Black's Law Dictionary 1438, 1699 (9th ed. 1999).   If individual States, pursuant to their concurrent authority over the militia, could take away the conditional privilege of State residents under the age of 21 to serve in a militia, it cannot be deemed a vested right.   The

---

[40] See also Charles, The 1792 National Militia Act, 9 Geo. J.L. & Pub. Pol'y at 9 (noting that the Militia Act's drafters left to the States the power to exempt classes, impose fines for non-compliance, arrange their respective militias into divisions, brigades, regiments, battalions and companies, and regulate manner of "keeping" militia arms).

[41] States enrolling only individuals over 21: Delaware, Georgia, Kansas, New Jersey, North Carolina, Ohio, Pennsylvania, see App. 21-23.   Additionally, Michigan, Missouri, and New York required parental consent for individuals under 21 to serve in their militias, see id. 24.

[42] Moreover, in the 1830s, Delaware abolished its militia system, and in the 1840s, mandatory militia service was eliminated in Massachusetts, Maine, Ohio, Vermont, Connecticut, New York, and Missouri; New Hampshire followed in the early 1850s.   John K. Mahon, History of the Militia and the National Guard 83 (1983).   In fact, "[b]y the middle of the 1840s, the enrolled militia system had all but faded away into obsolescence."   Michael D. Doubler, Civilian in Peace, Soldier in War 90 (2003).

Militia Act thus in no way shows that Congress meant, for all time thereafter, to bestow on them a permanent *entitlement* to serve as part of a militia.[43]

Neither Congress nor the States ever established a constitutional right to serve in the militia at a particular age. "The Constitution vests '[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force' exclusively in the legislative and executive branches." Kreis v. Sec'y of Air Force, 866 F.2d 1508, 1511 (D.C. Cir. 1989) (quoting Gilligan v. Morgan, 413 U.S. 1, 10 (1973)); cf. Nieszner v. Mark, 684 F.2d 562, 565 (8th Cir. 1982) (affirming dismissal of challenge to Air Force regulation imposing mandatory age restrictions for commissioned officers as non-justiciable). In effect, Plaintiffs are contending that once the legislature sets a minimum age for the exercise of one of the privileges that collectively constitute adulthood, it can never again raise it. Plaintiffs are mistaken. See Felix, 463 F. Supp. at 1382-83 (rejecting argument that because a State had lowered the age of majority to 18, and because "drinking is a privilege of this lowered age of majority," the State could not raise the drinking age to 21, because "the status of majority or minority by its very nature does not of itself involve any vested right").

Plaintiffs also incorrectly claim that the Militia Act's legislative debates show that Congress created a vested right in 18 year olds to serve in a militia. Pl. Opp. at 27. All these debates show, however, is that the age of service was at the discretion of the legislative branches.[44] This was part

---

[43] Nowhere is Plaintiffs' confusion more apparent than in their claim that the Militia Act shows that "Second Amendment rights fully vest *at the latest* by age 18." Pl. Opp. at 27 (emphasis in original). A rights either vests at a particular time, or it does not. And no right can be considered "vested" if it is not possible to identify with certainty the time at which the right vests.

[44] Similarly, Plaintiffs place great emphasis on a militia plan submitted by Secretary of War Henry Knox to Congress, Pl. Opp. at 27, while failing to note that "[t]he Knox plan found

of the authority of defining who was capable of service in the militia, a power shared by Congress

and the States.

Regarding this governmental power "to select particular classes of men from the people at

large," Representative John Laurence elaborated:

> If the proper idea be, that all the citizens who are capable of rendering personal service, are included in the general term "militia" – and *if to "organize" that militia, be to form it into particular bodies for particular uses*, it is the duty of Congress to consider what measures, in this respect, will be productive of the greatest public benefit. *If the selection of the proper men will best contribute to this end, Congress have a right to select*. . . . Now we have declared, that *all exemptions, made by the state legislatures, shall be considered as made by us*, since by this law we give them the sanction of this house, and we also give them the power of making what further exemptions they may deem expedient.

House of Representatives, On the Militia Bill, December 24, 1790, *reprinted in* The Federal Gazette

and Philadelphia Daily Advertiser (Philadelphia), January 10, 1791, at 2 col. 1, App. 26 (emphasis

added).  While responding to an objection that a proposed amendment to allow Congress to exempt

themselves from militia service would unduly extend Congress's privilege, Representative John

Laurence stated: "[T]here cannot be any force in this, *as it is conceded that Congress may designate*

*the age of the militia*; now if their ages be restricted from eighteen to forty-five, it effectually

exempts many of the members of Congress."  2 Annals of Cong. 1870 (1793), App. 33 (emphasis

added).  And although one representative did opine that "from eighteen to twenty-one was found to

be the best age to make soldiers of," see Pl. Opp. at 28, this opinion was not shared by all.  For

example, Representative Elias Boudinot (who introduced the bill that became the Militia Act) "very

much disapproved the idea of making a soldier of every man between eighteen and forty-five years

of age – there is a manifest impropriety in the measure."  2 Annals of Cong. 1852, App. 29.  Nor did

little favor in Congress" and died in committee.  John McAuley Palmer, America in Arms: The Experience of the United States with Military Organization 43 (1941).

Congress agree as to the maximum age for militia service, disagreeing as to whether it should be forty-five or fifty.  Id. at 1851, App. 29.  In short, during the legislative debates, different representatives disagreed as to the proper ages for militia service – and the legislative history is bereft of any notion that Congress thought it was laying down a lasting principle for all time as to the age at which individuals should be permitted to purchase or possess firearms.[45]

> **2.     Colonial and Early State Militia Laws Neither Established a Vested Right in Individuals Under 21 to Serve in a Militia Nor Presupposed Their Possession of Firearms.**

Although colonial and early State militia laws often did allow 18-to-20 year olds the statutory privilege of serving in a militia, they did not purport to create a vested entitlement in such individuals to militia service, such that the minimum age for service could not later be changed.  As explained above, a number of States *did* increase their minimum age for militia service to 21 (or eliminated mandatory militia service altogether), which is inconsistent with the notion of a vested right to serve in a militia at age 18.  That many colonies and early States decided at a particular time to set a particular minimum age for militia service does not mean they thereby divested themselves of the authority to change that minimum age.

This is most clearly seen in the experience of colonial Virginia.  In 1705, during Queen Anne's War (1702-13), Virginia set the age restriction on militia duty at 16.  In 1723, it raised the minimum age for militia duty to 21.  Twenty-one remained the minimum age when Virginia passed a later militia law in 1738, and when it sought recruits for a 1754 expedition against the French.

--------

[45] Additionally, while it is true that in 1783, George Washington recommended that citizens from 18-50 be enrolled in the militia, Pl. Opp. at 28, this was a personal recommendation and not a legal directive or a legal interpretation of the right to bear arms; moreover, Washington's reference to "our system" did not refer to the American system, but only to Washington's recommended proposal.  See George Washington, Sentiments on a Peace Establishment, *available at* http://press-pubs.uchicago.edu/founders/documents/a1_8_12s6.html.

However, at the beginning of the Seven Years War in 1755, the legislature decided to lower the minimum age for service to 18.  At the beginning of the Revolutionary War, it was lowered to 16. In 1784, after war had ended, the Virginia legislature raised the minimum age back to 21.  See App. 36-38.  This pattern demonstrates that "[a]lthough the Virginia legislature preferred older soldiers, it lowered the qualifications when it wanted more.  Its minimum age to fight thus fluctuated wildly: from none in the seventeenth century to as high as twenty-one in the eighteenth."  Holly Brewer, By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority 138 (2005). Also instructive is New Jersey, which set 16 as its minimum age for militia service in 1777, see Pl. Opp., App. 87, but then raised it to 21 in 1779 (while expressly reserving the right to "employ[] Officers, and enlist[] non-commissioned Officers and Privates" as young as 16), see App. 35.

These examples show that, far from believing themselves bound to require individuals under 21 to serve in the militia, colonial and State legislatures preserved their discretion to raise and lower the minimum age limit as they saw fit.  This retention of discretion is entirely inconsistent with the premise that the States divested themselves of the ability to determine whether individuals under 21 should serve in their respective militias.

Similarly, the historical record shows the flaws in Plaintiffs' assumption that "militia membership presupposed firearm possession" by all militia members.[46]  Pl. Opp. at 29.  To the

---

[46] As to this point, United States v. Miller, 307 U.S. 174 (1939), never claims that *minors,* as opposed to adult males, were expected to provide their own arms, rather than being supplied by their parents or guardians.  See id. at 179-80 (noting that in the American colonies, as in England, the principle of assize "implied the general obligation of all *adult male* inhabitants to possess arms, and, with certain exceptions, to cooperate in the work of defence") (quoting 1 Herbert L. Osgood, The American Colonies in the Seventeenth Century ch. 13 (1904)) (emphasis added).  In context, Miller's assertion that militia members were "expected to appear bearing arms" thus means only that it was not expected that members would be furnished with arms by the State, although this apparently did occur on occasion.  See, e.g., Pl. Opp., App. 87 (1786 New Hampshire law requiring that "such of the training band, or alarm list, as shall be unable to

contrary, a number of State laws expressly provided that parents were expected to furnish their minor children with firearms for their militia duty.[47]   Indeed, the legislative history of the 1792 Militia Act shows that this was common knowledge.   During a debate over whether the United States should furnish firearms to persons who were unable to equip themselves, Representative John Vining "asked by what means minors were to provide themselves with the requisite articles?"   2 Annals of Cong. 1854-55, App. 30-31.   This statement presupposes that individuals under 21 did *not* possess their own arms.   The remedy, according to Representative Jeremiah Wadsworth, was that "as to minors, *their parents or guardians* would prefer furnishing them with arms themselves, to depending on the United States when they knew they were liable to having them reclaimed."   Id. at 1855-56, App. 31 (emphasis added).   Thus, it is incorrect to presume, as Plaintiffs do, that individuals under 21 were "expected to keep and maintain . . . arms as private citizens."   Pl. Opp. at 29.   Rather, as with the present-day age qualification, the presumption was that parents and guardians would be better entrusted with the furnishing of arms to underage individuals.

---

furnish themselves [with arms and accoutrements] shall make application to the selectmen of the town, who are to certify to his captain, or commanding officer, that he is unable to equip himself; and the said selectmen shall, at the expense of the town, provide for, and furnish such person with arms and equipments; which arms and equipments shall be the property of the town at whose expense they are provided. . .").

[47] See Pl. Opp., App. 82 (1785 Delaware law, § 7, requiring every "person of the age of eighteen and under-twenty-one years, who hath an estate of the value of eighty pounds, or whose parents shall pay six pounds annually towards the public taxes, shall by his parent or guardian respectively be provided with" arms); Pl. Opp., App. 84 (1789 Massachusetts law, § XIII, requiring "every non-commissioned officer and private [soldier] of the said militia, *not under the control of parents, masters or guardians*. . . [to] equip himself. . . with a good fire-arm"; id. § XIV, requiring that "all parents, masters and guardians, *shall furnish* those of the said militia who shall be under their care and command, *with the arms* and equipments aforementioned"); Pl. Opp, App. 87 (1786 New Hampshire law, § 6, providing that "Such of the training band as are under the care of parents, masters, or guardians, are to be *furnished* by them *with such arms* and accoutrements") (emphasis added); see also App. 39-42 (similar laws passed by Maine, Missouri, North Carolina, and Vermont).

**D.**      **Plaintiffs' Remaining Arguments Are Policy Arguments, the Resolution of Which Is Within Legislative Discretion.**

Plaintiffs' remaining arguments under this rubric are policy-based and intended to support their opinion that Congress *should* have chosen a different minimum age for the direct purchase of handguns from licensed dealers.  These policy arguments are that the age of majority in most States is no longer 21; and that 18 year olds are able to vote, serve in the armed forces, and to be subject to capital punishment.  Pl. Opp. at 33-35.  Plaintiffs' contentions would be better addressed to a legislative body, as "'[u]nder the system of government created by our Constitution, it is up to the legislatures, not the courts, to decide on the wisdom and utility of legislation.'"  Sonnier v. Quarterman, 476 F.3d 349, 368 (5th Cir. 2007) (quoting Ferguson v. Skrupa, 372 U.S. 726, 729 (1963)); see also Blassman, 359 F. Supp. at 6 ("[W]ere we to strike down the age minimum requirement here, we would be accomplishing nothing other than substituting our judgment for that of the [State] legislature.  This we decline to do.").

In any event, there are sound reasons why Plaintiffs' policy arguments are not persuasive here.  Although many States do not generally define 18-to-20 year olds as "minors," many States also do not consider 18-to-20 year olds to be, in all respects, full adults.  As explained above, legislatures have broad discretion to allow for the exercise of certain privileges at, above, or below the bright-line age of majority.  And as shown in Defendants' opening brief, "[t]wenty-one continues to be the age of majority for a variety of purposes in states across the country."  Def. Mot. at 32.  State legislatures have thus decided that for a variety of purposes, 18-to-20 year olds should not be treated as full adults.  Twelve State legislatures and the District of Columbia have made this determination as to the ability to purchase firearms, and the age qualification for purchasing handguns from a licensed dealer helps protect their determination by preventing underage

-50-

individuals from evading these States' laws simply by crossing State lines.

And while 18 year olds may now vote, the fact remains that in order to ban minimum age qualifications that excluded 18 year olds, the Constitution had to be amended. <u>See</u> U.S. Const. amend. XXVI (1971). As explained previously, prior to that amendment, the Supreme Court in <u>Mitchell</u>, 400 U.S. 112, made clear that the Constitution did not prohibit States from setting their minimum voting age for State and local elections at 21, despite the fact that voting is undeniably a fundamental constitutional right. And the sole effect of the Twenty-Sixth Amendment was to lower the voting age, not to bestow any other rights on individuals 18 and older. <u>See</u>, <u>e.g.</u>, <u>United States v. Olson</u>, 473 F.2d 686, 687-88 (8th Cir. 1973) (rejecting contention that passage of Twenty-Sixth Amendment <u>ipso</u> <u>facto</u> rendered unconstitutional the federal law setting 21 as the age for jury service). Accordingly, the Twenty-Sixth Amendment does not require Congress or the States to grant 18-to-20 year olds any other rights or privileges. <u>See</u> <u>Felix</u>, 463 F. Supp. at 1384 (observing that "the right to vote might be given and the capacity to enter into binding contracts withheld" at particular age by a State legislature).

Eighteen-to-twenty year olds are indisputably eligible for military service, <u>see</u> 10 U.S.C. § 505(a), but this eligibility neither bestows a right to unrestricted use of to firearms by such individuals, nor implies anything about the rights of civilians under 21 regarding the purchase of firearms from licensed dealers. Serving military personnel may not carry loaded firearms whenever they wish, but only as prescribed in the course of their duty. The military's practice is to extensively regulate firearms. Even for the military police and security forces, the ability to carry firearms requires written authorization after mandatory training. <u>See</u>, <u>e.g.</u>, Army Reg. 190-14, §§ 2-4, 2-5

(March 1993).[48]  Those who exhibit "unsuitable behavior," have certain medical conditions, or are taking certain medications will not be authorized to carry firearms.  Id. § 2-7(a)(1).  The carrying of firearms for "personal protection" will "only be approved on a case-by-case basis" after an authorizing official evaluates the need for such protection.  Id. § 2-2(b), (d); see also U.S. Dep't of Defense Directive 5210.56, § 4.1 (Nov. 2001) ("It is DoD policy… [t]o limit and control the carrying of firearms by DoD military and civilian personnel.  The authorization to carry firearms shall be issued only to qualified personnel when there is a reasonable expectation that life or DoD assets will be jeopardized if firearms are not carried.").[49]  Moreover, as a matter of policy, it is perfectly appropriate for Congress to distinguish between the privileges and responsibilities afforded to active service personnel in the U.S. armed forces, and those afforded to civilians, and none of the three individual plaintiffs serve in the U.S. military.[50]

In sum, Plaintiffs' policy arguments are unpersuasive, and should be rejected.

---

[48] *Available at* http://www.apd.army.mil/pdffiles/r190_14.pdf.

[49] *Available at* http://www.dtic.mil/whs/directives/corres/pdf/521056p.pdf.

[50] It is unclear why Plaintiffs believe the Supreme Court's decision in Roper v. Simmons, 543 U.S. 551 (2005), holding that the execution of individuals under 18 constitutes "cruel and unusual punishment," has any bearing on the issue of whether Congress may constitutionally restrict the sale of handguns by licensed dealers to individuals under 21.  Unlike other constitutional provisions, the Cruel and Unusual Punishments Clause is interpreted by "referring to the evolving standards of decency that mark the progress of a maturing society to determine which punishments are so disproportionate as to be cruel and unusual."  Roper, 543 U.S. at 561 (citation and internal punctuation omitted).  To construe the Second Amendment in similar fashion would be wholly at odds with Heller's focus on the original understanding of the amendment.  In any event, it does not follow from the Court's observation in Roper that age 18 is "the point where society draws the line for many purposes," id. at 574, that legislatures *must* do so for *all* purposes.  As explained above, courts have upheld legislative decisions to draw the line above the age of 18 for some purposes.  Nothing in the Constitution prevents such an exercise of legislative discretion.

IV.     **SECTION 922(B)(1) SURVIVES ANY LEVEL OF CONSTITUTIONAL MEANS-END SCRUTINY.**

Assuming *arguendo* that the Court were to find that the age qualification for buying

handguns from a licensed dealer imposed a burden on conduct falling within the Second

Amendment's guarantee, it should "evaluate the law under some form of means-end scrutiny."

Marzzarella, 614 F.3d at 89; accord Reese, 627 F.3d at 800-01; Chester, 628 F.3d at 680.  In the

event that a "standard of scrutiny" analysis is necessary here, the Court should evaluate Section

922(b)(1) under no more stringent level of review than intermediate scrutiny.

A.     **If the Court Were to Determine that Section 922(b)(1) Burdens Conduct Protected by the Second Amendment, It Should Apply No More Than Intermediate Scrutiny.**

As explained in Defendants' opening brief, most courts, including courts in this Circuit,

have applied an intermediate standard of review to Second Amendment challenges.  See Def. Mot.

at 34-35 (citing Bledsoe, 2008 WL 3538717, at *4; Reese, 627 F.3d at 802; Marzzarella, 614 F.3d at

97-99; United States v. Williams, 616 F.3d 685, 692 (7th Cir. 2010), cert. denied, 131 S. Ct. 805

(2010)); Heller II, 698 F. Supp. 2d at 188); see also Chester, 628 F.3d at 682-83.  Indeed, the

Western District of Texas decided to use intermediate scrutiny for its analysis of the very statute at

issue here.  Bledsoe, 2008 WL 3538717, at *3-4.  Thus, assuming *arguendo* that the Court deems it

necessary to apply a constitutional means-end analysis, it should adopt the reasoning of these courts,

and apply no more than intermediate scrutiny.

Plaintiffs' initial response – that because the right to bear arms is a fundamental enumerated

right, their challenge to Section 922(b)(1) must be reviewed under strict scrutiny – is inaccurate.

See Pl. Opp. at 55-58.  As Courts of Appeals have specifically held in the Second Amendment

context, courts "do not apply strict scrutiny whenever a law impinges upon a right specifically

enumerated in the Bill of Rights." Chester, 628 F.3d at 682; accord Marzzarella, 614 F.3d at 96

("Strict scrutiny does not apply automatically any time an enumerated right is involved.").

Although strict scrutiny is sometimes applied to constitutional claims that involve enumerated and

fundamental rights, less demanding scrutiny is frequently applied as well. See Adam Winkler,

Fundamentally Wrong About Fundamental Rights, 23 Const. Comment. 227, 233 (Summer 2006)

("All incorporated rights may be fundamental, but not all incorporated rights trigger strict scrutiny.

As noted above, there is no strict scrutiny found in Fourth Amendment doctrine, Sixth Amendment

doctrine, or in the case law emerging from the incorporated provisions of the Eighth Amendment.").

 Moreover, even in contexts where strict scrutiny sometimes applies, such as the right to free

speech, the Supreme Court will, depending on the nature of the restriction at issue, use a more

deferential standard of review. See Marzzarella, 614 F.3d at 96 ("[T]he right to free speech, an

undeniably enumerated fundamental right, is susceptible to several standards of scrutiny, depending

upon the type of law challenged and the type of speech at issue. We see no reason why the Second

Amendment would be any different."); Chester, 628 F.3d at 682; Adam Winkler, Scrutinizing the

Second Amendment, 105 Mich. L. Rev. 683, 695 (2007); Ashutosh Bhagwat, The Test That Ate

Everything: Intermediate Scrutiny in First Amendment Jurisprudence, 2007 U. Ill. L. Rev. 783, 786-

800 (2007). Accordingly, that the Second Amendment protects rights that are "fundamental,"

McDonald, 130 S. Ct. at 3036-42, does not mandate application of strict scrutiny to Plaintiffs'

claim.

 Nor would a strict scrutiny approach be easy to reconcile with Heller itself. "[A]s the Heller

dissent and numerous other courts and legal scholars have pointed out, a strict scrutiny standard of

review would not square with the majority's references to presumptively lawful regulatory

measures." Heller II, 698 F. Supp. 2d at 187; see Heller, 554 U.S. at 688 (Breyer, J., dissenting)

("[T]he majority implicitly . . . rejects [a "strict scrutiny" test] by broadly approving a set of laws

[including] governmental regulation of commercial firearm sales . . . whose constitutionality under a

strict scrutiny standard would be far from clear."). As to this point, Plaintiffs incorrectly suggest

that, by rejecting Justice Breyer's "interest balancing" approach, Heller also rejected intermediate

scrutiny review. Pl. Opp. at 58-59. In fact, neither the Heller majority nor Justice Breyer identified

his approach as applying any of the "traditionally expressed levels" of scrutiny. See Heller, 554

U.S. at 634 (characterizing Justice Breyer's approach as "propos[ing], explicitly at least, none of the

traditionally expressed levels (strict scrutiny, intermediate scrutiny, rational basis), but rather a

judge-empowering interest-balancing inquiry") (citation omitted).[51]

     For these reasons, every appellate court to have considered arguments like those advanced

by Plaintiffs has rejected strict scrutiny. See, e.g., Chester, 628 F.3d at 682-83; see also, e.g., Reese,

627 F.3d at 801-02 (upholding 18 U.S.C. § 922(g)(8), which disarms persons subject to domestic

violence protective orders, under intermediate scrutiny); United States v. Yancey, 621 F.3d 681,

---

     [51] Moreover, it is misleading to claim, as Plaintiffs do, that "Justice Breyer argued that the
proper standard of review should be drawn from 'cases applying intermediate scrutiny' in the
First Amendment context, such as Turner Broad. Sys. Inc. v. FCC, 520 U.S. 180 (1997)" and
"contended that '[t]here is no cause here to depart from the standard set in Turner.'" Pl. Opp. at
58. Justice Breyer's dissenting opinion was not discussing the appropriate level of scrutiny, but
the appropriate degree of deference to legislative predictive judgments. See Heller, 554 U.S. at
704-05 (Breyer, J., dissenting) ("In particular this Court, in First Amendment cases applying
intermediate scrutiny, has said that our sole obligation in reviewing a legislature's predictive
judgments is to assure that, in formulating its judgments, the legislature has drawn reasonable
inferences based on substantial evidence. Turner, 520 U.S., at 195 (internal quotation marks
omitted). And judges, looking at the evidence before us, should agree that the District
legislature's predictive judgments satisfy that legal standard. That is to say, the District's
judgment, while open to question, is nevertheless supported by substantial evidence. There is no
cause here to depart from the standard set forth in Turner, for the District's decision represents
the kind of empirically based judgment that legislatures, not courts, are best suited to make.").

682-87 (7th Cir. 2010) (upholding 18 U.S.C. § 922(g)(3), which disarms unlawful drug users, under

intermediate scrutiny review); Williams, 616 F.3d at 692-94 (upholding 18 U.S.C. § 922(g)(1), as

applied to violent felons, under intermediate scrutiny); Marzzarella, 614 F.3d at 95-101 (upholding

18 U.S.C. § 922(k), which prohibits possession of a firearm with an obliterated serial number, under

intermediate scrutiny).[52]

Applying no more than intermediate scrutiny is even more appropriate in the present case,

which does not involve a presumptive ban on the purchase or possession of all firearms, but only a

temporary restriction on the ability to purchase handguns directly from a particular type of seller

(licensed commercial dealers).  As explained by the Western District of Texas:

> While [Heller] does make brief mention of strict scrutiny analysis in conjunction
> with the Second Amendment, the Court's discussion has nothing to do with laws
> *restricting* the rights protected under the Second Amendment.  Rather, the Court's
> discussion concerns *proscriptions* of constitutional rights, not *restrictions*, as
> Defendant would argue.  The statutes used to indict Defendant in no way proscribe
> gun possession generally among all people.  Those statutes, instead, regulate the age
> and manner in which an individual may purchase certain types of firearms.  The
> Supreme Court suggests that [18 U.S.C.] § 922 does not fall within the same class of
> statutes proscribing gun possession, such as the statute in question in Heller.  "Few
> laws in the history of our nation have come close to the severe restriction of the
> District's handgun ban."

Bledsoe, 2008 WL 3538717, at *3 (quoting Heller, 554 U.S. at 629) (emphasis in original); see also

---

[52] Indeed, nearly every federal district court has rejected the argument as well.  The sole
reported decision finding otherwise is United States v. Engstrum, 609 F. Supp. 2d 1227 (D. Utah
2009), which *upheld* the constitutionality of Section 922(g)(9) under strict scrutiny (making its
perfunctory discussion of the appropriate standard of scrutiny unnecessary to the holding).  In any
event, Engstrum does not reflect the law in the Tenth Circuit.  See Reese, 627 F.3d at 801-02
(applying intermediate scrutiny).  Indeed, in Engstrum itself, the Tenth Circuit disagreed with the
district court's approach.  After concluding that strict scrutiny applied to the defendant's Second
Amendment claim, the district court decided to instruct the jury that "if you find that the
Defendant did not pose a prospective risk of violence, he may not be deprived of his Second
Amendment rights[.]"  The Tenth Circuit granted the government's petition for a writ of
mandamus to preclude this instruction, and concluded that no such individualized inquiry was
required.  In re United States, 578 F.3d 1195, 1197-1200 (10th Cir. 2009) (unpublished order).

Chester, 628 F.3d at 682 ("In the analogous First Amendment context, the level of scrutiny we apply

depends on the nature of the conduct being regulated and the degree to which the challenged law

burdens the right."); Yancey, 621 F.3d at 686-87 (because 18 U.S.C. 922(g)(3) prohibits only

"*current* drug users" from possessing firearms, it "is far less onerous than [the 1968 Act's]

provisions affecting felons and the mentally ill") (emphasis in original); United States v. Knight,

574 F. Supp. 2d 224, 226 (D. Me. 2008) ("Unlike Heller, the § 922(g)(8) crime [of possession of a

firearm while under a restraining order] is not an outright ban on firearm possession.  Instead, the

prohibition lasts only as long as the underlying state court order is in effect."); Stiles v. Blunt, 912

F.2d 260, 265 (8th Cir. 1990) ("[I]t is particularly appropriate to apply a deferential standard of

review to age requirements affecting young people because such requirements do not result in an

absolute prohibition but merely postpone the opportunity to engage in the conduct at issue.").

Moreover, although it is true that many of the cases applying intermediate scrutiny to Second

Amendment challenges involved, as Plaintiffs put it, "felons, wife-beaters, and those who traffic in

illegal guns," Pl. Opp. at 60, courts have also applied intermediate scrutiny to challenges by law-

abiding adults.  See Heller II, 698 F. Supp. 2d at 188 (challenge to District of Columbia's

registration requirements); see also GeorgiaCarry.Org., __ F. Supp. 2d __, 2011 WL 240108, at *10

(challenge by nonprofit organization, religious institution, and individuals to law prohibiting

carrying of firearms in a place of worship); Peterson v. LaCabe, 2011 WL 843909, at *5 (D. Colo.

March 8, 2011) (challenge to state law requiring applicant for permit to carry concealed weapon to

be state resident); Peruta v. County of San Diego, __ F. Supp. 2d __, 2010 WL 5137137, at *8 (S.D.

Cal. Dec. 10, 2010) (challenge by county residents to sheriff's policy of requiring applicant for

license to carry concealed weapon to demonstrate "good cause" for its issuance); Wilson v. Cook

Cty., __ N.E.2d __, 2011 WL 488753, at *6-7 (Ill. App. Ct. Feb. 9, 2011) (county residents'

challenge to assault-weapons ban) (unpublished opinions attached as Ex. 1-4).

Because courts have nearly universally applied intermediate scrutiny to Second Amendment

challenges, and because the law at issue here "in no way proscribe[s] gun possession generally

among all people" but instead "regulate[s] the age and manner in which an individual may purchase

certain types of firearms," Bledsoe, 2008 WL 3538717, at *3, if the Court elects to conduct an

independent constitutional analysis of the age qualification for buying handguns from a licensed

dealer, it should apply no more than intermediate scrutiny.

**B.      The Age Qualification for Purchasing Handguns from Licensed Dealers Is
          Substantially Related to the Important Governmental Interest in Protecting
          Public Safety and Combating Violent Crime.**

Applying intermediate scrutiny, the law restricting the sale of handguns and handgun

ammunition by licensed dealers to individuals under 21 relates substantially to the important

governmental objective of reducing violent crime and protecting public safety.  As explained in

Defendants' opening brief, in 1968, Congress enacted restrictions on the commercial purchase of

handguns – a firearm commonly used in crime – to an especially at-risk age group, in order to

forward its interests in crime prevention and public safety.  See Def. Mot. at 4-11.  Congress

determined that such restrictions were necessary following a seven-year investigation of violent

crime, during which Congress heard testimony from police officials and others about the high

violent crime rate for individuals under 21.  See id. at 4-8.  It also heard testimony about the ease

and frequency with which individuals had evaded State requirements for handgun purchases –

including underage individuals evading State minimum-age requirements – by crossing nearby State

lines, and then using the purchased handguns in criminal activities.  See id. at 5-8 & n.13.  Based on

this testimony, Congress found "that there is a causal relationship between the easy availability of firearms other than rifles and shotguns, and juvenile and youthful criminal behavior, and that such firearms have been widely sold by *federally licensed importers and dealers* to emotionally immature, or thrill-bent juveniles *and minors* prone to criminal behavior."  S. Rep. No. 90-1097, at 81 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2198 (emphasis added).

Section 922(b)(1) was thus designed to "bar federally licensed importers, manufacturers, and dealers from selling or otherwise disposing of any firearms to any person who (in the case of an individual) he knows, or has reasonable cause to believe, is under 21 years of age (except for a shotgun or rifle)."  1968 U.S.C.C.A.N. at 2166-67; see also id. at 2256 (finding federal legislation was needed to "increase safety and strengthen local regulation" by, inter alia, "[e]stablishing minimum ages of 18 for the purchase of long guns and 21 for the purchase of handguns").  The mechanism for ensuring proper access was the licensed federal firearms dealer.  See Huddleston v. United States, 415 U.S. 814, 824 (1974) (explaining that the principal purpose of the 1968 Act "was to curb crime by keeping firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency," and noting that "[t]he principal agent of federal enforcement is the dealer").  Additionally, Congress sought to increase parental involvement in the purchase of handguns by 18-to-20 year olds, and decided that a prohibition on the possession of handguns by individuals who were gifted handguns from their parents would be unnecessary. See Def. Mot. at 8 n.14.

As demonstrated in Defendants' opening brief, it is readily apparent that the age qualification for buying handguns from a licensed dealer survives intermediate scrutiny.  Def. Mot. at 34-42.  Both the testimony received by Congress during its seven-year investigation and more

recent empirical evidence show that when compared with other age groups, 18-to-20 year olds are especially likely to be perpetrators of violence committed with handguns.[53]   In attempting to prevent the clandestine purchase of handguns by this age group, Section 922(b)(1) advances an interest that is not merely "important," but rather "compelling."   United States v. Salerno, 481 U.S. 739, 748, 755 (1987); see also Bledsoe, 2008 WL 3538717, at *4 ("To assert, as Defendant's contentions suggest, that regulations governing the sale of handguns for the 18-20 year-old age group do not further a substantial governmental interest is meritless, given the statistics suggesting that the vast majority of guns confiscated from 18-20 year old criminal defendants are handguns.").   This is shown nowhere more clearly than the fact that twelve States and the District of Columbia currently restrict the purchase or possession of handguns (or all firearms) by individuals under 21.

Moreover, the "fit" between this goal and the under-21 age qualification for buying handguns from a licensed dealer is substantial.   Congress was justifiably concerned about the high rate of violent crime committed by individuals under 21, and about the ease and frequency with

---

[53] See also James Alan Fox et al., The Will to Kill: Making Sense of Senseless Murder 49 (2d ed. 2005) ("Despite the intense attention given to juvenile offenders, . . . only about 10 percent of murderers and victims are under 18 years old.  By contrast, young adults, ages 18 to 24, represented over one-third of the offenders and about one-quarter of the victims."); National Adolescent Health Information Center, 2007 Fact Sheet on Violence: Adolescents & Young Adults 3 ("The rate of firearm-related homicide peaks in young adulthood (ages 18-24) and decreases significantly throughout the life-span.  This is a longstanding trend: firearm-related homicides have been highest among young adults since 1981."), available at http://nahic.ucsf.edu/downloads/violence.pdf; Blueprint of 2004 Violent Crime Initiatives, Office of the District Attorney, City of Philadelphia 1 ("Firearms are the weapon of choice for murderers in Philadelphia . . . . Crime statistics for the city's youth – ages 18 to 24 – are breathtaking.  The city's young men are literally killing each other.  Nearly nine of every ten shooting victims are African-American, and the majority of shooting victims were between 18 and 20 years old.  Nineteen-year-olds were the most likely defendants to face shooting charges, and the overwhelming majority of defendants in shooting cases were between 18 and 24 years old."), available at http://www.phila.gov/districtattorney/pdfs/Blueprint.pdf.

which underage individuals could avoid State minimum-age requirements for firearms purchases simply by crossing State lines.  At the same time, Congress was aware that some parents might deem their children under 21 sufficiently mature to be entrusted with the use of handguns.  Accordingly, instead of prohibiting altogether the use of handguns by 18-to-20 year olds, Congress decided to permit parents and guardians to purchase handguns from federally-licensed sellers, and give them to their 18-to-20-year-old children as gifts.  One court has explained the reasonableness of the balance struck by Congress:

> The use of guns and ammunition for purposes of hunting, target practice, gun collecting, and personal protection is not proscribed . . . Rather, these legitimate uses are balanced against the principal purpose of the legislation: "to curb crime by keeping firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency."  In striking a balance, Congress gave "persons over age eighteen and under twenty-one greater access to rifle and shotgun ammunition than to ammunition usable solely in handguns."

Wal-Mart Stores, Inc. v. Tamez, 960 S.W.2d 125, 130 (Tex. App. 1997) (citations omitted).

Similarly, as another court described the appropriateness of Congress's decision:

> Those under eighteen are deemed to be, as a matter of law, incompetent, or too immature to possess a handgun without adult supervision. Those twenty-one and older are deemed to be, as a matter of law, competent, or mature enough to possess a handgun without such supervision.  However, eighteen to twenty-one is a transitional period.  The Act seems to recognize that some persons in this age group are mature enough to possess a handgun without supervision while others are not.  Thus, the Act attempts to balance the rights of those individuals with a concern for the public interest in keeping handguns away from those who are not mature enough to possess them without supervision.  It does so by making it more difficult for persons within the relevant age group to purchase a handgun from one who is totally indifferent to the buyer's aptitude for safely using a handgun, i.e., the commercial dealer in a retail transaction.

T & M Jewelry v. Hicks ex rel. Hicks, 189 S.W.3d 526, 532 (Ky. 2006).

Heller II is instructive here.  In that case, the court rejected a Second Amendment challenge to the District of Columbia's firearms registration scheme, finding it to be substantially related to

the government's interest in preventing crime and promoting public safety.  698 F. Supp. 2d at

190-91.  The court noted that the District had conducted hearings, heard testimony, and made

various factual findings.  Id. at 191-92.  Moreover, the plaintiffs in that case were not prohibited

from owning or possessing firearms, but were simply required to comply with the District's

registration scheme.  The same is true here, and the same result should follow: Congress conducted

hearings over a seven-year period, made express factual findings, and chose not to prohibit

individuals between 18 and 20 from owning or possessing handguns.  Like the plaintiffs in Heller II,

Plaintiffs have in no way been deprived of their core Second Amendment rights to "to use arms in

defense of hearth and home."  Heller, 554 U.S. at 635.

  In their response, Plaintiffs do not cast any serious doubt on the correctness of Congress's

determination that the clandestine purchase of handguns by individuals under 21 is a serious

problem facing law enforcement and law-abiding citizens.  Nor have Plaintiffs shown that

Congress's response to that problem does not substantially relate to the important government

interest in combating violent crime and protecting public safety.  Instead, Plaintiffs make several

peripheral arguments: (1) the Court should afford Congress's findings no deference because during

the hearings that produced the 1968 Act, some witnesses espoused a collective-rights view of the

Second Amendment; (2) the legislative history of Section 922(b)(1) allegedly did not focus on youth

delinquency, and did not always distinguish between individuals under 18 and individuals under 21;

(3) in its means-end analysis, the Court may not consider empirical evidence that was compiled in

conjunction with proposed legislation that postdates the 1968 Act; and (4) Section 922(b)(1) is

fatally undermined by the existence of another statute precluding individuals under 18 from

possessing firearms.  Pl. Opp. at 63-71.  Each of Plaintiffs' arguments is baseless.

1. The fact that some witnesses during the hearings that culminated in passage of Section 922(b)(1) espoused a "collective rights" view of the Second Amendment does not mean that the factual testimony they presented was incorrect or unreliable, or that Congress erred in relying on such testimony. Plaintiffs cite no authority for their conclusion that the Court should afford an act of Congress no deference because some witnesses during legislative hearings espoused a collective-rights interpretation of the Second Amendment, and Defendants are aware of no such authority. And while it is true that one Senate report on the pending legislation that became the 1968 Act did espouse a collective-rights view of the Second Amendment, in no way does it follow that Act should not receive any less than the full degree of deference afforded to acts of Congress.[54]

2. Plaintiffs' assertion that the hearings that preceded the enactment of Section 922(b)(1) did not focus on youth delinquency is mistaken. The testimony from the hearings quoted by Defendants in their opening brief, see Def. Mot. at 4-11, demonstrates that the problem posed by violent crimes committed by individuals under 21 was no mere afterthought by Congress. Moreover, as Plaintiffs themselves note, Congress explained: "The principal purposes of [Title IV of the draft bill, which included Section 922(b)(1)] are to aid in making it possible to keep firearms out of the hands of those are not entitled to possess them because of *age*, criminal background, or incompetency. . . ." 1968 U.S.C.C.A.N. at 2113 (emphasis added).[55]

---

[54] Moreover, it is not true that during a hearing, "Congress dismissed the very notion of Second Amendment rights as preposterous," as Plaintiffs contend. Pl. Opp. at 63. The sole evidence Plaintiffs present for this contention is a colloquy involving a congressional *witness* who characterized memoranda written by two other individuals as stating that, in their view, the *argument* that the pending bill would violate the Second Amendment was "preposterous." See App. 44-46. This colloquy in no way shows that the witness – much less Congress – "dismissed the very notion of Second Amendment rights as preposterous."

[55] As explained above, Congress heard ample testimony about the ease and frequency with which individuals evaded State firearms requirements – including minimum-age

Moreover, while it is correct that during the course of the hearings, Congress used varying terminology for younger individuals, including "minors," "juveniles," and occasionally "youth" or "the young," it is a mistake for Plaintiffs to extrapolate from this fact that "all the statistics and rationales put forth in support of Section 922(b)(1)'s limit on handgun sales that use the term 'juveniles' can be disregarded, insofar as they denote problems associated with those under the age of 18." Pl. Opp. at 65-66.  As made clear in Defendants' opening brief, Congress was concerned with the dangers posed by individuals under 21, including 18-to-20 year olds.  See Def. Mot. at 5-6; see also Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary, 89th Cong. 277 (1965) (testimony of Carl K. Miller, Chicago Police Department commander).  The mere fact that firearms purchases by 15 or 16 year olds was also troubling to Congress, see Pl. Opp. at 67, does not make purchases by 18-to-20 year olds any less so.  Moreover, since 1968, the available evidence has underscored the fact that when contrasted with other age groups, 18-to-20 year olds are especially likely to commit crimes of violence.  See Def. Mot. at 37-41.

Furthermore, "intermediate scrutiny, by definition, permits legislative bodies to paint with a broader brush than strict scrutiny. . . . As a consequence, the degree of fit between" Section 922(b)(1) "and the well-established goal of promoting public safety need not be perfect; it must only be substantial." Heller II, 698 F. Supp. 2d at 191 (citations and internal punctuation omitted).  Here,

---

requirements – by crossing State lines.  Those State minimum-age requirements included (as they still do today) restrictions on individuals under 21 from buying firearms.  See, e.g., Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency, Sen. Comm. on the Judiciary, 90th Cong. 666-67 (1967) (testimony of attorney general of South Carolina, noting that a provision prohibiting the sale of pistols to persons under 21 "was designedly incorporated in our State law enacted this year. . . chosen, and deliberately" by the state legislature").

as another court has already held, the degree of fit is substantially related to this goal.  Bledsoe,

2008 WL 3538717, at *4 ("To assert, as Defendant's contentions suggest, that regulations governing

the sale of handguns for the 18-20 year-old age group do not further a substantial governmental

interest is meritless, given the statistics suggesting that the vast majority of guns confiscated from

18-20 year old criminal defendants are handguns.").

    3.  Plaintiffs contend that in analyzing the constitutionality of Section 922(b)(1), the Court

may not consider statistics or other empirical evidence if they were compiled or used in support of

later bills proposed, but not enacted, by Congress.  Pl. Opp. at 67-69.  However, the cases cited by

Plaintiffs do not support this proposition.  Instead, they stand for a different principle: that

legislative *interpretations* of a law that postdate its enactment are not entitled to great weight.[56]

    But this case does not turn on an issue of statutory construction, and Defendants are not

proffering this evidence in support of an interpretation of Section 922(b)(1).  Rather, as explained in

Defendants' opening brief, the evidence is appropriately offered to show that the age qualification

for buying handguns from a licensed dealer survives intermediate scrutiny because when compared

with other age groups, 18-to-20 year olds are especially likely to be perpetrators of handgun

_____

    [56] See Consumer Prod. Safety Comm'n v. GTE Sylvania, 447 U.S. 102, 116-21 (1980)
(concluding that legislative interpretations of a statutory section made after the section was
enacted were not entitled to much weight); Weinberger v. Rossi, 456 U.S. 25, 26, 35-36 (1982)
(same); United States v. Estate of Romani, 523 U.S. 517, 535-37 (1998) (Scalia, J., concurring)
(in case analyzing which of two statutes were to have priority, rejecting the hypothetical
proposition that Congress's failure to enact legislation altering the priority of the two statutes had
any bearing on the issue; "If the *enacted* intent of a later Congress cannot change the meaning of
an earlier statute, then it should go without saying that the later *unenacted intent* cannot possibly
do so.") (emphasis in original); Solid Waste Agency of N. Cook Cty v. U.S. Army Corps of
Eng'rs, 531 U.S. 159, 169-70 (2001) (rejecting contention that Congress's failure to pass
legislation that would have overturned agency's regulatory interpretation of statute meant that
Congress agreed with agency's interpretation; "Failed legislative proposals are a particularly
dangerous ground on which to rest an *interpretation* of a prior statute.") (emphasis added)
(citation and internal punctuation omitted)).

violence.  See Bledsoe, 2008 WL 3538717, at *4 (relying on Gun Crime in the Age Group 18-20, a 1999 report by the Department of the Treasury and the Department of Justice, in concluding that the Section 922(b)(1) satisfied intermediate scrutiny) (citing prior decision, United States v. Bledsoe, 2008 WL 744718 (W.D. Tex. March 20, 2008), at *3 n.6); Skoien, 614 F.3d at 643-44 (analyzing data compiled after enactment of 18 U.S.C. § 922(g)(9), prohibiting domestic violence misdemeanants from carrying firearms, in upholding the provision under intermediate scrutiny).

4.  Plaintiffs contend that Section 922(b)(1) is inconsistent with 18 U.S.C. § 922(x), which prohibits only individuals 18 or younger from possessing firearms.  Contrary to Plaintiffs' argument, Sections 922(b)(1) and 922(x) complement one another by permitting greater access to handguns as people age and correspondingly mature.  Those under 18 are not allowed to possess handguns at all (with some exceptions) and those under 21 may possess handguns, but their primary means of obtaining them involves parental participation.[57]

The legislative history of the 1968 Act demonstrates the relationship between Sections 922(b)(1) and 922(x).  See supra at 58-62 (discussing the direct link between the easy availability of firearms and criminal behavior by juveniles and minors, as well as the means of ensuring proper access to handguns through regulation of the sale of firearms by licensed dealers).  Though Congress prohibited the independent purchase of handguns and handgun ammunition by persons under 21, it recognized that with parental involvement serving as a proxy for maturity for 18-to-20 year olds, no outright ban on possession was necessary.  See id.  Thus, Section 922(x) is consistent with the concern expressed by Congress in 1968 – the clandestine acquisition by juveniles and

---

[57] Arguing that Section 922(b)(1) is simply an "artifact of time," Pl. Opp. at 70, Plaintiffs ignore the fact that Congress did not amend that section in 1994, when the related Section 922(x) was passed.

minors of specified firearms, including handguns.

Plaintiffs also mistakenly contend that the fact that "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms," 18 U.S.C. § 921(a)(21)(C), may sell a handgun to an individual between 18 and 20 renders Section 922(b)(1) fatally underinclusive.  Pl. Opp. at 69-71.  Because it is used in strict scrutiny analysis, the First Amendment underinclusivity doctrine is a poor fit to the Second Amendment issue here.  See United States v. Virginia, 518 U.S. 515, 573 (1996) (Scalia, J., dissenting) ("Intermediate scrutiny has never required a least-restrictive-means analysis, but only a 'substantial relation' between the classification and the state interests that it serves.").  Additionally, because the doctrine's purpose is to prevent "governmental attempt[s] to give one side of a debatable public question an advantage in expressing its views to the people" or government attempts to "select the permissible subjects for public debate and thereby to control the search for political truth," City of Ladue, 512 U.S. at 51 (internal citations and punctuation omitted), it is difficult to apply outside the First Amendment context, where content-based regulations of expression receive the most exacting scrutiny.[58]

In any event, however, Section 922(b)(1) is not underinclusive.  "[A] regulation is not fatally underinclusive simply because an alternative restriction, which would restrict *more* speech or the speech of *more* people, could be more effective. . . . [W]ith regard to First Amendment *under*inclusiveness analysis, neither a perfect nor even the best available fit between means and ends is required."  Blount v. SEC, 61 F.3d 938, 946 (D.C. Cir. 1995) (emphasis in original).  Thus,

---

[58] See, e.g., Carey v. Brown, 447 U.S. 455, 460 (1980) (striking down state statute discriminating between lawful and unlawful conduct based on the content of the subject's expression, namely, labor matters).

the Fifth Circuit rejected an underinclusiveness challenge by newspapers alleging that a city

ordinance prohibiting street-vendor solicitations at traffic intersections controlled by traffic-signal

lights was "too narrowly tailored to effectively serve any real public-safety interest." Houston

Chronicle Pub. Co. v. City of League City, 488 F.3d 613, 622 (5th Cir. 2007).  The Court reasoned

that because such intersections were "generally the most heavily trafficked," they were "the most

dangerous," and the law thus "serves a compelling interest at the heart of government's function:

public safety." Id.  Similarly, the fact that the age qualification for buying handguns from a licensed

dealer does not bar "person[s] who make occasional sales, exchanges, or purchases of firearms for

the enhancement of a personal collection or for a hobby, or who sell[] all or part of [their] personal

collection of firearms," 18 U.S.C. § 921(a)(21)(C), from selling a handgun to an individual between

18 and 20, does not imply that the statute is too narrowly drawn.[59]

It can be inferred from Congress's factual findings in support of the 1968 Act that Congress

did not consider such persons to represent a significant source of firearms for individuals under 21.

See Def. Mot. at 48.  Plaintiffs themselves do not dispute this characterization, see Pl. Opp. at 52,

and as another court has noted,

> [t]he result of this restriction is that individuals between eighteen and twenty-one
> may lawfully obtain possession of a handgun, if at all, only through one who is not a
> licensed dealer, presumably, one who may evaluate his or her aptitude for possessing
> a handgun.  Admittedly, a person may conduct a private sale of a handgun to an
> individual in the relevant age group if she or he is not engaged in the business of
> selling firearms.  However, one who sells more than five firearms per year is likely to
> be deemed to be engaged in the business and would be bound by the provisions of
> the Gun Control Act.

---

[59] Moreover, Plaintiffs cannot simultaneously contend that Section 922(b)(1) violates the
Second Amendment because it allegedly operates as a complete ban on possession, and also
maintain that the law is fatally underinclusive under the Second Amendment because it does *not*
operate in practice as a complete ban on possession.

-68-

Hicks, 189 S.W.3d at 532.

Moreover, in analyzing the constitutional propriety of the limitations of a statute, courts are "guided by the familiar principles that a statute is not invalid under the Constitution because it might have gone farther than it did, that a legislature need not strike at all evils at the same time, and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." Buckley v. Valeo, 424 U.S. 1, 105 (1976) (internal citations and punctuation omitted); see also Olympic Arms v. Buckles, 301 F.3d 384, 390 (6th Cir. 2002) (rejecting argument that import ban of certain semi-automatic weapons was irrational because it prohibited firearms with more than one of four enumerated features, but allowed weapons with one of the features, because "Congress may work incrementally in protecting public safety" and its "decision first to target weapons commonly used for criminal activity or, likewise, those most heavily loaded with dangerous features is within their legislative authority"); United States v. Lewitzke, 176 F.3d 1022, 1027 (7th Cir. 1999) (Congress did not act irrationally in imposing firearms disability solely upon persons convicted of domestic violence misdemeanors, despite the fact that "persons convicted of other sorts of misdemeanors [may] pose a danger to society if armed," because "Congress is free to take one step at a time"); Nat'l Ass'n of Gov't Emps. v. Barrett, 968 F. Supp. 1564, 1573 (N.D. Ga. 1997) (same), aff'd, Hiley v. Barrett, 155 F.3d 1276 (11th Cir. 1998); United States v. Ziegenhagen, 420 F. Supp. 72, 75 (E.D. Wis. 1976) (rejecting challenge to federal prohibition of receipt of firearms transported in interstate commerce, but not of firearms transported in intrastate commerce because "Congress may have focused on the interstate transport of firearms and left the area of intrastate transport for whatever regulation the states might respectively deem appropriate").

-69-

Finally, and as discussed above, that Congress maintains a strong interest in curbing youth violence and unauthorized access to firearms cannot be seriously disputed, and the concerns animating Section 922(b)(1) have not diminished over time.  See supra at 58-62; see also Def. Mot. at 38-41.  In 2009, for example, the FBI reported that for individuals under 24, arrests for violent crimes by single year of age peaked at 18 years (at 23,487), 19 years (at 22,381), and 20 years of age (at 20,489).  Arrests for weapons offenses peaked at 18 years (at 8,801), followed by 19 years (at 7,856), and 20 years of age (at 6,907).[60]  Restricting the ability of 18-to-20 year olds to buy handguns from federal firearms licensees, a significant source for acquiring a firearm – while using parental participation as a proxy for maturity by allowing parents and guardians of 18-to-20-year-olds to gift handguns to their underage children or wards –  certainly "serves a compelling interest at the heart of government's function: public safety."  Houston Chronicle Pub. Co., 488 F.3d at 622.[61]  Conversely, because persons who only make occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sell from a personal collection of firearms, do not represent a significant source for 18-to-20 year olds to

---

[60] Crime in the United States 2009, Table 38, *available at* http://www2.fbi.gov/ucr/cius2009/data/table_38.html.

[61] Plaintiffs' claim that "only a miniscule fraction of 18-to-20 year olds engage in criminal violence," Pl. Opp. at 74, is unavailing.  Congress may place "[c]ategorical limits on the possession of firearms" and "is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons."  Skoien, 614 F.3d at 641; accord Reese, 627 F.3d at 802.  Moreover, "a classification need not be accurate in every case to survive intermediate scrutiny so long as, in the aggregate, it advances the underlying objective."  Virginia, 518 U.S. at 573-74 (Scalia, J., dissenting) (internal punctuation omitted).  Here, because 18-to-20 year olds, as compared with other age groups, are particularly likely to be perpetrators of violence committed with handguns, Section 922(b)(1) advances the underlying objective of protecting public safety and preventing violent crime.  Congress's "predictive judgments" about the risk of dangerous behavior are entitled to "substantial deference" by the courts.  Turner Broad Sys. v. FCC, 512 U.S. 622, 665 (1994).

obtain firearms, their exclusion from Section 922(b)(1) does not significantly undermine this purpose.

## V.      SECTION 922(B)(1) DOES NOT SUBSTANTIALLY BURDEN PLAINTIFFS' SECOND AMENDMENT RIGHT TO KEEP AND BEAR ARMS AND THUS DOES NOT VIOLATE EQUAL PROTECTION.

Plaintiffs incorrectly assert that Section 922(b)(1) creates a classification that "burdens 18-20-year-olds' fundamental right to keep and bear arms" and thus violates equal protection.  Pl. Opp. at 71.  Fatal to this argument, however, is the fact that the restriction on Plaintiffs' ability to purchase handguns from a particular source – a federally-licensed dealer – does not substantially infringe upon the core Second Amendment right recognized in Heller and McDonald.

Equal protection analysis "requires strict scrutiny of a legislative classification *only* when the classification *impermissibly interferes* with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 312 (1976) (emphasis added).  Included in this category of fundamental rights is the right to privacy, the right to vote, the right of interstate travel, rights guaranteed by the First Amendment, and the right to procreate.  See id. at 313 n.3.  As the Supreme Court has held, however, "the Equal Protection Clause does not make every minor difference in the application of laws to different groups a violation of our Constitution." Williams v. Rhodes, 393 U.S. 23, 30 (1968).  In determining whether or not a law violates equal protection, a court "must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." Id.

Plaintiffs incorrectly assume that courts apply strict scrutiny to every statute that creates a classification affecting a fundamental right.  See Pl. Opp. at 71-72.  The Supreme Court has

cautioned against this one-size-fits-all approach, and has refused to apply strict scrutiny in every instance of a limitation or incidental effect on a fundamental right.  See Bullock v. Carter, 405 U.S. 134, 143 (1972).  Instead, the Court focuses on the extent to which a challenged provision burdens the exercise of whatever right is at issue, and then determines the appropriate standard of review. See id.; see also Winkler, Scrutinizing the Second Amendment, 105 Mich. Law. Rev. at 698-700 (2007) (discussing the Supreme Court's application of lower levels of scrutiny to "incidental burdens" on the rights to privacy, speech, and freedom of religion and, in some cases, the Court's application of "something less than strict scrutiny" to analyze even substantial burdens on such rights) (citing, inter alia, Alan Brownstein, How Rights Are Infringed: The Role of Undue Burden Analysis in Constitutional Doctrine, 45 Hastings L.J. 867, 893-94 (1994)).[62]

For instance, in McDonald v. Bd. of Elections Comm'n, 394 U.S. 802 (1969), the Court upheld an Illinois statute denying absentee voting ballots to prison inmates.  Strict scrutiny was deemed inapplicable, as "nothing in the record [indicated] that the Illinois statutory scheme ha[d] an impact on the appellants' ability to exercise the fundamental right to vote."  Id. at 807.  The Court characterized the plaintiff's claim as the "right to receive absentee ballots," a privilege that could not be equated with the exercise of the franchise, and went on to note that "constitutional safeguards are not [] offended simply because some prisoners, as a result [of the Illinois statute] find voting more convenient than appellants."  Id. at 810.

The reasoning employed in McDonald has been extended to statutory classifications affecting the fundamental right to marry and structure family living arrangements.  See, e.g.,

---

[62] Brownstein surveys Supreme Court caselaw examining the right to marry, the right of political association, property rights, the free exercise of religion, and procedural due process to demonstrate how the Court evaluates laws alleged to abridge fundamental rights by analyzing the extent of the burden on the constitutionally-protected interest.  See 45 Hastings L.J. at 894-908.

Zablocki v. Redhail, 434 U.S. 374, 386 (1978) ("[R]easonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed.");[63] Lyng v. Castillo, 477 U.S. 635, 638, 639 (1986) (statutory classification treating only parents, children, and siblings who lived together as a "single household" for food stamp purposes did not "directly and substantially interfere with family living arrangements and thereby burden a fundamental right") (citation and internal punctuation omitted).  The Fifth Circuit likewise upheld a public housing leasehold provision under rational basis review, permitting the El Paso Housing Authority to evict a tenant because of her son's violent and unruly behavior.  Chavez v. Hous. Auth. of El Paso, 973 F.2d 1245, 1248 (5th Cir. 1992).  The court found that the leasehold provision did not "directly and substantially" interfere with family living arrangements.  Id.; see also Plante v. Gonzalez, 575 F.2d 1119, 1131 (5th Cir. 1978) (upholding financial disclosure provisions of Florida's Sunshine Amendment because, while disclosure obligations may have had some effect on intimate decision-making and family dynamics, "any influence does not rise to the level of a constitutional problem").[64]

---

[63] As one commentator notes, "Zablocki clearly focuses on the *magnitude* of the burden, not on its allegedly indirect or incidental nature."  Brownstein, How Rights Are Infringed, 45 Hastings L.J. at 895 (emphasis added).  Accordingly, "the critical variable of the Zablocki test will necessarily be the degree of interference created by the challenged law."  Id.

[64] This reasoning is consistent with that of other circuits.  See, e.g., Johnson v. Pomeroy, 294 Fed. Appx. 397 (10th Cir. 2008) (employees' denial of extended workers' compensation disability benefits based on spouse's income did not impermissibly interfere with the claimant's exercise of Fourteenth Amendment rights); Shawiak v. City of Phoenix, 252 Fed. Appx. 828 (9th Cir. 2007) (distinction between permanent and temporary employees did not substantially interfere with employees' right to associate with a union); Christenson v. Cty. of Boone, 483 F.3d 454 (7th Cir. 2007) (deputy sheriff's alleged conduct did not substantially interfere with unmarried couple's right to associate intimately with one another); Beecham v. Henderson Cty., 422 F.3d 372 (6th Cir. 2005) (to constitute an interference with a protected intimate association in violation of the First Amendment, a plaintiff must present a direct and substantial interference with the right of such an association).

Similarly, analyzing the extent to which residency requirements affected the fundamental right to travel, the Fifth Circuit upheld a rule requiring a high school student to be resident of a school district for at least one year prior to participating in interscholastic events.  According to the court, the restriction did not constitute an "impermissible burden upon" the student's constitutional right to travel or freedom of association.  Niles v. Univ. Interscholastic League, 715 F.2d 1027, 1031 (5th Cir. 1983) (citing Walsh v. Louisiana High Sch. Athletic Ass'n, 616 F.2d 152, 156-57 (5th Cir. 1980)); see also Gary v. City of Warner Robins, 311 F.3d 1334, 1338 (11th Cir. 2002) (though freedom of association is a fundamental right, ordinance prohibiting persons under 21 from entering non-eating establishment selling alcohol "did not infringe" on this right because, inter alia, the right does not include a "generalized right to associate in alcohol-purveying establishments with other adults").[65]

At issue in this case is a temporary three-year restriction on a particular means of purchasing one type of firearm – the handgun – which, by no coincidence, is the type of firearm most frequently used to perpetuate crimes of violence.  As Heller explained, the Second Amendment permits "a variety of tools" for combating "the problem of handgun violence in this country," 554 U.S. at 636, including laws imposing conditions on the commercial sale of firearms, id. at 626-27.  "In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition." Marzzarella, 614

---

[65] Similar considerations guide courts in reviewing restrictions on religious exercise.  See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 428 (2006) (prima facie claim under the Religious Freedom Restoration Act requires a plaintiff to establish that a government regulation "would (1) substantially burden (2) a sincere (3) religious exercise"); Adkins v. Kaspar, 393 F.3d 559, 570 (5th Cir. 2004) (government places a substantial burden on religion "if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs").

F.3d at 92 n.8.  As discussed at length above, Section 922(b)(1) does not prohibit the possession of

handguns or handgun ammunition by the individual plaintiffs.  Far from operating as a wholesale

ban on the acquisition of firearms by 18-to-20 year olds, as Plaintiffs incorrectly contend, Section

922(b)(1) aims to prevent individuals of a certain age group – one found by Congress to be

particularly prone to commit violent crime – from obtaining handguns without parental

participation.  This provision does not impermissibly burden Plaintiffs' Second Amendment right to

keep and bear arms for the purpose of self-defense.

Plaintiffs' equal protection argument, which assumes that "every law which makes a right

more difficult to exercise is, *ipso facto*, an infringement" of that right, must fail.  Casey, 505 U.S. at

873.  The individual plaintiffs in this suit are able to obtain handguns and handgun ammunition to

use for the purpose of self-defense.  While procuring a handgun might become more convenient on

plaintiffs' twenty-first birthdays, this fact alone should not subject Section 922(b)(1) to strict

scrutiny.

## **<u>CONCLUSION</u>**

For the reasons stated above and in Defendants' opening brief, the Court should grant

Defendants' motion to dismiss or, in the alternative, enter summary judgment for Defendants.

Dated: April 6, 2011                                        Respectfully submitted,


*OF COUNSEL*:                                              TONY WEST
                                                          Assistant Attorney General
MELISSA ANDERSON
Bureau of Alcohol, Tobacco,                               JAMES T. JACKS
Firearms & Explosives                                     United States Attorney
99 New York Avenue, N.E.
Washington, D.C. 20226                                    JOHN R. PARKER
Tel: (202) 648-7056                                       Assistant United States Attorney
Melissa.Anderson@usdoj.gov


-75-

_/s/ Daniel Riess_
SANDRA M. SCHRAIBMAN
Assistant Director
DANIEL RIESS (Texas Bar No. 24037359)
JESSICA LEINWAND (New York Bar)
Trial Attorneys
U.S. Department of Justice
Civil Division, Rm. 6122
20 Massachusetts Avenue, NW
Washington, D.C. 20530
Telephone: (202) 353-3098
Fax: (202) 616-8460
Email: Daniel.Riess@usdoj.gov
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

On April 6, 2011, I electronically submitted the foregoing document with the clerk of court

for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the

court. I hereby certify that I have served all counsel and/or *pro se* parties of record electronically or

by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

_/s/ Daniel Riess_
Daniel Riess