# EXHIBIT

# 1

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

Only the Westlaw citation is currently available.

United States District Court,
M.D. Georgia,
Macon Division.
GEORGIACARRY.ORG, INC., the Baptist Tabernacle of Thomaston, Georgia, Inc., Edward
Stone, and Jonathan Wilkins, Plaintiffs,
v.
The State of GEORGIA, Upson County, Georgia, Gov. Sonny Perdue, in his official capacity
as Governor of The State of Georgia, and Kyle Hood, in his official capacity as County Man-
ager for Upson County, Georgia, Defendants.

Civil Action No. 5:10-CV-302 (CAR).
Jan. 24, 2011.

**Background:** Non-profit organization, religious institution, and related individuals brought
action against the state of Georgia, the county, and related public officials, challenging provi-
sion of Georgia's firearms laws regulating the possession of weapons in a place of worship.
Defendants moved to dismiss, and plaintiffs moved for summary judgment.

**Holdings:** The District Court, C. Ashley Royal, J., held that:
(1) provision did not violate First Amendment's Free Exercise Clause, and
(2) provision did not violate the Second Amendment.

Defendants' motions granted; plaintiffs' motion denied.

West Headnotes

**[1] Constitutional Law 92 ⟜1305**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
      92XIII(A) In General
         92k1302 Free Exercise of Religion
            92k1305 k. Beliefs Protected; Inquiry Into Beliefs. Most Cited Cases
   To plead a valid free exercise claim under the First Amendment, a plaintiff must allege
that the government has impermissibly burdened one of his sincerely held religious beliefs.
U.S.C.A. Const.Amend. 1.

**[2] Constitutional Law 92 ⟜1292**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
      92XIII(A) In General
         92k1292 k. Beliefs Protected; Inquiry Into Beliefs. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

First Amendment prohibits the government from regulating religious beliefs. U.S.C.A. Const.Amend. 1.

**[3] Constitutional Law 92 ⚮1290**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
     92XIII(A) In General
       92k1290 k. In General. Most Cited Cases

First Amendment protects not only religious beliefs, but the performance of or abstention from conduct, such as assembling with others for worship or proselytizing. U.S.C.A. Const.Amend. 1.

**[4] Constitutional Law 92 ⚮1414**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
     92XIII(B) Particular Issues and Applications
       92k1413 Criminal Law
         92k1414 k. In General. Most Cited Cases

**Weapons 406 ⚮106(4)**

406 Weapons
   406I In General
     406k102 Constitutional, Statutory, and Regulatory Provisions
       406k106 Validity
         406k106(4) k. Violation of Other Rights or Provisions. Most Cited Cases

Provision of Georgia's firearms laws regulating the possession of weapons in a place of worship did not pressure religious conduct of religious institution and its members enough to constitute a substantial burden to trigger scrutiny under the First Amendment's Free Exercise Clause; religious institution and its members only risked criminal sanction if they refused to comply with the law's mandates about carrying firearms in a place of worship, an activity they did not attach to any sincere religious belief. U.S.C.A. Const.Amend. 1.

**[5] Constitutional Law 92 ⚮1414**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
     92XIII(B) Particular Issues and Applications
       92k1413 Criminal Law
         92k1414 k. In General. Most Cited Cases

**Weapons 406 ⚮106(4)**

406 Weapons
   406I In General

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

        406k102 Constitutional, Statutory, and Regulatory Provisions
            406k106 Validity
                406k106(4) k. Violation of Other Rights or Provisions. Most Cited Cases

    Provision of Georgia's firearms laws regulating the possession of weapons in a place of worship did not encroach on religious institution's ability to manage its internal affairs in a way that violated the First Amendment; the law did not touch on matters of church government, faith, or doctrine. U.S.C.A. Const.Amend. 1.

**[6] Constitutional Law 92 &#x25AC;1340(2)**

92 Constitutional Law
    92XIII Freedom of Religion and Conscience
        92XIII(B) Particular Issues and Applications
        92k1327 Religious Organizations in General
            92k1340 Clergy; Ministers
                92k1340(2) k. Ministerial Exception in General. Most Cited Cases

    The free exercise principles underlying the ministerial exception are only implicated when the state interferes with matters of church government, faith, or doctrine. U.S.C.A. Const.Amend. 1.

**[7] Constitutional Law 92 &#x25AC;656**

92 Constitutional Law
    92V Construction and Operation of Constitutional Provisions
        92V(F) Constitutionality of Statutory Provisions
        92k656 k. Facial Invalidity. Most Cited Cases

    A party ordinarily can only succeed in a facial challenge to a statute by establishing that no set of circumstances exists under which the law would be valid, i.e., that the law is unconstitutional in all of its applications.

**[8] Weapons 406 &#x25AC;106(3)**

406 Weapons
    406I In General
        406k102 Constitutional, Statutory, and Regulatory Provisions
        406k106 Validity
             406k106(3) k. Violation of Right to Bear Arms. Most Cited Cases

    Intermediate scrutiny was the appropriate standard of scrutiny in determining whether provision of Georgia's firearms laws regulating the possession of weapons in a place of worship violated the Second Amendment. U.S.C.A. Const.Amend. 2.

**[9] Constitutional Law 92 &#x25AC;1054**

92 Constitutional Law
    92VII Constitutional Rights in General
        92VII(A) In General
        92k1054 k. Intermediate Scrutiny. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

Under an intermediate scrutiny standard, a regulation may be upheld so long as it is substantially related to an important governmental objective; the fit between the government's objective and regulation need not be necessarily perfect, but reasonable, and the government need not necessarily employ the least restrictive means.

**[10] Weapons 406 ⬩106(3)**

406 Weapons
    406I In General
        406k102 Constitutional, Statutory, and Regulatory Provisions
            406k106 Validity
                406k106(3) k. Violation of Right to Bear Arms. Most Cited Cases

Prohibiting the carrying of firearms in a place of worship bore a substantial relationship to important government interest of protecting the free exercise of religion, by protecting attendees from the fear or threat of intimidation or armed attack, and therefore the provision of Georgia's firearms laws regulating the possession of weapons in a place of worship did not violate the Second Amendment. U.S.C.A. Const.Amend. 2.

**[11] Federal Courts 170B ⬩266.1**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
        170BIV(A) In General
            170Bk266 Waiver of Immunity
                170Bk266.1 k. In General. Most Cited Cases

In the absence of consent, a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment; this jurisdictional bar applies regardless of the nature of the relief sought. U.S.C.A. Const.Amend. 11.

**[12] States 360 ⬩191.1**

360 States
    360VI Actions
        360k191 Liability and Consent of State to Be Sued in General
            360k191.1 k. In General. Most Cited Cases

Even if a State has consented to suit in a federal forum, it maintains its inherent immunity from suit under its own laws.

John R. Monroe, Roswell, GA, for Plaintiffs.

Laura Louise Lones, Atlanta, GA, John Edward Trice, Jr., Truitt A. Mallory, Thomaston, GA, for Defendants.

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS

C. ASHLEY ROYAL, District Judge.

**\*1** In this action, Plaintiffs GeorgiaCarry.Org, Inc. ("GCO"), The Baptist Tabernacle of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

Thomaston, Georgia, Inc. ("Tabernacle"), Edward Stone, and Jonathan Wilkins seek a ruling on the constitutionality of a provision of Georgia's firearm laws regulating the possession of weapons in a place of worship. Currently pending before the Court are motions to dismiss filed by: Defendants Governor Sonny Perdue and the State of Georgia [Doc. 9], Defendant Upson County, Georgia [Doc. 15], and Defendant Kyle Hood [Doc. 24]. Earlier in this action, the Court conducted a hearing on a request for a preliminary injunction. The Court denied Plaintiffs' request for a preliminary injunction against enforcing the law [Doc. 14]. At that hearing, the Court also notified the parties that they were free to file supplementary briefs on the pending motions. Plaintiffs responded by filing their supplemental brief styled as a motion for summary judgment [Doc. 20]. Defendants Governor Perdue and the State of Georgia filed a supplemental brief in support of their earlier motion to dismiss [Doc. 21].

Having carefully considered the parties' briefs and the relevant case law, the Court determines that Plaintiffs have failed to state a claim for relief. Accordingly, Defendants' motions to dismiss [Docs. 9, 15, 24] are **GRANTED.** Plaintiffs' motion for summary judgment is **DENIED** as moot.

## I. BACKGROUND
The Plaintiffs' well pleaded factual allegations are as follows.

On June 4, 2010, Governor Sonny Perdue signed into law Senate Bill 308, which contained various amendments to Georgia's firearms laws. In particular, the bill amended O.C.G.A. § 16-11-127, which at that time prohibited the carrying of firearms at a "public gathering." In pertinent part, O.C.G.A. § 16-11-127 now provides that:

A person shall be guilty of carrying a weapon or long gun in an unauthorized location and punished as for a misdemeanor when he or she carries a weapon or long gun while:

(1) In a government building;

(2) In a courthouse;

(3) In a jail or prison;

(4) In a place of worship;

(5) In a state mental health facility as defined in Code Section 37-1-1 which admits individuals on an involuntary basis for treatment of mental illness, developmental disability, or addictive disease; provided, however, that carrying a weapon or long gun in such location in a manner in compliance with paragraph (3) of subsection (d) of this Code section shall not constitute a violation of this subsection;

(6) In a bar, unless the owner of the bar permits the carrying of weapons or long guns by license holders;

(7) On the premises of a nuclear power facility, except as provided in Code Section 16-11-127.2, and the punishment provisions of Code Section 16-11-127.2 shall supersede the punishment provisions of this Code section; or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

(8) Within 150 feet of any polling place, except as provided in subsection (I) of Code Section 21-2-413.

O.C.G.A. § 16-11-127(b). A weapon, for purposes of section 16-11-127, is defined as a knife or handgun. *Id.* § 16-11-125.1.

**\*2** Plaintiff GeorgiaCarry.Org, Inc., is a non-profit corporation organized under the laws of the State of Georgia. Its primary mission is to foster the rights of its members to keep and bear arms. Most of GCO's members possess valid Georgia Weapons Licenses issued pursuant to O.C.G.A. § 16-11-129.

Plaintiff Edward Stone is the former President of GCO and a current member of its board of directors. Stone has a valid Georgia Weapons License. Stone regularly attends worship services. While attending services, he would like to carry a firearm to defend himself and his family, but he alleges that he fears arrest and prosecution under O.C.G.A. § 16-11-127 for doing so.

Plaintiff Baptist Tabernacle of Thomaston, Georgia, Inc., is a non-profit corporation organized under the laws of the state of Georgia. The Tabernacle is a religious institution and owns real property in Thomaston, Georgia, where it conducts religious worship services. The Tabernacle would like to allow certain members with valid Georgia Weapons Licenses to carry firearms on Tabernacle property, but alleges that it fears its members will be arrested and prosecuted for doing so.

Plaintiff Jonathan Wilkins is the CEO and pastor of the Tabernacle. He is also a member of GCO and has a valid Georgia Weapons License. He regularly conducts worship services on Tabernacle property and would like to carry a weapon to defend himself, his family, and his congregation while doing so. He also has an office in the Tabernacle building and is frequently the only occupant of the building. He would like to keep a firearm in his office for self-defense, but he alleges that he fears being prosecuted for carrying a firearm while conducting services or keeping one in his office.

Plaintiffs filed this action against the following Defendants: the State of Georgia; Upson County, Georgia; Governor Sonny Perdue, in his official capacity as Governor of Georgia; and Kyle Hood, in his official capacity as County Manager for Upson County. In this action, Plaintiffs allege that O.C.G.A. § 16-11-127(b)(4) violates their First Amendment right to the free exercise of religion and their Second Amendment right to keep and bear arms. The Plaintiffs seek declaratory relief in the form of a ruling that the statute is unconstitutional both on its face and as applied to them and an injunction prohibiting enforcement of the statute.

## II. LEGAL STANDARD

In considering dismissal of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a district court must accept the allegations set forth in the complaint as true and construe facts in the light most favorable to the plaintiff. *See Kirby v. Siegelman,* 195 F.3d 1285, 1289 (11th Cir.1999) (per curiam). Mere conclusory allegations, however, are not entitled to be assumed as true upon a motion to dismiss. *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 1951, 173 L.Ed.2d 868 (2009). The Supreme Court requires that "a complaint must con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

tain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face,' " which requires that the plaintiff plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (internal citations omitted). This plausibility standard is not a probability requirement but demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

### III. FIRST AMENDMENT CHALLENGE

**\*3** Plaintiffs first argue that the statute violates their free exercise rights because it imposes an impermissible burden on their ability to attend or conduct worship services by prohibiting them from carrying a firearm on their person for self defense while doing so. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." U.S. Const. amend. I. That guarantee was made applicable to the States in *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

[1] Plaintiffs contend that the statute violates the Free Exercise Clause by forcing otherwise licensed congregants to give up the right to carry a gun while attending or conducting worship services. "To plead a valid free exercise claim, [a plaintiff] must allege that the government has impermissibly burdened one of his sincerely held religious beliefs." *Watts v. Fla. Int'l Univ.,* 495 F.3d 1289, 1294 (11th Cir.2007) (internal quotation marks omitted). In this case, neither individual plaintiff alleges that his religious beliefs require him to carry a firearm into a place of worship. Nor does the Tabernacle allege that its members' religious beliefs require that any member carry a firearm into the Tabernacle, whether during worship services or otherwise. Instead, Plaintiffs assert that attending worship services is a sincere religious belief that has been impermissibly burdened by the statute's requirements.

Before inquiring into the burden imposed on Plaintiffs' religious beliefs, the Court notes the regulation of firearm possession continues to be an important governmental interest. *See District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 2816-2817, 2822, 171 L.Ed.2d 637 (noting the importance of the "variety of tools for combating th[e] problem [of handgun violence], including some measures regulation handguns").

[2][3] The question then is whether the alleged burden on Plaintiffs' ability to attend worship services constitutes a burden sufficient to state a free exercise violation. It is beyond doubt that the First Amendment prohibits the government from regulating religious beliefs. *Employment Div., Dep't of Human Res. of Or. v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). It is also clear that the First Amendment protects not only religious beliefs, but the performance of or abstention from conduct, such as assembling with others for worship or proselytizing. *Id.* Although not confronted by the question in *Smith,* the Supreme Court opined that laws banning such acts when engaged in for religious reasons "would doubtless be unconstitutional." *Id.*

The law at issue here, however, does not prohibit anyone from attending services at a place of worship. Instead, any burden on attending worship services is attenuated and tangential because the law only requires that persons either not carry a weapon to a place of worship, leave their weapons secured in their vehicles, or notify security or management personnel of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

the presence of the weapon and follow directions for removing, securing, storing, or temporarily surrendering the weapon. *See* O.C.G.A. § 16-11-127(d)(2),(3).

**\*4** Although the Supreme Court's Free Exercise Clause jurisprudence has been muddled at times, the consistent theme is that laws imposing substantial burdens on religious practices trigger the heightened scrutiny of a free exercise claim. *See Sherbert v. Varner,* 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Thus, the Supreme Court has invalidated laws that prohibited plaintiffs from engaging in conduct that their religious beliefs required. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (law banning animal sacrifice, which was a principal form of devotion for the Santeria religion). The Court has also exempted plaintiffs from the operation of laws that require plaintiffs to engage in conduct that their religious beliefs proscribed in order to earn a livelihood. *See Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (claimant denied unemployment compensation after terminating his job because of religious belief that prohibited participation in the production of weapons); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (Seventh-day Adventist denied unemployment benefits because she refused to work on Saturday). Even though the burdens on religious belief in *Thomas* or *Sherbert* were more indirect-in that plaintiffs were not compelled to engage in conduct prohibited by their religious beliefs by a direct criminal sanction-the pressure those laws exerted on plaintiffs to "forego" their religious practices was "unmistakable." 374 U.S. at 404.

The substantial burden requirement also appears in statutory protections of the free exercise right. The Religious Freedom Restoration Act (RFRA) [FN1] and the Religious Land Use and Institutionalized Persons Act (RLUIPA) [FN2] both provide protection against laws that place a substantial burden on religious exercise. 42 U.S.C. §§ 2000bb, 2000cc. While neither statute is directly at issue in this case, the free exercise ideals embodied in them are still instructive. In the context of RLUIPA, the Eleventh Circuit has explained that a substantial burden is more than a mere inconvenience, but instead "is akin to a significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1227 (11th Cir.2004). Although the Eleventh Circuit's explication of a "substantial burden" for purposes of RLUIPA does not strictly control what constitutes a sufficient burden under the Free Exercise Clause, the Court finds the idea expressed there persuasive because free exercise cases informed the Eleventh Circuit's understanding. *See id.* at 1226 ("The Supreme Court's definition of "substantial burden" within its free exercise cases is instructive in determining what Congress understood "substantial burden" to mean in RLUIPA.").

[4] Bearing those principles in mind, the Court finds that the law at issue here does not pressure religious conduct enough to constitute a substantial burden to trigger scrutiny under the Free Exercise Clause. No criminal sanctions forbid Plaintiffs from attending a place of worship. The law does not force them to decide between attending worship services or supporting themselves and their families. Instead, Plaintiffs only risk criminal sanction if they refuse to comply with the law's mandates about carrying firearms in a place of worship, an activity they do not attach to any sincere religious belief. The burden of complying with the law's requirements does not prohibit them from attending worship services, nor does it place

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

an "unmistakable" pressure on them "to forego religious precepts." *Sherbert,* 374 U.S. at 404; *Midrash Sephardi,* 366 F.3d at 1227. Accordingly, the Court concludes that any burden posed by the law is too insubstantial and too attenuated to any of Plaintiffs' sincere religious beliefs to state a claim under the Free Exercise Clause.

**\*5** [5] In addition to the claim that the statute impermissibly burdens attendance at worship services, the Tabernacle raises the additional claim that the statute encroaches on its ability to manage its internal affairs. The Eleventh Circuit has observed that government action can burden the free exercise of religion " 'by encroaching on the ability of a church to manage its internal affairs.' " *Gellington v. Christian Methodist Episcopal Church, Inc.,* 203 F.3d 1299, 1303 (11th Cir.2000) (quoting *EEOC v. Catholic University of America,* 83 F.3d 455, 460 (D.C.Cir.1996)). That observation arose in the context of describing the operation of the ministerial exception to the application of Title VII. The ministerial exception was first articulated in *McClure v. Salvation Army,* 460 F.2d 553, 560 (5th Cir.1972), when the Fifth Circuit concluded that "the application of the provisions of Title VII to the employment relationship existing between ... a church and its minister would result in an encroachment by the State into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment." Accordingly, the court held that Title VII did not apply to the employment relationship between a church and minister. Thus, the exception primarily functions to exempt religious organizations from the operation of otherwise applicable laws such as Title VII or the ADEA in employment discrimination cases brought by those performing certain ministerial functions.[FN3] The exception was founded, however, on a broader principle that "there exists 'a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.' " *Id.* (quoting *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 116, 73 S.Ct. 143, 154, 97 L.Ed. 120 (1952) (alterations omitted)).

[6] As the quotation from *Kedroff* makes clear, the free exercise principles underlying the ministerial exception are only implicated when the state interferes with matters of church government, faith, or doctrine. The law at issue here does not touch on such ecclesiastical matters. The Tabernacle does not allege that the safety concerns or security protocols of a place of worship involve issues of religious faith or doctrine, as opposed to purely secular issues. Consequently, the law in this case does not encroach on the Tabernacle's ability to manage its internal affairs in a way that violates the First Amendment.

[7] For the foregoing reasons, the Court concludes that Plaintiffs have failed to state a claim for relief under the Free Exercise Clause of the First Amendment.[FN4]

## IV. SECOND AMENDMENT

Plaintiffs also contend that the statute impermissibly burdens their right to keep and bear arms secured by the Second Amendment. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In determining whether the statute impermissibly decision in *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), is the appropriate starting point.[FN5]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

*A. Heller*

**\*6** In *Heller,* the Supreme Court held that several D.C. statutes, which taken together amounted to a total ban on possessing a handgun in the home, violated the Second Amendment. Employing a textual and historical analysis of the Second Amendment, the Court identified the Second Amendment as guaranteeing an "individual right to possess and carry weapons in case of confrontation." *Id.* at 2797. The Court went on to describe "the inherent right of self-defense" as "central to the Second Amendment right." *Id.* at 2817. The Court then declared that the statutes at issue in the case, which "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose" and "extend[ed] ... to the home, where the need for defense of self, family, and property is most acute," would fail at any level of scrutiny applied to assess the validity of limitations of enumerated constitutional rights. *Id.* at 2817-18. Having reached that conclusion, the Court held that the District's ban on possessing a handgun in the home violated the Second Amendment. *Id.* at 2821-22.

Although an "individual right to possess and carry weapons in case of confrontation" in support of "the inherent right of self-defense" seems quite broad, the Court carefully noted that "the right secured by the Second Amendment is not unlimited." *Id.* at 2816. Historically, the right had never been viewed as "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* Unfortunately, the Court declined to "undertake an exhaustive historical analysis ... of the full scope of the Second Amendment." *Id.*

The Court did, however, offer some thoughts on the impact of its ruling on existing regulations. Particularly, the Court noted that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 2816-17. The Court identified these "presumptively lawful regulatory measures" as examples and not an exhaustive list. *Id.* at 2817 n. 26.

*B. Analytical Framework*

With those principles in mind, the Court turns to whether this state law passes constitutional muster. Unfortunately, *Heller* does not explicitly answer the question. The Supreme Court recognized that the Second Amendment protects a right to possess and carry weapons for self defense; however, given the "severe" nature of the law in that case, the only conduct that the Court clearly located within the Second Amendment right was the possession and carrying of a handgun by an otherwise qualified person within his home for self-defense. *Id.* at 2811, 2821-22.

As an initial matter, the Court notes that Defendants have not argued that the scope of the Second Amendment is limited to possession of a firearm within the home. Thus, the Court will proceed on the assumption that the right is not so limited. Having made that assumption, the Court must determine the proper mode of analysis to follow. *Heller* provides little guidance in this regard as well. Thus, before answering that question, the Court will briefly survey approaches followed by other courts faced with Second Amendment challenges.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

**\*7** The Seventh Circuit suggests an approach that focuses primarily on whether the law satisfies an appropriate means-ends scrutiny. *United States v. Skoien,* 614 F.3d 638 (7th Cir.2010) (en banc). *Skoien* presented a challenge to 18 U.S.C. § 922(g)(9), which prohibits the possession of a firearm by anyone convicted of a misdemeanor crime of domestic violence. Looking at both the holding of *Heller* and its list of presumptively lawful regulations, the Seventh Circuit, sitting en banc, noted that neither "contained an answer to the question whether [18 U.S.C.] § 922(g)(9) is valid." *Id.* at 640. The court eschewed the historical inquiry undertaken in the panel opinion [FN6] and instead took from *Heller* that although the Supreme Court had not established that any particular statute was valid, statutory "exclusions need not mirror limits that were on the books in 1791." *Id.* at 641. Thus, the court accepted that "some categorical disqualifications are permissible," but declined to ground those disqualifications in an historical basis. *Id.* at 641.

Accepting that categorical limits on the possession of firearms could be permissible, the court turned to the appropriate showing to justify such a limitation. It concluded that a rational-basis test was not appropriate, and instead put the government to the burden of making a "strong showing." *Id.* at 641-42. Employing an intermediate scrutiny standard, the court concluded that "logic and data establish a substantial relationship between § 922(g)(9)" and the objective of preventing armed mayhem. *Id.* at 642. Finally, the court refused to entertain the question of whether § 922(g)(9) would be constitutional as applied to a misdemeanant who had been law abiding for an extended period of time because Skoien had been convicted of domestic battery twice and was arrested for possessing multiple guns just one year after his second conviction. *Id.* at 645.

The Third Circuit suggests a two-pronged approach focusing first on the scope of the Second Amendment protection and second on whether the challenged law passes means-ends scrutiny. *United States v. Marzzarella,* 614 F.3d 85, 89 (3d Cir.2010). [FN7] In attempting to define the scope of the Second Amendment, the *Marzzarella* court turned to the list of presumptively lawful regulatory measures. The court noted that it was unclear whether the measures were presumptively lawful because they fell outside the scope of conduct protected by the Second Amendment or because they would survive under the appropriate standard of scrutiny. *Id.* at 91. Reasoning that the *Heller* opinion had equated the list of presumptively lawful regulatory measures with restrictions on dangerous and unusual weapons, the court concluded that the presumptively lawful regulatory measures were best understood as "exceptions to the Second Amendment guarantee." *Id.* The court further noted that the list was not exhaustive; thus, "the Second Amendment appears to leave intact additional classes of restrictions." *Id.* at 92-93. But the court counseled caution in "extend[ing] these recognized exceptions to novel regulations unmentioned in *Heller,*" because *Heller* does not make clear the proper analytical approach for identifying additional restrictions. *Id.* at 93.

**\*8** Turning to the law at issue in *Marzzarella,* 18 U.S.C. § 922(k), which prohibits the possession of weapons with obliterated serial numbers, the Third Circuit concluded that although the law may have been similar to those banning dangerous or unusual weapons, the safer approach was to assume that § 922(k) burdened protected conduct and to evaluate the law under means-ends scrutiny. *Id.* at 95. Finding that the law was properly characterized as regulating the manner of the exercise of Second Amendment rights, as opposed to limiting, the court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

concluded that intermediate scrutiny was appropriate and that the law satisfied that standard. *Id.* at 97-99.[FN8]

Other courts have taken less rigorous approaches than those outlined above. In cases involving regulations found on *Heller'* s presumptively lawful list of prohibitions, many courts have simply pointed to the list as a source of categorical exclusions and upheld the application of the law in that case. *See United States v. Rozier,* 598 F.3d 768, 771 (11th Cir.2010) (upholding application of prohibition on possession by a felon in 18 U.S.C. § 922(g)(1)); *United States v. Vongxay,* 594 F.3d 1111, 1115 (9th Cir.2010) (same); *United States v. Mc-Cane,* 573 F.3d 1037 (10th Cir.2009) (same).

Following the *Skoien* en banc opinion, however, the Seventh Circuit has applied a more rigorous approach even to regulations on the list. Noting that regulations on the list were only "presumptively lawful," the court required the government to prove that applying 18 U.S.C. § 922(g)(1)[FN9] to the defendant satisfied a "strong showing" in the form of an intermediate scrutiny standard. *United States v. Williams,* 616 F.3d 685, 692-94 (7th Cir.2010). Although the government satisfied its burden in that case, the Seventh Circuit entertained the idea that in other cases, the government might not be able to prove that the application of § 922(g)(1) met that "strong showing." *Id.* at 693.

In cases in which the regulation at issue was similar to one found on *Heller'* s list, but not on the list itself, courts have followed a wider variety of approaches. In some cases, courts have analogized the challenged regulation to regulations on the list, but declined to subject the law to any further independent scrutiny. Analyzing 18 U.S.C. § 922(g)(9)'s prohibition against firearm possession by persons convicted of the misdemeanor crime of domestic violence, the Eleventh

Circuit phrased the issue before it as "whether the statutory prohibition against the possession of firearms by persons convicted of the misdemeanor crime of domestic violence ... warrants inclusion on *Heller'* s list of presumptively lawful longstanding prohibitions." *United States v. White,* 593 F.3d 1199, 1205 (11th Cir.2010). The court noted that, unlike a conviction under § 922(g)(1), a conviction under § 922(g)(9) required prior violent conduct on the part of the defendant and that § 922(g)(9) was passed in order to address the "dangerous loophole" that resulted when domestic abusers were not ultimately charged and convicted of a felony. *Id.* at 1205-06 (internal quotation marks omitted). Thus, the court reasoned that § 922(g)(9) deserved a place on the "list of longstanding prohibitions on which *Heller* does not cast doubt." *Id.* at 1206. Having reached that conclusion, the court then upheld the law in that case without subjecting it to any independent means-ends scrutiny.[FN10] *Id.*

**\*9** Other courts have hedged their bets on the proper mode of analysis by both analyzing the challenged law in light of the list of presumptively lawful measures and subjecting it to independent means-ends scrutiny. *See United States v. Walker,* 709 F.Supp.2d 460, 464-67 (E.D.Va.2010) (analyzing 18 U.S.C. § 922(g)(9) both by reference to the presumptively lawful regulations and against intermediate scrutiny); *United States v. Luedtke,* 589 F.Supp.2d 1018, 1021-25 (E.D.Wis.2008) (analyzing 18 U.S.C. § 922(g)(8) primarily by analogy method but briefly concluding it would survive strict scrutiny as well); *United States v. Booker,* 570

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

F.Supp.2d 161, 163-64 (D.Me.2008) (noting that a "useful approach is to ask whether a statutory prohibition against the possession of firearms by felons and the mentally ill is similar enough to the statutory prohibition against the possession of firearms by persons convicted of the misdemeanor crime of domestic violence to justify its inclusion in the list of 'longstanding prohibitions' that survive Second Amendment scrutiny," but still evaluating 18 U.S.C. § 922(g)(9) in terms "the critical nature of the governmental interest, and the definitional tailoring of the statute").

*C. Application to Georgia's Law*

Having surveyed the approaches followed by other courts, the Court turns now to the law at issue in this case. Drawing from the discussion in *Marzzarella* and in light of the Eleventh Circuit's focus on the list of presumptively lawful regulatory measures in *White* and *Rozier,* the Court finds it appropriate to first inquire whether the conduct burdened by this law simply lies beyond the protections of the Second Amendment.[FN11] Defendants argue, based on the *Heller* list of presumptively lawful regulatory measures, that the conduct burdened by this law lies beyond the Second Amendment. That list includes laws prohibiting carrying a firearm in "sensitive places such as schools and government buildings." *Heller,* 128 S.Ct. at 2816. In *Heller,* the Supreme Court did nothing more to elucidate exactly what constitutes a "sensitive place." Notwithstanding that, however, the list still indicates that categorical exclusions on carrying firearms in certain places may be permissible and that the list is not limited to schools or government buildings.

The trend in the Eleventh Circuit has been to subject the challenged regulation to no further means-ends scrutiny if it falls on the *Heller* list or is easily linked to a regulation on the list, *see Rozier,* 598 F.3d at 771; *White,* 593 F.3d at 1205. Given, however, that the Supreme Court did not indicate why a certain place might be considered "sensitive" for purposes of prohibiting firearms, the Court is hesitant to accept that whatever "sensitive" might mean, it must include places of worship. *See United States v. Dorosan,* 350 Fed. Appx. 874, 875-76 (5th Cir.2009) (positing that a parking lot belonging to the USPS was a sensitive place); *United States v. Masciandaro,* 648 F.Supp.2d 779, 790 (E.D.Va.2009) ("Although *Heller* does not define 'sensitive places,' the examples given-schools and government buildings-plainly suggest that motor vehicles on National Park land fall within any sensible definition of a 'sensitive place.' "). Schools and government buildings do not immediately suggest any unifying theme or greater purpose that would go unserved if places of worship were not included, nor have Defendants suggested one.[FN12] Given the indeterminacy of what the Supreme Court intended to capture with the term "sensitive places," the Court finds that the better analytical approach is to lay aside the *Heller* list for the moment, to assume that Georgia's law burdens conduct within the scope of the Second Amendment, and to test whether the State can make the necessary showing to demonstrate that categorically prohibiting the possession of firearms in places of worship is permissible. *See Marzzarella,* 614 F.3d at 93-95.

*10 Having adopted that approach, the question then becomes what level of scrutiny to apply in a means-ends analysis. In *Heller,* the majority eschewed the use of a rational basis test. *Heller,* 128 S.Ct. at 2818 n. 27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). The majority also

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

rejected an " 'interest-balancing' approach" suggested by Justice Breyer in dissent. *Id.* at 2821. *Heller* having ruled out rational basis and an interest balancing approach, courts have been left to choose between strict and intermediate scrutiny. Most have chosen intermediate scrutiny. *See Heller v. District of Columbia,* 698 F.Supp.2d 179, 185-86 (D.D.C.2010) (collecting cases applying strict scrutiny, intermediate scrutiny, or an undue burden test).

[8] This Court joins the majority of other courts and concludes that intermediate scrutiny is the appropriate standard of scrutiny for this case. Two considerations support this result. First, as others-including the *Heller* dissent-have suggested, the Supreme Court's description of a list of presumptively lawful regulatory measures is at least implicitly inconsistent with strict scrutiny. *See, e.g., Heller,* 128 S.Ct. at 2851 (Breyer, J., dissenting) (noting that "the majority implicitly, and appropriately, reject [ed]" a strict scrutiny standard through its list of presumptively lawful regulatory measures); *Heller,* 698 F.Supp.2d at 187 (noting that "the *Heller* dissent and numerous other courts and legal scholars" have concluded that "a strict scrutiny standard of review would not square with the majority's references to 'presumptively lawful regulatory measures' "). Second, the burden imposed by this law falls at least one level outside the core right recognized in *Heller* for a law abiding individual to keep and carry a firearm for the purpose of self defense in the home. Although Plaintiffs here are otherwise qualified and allege that they intend to carry their firearms for the purpose of self defense, the law does not impact their ability to do so in their homes. FN13

[9] Under an intermediate scrutiny standard, a regulation "may be upheld so long as it is substantially related to an important governmental objective." *Nat'l Parks Conservation Ass'n v. Norton,* 324 F.3d 1229, 1244 (11th Cir.2003) (internal quotation marks omitted). The fit between the government's objective and regulation need not be "necessarily perfect, but reasonable"; the government need "not necessarily [employ] the least restrictive means." *Bd. of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989).

Defendants advance three interests in support of the statute: 1) an interest in deterring and punishing violent crime, 2) an interest in deterring and punishing crime directed at "sensitive places" FN14 -such as places of worship, government buildings, courthouses, and polling places, and 3) an interest in protecting the free exercise of religion.

*11 Defendants' first proffered reason has been a popular one in many recent Second Amendment challenges to the provisions found in 18 U.S.C. § 922(g). No one disputes that the government's interest in preventing crime is not only important, but compelling. *See United States v. Salerno,* 481 U.S. 739, 750, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Section 922(g) attempts to meet that goal by prohibiting the possession of firearms by different groups that present an increased risk for criminal or violent behavior. *See* 18 U.S.C. § 922(g) (prohibiting firearm possession by: felons, fugitives from justice, unlawful users or persons addicted to a controlled substance, persons committed to a mental institution, persons convicted of a misdemeanor crime of domestic violence). The fit between the legislative means and ends is necessarily tighter when the law seeks to prevent crime by targeting those groups demonstrably more likely to commit criminal or violent behavior for firearm dispossession.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)

**(Cite as: 2011 WL 240108 (M.D.Ga.))**

Although the importance of the government interest in preventing crime is clear, the fit between the legislative means of prohibiting the carrying of a firearm by a license holder in a place of worship and the end of preventing crime is less clear. In this case Defendants have not demonstrated that places of worship are either targets or locations of frequent criminal activity such that prohibiting the possession of firearms there would achieve the tighter fit demonstrated by the prohibitions in section 922(g). If, however, one accepts that restricting access to firearms aids in crime prevention, then prohibiting the carrying of firearms in any particular place will have some relationship to the aim of preventing crime. Presumably that is what Defendants are getting at when they argue that by "limiting the locations to which one may lawfully bring a weapon, the Statute deters gun violence by providing for punishment for those who do bring weapons to those locations." [Doc 9-1 at 19.] That reasoning may be sufficient to meet a rational basis test, but whether it demonstrates the sort of substantial relationship required by intermediate scrutiny is not certain. Because Defendants have advanced other interests, however, the Court need not decide whether the general crime prevention interest standing alone is sufficient to sustain the challenged law.

[10] Defendants' third objective, protecting the free exercise of religion, is an important governmental interest. The free exercise right is enshrined in the First Amendment to our Constitution. Although the Constitution protects a person's right to free exercise only against governmental intrusion, it is clear that the protection of religious freedom against private bias or coercion is also an important governmental goal. *See, e.g.,* 42 U.S.C. § 2000e-2(a) (prohibiting discrimination in employment on the basis of religion). Prohibiting the carrying of firearms in a place of worship bears a substantial relationship to that important goal by protecting attendees from the fear or threat of intimidation or armed attack.FN15

**\*12** Having concluded that the statute passes intermediate scrutiny, the Court turns briefly again to *Heller'* s list of presumptively lawful measures. Included on that list are "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller,* 128 S.Ct. at 2817. The Third Circuit, in *Marzzarella,* suggests that this list is best thought of as exceptions to the Second Amendment guarantee. The Eleventh Circuit's analysis of sections 922(g)(1) and 922(g)(9) in *Rozier* and *White* indicate similar thinking. Following that reasoning, if a place of worship were a "sensitive place," then regulations on the possession of firearms at places of worship would be excepted from the Second Amendment guarantee.

The problem with that approach, as previously discussed, lies in the indeterminacy of what the Supreme Court intended to capture with the term "sensitive places." Defendants suggest that a place might be considered sensitive for any number of reasons. Certainly true. A place, such as a school, might be considered sensitive because of the people found there. Other places, such as government buildings, might be considered sensitive because of the activities that take place there. A reasonable argument can be made that places of worship are also sensitive places because of the activities that occur there. Indeed, the prior intermediate scrutiny analysis suggests as much. In the absence of clearer guidance as to what the Supreme Court meant to capture within the net of "sensitive places"; however, the Court concludes that the safer approach for now is the one taken-assuming that possession at a place of worship is within the Second Amendment guarantee and applying intermediate scrutiny.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

Because the statute survives intermediate scrutiny, the Court concludes that it does not violate the Second Amendment as applied to Plaintiffs' allegations. As with their First Amendment challenge, Plaintiffs have done little to differentiate between their purported as-applied and facial challenges. Again, however, the Court finds that Plaintiffs' facial challenge based on the Second Amendment must fail as well. As before, Plaintiffs have failed to demonstrate that no set of circumstances exists under which the law would be valid because the law does not violate the Second Amendment as applied to them. Moreover, again assuming that an overbreadth challenge is available under the Second Amendment-and there is ample reason to believe it may not be-Plaintiffs have not demonstrated that a substantial number of its applications are unconstitutional relative to its legitimate sweep. Indeed, challengers possessing valid Georgia Weapons Licenses and wishing to carry a handgun for self defense probably represent the most likely challengers of this statute. If the statute is constitutional as applied to them, then plainly it is not overbroad.

Before concluding the Second Amendment analysis, the Court will also briefly address Plaintiff Wilkins's contention that the statute is unconstitutional because it prevents him from keeping a firearm in his office at the Tabernacle. As with the home worship question, the Court does not reach the issue of whether such application of the statute would be unconstitutional because the statute does not prohibit Plaintiff Wilkins from keeping a firearm in his office at the church.

**\*13** Although the statute generally prohibits persons with valid Georgia Weapons Licenses from carrying a firearm in a place of worship, the statute also provides that the prohibition on carrying in the unauthorized locations listed in subsection (b) does not apply to, *inter alia,* "a license holder who approaches security or management personnel upon arrival ... and notifies such security or management personnel of the presence of the weapon ... and explicitly follows the security of management personnel's direction for removing, securing, storing, or temporarily surrendering such weapon." O.C.G.A. § 16-11-127(d)(2). As a result, the statute would allow Wilkins to keep a firearm in his office if he obtained permission from security or management personnel of the Tabernacle and kept it secured or stored as directed. If management or security personnel at the Tabernacle, which presumably includes Wilkins as CEO, did not grant him permission to secure or store a firearm in his office, then that would be at their discretion. Plaintiffs do not argue, however, that they possess a constitutional right to carry a firearm onto private property against the wishes of the owner or controller of the property.

For the foregoing reasons, the Court concludes that even accepting the Plaintiffs' well-pleaded allegations as true, they have failed to state a claim for relief under the Second Amendment.

### V. State of Georgia's Immunity
The State of Georgia also contends that it must be dismissed as a party because it is immune from suit. In response, Plaintiffs contend that the State waived its Eleventh Amendment immunity by removing this case to federal court.

[11] The Eleventh Amendment provides:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. Although the language of the amendment does not contemplate suits brought against a state by its own citizens, the Supreme Court has recognized that "a federal court could not entertain a suit brought by a citizen against his own State." *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). That immunity may be waived, but "in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Id.* at 100. "This jurisdictional bar applies regardless of the nature of the relief sought." *Id.; see also Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 58, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("[W]e have often made it clear that the relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment.").

Plaintiffs argue that the State has waived its Eleventh Amendment immunity by removing this case to federal court. For that proposition, Plaintiffs cite *Lapides v. Board of Regents of the University System of Georgia,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002), in which the Supreme Court decided the question of whether a state waives its Eleventh Amendment immunity by its affirmative litigation conduct when it removes a case to federal court. The precise question before the Court, however, was whether the State waived its Eleventh Amendment immunity against litigating in a federal forum by removing a case based on state law claims for which it had explicitly waived its immunity in state-court proceedings. *Id.* at 617 ("It has become clear that we must limit our answer to the context of state-law claims, in respect to which the State has explicitly waived immunity from state-court proceedings."). The Court specifically declined to "address the scope of waiver by removal in a situation where the State's underlying sovereign immunity from suit has not been waived or abrogated in state court." *Id.* at 617-18. Ultimately, the Court concluded removal of the case by the State waived its Eleventh Amendment immunity to litigating those state-law claims in a federal forum. *Id.* at 624.

**\*14** [12] The State contends that *Lapides* only stands for the proposition that a state waives its Eleventh Amendment immunity against litigating in a federal forum by removing a case, but that it may still assert its sovereign immunity against the claims at issue if it retained that immunity in state court as well. The Eleventh Circuit has yet to decide whether the reasoning of *Lapides* indicates that a state waives its sovereign immunity against claims for which it would still enjoy immunity in state court by removing the case to federal court. In analyzing *Lapides,* however, this Court has concluded that "consent to litigation in a federal forum does not ... necessarily entail a waiver of a State's sovereign immunity from suit under its own state laws." *Coates v. Natale,* 2010 WL 749630, \*10 (M.D.Ga. Mar.1, 2010). Thus, "[e]ven if [a State] has consented to suit in a federal forum, [it] maintains its inherent immunity from suit under its own laws." *Id.*

In this case, the State of Georgia does not seek to invoke its Eleventh Amendment immunity against litigating in a federal forum. Instead, it invokes its sovereign immunity against the claims that it contends it could invoke in state court as well. The Georgia Constitution

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

provides that "sovereign immunity extends to the state and all of its departments and agencies," and that "sovereign immunity can only be waived by an Act of the General Assembly." Ga. Const.1983, Art. I, § 2, Para. 9(e). It goes on to state that "[n]o waiver of sovereign immunity under this Paragraph shall be construed as a waiver of any immunity provided to the state ... by the United States Constitution." *Id.* Art. I, § 2, Para. 9(f). Plaintiffs do not cite any statutory waiver of sovereign immunity to the claims at issue in this case.

Plaintiffs only support for their contention that the State has waived its sovereign immunity to these claims is a citation to *In Interest of A.V.B.,* 267 Ga. 728, 482 S.E.2d 275 (Ga.1997). There, the Georgia Supreme Court stated that "[s]overeign immunity does not protect the state when it acts illegally and a party seeks only injunctive relief." *Id.* at 276 (citing *International Business Machines, Corp. v. Evans,* 265 Ga. 215, 453 S.E.2d 706 (Ga.1995)). The claims in that case, however, were not based on a violation of a federal constitutional right. Indeed, in *Evans,* the Georgia Supreme Court observed that it was not deciding "whether sovereign immunity would bar a suit [seeking injunctive relief] based on the alleged violation of a constitutional right." 453 S.E.2d at 709 n. 3.

Accordingly, the Court concludes that Plaintiffs have failed to demonstrate the State has waived its sovereign immunity, as a matter of state law, against the claims presented in this case. Although the State may have waived its immunity against litigation in a federal forum by removing this case, its underlying sovereign immunity against the claims presented remains. Thus, the State of Georgia is immune from suit and must be **DISMISSED** as a defendant.

## VI. CONCLUSION

**\*15** Plaintiffs' allegations fail to state a claim for relief either under the First Amendment or the Second Amendment. The State of Georgia also enjoys immunity from the claims raised in this case; thus, it must be dismissed as a defendant. Accordingly, Defendants' motions to dismiss are **GRANTED.** Plaintiffs' motion for summary judgment in **DENIED** as moot.

SO ORDERED.

FN1. RFRA was passed to restore the *Sherbert* approach after the Supreme Court's decision in *Smith.* 42 U.S.C. § 2000bb(b).

FN2. RLUIPA was passed in response to the Supreme Court's holding in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), that RFRA was not applicable to the States. *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1229 (11th Cir.2004).

FN3. The precise scope of the exception in regards to what positions or functions are sufficiently "ministerial" is not altogether clear. That question, however, is immaterial to this case.

FN4. Although Plaintiffs purport to bring both a facial and an as-applied challenge to the statute, they do little to distinguish between the two. Having determined that the statute is not unconstitutional as applied to the religious beliefs in the Plaintiffs' allega-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

tions, the Court also finds that the statute does not violate the First Amendment on its face.

A party ordinarily "can only succeed in a facial challenge by 'establish [ing] that no set of circumstances exists under which the [law] would be valid,' i.e., that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (quoting *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). Plaintiffs have clearly failed to establish that no set of circumstances exists under which the statute is valid because the statute is in fact valid as applied to their professed religious beliefs.

In the First Amendment free speech context, the Supreme Court has recognized another type of facial challenge "under which a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 449 n. 6 (quotation marks omitted). Even assuming an overbreadth challenge is available here, Plaintiffs have not demonstrated that a substantial number of instances exist in which the statute cannot be constitutionally applied.

FN5. In *McDonald v. City of Chicago,* --- U.S. ----, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), the Court took up the question of whether the Second Amendment applied only against the federal government or against the States as well. Although disagreeing on the proper reasoning, a majority of the Court concluded that the Second Amendment right recognized in *Heller* was fully applicable to the States by way of the Fourteenth Amendment. *Id.* at 3050 (plurality opinion); *id.* at 3088 (Thomas, J., concurring). Although *McDonald* is important to this case in that it makes clear that the right recognized in the Second Amendment applies against the States, it adds little to the content of the Second Amendment right beyond what is found in *Heller.* Accordingly, the Court will draw primarily from *Heller* in discussing the Second Amendment right.

FN6. The panel opinion had focused first on whether the conduct burdened by the law at issue fell within the scope of the Second Amendment right as publicly understood at the time of the ratification of the Bill of Rights. *United States v. Skoien,* 587 F.3d 803, 809 (7th Cir.2009), *rev'd by,* 614 F.3d 638 (7th Cir.2010) (en banc).

FN7. The Fourth Circuit, drawing from *Marzzarella,* recently adopted a similar approach in *United States v. Chester,* 628 F.3d 673, 2010 WL 5396069 (4th Cir. Dec.30, 2010).

FN8. The court also held that the law would pass strict scrutiny as well. *Marzzarella,* 614 F.3d at 99-101.

FN9. Section 922(g)(1), the felon in possession statute, prohibits the possession of a firearm by anyone convicted of a crime punishable by imprisonment for a term exceeding one year. 18 U.S.C. § 922(g)(1).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

**FN10.** Other courts have employed this same approach. *See United States v. Seay,* 620 F.3d 919, 925 (8th Cir.2010) (analyzing 18 U.S.C. § 922(g)(3)); *United States v. Richard,* 350 Fed. Appx. 252, 260 (10th Cir.2009) (same); *United States v. Gillman,* No. 2:09-CR-896, 2010 WL 2598398, at *3 (D.Utah June 24, 2010) (analyzing 18 U.S.C. § 922(g)(8)); *United States v. Yanez-Vasquez,* No. 09-40056-01-SAC, 2010 WL 411112, at *4 (D.Kan. Jan.28, 2010) (analyzing 18 U.S.C. § 922(g)(5)).

**FN11.** The Court notes that Defendants have offered little evidence or argument for the proposition that the possession of a firearm specifically in a place of worship was outside the protections of the Second Amendment as an historical matter.

**FN12.** Defendants do attempt to explain why all the locations found in O.C.G.A. § 16-11-127(b) might be considered "sensitive" in some sense. The question that Defendants fail to answer, however, is what the Supreme Court meant by "sensitive" in *Heller.*

**FN13.** In their supplemental brief, styled as a motion for summary judgment, Plaintiffs, for the first time, advance the allegation that the statute prohibits Plaintiff Wilkins, who lives in a Tabernacle-supplied parsonage and often holds Tabernacle meetings there, from carrying a gun in his home. The Court declines to consider the constitutional implications of that allegation. Instead, it concludes that the statute does not prohibit Plaintiff Wilkins from carrying a firearm in his residence.

> The statute does not define place of worship. Defendants suggest that a place of worship describes the entire building in which a religious congregation meets, as opposed to attempting to distinguish between a chapel or a secretary's office in a church building. Plaintiffs do not dispute that definition. The other places listed in subsection (b) all naturally encompass the entirety of a building, and when the statute wishes to define only a portion of a building as constituting a covered location, it does so. *See* O.C.G.A. § 16-11-127(a)(3)(C). Thus, the Court agrees that the entire building in which a religious congregation meets is an appropriate definition for a place of worship for purposes of this case.

> While certainly not undertaking to explore the full scope of buildings or structures that would fall under that definition, the Court readily concludes that Plaintiff Wilkins's residence does not. Plaintiffs do not allege that the primary purpose of this parsonage is anything but a residence. More particularly, they do not allege that the purpose of this parsonage is to host the worship services of a religious congregation. The parsonage does not transform into a place of worship simply because church matters might be discussed within its walls or because attendees at those meeting might engage in prayer. The Court leaves for another day the interpretational and constitutional questions that might be posed by a plaintiff who actually lives in a building that functions primarily as a meeting place for religious congregations.

**FN14.** Defendants' decision to describe these locations as "sensitive places" is an attempt to link them to the *Heller* list.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)
**(Cite as: 2011 WL 240108 (M.D.Ga.))**

> FN15. As applied to this case, Defendants' second objective, protecting individuals at sensitive locations, is only a generalization of their more specific third objective. They assert, in their second objective, that the State has an interest in protecting individuals at various locations deemed sensitive for one reason or another. Only their third object-ive, however, gives any content as to why they view places of worship as sensitive loc-ations. In light of Defendants' explanation for why the State has a heightened interest in places of worship, the Court agrees that Defendants' second objective is an import-ant one and that the statute bears a substantial relation to that goal.

M.D.Ga.,2011.
GeorgiaCarry.Org, Inc. v. Georgia
--- F.Supp.2d ----, 2011 WL 240108 (M.D.Ga.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.