## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | |
|---|---|
| REBEKAH JENNINGS, BRENNAN HARMON, ANDREW PAYNE, and NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., <br><br> **Plaintiffs,** <br><br> vs. <br><br> BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; KENNETH E. MELSON, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and ERIC H. HOLDER, Jr., in his official capacity as Attorney General of the United States, <br><br> **Defendants.** | Case No. 5:10-cv-00140-C |

**APPENDIX TO DEFENDANTS' COMBINED REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

TONY WEST
Assistant Attorney General
JAMES T. JACKS
United States Attorney
JOHN R. PARKER
Assistant United States Attorney
SANDRA M. SCHRAIBMAN
Assistant Director

DANIEL RIESS (Texas Bar No. 24037359)
JESSICA LEINWAND
Trial Attorneys
U.S. Department of Justice
Civil Division, Rm. 6122
20 Massachusetts Avenue, NW
Washington, D.C. 20530
Telephone: (202) 353-3098
Fax: (202) 616-8460
Email: Daniel.Riess@usdoj.gov
*Attorneys for Defendants*

## **TABLE OF CONTENTS**

ATF Chief Counsel Opinion 23362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Excerpt, Thomas M. Cooley, Treatise on Constitutional Limitations (5th ed. 1883) . . . . . . . . . . . . 6

States Enrolling in Their Militias Only Individuals Over 21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

States Requiring Parental Consent for Individuals Under 21 to Serve
in the Militia  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

On the Militia Bill, The Federal Gazette and Philadelphia Daily Advertiser
(Philadelphia), January 10, 1791 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Excerpt, 2 Annals of Congress (1793) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Early New Jersey and Virginia Militia Laws  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

States Requiring Parents to Furnish Minors Enrolled in the Militia with Arms . . . . . . . . . . . . . . . 39

Excerpt, Federal Firearms Act: Hearings Before the Subcomm. to Investigate
Juvenile Delinquency, Sen. Comm. on the Judiciary, 90th Cong. (1967) . . . . . . . . . . . . . . . . . . 43

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

REBEKAH JENNINGS, et al.,                )
                                         )
                    Plaintiffs,          )
                                         )
v.                                       )          Case No.  5:10-cv-00140-C
                                         )
BUREAU OF ALCOHOL TOBACCO,               )
FIREARMS AND EXPLOSIVES et al.,          )
                                         )
                    Defendants.          )
                                         )

## DECLARATION OF JACQUELINE R. MAGRUDER

I, Jacqueline R. Magruder, hereby declare:

1.    I am of majority age and otherwise competent to testify as to the matters herein, based on my personal knowledge.

2.    I am currently the Staff Assistant for the Office of Chief Counsel, Bureau of Alcohol, Tobacco, Firearms and Explosives in Washington, D.C.  I have served in this position since 1978.  As Staff Assistant, I am responsible for maintaining the records of the office and I make the following statement based on my personal knowledge or on the basis of information made available to me.

3.    Attached hereto is a true and correct copy of Chief Counsel Opinion 23362 (1983).

I declare under penalty of perjury that the foregoing is true and correct.

Jacqueline R. Magruder
Staff Assistant
Office of Chief Counsel
Bureau of Alcohol, Tobacco, Firearms and Explosives

Executed this 29th day of March, 2011.

```
Subject:  0001177
 Ruling:  23362.0
   Date:  19831205
   Auth:  KAS
```

KeyWords:
"Purchasing, possession of firearms by minors"

Law-Regs:
Possession, Sales, juveniles, minors

Related Opinions:
18 USC 922(b)(1), 927

Summary:
Re your letter inquiring about Federal statutes restricting minors from purchasing and possessing firearms.
Firearms licensees are prohibited from selling or delivering handguns to persons under the age of 21.  A minor or juvenile is not prohibited by Federal law from possesing, owning, or learning the proper usage of firearms since any firearm that the parents or guardian desire the minor to have can be obtained by the parents or guardian.           The age restrictions in Federal law were intended to prevent juveniles from acquiring firearms without their parents' or guardian's knowledge.      State and local age restrictions may differ from those imposed by Federal law.                    Where the licensee knows or has reasonable cause to believe that an underaged person is using a straw purchaser as his agent to purchase a firearm andthe underaged person is the actual person, the licensee should not make the sale or delivery.      Federal law was not intended to preclude a parent or guardian from purchasing a firearm and placing it in the possession of a minor child or ward.

emr

23362

CLOSED

DEC 5 1983

CC-32,980 FB:KAS

Mr. Sig Shore
Shore Galleries, Inc.
3318 W. Devon
Lincolnwood, IL 60659

Dear Mr. Shore:

This is in response to your recent letter to the Director inquiring about Federal statutes restricting minors from purchasing and possessing firearms. Specifically, you are concerned about a recent Chicago Tribune article which stated that any 18 year old could own a handgun. After contacting the National News Council about this item, you were informed that the information contained in the newspaper article was correct. You have written to the Bureau asking for clarification of the entire issue.

Under Title I of the Gun Control Act of 1968, 18 U.S.C. § 922(b)(1), it is stated:

"(b) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver--

"(1) any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age."

As you can see from the above, Federal firearms licensees are prohibited from selling or delivering handguns to persons under the age of 21. However, a minor or juvenile is not prohibited by Federal law from possessing, owning, or learning the proper usage of firearms since any firearm that the parents or guardian desire the minor to have can

App. 3

23362

- 2 -

Mr. Sig Shore

be obtained by the parents or guardian. The age restric-
tions in Federal law were intended to prevent juveniles
from acquiring firearms without their parents' or
guardian's knowledge.

It should be noted, however, that State and local age
restrictions may differ from those imposed by Federal
law. As provided by 18 U.S.C. § 927, the Gun Control Act
was not intended to operate to the exclusion of State law
on the same subject matter. Thus, if State or local law
establishes a minimum age higher than the Federal age
requirements for the purchase of a firearm, then licensees
must observe the State or local age requirements. On the
other hand, if State or local law establishes a minimum
age requirement lower than that imposed by Federal law for
the purchase of a firearm, licensees must observe the
Federal age restrictions.

In addition, you inquire about the involvement of minors
in so-called "strawman" purchases. As previously stated,
section 922(b)(1) prohibits the sale or delivery of a
firearm to an underaged person. Thus, where the licensee
knows or has reasonable cause to believe that an underaged
person is using a straw purchaser as his agent to purchase
a firearm and the underaged person is the actual
purchaser, the licensee should not make the sale or
delivery. This is to be distinguished from a situation
where the actual purchaser, a person of legal age, is
acquiring the firearm for the purpose of loaning or giving
it to an underaged person. Neither the sale nor the
minor's subsequent receipt and possession of the firearm
would violate Federal law, provided that the person is not
otherwise disabled. As previously stated, Federal law was
not intended to preclude a parent or guardian from pur-
chasing a firearm and placing it in the possession of a
minor child or ward. Your understanding is correct that
under no circumstances should a licensee sell or deliver a
firearm that the licensee has reason to believe would be
received and possessed by a felon or other prohibited
person. Under these circumstances, even if the sale was

**App. 4**

23362

- 3 -

Mr. Sig Shore

made to a legal purchaser, the licensee would violate Federal law by aiding and abetting the prohibited person's violations of receiving and possessing a firearm.

Sincerely yours,

/S/

Daniel Hartnett
Assistant Director
(Criminal Enforcement)

CC FE          CC FE          W
Koscott        Patterson      12/2/83
11/30/83       11-30-83



A

# TREATISE

ON THE

# CONSTITUTIONAL LIMITATIONS

WHICH REST UPON

## THE LEGISLATIVE POWER OF THE STATES
## OF THE AMERICAN UNION.

BY

### THOMAS M. COOLEY, LL.D.,

ONE OF THE JUSTICES OF THE SUPREME COURT OF MICHIGAN, AND JAY PROFESSOR
OF LAW IN THE UNIVERSITY OF MICHIGAN.

FIFTH EDITION,

WITH CONSIDERABLE ADDITIONS, GIVING THE RESULTS OF
THE RECENT CASES.

BOSTON:
LITTLE, BROWN, AND COMPANY.
1883.

Private Law Library
OF
Francis C. Wilson,
Santa Fe, - New Mex.

## PREFACE TO THE FOURTH EDITION.

NEW topics in State Constitutional Law are not numerous; but such as are suggested by recent decisions have been discussed in this edition, and it is believed considerable value has been added to the work by further references to adjudged cases.

THOMAS M. COOLEY.

UNIVERSITY OF MICHIGAN,
Ann Arbor, April, 1878.

## PREFACE TO THE FIFTH EDITION.

IN this edition numerous cases reported since the last was published are referred to, and such modifications of text and notes as the new cases seemed to call for have been made.

THOMAS M. COOLEY.

UNIVERSITY OF MICHIGAN,
Ann Arbor, February, 1883.

in England; and indeed it will be remembered that one of the most notable attempts to crush the liberties of the kingdom made the right of petition the point of attack, and selected for its contemplated victims the chief officers in the Episcopal hierarchy. The trial and acquittal of the seven bishops in the reign of James II. constituted one of the decisive battles in English constitutional history;[1] and the right which was then vindicated is "a sacred right which in difficult times shows itself in its full magnitude, frequently serves as a safety-valve if judiciously treated by the recipients, and may give to the representatives or other bodies the most valuable information. It may right many a wrong, and the deprivation of it would at once be felt by every freeman as a degradation. The right of petitioning is indeed a necessary consequence of the right of free speech and deliberation, — a simple, primitive, and natural right. As a privilege it is not even denied the creature in addressing the Deity."[2] Happily the occasions for discussing and defending it have not been numerous in this country, and have been confined to an exciting subject now disposed of.[3]

[* 350]              * *Right to bear Arms.*

Among the other safeguards to liberty should be mentioned the right of the people to keep and bear arms.[4] A standing army is peculiarly obnoxious in any free government, and the jealousy of such an army has at times been so strongly manifested in England as to lead to the belief that even though recruited from among themselves, it was more dreaded by the people as an in-

---

[1] See this case in 12 Howell's State Trials, 183; 8 Mod. 212. Also in Broom, Const. Law, 408. See also the valuable note appended by Mr. Broom, p. 498, in which the historical events bearing on the right of petition are noted. Also, May, Const. Hist. c. 7; 1 Bl. Com. 143.

[2] Lieber, Civil Liberty and Self-Government, c. 12.

[3] For the discussions on the right of petition in Congress, particularly with reference to slavery, see 1 Benton's Abridgment of Debates, 397; 2 Benton's Abridgment of Debates, 57–60, 182–188,

209, 436–444; 12 Benton's Abridgment of Debates, 660–679, 705–748; 13 Benton's Abridgment of Debates, 5–28, 266–290, 557–562. Also Benton's Thirty Years' View, Vol. I. c. 135, Vol. II. c. 32, 33, 36, 37. Also the current political histories and biographies. The right to petition Congress is one of the attributes of national citizenship, and as such is under the protection of the national authority. United States v. Cruikshank, 92 U. S. Rep. 542, 552, per *Waite*, Ch. J.

[4] 1 Bl. Com. 143.

.

strument of oppression than a tyrannical monarch or any foreign power.  So impatient did the English people become of the very army that liberated them from the tyranny of James II. that they demanded its reduction even before the liberation became complete; and to this day the British Parliament render a standing army practically impossible by only passing a mutiny act from session to session.  The alternative to a standing army is "a well-regulated militia;" but this cannot exist unless the people are trained to bearing arms.   The federal and State constitutions therefore provide that the right of the people to bear arms shall not be infringed; but how far it may be in the power of the legislature to regulate the right we shall not undertake to say.[1]  Happily there neither has been, nor, we may hope, is likely to be, much occasion for an examination of that question by the courts.[2]

[1] See Wilson v. State, 33 Ark. 557.

[2] In Bliss v. Commonwealth, 2 Lit. 90, the statute "to prevent persons wearing concealed arms" was held unconstitutional, as infringing on the right of the people to bear arms in defence of themselves and of the State.  But see Nunn v. State, 1 Kelly, 243; State v. Mitchell, 3 Blackf. 229; Aynette v. State, 2 Humph. 154; State v. Buzzard, 4 Ark. 18; Carroll v. State, 28 Ark. 99; s. c. 18 Am. Rep. 538; State v. Jumel, 13 La. Ann. 399; s. c. 1 Green, Cr. Rep. 481; Owen v. State, 31 Ala. 387; Cockrum v. State, 24 Tex. 394; Andrews v. State, 3 Heisk. 165; s. c. 8 Am. Rep. 8; State v. Wilburn, 7 Bax. 51; State v. Reid, 1 Ala. 612.   A statute prohibiting the open wearing of arms upon the person was held unconstitutional in Stockdale v. State, 32 Ga. 225.  And one forbidding carrying, either publicly or privately, a dirk, sword-cane, Spanish stiletto, belt or pocket pistol or revolver, was sustained, except as to the last-mentioned weapon; and as to that it was held that, if the weapon was suitable for the equipment of a soldier, the right of carrying it could not be taken away.   As bearing also upon the right of self-defence, see Ely v. Thompson, 3 A. K. Marsh. 73, where it was held that the statute subjecting free persons of color to corporal punishment for "lifting their hands in opposition" to a white person was unconstitutional.  And see, in general, Bishop on Stat. Crimes, c. 36, and cases cited.

[* 572]            * CHAPTER XVI.

### THE POLICE POWER OF THE STATES.

FREQUENTLY when questions of conflict between national and State authority are made, and also when it is claimed that government has exceeded its just powers in dealing with the property and controlling the actions of individuals, it becomes necessary to consider the extent and pass upon the proper bounds of another State power, which, like that of taxation, pervades every department of business and reaches to every interest and every subject of profit or enjoyment.   We refer to what is known as the police power.

The police of a State, in a comprehensive sense, embraces its whole system of internal regulation, by which the State seeks not only to preserve the public order and to prevent offences against the State, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own so far as is reasonably consistent with a like enjoyment of rights by others.[1]

[1] Blackstone defines the public police and economy as " the due regulation and domestic order of the kingdom, whereby the inhabitants of a State, like members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood, and good manners, and to be decent, industrious, and inoffensive in their respective stations." 4 Bl. Com. 162.  Jeremy Bentham, in his General View of Public Offences, has this definition : " Police is in general a system of precaution, either for the prevention of crimes or of calamities.  Its business may be distributed into eight distinct branches: 1. Police for the prevention of offences ; 2. Police for the prevention of calamities ; 3. Police for the prevention of endemic dis-eases ; 4. Police of charity ; 5. Police of interior communications ; 6.  Police of public amusements ; 7.  Police for recent intelligence ; 8.  Police for registration." Edinburgh ed. of Works, Part IX. p. 157.  Under the head of police for charity may be classed the provision which it is now customary with all enlightened States to make for the custody and care, and if possible the cure, of insane persons.  That the State, for the protection of others, may cause such persons to be restrained of their liberty is undoubted, and it has been common to provide that this may be done on the certificate of physicians to the diseased mental condition.  But while confinement on such a certificate may be justified when no mistake is made as to the fact, it is certain that it cannot

In the present chapter we shall take occasion to speak of the police power principally as it affects the use and enjoyment of property; the object being to show the universality of its presence, and to indicate, so far as may be practicable, the limits which settled principles of constitutional law assign to its interference.

No definition of the power can be more complete and satisfactory than some which have been given by eminent jurists in deciding cases which have arisen from its exercise, and which have been so often approved and adopted, that to present them in any other than the language of the decisions would be unwise, if not inexcusable.  Says Chief Justice *Shaw*, " We think it is a settled principle, *growing out of the nature of   [* 573] well-ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community.  All property in this Commonwealth is . . . held subject to those general regulations which are necessary to the common good and general welfare.  Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient.  This is very different from the right of eminent domain, — the right of a government to take and appropriate private property whenever the public exigency requires it, which can be done only on condition of providing a reasonable compensation therefor.  The power we allude to is rather the police power; the power vested in the legislature by the constitution to make, ordain, and establish all manner of wholesome and reasonable laws, statutes, and ordinances, either

be if the person deprived of his liberty was not in truth at the time insane. No number of physicians can be given the power to take from a sane man his liberty, without a public investigation in which he may produce his witnesses; and any legislation assuming to confer such power would be void.  On this general subject the following cases are of interest.  Anderdon *v.* Burrows, 4 C. & P. 210; Fletcher *v.* Fletcher, 1 El. & El. 526; Colby *v.* Jackson, 12 N. H. 526; Look *v.* Dean, 108 Mass. 116; Van Deusen *v.* Newcomer, 40 Mich. 90; Morton *v.* Sims, 64 Ga. 298.

but for the protection of the general public.[1]   Laws imposing on the owners the duty of draining large tracts of land which in their natural condition are unproductive, and are a source of danger to health, may be enacted under the same power,[2] though in general the taxing power is employed for the purpose;[3] and sometimes land is appropriated under the eminent domain.[4]

*Regulations of Civil Rights and Privileges.*   Congress, to give full effect to the fourteenth amendment to the federal Constitution, passed an act in 1875, which provided that all persons within the jurisdiction of the United States shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of inns, public conveyances on land and water, theatres and other places of public amusement, subject only to the conditions and limitations established by law, and applicable alike to citizens of every race and color, regardless of any previous condition of servitude.[5]   As the general power of police is in the States, and not in the federal government, the power of Congress to make so sweeping a provision may possibly be brought in question ; but as the States have undoubted right to legislate for the purpose of securing impartiality in the accommodations afforded by innkeepers and common carriers, and as the proprietors of theatres and other places of public amusement are always subject to the license and regulation of the law, a corresponding enactment by the State would seem to be competent, and has been sustained as a proper regulation of police.[6]

*Regulation of Business Charges.*   In the early days of the common law it was sometimes thought necessary, in order to prevent

[1] Cooley on Taxation, 401, 402.  See State *v.* Newark, 27 N. J. 185, 194, per *Elmer,* J. ;  Crowley *v.* Copley, 2 La. An. 329.  In Pennsylvania it has been held that the State cannot, as a measure of police, compel the owner of lands bounded on inland tide-water to construct embankments to exclude the natural flow of the water, but that where the State constructs them at its own expense, it may impose on him the duty of repair.  Philadelphia *v.* Scott, 81 Penn. St. 80.

[2] See State *v.* City Council of Charleston, 12 Rich. 702, 788.  It is competent to require a lot-owner to fill up at his own expense a lot which otherwise would be-

come a nuisance.  Nickerson *v.* Boston, 131 Mass. 306.

[3] Reeves *v.* Treasurer of Wood Co., 8 Ohio St. 333; Sessions *v.* Crunkilton, 20 Ohio St. 349;  Egyptian Levee Co. *v.* Hardin, 27 Mo. 495; McGeehee *v.* Mathis, 21 Ark. 40;  Yeatman *v.* Crandall, 11 La. An. 220;  Scuffletown Fence Co. *v.* McAllister, 12 Bush, 312;  Davidson *v.* New Orleans, 96 U. S. 97.

[4] Commissioners who are empowered to straighten a river to protect a country against inundation are not liable personally for incidental injuries to individuals.  Neither is there any claim against the public.  Green *v.* Swift, 47 Cal. 536.

[5] Laws of 1875, c. 114

[6] Donnell *v.* State, 48 Miss. 661.

extortion, to interfere, by royal proclamation or otherwise, and establish the charges that might be exacted for certain commodities or services. The price of wages was oftener regulated than that of anything else, the local magistrates being generally allowed to exercise authority over the subject. The practice was followed in this country, and prevailed to some extent up to the time of independence. Since then it has been commonly supposed that a general power in the State to regulate prices was inconsistent with constitutional liberty. It has nevertheless been conceded that in some cases this might be done, and the question of the bounds to legislative power has recently been made prominent in what are known as the Chicago Warehouse Cases. The legislature of Illinois, on the supposition that warehouse charges at Chicago were excessive and unfair, undertook to limit them to a maximum. They also required warehousemen to take out licenses and observe various regulations, which are not important here, and imposed certain penalties for a refusal to observe the statute. The validity of the legislation was affirmed by the State court, which overruled various objections made on constitutional grounds, among which was, that in effect it deprived warehousemen of their property without due process of law. The warehousemen denied wholly the right of the legislature to prescribe charges for private services or for the use of private property, and it was urged by them that, if admitted at all, no bounds could be set to it. The court, in sustaining the power, placed it upon the same ground with the right to regulate the charges of hackmen, draymen, public ferrymen, and public millers.[1] The case being removed to the federal Supreme Court, the decision of the State court was affirmed, and the principle fully approved. The ground of the decision appears to be that the employment of these warehousemen is a public or *quasi* public employment; that their property in the business is "affected with a public interest," and thereby brought under that general power of control which the State possesses in the case of other public employments. Says Mr. Chief Justice *Waite:* "Under these powers the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulation becomes necessary for the public good. In their

---

[1] Munn *v.* People, 69 Ill. 80. In this case, Justices *McAllister* and *Scott* dissented.

exercise it has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, &c., and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold. To this day statutes are to be found in many of the States upon some or all these subjects, and we think it has never yet been successfully contended that such legislation came within any of the constitutional prohibitions against interference with private property." [1] Some of the cases here referred to seem plain enough. Ferries are public highways, and when individuals are permitted to establish them, they are allowed the sovereign prerogative of charging and collecting tolls; and tolls can never be taken except by permission of the State, which generally ought to and does prescribe their limits. A hackman exercises a public employment in the public streets; one which affords peculiar opportunities for impositions and frauds, and requires special supervision, insomuch that it is commonly thought necessary to prohibit one making himself such except with permission of the State, and the number is sometimes limited so as in effect to give special privileges. The rates of toll, when mills grind for toll, is usually fixed by law; but there is nothing exclusive in this: the parties may make their own bargains, and the legislative rate only controls where the parties by implication have apparently acted in reference to it. In England, formerly, the lords of manors, as mill-owners, had exclusive rights; and where an exclusive right exists in one's favor, to compel the public to deal with him, there can be no doubt of the right in the State to compel him to deal fairly with the public. Such a right existed in the English warehouse case of Allnutt v. Inglis,[2] in which the Court of King's Bench denied the right of the warehousemen to fix their own charges at discretion, when the public, under exclusive privileges which the warehousemen possessed, were compelled to deal with them.[3]

[1] Munn v. Illinois, 94 U. S. Rep. 113, 125. In this case, Justices *Field* and *Strong* dissented.

[2] 12 East, 527.

[3] In Munn v. People, 69 Ill. 80, 91, Chief Justice *Breese*, in speaking of the power to "make all needful rules and regulations respecting the use and enjoyment of property," speaks of familiar instances in which the exercise of it in the State has been unquestioned, and among them, "in delegating power to municipal bodies to regulate charges of hackmen and draymen, and the weight and price of bread." Regulating the weight of bread is common, and necessary to prevent imposition; but regulating the price of bread we should suppose would now

What circumstances shall affect property with a public interest is not very clear. The mere fact that the public have an interest in the existence of the business, and are accommodated by it, cannot be sufficient, for that would subject the stock of the merchant, and his charges, to public regulation. The public have an interest in every business in which an individual offers his wares, his merchandise, his services, or his accommodations to the public; but his offer does not place him at the mercy of the public in respect to charges and prices. If one is permitted to take upon himself a public employment, with special privileges which only the State can confer upon him, the case is clear enough; and it seems to have been the view of both courts in this case, that the circumstances were such as to give the warehousemen in Chicago, who were the only persons affected by the legislation, a " virtual " monopoly of the business of receiving and forwarding the grain of the country to and from that important point, and by the very fact of monopoly to give their business a public character, affect the property in it with a public interest, and render regulation of charges indispensable.[1]

meet with such resistance anywhere, as would require a distinct determination upon its constitutional rightfulness. How the baker can have the price of that which he sells prescribed for him, and not the merchant or the day-laborer, is not apparent. Indeed, to admit the power seems to render necessary the recognition of the principle that there is and can be no limit to legislative interference but such as legislative discretion from time to time may prescribe.

[1] See what is said by *Breese*, Ch. J., in 69 Ill. 88–89, and by *Waite*, Ch. J., in 94 U. S. Rep. 131. In Attorney-General *v.* Chicago, &c. R. R. Co., 35 Wis. 425, 589, Chief Justice *Ryan*, in his very able opinion affirming the right to fix railroad charges by amendment to charters which reserved the power of amendment, intimated decided views in favor of the authority under the general power of police. That right would probably be claimed on the ground that railroads receive special privileges from the State; the eminent domain being always employed in their favor, and sometimes the power of taxation.

The question of the power of the State

legislature to regulate the charges of common carriers for the transportation of persons and property within the State, is fully determined in the affirmative by the decisions of the federal Supreme Court. In Railroad Company *v.* Fuller, 17 Wall. 560, an act was sustained which provided, 1. That each railroad company should annually, in a month named, fix its rates for the transportation of passengers and freights; 2. That it should on the first day of the next month cause a printed copy of such rates to be put up in all its stations and depots, and to be kept up during the year; 3. That the failure to comply with these requirements, or the charging of a higher rate than was posted, should subject the offending company to penalties. In the warehouse case of Munn *v.* Illinois, 94 U. S. 113, the power to limit charges was directly involved, and was affirmed. In Chicago, &c. R. R. Co. *v.* Iowa, 94 U. S. 155, the right to limit the charges of a railroad company was sustained. In these cases no question arose of the application of the power to contracts for transportation through the State, or from or to points within a State and other points outside; but in Peik *v.*

The phrase "affected with a public interest" has been brought into recent discussions from the treatise *De Portibus Maris* of Lord Hale, where the important passage is as follows : " A man for his own private advantage may, in a port or town, set up a wharf or crane, and may take what rates he and his customers can agree for cranage, wharfage, housellage, pesage ; for he doth no more than is lawful for any man to do, viz., makes the most of his own. If the king or subject have a public wharf unto which all persons that come to that port must come and unlade or lade their goods as for the purpose, because they are the wharves only licensed by the queen, or because there is no other wharf in that port, as it may fall out where a port is newly erected ; in that case there cannot be taken arbitrary and excessive duties for cranage, wharfage, pesage, &c., neither can they be enhanced to an immoderate rate ; but the duties must be reasonable and moderate, though settled by the king's license or charter. For now the wharf, crane, and other conveniences are affected with a public interest, and they cease to be *juris privati* only ; as if a man set out a street in new building on his own land ; it is

Chicago, &c. R. R. Co., 94 U. S. 164, it was decided that the State had power to prescribe a maximum of charges to be made by railroad companies, not only for transporting persons or property within the State, but also persons or property taken up outside the State and brought within it, or taken up inside and carried without. Note was made in the case that Congress had established no regulation with which the State statute would conflict. In Carton *v.* Ill. Cent. R. R. Co. (Iowa), 13 N. W. Rep. 67 ; s. c. 6 Am. & Eng. R. R. Cas. 305, it was held that a contract for carriage from a point within the State to a point in another State was entire, and that the State could not limit the charges, because the limitation would be an encroachment on the power of Congress over inter-state commerce. In support of this view several decisions of the federal Supreme Court are referred to, notably Case of State Freight Tax, 15 Wall. 232, in which it was held that a State could not impose a tax on freights carried by a railroad company from one State into another ; Railroad Co. *v.* Husen, 95 U. S. 465, in which the statute of Missouri forbidding the bringing of Texas,

Mexican, or Indian cattle into the State at certain seasons of the year was held invalid ; and Hall *v.* De Cuir, 95 U. S. 485, in which it was decided that the States could not legislate to give equal rights to all persons on the public conveyances in use by common carriers between points outside the State and points within it. Under this Iowa decision the power to legislate upon charges must be restricted to contracts of carriage to be performed wholly within the State, and cannot be of much importance.

See further, Philadelphia, &c. R. R. Co. *v.* Bowers, 4 Houst. 506 ; Parker *v.* Metropolitan R. R. Co., 109 Mass. 506 ; People *v.* Boston, &c. R. R. Co., 70 N. Y. 569 ; Chicago, &c. R. R. Co. *v.* People, 67 Ill. 1 ; Ruggles *v.* People, 91 Ill. 256 ; Fuller *v.* Chicago, &c. R. R. Co., 31 Iowa, 188 ; Council Bluffs *v.* Kansas City, &c. R. R. Co., 45 Iowa, 338 ; Attorney-General *v.* Railroad Companies, 35 Wis. 425 ; Peik *v.* Chicago, &c. R. R. Co., 6 Biss. 177 ; Blake *v.* Winona, &c. R. R. Co., 19 Minn. 418 ; s. c. 18 Am. Rep. 345 ; s. c. in error, 94 U. S. 180 ; Chicago, &c. R. R. Co. *v.* Ackley, 94 U. S. 179.

now no longer bare private interest, but is affected by a public interest."

If the case of a street thrown open to the public is an apt illustration of the public interest Lord Hale had in mind, the interest is very manifest. It will be equally manifest in the case of the wharf, if it is borne in mind that the title to the soil under navigable water in England is in the Crown, and that wharves can only be erected by express or implied license, and can only be made available by making use of this public property in the soil. If, then, by public permission, one is making use of the public property, and he chances to be the only one with whom the public can deal in respect to the use of that property, it seems entirely reasonable to say that his business is affected with a public interest which requires him to deal with the public on reasonable terms.

In the following cases we should say that property in business was affected with a public interest : 1. Where the business is one the following of which is not of right, but is permitted by the State as a privilege or franchise. Under this head would be comprised the business of setting up lotteries, of giving shows, &c., of keeping billiard-tables for hire, and of selling intoxicating drinks when the sale by unlicensed parties is forbidden ; also the cases of toll-bridges, &c. 2. Where the State, on public grounds, renders to the business special assistance, by taxation or otherwise. 3. Where, for the accommodation of the business, some special use is allowed to be made of public property or of a public easement. 4. Where exclusive privileges are granted in consideration of some special return to be made to the public. Possibly there may be other cases.

*Miscellaneous Cases.* It would be quite impossible to enumerate all the instances in which the police power is or may be exercised, because the various cases in which the exercise by one individual of his rights may conflict with a similar exercise by others, or may be detrimental to the public order or safety, are infinite in number and in variety. And there are other cases where it becomes necessary for the public authorities to interfere with the control by individuals of their property, and even to destroy it, where the owners themselves have fully observed all their duties to their fellows and to the State, but where, nevertheless, some controlling public necessity demands the interference or destruction. A strong instance of this description is where it becomes necessary

to take, use, or destroy the private property of individuals to prevent the spreading of a fire, the ravages of a pestilence, the advance of a hostile army, or any other great public [* 595] calamity.[1] Here the individual is in no degree in * fault, but his interest must yield to that "necessity" which "knows no law." The establishment of limits within the denser portions of cities and villages, within which buildings constructed of inflammable materials shall not be erected or repaired, may also, in some cases, be equivalent to a destruction of private property; but regulations for this purpose have been sustained notwithstanding this result.[2] Wharf lines may also be established for the general good, even though they prevent the owners of water-fronts from building out on soil which constitutes private property.[3] And, whenever the legislature deem it necessary to the protection of a harbor to forbid the removal of stones, gravel, or sand from the beach, they may establish regulations to that effect under penalties, and make them applicable to the owners of the soil equally with other persons. Such regulations are only "a just restraint of an injurious use of property, which the legislature have authority" to impose.[4]

So a particular use of property may sometimes be forbidden, where, by a change of circumstances, and without the fault of the owner, that which was once lawful, proper, and unobjectionable has now become a public nuisance, endangering the public health or the public safety. Mill-dams are sometimes destroyed upon

---

[1] Saltpetre Case, 12 Coke, 13; Mayor, &c. of New York v. Lord, 18 Wend. 126; Russell v. Mayor, &c. of New York, 2 Denio, 461; Sorocco v. Geary, 3 Cal. 69; Hale v. Lawrence, 21 N. J. 714; American Print Works v. Lawrence, 21 N. J. 248; Meeker v. Van Rensselaer, 15 Wend. 897; McDonald v. Redwing, 13 Minn. 38; Philadelphia v. Scott, 81 Penn. St. 80; Dillon, Mun. Corp. §§ 756–759. And see Jones v. Richmond, 18 Grat. 517, for a case where the municipal authorities purchased and took possession of the liquor of a city about to be occupied by a capturing military force, and destroyed it to prevent the disorders that might be anticipated from free access to intoxicating drinks under the circumstances. And as to appropriation by military authorities, see Harmony v. Mitchell, 1 Blatch. 549; s. c. in error, 13 How. 115.

[2] Respublica v. Duquet, 2 Yeates, 493; Wadleigh v. Gilman, 12 Me. 403; s. c. 28 Am. Dec. 188; Brady v. Northwestern Ins. Co., 11 Mich. 425; Monroe v. Hoffman, 29 La. An. 651; s. c. 29 Am. Rep. 345; King v. Davenport, 98 Ill. 305; s. c. 38 Am. Rep. 89.

[3] Commonwealth v. Alger, 7 Cush. 53. See Hart v. Mayor, &c. of Albany, 9 Wend. 571; s. c. 24 Am. Dec. 165.

[4] Commonwealth v. Tewksbury, 11 Met. 55. A statute which prohibited the having in possession of game birds after a certain time, though killed within the lawful time, was sustained in Phelps v. Racey, 60 N. Y. 10. That the State may prohibit the sale of arms to minors, see State v. Callicut, 1 Lea, 714.

this ground; [1] and churchyards which prove, in the advance of urban population, to be detrimental to the public health, or in danger of becoming so, are liable to be closed against further use for cemetery purposes. [2]  The keeping of gunpowder in unsafe quantities in cities or villages; [3] the sale of poisonous drugs, unless labelled; allowing unmuzzled dogs to be at large when danger of hydrophobia is apprehended; [4] or the keeping for sale unwholesome * provisions, or other deleterious     [* 596] substances, — are all subject to be forbidden under this power.   And, generally, it may be said that each State has complete authority to provide for the abatement of nuisances, whether they exist by the fault of individuals or not, [5] and even though

---

[1] Miller v. Craig, 11 N. J. Eq. 175. And offensive manufactures may be stopped. Coe v. Schultz, 47 Barb. 64.  See League v. Journeay, 25 Tex. 172; ante, p. *584, and cases cited in note.

[2] Brick Presbyterian Church v. Mayor, &c. of New York, 5 Cow. 538; Coates v. Mayor, &c. of New York, 7 Cow. 604; Kincaid's Appeal, 66 Penn. St. 411; s. c. 5 Am. Rep. 377.  As to the general power of regulation of places of burial, see Woodlawn Cemetery v. Everett, 118 Mass. 354; Lake View v. Rose Hill Cemetery Co., 70 Ill. 191; Upjohn v. Board of Health, 46 Mich. 542.  And see ante, p. *584, note.  The legislature may authorize a municipal corporation to remove the dead from a cemetery within it. Craig v. First Presb. Church, 88 Penn. St. 42; s. c. 32 Am. Rep. 417.

[3] Foote v. Fire Department, 5 Hill, 99; Williams v. Augusta, 4 Ga. 509.  And see License Cases, 5 How. 504, 589, per McLean, J.; Fisher v. McGirr, 1 Gray, 127, per Shaw, Ch. J.

[4] Morey v. Brown, 42 N. H. 373; Washington v. Meigs, 1 MacArthur, 58. Dogs, which are animals in which the owner has no absolute property, are subject to such regulations as the legislature may prescribe, and it is not unconstitutional to authorize their destruction, without previous adjudication, when found at large without being licensed and collared according to the statutory regulation.  Blair v. Forehand, 100 Mass. 136. And see Carter v. Dow, 16 Wis. 298; Morey v. Brown, 42 N. H. 373; Ex parte

Cooper, 3 Tex. Ct. Ap. 489; s. c. 30 Am. Rep. 152.  As a measure of internal police, the State has the power to encourage the keeping of sheep, and to discourage the keeping of dogs, by imposing a penalty upon the owner of a dog for keeping the same. Mitchell v. Williams, 27 Ind. 62. Or by imposing a dog tax for a fund to indemnify sheep owners for losses suffered from dogs.  Van Horn v. People, 46 Mich. 183.  A law prohibiting the bringing of Texas and Cherokee cattle into the State because of the tendency to communicate a dangerous and fatal disease to other cattle, was sustained in Yeazel v. Alexander, 58 Ill. 254.  It has since, however, been questioned, and in Railroad Company v. Husen, 95 U. S. 465, such an act was held to be an invasion of the power of Congress over interstate commerce.  See also Hall v. De Cuir, 95 U. S. 485.

[5] See Miller v. Craig, 11 N. J. Eq. 175; Weeks v. Milwaukee, 10 Wis. 242; Watertown v. Mayo, 109 Mass. 315.  One of the powers most commonly conferred upon municipal corporations is that to declare and abate nuisances.  The general authority is commonly given to the common council or other legislative body, but so far as the nuisances are supposed to be injurious to the public health, jurisdiction in respect to them is likely to be conferred upon boards of health.  Where nuisances are spoken of in statutes delegating this authority, public nuisances must be understood as intended, and for whatever is merely a private nuisance individuals must seek their own remedy.  The dele-