# APPENDIX

# Part 2 of 2

in their origin they may have been permitted or licensed by law.[1]

gation of this authority over nuisances is very apt to raise troublesome questions, and the authority itself is likely to be taken to be broader than it is. It is first to be understood that nothing is a public nuisance which the law itself — either common or statute — authorizes. Pittsburgh, &c. R. R. Co. v. Brown, 67 Ind. 45 ; s. c. 33 Am. Rep. 73 ; Chicago, &c. R. R. Co. v. Joliet, 79 Ill. 25. And therefore if the municipal authority should assume to declare something which was entirely lawful by the law of the State to be a nuisance, the declaration would be a mere nullity because in conflict with the superior law. An illustration is found in a case where a city declared the occupation by a railroad company of certain grounds where it had been lawfully located to be a nuisance, and forbade its longer continuance. Chicago, &c. R. R. Co. v. Joliet, 79 Ill. 25. Whether any particular thing or act is or is not permitted by the law of the State must always be a judicial question, and therefore the question what is and what is not a public nuisance must be judicial, and it is not competent to delegate it to the local legislative or administrative boards. Yates v. Milwaukee, 10 Wall. 497 ; Wreford v. People, 14 Mich. 41 ; State v. Street Commissioners, 36 N. J. 283 ; Everett v. Council Bluffs, 46 Iowa, 66 ; Hutton v. Camden, 39 N. J. 122 ; s. c. 23 Am. Rep. 203 ; St. Louis v. Schnuckelberg, 7 Mo. App. 536. The local declaration that a nuisance exists is therefore not conclusive, and the party concerned may contest the fact in the courts. In Kennedy v. Board of Health, 2 Penn. St. 366, it was held competent for the legislature to make it conclusive ; but this seems questionable. It is entirely competent, however, to confer upon the municipalities the authority to supersede the general law in respect to those matters which are found to be injurious in their locality, and to create as to them a new class of public offences. Thus, under proper legislation, a muni-

cipal council may make the selling of spirituous liquors within their jurisdiction a nuisance : Goddard v. Jacksonville, 15 Ill. 588 ; or the keeping of a bowling alley for hire : Tanner v. Albion, 5 Hill, 121 ; or an offensive manufactory : Kennedy v. Phelps, 10 La. An. 227 ; or a slaughterhouse within certain specified limits : Metropolitan Board of Health v. Heister, 37 N. Y. 661 ; or a private hospital : Milne v. Davidson, 5 Mart. n. s. 409 ; s. c. 16 Am. Dec. 189 ; or the erection of wooden buildings : King v. Davenport, 98 Ill. 305 ; or the running at large of swine : Roberts v. Ogle, 30 Ill. 459 ; Whitfield v. Longest, 6 Ired. 268 ; Crosby v. Warren, 1 Rich. 385 ; or the unreasonable occupation of public waters : Tourne v. Lee, 8 Mart. n. s. 548 ; s. c. 20 Am. Dec. 260. And if in any of these cases there was doubt whether what was forbidden was not a nuisance at the common law, the municipal declaration would, as to the future, resolve the doubt, but could not operate retrospectively. If a municipal corporation proceeds to abate a nuisance, it possesses for that purpose only the rights of any private person, and if injury results to an individual, it must justify its action by showing that a nuisance existed in fact. Wood on Nuisances, §§ 738, 739 ; Welch v. Stowell, 2 Doug. (Mich.) 332 ; Brightman v. Bristol, 65 Me. 426 ; s. c. 20 Am. Rep. 711. But a municipal corporation may order the removal of a nuisance at the expense of the person creating or responsible for it. Salem v. Eastern R. R. Co., 98 Mass. 431. And this is frequently done in the case of city lots which are a nuisance in their natural condition, or have become so by the act or neglect of the owner. The municipal order for removal is conclusive. Baker v. Boston, 12 Pick. 421 ; though when it is to be done at the cost of the owner he is not concluded as to the cost by the action of the corporation, but has a right to be heard as to the items. Salem v. Eastern R. R. Co., 98

---

[1] See Beer Company v. Massachusetts, 97 U. S. 25 ; Fertilizing Co. v. Hyde Park, 97 U. S. 659, ante, p. *283 and note.

## STATES ENROLLING IN THEIR MILITIAS ONLY INDIVIDUALS OVER 21

| State and Date of Enactment | Relevant Statutory Text | Source |
|---|---|---|
| Delaware (1807) | Section 1.  *Be it enacted*, . . . That each and every free able-bodied white male citizen of this State, or any of the United States, residing in this State, who is or shall be, of the age of eighteen years, and under the age of forty-five years, except as hereinafter excepted, shall severally and respectively be enroled in the militia. . . .<br><br>Sect. 2. [Exempting certain persons from militia duty].<br><br>Sect. 4.  *And be it further enacted*, That in order that the militia may be well armed, equipped and accoutred, every citizen whose assessment shall amount to the sum of five hundred dollars, that has been, or hereafter shall be enroled and notified thereof, (except as herein before excepted, and all young men under the age of twenty-one years, enroled agreeably to the second section of this act, shall be exempted from furnishing the necessary arms and accoutrements, and from all militia duties and fines during such minority, except in cases of rebellion or any actual invasion of this State,) shall, within a year after the passing of this act, provide himself with a good musket, a sufficient bayonet and belt, two spare flints, and cartouch box, to contain twenty-four cartridges, suited to the bore of his gun, or with a good rifle and shot pouch, and in case of neglect, shall be considered and returned among the absentees. | An Act to establish an Uniform Militia throughout this State, ch. XLIX, §§ 1-2, 4, *in* 4 M. BRADFORD & R. PORTER, EDS., LAWS OF THE STATE OF DELAWARE 123, 123-24, 125-26 (1816). |
| Georgia (1861) | § 981.  All able bodied free white male citizens between the ages of twenty-one and forty-five years, residents in this State, and not exempted by this Code, are subject to military duty.<br><br>. . . . .<br><br>§ 1026.  The militia of the State consists of all persons, not heretofore classified, within its limits subject to military duty, and not exempted therefrom by the Acts of Congress or the laws of this State, or belonging to some volunteer organization. | R. H. CLARK ET AL., EDS., THE CODE OF THE STATE OF GEORGIA, pt. 1, tit. 11, ch. 2, §§ 981, 1026, at 189, 199 (1861). |

| | | |
|---|---|---|
| Kansas (1859) | Section 1. The militia shall be composed of all able-bodied white male citizens between the ages of twenty-one and forty-five years, except such as are exempted by the laws of the United States, or of this state; but all citizens, of any religious denomination whatever, who, from scruples of conscience, may be averse to bearing arms, shall be exempted therefrom, upon such conditions as may be prescribed by law. | KAN. CONST. of 1859, art. 8, § 1. |
| New Jersey (1829) | 1. Be it enacted *by the Council and General Assembly of this State, and it is hereby enacted by the authority of the same*, That from and after the passing of this act, all persons under the age of twenty-one years be, and they are hereby, exempt from militia duty in time of peace. | An Act to exempt minors from Militia Duty in time of peace (1829), *in* JOSIAH HARRISON, ED., A COMPILATION OF THE PUBLIC LAWS OF THE STATE OF NEW-JERSEY PASSED SINCE THE REVISION IN THE YEAR 1820 (1833) 266, 266. |
| North Carolina (1868) | Section 1. All able bodied male citizens of the State of North-Carolina, between the ages of twenty-one and forty years, who are citizens of the United States, shall be liable to duty in the Militia: *Provided*, That all persons who may be adverse to bearing arms, from religious scruples, shall be exempt therefrom. | N.C. CONST. of 1868, art. XII, § 1. |
| Ohio (1843) | Sec. 2. That every able bodied white male inhabitant, resident within this state, who is or shall be of the age of twenty one years, and under the age of forty five years, excepting persons who may be members of volunteer companies, persons absolutely exempted by law, idiots and lunatics, shall be enrolled in the militia. | An Act to regulate the Militia, § 2, *in* 1843 OHIO ACTS 53, 53. |

| Pennsylvania (1793) | I.  Be it enacted. . . That each and every free, able-bodied, white, male citizen of this or any other of the United States, residing in this commonwealth, who is or shall be of the age of eighteen years and under the age of forty-five years, except as hereinafter excepted, shall severally and respectively be enrolled in the militia. . . .<br><br>II.  And be it further enacted. . . [that certain categories of persons] shall be, and are hereby, excepted from military duty, notwithstanding their being above the age of eighteen and under the age of forty-five years.  And also all young men under the age of twenty-one years, and all servants purchased bona fide and for a valuable consideration, shall be exempted from furnishing the necessary arms, ammunition and accoutrements, as are required by the fifth section thereof, and shall be excepted from militia duties and fines during such minority or servitude, except in cases of rebellion, or an actual or threatened invasion of this or any of the neighboring states. | An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania, ch. MDCXCVI, §§ I-II, *in* 14 JAMES T. MITCHELL & HENRY FLANDERS, EDS., THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801 454, 455-56 (1909). |
| Pennsylvania (1864) | Section 1. *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same.* That every able bodied white male citizen, resident within this state, of the age of twenty-one years, and under the age of forty-five years, excepting persons enlisted into volunteer companies, persons exempted by the following sections, idiots, lunatics, common drunkards, vagabonds, paupers, and persons convicted of any infamous crime, shall be enrolled in the militia; persons so convicted, after enrolment, shall forthwith be dis-enrolled; and in all cases of doubt, respecting the age of a person enrolled, the burden of proof shall be upon him. | An Act For the Organization, Discipline, and Regulation of the Militia of the Commonwealth of Pennsylvania, No. 211, § 1, *in* 1864 PA. LAWS 221, 221-22. |

## STATES REQUIRING PARENTAL CONSENT FOR
## INDIVIDUALS UNDER 21 TO SERVE IN THE MILITIA

| State and Date of Enactment | Relevant Statutory Text | Source |
|---|---|---|
| Michigan (1863) | The active militia shall be composed of volunteers between the ages of eighteen and forty-five years, and shall be known as State troops, and in case of war, rebellion, invasion, the prevention of invasion, the suppression of riots, to aid civil officers in the execution of the laws of this State, shall first be ordered into service. Minors over the age of eighteen years may be admitted into any company of State troops, with the consent, in writing of their parents or guardians, or, if they have none, with the consent, in writing of a justice of the peace of the township or city in which they reside. | An Act for the reorganization of the military forces of the State of Michigan, tit. VII, ch. XVIII, § 6, *in* JAMES S. DEWEY, ED., 1 THE COMPILED LAWS OF THE STATE OF MICHIGAN 317, 320 (1872). |
| Missouri (1835) | No person under the age of twenty-one years, shall hereafter enlist in or join any uniform troop or company, without the consent in writing, of his parent or guardian, master or mistress. | An Act to organise, govern, and discipline the Militia, art. IV, § 22, *in* 2 LAWS OF A PUBLIC AND GENERAL NATURE OF THE STATE OF MISSOURI 512, 521 (1842). |
| New York (1818) | *And be it further enacted*, That no person under the age of twenty-one years, shall hereafter enlist in or join any company of cavalry, artillery or flying artillery, without the consent in writing of his parent or guardian. | An Act to organize the Militia, ch. CCXXII, § XXXIII, 1818 N.Y. LAWS 210, 225. |

# The Federal Gazette

### AND

## PHILADELPHIA DAILY ADVERTISER.

Printed and published by *ANDREW BROWN*, at WASHINGTON's Head, in Chesnut-street, near Front-street, where Subscriptions and Advertisements for this Paper, are gratefully received.

| Volume V.—No. 708. | MONDAY, 10th JANUARY, 1791. | Price 4 Dollars and a Half per ann. |
| --- | --- | --- |

## JOHN VAN REED,

At his Wholesale Store, No. 69, Water near Walnut-streets,
HAS FOR SALE,
A GENERAL ASSORTMENT OF

## GROCERIES,

Which he will sell very low, for cash, or on reasonable credit.

HE begs leave to present his most sincere thanks to those who have already favoured him with their commands, and at the same time to assure them, he will do every thing in his power to merit a continuance of their favors.

Philadelphia, Dec. 23, 1790.
N. B. J. V. REED has some excellent BRANDY, and very old MADEIRA WINE, the former at 8s 4d, latter at 15s per gall. which he means to retail by single gallon, &c.

### For HULL,

THE American Ship SALLY, burthen 200 tons, will sail as soon as the navigation will permit, and return early with Fall Goods. For freight or passage apply to
JAMES CRAWFORD.
January 1st, 1791.   dtf.

# CASH,

And the HIGHEST PRICE given for all Kinds of

# CERTIFICATES

By Samuel Hays, No. 19,

Front-street, six doors below the Post-Office, Where money may be immediately obtained, for good notes, or on a deposit of Certificates.

HE HAS FOR SALE,
A quantity of India Chintzes, Petticoat Patterns, and a few chests of fresh Hyson Tea, which articles will be sold very low.   d.6.m.

## To the PUBLIC.

THE subscriber respectfully informs the public, that he possesses a safe and speedy remedy for the cure of the rheumatism, and as he has been successful in the city of New-York, he offers to undertake the cure of any lady or gentleman afflicted with the above disorder; his terms are NO CURE NO PAY.

He lodges in Second, corner of Race street, at the sign of Franklin.
A. A. VAN OTTINGEN.
Philad. Dec. 10 1790.   d1m.

At No. 10, CHESNUT-STREET, PHILADELPHIA

## W. COULTHARD, & Co.

Are this day opening a very extensive and beautiful ASSORTMENT OF

## MERCHANDIZE,

AMONGST WHICH ARE,

Ocean and elastic cloths of very fashionable stripes and colours.
Superfine, second, and common broad cloths.
Very fine green and blue German serges.
A great variety of calicoes, chintzes, muslins, &c.
Bombazines, mantuas, and lutestrings.
Wildbores, durants, calimancoes, &c. &c.

Which they will sell at their usual low terms for Cash or Credit.

Also a very choice Parcel of

## HAIR SEATINGS,

of various widths and patterns.   d tf.

## WANTED,

A JOURNEYMAN BOOKBINDER. Enquire at No. 43, in Vine street, Philadelphia.   dtf

## SLAY AND HARNESS.

To be Sold, a very neat fashionable SLAY with HARNESS complete. Enquire of the Printer.   dtf.

## WANTED,

Continental & State Certificates,

For which the best current price will be given in CASH, by

## W. Poyntell, & Co.

No. 21, the corner of Black Horse Alley, Second street, South.
Dec. 21, 1790.   eod. tf.

## JOHN SHEPHERD,

### MERCHANT TAYLOR,

*Late of the City of New-York.*

RESPECTFULLY informs the Citizens of Philadelphia, the Honorable the Congress, with their Officers, and all Strangers, that he has commenced Business in this City, in No. 3, Fourth-Street, between Market and Chesnut-Streets, near the Indian Queen, and has on hand the following articles for said business, viz.

CLOTHS,
Superfine           Common
Second             Elastic Stripes.
CASSIMERS,
Buff and White     Fancy Colour.
WAISTCOAT PATTERNS,
Satin Cords         Fancy Cassimere, in Buff
Tambour, in Gold      and White
and Silver         Toilenets & Swandown,

And a variety of others, of different manufacture.
Valentia Cords, of different stripes and colours; Moulton Skin; rich Silk and Satin Florentines; Velvets; Worsted Florentines; bottle-green and olive Thicksets; Baths and common Coatings; Camblet for Cloaks, &c.
A very elegant assortment of FANCY BUTTONS, Plated and Gilt ditto, Imperial, Gold and Silver ditto.
Silk Hose, patent, black and white; Cotton ditto.

To mention the different colours of cloths, would be too tedious for a newspaper publication—suffice it to say, that he has nearly two hundred different colours—in Superfines only. His assortment far the above business, he presumes, without exaggeration, is the first in America. These, together with his known abilities in the above line of his business, and his attention to serve and oblige his customers, will, he flatters himself, recommend him to the patronage of a candid public—as well as his known attachment to the liberties and independence of this country—having taken an active and early part in the year 1775, and held an inconsiderable office of trust in the Continental army; and conscious of its just rights and liberties, did cheerfully venture himself with his fellow citizens for their support, and now exults with them in the happy privileges (under Gon) they now enjoy.
*Philadelphia, 10th November, 1790.*   d tf.

## For HULL,

### THE NEW AMERICAN SHIP

# HANNAH,

BURTHEN about 300 Tons. She is now completely fitted, and ready to take in her Cargo, intended to sail with all convenient expedition, and to return direct from Hull to this Port early next Fall, having good Accommodation for Passengers. For Freight, or Passage, apply to *Thomas, Samuel and Miers Fisher*, or *Thomas Penrose*.
12 mo. 30, 1790.   cd6d—2awtf.

## Lodgings Wanted,

CONSISTING of two or three rooms genteely furnished, with or without board; a situation between Second and Fourth-streets, or between Spruce and Chesnut-streets inclusive, would be preferred. Apply to the printer.
January 3, 1791.   d6t

## FRENCH SCHOOL,

THE Subscribers, Teachers of the French Language, in Videll's Alley, in Second, near Chesnut-street, in order to accommodate their employers (the hours of attendance during the winter) will be as follows:
For a class of young gentlemen from 8 to 9 o'clock, A. M.
For the young ladies from 10 to 12 o'clock, A. M.
The EVENING SCHOOL from 6 to 8, and for a class not exceeding six gentlemen from 8 to 9.
For Private Tuition, and particulars, apply to
BARTHELEMY & MANNIERCK.   e. tf

## Chestertown & Baltimore STAGES.

Philad. July 8, 1790.
THE Proprietors of the new line of Eastern Shore Stages, by way of Chestertown to Baltimore, start regularly from James Thompson's, at the Indian Queen in Fourth street, Philadelphia, every Monday, Wednesday, and Friday morning, precisely at 8 o'clock; and on the same mornings from Mr. Starck's, in Baltimore, as four o'clock.—
The high cultivation of the country and the goodness of the road together with the attention that shall be paid by the Proprietors with it is hoped, be a sufficient inducement for a preference being given to this rout.
JAMES THOMPSON,
ROBERT HODGSON,
G. P. VANHORN.
N. B. Light waggons for hire, by James Thompson, at the Indian Queen.   emtf

## AT THE CHEAP PRINTED
Calico & Muslin Ware-House,
No 91, Front-street, opposite Norris-Alley.
### Richard and James Potter,

Are rapidly disposing of their fall importation by the Pigou, Marquis de la Fayette, and Apollo, and wish their customers that have before purchased goods of them to be informed the articles consist of—

PRINTED calicoes,        Cordefores, &c. &c.&c.
Irish linens,            Cottonades,
Stuffs of all sorts,     Bandanoes,
Laces and edgings,       Ounce threads,
Ribbons,                 Shawls, printed, worked &
Modes,                     camels hair
Satin florentines,       Cotton hose,
Lutestrings,             Fashionable waistcoats,
Velverets,               Elastic cloths & coatings, &c.

### AND MUSLINS, viz.

4-4, 5-4, & 6-4, Jaconets,     stitched muslins,
1-4, 5-4, 6-4, and 7-4        Terrindams,
books                         Chundconoees
Two yards pullicats           Seerhandconoees,
Cossaes,                      Humhums,
Allibalties,                  Book hankfts
Nainsooks,                    Decca hankfs
Canjeviarns,                  Barcelona hankfs:
Tanjebs,                      Fashionable cravats,
Elegant tambour and satin     Check & strip'd dorees
 They have likewise a consignment of
Mens fashionable hats         Hardware
Ready made cloths,            Gloves and mitts,
N. B. Three other Ships are daily expected, viz. the John, Goliah, and Flora, which will hand them many, other cheap and Fashionable Goods.   4d.

## CERTIFICATES,

PAPER Money, and all Kind of Public Securities bought and Sold, and the highest Prices given, by

### Benj. Nones, Broker.

No. 13, North Front,
7 doors from the corner of Market street.   dtf

## FOR SALE BY
Willing, Morris & Swanwick,
IN FRONT-STREET,
Madeira, Lisbon,
AND
TENERIFFE WINE,
of good Quality, in large or Small Casks.   d. t. f.

## Burill & Edward Carnes,

Have for Sale in their

## Paper Hanging Manufactory,
No. 71,

Second street between Chesnut & Walnut streets.
A GREAT variety of Papers, with rich festoon and common borders, some of which are in the most modern taste.

As BURRILL and EDWARD CARNES intend to carry on the said Manufactory on the most extensive plan, they are determined to sell at a lower price than can be imported; and it will be their constant endeavour to introduce the newest patterns. The taste of any person may be gratified, by giving a short notice.

Orders for any quantity will be thankfully received and executed with punctuality and dispatch, and the usual allowance made to those who purchase to sell again.

Their Papers having stood the test of examination by good judges, and being acknowledged to be fully equal to any imported, they hope to meet with encouragement from a liberal Public, and especially from the Friends to American manufactures.

To prevent mistakes, they have thought it necessary to inform the public, that their papers are marked BURRILL & EDWARD CARNES, and are at present sold in this city at their MANUFACTORY only.
Sept. 1.   dtf.

## LIBRARY.

NOTICE is hereby given, that the delivery of BOOKs from the new apartment belonging to the *Library Company of Philadelphia*, will commence to-morrow; and that, in future, the Library will be opened every day (Sundays excepted) from one o'clock, P. M. until sun set.
By Order of the Directors
ZACHARIAH POULSON, jun. Librarian.
Dec. 31, 1790.

## HOUSE OF REPRESENTATIVES.

### DEBATES OF FRIDAY, Dec. 24.

[Concluded from our last.]

*( Militia Bill, under Confideration.)*

Mr. Lawrence obferved, that, as gentlemen feem-
ed to difagree in their acceptations of the word "mi-
litia," it would be proper to afcertain the precife
meaning, in which it was to be underftood in the
conftitution. If this were once done, the conclufi-
ons, drawn by the Houfe, would, perhaps be dif-
ferent from what they had been. Though the word,
in its general acceptation, conveyed to him the idea
of a certain portion of the people formed into a body
by the ftate legiflatures, and defignated for particular
fervices ; yet the other acceptation, which includes
in the expreffion every man in the ftates who is capa-
ble of performing military duty, though not actually
enrolled in any particular body, appeared to him pre-
ferable. The former definition of the militia, he
could not on this occafion, think the true and proper
one : for at that time, when the conftitution was
framed, fome ftates were as yet unprovided with mi-
litia laws. If the power of the houfe extended to
fuch defcriptions of men, as were defined to be mi-
litia under the fecond conftruction he had mentioned,
then the militia muft mean all perfons without excep-
tion, who are capable of bearing arms in defence of
their country : and the Congrefs have power to felect
particular claffes of men from the people at large, to
form them into particular bodies, and to appoint par-
ticular fervices for each body. They may for inftance,
felect all thofe between the ages of 18 and 45, for the
purpofe of training and difciplining, and declare
that all others capable of bearing arms, whatever
their age may be, fhall take the field in cafe of actual
invafion. If the proper idea be, that all the citizens
who are capable of rendering perfonal fervice, are
included in the general term "militia"—and if to "or-
ganize" that militia, be to form it into particular bo-
dies for particular ufes, it is the duty of Congrefs to
confider what meafures, in this refpect, will be pro-
ductive of the greateft public benefit. If the felecti-
on of proper men will beft contribute to this end,
Congrefs have a right to felect. The only queftion,
that can arife, is, whether it be expedient to grant
any exemptions. Now we have declared, that all
exemptions, made by the ftate legiflatures, fhall be
confidered as made by us, fince by this law we give
them the fanction of this houfe, and we alfo give them
the power of making what further exemptions they
may deem expedient. In many of the ftates, the
exemptions now contended for are already made,
and more accurately defined, than in the amendment
under confideration. There are certain defcriptions
of men, who ought to be exempted. It would be
highly improper to force into the fervice fuch perfons
as are confcientioufly fcrupulous of bearing arms ; and
befides it would not promote the general advantage.
It would therefore be proper to exempt fuch perfons :
but the exemption ought to be made as precife as-
poffible. Such precifion is obfervable in the con-
ftitution of the ftate of New York, which expreffly
exempts the Quakers. But we fay, that the ftates
may exact an equivalent for this exemption. We
find no difficulty in this bufinefs. It is eafy to afcer-
tain the particular fociety, and the number of perfons
to be exempted ; in which cafe no impofition can
be practifed. But the exception before us goes far-
ther ; and fays, that all men, who are confcientioufly
fcrupulous of bearing arms, fhall be exempt from
military duty. This opens a door for fraud and im-
pofition ; and leaves it in every man's power to a-
void the fervice, by fimply declaring that it is repug-
nant to his confcience : and there is no penalty a-
gainft the man who fhall make fuch a declaration
falfely. Though I agree to the principle of the a-
mendment, yet as it is not expreffed in words fuffi-
ciently precife, I muft oppofe it. If any gentleman
brings forward an amendment, which fhall properly
defignate the clafs of men, who are to be exempted,
it fhall have my hearty concurrence. We undoubtedly
poffefs the power neceffary for this purpofe : and it
is much better, that we fhould be precife in this bu-
finefs, than leave the power unfixed. Rather than fee
the bill pafs in its prefent ftate, I would confent that
there fhould be no militia on the continent, except
fuch as before exifted in the feveral ftates.

Mr. Madifon admitted that his propofition might
not be defignated with the moft defirable accuracy ;
but he conceived its imperfection might be overlook-
ed, if it was confidered, that the whole bill was in-
tended to be given to a felect committee for arrange-
ment and correction. But if the teft was not fatisfac-
torily defignated, he thought it might have been ex-
pected of the candor and ability of the gentleman,
that he would have amended it, rather than have
made it a reafon for voting againft a propofition, the
principle of which was approved. I do not know,
continued he, what better criterion can be fuggefted :
fome criterion muft, however, be had. If we do not
take the declaration of the party, we muft, perhaps,
depend upon a certificate from fby religious fociety of
which he is a member, or other voucher to fatisfy the
magiftrate with refpect to the fcruples of confcience.
Now, I will fubmit it to the gentleman, whether we
can confine our exemption to this or that particular
fect ; or whether, becaufe a man happened to be dif-
fevered from a meeting of the Quakers, he ought not
to be equally excufed if he had really the fame fcru-
ple. If this would be improper, than our criterion

muft apply to individuals, and not to focieties. If it
fhould be found by experience, that the operation of
texts, as had been confidered, the legiflature will
always be at hand to redrefs the evil. We do not
prefume to confider our regulations as perfect : if we
get as near that defirable point as is practicable, at pre-
fent, we ought not to defpair of approximating more
and more, as experience fhall point out.

With refpect to the alliance which the gentleman
from New-Hampfhire pleafes himfelf in having for-
med with my colleague, I cannot but obferve, that
if he is right in his principles, his ally muft be
wrong. Yet his ally has inconteftably fhewn, that
the power of defignating the militia refides abfolute-
ly in the United States. Whether the probable ob-
ject of the convention be confidered, when they
propofed to take away the power of regulating the
militia from the ftate governments, and to place it in
the hands of the federal government : or whether
we examine the nature and conftruction of the term
itfelf, we cannot but be convinced, that the authori-
ty was intended to be given us for the eftablifhment
of an effective militia—a militia that hitherto was
not fo effectually eftablifhed as to cenfure a fufficient
defence againft foreign invaders ; or efficient enough
to deftroy the neceffity of a ftanding national force ;
or in cafe of fuch a force being raifed, and turned
againft the liberties of our fellow-citizens, adequate
to repel the hoftile attacks of mad ambition. Let
us not, by a falfe conftruction, admit a doctrine fub-
verfive of the great end which the conftitution aim-
ed to fecure, namely, perfection to the union, the
means of infuring domeftic tranquillity, and provi-
ding for the common defence.

If then it belongs to the general government, to
provide for the eftablifhment of a militia, it fhould
be done by us in the beft manner poffible. Now,
whether that may be by making the exemption in
the manner propofed, by exempting and laying an
equivalent or fine, is the queftion. Inftead of de-
nominating it a punifhment, for a crime, let it be
the effect of compaffion, to an unfortunate, not a vi-
cious clafs of the fociety. When this is adone, and
the mode of appropriation and collection both made
convenient, there will be no apprehenfion of oppreff-
fion, or caufe of complaint.

Mr. Clymer propofed to amend Mr. Madifon's
motion, by making it read, " that any perfon in
known memberfhip with a religious community, pro-
feffing to be confcientioufly fcrupulous of bearing
arms, or any perfon making a declaration, that he is
fo confcientioufly fcrupulous, fhall be exempted from
being enrolled in the militia."

Mr. Boudinot approved of the alteration propofed
by the gentleman laft up, and was of opinion, that
the Quakers and all others who were exempted,
ought to pay an equivalent for the exemption, not a
fine for a breach of the law. He thought it proper
to fubject them to fuch an alternative.

Mr. Stone. I prefume, Mr. Speaker, that it is
needlefs to enquire, whether the principle of felf-
defence by arms, is proper to be exercifed in any go-
vernment ; becaufe it is clear, that it is a governing
principle in ours ; it was the fole principle upon
which we feparated from Great-Britain : it was the
principle upon which we conducted the late war ;
and a principle not only received by the ftate govern-
ments, but by the continental government likewife.
If it be wrong principle, all the calamities which
the war brought upon us, were improperly incured,
and all the benefits we have received, were received
unjuftly. In fhort, if the principle of felf-defence
by force of arms is not a juft one, the whole govern-
ment and independence of this country originates in
outrage and violence. But if it is a right principle,
every regulation which tends to its deftruction, is
contrary to the very foundation of the government.
It is in a political fenfe, a crime to deny that doc-
trine on which our national exiftence refts. If there
are fects or communities among us, who hold that
arbitrary governments, which infringe, or attempt to
fubvert the liberties of the fubject, ought to be refift-
ed. They hold principles deftructive of all the go-
vernments in America. If it be true, that fuch are
the principles of our government, it is the duty of
every citizen who has joined the government, to fup-
port the fame. If it be a political debt due from
every individual, it is a crime to withhold that due
from the community. If to fupport and defend the
United States, is a duty impofed upon each citizen—
and any regulation becomes neceffary to give efficacy
to individual exertion. It is right and proper, that
fuch regulation fhould operate equally upon one part
as well as another. Hence I infer, that every man
who has joined our government, is bound to the per-
formance of militia duty.

If a diftinction fhould take place, it muft be on
this ground, that the principle of felf defence was
not properly inferted in our government. And that
a part of the community are not bound by the moft
fubftantial and effective principle upon which we
ftand. But to what may this be extended ? It may
be drawn out, fo as to loofen the bond of fociety,
for every man may make an affertion that will dif-
charge him from contributing towards the public de-
fence. We lay it down as a legiflative principle,
that the belief of certain tenets, diffolves fo much of
the cement of the government, as thereby to fepa-
rate the interefts and connexion of the parts ; it is
allowing principles in direct oppofition to the prin-
ciples under which we act. Therefore, my opinion
is, that you cannot make diftinctions, which admit-
ted, will deftroy the government.

The gentleman from New-Jerfey, admitted among
his remarks, that all citizens ought to be on an equal
footing. I think this principle to clear in a republi-

can government, that Congrefs ought not on any oc-
cafion to depart from it ; and fhall I then declare
that, from religious opinions, one man muft do bear-
then as another ? Will Congrefs venture to fay, any
people fhall be excluded ? Then I fay, every diftinc-
tion may be made on the fame principle. And fome
fect of religion may become the prevailing fect of
America—and every privilege of an eftablifhed
church, may be conferred equally as an exemption
from the burthen of the militia duty—at leaft, this is
the light in which it appears to me.

I have faid that it is a political crime for a citizen
not to defend his country in time of danger : being
fuch, I would punifh it accordingly ; but in confi-
deration of the particular fituation of a part of the
community, I would deal as gently with them as poff-
ible. But no man has a right to fay, he will not
bear arms, inafmuch as it would be the fame thing
as faying, that this government is formed, and the
revolution was conducted, on erroneous principles.
I cannot agree, that the fine propofed fhall be con-
fidered in the nature of a tax. There is no principle
in the conftitution, that can juftify a tax laid in fuch
a mode. In what manner are the United States au-
thorized to collect taxes ? Congrefs may levy and
collect taxes, duties impofts and excifes : but the
three latter muft be general and uniform throughout
the United States ; but all direct or perfonal taxes,
muft be according to the enumeration of inhabitants
in each ftate, as directed in the conftitution. Now
what kind of a tax is this ? Is it impoft, is it excife, or
pertaining to either ? It belongs to neither of thofe
claffes. Can gentlemen fhew ? If they can, I call up-
on them to fhew that fuch a tax can be other than a
direct tax ? and upon what conftitutional ground
will they pretend to lay fuch a tax ? Surely, no one
will contend, that it will operate on each ftate accord-
ing to the number of inhabitants. In Pennfylvania,
a tax on exempted Quakers would bring in a con-
fiderable revenue ; in South Carolina and Georgia, it
would amount to nothing, or at moft to a mere trifle.
In fhort, it appears to me, that it would be exceed-
ingly improper to allow a principle fo hoftile to the
government, as either the right of exemption from
bearing arms, or of laying a tax as a compenfation.
But why do gentlemen ftickle for a tax inftead of a
fine ? Is there any difference as to thofe who pay ?
There is none in policy. If a difference exifts, it is
merely that one mode is more polite than the other.

Mr. Scott conceived, that it was not one of the
leaft confpicuous glories of the American revolution,
that all religions were put on a level. He entertain-
ed hopes, that Congrefs would have legiflated, with-
out once taking religion into the queftion ; religion
ought not to be the fubject of legiflative difcuffion,
unlefs fome fect fhould arife, whofe tenets were inimi-
cal to the peace of the community. By conftitu-
tion, the avenues to pofts of honour and profit, and
to the confidence of government, were equally open
to all religious denominations : he conceived, there-
fore, that every man owes equal duties to the com-
munity. He did not, however, think it neceffary,
that every man fhould difcharge that debt in the fame
manner. The nature of our government will admit
of various modes of performing that duty : and he
hoped the houfe could enfure that performance, with-
out hurting the religious principles of any fociety.—
No man, added he, can tell, whether the religion,
which I profefs, be right or wrong : nor can I decide
with refpect to any other man's religion. Under the
influence of fuch an opinion, he difliked the propo-
fition on the table, and could never give it his affent.
He wifhed that all mankind profeffed the religious
tenets,which were the fubject of the prefent debate :
if fuch a revolution could take place in the minds of
men, the world would be much the better for it.
Were all men confcientioufly fcrupulous of fhedding
human blood, univerfal happinefs would be the con-
fequence of fuch fcruples. But he feared he fhould
not live to fee the happy day, therefore was difpofed
to take the world as it went, and provide againft
hoftile attempts. He had heard it often declared as
the opinion of America, that the natural defence of
this country was its yeomanry, its farmers, mechanics
merchants and manufacturers. If this affertion was
well founded, he had no doubt, after exempting all
that were defirous of being exempted, whether from
religioufor other motives, the militia would be a
formidable body.

But he wifhed to afcertain the truth of fuch de-
claration—and while he did this, he would manage
his bufinefs in fome other way, to avoid altercation
about religious fcruples. He propofed as an amend-
ment, that it fhould be enacted, that every perfon
fhould fend in his name to be enrolled in the militia
within a certain time, or pay an annual fine in cafe
he chofe to decline entering himfelf in that fervice.

Mr. Bourne was of opinion, that the claufe would
not bring about what the mover feemed to wifh,
namely, the relief of the perfons who were the object
of it : but on the contrary, would fubject them to an
unfual burthen—at leaft, this would be the cafe of
thofe who refided in New Hampfhire, Maffachufets,
Rhode Ifland and Connecticut, for the laws of all
thofe ftates exempted Quakers from militia duty on con-
ditions purely gratuitous. Now as it would not be-
nefit the memorialifts—and there was no abfolute ne-
ceffity for Congrefs to go into further exemptions, he
fhould vote againft the claufe.

Mr. Williamfon faid, there were two points of
light in which the queftion might be viewed. The
firft was to confider the militia of the refpected ftates,
and this was the point in which he had accuftomed
himfelf to view it : in this cafe, Congrefs had nothing
to do with fuch exemptions, the motion intend at-
The fecond was to view the militia as the national bo-
dy, and then if conditions are made to exemptions

Case 5:10-cv-00140... Document 48-4 Filed 04/06/11 Page 9 of 28 PageID.916

and a tax... it accordingly passed... If military duty is called a poll tax, and a man must pay in time or money, you must regulate it by the enumeration, and not confine it to this or to that religious society. For these reasons he should vote against the clause: but if after all it should succeed, he hoped they would then regulate it according to that principle fixed in the constitution.

The question was now taken on Mr. Clymer's amendment to Mr. Madison's motion, and being lost, 20 to 27.

The question on Mr. Madison's motion, was then divided on request of Mr. Benson, who wished to try whether the exemption should be made gratuitous. On the first part being put, it passed in the negative, 10 to 39. So the whole motion was lost of course.

The rest of the bill was gone through; and it was recommitted.

## Domestic Occurrences.

### NEW-YORK, January 6.

The sales of stocks have been very dull for several days, which renders it difficult to affix prices—the following however, we presume, are right:—

6 per cent. stock,  17/.
3 per cent do.  8/9d.
Deferred 6 per cent.  8/9d.

We congratulate our citizens on the prospect of a January thaw, which will doubtless open the wood sluices, and render that article tolerably cheap in a few days.

The Convention, between Great-Britain and Spain, said to be signed at Madrid on the 27th of last October, brings to recollection what passed between those two Courts in the year 1739, at the commencement of which Preliminaries of a Convention were signed; and, the difference, then subsisting being but scarcely discussed by a Congress, the interests of Great-Britain were supposed to be betrayed, and that whole nation was thrown into a ferment—petitions against the Convention were sent from all the principal trading towns, and the universal outcry was, "A Free Sea, or a War !"—the latter of which was, on the 19th day of October, in the same year the Convention was signed, formally declared by Great-Britain, under the auspices of Sir Robert Walpole, then premier, who had previously sent Admiral Vernon to attack the town of Porto Bello, in the Spanish West-Indies, which he took on the 22d of November, 1739 ; Admiral Haddock had also, in October, taken two Caracca ships, with two million of dollars: from which proceedings we are not suddenly to credit a prospect of a permanent peace between those two powers, founded on the aforesaid Convention of the 27th of October; but the proceedings of the British Parliament, to which the question of peace and war is now referred by Mr. Pitt and the Cabinet Council, will afford us more light into the mystery. In the mean time, unremitting preparations are continued by the British, in order to attack the Spanish nation in parts most susceptible of impression.

Arrived Sloop New-York Packet, Curwin, Norfolk ; Brig Catharine, Bull, St. Petersburgh.

### PHILADELPHIA, JANUARY 10.

*Extract from the Speech of Governor Clinton, to the Senate and Assembly of New-York, on the 6th inst.*

The promotion of manufactures is at all times highly worthy the attention of government ; but under the present system of our national affairs, obvious and cogent reasons exist for affording our's such encouragement, as to place them in as thriving and respectable a condition as those of our sister states. Essays have lately been made to manufacture sugar from the juice of the maple tree, attended with success hitherto unknown. Our extensive forests abound with trees of that species, and the season of this business will admit of attention to it without essentially interfering with ordinary pursuits : considering therefore these favourable circumstances, and our large expenditures for that article in foreign countries ; it is submitted to the legislature, whether a degree of public encouragement might not be advantageously extended to that object.

Wood has been lately sold in the city of New-York, at the rate of nine pounds a cord ! flour, we are sorry to hear, is at present very scarce in that city, owing, it is said, to the obstruction of the navigation of the Hudson.

*Philadelphia, January 8, 1791.*

The committee of fourteen, and the gentlemen appointed to solicit contributions for the benevolent purpose of relieving our distressed fellow citizens, having met this evening at the Court house,

Robert Annan in the chair.

*Resolved*—That the following gentlemen be added to those already appointed in collecting for this charity.

Middle Ward—J. Jones, Wm. Richards.
Northern Liberties—John Norris.
High Street—Joseph Fisher.
Dock Ward—Josiah Matlock.
New-Market Ward—John M'Cullough, Jesse Williams, Samuel Paincoalt jun.

Adjourned to meet again at the Old Court House, on Wednesday evening at 6 o'clock.

---

it is accordingly punished... A final list of such... persons appointed as Candidates, to be voted for by the electors of New-Jersey, as Representatives in the Congress of the United States, that have been returned to me by the respective clerk's of the several counties in this state ; and which, according to the directions of an act of the legislature, in that behalf lately made and provided, I am to cause to be published in certain newspapers therein mentioned.

Col. John Bayard
John Beaty
John Benson
Joseph Bloomfield
Elias Boudinot
James Cadwallader
Lambert Cadwallader
Archibald Campbell
Abraham Clark
Franklin Davenport
Jonathon Dayton
Samuel Dick
George L. Dooremus
Jeremiah Eldredge
Joseph Ellis
Ebenezer Elmer
*Jonathan Elmer
*Frederic Frelinghuysen
John Harring
Dr. Thomas Henderson
Cornelius Hennion
Robert Hooper
Robert L. Hooper
Robert Hoops
Dr. Ebenezer Howell
Richard Howell
Joseph Hugg
William Eugene Imlay
Aaron Kitchel
Dr. Henry Land
Garret Leydecker
James Linn.
Bateman Lloyd
Abraham Ogden
Robert Ogden
James Parker
Abraham Ryerson
James Schureman
Adonijah Schuyler
Samuel Sharp
John Shepherd
Thomas Sinnickfon
Job Smith, fen.
*Samuel W. Stockton
Dr. John Witherspoon

*Given under my hand, at New-Brunswick, the first day of January, in the year of our Lord one thousand seven hundred and ninety-one.*

Wм. PATERSON.

The names are alphabetically arranged—Those marked thus*, decline to serve.

---

### COMMONWEALTH OF PENNSYLVANIA.

#### AN ACT,

*To declare and establish the Seals of this Commonwealth.*

*Section First.* WHEREAS the late convention of this commonwealth did on the second day of September last establish a new form of government for Pennsylvania, and no provision is therein made for public seals.

*Section Second.* Be it therefore enacted by the Senate and House of Representatives of the commonwealth of Pennsylvania, in General Assembly met, and it is hereby enacted by the authority of the same, That from and after the passing of this act, the seal heretofore known by the name of the state-seal, lately in the custody of the supreme executive council, is hereby constituted the state-seal and shall be affixed to all patents, proclamations and other public writs, commissions and papers of state, which require the great-seal of the commonwealth, and to which the same has heretofore been usually applied.

*Section Third.* And be it further enacted by the authority aforesaid, That the seal lately in the custody of the supreme executive council called the lesser-seal shall be henceforth deemed and taken and shall be applied as the less-seal of this commonwealth and as such fixt to land-office-warrants, marriage licences, licences to keep public houses, and such other documents as have heretofore been issued under the lesser-seal.

*Section Fourth.* And be it further enacted by the authority aforesaid, That the said seals respectively shall be and the same are hereby declared to be the great and less seals of this commonwealth and shall be affixed accordingly under the direction of the Governor.

WILLIAM BINGHAM, Speaker of the House of Representatives.

RICHARD PETERS, Speaker of the Senate.

Approved, January eighth, one thousand seven hundred and ninety one.

THOMAS MIFFLIN, Governor of the Commonwealth of Pennsylvania.

---

## On Monday the 24th inst.

At half past 10 o'clock

AT THE

## Northern Liberty Auction Store,

The corner of Third and Vine streets,

WILL BE SOLD BY PUBLIC VENDUE,

TWO Lots of ground in Kensington, on the north side of Queen-street, 40 feet wide, and 135 feet deep ; on which is erected a two story brick house, 16 feet front and 18 feet deep, with a two story frame kitchen, 15 feet by 11.

*Also,* a two story frame house, 16 feet front, and 13 feet deep, with a large commodious shade at the front, and another in the rear : a good bake oven, with a well of water before the door. They will be sold together, or separate, as may suit the purchasers. The terms of payment and further particulars will be made known at the time and place of sale by

JOHN CHALONER, Auctioneer.
di 24th.

---

## A WET NURSE,

WANTS a place, she is a married woman, of good character.

Apply to the Printer hereof.
Jan. 10th 1791.  d3t.

---

### HOUSE OF REPRESENTATIVES.

*MINUTES of the business this FORENOON.*

Mr. Heister presented the petition of attorney to Nicholas Hagenrupler, a soldier in the late Pennsylvania line, praying compensation for services. which was read, and referred to the secretary at war.

Mr. Boudinot presented the petition of Lawrence Tallman, late lieutenant in the Continental army, praying to be allowed the depreciation of his pay, which was read and referred to the secretary at war.

On motion the house resolved itself into a committee of the whole house, to take into further consideration, the bill directing the mode in which the evidences of the debt of the United States, which have been, or may be lost or destroyed, shall be renewed.

Mr. Boudinot in the chair.

The bill being gone through, on motion the committee rose, and the chairman reported that the committee had according to order, had the said bill under consideration, had gone through the same, and made sundry amendments, which he reported ; and the said amendments being read and considered were agreed to by the House ; and on motion the said bill was referred to a select committee to prepare and bring in a bill, conformable to the resolutions agreed to by the House.

On motion the House again resolved itself into a committee of the whole, to take into consideration the bill declaring the officer, who in case of death, removal, or inability both of the President and Vice President shall exercise the office of President of the United States.

Mr. Boudinot took the chair of the committee.

After some time spent in debate, a motion was made for the committee's rising, which passed in the negative, a motion was afterwards made for the committee rising which was carried in the affirmative.

The committee of enrolled bills reported that they had examined the bill to continue an act, in amendment to an act, entitled an act declaring the assent of Congress to certain acts of the states of Rhode-Island, Maryland, and Georgia, so far as the same respects Rhode-Island and Georgia, and found the same duly enrolled ; whereupon the Speaker signed the same. And the committee afterwards reported that they had delivered the said bill to the President of the United States.

A message was received from the President of the United States notifying, that he has approved and signed the act above mentioned.

Mr. Williamson moved that a committee be appointed to prepare and bring in a bill, to prevent invalid pensioner of the United States from selling or disposing of their pensions before they become due, and a committee of three was appointed to prepare and bring in the same, the members chosen, Mr. Williamson, Mr. Boorn, and Mr. Griffin.

Mr. Fitzsimons presented the petition of the inspectors of the revenue, for the port of Philadelphia, praying an additional compensation for their services, which was read.

Mr. Ames, made the following motion, that a committee be appointed to consider and report whether any and what further compensation is necessary to be made to the commissioners of loans which was ordered to lie on the table.

Adjourned.

---

☞ THE list of Letters remaining in the Post-Office of this city, shall be published to-morrow.

---

## To Morrow Morning,

At Nine o'Clock—At the

## Old City Auction Store,

WILL BE SOLD BY PUBLIC VENDUE,

A Large and General Assortment of

## MERCHANDISE,

CONSISTING OF

Cottons
Calicoes
Chintzes
Irish linens
Sheetings
Corduroys
Velverets
Thicksets
Lastings
Lawns
Kentings
Cambricks
Shawls
Hosiery
Flannels
Blankets
Cloths
Coatings
Halfthicks
Blue nankins
Durants
Callimancoes
Tammies
Muslins
Muslin handkfs
Linen do
India bandanos
Hardware &c. &c.

And Precisely at 11 o'clock

Will positively be struck off to the highest Bidder,

(being the property of a person deceased)

20 dozen men and boys hats
50 pieces double purple and chocolate calicoes, warranted fast colours
2.5 pieces durants
20 do. camblets
12 dozen mens worsted hose
7 do. womens worsted gloves
10 pieces Yorkshire plains
6 pieces broad cloths
6 do. superfine do.
30 dozen printed linen handkerchiefs
Jan. 10.  JOHN PATTON, Auctioneer.

---

## WANTED,

AN APPRENTICE in a WHOLESALE STORE. Enquire of the Printer.
nuary 8, 1791.  d

---

## Claret of excellent quality,

In cases of 3 doz. each, to be sold at No. 109, Front street south, by

PALYART and Co.
eutf

# THE

# DEBATES AND PROCEEDINGS

IN THE

# CONGRESS OF THE UNITED STATES;

WITH

# AN APPENDIX,

CONTAINING

## IMPORTANT STATE PAPERS AND PUBLIC DOCUMENTS,

AND ALL

## THE LAWS OF A PUBLIC NATURE;

WITH A COPIOUS INDEX.

VOLUME II,

COMPRISING (WITH VOLUME I) THE PERIOD FROM MARCH 3, 1789,
TO MARCH 3, 1791, INCLUSIVE.

COMPILED FROM AUTHENTIC MATERIALS,

BY JOSEPH GALES, Senior.

WASHINGTON:

PRINTED AND PUBLISHED BY GALES AND SEATON.

1834.

and how near the longitude can be thereby ascertained, may now be determined.

*Ordered,* That the said petitions do lie on the table.

Mr. JACKSON, from the committee appointed for the purpose, presented a bill to continue an act for declaring the assent of Congress to certain acts of the States of Maryland, Georgia, and Rhode Island.

### MILITIA.

The House resolved itself into a Committee of the whole on the bill to establish a uniform militia throughout the United States, Mr. LIVERMORE in the chair.

The committee made some progress in the discussion of the bill. Several amendments and alterations were proposed, and some of them adopted.

Mr. PARKER observed, the clause which enacts that every man in the United States shall "provide himself" with military accoutrements would be found impracticable, as it must be well known that there are many persons who are so poor that it is impossible they should comply with the law. He conceived, therefore, that provision should be made for arming such persons at the expense of the United States. He then gave notice that, in the course of the discussion of the bill, he should move an amendment to this purpose.

Mr. GILMAN observed, that obliging persons to turn out in the militia till they were fifty years of age, agreeable to the bill, would be found unnecessary and inconvenient, and is contrary to the practice of the several States; few, if any, requiring militia duties to be performed after the age of forty-five. He moved therefore, that fifty be struck out, and forty-five inserted.

Mr. VINING objected to the motion. He observed, that a great proportion of our citizens, especially those at the Eastward and Northward, were as capable of military services at fifty as at any period. Many in the ranks of the late Continental army, were, he believed, fifty and upwards, who were as good soldiers as any in the service. He thought the alteration unnecessary.

Mr. GILMAN replied, that he conceived the general practice of the States, which was found on experience to be the best, was a sufficient answer to the gentleman last speaking, and would sanction the adoption of the amendment he proposed.

Mr. LAWRENCE said, that by the laws of the State of New York, persons above forty-five years of age are not enrolled to do duty in the militia; and he thought that fifty was a period too late in life to be subject to military hardships, if it could be avoided.

Mr. WILLIAMSON was in favor of the motion. Though he had seen men in the field who were advanced in life, it had not been without pain. He thought from sixteen to eighteen too early a period. Many at that tender age fell sacrifices to sickness and fatigue.

Mr. GILMAN's motion being put, was carried in the affirmative.

Mr. FITZSIMONS suggested to the consideration of the committee, whether it would be the most eligible mode to subject all the citizens from eighteen to forty-five years of age, without exception, to turn out as soldiers. A much smaller number would, in his opinion, answer all the purposes of a militia. He thought the active militia might be comprised within a much smaller number, to be proportioned to the citizens of each State. The militia law of Pennsylvania had been of this general complexion, and had never compensated in its operation for the uneasiness it had excited, and the tax and grievance it had been to the people.

Mr. BOUDINOT said, that the idea now suggested was debated in the committee; and they could not agree upon any other mode than that proposed in the bill. He very much disapproved the idea of making a soldier of every man between eighteen and forty-five years of age—there is a manifest impropriety in the measure; and he wished some gentleman would propose an alteration.

Mr. LAWRENCE said, that the idea of the gentleman from Pennsylvania struck at the principle of the bill; but as the hint may not be unworthy of consideration, he proposed that he should form a motion, and reduce it to writing.

Mr. FITZSIMONS apologized for engrossing the time of the committee, especially as he had not prepared an amendment to that part of the bill to which he objected, not having contemplated the subject sufficiently; but on perusing the bill, it had been forcibly impressed on his mind, that subjecting the whole body of the people to be drawn out four or five times a year was a great and unnecessary tax on the community; that it could not conduce either to the acquisition of military knowledge, or the advancement of morals. As far as the whole body of the people are necessary to the general defence, they ought to be armed; but the law ought not to require more than is necessary; for that would be a just cause of complaint.

Mr. WADSWORTH said, that it appeared to him the gentleman's objections went only to that part of the bill which points out the number of days to be devoted to training the militia; as he had conceded that all from eighteen to forty-five ought to be armed.

Mr. JACKSON said, that he was of opinion that the people of America would never consent to be deprived of the privilege of carrying arms. Though it may prove burthensome to some individuals to be obliged to arm themselves, yet it would not be so considered when the advantages were justly estimated. Original institutions of this nature are highly important. The Swiss Cantons owed their emancipation to their militia establishment. The English cities rendered themselves formidable to the Barons, by putting arms into the hands of their militia; and when the militia united with the Barons, they extorted *Magna Charta* from King John. I n

France, we recently see the same salutary effects from arming the militia. In England, the militia has of late been neglected—the consequence is a standing army. In Ireland, we have seen the good effects of arming the militia, in the noble efforts they have made to emancipate their country. If we neglect the militia, a standing army must be introduced; but if the idea suggested by the gentleman from Pennsylvania is adopted, certain classes must be drawn out, and kept for months together, which would prove as great a burthen as a standing army. None of the States, he observed, have adopted such a plan. In Georgia, the militia service has been as strict as is contemplated by the bill, but they have never complained. In a Republic every man ought to be a soldier, and prepared to resist tyranny and usurpation, as well as invasion, and to prevent the greatest of all evils—a standing army. Mankind have been divided into three classes, Shepherds, Husbandmen, and Artificers—of which the last make the worst militia; but as the arts and sciences are the sources of great wealth to the community, which may excite the jealousy and avarice of neighbors, this class ought to be peculiarly qualified to defend themselves and repel invasions; and as this country is rising fast in manufactures, the arts and sciences, and from her fertile soil may expect great affluence, she ought to be able to protect that and her liberties from within herself.

Mr. Parker here introduced his motion, to amend the bill by a proviso, that persons who shall make it appear that they are not able to equip themselves, shall be furnished at the expense of the United States.

Mr. Wadsworth objected to this amendment. He said, it would empower the officers to create an enormous charge against the United States. He said, he had read almost all the militia laws of the several States, and had found no such provision in one of them; there is not a considerable number of such persons in any of the States; and rather than have this proviso inserted, he would prefer a clause to excuse them altogether.

Mr. Parker said, that in Virginia there is a law, which provides that poor persons, not able to arm themselves, should be equipped at the expense of the State. In every State there are doubtless many such persons, who ought to be provided for by the General Government; and if they are not, the law is rendered impracticable; as you require more than is possible for them to perform. As to excusing such poor persons from military duty, they would be found in cases of emergency, very useful to defend those, who do not choose to risk their own persons.

Mr. Huntington said, if the gentleman would vary his motion, so that the expense should be incurred by the State, he did not know but he should agree to it. There is one State, said he, in which every person is obliged to provide himself with arms and accoutre-

ments—and no difficulty has resulted from the law. Penalties on default are exacted and collected; but this proposition will produce great inequalities; it will excite jealousies and discord between the Governments—but if left to the States, the officers will be more exact to prevent impositions on the particular State from which they receive their appointments.

Mr. Parker agreed to alter his motion agreeable to Mr. Huntington's idea.

Mr. Boudinot said, that there did not appear to be any necessity for the amendment, as the bill makes provision for excepting persons who are unable to purchase arms, in case the State Legislatures choose to make such exceptions.

Mr. Giles said, he was opposed to the motion on principle; but if that was not the case he should object to it in its present form as it was not full enough. He did not suppose that it was intended that the United States should make a present of the arms thus furnished—but the motion does not provide for their return, when not in use. His principal objection to the motion, however, arose from its being an improper interference with the authority of the State Governments. They may, or may not comply with the law. If they should not, it would prove nugatory—and render the authority of the United States contemptible. For these reasons, and others which had been advanced, he thought the amendment improper.

Mr. Bloodworth observed, that as the militia was to be organized and disciplined under the authority of the United States, and to be employed for the general defence, whenever and wherever Congress should direct, it appeared but reasonable that those who were benefited by them should be at the expense of arming them.

Mr. Sherman said, it appeared to him, that by the Constitution, the United States were to be put to no expense about the militia, except when called into actual service. The clause is not so explicit as might have been wished; but it will be difficult to fix the construction mentioned by the gentleman from North Carolina. What relates to arming and disciplining means nothing more than a general regulation in respect to the arms and accoutrements. There are so few freemen in the United States who are not able to provide themselves with arms and accoutrements, that any provision on the part of the United States is unnecessary and improper. He had no doubt that the people, if left to themselves, would provide such arms as are necessary, without inconvenience or complaint; but if they are furnished by the United States, the public arsenals would soon be exhausted—and experience shows, that public property of this kind, from the careless manner in which many persons use it, is soon lost. The expense and inconvenience would, in his opinion, far overbalance any good that would be derived from such a proposition.

Mr. Vining observed, that the greatest objec-

tion against the motion is, that it stops short in the regulation of the business. No provision, it is said, is made for the return of the arms to the public; and it gives a discretionary power to the officers to dispose of the property of the United States; but he conceived these difficulties were not beyond the reach of remedies; the wisdom of the House, he doubted not, would devise such as were adequate to the object. He asked by what means minors were to provide themselves with the requisite articles? Many of them are apprentices. If you put arms into their hands, they will make good soldiers; but how are they to procure them? It is said, if they are supplied by the United States the property will be lost; if this is provided against, every objection may be obviated. He then offered an addition to the motion, providing for the return of the arms to the commanding officer.

The Chairman then stated the motion with the amendment.

Mr. Tucker observed, that the motion in its present form differed from the original proposed by the gentleman from Virginia. He conceived the gentleman had no right to alter it, nor could it be done without a vote of the committee. He preferred the motion in its original state—for the United States may, without doubt, furnish the arms—but he very much questioned their right to call on the individual States to do it.

Mr. Williamson was in favor of the question's being taken with the amendment admitted by Mr. Parker. He wished to know whether Congress meant to tax the individual States in this unusual manner. Perhaps as they had assumed the State debts upon this principle, or rather without any principle, they might think they had a right to call upon them to furnish quotas in proportion, this would be getting something for something; and not like the other measure, losing something for nothing.

Mr. Vining said, he could not understand what was meant by saying that the amendment was dictating to the States. What is the whole bill but dictating; a law that affects every individual, touches the whole community. With respect to the constitutionality of the measure, there can be no doubt; every grant of power to Congress necessarily implies a conveyance of every incidental power requisite to carry the grant into effect.

Mr. Wadsworth apologized for detaining the attention of the committee a moment, while he asked the gentlemen who favored the motion what was the extent of their wishes? The motion at first appeared to be in favor of poor men, who are unable to purchase a firelock; but now it seems, minors and apprentices are to be provided for. Is there a man in this House who would wish to see so large a proportion of the community, perhaps one-third, armed by the United States, and liable to be disarmed by them? Nothing would tend more to excite suspicion, and rouse a jealousy dangerous to the

Union. With respect to apprentices, every man knew that they were liable to this tax, and they were taken under the idea of being provided for by their masters; as to minors, their parents or guardians would prefer furnishing them with arms themselves, to depending on the United States when they knew they were liable to having them reclaimed.

The question on Mr. Parker's motion was lost.

On motion of Mr. Heister, a proviso was added to the section in the following words:

"That every citizen so enrolled, and providing himself with the arms and accoutrements required as aforesaid, shall hold the same exempt from all executions, or suits for debt, or for the payment of taxes."

Mr. Fitzsimons moved to strike out the words "provide himself," and insert "shall be provided."

This motion was objected to by Messrs. Boudinot, Huntington, Jackson, Partridge, Vining, and Madison. It was said that it would be destructive of the bill, as it would leave it optional with the States, or individuals, whether the militia should be armed or not.

This motion was lost by a great majority. The second section comprises the characters that are to be exempted from enrolment or militia duty.

Mr. Madison moved to strike out that part which related to members of Congress, their officers and servants, attending either House—and to insert "members of the Senate and House of Representatives whilst travelling to, attending at, or returning from the sessions of Congress." He saw no reason for a total exemption from militia service; exceptions in favor of the framers of laws ought not to be extended beyond what is evidently necessary. The members of Congress, during the recess, are at liberty to pursue their ordinary avocations, and may participate in the duties and exercises of their fellow-citizens. They ought to bear a part in the burdens they lay on others, which may check an abuse of the powers with which they are vested.

Mr. Jackson observed, that this alteration might interfere with the public interest; in cases of alarm or invasion, the members might be called to a great distance in the militia at the moment when their presence was required to attend the session of the Legislature. It would be well therefore to consider whether their services in the militia would be of equal importance to the public interest, as their services in Congress.

Mr. Boudinot objected to the amendment; not that he would exempt members of Congress from burdens imposed on their fellow-citizens; but the motion he conceived was inconsistent with this very idea. The bill provides that exempts shall pay a certain equivalent; it would be unjust to impose this equivalent, and compel the members of Congress to turn out in the

Mr. Stone withdrew his motion.

Mr. Bloodworth moved that the rank of brigadier should be given to them.—Agreed.

Mr. Benson moved for an additional clause to the bill, for granting to the President of the United States the power of calling out the militia into the service of the United States, &c. to repel invasions or suppress insurrections.

Mr. Sherman observed that the proposed clause was not explicit enough. The General Government, by the Constitution, had not the power of calling out the militia to suppress insurrections in the States without the special request of the States.

Mr. Bloodworth hoped the additional section would not be adopted, it would be a dangerous provision.

Mr. Benson agreed to withdraw his motion for the present, to bring it before the House when the principles of the bill came to be discussed by them.

The committee, having gone through the bill, rose, and reported the same, with sundry amendments, which were laid on the table.

PUBLIC DEBT.

The Speaker laid before the House a report from the commissioners appointed for the purpose, of the amount of the purchases which had been made of the public debt, which was ordered to lie on the table. The amount purchased was $278,687, for which the sum of $159,239 in specie had been paid.

WEDNESDAY, December 22.

ENROLLED BILLS.

A joint committee was appointed for the examination of enrolled bills, consisting of Mr. Foster, of the Senate, and Messrs. Floyd and P. Muhlenberg, of the House.

MILITIA.

The House took up the report of the Committee of the whole of yesterday on the bill for establishing a uniform militia. The amendments being read,

Mr. Boudinot moved, that the persons of the militia should be exempt from civil process on the days of rendezvous.

Mr. Livermore opposed the motion. He conceived it was an unconstitutional interference with the internal police of the individual States. The States have an exclusive right, said he, to regulate the times of training the militia; and Congress has no right to say that the citizens shall or shall not be liable to a legal arrest on such occasions.

Mr. Boudinot admitted, that there was some weight in Mr. Livermore's objections; but, at the same time, observed, that the principle once admitted that Congress has a power to discipline the militia, every incidental power to carry that idea into effect must follow. He should, however, reserve himself to offer some further remarks on the subject.

The question being taken, it passed in the affirmative. The amendment, as thus amended, was put and carried.

Mr. Bloodworth proposed an amendment to the second section, by which all persons exempted by the laws of the respective States should also be exempted by this law. This was objected to by several members.

Mr. Livermore said, it was so general; that it opened the door to an almost universal exemption; it likewise involved an uncertainty with respect to the present and future laws of the several States, which ought not, in his opinion, to be admitted.

Mr. Bloodworth said, he moved the amendment, because he was fully persuaded that the United States had nothing to do with the exemptions heretofore usually made by the particular States. It is proper for Congress only to exempt their own particular officers; but he considered the bill of a very important nature, one that will undergo the strictest scrutiny, and may either be made very agreeable to the States, or very much the reverse. He adverted to the Constitution, and said that the powers of Congress only extend to the mere arrangement of the militia; but, in its present form, it is a Government bill, and goes to the minutiæ of the regulations in the militia.

Mr. Giles objected to the motion. He considered the section, as it stood without the amendment, useless, and therefore the amendment is unnecessary; for if the States possess the power of making the exemptions in themselves they cannot be deprived of it. He was consequently against the present motion, and should move to obliterate the whole, so far as it interferes with the power of the particular States.

Mr. Sherman was opposed to the particular interference of the General Government any further than they are expressly warranted by the Constitution. The powers of Congress, he contended, were very much limited in respect to the militia. He moved a more general modification of the section; by which the officers of the General Government, such as the members of Congress, the Executive officers, post-officers, postmasters, and mail-carriers should be designated, and all other persons that are, or shall be, exempted by the laws of the several States.

Mr. Bloodworth acceded to this modification.

Mr. Giles objected to the proposition as amended, as blending and confusing the powers of the General Government with those of the particular States. He objected to it as it went to extend the privileges of the members of Congress, whose privileges are defined in the Constitution. He objected to it also as it violates the principle which had before been laid down, that the lawmakers ought to sympathize with those on whom the laws are designed to operate, and pursuing the idea, said Congress may go on to exempt themselves from every public duty.

Mr. Williamson, adverting to the Constitution said, that it was plain Congress are to provide for arming and disciplining the militia;

but who are the militia? Such men, he presumed, as are declared so to be by the laws of the particular States, and on this principle he was led to suppose that the militia ought to consist of the whole body of citizens without exception. If this construction be just, the propriety of the motion is apparent. He did not anticipate an abuse of the power of exemption on the part of the States; he thought the period far distant when the United States would trust their defence to mercenaries. He objected to the numerous exemptions proposed to be made by the General Government, and observed that he feared great impositions and evasions would be practised in consequence of them; the power will be exercised by the States, and ought not to be by Congress.

Mr. BURKE said, no man was more in favor of an efficient and competent militia than he was; but the various exemptions contended for are so many that he conceived the consequences would be subversive of the whole plan. Observations had been thrown out which he was sorry to hear, that except these exemptions took place, the bill would be lost. He then mentioned the several classes proposed to be exempted, by which the whole country would, in effect, be divided into two tribes; and the rich, the governors and rulers of the land would be relieved from the burthen, while the mechanics, the farmers, the laborers, the hard-working part of the community would be made to sustain the whole weight of the service in defending the country. He was opposed to exempting members of Congress; in the recess they may attend militia duty. It was agreeable to the practice of South Carolina; he had himself performed militia duty during the recess. He thought that all should equally be made to turn out in the ranks, high and low, rich and poor, old and young, and thus make the militia honorable. I know, said he, it is the policy of the day to make the militia odious; but I hope such policy will not be adopted by this House. He was not, however, opposed to all exemptions; he would exempt the people called Quakers, and all persons religiously scrupulous of bearing arms, stage-drivers, and instructors of youth; but their pupils, the students in colleges and seminaries of learning, should not be exempt; youth is the proper time to acquire military knowledge. He hoped that the House would not make two distinct tribes or classes of people. There ought to be no such distinctions in a free country.

Mr. JACKSON said, he was sorry that his honorable friend was so determined to have two tribes of people; but he set out with that resolution, and now concludes with the same idea. He then adverted to the exemption of Quakers, provided for in the bill. He said, that the operation of this privilege would be to make the whole community turn Quakers; and in this way it would establish the religion of that denomination more effectually than any positive law could any persuasion whatever. He en-

larged on the obligations which every man owes to society to afford his personal services to assist and defend the community; protection and service are reciprocal. Those who are exempted ought to pay a full equivalent on every principle of justice and equity. He then adverted to exemptions generally, and advocated those of the members of Congress; but, with respect to all others, he was absolutely opposed to them; and said they were so numerous as to destroy the militia bill altogether. The consequence would be, we must resort to a standing force for the general defence.

Mr. VINING was opposed to giving the general power of making such exemptions as they please to the several States. The Legislature of the Union is competent to making such as are necessary. He enlarged on the mischievous consequences of delegating this power. It will, said he, destroy every appearance of uniformity; nor is there any danger that the members of the House will abuse this power by undue exemptions. With respect to the Quakers, he replied to some observations of Mr. JACKSON, who had asked, what will become of our boasted independence in case of the exemption of the Quakers? He asked, were there no Quakers in the late war? He adverted to the conduct of the first settlers of Pennsylvania, who were Quakers; their peaceful principles were productive of the happiest consequences; and in this view their conduct had been an example, which, in proportion as mankind shall recede from the force of turbulent passions, will be more and more imitated. He, however, supposed that an equivalent might be assessed on these people without difficulty, and which, from their numbers, supposed to be one-twentieth part of the people, would amount to a sum sufficient to support a militia; at least, to furnish them with arms, drums, colors, &c.

Mr. LAWRENCE observed, that it appeared to him that the object of the motion is to revive a subject which has already been decided in the committee; he had not, however, altered his opinion, he still thought it would be impolitic, if not dangerous, to delegate a power which they can exercise themselves.

He adverted to the observations of Mr. GILES, that Congress cannot extend their privileges; and observed that the clause in the Constitution refers to the privileges of being exempt from arrest, that they might not be precluded from attending their duty in Congress; with respect to its being an extension of their privileges to provide for their exemption, there cannot be any force in this, as it is conceded that Congress may designate the age of the militia; now if their ages are restricted from eighteen to forty-five, it effectually exempts many of the members of Congress; but this exemption from arrest is not the only privilege that members of Congress possess; and he had no doubt of their right in the present case to exempt themselves; the expediency of the measure is sanctioned by the practice of every State in the Union.

Mr. BOUDINOT asked what is the object of the bill? It is to provide an uniform militia, competent to the defence of the country; it is not to take money out of the pockets of the people. He then adverted to the idea that was maintained by several gentlemen, that the militia ought to consist of every person in the United States, and said that this, so far from conducing to the formation of a national defence; would prove the reverse; for it would necessarily include persons religiously scrupulous of bearing arms, men in years not able to bear them, and a great variety of characters not suitable to bear them.

With respect to exemptions, he contended, that the right of Congress to make them is already conceded; for it is already agreed that the militia shall consist of persons of particular ages, consequently all under eighteen and above forty-five are expressly exempted; the reverse of this principle will give the States the absolute control of the General Government. He then observed, that the amendment ought not to be adopted; because it would be throwing a burthen on others which Congress ought to bear themselves; because it will destroy every idea of uniformity; because it invests a power in the States to impose fines and penalties which may operate oppressively on many descriptions of persons; because it invests the States with a power to make partial exemptions, create invidious distinctions, and excite unwarrantable competitions among different classes and professions. He then adverted to the Quakers, and asked, what would become of our independence, if one thousand troops were to attack us, and we had an army of ten thousand Quakers to oppose them; what dependence can be had on men who are forced into the field? He had trusted that the rights of men were so well defined at this enlightened period, that the principles which had been advanced would not have been applied on this occasion. He entered into a defence of the exemptions generally provided for, and justified them on principles of justice and policy. He was sorry that the distinctions mentioned by the gentleman from South Carolina had been brought forward. He had no idea of different tribes or classes. The members of this House at the end of every two years revert to the mass of the people, and then become liable to bear their proportion of militia duty as well as their fellow-citizens.

Mr. MADISON moved to insert among the exemptions, persons conscientiously scrupulous of bearing arms. It is the glory of our country, said he, that a more sacred regard to the rights of mankind is preserved than has heretofore been known. The Quakers merit some attention on this delicate point, liberty of conscience. When they had it in their power to establish their religion by law they did not. He was disposed to make the exemption gratuitous, but supposed it impracticable. He replied to Mr. JACKSON's observations, that exempting such persons would induce the people generally to

turn Quakers. He did not believe that the citizens of the United States would hypocritically renounce their principles, their conscience, and their God, for the sake of enjoying the exemption.

Mr. SHERMAN seconded this motion. He said that persons conscientiously scrupulous of bearing arms could not be compelled to do it; for such persons will rather suffer death than commit moral evil; they may be punished, it is true, by fines and penalties, but whether this would be eligible or not remains to be determined. We, however, have the sense of these people on the subject. He suggested whether some expedient cannot be devised to operate as an indemnity, by excusing part of the militia from a poll tax, so as to equalize the exemption, if made gratuitous.

Mr. LIVERMORE said he disliked the whole amendment. He also disliked the bill on several accounts, more particularly as it interfered too much with the regulations of the several States. The present proposition, he thought, would come in more properly in the second section.

Mr. JACKSON said, he was glad that the motion of the gentleman from Virginia had been brought forward; it might serve to ascertain the sentiment of the House on this important subject. He observed that, in his opinion, the gentleman had not argued with his usual ingenuity and knowledge of the human heart, in respect to the exemptions proposed in favor of the Quakers. It is too evident that mankind stand in greater dread of present evil than of future punishment. The influence of conscience is a weak defence against the powerful temptations of pecuniary advantages; and as he had been informed since he came to this city that one Quaker will convert ten men to Quakerism before ten of a different persuasion will convert one Quaker. With the assistance of this law the converts will be ten times as numerous. He conceived that the natural operation of it would be to destroy the whole militia bill. He insisted on their being liable to a penalty in lieu of personal service, and enlarged on the reasonableness of paying their proportion to the general defence. He replied to Mr. BOUDINOT's query respecting ten thousand Quakers; they would all run away, said he, and one thousand men in this case would subjugate the country.

Mr. GILES observed, that he was opposed to the exemption of the Quakers, and gave his reasons; protection and personal services result from society; they are due from every individual, and it is a violation of moral duty to withhold this personal service. He was in favor of exempting every man from doing that which his general conduct evinced was contrary to his conscience; but it cannot be said that it is against the conscience of a Quaker to hold and possess property; therefore every man who receives the protection of the laws ought to contribute his proportion to the

**EARLY NEW JERSEY AND VIRGINIA MILITIA LAWS**

| State and Date of Enactment | Relevant Statutory Text | Source |
|---|---|---|
| New Jersey (1778) | 3.  And Be It Enacted *by the Authority aforesaid*, That the Colonel or Commanding Officer of each Regiment of Militia in this State shall, immediately after the Passing and Publication of this Act, issue Orders to the Captain or Commanding Officer of each Company in his Regiment, directing him to call a Meeting of the commissioned Officers of such Company, and with their Assistance to make out full, particular, and exact Lifts or Returns of all Male Free Inhabitants of twenty-one Years old and upwards, to which shall be separately subjoined the Names of the Owners or Possessors of such Estates as have not Male Representatives of that Age. . . . And Provided Also, That the Enrolments or Returns so made shall extend to the Purposes of this Act only.  And Provided Also, That nothing herein contained shall be construed to prevent employing Officers, and enlisting non-commissioned Officers and Privates between the Age of sixteen and twenty-one Years.<br><br>4.  And Be It Further Enacted, That the Lists or Returns so made out shall be signed and authenticated . . . and the said Captain or  Commanding Officer of the Company shall, without Delay, transmit the same to the Colonel or Commanding Officer of the Regiment, and the Field Officers of each Regiment shall meet at the usual Place of holding the annual Election in the County to which they belong, on the fifteenth Day of *June* Instant, and then and there shall compute the whole Number of Persons borne upon the Lifts or Returns of all the Male Free inhabitants of twenty-one Years old and upwards within the Bounds of the respective Companies in the County, and in Proportion to such Number shall divide the Quota of Officers and Men,  . . . . | An Act to embody, for a limited Time, One Thousand of the Militia of this State, for the Defence of the Frontiers thereof, ch. XXIV, §§ 3-4 *in* 1778 N.J. ACTS (3D SESS., 2D SITTING) 58, 59-60. |

| Virginia (1705) | *Be it enacted*. . . That from and after the publication of this act, the colonel or chief officer of the militia of every county have full power and authority to list all male persons whatsoever, from sixteen to sixty years of age within his respective county, to serve in horse or foot, as in his discretion he shall see cause and think reasonable, having regard to the ability of each person, he appoints to serve in the horse, and to order and place them and every of them under the command of such captain in the respective countys of their abode, as he shall think fitt. | An act for settling the Militia, ch. XXIV, *in* 3 WILLIAM WALLER HENING, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 335, 335-36 (1823). |
|---|---|---|
| Virginia (1723) | II. *Be it therefore enacted*, . . . That from and after the publication of this act, the colonel, or chief officer of the militia of every county, have full power and authority to list all free male persons whatsoever, from twenty-one to sixty years of age, within his respective county, to serve in horse or foot; having regard to the ability of each person, and to order and place them under the command of such captain as he shall think fit. | An Act for the settling and better Regulation of the Militia, ch. II, § II, *in* 4 HENING 118, 118 (1820). |
| Virginia (1738) | II. *Be it therefore enacted*, . . . That from and after the publication of this act, the colonel, or chief officer of the militia, in every county, shall list all free male persons, above the age of one and twenty years, within this colony, under the command of such captains as he shall think fit. | An Act, for the better Regulation of the Militia, ch. II, § II, *in* 5 HENING 16, 16 (1819). |

| | | |
|---|---|---|
| Virginia (1754) | I.  Whereas his majesty has been pleased to send instructions to his Lieutenant Governor of this colony, to raise and levy soldiers for carrying on the present expedition against the French on the Ohio; . . . <br><br> II.  *Be it therefore enacted*, . . . That it shall and may be lawful to and for the justices of the peace of every county and corporation within this county, or any two or more of them, within their several and respective counties and corporations, upon application made to them, by any officer or officers appointed or impowered to enlist men, to raise and levy such able bodied men, as do not follow or exercise any lawful calling or employment, or have not some other lawful and sufficient support and maintenance, to serve his majesty, as soldiers in the present expedition; . . . . <br><br> III.  *Provided always*, That nothing in this act contained shall extend to the taking or levying any person to serve as a soldier, who hath any vote in the election of a Burgess or Burgesses to serve in the General Assembly of this colony, or who is, or shall be an indented or bought servant, or any person under the age of twenty one years, or above the age of fifty years. | An Act for raising levies and recruits to serve in the present expedition against the French, on the Ohio, ch. II, §§ I-III, *in* 6 HENING 438, 438-39 (1819). |
| Virginia (1755) | II.  *Be it therefore enacted*. . . That from, and after the passing of this act, all county lieutenants, colonels, lieutenant colonels, and other inferior officers, bearing any commission in the militia of this colony, shall be an inhabitant of, and resident in the county of which he is, or shall be commissioned to be an officer of the militia. <br><br> III.  *And be it further enacted*, . . . That the lieutenant, or in his absence, the chief officers of the militia in every county shall list all male persons, above the age of eighteen years, and under the age of sixty years, within this colony, (imported servants excepted) under the command of such captain, as he shall think fit, within two months after the passing of this act. | An Act for the better regulating and training the Militia, ch. II, §§ II-III, *in* 6 HENING 530, 530-31 (1819). |

| | | |
|---|---|---|
| Virginia (1775) | *And be it further ordained*, That within the district containing the counties of Accomack and Northampton there shall be forthwith raised one regiment, consisting of six hundred and eighty men, from the ages of sixteen to fifty, to be divided into ten companies. . . .<br><br>*And be it further ordained*, That within each of the other districts there shall be immediately enlisted one battalion, consisting of five hundred men rank and file, from the age of sixteen to fifty, to be divided into ten companies of fifty men each, . . . | An ordinance for raising and embodying a sufficient force, for the defence and protection of this colony, ch. I, *in* 9 HENING 9, 16-17 (1821). |
| Virginia (1784) | II. *Be it enacted*, That all free male persons between the ages of eighteen and fifty years, except the members of the council of state, members of the American congress, judges of the superior courts, speakers of the two houses of assembly, treasurer, attorney general, auditors and their clerks, solicitor general and his clerks, clerks of the council of state and treasury, register of the land-office, his deputy and clerks, custom-house officers, all inspectors of tobacco, all professors, tutors, and students at the university of William and Mary, and other public seminaries of learning, all ministers of the gospel, licensed to preach according to the rules of their sect, who shall have previously taken, before the court of their county, an oath of fidelity to the commonwealth, post-masters, keepers of the public gaol and public hospital, millers, persons concerned at iron or lead works, or persons solely employed in repairing or manufacturing fire arms, all of whom are exempted from the obligations of this act, shall be enrolled or formed into companies. . . . | An act for amending the several laws for regulating and disciplining the militia, and guarding against invasions and insurrections, ch. XXVII, § II, *in* 11 HENING 476, 476-77 (1823). |

**STATES REQUIRING PARENTS TO FURNISH**
**MINORS ENROLLED IN THE MILITIA WITH ARMS**

| State and Date of Enactment | Relevant Statutory Text | Source |
|---|---|---|
| Maine (1821) | Sec. 34. *Be it further enacted*, That all parents, masters or guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively, with the arms, and equipments, required by this Act; and if any parent, master, or guardian, having any minor under his care, enrolled as aforesaid, shall neglect to provide such minor with the arms and equipments, required by this Act; or if said minor shall absent himself from any meeting of the company, to which he belongs, required by law, without sufficient excuse, the said parent, master or guardian is hereby subjected and made liable to the same forfeitures as such minor would be liable to, for a like deficiency, neglect or non-appearance, if such minor were of age; and all persons liable by this Act to military duty, shall be allowed six months immediately from and after their arrival at the age of eighteen years, and not afterwards, within which to furnish themselves with the arms and equipments required by law: *Provided however*, That such parents, masters, or guardians as shall produce, on or before the first Tuesday of May annually, certificates from the Overseers of the poor of the town or district in which they reside, of their inability to provide arms and equipments as aforesaid, to the Commanding officer of the company in which the minor under their care is enrolled, shall be exempted from the forfeitures aforesaid. | An Act to organize, govern, and discipline the Militia of this State, ch. CLXIV, § 34, *in* 1821 ME. LAWS 687, 716. |

| Massachusetts (1810) | Sec. 28. *Be it further enacted*, That all parents, masters or guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively with the arms and equipments, required by this act; and if any parent, master, or guardian, having any minor under his care, enrolled as aforesaid, shall neglect to provide such minor with the arms and equipments, required by this act, he is hereby subjected and made liable to the same forfeitures, as such minor would be liable to, for a like deficiency or neglect, if such minor were of age: *Provided however*, That such parents, masters, or guardians as shall produce, on or before the first Tuesday of May, annually, certificates from the overseers of the poor of the town or district in which they reside, of their inability to provide arms and equipments as aforesaid, to the commanding officer of the company in which the minor under their care is enrolled, shall be exempted from the forfeitures aforesaid. | An Act for regulating, governing, and training the Militia of this Commonwealth, ch. CVII, § 28, *in* 1810 MASS. LAWS 151, 176. |
| --- | --- | --- |
| Missouri (1825) | Sec. 24. *Be it further enacted*, That every officer, non-commissioned officer and private, of infantry, light infantry, cavalry, artillery, grenadiers and riflemen, shall constantly keep himself furnished and provided with arms and equipments as required by the laws of the United States; and every officer, non-commissioned officer and private of light artillery shall be armed and equipped in the same manner as the officers, non-commissioned officers and privates of cavalry, respectively, and shall constantly keep himself furnished and provided with a horse, arms and equipments, as required by the laws of the United States of the officers, non-commissioned officers and privates of cavalry; and each company of light artillery shall do duty as cavalry until proper ordnance or field artillery is provided. And all parents, masters and guardians, shall furnish all minors, enrolled in the militia, who shall be under their care, respectively, with the arms and equipments required by this act. | An Act to organize, govern and discipline the Militia, ch. I, § 24, *in* 1825 MO. LAWS 533, 554. |

| | | |
|---|---|---|
| New Hampshire (1820) | Sect. 46. *And be it further enacted*, That all parents, masters, and guardians shall furnish all minors enrolled in the militia, who shall be under their care respectively, with the arms and equipments required by this act; and if any parent, master or guardian, having any minor under his care enrolled as aforesaid, shall neglect to provide such minor with the arms and equipments required as aforesaid, he is hereby subjected and made liable to the same forfeitures as such minor would be liable to for a like deficiency or neglect, if such minor were of age: *Provided however*, that such parents, masters or guardians, as shall produce on or before the first Tuesday of May annually, certificates from the overseers of the poor of the town or district in which they reside, of their inability to provide arms and equipments as aforesaid to the commanding officer of the company in which they minor under their care is enrolled, shall be exempted from the forfeitures aforesaid. | An Act for the forming, arranging and regulating the militia, *in* 2 NEW HAMPSHIRE LAWS ENACTED SINCE JUNE 1, 1815  51, 80 (1824). |
| North Carolina (1806) | Every citizen enrolled and notified, as is directed in this chapter, shall, within six months thereafter, provide himself with a good musket, smooth-bored gun or good rifle, shot-pouch and powder-horn, and shall appear so armed and accoutred when called out to exercise or in actual service; the commissioned officers shall severally be armed with a sword, or hanger, or an espontoon; and every citizen so enrolled and providing himself with arms and accoutrements as herein directed, shall hold the same exempt from all suits, executions or sales for debts, or for the payment of taxes; and if he shall fail to provide himself with arms and accouterments, as herein directed, and if the commissioned officers of his company shall deem him in sufficient circumstances to equip himself he shall forfeit and pay for the want of a good, serviceable musket, gun or rifle fifty cents.  And all parents and masters shall furnish those of the militia, who shall be under their care or command, with the arms and equipments above mentioned, under the like penalty for each neglect. | 2 WILLIAM T. DORTCH, JOHN MANNING, JOHN S. HENDERSON, THE CODE OF NORTH CAROLINA § 3168, at 346-47 (1883). |

| Vermont (1797) | Sect. 15 - That every non-commissioned officer or private of the infantry, who shall neglect to keep himself armed and equipped, as aforesaid, or who shall on a muster day, or at any other time of examination, be destitute of, or appear unprovided with, the arms and equipments here in directed (excepting as before excepted;) shall pay a fine, not exceeding *seventeen cents* for a gun, and *eight cents* for every other article, in which he shall be deficient: at the discretion of the court, before whom trial shall be had.  And all parents, masters or guardians, shall furnish those of the said militia who shall be under their care and command, with the arms and equipments above mentioned, under the like penalties for any neglect.  And when the selectmen of any town shall judge any inhabitant thereof belonging to the militia, unable to arm and equip himself, in manner aforesaid; they shall, at the expense of the town, provide for and furnish such inhabitant with the aforesaid arms, and equipments: which shall remain the property of the town, at the expense of which they shall be provided. | An Act, for regulating and governing the militia of this State, ch. LXXXI, No. 1, § 15, *in* 2 LAWS OF THE STATE OF VERMONT DIGESTED AND COMPILED 122, 131-32 (1808). |

# FEDERAL FIREARMS ACT

*1852-1*

# HEARINGS

### BEFORE THE

## SUBCOMMITTEE TO INVESTIGATE
## JUVENILE DELINQUENCY

#### OF THE

## COMMITTEE ON THE JUDICIARY
## UNITED STATES SENATE

### NINETIETH CONGRESS

#### FIRST SESSION

##### PURSUANT TO

### S. Res. 35

#### NINETIETH CONGRESS

###### ON

### S. 1

A BILL TO AMEND THE FEDERAL FIREARMS ACT

#### Amendment 90 to S. 1

A BILL TO AMEND THE FEDERAL FIREARMS ACT

### S. 1853

A BILL TO AMEND THE FEDERAL FIREARMS ACT

### S. 1854

A BILL TO AMEND THE NATIONAL FIREARMS ACT

JULY 10, 11, 12, 13, 19, 20, 25, 28, AND 31; AND AUGUST 1, 1967

Printed for the use of the Committee on the Judiciary

®

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1967

82-646

Now we are back into a situation where we are considering not only that measure but S. 1 and other measures, on which as I mentioned earlier, we have had considerable testimony.

I might mention, if it isn't a violation of our meeting rules, that already this year I moved the Senator from Nebraska's bill out at a previous full Judiciary Committee meeting, and I was reminded at that time that this was an improper motion, that this subcommittee ought to have a chance to consider the legislation. Also I was reminded by the Senator from Nebraska that he hadn't placed his new bill in this year.

But I am always ready to move if need be the Senator from Nebraska's bill at any time. Hopefully we will be able, as I have mentioned previously, to report out S. 1, Amendment 90 which I strongly support, but as a last resort, the full committee might have to report the measure of the Senator from Nebraska so at least the Senate itself will have a chance to consider it.

Senator HRUSKA. So the record here will be complete, the Senator from Massachusetts well knows, and I know he would recite the fact if it occurred to him, the reason for my not introducing a bill sooner. Hearings were in progress in the House. Some of the gentlemen sitting here were testifying. Other witnesses were testifying.

It was thought well to allow those hearings to continue to a point where we could ascertain whether there would be any further need for modifying the bill in any way that I ultimately introduced. So it wasn't a dilatory tactic. It didn't hold us up one bit, and that I recite by way of having a full and complete record here so that there would not be any ground for suggesting maybe the Senator from Nebraska was dilatory.

Chairman DODD. Well, do you think that we can get on with the hearing?

Senator Hart, you might wish to say something.

Senator HART. Yes; I was tempted to. I think our problem is over these many months some of us have dug ourselves into positions. Politicians aren't supposed to admit that ever happens but it does. I take it that these hearings may provide an opportunity for all of us to test our own conception of these things.

Chairman DODD. Thank you very much.

Our first witness this morning is the Honorable Joseph W. Barr, accompanied by the Honorable Sheldon S. Cohen. Mr. Barr is the Under Secretary of the Treasury. Mr. Cohen is the U.S. Commissioner of Internal Revenue.

I take it that you both want to appear together.

## STATEMENT OF JOSEPH W. BARR, UNDER SECRETARY OF THE TREASURY, ACCOMPANIED BY SHELDON S. COHEN, COMMISSIONER OF INTERNAL REVENUE

Mr. BARR. Yes, sir, Mr. Chairman.

Chairman DODD. I don't think either of these gentlemen need any introduction to the subcommittee. Mr. Barr was a former Member of Congress, Assistant to the Secretary of the Treasury, Chairman of the Federal Deposit Insurance Corporation, and has been Under Secretary of the Treasury since 1965.

Mr. Cohen. No, sir; I don't believe——

Senator Hruska. To sustain your ruling.

Mr. Cohen. No, sir. I believe we would have the normal procedure. The potential licensee would have the burden of proving that he is entitled to the license. Should he establish prima facie that he is, we would have then the burden of overcoming that. This is the normal rule in a court proceeding.

Senator Hruska. Very well.

Chairman Dodd. I am trying to get on the record the criticisms that were made of this legislation, Mr. Commissioner, and Secretary Barr. It has been commonly said the trouble with S. 1, amendment No. 90 is that it doesn't punish the criminal use of the firearm, but rather places unjustified restrictions on the law-abiding citizen.

Mr. Cohen. That is a common statement. I have discussed this with people with long experience in penology, criminology. Severe punishment is not enough to deter crime. We must take preventive action, and the preventive action that we are trying to take here is the preventing of firearms, of these very destructive devices, falling into the hands of people that the local jurisdictions decide are not capable of handling them.

A juvenile, a 16-year-old, doesn't worry about a potential 5-year or 10-year criminal sentence. He really doesn't have the wherewithal to take that all into account. He should not have the weapon in the first place. We won't have to worry about whether we sentence him to 5 or 10 years.

Chairman Dodd. It has been said over and over again, too, that the cost of administering and enforcing this law, if it is adopted with its additional controls, would be exorbitant. I think that the critics have even said that it would be prohibitive.

Mr. Cohen. I have consulted very carefully with the Director of our Alcohol and Tobacco Tax Division, Mr. Serr, and he says that the administration of the present Act is so inefficient because of the cumbersomeness of the act that he believes that he could enforce the Act, S. 1, Amendment No. 90, with about the same manpower he has today.

He certainly said at least for the first year he would like to try, without any increase in manpower, except that we would temporarily assign several of his people who are now assigned to other duties in the original licensing, since the original licensing would be a one-time operation, rather than go out and hire temporary people.

We would make a temporary reassignment of some of our other investigative people to that function, but that the ongoing function, once the original investigation process is over, would require about the same number of men, about a thousand frontline investigators, putting about the same number of hours into this activity.

Chairman Dodd. Perhaps the most frequent criticism, certainly within the last 2 years, was that this bill, if it is adopted into law, would be a violation of the second amendment to the Constitution. I know that was touched on here in Secretary Barr's testimony. This is the last question I have, and I would like to get both of you, Mr. Commissioner, and the Secretary to speak on this.

Mr. Cohen. The Secretary has covered that.

Chairman Dodd. It is important to get this on the record. I get a lot of mail on this.

Mr. COHEN. The former Attorney General, Mr. Katzenbach, submitted a memorandum, I understand, from the present Attorney General, Mr. Clark, that he will submit a similar memorandum to the committee, and I think that they both think that the argument is rather preposterous.

Chairman DODD. Very well. There are a lot of other questions. I don't want to take up any more time.

Senator Hruska, do you have any questions?

Senator HRUSKA. Yes: I have some. Mr. Chairman, reference was made to that portion of the President's Crime Commission report recommending State gun registration legislation and by way of other legislation by the Federal Government, if the States did not enact such laws. I ask unanimous consent that that portion with those recommendations be set forth at that point in the record so we we have them available for consideration.

Also, Mr. Cohen, inasmuch as we are dealing with enforcement of this act, I presume a lot of this enforcement has for its basis, rules and regulations of your Department?

Is that correct?

Mr. COHEN. Yes, sir.

Senator HRUSKA. Is that correct?

Mr. COHEN. Yes, sir.

Senator HRUSKA. I ask unanimous consent that copies of these regulations, both for the National Act and the Federal Act be incorporated in the record at this point.

Chairman DODD. Without objection.

(The documents referred to were marked "Exhibits Nos. 8 and 9" and are as follow:)

### EXHIBIT No. 8

THE PRESIDENT'S COMMISSION ON LAW ENFORCEMENT
AND ADMINISTRATION OF JUSTICE,
EXECUTIVE OFFICE OF THE PRESIDENT,
*Washington, February 19, 1967.*

I am enclosing a copy of "The Challenge of Crime in a Free Society," a report to President Johnson and the Nation by his Commission on Law Enforcement and Administration of Justice.

Because of his concern about crime, the President appointed the Commission eighteen months ago, as part of his program to develop a National Strategy against crime. The broad new legislative program which the President proposed to Congress earlier this month should help put this strategy into action.

The Commission's mandate was to examine all aspects of crime and to recommend ways in which America might meet its challenge. This report makes more than 200 specific recommendations for preventing crime, for improving the operations of the police, the courts and the correctional agencies and for mobilizing government and private support for these tasks.

The report embodies the findings of a Commission composed of distinguished men and women from many professional backgrounds and many parts of the country. It reflects the work of an outstanding staff and hundreds of expert consultants from all relevant fields. I hope you will give it your close attention.

Sincerely yours,

NICHOLAS DEB. KATZENBACH, *Chairman.*

THE PRESIDENT'S COMMISSION ON LAW ENFORCEMENT AND ADMINISTRATION OF JUSTICE

Nicholas DeB. Katzenbach, Chairman; Washingon, D.C.; Under Secretary of State; Attorney General of the United States 1965–1966

Genevieve Blatt, Harrisburg, Pa.; Assistant Director, Office of Economic Opportunity