# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | | |
|---|---|---|
| REBEKAH JENNINGS, BRENNAN HARMON, ANDREW PAYNE, and NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No. 5:10-cv-00140-C |
| v. | ) ) | |
| THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; KENNETH E. MELSON, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives; ERIC HOLDER, in his official capacity as Attorney General of the United States, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## REPLY IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

## ORAL ARGUMENT REQUESTED

Fernando M. Bustos
State Bar No. 24001819
LAW OFFICES OF FERNANDO M. BUSTOS, P.C.
P.O. Box 1980
Lubbock, TX 79408-1980
Tel: (806) 780-3976
Fax: (806) 780-3800
Email: fbustos@bustoslawfirm.com

Charles J. Cooper*
David H. Thompson*
Peter A. Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C.  20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

Brian Koukoutchos*
28 Eagle Trace
Mandeville, LA 70471
Tel:  (985) 626-5052
Email:  bkoukoutchos@gmail.com

*Admitted *pro hac vice*.

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

I.     PLAINTIFFS HAVE STANDING TO CHALLENGE SECTION 922(b)(1). ...................1

II.    THE TEXT AND HISTORY OF THE SECOND AMENDMENT PRESERVE THE RIGHTS OF ALL LAW-ABIDING ADULTS. ...................................................................5

III.   THE SECOND AMENDMENT PROTECTS THE RIGHT TO ACQUIRE ARMS. ......11

IV.   SECTION 922(b)(1) CANNOT SURVIVE HEIGHTENED SCRUTINY. ......................18

V.    SECTION 922(b)(1) DENIES EQUAL PROTECTION OF THE LAW. .........................25

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                             **Page**

*Adar v. Smith*, 2011 WL 1367493 (5th Cir. April 12, 2011) .......................................................... 3

*Anheuser-Busch v. Schmoke*, 101 F.3d 325 (4th Cir. 1996) .........................................17

*Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979).........................................2

*Barnes v. Mississippi,* 992 F.2d 1335 (5th Cir. 1993) ..................................................17

*Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983) ...........................................22

*Carey v. Population Services*, 431 U.S. 678 (1977)...............................................14, 15, 17, 18, 25

*Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S. 557 (1980) ..............................19

*Chisholm v. Georgia*, 2 U.S. 419 (1793) ................................................................10

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993)...........................22

*City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993).........................................22

*Craig v. Boren*, 429 U.S. 190 (1976).................................................................1, 2, 3, 18, 22

*District of Columbia v. Heller*, 554 U.S. 570 (2008)....................................5, 6, 9, 12, 13, 18, 23

*Dred Scott v. Sandford*, 60 U.S. 393 (1856) ................................................................10

*Educational Media Co. v. Swecker*, 602 F.3d 583 (4th Cir. 2010)..............................................17

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ................................................................15, 16

*Erznoznik v. Jacksonville*, 422 U.S. 205 (1975) .............................................................17

*FCC v. Pacifica*, 438 U.S. 726 (1978)........................................................................17

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) ...............................................................25

*Gilbert Equip. Co. v. Higgins*, 709 F. Supp. 1071 (S.D. Ala. 1989) ........................................12

*Griswold v. Connecticut*, 381 U.S. 479 (1965)...............................................................15

*H.L. v. Matheson*, 450 U.S. 398 (1981) ..................................................................4, 17

*Hanson v. Veterans Admin.*, 800 F.2d 1381 (5th Cir. 1986)................................................3

*Joelner v. Village of Washington Park*, 508 F.3d 427 (7th Cir. 2007) ...................................22

*Martin v. Parrish*, 805 F.2d 583 (5th Cir. 1986) ...........................................................17

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)......................................................4

*Montana Shooting Sports Ass'n v. Holder,* 2010 WL 3926029 (D. Mont. Aug. 31, 2010) ..........11

*National Ass'n of Gov't Employees. v. Barrett,* 968 F. Supp. 1564 (N.D. Ga. 1997) .................22

*Navegar v. United States*, 103 F.3d 994 (D.C. Cir. 1997)..................................................2

*Nordyke v. King*, 2011 WL 1632063 (9th Cir. May 2, 2011)..............................................12

*NRA v. Magaw*, 132 F.3d 272 (6th Cir. 1997) ..............................................................2

*Olympic Arms v. Buckles*, 301 F.3d 384 (6th Cir. 2002) ....................................................22

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ...........................................................................10

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ...........................................2

*Planned Parenthood v Casey*, 505 U.S. 833 (1992) .....................................................17, 18

*Planned Parenthood v. Camblos*, 155 F.3d 352 (4th Cir. 1998) .................................17

*Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008) ...............................16

*Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) .................................................22, 23

*State v. Sieyes*, 225 P.3d 995 (Wash. 2010).............................................................16

*T&M Jewelry v. Hicks*, 189 S.W.3d 526 (Ky. 2006) .................................................21

*United States v. Bledsoe*, 2008 WL 3538717 (W.D. Tex. Aug. 8, 2008).....................21

*United States v. Chafin*, 2011 WL 1395818 (4th Cir. March 22, 2011) ......................14

*United States v. King*, 532 F.2d 505 (5th Cir. 1976) .................................................12

*United States v. Lewitzke*, 176 F.3d 1022 (7th Cir. 1999) ........................................22

*United States v. Marzzarella*, 595 F. Supp. 2d 596 (W.D. Pa. 2009)..........................11

*United States v. Skoien,* 614 F.3d 638 (7th Cir. 2010) ................................................9

*United States v. Virginia*, 518 U.S. 515 (1996) .........................................18, 19, 22, 24

*United States v. Ziegenhagen,* 420 F. Supp. 72 (E.D. Wisc. 1976)...........................23

*Vincenty v. Bloomberg*, 476 F.3d 74 (2d Cir. 2007) ..............................................16, 18

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Counsel, Inc.*,
   425 U.S. 748 (1976)..................................................................................................4

*Wal-Mart v. Tamez*, 960 S.W.2d 125 (Tex. App. 1997)..........................................21

## Constitutional and Legislative Materials

U.S. CONST. art. I, § 8 ..............................................................................................6

18 U.S.C. § 922(q)(1)(E) ........................................................................................25

18 U.S.C § 922(x) ...............................................................................................24, 25

18 U.S.C. § 922(x)(1) ...............................................................................................20

18 U.S.C. § 922(x)(2) ...............................................................................................20

18 U.S.C. § 922(x)(3)(D)(5) .....................................................................................20

Mo. Stat. 571.101(2) ...............................................................................................11

2 ANNALS OF CONGRESS 1855-56 ..............................................................................8

1 BLACKSTONE, COMMENTARIES *453 .......................................................................8

THOMAS M. COOLEY, TREATISE ON CONSTITUTIONAL LIMITATIONS 740 (5th ed. 1888) ..............9

An act more effectually to provide for the National Defence by establishing an Uniform Militia throughout the United States, ch. 33, 1 Stat. 271 (1792) ...........................................................5

WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY 590 (2d ed. 1976) .....................................13

An Act for the Regulating, Training, and Arraying of the Militia and for Providing More Effectually for the Defence and Security of the State, ch. XIII, §10,1781 N.J. Acts 39 ..........7

An Act to embody, for a limited Time, One Thousand of the Militia of this State, for the Defence of the Frontiers thereof, ch. XXIV, § 1 *in* 1778 N.J. Acts (3d Session, 2d Sitting) 58  ............7

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:  An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443 (2009)  ...................................11

Gary Kleck, *The Impact of the 1968 Gun Control Act's Restriction on Handgun Purchases by Persons Age 18-20* (May 7, 2011), *available at* Social Science Research Network, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1843526................................................23

*The Address and Reasons of Dissent of the Pennsylvania Minority of the Convention of the State of Pennsylvania to their Constituents* (1787), *reprinted in* 2 B. SCHWARTZ, THE BILL OF RIGHTS 665 (1971) ..............................................................................................................9

## I.     PLAINTIFFS HAVE STANDING TO CHALLENGE SECTION 922(b)(1).

1.   In *Craig v. Boren*, 429 U.S. 190 (1976), the Supreme Court held that a beer vendor had standing to challenge Oklahoma statutes barring the sale of beer to men aged 18 to 20, but permitting sales to women of the same age.  Pl. Br. 13-14.  The Government offers several supposed distinctions, but it cannot escape the force of *Craig*.  First, contrary to the Government's contention, this decision did not "focu[s] solely on … prudential considerations … and not on the constitutional injury-in-fact requirement."  DOJ Reply 4.  The Court squarely held that the "operation of [the challenged statutes] plainly has inflicted 'injury in fact' upon appellant sufficient to guarantee her 'concrete adverseness,' and to satisfy the constitutionally based standing requirements imposed by Art. III." *Craig,* 429 U.S. at 194 (citations omitted).  In particular, the vendor satisfied the injury-in-fact requirement because she was "obliged either to heed the statutory discrimination, thereby incurring a direct economic injury through the constriction of her buyers' market, or to disobey the statutory command and suffer … 'sanctions and perhaps loss of license.' " *Id*.

2.   Second, the Government asserts that the vendor in *Craig* was – "at the time the challenged provision was passed – able to sell [beer] to 18-to-20-year-old male consumers," whereas the firearms "dealers in this case are trying to gain access to a particular sector of the market that is not currently available."  DOJ Reply 9.  Leaving aside the implausible notion that standing might turn on such irrelevant happenstance, the opinion in *Craig* did not even mention whether the vendor had been in business when the law was enacted, let alone place any emphasis on it.  To the contrary, the Court held that, where a vendor is forced to choose between "direct economic injury though the constriction of her buyers' market" and violating a statute and risking "sanctions and perhaps loss of license," it "repeatedly has recognized that such injuries establish the threshold requirements of a 'case or controversy' mandated by Art. III." *Craig,* 429

U.S. at 194; *see also id.* at 195 ("vendors and those in like positions have been *uniformly* permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function") (emphasis added).

3.   When a vendor is put to such a choice, standing doctrine does not require the vendor to allege that he will violate the law and risk prosecution *even if his constitutional challenge is unsuccessful*.  *See* Pl. Br. 13-14 n.6.  In *Craig*, the Court expressly rejected any suggestion that disobeying the statute was necessary to establish standing.  429 U.S. at 196 n.5.  Similarly, the Government's own authorities recognize that, "[w]hen a statute creates substantial economic burdens and compliance is coerced by the threat of enforcement, it is not necessary to determine whether a plaintiff subject to the regulation has sufficiently alleged an intention to refuse to comply."  *NRA v. Magaw*, 132 F.3d 272, 290 (6th Cir. 1997) (holding that firearms manufacturers and dealers had standing to challenge "assault weapon" ban).  Rather, where a plaintiff "must *either* forego possibly lawful activity because of her well-founded fear of prosecution, *or* willfully violate the statute, thereby subjecting herself to criminal prosecution and punishment," the "threat of prosecution provides the foundation for justiciability as a constitutional and prudential matter."  *Navegar v. United States*, 103 F.3d 994, 998 (D.C. Cir. 1997) (emphasis added); *see also id.* at 997 (manufacturers had standing to challenge "assault weapon[s]" ban even though they had "ceased the manufacture and transfer of the outlawed weapons" and "expressed no intention to violate the Act in the future").[1]  The Government is

---

[1] *A fortiori*, it is not necessary for the NRA dealers to allege a "specific threat to prosecute" them for a "particular act" at a "particular time and place."  DOJ Reply 6 n.4.  While some decisions from the D.C. Circuit have imposed heightened requirements for pre-enforcement review, that court has itself recognized that those decisions are in substantial "tension" with Supreme Court precedent.  *See Parker v. District of Columbia*, 478 F.3d 370, 374 (D.C. Cir. 2007).  And while *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979), states that "persons having *no* fears of state prosecution except those that are *imaginary and speculative*" may not be

unable to identify even a single decision from any court—let alone a controlling precedent from

the Supreme Court or Fifth Circuit—denying standing to a vendor forced to choose between

abiding by a statute that constricts its market and risking a credible threat of prosecution if it

violates that statute.[2]

4.   Individuals aged 18 to 20 whose access to handguns is burdened by Section 922(b)(1)

also have standing to challenge that statute.  The Government's principal response appears to be

that Section 922(b)(1) does not infringe these individuals' Second Amendment rights.  *See* DOJ

Reply 11-12, 14-18.  But that argument begs the question and assumes that the Government's

position on the merits is correct.  "It is inappropriate for the court to focus on the merits of the

case when considering the issue of standing," *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1385

(5th Cir. 1986), because "standing does not depend upon ultimate success on the merits." *Adar v.*

*Smith*, No. 09-30036, 2011 WL 1367493, at *2 (5th Cir. April 12, 2011) (*en banc*).

5.   Leaving aside our merits arguments that Section 922(b)(1) violates the rights of the

individual plaintiffs and NRA's 18-to-20-year-old members (which would be dispositive on the

Government's view of standing), the statute imposes a significant burden on these individuals'

access to handguns as a factual manner.  *See* Pl. Br. 20-21.  Indeed, the law imposes the very

burden on these individuals' Second Amendment rights that courts have repeatedly held

_____

"appropriate plaintiffs," it emphasizes that "[w]hen contesting the constitutionality of a criminal
statute, it is *not* necessary that the plaintiff first expose himself to actual arrest or prosecution to
be entitled to challenge the statute that he claims deters the exercise of his constitutional rights"
so long as there exists a "credible threat of prosecution."  *Id.* at 298 (emphasis added, quotation
marks and brackets omitted).

[2] Nor did the Supreme Court require the vendor put to this choice in *Craig* to document the
obvious "direct economic injury through the constriction of her buyers' market," 429 U.S. at
194, by providing such "details as … the number of individuals, aged 18-20, who ha[d]
committed to purchasing" low-alcohol beer." DOJ Reply 8.  Plaintiffs here have provided more
proof of their injury than did the vendor in *Craig*, identifying at least one handgun that would be
sold to a particular buyer but for Section 922(b)(1).  The Government identifies no authority
finding such allegations of injury insufficient (or even required) to establish standing.

constitutes cognizable constitutional injury in other contexts.  *See* Pl. Br. 16-20.  The Government argues that our cases did not address standing, but rather held those burdens unconstitutional on the merits.  DOJ Reply 15.  Although a burden need not violate an individual's constitutional rights to constitute injury in fact for purposes of standing, the courts' holdings that these burdens *did* violate individual constitutional rights surely establish *a fortiori* that the burdens also inflicted injury in fact.  The courts have found burdens similar to those imposed by Section 922(b)(1) sufficient to support standing, either explicitly, *see, e.g., H.L. v. Matheson*, 450 U.S. 398, 405-07 (1981), or implicitly, *see, e.g.*, *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Counsel, Inc*., 425 U.S. 748, 753-57 (1976) (entertaining and deciding on the merits suit brought by consumers whose access to pricing information was hindered, but not blocked, by challenged law).

6.   The Government argues that Second Amendment rights differ from the speech or privacy rights at issue in those cases.  But if a consumer has standing to challenge a law that merely bars a vendor from providing pricing information about a product unless the consumer requests it, *see Virginia State Board of Pharmacy*, he surely has standing to challenge a law that bars the vendor from actually selling him that product.  And if a *minor* has standing to challenge a statute that requires merely that her parents be notified of, but not necessarily consent to, an abortion, *see H.L v. Matheson*, then surely an *adult* has standing to challenge a statute that does not permit her to obtain a handgun from a licensed dealer (even *with* parental consent) unless her parents themselves purchase the handgun and then give it to her.  There is no heightened standing requirement for Second Amendment claims:  the Second Amendment cannot be treated as "a second-class right, subject to an entirely different body of rules" from other constitutional guarantees.  *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3044 (2010).

## II.   THE TEXT AND HISTORY OF THE SECOND AMENDMENT PRESERVE THE RIGHTS OF ALL LAW-ABIDING ADULTS.

1.  The most telling evidence that 18-to-20-year-olds were understood, at the time the Second Amendment was ratified, to possess the right to keep and bear arms is the Militia Act of 1792, which required individuals upon turning 18 to enroll in the militia and, within six months, to "provide [themselves] with a good musket or firelock."  An act more effectually to provide for the National Defence by establishing an Uniform Militia throughout the United States, ch. 33, 1 Stat. 271 (1792).  The Government attempts to escape this founding-era evidence by erecting a straw man, stating that we claim this evidence demonstrates that 18-to-20-year-olds have a vested right to "serve in the militia."  DOJ Reply 36.  Not so.[3]  We argue that the Militia Act shows they were understood to have a vested right *to keep and bear arms*.  This conclusion flows from an understanding of (i) the reason the right to bear arms was codified in the Constitution; (ii) the meaning of the term "Militia;" and (iii) Congress' power with respect to the Militia.

*Codification of the Right to Keep and Bear Arms*.  While the "*central component*" of the right to keep and bear arms is "individual self-defense," self-defense "had little to do with the right's *codification*."  *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008) (emphasis in original).  Rather, "the purpose for which the right was codified" was to "prevent elimination of the militia."  *Id.*  Although the right to bear arms is not *limited* to members of the militia, plainly those whom the Founders understood to be part of the militia are at the *core* of the Second Amendment's protection.

*Meaning of "Militia."*  This term refers not to any organized fighting force but rather to "all able-bodied men."  *Heller*, 554 U.S. at 596.  The question is thus not whether, as the

---

[3] The Government's citation to a law review article discussing a "right to 'keep and bear arms' in a 'well-regulated militia' " is thus inapposite.  *See* DOJ Reply 38 n.32; *see also id.* at 44 n.40.

Government would have it, 18-to-20-year-olds have any vested interest in serving in an "organized" militia, but rather whether they were understood, at the time of the founding, to be members of the population the Second Amendment was designed to protect.

*Congressional Power over the Militia*. Congress "provide[s] for organizing, arming, and disciplining, the Militia." U.S. CONST. art. I, § 8. This is the power Congress exercised in the Militia Act of 1792, requiring individuals to enroll at age 18 and to arm themselves. Congress thus *had no authority* to require individuals to take these actions *unless* they were *already* deemed able-bodied members of the community understood to constitute the militia and hence entitled to keep and bear arms. In other words, while "the militia consists of all able-bodied men, the federally organized militia may consist of a *subset* of them." *Heller*, 554 U.S. at 596 (emphasis added).[4]

In sum, taken together these three points demonstrate that unless Congress exceeded its constitutional authority in the Militia Act of 1792 by requiring 18-year-olds to enroll in the federal militia and to arm themselves, "Second Amendment rights fully vest at the latest by age 18." Pl. Br. 27.

2. Because the Government has attacked a straw man, it has no response to the true import of the Militia Act of 1792. And while the Government makes other arguments purportedly based on founding-era history, those arguments are unpersuasive.

First, the Government points out that, following passage of the Second Amendment, a handful of states "chose to enroll only individuals over 21 in their respective militias" at certain times in their history, or to require parental consent for individuals under 21 to perform certain

---

[4] This point is underscored by the statement of Representative Lawrence cited by the Government: Because the militia "includes … every man in the states who is capable of performing military duty, though not actually enrolled in any particular body," Congress had the power organize "particular classes of men" from this group. DOJ App. 26; *see* DOJ Reply 46.

militia duties.  DOJ Reply 44.  But this shows, at most, that states sometimes chose to organize

only a *subset* of the militia; it certainly does not show that 18-to-20-year-olds were understood to

be outside the scope of the Second Amendment.[5]

Second, the Government claims that colonial and pre-ratification Virginia and New

Jersey at times enrolled those 18 and up in their militias, but at other times set 21 as the

minimum age.  Again, this merely shows that states did not always draw upon the entire militia.

Furthermore, the Government is simply wrong (as its own appendix shows) when it says that

"the Virginia legislature raised the minimum age … to 21" in 1784. DOJ Reply 48.  *See* DOJ

App. 38 ("all free male persons between the ages of *eighteen and fifty years* … shall be enrolled

or formed into companies," subject to certain exceptions) (emphasis added).  The 1779 New

Jersey law, which *permitted* 18-to-20-year-olds to enroll but did not *require* enrollment until 21,

was enacted to supply militiamen for a specific purpose for a specific period of time, and there is

no indication that it displaced the State's general 1777 militia law, which required 18-to-20-year-

olds to enroll.[6]  We are not aware of a single state that exempted 18-to-20-year-olds from militia

service at the time the Second Amendment was ratified.

---

[5] Moreover, most of the eleven state laws the Government identifies were enacted at least 38
years after enactment of the Second Amendment.  *See* DOJ App. 21-24.  And the two that were
enacted within 20 years *did* require 18-to-20 year olds to enroll, but exempted them from active
militia duty during times of peace.  *See* DOJ App. 21, 23 (Delaware and Pennsylvania (1793)).
[6] *See* An Act to embody, for a limited Time, One Thousand of the Militia of this State, for the
Defence of the Frontiers thereof, ch. XXIV, § 1 *in* 1778 N.J. Acts (3d Session, 2d Sitting) 58
(men enlisted under act are "to continue in the Service *until the fifteenth day of December next*");
*id.* § 2 (these men are to be "raised *from the Militia of the several Counties of this State*"); *id.*
("said troops ... [are] not [to be] called out of the State unless in such Cases … by the same
Authority in and by which *the Militia* are liable to be called out"); *id.* § 3 ("the Enrolments or
Returns so made *shall extend to the Purposes of this Act only*").  At any rate, New Jersey enacted
a new law governing the militia in 1781 reiterating the inclusion of 18-to-20-year-olds.  *See* An
Act for the Regulating, Training, and Arraying of the Militia and for Providing More Effectually
for the Defence and Security of the State, ch. XIII, §10, 1781 N.J. Acts 39, 42-43.

Third, drawing on a handful of state militia laws that required parents to furnish arms for children under their control and a related discussion in the legislative history of the Militia Act of 1792, the Government claims that "the presumption was that parents and guardians would be better entrusted with the furnishing of arms to underage individuals" than the individuals themselves.  DOJ Reply 49.  But Plaintiffs are not "underage," so this argument does not amount to much.[7]  The argument also suffers deeper flaws.  The Government points to nothing indicating that, during the founding era, 18-to-20-year-olds were prohibited from acquiring firearms without parental consent.  Rather, the historical evidence merely illustrates the consequences of the common-law rule that minors were for the most part unable to bind themselves contractually, and that it thus may have been difficult for them to find someone willing to sell them *anything*, not just a firearm.  *See* 1 BLACKSTONE COMMENTARIES *453 ("It is generally true, that an infant can neither aliene his lands, nor do any legal act, nor make a deed, nor indeed any manner of contract, that will bind him.").  States therefore sometimes acted to ensure that parents put arms into the hands of their minor children, and the legislative history of the Militia Act of 1792 shows that this practice was preferable to having the federal government supply minors with arms *because of the risk that doing so would enable the federal government to later disarm them*.[8]  It shows, in other words, the jealously with which the founding generation guarded the right to arms of even minor 18-to-20-year-olds.

---

[7] Furthermore, the Government has identified only four states that enacted such laws before 1800, so there is no evidence that this practice was widespread at the founding.  And in three of those states, the laws on their face only required parents or guardians to provide arms for militia members *under their care*.  *See* DOJ Reply 49 n.47 (Massachusetts, New Hampshire); DOJ App. 42 (Vermont).  Other issues aside, those laws plainly provide no support for requiring *legal adults* to get parental authorization to obtain handguns.

[8] *See* 2 ANNALS OF CONGRESS 1855-56, DOJ App. 31 (Statement of Rep. Wadsworth:  "The motion at first appeared to be in favor of poor men, who are unable to purchase a firelock; but now it seems, minors and apprentices are to be provided for.  Is there a man in this House who

3. Implicitly conceding the lack of founding-era precedent for Section 922(b)(1)'s sales ban, the Government argues that restrictions on the right to bear arms " 'need not mirror limits that were on the books in 1791.' " DOJ Reply 33 (quoting *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010)). While this may be true as a general matter, *Heller* ruled that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." 554 U.S. at 634-35. And when there is clear evidence that the Framers understood the right as encompassing those aged 18-to-20, it matters not that "future legislatures" may have disagreed with that judgment. *Id.* at 635.[9] The Government lists a number of state laws that imposed an age limit of 21 on some gun purchases between 1856 and 1923. DOJ Reply 31-32. As an initial matter, this practice prevailed in only a minority of the States. Furthermore, the subsequent, widespread change in the age of majority from 21 to 18 renders these laws restricting the ability of 18-to-20-year-old *minors* to purchase firearms incapable of providing a foundation for a law that restricts the ability of 18-to-20-year-old *adults* to do so. Pl. Br. 33.[10] Indeed, *none* of the laws imposing minimum age requirements that the

---

would wish to see so large a proportion of the community, perhaps one-third, armed by the United States, and liable to be disarmed by them? Nothing would tend more to excite suspicion, and rouse a jealously dangerous to the Union.").

[9] Laws from the founding era do not indicate that felons and the mentally ill were understood to enjoy the right to bear arms. Therefore, individuals in those categories, unlike 18-to-20-year-olds, may plausibly be considered to be "disqualified from the exercise of Second Amendment rights." *Heller*, 554 U.S. at 635. Indeed, there is historical evidence that criminals and others who were a proven danger to public safety were excluded from the right. *See The Address and Reasons of Dissent of the Pennsylvania Minority of the Convention of the State of Pennsylvania to their Constituents* (1787), *reprinted in* 2 B. SCHWARTZ, THE BILL OF RIGHTS 665 (1971) ("That the people have a right to bear arms for the defense of themselves and their own State, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals.").

[10] The same response applies to Thomas Cooley's statement that "the State may prohibit the sale of arms to minors." THOMAS M. COOLEY, TREATISE ON CONSTITUTIONAL LIMITATIONS 740 n.4 (5th ed. 1888) (quoted at DOJ Reply Br. 35).

Government cites from this time period purports to restrict arms purchases by adults; the vast majority, in fact, expressly limit their application to minors. *See* DOJ Br. 27 n.23 & 28 n.24 and statutes cited therein. Although "[t]welve States and the District of Columbia" currently limit 18-to-20–year-old adults' Second Amendment rights by setting 21 as the minimum age for the purchase or use of handguns, DOJ Reply 1 n.1, this practice is neither longstanding nor widespread. Nor is it constitutional.

4. Having failed to adduce any persuasive evidence that law-abiding adults under 21 do not enjoy full Second Amendment rights, the Government offers analogies to other restrictions, such as minimum ages for buying tobacco or alcohol. *Id.* at 40. While these laws may well be supported by a rational basis, they do not establish that the fundamental, enumerated rights of law-abiding adults may be restricted solely on account of their age.

5. The Government also continues to lean heavily on *Oregon v. Mitchell*, 400 U.S. 112 (1970), but that case turned on the power of the federal government vis-à-vis the States on matters pertaining to state and local elections, not the rights of individuals to participate in those elections. *Id*. at 118 (opinion of Black, J., announcing the judgment of the Court). And even if one takes the view that, in *Mitchell,* "denial of the right to vote to those under age twenty-one was implicitly upheld as constitutional," DOJ Reply 42 (quotation marks and brackets omitted), any such inference was resoundingly rejected by the swift enactment of the 26th Amendment. Attempting to derive continuing significance from *Mitchell*'s treatment of 18-to-20-year-olds is thus akin to attempting to discern the principles of state sovereignty by studying *Chisholm v. Georgia*, 2 U.S. 419 (1793), or the basis for determining who properly is considered a citizen by reference to *Dred Scott v. Sandford*, 60 U.S. 393 (1856).

6.  The logical implications of the Government's position are nothing short of breathtaking.  Under its reasoning, *any* minimum age requirement for purchasing handguns would be consistent with the Second Amendment.  The Government insists that it is "not contending … that Congress or the States could set the minimum age for purchase of firearms at an age above 21."  DOJ Reply 41 n.38.  But by arguing that "statutes setting different ages at which a person may engage in an activity … are within the province of the legislature," DOJ Reply 39 (quotation marks omitted), the Government leaves no principled ground for distinction between a law setting the minimum age for the use or purchase of firearms at 21 and one setting the age at 23, 27, or 35.[11]  This Court should reject the Government's invitation to subject the right to keep and bear arms of adults of all ages to the whims of lawmakers and adhere to the understanding of the framers that Second Amendment rights fully vest by age 18.

## III.   THE SECOND AMENDMENT PROTECTS THE RIGHT TO ACQUIRE ARMS.

1.  The Government urges this Court to follow the lead of other post-*Heller* courts that have (supposedly) treated all restrictions on gun sales as presumptively lawful. DOJ Reply 18-19.  But the Government's first authority, *Montana Shooting Sports Ass'n v. Holder,* 2010 WL 3926029 (D. Mont. Aug. 31, 2010), was decided under the Commerce Clause and did not even involve a claim under the Second Amendment.  *See id*. at *22.  The other case upheld a federal statute outlawing trafficking in untraceable guns with their serial numbers filed off, a category of "contraband*"* in which *only criminals* have an interest.  *United States v. Marzzarella*, 595 F.

---

[11] *See* DOJ Reply 40 ("the states have considerable discretion in either raising or lowering the age requirements with regard to a particular privilege") (emphasis omitted); *id.* ("State legislatures may provide for the attainment of adult status for different rights at different ages."); *cf.* Mo. Stat. 571.101(2) (concealed carry licensee must be "at least twenty-three years of age"); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:  An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1512 (2009) ("There's a reason why auto insurance companies charge higher rates all the way up to age 25. And gun death rates remain within 10 percent of their age 18 levels into the late 20s.").

Supp. 2d 596, 600-03 & n.3 (W.D. Pa. 2009).   That decision has no bearing here, where the challenged law restricts the sale of *legal* weapons by federally *licensed* firearms dealers to *law-abiding* adults.   Indeed, *Marzzarrella* undermined the Government's argument here when it explained that the challenged law did not "meaningfully burden[] the 'core' Second Amendment right recognized in *Heller*" because legal "firearms with intact serial numbers" remain "readily available in our society through ordinary commercial channels." *Id*. at 599.   It is precisely those "ordinary commercial channels" that Section 922(b)(1) denies to law-abiding adults under 21.   By the Government's own authority, that makes the statute constitutionally dubious.[12]

To similar effect is *Nordyke v. King*, 2011 WL 1632063 (9th Cir. May 2, 2011), which recognized that *Heller* laid the foundation for challenges to laws restricting firearms sales: "when deciding whether a restriction on gun sales substantially burdens Second Amendment rights, we should ask whether the restriction leaves law-abiding citizens with reasonable alternative means for obtaining firearms sufficient for self-defense purposes." *Id.* at *7.   The court dismissed a challenge to an Alameda County ordinance that banned use of the county fairground for gun shows because the plaintiff did "not assert that the Ordinance makes it materially more difficult to obtain firearms.   Nor does it allege a shortage of places to purchase guns in or near Alameda County." *Id* at *8.   Plaintiffs here make precisely such allegations and

---

[12] The Government also invokes a couple of cases that were decided long before *Heller* and that proceeded on the erroneous premise that the Second Amendment does not protect an individual right to arms.   DOJ Reply 20.  *See Gilbert Equip. Co. v. Higgins*, 709 F. Supp. 1071, 1090-91 & n.28 (S.D. Ala. 1989) (expressly rejecting an individual right to bear arms); *United States v. King*, 532 F.2d 505, 510 (5th Cir. 1976) (relying on *Miller*).   Furthermore, King was convicted of engaging in the business of firearms sales without a federal license, *id*. at 510, whereas here the Plaintiffs merely seek access to that federally licensed sales market, rather than being forced by Section 922(b)(1) to resort to clandestine arms purchases.   A decision for plaintiffs here would not impair congressional power to mandate that firearms dealers be licensed by the BATF, and the Government does not argue otherwise.

the Government does not dispute them – nor could it, since Section 922(b)(1) denies Plaintiffs access to the entire commercial firearms market.

2. Adoption of the Second Amendment was driven by the Founders' determination to prevent Congress, like the British Crown before it, from disarming the people by suppressing the trade in firearms.  Pl. Br. 40-41; *Heller*, 554 U.S. at 583 n.7, 592-94.  The Government takes issue with one or two pieces of this body evidence, but concedes that the Founders understood "import bans" and "embargos," as well as "seizures of arms," to be violations of "the Anglo-American right to bear arms."  DOJ Reply 20-21.  The Government nevertheless insists that none of this affects congressional power to cut law-abiding citizens off from commercial firearms sales, apparently on the belief that there is a constitutional distinction between taking away a citizen's firearms after he has bought them and outlawing a citizen's purchase of those firearms in the first place.  Perhaps there is such a difference under the Takings Clause of the Fifth Amendment, but the Second Amendment's right to keep and bear arms is infringed in either instance.  Moreover, the Government offers not even a hint as to why a "ban" or "embargo" on licensed retail sales of firearms does not violate the Second Amendment, while it concedes that an "import ban" or an "embargo" that prevented firearms dealers from importing or otherwise procuring weapons for resale would – we are aware of no constitutional distinction between retail and wholesale.[13]

3. The Government dismisses Plaintiffs' claim as an absurd plea for the court to "invent a new constitutional right to 'acquire and buy' arms."  DOJ Reply 21.  But the proposition that a constitutional guarantee extends beyond the right itself, to include the right to buy the tools or

---

[13] An embargo is defined as "any restriction imposed on commerce by law."  WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY 590 (2d ed. 1976).  A prohibition on licensed sales to law-abiding adults qualifies.  Indeed, elsewhere the Government itself treats federal regulation of imports and regulation of retail sales as of a piece.  DOJ Reply 59.

products necessary to exercise that right, is well established.  *See* Pl. Br. 43-47.[14]  The

Government would distinguish that host of authorities on two grounds: (1) those cases

supposedly involved "total bans on sale or possession" that "were tantamount to complete bans

on these constitutional rights *for all individuals,*" DOJ Reply 23 (emphasis in original); (2) those

cases supposedly confirm that anything "less than a blanket prohibition" is constitutional as to

"minors," for whom " 'the scope of permissible state regulation is broader,' " *id*. at 25.

The Government repeats the phrases "total ban" and "blanket prohibition," *id*. at 23, 24,

25, 28-29, but these statements misrepresent both the facts and the holdings of those cases.  The

very arguments the Government makes here were rehearsed – and rejected – in *Carey v.*

*Population Services*, 431 U.S. 678 (1977), which struck down two laws that restricted the sale of

contraceptives.  The first law permitted only licensed pharmacists to sell non-prescription

contraceptives to persons under 16.  *Id*. at 681, 689.  This is the opposite of Section 922(b)(1)

here, which *forbids* the sale of handguns by licensed firearms dealers to those under 21, and thus

denies Plaintiffs access to the *entirety of the commercial firearms market*.  Contrary to the

Government's contention, the *Carey* Court explicitly noted that, although the burden of the

statutory restriction was "*not as great as that under a total ban* on distribution," it was

nonetheless unconstitutional:  "the restriction of distribution channels to a small fraction of the

total number of possible retail outlets renders contraceptive devices considerably less accessible

to the public."  *Id*. at 689 (emphasis added).

Furthermore, the Court addressed a potential alternative channel for contraceptives that

has important implications for Section 922(b)(1).  The Court examined the ameliorative impact

---

[14] Because Plaintiffs do not assert a right to sell a firearm, much less a right to sell "a firearm *to an unlawful user of drugs*," *United States v. Chafin* is off-point.  2011 WL 1395818, at *2 (4th Cir. March 22, 2011) (emphasis added).

of a statutory exception allowing physicians to supply their patients with contraceptives, but concluded that it was insufficient to save the law because it "obviously does not significantly expand the number of *regularly available, easily accessible retail outlets* for nonprescription contraceptives." *Id*. at 689 n.7 (emphasis added).  *A fortiori*, the prospect of getting contraceptives as a gift or buying them from a friend could not make up for the regular retail channels that the statute had choked off.  This defeats the Government's argument here that Section 922(b)(1)'s ban on licensed handgun sales can be redeemed by the possibility that an adult Texan under 21 might be able (i) to persuade his parents to buy him a handgun as a gift or (ii) to buy a second-hand pistol from a private seller in an unlicensed transaction.  Under *Carey*, such alternatives are not "regularly available, easily accessible retail outlets" and therefore cannot save the statute.

The second New York statute struck down in *Carey* provided that only physicians could distribute non-prescription contraceptives to those under age 16.  *Id*. at 691-92 & n.13, 694.  Here, too, there was an exception:  New York welfare agencies were *required* to distribute contraceptives to all welfare recipients of child-bearing age, even those under 16.  *Id*. at 695 n.18.  Like the Government here, the state argued that these exceptions rendered the sales restriction constitutional because they demonstrated that the state "does not totally prohibit distribution of contraceptives to minors under 16." *Id*. at 697.  But the Supreme Court rejected this ploy because the "less than total restrictions on access to" the products essential for exercise of the constitutional right nevertheless "significantly burden[ed]" that right. *Id*.[15]

---

[15] Neither *Eisenstadt v. Baird*, 405 U.S. 438 (1972), nor *Griswold v. Connecticut*, 381 U.S. 479 (1965), involved a "total ban."  DOJ Reply 24 n.18.  The statute struck down in *Griswold* restricted use and sales of condoms only when the purpose was contraception; use and sales for the purpose of preventing the transmission of disease were permitted.  *See* 381 U.S. at 498 (Goldberg, J., concurring); *id*. at 505-07 (White, J., concurring). The statute struck down in

Finally, the Government fails to distinguish *Vincenty v. Bloomberg*, 476 F.3d 74 (2d Cir. 2007), which closely parallels this case.  New York City's anti-graffiti law restricted sales of broad-tipped indelible markers and cans of spray paint to those under 21 and was challenged on behalf of those aged 18-to-20, who were classified as adults under state law.  *Id*. at 76.  The law contained a legislative finding that those aged 12-20 were the source of the graffiti problem, and the court, applying intermediate scrutiny, did not disturb that finding. *Id*. at 86, 88.  The city argued that the law did not impose a constitutionally significant limit on access to materials integral to the exercise of free speech because artists aged 18-to-20, who could not buy the spray paint and markers themselves, could "have friends, older relatives, or an art school purchase" the items "for them," or "use unregulated materials" such as other types of markers. *Id*. at 88.  The Second Circuit panel (which included then-Judge Sotomayor) unanimously held that these alternative channels for acquiring the tools of artistic expression did not excuse the constitutional violation.  *Id*. The same is true of the argument here that adults under 21 can ask their relatives to buy handguns and present them as gifts or can purchase rifles or shotguns instead.  See DOJ Reply 28-29.  Adults do not need permission slips from their parents.[16]

4.  The Government's second attack on the proposition that a constitutional right includes the right to buy tools needed for its exercise is the argument that, even if that is generally true as

---

*Eisenstadt* restricted only sales to unmarried adults, 405 U.S. at 440 n.1, 441-42, and even as to them sales were lawful if the purpose was not contraception but the prevention of disease, *id*. at 442, 448-49. *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008), did not impose a "total ban" either.  *See id.* at 741, 742 & n.16.  Yet the Fifth Circuit struck down the sales restriction nonetheless because it "heavily burden[ed] a constitutional right." *Id*. at 744.

[16] *State v. Sieyes*, 225 P.3d 995 (Wash. 2010), stated that the restriction at issue was not an "absolute prohibition" on firearm possession only because the plaintiff argued to the contrary. 225 P.3d at 1005 n.21.  Furthermore, *Sieyes* addressed "whether Washington's restrictions on *children* possessing firearms unconstitutionally infringe on a *minor's* right to bear arms." *Id*. at 1004 (emphasis added).  Indeed, the plaintiff in *Sieyes*'s position was that "*his right to bear arms should be equal to that of an 18-year-old's*." *Id*. at 1005 (emphasis added).

to adults, " 'the scope of permissible state regulation is broader as to minors than as to adults.' "
DOJ Reply at 25 (quoting *Carey*, 431 U.S. at 694 n.17.).  But *Carey* struck down sales
restrictions on minors' purchases of contraceptives, even as applied to juveniles below the age of
16, and *Vincenty* struck down sales restrictions on spray paint as applied to 18-to-20-year-olds.
Moreover, all the cases cited by the Government drew lines between "minors" (those under 18)
and "adults" (those over 18) – and that line gets the Government nowhere because the Plaintiffs
here are adults.[17]   Undeterred by what those cases actually said, the Government insists that "the
cases themselves do not establish any such bright-line rule, instead speaking broadly of 'youths'
and 'minors' as opposed to 'adults.' " DOJ Reply 27 n.21.  The cases (reviewed in the margin)
speak for themselves, and the Government's only additional authorities are wholly inapposite.[18]

 5.  The Government contends that, even if Section 922(b)(1) imposed a total ban on
handgun sales, it would not violate the Second Amendment because "18-to-20 year olds may buy
rifles and shotguns directly from licensed dealers to bear for protection in their homes." DOJ

---

[17] *See, e.g., Planned Parenthood v. Casey*, 505 U.S. 833, 895 (1992) (state can regulate the
access of "children" on the assumption that they are immature but "cannot adopt a parallel
assumption about adult women"); *H.L. v. Matheson*, 450 U.S. 398, 407, 413 (1981) (regulation
restricted access of a 15-year-old to abortion services); *Barnes v. Mississippi,* 992 F.2d 1335,
1341-43 (5th Cir. 1993) (regulation applied to "minor" under 18); *Planned Parenthood v.
Camblos*, 155 F.3d 352, 367-84 (4th Cir. 1998) (*en banc*) (regulation applied to "children" under
18); *Erznoznik v. Jacksonville*, 422 U.S. 205, 212, 214 n.11 (1975) (court distinguished between
"rights of minors" and "those of adults"); *FCC v. Pacifica*, 438 U.S. 726, 749 (1978)
(distinguishing between adults and "youth," including "children, even those too young to read").
[18] Two of the cases involved limitations on liquor advertising to prevent its display to minors and
children, who of course have no constitutional right to buy alcohol.  *See Anheuser-Busch v.
Schmoke*, 101 F.3d 325, 327, 330 (4th Cir. 1996); *Educational Media Co. v. Swecker*, 602 F.3d
583, 590-91 (4th Cir. 2010).  Finally, the Government cites *Martin v. Parrish*, 805 F.2d 583 (5th
Cir. 1986), for the proposition that precedents about restrictions on the speech of high school
students are relevant to restrictions on the speech of college students.  DOJ Reply 27 n.21.  But
*Martin* involved no restraint on the speech of college students, whether under 21 or over 21; the
court simply upheld a university's decision to fire a professor who had yelled profanity at his
students in the classroom.  805 F.2d at 584-85.

Reply 24 n.16; *see also id.* 28-29.  This argument, which the Government also made in its

opening brief, is of course foreclosed by *Heller*.  *See* Pl. Br. 19 (quoting *Heller,* 554 U.S. at 629).

6.  The Government's last-ditch defense of Section 922(b)(1) is the notion that even if

that provision dramatically restricts sales of handguns to adults under 21, it is nonetheless

constitutional because it is only "a temporary restriction."  DOJ Reply 21.  *See also id.* at 23.  An

18-year-old Texan wishing to purchase a handgun need only wait three years until there are 21

candles on his birthday cake, whereupon the "temporary" sales restriction will evaporate.

Unsurprisingly, the Government cites no authority for the bizarre proposition that the

infringement of a fundamental, enumerated right is not a violation of the Constitution if the

victim will eventually "outgrow" the statutory restriction.  If this were the law, all age-based

restrictions on access to contraceptives, abortion services, alcohol, spray-paint or any other item

necessary for the exercise of a constitutional right would be upheld as mere "temporary

restrictions" because the affected individuals would, someday, be old enough that the laws would

no longer apply to them.  But that is not the law.  *See Carey,* 431 U.S. 678; *Casey,* 505 U.S. 833;

*Craig,* 429 U.S. 190; *Vincenty*, 476 F.3d 74.

## IV.  SECTION 922(b)(1) CANNOT SURVIVE HEIGHTENED SCRUTINY.

1.  Even assuming *arguendo* that intermediate scrutiny is the appropriate standard – and it

is not – Section 922(b)(1) cannot meet that test.[19]  The Government "must demonstrate an

'exceedingly persuasive justification' " for the challenged law and show that "the discriminatory

means employed are substantially related" to the government objective.  *United States v.*

*Virginia*, 518 U.S. 515, 531, 533 (1996).  The fit between means and end must survive "skeptical

---

[19]  Even the State of Texas rejects the Government's standard of scrutiny: "The widely held
notion that firearms regulations should trigger mere 'intermediate scrutiny,' while laws affecting
free speech [and other] rights receive strict scrutiny, is not defensible and should be emphatically
rejected by this Court." Texas' Summary Judgment Brief in No. 5:10-CV-141-C at 24.

scrutiny," *id*. at 531, and the Court is to determine whether the challenged regulation "is not more extensive than is necessary to serve that [state] interest." *Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S. 557, 566 (1980).[20]

2.  The Government defends Section 922(b)(1) as a means of reducing violent crime, on the theory that "18-to-20-year-olds are especially likely to be perpetrators of violence committed with handguns." DOJ Reply 60. But when applying a classification that restricts fundamental rights, the state "may not rely on 'overbroad' generalizations to make 'judgments about people' " based on their membership in a group that is thought to have particular characteristics or to present particular risks. *United States v. Virginia*, 518 U.S. at 542. Intermediate scrutiny does not tolerate "categorical exclusion, in total disregard of th[e] individual merit" of a given individual. *Id*. at 546. Individual merit (or individual disqualification) is revealed by the prohibition on purchases by criminals and mentally ill individuals, which licensed dealers enforce through a criminal background check. By denying the ability to purchase a handgun from a licensed dealer, Section 922(b)(1) perversely drives this supposedly volatile and untrustworthy 18-to-20-year-old cohort to obtain handguns through unregulated, clandestine purchases from unlicensed private sellers.

3.  The Government contends that the principal purpose of Section 922(b)(1) is " 'to keep firearms out of the hands of those who are not entitled to possess them because of *age*.' " DOJ Reply 63 (quoting the legislative record) (emphasis added by the Government). But on that basis Section 922(b)(1) makes no sense, because law-abiding adults aged 18-to-20 *are* "entitled to possess" handguns. As the Government concedes, the statute imposes no restrictions whatsoever

---

[20] The Government relies on *United States v. Virginia* and appears to agree that it provides the proper formulation of intermediate scrutiny. Oddly, however, the Government cites to the opinion of the sole dissenting Justice in that case. DOJ Reply 67, 70 n.61. It is, of course, the opinion of the Court that controls, and that opinion rejected the dissent's criticisms.

on use or possession of handguns by those aged 18 to 20.  DOJ Reply 59, 61, 62.  And Section

922(x) expressly provides that only "juvenile[s]" – defined as those "less than 18 years of age" –

are subject to federal restrictions on possession, use or receipt (whether as a gift, loan or

otherwise) of handguns. 18 U.S.C. § 922(x)(1), (2) & (3)(D)(5).  Thus, only those under 18, not

adults aged 18-20, "are not entitled to possess [handguns] because of age."  The statute does not

remotely fit the purpose proffered by the Government.

4.  In a similar vein, the Government repeatedly asserts that the purpose of Section

922(b)(1) was to prevent "the clandestine purchase of handguns by individuals under 21."  DOJ

Reply 62; *see also id*. at 60, 66.  The Government insists that the "fit" between this end and

Section 922(b)(1) "is substantial," *id*. at 60, yet that provision not only *permits* clandestine

acquisitions of handguns, it *encourages* them by closing off the entirety of the federally licensed

commercial handgun market to 18-to-20-year-olds, thereby forcing them to resort to legal, but

unreported, unlicensed, and unregulated channels.  There are two such channels identified by the

Government.  First, another person – who can be a parent, friend, or none of the above –

purchases the handgun from a federally licensed dealer and gives it or lends it to the 18-to-20-

year-old; the Government stresses that this is perfectly legal. DOJ Reply 3 n.2, 8 n.5, 12-13 &

nn. 8-9, 22, 61.  Second, the 18-to-20-year-old herself buys a pistol second-hand from a private

gun owner in an unregulated transaction; this, too, the Government concedes, is entirely legal.

*Id*. at 3 n.3, 67, 68, 70-71.  No background checks are conducted on these clandestine

acquisitions.  And, as part of its argument on standing, the Government itself contends that these

lawful, clandestine channels are a "viable" alternative to purchasing handguns from a federally

licensed dealer.  DOJ Reply 14, 18.  The only federal court to examine the operation and effect

of Section 922(b)(1) post-*Heller* found this arrangement perverse and deeply troubling: "it

appears as though the law would rather an 18 to 20 year old purchase a handgun from an unlicensed seller than from a licensed seller." *United States v. Bledsoe*, 2008 WL 3538717, at *6 (W.D. Tex. Aug. 8, 2008). *See* Pl. Br. 70.[21]

The Government dismisses all of this, arguing that Congress is free to enact reforms incrementally, " 'addressing itself to the phase of the problem which seems most acute to the legislative mind.' " DOJ Reply 69 (citation omitted).  And the "problem," we are told, is "clandestine" handgun acquisitions by 18-to-20-year-olds.  *Id.* at 60, 62, 66.  Yet by the Government's own account, Section 922(b)(1) outlaws *only* fully regulated handgun purchases by 18-to-20-year-olds from federally licensed firearms dealers.  Indeed, to bolster its argument that Plaintiffs lack standing, the Government touts the way Section 922(b)(1) leaves 18-to-20-year-olds free to obtain handguns through wholly unregulated "gifts" from anyone – not just from parents – and through under-the-radar, unreported purchases from unlicensed private sellers.  *These* are "clandestine" handgun acquisitions, made without background checks to screen out criminals, drug addicts or the mentally ill.  Thus Section 922(b)(1) does *not* address the clandestine sales that the Government identifies as the "most acute phase" of the problem; instead, that provision ignores the problem entirely and outlaws only fully regulated sales by licensed dealers.  If the purpose is to stamp out clandestine sales, this approach is not "incremental"—it is *incoherent*.

---

[21] Unable to find even a single federal court that has ever found this regime "rational," let alone animated by an "exceedingly persuasive justification," the Government abandons federal case law and seizes on two state court decisions that discuss Section 922(b)(1) in the course of deciding state-law negligence claims: *Wal-Mart v. Tamez*, 960 S.W.2d 125 (Tex. App.- Corpus Christi 1997, no writ); *T&M Jewelry v. Hicks*, 189 S.W.3d 526 (Ky. 2006). *See* DOJ Reply 61, 68-69.  Both were decided before *Heller*, no Second Amendment issue was raised in either case, and neither case involved any scrutiny of the fit between the statute's means and its purpose.

Such a disconnect between a statute's purpose and operation is fatal under intermediate scrutiny.  Section 922(b)(1)'s ban on licensed, regulated handgun sales "cannot directly and materially advance its asserted interest" in preventing clandestine handgun acquisitions "because of the overall irrationality of the Government's regulatory scheme." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 488 (1995).  Driving 18-to-20-year-olds out of the regulated handgun market "makes no rational sense if the Government's true aim is to suppress" clandestine sales. *Id.*  A statute fails intermediate scrutiny if it "provides only the most limited incremental support for the interest asserted."  *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 73 (1983).  Section 922(b)(1) fails *a fortiori* because it actually subverts the interest asserted.[22]

5.  The Government urges judicial deference to this self-defeating firearms regime, but the whole point of intermediate scrutiny is *not* to defer to government rationalizations, but to engage in "skeptical scrutiny":  "The burden of justification is demanding and it rests entirely on the State." *United States v. Virginia*, 518 U.S. at 533.  The supposedly contrary authorities cited by the Government in favor of deferential review of federal firearms regulations were equal-protection cases decided before *Heller* recognized an individual Second Amendment right, and in each case the court expressly applied *mere rationality* review. DOJ Reply 69.[23]  The

---

[22] Thus Section 922(b)(1) is worse than merely "underinclusive."  The Government contends that underinclusiveness analysis is used only in free speech cases applying strict scrutiny.  DOJ Reply 67.  That is incorrect.  Consideration of whether a challenged law is underinclusive is a regular part of intermediate scrutiny.  *See, e.g., Rubin v. Coors*, 514 U.S. at 482-84, 489; *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 416-17 & n.11, 425 (1993); *Joelner v. Village of Washington Park*, 508 F.3d 427, 433 (7th Cir. 2007).  It is also employed outside the context of free speech.  *See, e.g.*, *Craig*, 429 U.S. at 202-03 & n.12 (equal protection); *id.* at 226 (Rehnquist, J., dissenting) (concurring that underinclusiveness was an appropriate tool to apply, but disagreeing as to conclusion in particular case); *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 543 (1993) (religious discrimination).

[23] *See Olympic Arms v. Buckles*, 301 F.3d 384, 386, 388-89 (6th Cir. 2002) (holding there is no fundamental individual right to keep and bear arms and applying rational-basis review); *United States v. Lewitzk*e, 176 F.3d 1022, 1025 (7th Cir. 1999) (rational basis); *National Ass'n of Gov't*

Government thus exposes the poverty of its position:  it espouses intermediate scrutiny but can obtain the result it seeks only by resorting to the rational-basis standard that the Supreme Court expressly rejected in *Heller*. *See* 554 U.S. at 628 n.27.

6.  Under intermediate scrutiny, a law must "directly and materially advance its asserted interest," *Rubin v. Coors*, 514 U.S. at 488, but the Government offers absolutely no evidence that Section 922(b)(1) even marginally advances its goal of reducing violent crime by those aged 18 to 20.  Indeed, empirical evidence shows that Section 922(b)(1) *is not* advancing this asserted interest.  The only statistical study of the effect of Section 922(b)(1) of which we are aware concluded that the provision has had no discernible effect on violent crime by 18-to-20-year-olds, and in fact the proportion of violent crime committed by that age group *went up* after its enactment in 1968.  *See* Gary Kleck, *The Impact of the 1968 Gun Control Act's Restriction on Handgun Purchases by Persons Age 18-20* (May 7, 2011) at 4, *available at* Social Science Research Network, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1843526.

7.  The Government initially characterized Section 922(b)(1) as a "parental-consent regime," but in its reply brief it acknowledges that this was misleading. DOJ Reply 3 n.2.  The Government now describes the law as a "parental proxy" regime. *Id*. at 59, 61, 66, 70.  It asserts that "Congress sought to increase parental involvement in the purchase of handguns by 18-to-20 year olds," *id*. at 59, that "Congress decided to permit parents and guardians to purchase handguns from federally-licensed sellers, and give them to their 18-to-20-year-old children as gifts," *id*. at 61, and that, accordingly, Section 922(b)(1) "allows for the purchase of handguns from a licensed dealer[] through exercise of parental authority." DOJ Br. 48.  The Government

---

*Employees. v. Barrett,* 968 F. Supp. 1564, 1573 (N.D. Ga. 1997) (rational basis); *United States v. Ziegenhagen,* 420 F. Supp. 72, 74-75 (E.D. Wisc. 1976) (rational basis).

thus beholds a carefully crafted regulatory regime replete with "parents" and "guardians" exercising judgment for "their children or wards."  DOJ Reply 3 n.2, 22.

As we have previously explained (Pl. Br. 49-50), this legislative scheme exists only in the imagination of the Government's attorneys, and such *post hoc* rationalizations do not survive even intermediate scrutiny.  *See United States v. Virginia*, 518 U.S. at 533.  Neither "parent" nor "guardian" appears in Section 922(b)(1) – nor, indeed, *anywhere in the entire statute* (with one exception that we will discuss in a moment).  Contrary to the Government's representations, parents are not required for either of the two channels by which adults under 21 can lawfully acquire handguns.  As to gifts, the Government concedes that *anyone* who can lawfully buy a handgun can then give it to an 18-to-20-year-old; such gifts are not restricted to parents, guardians, family members or even friends or neighbors.  DOJ Reply 8 n.5 ("parents *or others* can purchase handguns directly from licensed dealers as gifts for 18-to-20-year-olds") (emphasis added).  Indeed, a purchaser can *lend* a handgun to a minor.  Under Justice Department policy (as described by the Government's own exhibits), "[n]either the *sale* nor the minor's subsequent receipt and possession of the firearm would violate federal law" where "the actual purchaser, a person of legal age, is acquiring the firearm for the purpose of loaning or giving it to an underaged person." DOJ App. 4 (original emphasis).  Similarly, the law requires no parental involvement in the purchase of a handgun from a private gun owner.  DOJ Reply 3 n.3.

The words "parent" and "guardian" *do* appear in one place in the statute:  Section 922(x). And that provision *does* contain an elaborate set of mandatory parental controls – *but it applies only to "juveniles" under the age of 18.*[24]  Nobody can give, loan, sell or in any other way put a

---

[24] This is the only operative provision of Section 922 that mentions "parents." The word does appear in some legislative findings in the statute, which warn that parents might be unwilling to

handgun in a juvenile's possession – not even for a minute – without the written consent of that child's parent. 18 U.S.C. § 922(x).[25]  Thus, it is apparent that Congress knew precisely how to draft a parental proxy regime for handguns, but it chose to do so *only* for "juveniles," and not for adults of ages 18 to 20.[26]

## V.      SECTION 922(b)(1) DENIES EQUAL PROTECTION OF THE LAW.

The Government's equal protection analysis repeats its Second Amendment arguments that Section 922(b)(1) is not a not a "total ban," is merely a "temporary" restriction, and is a minor inconvenience, not an infringement.  DOJ Reply 71-75.  All of these points are discussed and defeated above.

### CONCLUSION

For these reasons, the Government's motions for dismissal and summary judgment should be denied and the Plaintiffs' motion for summary judgment should be granted.

---

send their children to school if guns were not banned from the school zone. 18 U.S.C. § 922(q)(1)(E).

[25] The Government cites the legislative history to support its "parental proxy" interpretation.  But legislative history cannot endow a statute with an effect that is not mandated by its actual text, nor a meaning that is incompatible with its text.  As demonstrated above, the text does not support the Government's fanciful reading.  In any event, the passages cited show only that Congress was concerned about "juveniles" and "children" circumventing state minimum-age laws by ordering firearms through the mail, and that individual members of Congress took pains to reassure millions of American gun owners that the law would not interfere with them introducing their own children to the shooting sports.  *See* DOJ Br. 8-9 & n.14.

[26] The Government says that we "cannot simultaneously contend that Section 922(b)(1) violates the Second Amendment because it allegedly operates as a complete ban on possession, and also maintain that the law is fatally underinclusive under the Second Amendment because it does *not* operate in practice as a complete ban." DOJ Reply 68 n.59 (original emphasis).  But we do not claim, and the law does not require, that Section 922(b)(1) operate "as a complete ban."  As explained above, *that is the Government's position, not ours. Our* position is that a sales restriction is unconstitutional if it significantly impairs access to items needed to exercise a right, *see Carey,* 431 U.S. at 689 & n.7, and that facial underinclusiveness "raises serious doubts about whether [the state] is, in fact, serving … the significant interests which [it] invokes." *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989).  Our position is therefore entirely consistent – unlike the Government's, which does try to have it both ways.  *See* Pl. Br. 47-49.

Dated May 18, 2011                    Respectfully submitted,


                                      /s/ Charles J. Cooper
Fernando M. Bustos                    Charles J. Cooper*
State Bar No. 24001819                David H. Thompson*
LAW OFFICES OF FERNANDO M. BUSTOS,    Peter A. Patterson*
P.C.                                  COOPER & KIRK, PLLC
P.O. Box 1980                         1523 New Hampshire Ave., NW
Lubbock, TX 79408-1980                Washington, D.C.  20036
Tel: (806) 780-3976                   Tel: (202) 220-9600
Fax: (806) 780-3800                   Fax: (202) 220-9601
Email: fbustos@bustoslawfirm.com      Email: ccooper@cooperkirk.com

                                      Brian Koukoutchos*
                                      28 Eagle Trace
                                      Mandeville, LA 70471
                                      Tel:  (985) 626-5052
                                      Email:  bkoukoutchos@gmail.com

                                      *Admitted *pro hac vice*.

                                      *Counsel for Plaintiffs*

### *Certificate of Service*

On May 18, 2011, I electronically submitted the foregoing document with the clerk of court for the U.S. District, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all counsel and/or *pro se* parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5 (b)(2).

s/Charles J. Cooper   

Charles J. Cooper
